**LOS ANGELES COUNTY / HARBOR-UCLA MEDICAL CENTER
PROFESSIONAL STAFF ASSOCIATION
BYLAWS**

Revised and approved: March 16, 2016

57
58
59
60
61

**LOS ANGELES COUNTY / HARBOR-UCLA MEDICAL CENTER
PROFESSIONAL STAFF ASSOCIATION BYLAWS**

APPROVED by the Professional Staff Association on January 6, 2016

_____

Brant Putnam, M.D.
President, Professional Staff Association
Los Angeles County / Harbor-UCLA Medical Center

/

APPROVED by the Interim Chief Executive Officer on ___3/15/16___

_____

Kimberly McKenzie, R.N., M.S.N., C.P.H.Q.
Interim Chief Executive Officer
Los Angeles County / Harbor-UCLA Medical Center

/

APPROVED by the Chief Medical Officer of Health Services on ___3/16/16___

_____

Hal Yee, M.D.
Chief Medical Officer of Health Services
Los Angeles County Department of Health Services

/

APPROVED by the Director of the Los Angeles County Health Agency

on ___3/16/16___

_____

Mitchell Katz, M.D.
Director
Los Angeles County Health Agency

62

63
64
65
66                                    **PREAMBLE**
67
68    .
69
70    These Bylaws are adopted in order to provide for the organization of the medical staff of Los Angeles
71    County Harbor/UCLA Medical Center and to provide a framework for self-government in order to permit
72    the medical staff to discharge its responsibilities in matters involving the quality of medical care, and to
73    govern the orderly resolution of those purposes, subject to the ultimate authority of the Hospital Governing
74    Body.  These bylaws provide the professional and legal structure for medical staff operations, organized
75    medical staff relations with the Governing Body, and relations with applicants to and members of the
76    medical staff.
77

**DEFINITIONS**

1. 2113-CERTIFIED PHYSICIAN means a physician who has been granted a Section 2113 certificate by the State of California.

2. ADMINISTRATIVE RESIDENT means a resident who has successfully completed his/her residency program and is working an additional year in an administrative capacity.

3. ALLIED HEALTH PROFESSIONAL means an advanced practice provider, other than a physician, podiatrist, dentist, or clinical psychologist, who exercises independent judgment within the areas of his/her professional competence and the limits established by the department, Association, and applicable law; who is qualified to render direct or indirect patient care under the supervision of an Association member; and who is licensed and has been accorded privileges, or works under standardized procedures, to provide such care in the Medical Center.

4. ASSOCIATE MEDICAL DIRECTOR means an individual appointed by the Chief Medical Officer who reports to the Chief Medical Officer and whose position in the Medical Center is to assist the Chief Medical Officer in providing administrative support for the Association.

5. ASSOCIATION means the formal organization of licensed or Section 2113 certified physicians, dentists, podiatrists, and clinical psychologists at the Medical Center which is known formally as the Professional Staff Association of the Los Angeles County Harbor-UCLA Medical Center.

6. ASSOCIATION YEAR means the period from the first day of July to the last day of June, inclusive.

7. CHIEF EXECUTIVE OFFICER or ADMINISTRATOR means the person, whose title is Chief Executive Officer, appointed by the Governing Body to act on behalf of the Governing Body in the overall management of the Medical Center.

8. CHIEF MEDICAL OFFICER means the physician, whose title is Chief Medical Officer, appointed by the Director with concurrence of the Dean of the UCLA School of Medicine.

9. CHIEF MEDICAL OFFICER OF HEALTH SERVICES means the person, whose title is Chief Medical Officer of the Department of Health Services.

10. CHIEF NURSING OFFICER means the nurse, whose title is Chief Nursing Officer, appointed by the Hospital Chief Executive Officer.

11. CLINICAL PRIVILEGES or PRIVILEGES means the permission granted to a practitioner or allied health professional to render specific diagnostic, therapeutic, medical, dental, podiatric, surgical, or clinical psychological services at the Medical Center.

12. CLINICAL PSYCHOLOGIST means an individual who holds a doctoral degree in psychology conferred by an approved school and who is licensed to practice clinical psychology in the State of California.

13. COUNTY means Los Angeles County unless otherwise stated.

14. COUNTY CIVIL SERVICE CLASSIFIED EMPLOYEE means an individual serving Los Angeles County with compensation by Los Angeles County.

15. COUNTY CIVIL SERVICE UNCLASSIFIED EMPLOYEE means an individual serving Los Angeles County without compensation by Los Angeles County.

16. DAY(S) means calendar day(s) and not business or working day(s), unless otherwise indicated.

17. DENTIST means an individual who is a graduate of an approved school of dentistry and who is licensed to practice dentistry in the State of California or who has been granted a special permit by the Dental Board of California.

18. DEPARTMENT means an administrative unit representing a medical specialty recognized by the American Board of Medical Specialties and granted departmental status under these bylaws. These usually correspond to similar Professional School departments. A department may include one (1) or more divisions. Chair of the Department refers to the role approved by the Executive Committee to fulfill the duties of chair as designated in these bylaws.

19. DIRECTOR means the Director of the Los Angeles County Department of Health Services who serves as the administrator of the Department of Health Services and its hospitals, including the Medical Center.

20. DIVISION means a subdivision of a department which may or may not be recognized as a subspecialty by the American Board of Medical Specialties.

21. EXECUTIVE COMMITTEE means the Executive Committee of the Association as described in these bylaws.

22. EX-OFFICIO means a person who is entitled by these bylaws to a position on a committee, for as long as he or she holds a certain office, and shall not have voting rights, except as otherwise provided by these bylaws.

23. GOVERNING BODY means the Board of Supervisors of Los Angeles County

24. HOSPITAL or MEDICAL CENTER means the Los Angeles County Harbor-UCLA Medical Center (or Harbor-UCLA Medical Center) including all inpatient and outpatient locations, clinics, associated health centers and services operated under the auspices of the Medical Center's license.

.25. IN GOOD STANDING means a member is currently not under suspension or serving with any limitation of voting or other prerogatives imposed by operation of the bylaws, rules and regulations or policy of the Association.

178  26.  LIMITED LICENSE PRACTITIONERS means dentists, clinical psychologists, and
179      podiatrists.
180
181  27.  MEMBER means, unless otherwise expressly limited, any physician, dentist,
182      podiatrist or clinical psychologist holding a current license to practice within the
183      scope of that license who is a member of the Association.
184
185  28.  NOTICE shall be (1) in writing, properly sealed, and through the United States
186      Postal Service, first-class postage prepaid, (2) by electronic mail; or (3) posted on
187      a website dedicated to communications with Association members.
188
189  29.  PHYSICIAN means an individual who is a graduate of an approved school of
190      medicine or osteopathy and who is licensed or certified under Business and
191      Professions Code Section 2113 to practice medicine in the State of California.
192
193  30.  PODIATRIST means an individual who holds a D.P.M. degree conferred by an
194      approved school of podiatric medicine and who is licensed to practice podiatry in
195      the State of California.
196
197  31.  PRACTITIONER means, unless otherwise expressly limited, any physician,
198      dentist, podiatrist, or clinical psychologist who is applying for or exercising clinical
199      privileges in the Medical Center.
200
201  32.  PRESIDENT means the President of the Association who, as chief officer of the
202      Association elected by members of the Association, serves as chief of staff.
203
204  33.  PROFESSIONAL SCHOOL(S) means the Schools of Medicine and/or Dentistry of
205      the University of California at Los Angeles.
206
207  34.  SPECIAL NOTICE shall be in writing and delivered by personal delivery with an
208      acknowledgment of receipt or by certified mail, return receipt requested.
209
210  35.  WRITING means any recorded information, regardless of medium or format; i.e.,
211      written, audio, visual, electronic, etc.
212

**ARTICLE I**

**NAME**

The name of this organization shall be the Professional Staff Association of the Los Angeles County Harbor-UCLA Medical Center.

**ARTICLE II**

**MEMBERSHIP**

## 2.1  NATURE OF MEMBERSHIP

**2.1-1 Eligibility:** Membership in the Association is a privilege which shall be extended only to professionally competent and licensed or 2113-certified practitioners who continuously meet the qualifications, standards and requirements set forth in these bylaws. No practitioner, including those in a medical administrative position by virtue of a contract with the Medical Center, shall admit or provide medical or health-related services to patients in the Medical Center unless the practitioner is a member of the Association or has been granted temporary privileges in accordance with the procedures set forth in these bylaws.

**2.1-2 Membership Distinction:** Membership in the Association is separate and distinct from any individually granted clinical privileges, and Association membership shall not automatically confer any clinical privileges.

**2.1-3 Employees:** Practitioners employed by the Medical Center in a purely administrative capacity with no clinical duties are subject to the regular personnel policies of the Medical Center and need not become members of the Association. Practitioners employed by the Medical Center whose duties include clinical responsibilities or functions involving their professional capabilities must apply for membership in the Association and the appropriate clinical privileges.  Persons in medico-administrative positions who desire Association membership and/or privileges are subject to the same requirements as all other applicants for Association membership or privileges.

**2.1-4 Non-Eligibility:** Interns or residents enrolled in a core specialty residency program, allied health professionals, and students shall not be eligible for membership in the Association.  Core specialty residency training does not include subspecialty training as Fellows or appointment as administrative residents as defined in these bylaws.

**2.1-5 Post-Graduate Physician Trainees:** In accordance with these bylaws, a post-graduate physician trainee (administrative resident, fellow), who is employed at the Medical Center as a County Civil Service employee, whether classified or unclassified, to provide health services as a licensed independent practitioner outside of his or her training program, may apply for Association membership, provided that the Association membership and clinical privileges of such person shall automatically terminate on the date of termination of his or her training program and such person shall not be entitled to a hearing and appellate review under Article VII,

264  provided that the practitioner may retain his/her Association membership and clinical
265  privileges, with change in category of membership if requested in writing to the
266  Executive Committee by the chair of the practitioner's department and with
267  concurrence of the practitioner prior to the termination of the contract.
268
269  **2.1-6 Determination of Need**
270
271  Medical practice at the Medical Center is different than community hospital practice,
272  with Association members generally assigned Medical Center patients, rather than
273  treating patients from their individual, private practices at the Medical Center. For this
274  and other practice reasons applicable to the Medical Center, there are times when
275  there is no need for additional practitioners in certain fields and with certain skills and
276  talents. Processing applications for membership and privileges for applicants for
277  which there is no need is an unnecessary drain on medical staff resources.
278
279  **2.1-6.1  Closing Applications**.
280
281  If a determination is made under this Section 2.1-6, the Executive
282  Committee may decline to accept application for Association membership
283  and/or clinical privileges, notifying prospective applicants of the lack of need.
284
285  **2.1-6.2  Process.**
286
287  Department Chair may notify the Executive Committee of their belief that no
288  need exists for further practitioners in a certain field of practice in their
289  Department. The Executive Committee, in cooperation with the Chief
290  Medical Officer and the Medical Center Chief Executive Officer may
291  commission an evaluation of need for such services for the next twelve
292  month period. If that evaluation demonstrates a lack of need, the matter may
293  be presented to the Executive Committee for decision. Any person may
294  appear at the Executive Committee session where this is to be considered to
295  provide their view as to need.
296
297  **2.1-6-3  Duration of Closing and Termination.**
298
299  Any decision to decline to accept applications based on need shall expire
300  automatically at the end of twelve months from such decision. The decision
301  may thereafter be renewed using the same process as the initial decision.
302  The executive committee may, at any properly noticed special or any regular
303  session, vote by simple majority to terminate the decision to not accept
304  applications.
305
306  **2.1-6.4  No Hearings.**
307
308  The decision to not accept applications based on need is a quasi-legislative
309  action of the Executive Committee. It is not a decision based on any medical
310  disciplinary cause or reason. Potential applicants are not denied based on
311  any element of their application, qualities or qualifications. For these
312  reasons, no hearing rights under the Hearing and Appellate Review
313  Procedures of Article VII of these Bylaws applies to any person who is
314  denied an application based on need.

315
316   **2.1-7 Contracted Practitioners: Contract with County or Non-County Entity:**
317        Notwithstanding any other provision of these bylaws, the Association membership
318        and clinical privileges of any practitioner who has any contract with the County to
319        provide health services at the Medical Center, or who provides health services at the
320        Medical Center under the contract of a non-County entity, unless a change in
321        category is requested and granted, shall automatically terminate on the date of
322        expiration or termination of such contract, and the practitioner shall not be entitled to
323        a hearing and appellate review under Article VII.
324
325

**2.2  QUALIFICATIONS FOR MEMBERSHIP**

**2.2-1  Basic Requirements:** Membership and clinical privileges shall be granted, revoked or otherwise restricted or modified based only on professional training, current experience and current competence criteria as set forth in these bylaws.

**2.2-2 Qualifications:** Except for members of the Honorary Staff, in which case these criteria shall only apply as deemed individually applicable by the Association, only practitioners licensed to practice in the State of California or certified under Business and Professions Code Section 2113 who

> **2.2-2.1** can document the following:
>
> > **2.2-2.1-a** their background;
> > **2.2-2.1-b** their current California licensure or Section 2113 certification;
> > **2.2-2.1-c** their adequate experience, education, and training;
> > **2.2-2.1-d** their current Drug Enforcement Administration certification, if applicable;
> > **2.2-2.1-e** their current professional competence and good judgment;
> > **2.2-2.1-f** their current adequate physical and mental health status,;
> > **2.2-2.1-g** possession of insurance coverage as indicated in Article XVII, if applicable; and
> > **2.2-2.1-h** their status as not excluded or suspended as a provider of services to Medicare, Medi-Cal or other federally-reimbursed health services programs
>
> with sufficient adequacy to demonstrate to and assure the Association and the Governing Body that they are professionally competent and qualified and that any patient treated by them in the Medical Center can reasonably expect to receive quality medical care;
>
> **2.2-2.2** are determined to adhere to the ethics of their profession, to maintain a good reputation, to be able to work cooperatively with others so as not to adversely affect patient care, and to keep as confidential, as required by law, all information or records received in the physician-patient relationship; and
>
> **2.2-2.3** except for clinical psychologists and dentists practicing general dentistry only, practitioners shall have graduated from a residency training program accredited by the Accreditation Council on Graduate Medical Education and/or the Commission on Dental Accreditation and, at the time of initial appointment, be certified by a specialty board that is under the purview of the American Board of Medical Specialties or be determined to possess the equivalent qualifications from another country or be an active specialty board candidate and have the recommendation of their department chair for such status, provided that this requirement will not be applied to persons employed by the County as Civil Service employees on an hourly basis

shall be qualified for membership in the Association.  Persons not fulfilling the third requirement, including, without limitation, board certification, may apply for special consideration and must demonstrate that their education, training, experience, demonstrated ability, judgment and medical skills are equivalent to or greater than the level of proficiency evidenced by this requirement and otherwise meet the requirements of Association membership.

Medical staff membership or clinical privileges shall not be conditioned or determined on the basis of an individual's participation or non-participation in a particular medical group, surgery center, or other outpatient service facility, IPA, PPO, PHO, hospital-sponsored foundation, or other organization or in contracts with a third party which contracts with this hospital. Association membership or clinical privileges shall not be revoked, denied, or otherwise infringed upon based on the member's professional or business interests.

**2.2-3 Nondiscrimination:** No applicant shall be denied Association membership or clinical privileges on the basis of age, gender, race, color, religion, ancestry, national origin, creed, disability, physical or mental impairment, marital status, sexual orientation, or any other criterion other than professional qualifications that do not pose a threat to the quality of patient care.

**2.2-4 Economic credentialing:**  Association membership and privileges may be granted, continued, modified or terminated by the Governing Body only according to the procedures set forth in these bylaws.  Under no circumstances shall economic criteria unrelated to quality of care be used to determine qualification for initial or continuing Association membership or privileges.

**2.3 PARTICULAR QUALIFICATIONS**

**2.3-1   Physicians**. An applicant for physician membership, except for the Honorary Staff, must hold an MD or DO degree or their equivalent and a valid and unsuspended certificate to practice medicine or Section 2113 certificate issued by the Medical Board of California or the Board of Osteopathic Examiners of the State of California.  For the purpose of this section 2.3-1, "or their equivalent" shall mean any degree (i.e., foreign) recognized by the Medical Board of California or the California Board of Osteopathic Examiners.

**2.3-2 Dentists**.   An applicant for dental membership in the Association, except for the Honorary Staff, must hold a DDS, DMD or equivalent degree and a valid and unsuspended certificate to practice dentistry issued by the Dental Board of California.

**2.3-3   Podiatrists**. An applicant for podiatric membership in the Association, except for the Honorary Staff, must hold a DPM degree and a valid and unsuspended certificate to practice podiatry issued by the California Board of Podiatric Medicine.

**2.3-4 Clinical Psychologists**. An applicant for clinical psychologist membership in the Association, except for the Honorary Staff, must hold a doctorate degree in psychology, have not less than two (2) years clinical experience in a multidisciplinary facility licensed or operated by this or another state or by the United States to

426   provide health care, and hold a valid and unsuspended certificate to practice clinical
427   psychology issued by the California Board of Psychology.
428
429   **2.4  BASIC RESPONSIBILITIES OF ASSOCIATION MEMBERSHIP**
430
431   Except for members of the Honorary Staff, the ongoing responsibilities of each member
432   of the Association shall include, but are not limited to:
433
434   **2.4-1**  Providing patients with continuing care and quality of care meeting the
435   professional standards of the Association;
436
437   **2.4-2**  Abiding by the Association bylaws, rules and regulations, and policies,
438   departmental rules and regulations, Medical Center policies and procedures, and
439   Department of Health Services applicable policies and procedures approved by the
440   Executive Committee;
441
442   **2.4-3**  Discharging in a responsible and cooperative manner such reasonable
443   responsibilities and assignments imposed upon the member by virtue of Association
444   membership, including, but not limited to, committee assignments and quality
445   improvement and risk management activities;
446
447   **2.4-4**  Preparing and completing in a timely fashion medical records for all the patients to
448   whom the member provides care in the Medical Center;
449
450   **2.4-5**  Abiding by the lawful ethical principles of the California Medical Association
451   and/or the member's professional association;
452
453   **2.4-6**  Participating in any Association approved educational programs actively supervising
454   (including, without limitation, providing direct supervision) resident physicians or dentists
455   in the course of  his/her responsibilities and assignments as a member of the
456   Association to ensure that the health services provided by residents are safe, effective,
457   compassionate, and within the scope of the knowledge and documented competence of
458   residents as required by Department of Health Services and Medical Center policies as
459   approved by the Association;
460
461   **2.4-7**  Working cooperatively so as not to adversely affect patient care;
462
463   **2.4-8**  Making appropriate arrangements for coverage for his/her patients as determined
464   by the Association;
465
466   **2.4-9**  Refusing to engage in improper inducements for patient referral and adhering to
467   County policy regarding "running and capping";
468
469   **2.4-10** Participating in continuing education programs as determined by the Association;
470
471   **2.4-11**  Serving as a proctor or other peer reviewer, and otherwise participating in
472   medical staff peer review as reasonably requested;
473
474   **2.4-12** Participating in such emergency service coverage or consultation panels as may
475   be determined by the Association;
476

**2.4-13** Providing information to and/or testifying on behalf of the Association, the County, or any practitioner under review, regarding any matter under review pursuant to Articles VI or VII;

**2.4-14** Notifying, in writing, the President and his/her department chair immediately after, but in no event later than ten (10) days after, the occurrence of any of the following:

**2.4-14.1** the practitioner is notified in writing by the Medical Board of California or other appropriate State licensing agency that an investigation regarding the practitioner is being conducted;

**2.4-14.2** the practitioner is served with an accusation by the Medical Board of California or other appropriate State licensing agency;

**2.4-14.3** the practitioner is served with a statement of issues by the Medical Board of California or other appropriate State licensing agency;

**2.4-14.4** the practitioner has been convicted of a misdemeanor or felony that relates to the qualifications, functions or duties of the practitioner;

**2.4-14.5** exclusion or suspension from a federally-reimbursed health services program;

**2.4-14.6** the practitioner's membership and/or clinical privileges are voluntarily or involuntarily revoked, suspended, reduced, or relinquished at any hospital or health care facility;

**2.4-14.7** the practitioner's Drug Enforcement Administration certificate, or his/her license to practice any profession in any jurisdiction, are voluntarily or involuntarily revoked, suspended, reduced, not renewed, or relinquished;

**2.4-14.8** the practitioner's membership in any local, state, or national medical society is involuntarily revoked, suspended, reduced or not renewed;

**2.4-14.9** any professional liability litigation involving the practitioner is commenced and/or**;**

**2.4-14.10** the practitioner is aware of any other information that would correct, change, modify or add to any information provided in the application or most recent reapplication when such correction, change, modification or addition may reflect adversely on current qualifications for membership or privileges;

**2.4-15** Possessing insurance coverage as indicated in Article XVII, if applicable; and

**2.4-16** Discharging such other obligations as may be lawfully established from time to time by the Association.

**2.5 MEMBERS' CONDUCT REQUIREMENTS**

528  As a condition of membership and privileges, an Association member shall continuously
529  meet the requirements for professional conduct established in these bylaws.  Non-
530  members with privileges will be held to the same conduct requirements as members.
531
532  **2.5-1 Acceptable Conduct**
533
534  Acceptable Association member conduct is not restricted by these bylaws and
535  includes, but is not limited to:
536
537  **2.5-1.1**  Advocacy on medical matters;
538  **2.5-1.2**  Fulfilling duties of Association membership or leadership;
539  **2.5-1.3**  Making recommendations or criticism intended to improve care;
540  **2.5-1.4**  Expressing concern about a patient's care and safety;
541  **2.5-1.5**  Exercising rights granted under the Association bylaws, rules and
542  regulations and  policies;
543  **2.5-1.6**  Expressing dissatisfaction with policies through appropriate grievance
544  channels or other civil non-personal means of communication;
545  **2.5-1.7**  Professional comments to any professional, managerial, supervisory or
546  administrative staff, or to members of the Governing Body about patient care
547  or safety;
548  **2.5-1.8**  Seeking legal advice or the initiation of legal action for cause; and
549
550  Acceptable conduct is not subject to discipline under these bylaws.
551
552  **2.5-2 Disruptive and Inappropriate Conduct**
553
554  Disruptive and inappropriate conduct by an Association member may lead to investigative
555  actions as set forth in Articles VI and VII. Disruptive and inappropriate Association
556  member conduct at the Medical Center affects or could affect the quality of patient
557  care at the Medical Center and includes:
558
559  **2.5-2.1** Harassment by an Association member against any individual involved
560  with the Medical Center (e.g., against another Association member, house
561  staff, trainee, Medical Center employee or patient) on the basis of race,
562  religion, color, national origin, creed, ancestry, physical disability, mental
563  disability, medical disability, age, marital status, gender or sexual orientation
564  which has the purpose or direct effect of unreasonably interfering with a
565  person's work performance or which creates an offensive, intimidating or
566  otherwise hostile work environment.
567
568  **2.5-2.2** "Sexual harassment" defined as unwelcome verbal or physical conduct of
569  a sexual or gender-based nature which may include verbal harassment (such
570  as epithets, derogatory comments or slurs), physical harassment (such as
571  unwelcome touching, assault, or interference with movement or work), and
572  visual harassment (such as the display of derogatory cartoons, drawings, or
573  posters).  Sexual harassment includes unwelcome advances, requests for
574  sexual favors, and any other verbal, visual, or physical conduct of a sexual
575  nature when (a) submission to or rejection of this conduct by an individual is
576  used as a factor in decisions affecting hiring, evaluation, retention, promotion,
577  or other aspects of employment; or (b) this conduct substantially interferes
578  with the individual's employment or creates and/or perpetuates an

14

intimidating, hostile, or offensive work environment. Sexual harassment also includes conduct which indicates that employment and/or employment benefits are conditioned upon acquiescence in sexual activities.

**2.5-2.3** Deliberate physical, visual or verbal intimidation or challenge, including disseminating threats or pushing, grabbing or striking another person involved in the Medical Center;

**2.5-2.4** Inappropriate conduct reasonably interpreted to be demeaning or offensive including, but not limited to:

**2.5-2.4-a** belittling or berating statements;
**2.5-2.4-b** name calling;
**2.5-2.4-c** use of profanity or disrespectful language;
**2.5-2.4-d** writing inappropriate comments in the medical record;
**2.5-2.4-e** blatant failure to respond to patient care needs or staff requests;
**2.5-2.4-f** deliberate refusal to return phone calls, pages or other messages concerning patient care or safety;
**2.5-2.4-g** deliberate lack of cooperation without good cause; and
**2.5-2.4-h** making degrading or demeaning comments about patients and their families, nurses, physicians, Medical Center personnel and/or the Medical Center.

Such conduct when persistent can become a form of harassment;

**2.5-2.5** Carrying a gun or other weapon in the Medical Center; and

**2.5-2.6** Refusal or failure to comply with these member conduct requirements.

**2.5-3  Association Conduct Complaints**

All complaints or reports of conduct issues will be discussed and decisions made in executive session of the Executive Committee.  Complaints or reports of disruptive and/or inappropriate conduct by Association members are subject to review whether or not the witness or complainant requests or desires action to be taken.  Complaints or reports must be in writing and will be transmitted to the Department Chair and the President, or to the Association officer designated by either the President or Executive Committee to handle the complaint, and must include, to the extent feasible:

**2.5-3.1** The date(s), time(s) and location of the alleged inappropriate or disruptive conduct;
**2.5-3.2** A factual description of the alleged inappropriate or disruptive conduct;
**2.5-3.3** The circumstances which precipitated the alleged incident;
**2.5-3.4** The name and medical record number of any patient or patient's family member who was involved in or witnessed the alleged incident;
**2.5-3.5** The names of other witnesses to the alleged incident;
**2.5-3.6** The consequences, if any, of the alleged inappropriate or disruptive conduct as it relates to patient care or safety, or Medical Center personnel or operations; and

**2.5-3.7** Any action taken to intervene in, or remedy, the alleged incident, including the names of those intervening.

Complaints are shared with the subject member who will be given the opportunity to respond in writing. The Department Chair, in consultation with the President, shall refer the matter immediately to the Well Being of Practitioners Committee for evaluation and monitoring and treatment if needed, if there is any indication that the member's health is implicated. The Department Chair, in consultation with the President, shall determine if the complaint or report is obviously specious and warrants no further action. If the Department Chair, in consultation with the President, determines no action is warranted, the decision is reported at the next Executive Committee meeting and may be discussed and acted upon at the request of any Executive Committee member with the support of the majority of the Executive Committee members present at that meeting.

Complaints not referred to the Well Being of Practitioner's Committee or not dismissed by the Department Chair, in consultation with the President, are referred to the appropriate department for peer review committee evaluation and investigation, if needed. The decision will be forwarded to the Executive Committee. Any action taken shall be commensurate with the nature and severity of the conduct in question. Interventions should initially be non-adversarial in nature, if possible, with the focus on restoring trust, placing accountability on and rehabilitating the offending Association member, and protecting patient care and safety. The Association supports tiered, non-confrontational intervention strategies, starting with collegial discussions of the matter with the appropriate division chief and/or department chairperson. Further interventions can include an apology directly addressing the problem, a letter of admonition, a final written warning, or corrective action pursuant to Article VI, if the behavior is or becomes disruptive. The use of summary suspension should be considered only where the member's disruptive behavior presents an imminent danger to the health of any individual. At any time rehabilitation may be recommended. If corrective action is decided by the Executive Committee, the member will be afforded hearing rights per Article VII. If the Executive Committee decides no further action is necessary, the complaint will be closed and filed in the member's Peer Review File.

If the Department Chair is the subject of the complaint, then the Department Chair shall be recused, and the role defined in this section 2.5-3 for the Department Chair shall be performed by the Department Vice Chair. If the President is the subject of the complaint, then the President shall be recused, and the role defined in this section 2.5-3 for the President shall be performed by the Vice President.

**2.5-4 Medical Center Staff Conduct Complaints**

Association members' reports or complaints about the conduct of any Medical Center administrator, nurse or other employee, contractor, Governing Body member or others affiliated with the Medical Center must be reduced to writing and submitted to the President or any Association officer. The President shall forward the complaint or report to the appropriate Medical Center authority for action. Reports and complaints regarding Medical Center staff conduct will be tracked through the Association Office which will report results of such reports and complaints to the Executive Committee.

**2.5-5   Abuse of Process**

Retaliation or attempted retaliation against complainants or those who are carrying out Association duties regarding conduct will be considered inappropriate and disruptive conduct and could give rise to evaluation and corrective action pursuant to these bylaws.

<u>ARTICLE III</u>

<u>CATEGORIES OF ASSOCIATION MEMBERSHIP</u>

**3.1**   <u>MEMBERSHIP CATEGORIES</u>

The Association membership shall be divided into:

**3.1-1**   The Honorary Staff
**3.1-2**   The Active Staff
**3.1-3**   The Associate Staff-Compensated and Volunteer
**3.1-4**   The Provisional Staff
**3.1-5**   The Ad-Hoc Staff
**3.1-6**   The Medico-administrative Staff

**3.2**   <u>THE HONORARY STAFF</u>

**3.2-1   Qualifications:** The Honorary Staff shall consist of practitioners who do not actively practice in the Medical Center but who are recommended for membership by the Executive Committee.  They may have retired from active hospital practice or are deemed deserving of membership by virtue of their outstanding reputation, their noteworthy contributions to the health or medical sciences, or their previous long-standing service to the Medical Center, and they continue to exemplify high standards of professional and ethical conduct.

**3.2-2   Prerogatives:** Honorary Staff members shall not be eligible to admit or attend patients, to vote, or to hold office, nor are they required to attend Association and department meetings.  They may serve on committees with or without vote at the discretion of the Executive Committee, and they may attend staff and department meetings including open committee meetings and educational programs.

**3.3**   <u>THE ACTIVE STAFF</u>

**3.3-1** Qualifications

The Active Staff shall consist of practitioners who

**3.3-1.1** meet the general qualifications for membership set forth in Section 2.2,

3.3-1.2

**3.3-1.2-a** are employed at least twenty (20) hours per week as County Civil Service employees, whether classified or unclassified, at the Medical Center,

**3.3-1.2-b** provide health services at the Medical Center at least twenty (20) hours per week under a contract which he/she has entered into with the County, or

**3.3-1.2-c** provide health services at the Medical Center at least twenty (20) hours per week under a contract of a non-County entity,

**3.3-1.3** regularly admit or attend patients in the Medical Center,

**3.3-1.4** assume all the functions and responsibilities of membership in the Association including, where appropriate, teaching and/or consultation assignments, and

**3.3-1.5** have completed the required period as provisional staff as set forth in Section 3.5 below.

**3.3-2** Prerogatives

Members of the Active Staff who are in good standing shall

**3.3-2.1** be entitled to admit and/or attend patients in the Medical Center, exercise only those clinical privileges clearly delineating their scope of practice and health services in the Medical Center, and assume all the functions and responsibilities of membership in the Association including, where appropriate, teaching and/or consultation assignments; and

**3.3-2.2** be appointed to a specific department, and, except as otherwise specified in these bylaws, be eligible to vote, to hold office, and to serve on Association committees.

**3.3-3**  Transfer of Active Staff Members

After two (2) consecutive years in which a member of the Active Staff fails to regularly care for patients in the Medical Center or be regularly involved in Association functions as determined by the Association, that member shall be automatically transferred to the appropriate category, if any, for which the member is qualified.

**3.4**  THE ASSOCIATE STAFF-COMPENSATED AND VOLUNTEER

**3.4-1** Qualifications

The Associate Staff shall consist of practitioners who

**3.4-1.1** meet the general qualifications for membership set forth in Section 2.2 except that this requirement shall not preclude an out-of-state practitioner from

781      membership as may be permitted by law if that practitioner is otherwise
782      deemed qualified by the Executive Committee,

784      **3.4-1.2** are not eligible for Active Staff membership,

786      **3.4-1.3** have completed the required period as provisional staff as set forth in
787      Section 3.5 below, and

789      **3.4-1.4** admit or attend patients at the Medical Center.

791 **3.4-2**   Compensated and Volunteer Categories

793      Associate Staff members who receive compensation related to services provided at
794      the Medical Center are deemed Associate Staff-Compensated.  Associate Staff
795      members whose services at the Medical Center are entirely voluntary are deemed
796      Associate Staff-Volunteer.

798 **3.4-3**   Prerogatives

800      Members of the Associate Staff who are in good standing shall

802      **3.4-3.1** be entitled to admit and attend patients in the Medical Center, exercise
803      only those clinical privileges clearly delineating their scope of practice and
804      health services in the Medical Center, and assume all the functions and
805      responsibilities of membership in the Association assigned to them including,
806      where appropriate, teaching and/or consultation; and

808      **3.4-3.2** be appointed to a specific department and shall be eligible to serve on
809      Association committees with the right to vote.  They shall not be eligible to
810      vote at Association and department meetings or to hold office, nor are they
811      required to attend Association and department meetings, although they are
812      encouraged to do so.

814 **3.4-4**   Change in Status

816 Associate Staff members who meet the requirements for Active Staff shall, upon review
817 of the Executive Committee, be obligated to seek membership in the Active Staff
818 category.  Associate Staff members whose status as receiving or not receiving
819 compensation for services provided in the Medical Center changes shall, upon review of
820 the Executive Committee, be obligated to seek membership in the appropriate Associate
821 Staff category.

823 **3.5**   <u>THE PROVISIONAL STAFF</u>

825 **3.5-1**   Qualifications

827      The Provisional Staff shall consist of practitioners who

829      **3.5-1.1** meet the general qualifications for membership set forth in Section 2.2,

831      **3.5-1.2** have provisional status as described in Section 4.1-3, and

**3.5-1.3** immediately prior to their application were not members of the Association.

**3.5-2** Prerogatives

Members of the Provisional Staff who are in good standing shall

**3.5-2.1** be entitled to admit and attend patients in the Medical Center, exercise only those clinical privileges clearly delineating their scope of practice and health services in the Medical Center, and assume all the functions and responsibilities of membership in the Association including, where appropriate, teaching and consultation assignments;

**3.5-2.2** be appointed to a specific department, but, except for department chairpersons and division chiefs, not be eligible to hold office in the Association or vote at Association, department or division meetings; and

**3.5-2.3** Serve on Association committees without the right to vote unless the right to vote is specified at the time of appointment.

**3.5-3** Observation of Provisional Staff Member

Provisional Staff members shall undergo a period of observation (proctoring) by designated Association members from each department wherein the Provisional Staff member has been granted privileges. The purpose of such observation is to evaluate the Provisional Staff member's: (1) proficiency in the exercise of clinical privileges initially granted; and (2) overall eligibility for continued Association membership and advancement within Association staff membership categories. Such observation and proctoring shall follow whatever format each department deems appropriate in order to adequately evaluate the Provisional Staff member and determine suitability to continue to exercise the clinical privileges granted in that department and shall include at least the first six (6) cases consisting of a sufficient variety and number of cases monitored and evaluated to be representative of the entire scope of requested privileges. Proctoring includes, but is not limited to, concurrent or retrospective chart review, mandatory consultation, and/or direct observation. Appropriate records shall be maintained by the department. The results of the proctoring and observation shall be submitted by the department chair to the Credentials Committee.

**3.5-4** Term of Provisional Staff Status

A Provisional Staff member shall remain in the Provisional Staff membership category for a maximum period of six (6) months, unless the Governing Body, upon recommendation of the Executive Committee, based on a report from the Credentials Committee, determines to extend such status for an additional six (6) month period upon a finding of good cause, which determination shall not be subject to a hearing and appellate review pursuant to Article VII.

**3.5-5** Action at Conclusion of Provisional Staff Status

If the Provisional Staff member has satisfactorily demonstrated his/her ability to exercise the clinical privileges provisionally granted and otherwise appears qualified for continued Association membership, the Provisional Staff member shall be eligible for appointment by the Governing Body as an Active Staff or Associate Staff member, as appropriate, upon recommendation by the Executive Committee. The failure to obtain approval under observation and proctoring for any requested clinical privilege shall not, by itself, preclude advancement in Association membership category. If such advancement is granted absent such approval, continued observation and proctoring on the unapproved clinical privilege shall continue for the time period specified by the Governing Body, upon recommendation of the department chair and the Executive Committee. If advancement is not recommended, the appropriate department chair shall advise the Credentials Committee, which shall make its report to the Executive Committee, which, in turn, shall make its recommendation to the Governing Body, for a determination regarding any modification or termination of clinical privileges and Association membership.

**3.6** THE AD-HOC STAFF

The Ad-hoc Staff shall consist of practitioners who do not actively practice at the Medical Center but are important resource individuals for Association quality assessment and improvement activities. Such persons shall be qualified to perform the functions for which they are made temporary members of the Association.

Ad-hoc Staff members shall be entitled to attend all meetings of committees to which they have been appointed for the limited purpose of carrying out quality assessment and improvement functions. They shall have no clinical privileges. They may not admit patients to the Medical Center or hold office in the Association. They may, however, serve on designated committees with or without vote at the discretion of the Executive Committee. Finally, they may attend Association meetings outside of their committees, upon invitation. Their membership term shall be no longer than 120 days, although they may be granted additional terms of up to 120 days if recommended by the Executive Committee and approved by the Governing Body.

**3.7** THE MEDICO-ADMINISTRATIVE STAFF

**3.7-1** General

The Medico-administrative Staff category membership shall be held by any physician who is not otherwise eligible for another staff category and who is retained by the Medical Center or Association solely to perform ongoing medical administrative activities.

**3.7-2** Qualifications

The Medico-administrative staff shall consist of members who

**3.7-2.1** meet the general qualifications for membership set forth in Section 2.2 and

**3.7-2.2** are charged with assisting the Association in carrying out medical-administrative functions.

**3.7-3** Prerogatives

The Medico-administrative Staff shall be entitled to attend open meetings of the Association and various departments and educational programs but shall have no right to vote at such meetings.  Medico-administrative Staff members shall not be eligible to hold office in the Association, admit patients or exercise clinical privileges.

**3.8** THE CHIEF MEDICAL OFFICER AND ASSOCIATE MEDICAL DIRECTORSHIPS

**3.8-1** General

The Chief Medical Officer and individuals holding titles as Associate Medical Directors in the Medical Center shall be members of the Medico-Administrative Staff if they have no clinical privileges or shall be members of another category if they hold clinical privileges.

**3.8-2**  Responsibilities of the Chief Medical Officer

**3.8-2.1** The Chief Medical Officer's duties shall be delineated by the Governing Body in keeping with the general provisions set forth in subparagraph 2 below. Executive Committee approval shall be required for any Chief Medical Officer duties that relate to authority to perform functions on behalf of the Association or directly affect the performance or activities of the Association.

**3.8-2.2**    In keeping with the foregoing, the Chief Medical Officer shall:

**3.8-2.2-a** Serve as administrative liaison among Medical Center administration, the Governing Body, outside agencies and the Association;

**3.8-2.2-b** Assist the Association in performing its assigned functions and coordinating such functions with the responsibilities and programs of the Medical Center; and

**3.8-2.2-c** In cooperation and close consultation with the President and the Executive Committee, supervise the day-to-day performance of the Association Office and Medical Center's quality improvement personnel.

**3.8-3**  Selection, Review and Removal of Chief Medical Officer

The Executive Committee will participate in the identification of candidates for the Chief Medical Officer position by inclusion of members on the Search Committee, in the interview process, and by submission of candidate evaluations to the Director, or his representative.  The Chief Executive Officer shall coordinate candidate interviews with representatives of Association leadership, who shall participate in the interview and review of candidates for position of Chief Medical Officer in the Medical Center.  The input and recommendation of the Executive Committee regarding the candidate selection shall be considered by the Chief Executive Officer and Governing Body when making a selection.

The Executive Committee shall provide the Chief Executive Officer and the Governing Body with its input into the performance review of its Chief Medical Officer periodically and transmitting the results of the review for their consideration.

The Executive Committee, by a majority vote of the voting members, can request the termination of an individual in the Chief Medical Officer position.  The Governing Body shall give weight to the recommendation of the Medical Executive Committee.  Prior to removing the CMO, the Governing Body or its designee shall meet and discuss the action with the Executive Committee.

**3.8-4**   Selection, Review and Removal of Associate Medical Directors

A listing of all Associate Medical Director positions in the Medical Center shall be made available to any Association member upon request.

The Executive Committee shall ensure that the Medical Staff participate in the identification of candidates for Associate Medical Director by the inclusion of members of a Search Committee and in the interview process, and by the submission of candidate evaluations to the Chief Medical Officer.

**3.8-5** Prerogatives

The Chief Medical Officer and individuals holding associate medical director positions in the Medical Center shall be entitled to the prerogatives of the Association staff category to which they belong except that they shall not be eligible to hold office in the Association or vote at Association, department or committee meetings. He/she may admit patients or otherwise provide patient care services only if he/she holds clinical privileges and only to the extent of those clinical privileges.

**3.9**   LIMITATION OF PREROGATIVES

The prerogatives set forth under each membership category are general in nature and may be subject to limitation by special conditions attached to a particular membership, by other sections of these bylaws and by Association Rules and Regulations. Regardless of the category of membership in the Association, limited license members:

**3.9-1** shall only have the right to vote on matters within the scope of their licensure.  In the event of a dispute over voting rights, that issue shall be determined by the chair of the meeting, subject to final decision by the Executive Committee; and

**3.9-2** shall exercise clinical privileges only within the scope of their licensure and as set forth in Sections 5.1-8, 5.1-9 and 5.1-10.

**3.10**   MODIFICATION OF MEMBERSHIP

On its own, upon recommendation of the Credentials Committee, or pursuant to a request by a member under Section 4.5, the Executive Committee may recommend a change in the Association category of a member consistent with the requirements of the bylaws.

ARTICLE IV

23

PROCEDURE FOR APPOINTMENT AND REAPPOINTMENT

**4.1** CONDITIONS AND DURATION OF APPOINTMENT

**4.1-1 General:** By applying to the Association for initial membership or renewal of membership (or, in the case of members of the Honorary Staff, by accepting membership in that category), the applicant acknowledges responsibility to first review these bylaws, Association Rules and Regulations – if any, Association policies and Medical Center policies approved by the Executive Committee, and agrees that throughout any period of membership that person will comply with the responsibilities of Association membership and with Association bylaws, Rules and Regulations and policies and Medical Center policies approved by the Executive Committee as they exist and as they may be modified from time to time.

**4.1-2 Authority of the Governing Body:** Initial appointments and reappointments to the Association shall be made by the Governing Body. The Governing Body shall act on appointments, reappointments, or suspension or revocation of appointments only after there has been a recommendation from the Executive Committee as described in these bylaws, provided that in the event of unwarranted delay on the part of the Executive Committee, the Governing Body may act without such recommendation on the basis of documented evidence of the applicant's or Association member's professional and ethical qualifications obtained from reliable sources other than the Executive Committee, but the Governing Body may never grant full membership or privileges unilaterally.

**4.1-3 Duration:** Except as otherwise provided in these bylaws, initial appointments when clinical privileges are granted shall be provisional for a period of not less than six (6) months nor more than twenty-four (24) months. Prior to the conclusion of the provisional period, the appropriate department chair shall recommend to the Credentials Committee, which shall recommend to the Governing Body through the Executive Committee, the removal of provisional status and appointment to the Active Staff or Associate Staff as appropriate, or the extension or termination of the appointment. Initial appointments and any reappointments shall each be for a period of not more than twenty-four (24) months.

**4.2** APPLICATION FOR APPOINTMENT

**4.2-1 Application Form:** All applications for appointment to the Association shall be in writing, shall be completed (or accompanied by an explanation of why answers are unavailable) and signed by the applicant. The application form shall be approved by the Executive Committee and shall require detailed information including, but not limited to, the following:

    **4.2-1.1** the applicant's professional training and experience, current California licensure or section 2113 certification, board certification status, current Drug Enforcement Administration (DEA) certification (for practitioners, in order to qualify for certain privileges to prescribe restricted medications), verification of

identity, clinical privileges requested, and, if applicable, current insurance coverage as indicated in Article XVII, and other professional qualifications;

**4.2-1.2** the names of at least three (3) persons who have had extensive experience in observing and working with the applicant and who can provide adequate references pertaining to the applicant's current professional competence, ethical character, and adequate physical and mental health status;

**4.2-1.3** past or pending professional disciplinary action and whether the applicant's membership status and/or clinical privileges have ever been voluntarily or involuntarily denied, revoked, suspended, reduced, not renewed, or relinquished at any hospital or health facility;

**4.2-1.4** whether the applicant's Drug Enforcement Administration certificate or his/her license to practice any profession in any jurisdiction, has ever been voluntarly or involuntarily revoked, suspended, not renewed, reduced, or relinquished;

**4.1-1.5** whether any professional liability litigation involving the applicant has been to final judgment, has been settled, or is in progress;

**4.2-1.6** whether the applicant has been or is currently excluded or suspended, or is pending exclusion or suspension, as a provider of services to Medicare, Medicaid or any other federally-reimbursed health services program;

**4.2-1.7** whether the applicant's membership in local, state or national medical societies has ever been involuntarily revoked, suspended, reduced or relinquished; and

**4.2-1.8** requested membership category, department assignment and clinical privileges.

**4.2-2 Burden of Producing Information:** In connection with all applications for appointment, the applicant shall have the burden of producing adequate information for a proper evaluation of the applicant's qualifications and suitability for the membership category and clinical privileges requested, for resolving any doubts about these matters, and for satisfying all requests for information. The applicant's failure to fulfill this requirement, the applicant's withholding of any relevant information, or the applicant's submission of any inaccurate or misleading information, shall be grounds for denial of the application. In addition, to the extent consistent with law, the applicant may be required to submit to a medical or psychological examination in order to assure that the practitioner will practice safely, at the applicant's expense, if deemed appropriate by the Executive Committee. The applicant may select the examining physician from an outside panel of three (3) physicians chosen by the Executive Committee. The Association Office shall promptly notify the applicant of any problems in obtaining any information required or if any of the information obtained from primary sources varies from that provided by the applicant.

**4.2-3 Effect of the Application:** In addition to the matters set forth in Section 4.1-1, by applying for appointment to the Association, each applicant thereby

   **4.2-3.1** signifies his/her willingness to appear for interviews in regard to his/her application;

   **4.2-3.2** authorizes representatives of the County of Los Angeles, the Association, and/or the professional schools, to consult with members of medical staffs of other hospitals or health facilities with which the applicant has been associated and with others who may have information bearing on his/her current competence, ethical character, adequate physical and mental health status, and other qualifications and authorizes such individuals and organizations to candidly provide such information;

   **4.2-3.3** consents to an inspection and copying by the above of all records and documents that may be material to an evaluation of his/her professional qualifications and current competence to carry out the clinical privileges he/she requests, as well as of his/her moral and ethical qualifications for membership, and further authorizes all persons and organizations in custody of such records and documents to permit such inspection and copying;

   **4.2-3.4** releases from any liability the County of Los Angeles, the Association, the professional schools, and their respective officers, employees or agents, for any of their acts performed in good faith and without malice in connection with evaluating the applicant and his/her credentials and other qualifications; and

   **4.2-3.5** releases from any liability all individuals and organizations that provide information to the County of Los Angeles, the Association, the professional schools, and their respective officers, employees or agents in good faith and without malice concerning the applicant's current competence, ethical character, adequate physical and mental health status, and other qualifications for Association membership and clinical privileges, including otherwise privileged or confidential information.

The initial application form shall include a statement that the applicant has received and read the bylaws of the Association and any rules and regulations applicable thereto, and that he/she agrees to be bound by the terms thereof, as they may be amended from time to time, without regard to whether or not he/she is granted membership and/or clinical privileges in all matters relating to consideration of his/her application.

**4.2-4 Requests for Additional Information:** Any committee or individual charged under these bylaws with responsibility of reviewing the appointment application and/or request for clinical privileges may request further documentation or clarification. If the applicant fails to respond within thirty (30) days, the application or request shall be deemed withdrawn, and processing of the application or request will be discontinued. Unless the circumstances are such that a report to the Medical Board of California is required, such a withdrawal shall not give rise to hearing and appeal rights pursuant to Article VII.

**4.2-5  Acceptance of Membership In Association:** Acceptance of membership in the Association shall constitute the member's agreement that:

    **4.2-5.1** he/she pledges to be bound by the Association bylaws, Rules and Regulations and policies, and Medical Center policies approved by the Executive Committee;

    **4.2-5.2** he/she will strictly abide by the *Guiding Principles For Physician-Hospital Relationships* of the California Medical Association as well as the *Code of Medical Ethics* of the American Medical Association, the *Code of Ethics* of the American Osteopathic Association, the *Principles of Ethics and Code of Professional Conduct* of the American Dental Association, the *Code of Ethics* of the American Podiatric Medical Association, or the *Ethical Principles of Psychologists and Code of Conduct* of the American Psychological Association, whichever is applicable;

    **4.2-5.3** he/she will maintain an ethical practice, including, without limitation, refraining from illegal inducements for patient referral, providing for the continuous care of his/her patients, seeking consultation whenever necessary, refraining from failing to disclose to patients when another surgeon will be performing the surgery, and refraining from delegating health services responsibility to non-qualified or inadequately supervised practitioners or residents;

    **4.2-5.4** he/she will report to the Association office within 10 days any and all information that would otherwise correct, change, modify or add to any information provided in the application or most recent reapplication when such correction, change, modification or addition may reflect adversely on current qualifications for membership or privileges; and

    **4.2-5.5** if a requirement exists for Association dues or assessment, he/she acknowledges responsibility for timely payment.

**4.2-6 Dual Appointments:**  An application for membership shall not be accepted for a primary appointment to a department or for clinical privileges in a department other than that representing the primary specialty in which the applicant possesses credentials and qualifications, provided that this prohibition shall not exclude the granting of clinical privileges in two or more departments if the privileges are recommended by the chairs of the departments.

**4.3**   INITIAL APPOINTMENT PROCESS

**4.3-1 Verification of Information:** The applicant shall submit a completed application, including desired membership category and a specific list of desired clinical privileges, to the President and an advance payment of Association dues and/or fees paid to the Association, as required, to the Association Office, which shall verify, with primary sources whenever possible, the references, licensure status and other information submitted or in support of the application.  The Medical Center's authorized representative shall query the Medical Board of California and National Practitioner Data Bank.  The Association Office shall promptly notify the applicant of

any problems in obtaining any information required or if any of the information obtained from primary sources varies from that provided by the applicant.  It shall be the applicant's responsibility to obtain all required information.

**4.3-2 Department Action:** When collection and verification is accomplished, the Association Office shall transmit the application and all supporting materials to the department chair where the applicant would be assigned who may consult with the appropriate department chair of the appropriate Professional School and the appropriate Dean of the Professional School.  The chair, or appropriate committee of each department to which the application is submitted, shall review the application and supporting documentation and may conduct a personal interview with the applicant at the chair's or committee's discretion.   The chair or appropriate committee shall evaluate all matters deemed relevant to a recommendation, including information concerning the applicant's provision of services within the scope of privileges granted, his/her clinical and technical skills and any relevant information available regarding his/her performance and shall transmit to the Association Office a written report and recommendation as to membership and, if membership is recommended, as to membership category, department affiliation, clinical privileges to be granted, and any special conditions to be attached.  The chair may also request that the Executive Committee defer action on the application.  If the recommendation is adverse to the applicant, such recommendation shall state the reason for such.

**4.3-3 Credentials Committee Action:** The Association Office shall transmit the application with the department chair's recommendation and all supporting materials to the Credentials Committee for evaluation.   Within ninety (90) days after receipt of the completed application for membership, the Credentials Committee shall review the application and evaluate and verify the supporting documentation and other relevant information and make a written report of its evaluation to the Executive Committee.   Prior to making this report, the Credentials Committee may elect to interview the applicant and/or seek additional information.   The written recommendations from every department in which the applicant seeks clinical privileges shall be made a part of the Committee's report. The Credentials Committee shall transmit to the Executive Committee the completed application and a recommendation that the applicant be either appointed to the Association with the privileges requested, that there be an adverse action on the application in the form of rejection of the application or limitation of the privileges requested, or that the application be deferred for further consideration.  Where rejection of the application, limitation of the privileges requested or deferment is recommended, the reasons for such recommendation shall be stated along with the recommendation.

**4.3-4 Executive Committee Action:**  At its next regular meeting following receipt of the application and the report and recommendation of the Credentials Committee, the Executive Committee shall consider the report and any other relevant information.  The Executive Committee may request additional information, return the matter to the Credentials Committee for further evaluation, which shall be provided to the Executive Committee within sixty (60) days, and/or elect to interview the applicant.  The Executive Committee shall promptly forward to the Governing Body a written report and recommendation that the applicant be provisionally appointed to the Association including membership category, department affiliation, clinical privileges to be granted and any special conditions to be attached to the membership; that

adverse action be taken on the application in the form of rejection of the application or limitation of the privileges requested; or that the application be deferred for further consideration.  The Executive Committee may, in its discretion, refer the application and all supporting and relevant documents back to the Credentials Committee for a recommendation, which shall be provided to the Executive Committee within sixty (60) days.  The reasons for each recommendation shall be stated.

### 4.3-5   Effect of Executive Committee Action

**4.3-5.1 Defer:**  When the recommendation of the Executive Committee is to defer the application for further consideration, the reasons for deferment should be stated, and the recommendation must be followed up within sixty (60) days with a subsequent recommendation for provisional appointment with specified clinical privileges or for rejection for Association membership.

**4.3-5.2 Favorable:**  When the recommendation of the Executive Committee is favorable to the applicant, the recommendation shall promptly be forwarded to the Governing Body.

**4.3-5.3 Adverse:**  When the recommendation of the Executive Committee is adverse to the applicant either in respect to appointment or clinical privileges, the Executive Committee shall also assess and determine whether the adverse recommendation is for a "medical disciplinary" cause or reason.  A medical disciplinary action is one taken for cause or reason that involves that aspect of a practitioner's current competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care.  All other actions are deemed administrative disciplinary actions.  In some cases, the reason may involve both medical disciplinary and administrative disciplinary cause or reason, in which case, the matter shall be deemed medical disciplinary for hearing purposes of Article VII.  After such adverse determination, the President shall promptly so notify the applicant by certified mail, return receipt requested and notify him/her of his/her hearing rights under Article VII.

### 4.3-6 Governing Body's Action on the Application

**4.3-6.1 Deferral:**  The Governing Body may accept the recommendation of the Executive Committee or may refer the matter back to the Executive Committee for further consideration, stating the purpose for such referral and setting a reasonable time limit for making a subsequent recommendation.

**4.3-6.2 After Favorable Executive Committee Recommendation:**

Within fifteen (15) days after the receipt of a favorable recommendation by the Executive Committee, the recommendation shall be affirmed by the Governing Body if the Executive Committee's decision is supported by substantial evidence or automatically after thirty (30) days if no action is taken by the Governing Body.  In the latter event, the Governing Body shall be deemed to have affirmed the Executive Committee's recommendation.

**4.3-6.2-a** If the Governing Body concurs with the recommendation of the Executive Committee, the decision of the Governing Body shall be deemed final action.

**4.3-6.2-b** If the Governing Body's decision is adverse to the applicant in respect to either appointment or clinical privileges, the Governing Body shall promptly notify him/her of such adverse decision by certified mail, return receipt requested, and such adverse decision shall be held in abeyance until the applicant has exercised or has been deemed to have waived his/her rights under Article VII.

**4.3-6.3 After Unfavorable Executive Committee Recommendation:**

In the event the recommendation of the Executive Committee, or any significant part of it, is unfavorable to the applicant the procedural rights set forth in Article VII shall apply.

**4.3-6.3-a** If procedural rights are waived by the applicant, the recommendations of the Executive Committee shall be forwarded to the Governing Body for final action, which shall affirm the recommendation of the Executive Committee if the Executive Committee's decision is supported by substantial evidence.

**4.3-6.3-b** If the applicant requests a hearing following the adverse Executive Committee recommendation pursuant to this Section 4.3-5.3 or an adverse Governing Body's tentative final action pursuant to Section 4.3-6.2-b, the Governing Body shall take final action only after the applicant has exhausted all procedural rights as established by Article VII.  After exhaustion of the procedures set forth in Article VII, the Governing Body shall make a final decision and shall affirm the decision of the judicial review committee if the judicial review committee's decision is supported by substantial evidence, following a fair procedure.  The Governing Body's decision shall be in writing and shall specify the reasons for the action taken.

**4.3-6.4 Governing Body Decision Contrary to Executive Committee Recommendation:**

Whenever the Governing Body's decision is contrary to the recommendation of the Executive Committee, the Governing Body shall submit the matter to a committee composed of the Chief Medical Officer, Chief Executive Officer, the President, and the department chair(s) involved for review and recommendation and shall consider such recommendation before making its decision final. Such committee shall report back to the Governing Body within fifteen (15) days with its recommendation, and the Governing Body shall render a decision within fifteen (15) days after its receipt of such recommendation.

**4.3-7 Notice of Final Decision**

1388     When the Governing Body's decision is final, the Governing Body shall send notice
1389     of such decision to the President, to the Chief Medical Officer, to the Chief Executive
1390     Officer, to the chair of each department concerned, and to the applicant, which notice
1391     shall be sent to the applicant by certified or registered mail, return receipt requested,
1392     if there is an adverse decision.
1393
1394 **4.3-8 Expedited Processing of AdHoc Staff:**
1395
1396     For applicants to the AdHoc Staff, an expedited process of appointment may be
1397     implemented if the President, with concurrence by the chair of the department most
1398     relevant to the applicant's credentials, recommends the applicant's appointment and
1399     the Governing Body concurs in that recommendation. Although an applicant to the
1400     AdHoc Staff may have been appointed through this expedited process, his or her
1401     application shall still be processed through the Executive Committee.
1402
1403     AdHoc Staff applicants are ineligible for expedited processing if, at the time
1404     membership may be granted, any of the following has occurred:
1405
1406         **4.3-8.1** The applicant submits an incomplete application.
1407         **4.3-8.2** There is a current challenge or previously successful challenge to
1408             licensure.
1409         **4.3-8.3** The applicant has received an involuntary termination of medical staff
1410             membership at another organization.
1411         **4.3-8.4** The applicant has received involuntary limitation, reduction, denial, or loss
1412             of medical privileges.
1413
1414 **4.3-9  Reapplication After Adverse Decision**
1415
1416     Any applicant whose application receives a final adverse decision, either by the
1417     Governing Body or under Article VII if the applicant requests a hearing, regarding
1418     membership appointment or clinical privileges shall not be eligible to reapply for
1419     Association membership or the rejected clinical privileges for a period of two years
1420     from the date of the final adverse decision of the prior application.  Any such
1421     reapplication shall be processed as an application for initial appointment.  In the
1422     reapplication, the applicant shall submit such additional information as may be
1423     requested to demonstrate that the basis for the previous adverse decision no longer
1424     exists.
1425
1426 **4.4** REAPPOINTMENT PROCESS
1427
1428 **4.4-1 Application Submission:**
1429
1430     At least one hundred twenty (120) days prior to the expiration date of a member's
1431     period of appointment (except for members of the Adhoc Staff), the member shall
1432     submit an application for reappointment to the Association Office.  If an application
1433     for reappointment is not received at least thirty (30) days prior to the expiration date,
1434     the member shall be deemed to have voluntarily resigned his/her Association
1435     membership and clinical privileges.  Written notice shall be promptly sent by the
1436     Association Office to the member advising that the application has not been received
1437     and that membership will expire on the expiration date.  In the event membership
1438     terminates for the reasons set forth herein, the procedures set forth in Article VII shall

1439    not apply.
1440
1441    **4.4-2 Application Information:**
1442
1443    Reappointment application forms shall include all information necessary to update
1444    and evaluate the qualifications of the member.  Upon receipt of the application, the
1445    information shall be processed as set forth in Section 4.3-1, When collection and
1446    verification is accomplished, the Association Office staff shall transmit the application
1447    and all supporting materials to the appropriate department chair.
1448
1449    **4.4-3   Burden of Producing Information:**
1450
1451    In connection with all applications for reappointment, the member shall have the
1452    burden of producing adequate information for a proper evaluation of his/her
1453    qualifications and suitability for the membership category and clinical privileges
1454    requested, for resolving any doubts about these matters, and for satisfying all
1455    requests for information.  The member's failure to fulfill this requirement, the
1456    member's withholding of any relevant information, or the member's submission of
1457    any inaccurate or misleading information, shall be grounds for denial of the
1458    application.  In addition, to the extent consistent with law, the member may be
1459    required to submit to a medical or psychological examination in order to assure that
1460    the practitioner will practice safely, at the member's expense, if deemed appropriate
1461    by the Executive Committee. The member may select the examining physician from
1462    an outside panel of three (3) physicians chosen by the Executive Committee. The
1463    Association Office shall promptly notify the member of any problems in obtaining any
1464    information required or if any of the information obtained from primary sources varies
1465    from that provided by the member.
1466
1467    The Credentials Committee or the Executive Committee may request further
1468    documentation or clarification.  If the member fails to respond within thirty (30) days,
1469    the application or request shall be deemed withdrawn, and processing of the
1470    application or request will be discontinued.  Unless the circumstances are such that a
1471    report to the Medical Board of California is required, such a withdrawal shall not give
1472    rise to hearing and appeal rights pursuant to Article VII.
1473
1474    **4.4-4   Department and Credentials Committee Action:**
1475
1476    The department chair shall review all pertinent information available on each
1477    member of his/her department who applies for reappointment and who is scheduled
1478    for periodic appraisal.  This review shall also include an assessment of information
1479    collected in the course of the Medical Center's Quality of Care Program as well as
1480    practitioner-specific information regarding the member's professional performance.
1481    Each department shall develop and monitor the practitioner-specific information and
1482    compare this data to relevant benchmarks.  The department chair shall promptly
1483    forward this information with his/her recommendation regarding reappointment to the
1484    Association and the granting of privileges for the ensuing two (2)-year period to the
1485    Credentials Committee for its review.  The Credentials Committee shall transmit its
1486    recommendations in writing to the Executive Committee. Where non-reappointment
1487    or a change in clinical privileges is recommended, the reasons for such
1488    recommendations shall be stated and documented.
1489

**4.4-5  Executive Committee Action:**

At its first regular meeting following receipt of the recommendations of the Credentials Committee, the Executive Committee shall consider the report and any other relevant information.   The Executive Committee may request additional information or return the matter to the Credentials Committee for further evaluation which shall report back to the Executive Committee in a timely manner, or the Executive Committee may elect to interview the member.  The Executive Committee shall make written recommendations to the Governing Body concerning the reappointment, non-reappointment, deferral for further consideration and/or clinical privileges of each member then scheduled for periodic appraisal.   Where non-reappointment or a change in clinical privileges is recommended, the reasons for such recommendations shall be stated and documented.  Thereafter, the procedure provided in Sections 4.3-5 through 4.3-7 relating to recommendations on applications for initial appointment shall be followed.

**4.5**  UNDERLINE[CHANGE IN MEMBERSHIP CATEGORY OR CLINICAL PRIVILEGES]

Any Association member who, prior to his/her application for reappointment, requests a change in his/her membership category or clinical privileges shall submit an application in writing on the prescribed form at any time, except that no such application shall be submitted within twelve (12) months of the date a similar request was denied.  Such applications shall be processed in the same manner as applications for initial appointment in accordance with Sections 4.2 and 4.3.

**4.6**  UNDERLINE[LEAVE OF ABSENCE]

**4.6-1 Leave Status:** At the discretion of the Executive Committee, an Association member may obtain a voluntary leave of absence from the Association upon submitting a written request to the Executive Committee stating the approximate period of leave desired, which may not exceed one (1) year.  During the period of the leave, the member shall not exercise clinical privileges at the Medical Center, and membership rights and responsibilities shall be inactive, but the obligation to pay dues, if any, shall continue, unless waived by the Association.

**4.6-2 Termination of Leave:** At least thirty (30) days prior to the termination of the leave of absence, or at any earlier time, the Association member may request reinstatement of privileges by submitting a written notice to that effect to the Executive Committee. The member shall submit a summary of relevant activities during the leave, if the Executive Committee so requests. The Executive Committee shall make a recommendation concerning the reinstatement of the member's privileges and prerogatives, and the procedure provided in Sections 4.2 through 4.4 shall be followed. A member whose membership is not reinstated because of a medical disciplinary cause or reason shall be entitled to the procedural rights provided in Article VII.

**4.6-3 Failure to Request Reinstatement:** Failure, without good cause, to request reinstatement shall be deemed a voluntary resignation from the Association and shall result in automatic termination of membership, privileges, and prerogatives. A

1540 member whose membership is automatically terminated shall be entitled to the
1541 procedural rights provided in Article VII for the sole purpose of determining whether
1542 the failure to request reinstatement was unintentional or excusable, or otherwise. A
1543 request for Association membership subsequently received from a member so
1544 terminated shall be submitted and processed in the manner specified for applications
1545 for initial membership.
1546
1547 **4.6-4 Medical Leave of Absence:** The Executive Committee shall determine the
1548 circumstances under which a particular Association member shall be granted a leave
1549 of absence for the purpose of obtaining treatment for a medical condition or
1550 disability. In the discretion of the Executive Committee, unless accompanied by a
1551 reportable restriction of privileges, the leave shall be deemed a "medical leave"
1552 which is not granted for a medical disciplinary cause or reason.
1553
1554 **4.6-5 Military Leave of Absence:** Requests for leave of absence to fulfill military service
1555 obligations shall be granted upon notice and review by the Executive Committee.
1556 Reactivation of membership and clinical privileges previously held shall be granted,
1557 notwithstanding the provisions of Sections 4.6-2 and 4.6-3, but may be granted
1558 subject to monitoring and/or proctoring as determined by the Executive Committee.
1559
1560 **4.7** CONFIDENTIALITY
1561
1562 To maintain confidentiality and to assure the unbiased performance of appointment and
1563 reappointment functions, participants in the credentialing process shall limit their
1564 discussion of the matters involved to the formal avenues provided in these bylaws and
1565 rules and regulations for processing applications for appointment and reappointment.
1566
1567
1568 <u>ARTICLE V</u>
1569
1570 <u>CLINICAL PRIVILEGES</u>
1571
1572 **5.1** <u>DELINEATION OF CLINICAL PRIVILEGES</u>
1573
1574 **5.1-1 Exercising Only Privileges Granted:** Every practitioner who practices at the
1575 Medical Center by virtue of Association membership or otherwise, shall be entitled to
1576 exercise only those clinical privileges specifically granted to him/her by the
1577 Governing Body, except as provided in Sections 5.2, 5.4 and 5.5.  All such clinical
1578 privileges shall be hospital and site specific, shall be within the scope of the license
1579 to practice in the State of California and consistent with any restrictions thereon, and
1580 shall be subject to the rules and regulations and/or policies of the clinical department
1581 and the authority of the department chair and the Association.
1582
1583 **5.1-2 Request for Privileges:** Every initial application for appointment and every
1584 application for reappointment to Association membership must contain a request for
1585 the specific clinical privileges desired by the applicant.
1586
1587 **5.1-3 Bases for Privileges Determination:** The evaluation of such requests shall be
1588 based upon documentation and verification, with primary references whenever
1589 possible, of the applicant's current California licensure or Section 2113 certification,
1590 board certification, current Drug Enforcement Administration certification (for

1591   physicians, dentists and podiatrists, in order to qualify for certain privileges to
1592   prescribe restricted medications), education, training, current experience,
1593   demonstrated current competence, references, current adequate health status, an
1594   appraisal by the department in which privileges are sought, clinical performance at
1595   the Medical Center, the documented results of patient care and other quality review
1596   and monitoring which the Association deems appropriate, and other relevant
1597   information.  Privilege determinations may also be based on pertinent information
1598   concerning clinical performance obtained from other hospitals and health care
1599   settings where the applicant exercises clinical privileges.  It shall be the applicant's
1600   responsibility to obtain all required information.  The applicant shall have the burden
1601   of establishing his/her qualifications and competency in the requested clinical
1602   privileges. No specific privilege may be granted to an applicant if the task, procedure
1603   or activity constituting the privilege is not available within the Medical Center despite
1604   the applicant's qualifications or ability to perform the requested privilege.

1605

1606   **5.1-4 Additional Privileges:** Applications for additional clinical privileges shall be in
1607   writing on the prescribed form.  Such applications shall be processed in the same
1608   manner as applications for initial appointment in accordance with Sections 4.2 and
1609   4.3 and must be supported by documentation of training and/or current experience
1610   supportive of the request. Such individuals shall be subject to the proctoring
1611   requirements described in Section 5.3.

1612

1613   **5.1-5 Reevaluation of Privileges:** Periodic redetermination of clinical privileges and the
1614   increase or curtailment of same shall be based, in part, upon the observation of care
1615   provided, review of the records of patients treated in the Medical Center or other
1616   hospitals, and review of the records of the Association which document the
1617   evaluation of the member's participation in the delivery of health care.

1618

1619   **5.1-6 Admitting Privileges:**  Privileges to admit patients must be specifically requested
1620   and can be granted only to qualified practitioners meeting the clinical criteria for
1621   admitting privileges.  Admitting privileges are not limited and shall not be exclusive to
1622   Medical Center employees, members with Medical Center contracts, or to any single
1623   specialty.

1624

1625   **5.1-7 Cross-Specialty Privileges:** Any request for clinical privileges that are either new
1626   to the Medical Center or that overlap more than one department shall initially be
1627   reviewed by the appropriate departments, in order to establish the need for, and
1628   appropriateness of, the new procedure or services. The Executive Committee,
1629   through the Credentials Committee, shall facilitate the establishment of hospital-wide
1630   credentialing criteria for new or trans-specialty procedures, with the input of all
1631   appropriate departments, with a mechanism designed to ensure that quality patient
1632   care is provided for by all individuals with such clinical privileges. In establishing the
1633   criteria for such clinical privileges, the Executive Committee may establish an ad-hoc
1634   committee with representation from all appropriate departments. Such hospital-wide
1635   credentialing criteria shall be submitted to the Credentials Committee for
1636   recommendation to the Executive Committee.

1637

1638   **5.1-8 Privileges for Dentists and Oral and Maxillofacial Surgeons:** Privileges granted
1639   to duly licensed dentists and oral and maxillofacial surgeons shall be based on their
1640   training, current experience, and demonstrated current competence and judgment.
1641   The scope and extent of surgical procedures that each dentist and oral and

1642 maxillofacial surgeon may perform shall be specifically delineated and granted in the
1643 same manner as all surgical privileges including, but not limited to, performance of
1644 admission history and physical examination if training is provided for this. Surgical
1645 procedures performed by dentists or oral and maxillofacial surgeons shall be under
1646 the overall supervision of the Chief of the Division of Oral and Maxillofacial Surgery
1647 in the Department of Surgery. A history and physical of all dental patients covering
1648 the area of concern shall be performed by the admitting dentist or oral and
1649 maxillofacial surgeon. All dental patients shall receive the same basic medical
1650 appraisals as patients admitted to other surgical services, except that qualified oral
1651 and maxillofacial surgeons who admit patients without medical problems may
1652 perform the history and physical examination on these patients, if such oral and
1653 maxillofacial surgeons have such privileges, and may assess the medical risks of the
1654 proposed surgical procedures. A physician member of the Association shall be
1655 responsible for the care of any medical problem that may be present at the time of
1656 admission, during hospitalization, or at any other time at the Medical Center, and
1657 such physician member's judgment in this regard shall take precedent over the
1658 judgment of the dentist member.
1659
1660 **5.1-9 Privileges for Podiatrists:** Privileges granted to duly licensed podiatrists shall be
1661 based on their training, current experience, and demonstrated current competence
1662 and judgment. In making its recommendation, the Executive Committee may
1663 consider the need for podiatry services which either are not presently being provided
1664 by other members of the Association or may be provided in the Medical Center
1665 without disruption of existing services. The scope and extent of medical or surgical
1666 procedures that each podiatrist may perform shall be specifically delineated and
1667 granted in the same manner as all other medical or surgical privileges. Procedures
1668 performed by podiatrists shall be under the overall supervision of the chair of the
1669 department in which their privileges were granted. All podiatric patients shall receive
1670 the same basic medical appraisals as patients admitted to other medical or surgical
1671 services. When a podiatrist who does not hold history and physical privileges admits
1672 a patient, a physician member of the Association, who has been granted privileges to
1673 perform a history and physical examination, shall do so. A physician member of the
1674 Association shall be responsible for the care of any medical problem that may be
1675 present at the time of admission, during hospitalization, or at any other time at the
1676 Medical Center, and such physician member's judgment in this regard shall take
1677 precedent over the judgment of the podiatrist member.
1678
1679 **5.1-10 Privileges for Clinical Psychologists:** Privileges granted to duly licensed
1680 clinical psychologists shall be based on their training, current experience, and
1681 demonstrated current competence and judgment and shall not include the
1682 prescribing of any medications. In making its recommendation, the Executive
1683 Committee may consider the need for clinical psychological services which are either
1684 not presently being provided by other members of the Association or which may be
1685 provided in the Medical Center without disruption of existing services. The scope
1686 and extent of services that each clinical psychologist may perform shall be
1687 specifically delineated and granted within any guidelines set forth by the Executive
1688 Committee. Psychologist services shall be under the overall supervision of the
1689 Chief, Division of Psychology in the Department of Psychiatry. A physician member
1690 of the Association shall be responsible for the care of any medical problem that may
1691 be present at the time of admission, during hospitalization, or at any other time at the
1692 Medical Center.

**5.1-11 Dissemination of Privilege List:**  Documentation of current privileges (granted, modified, or rescinded) shall be disseminated to, or otherwise immediately accessible electronically to, the Medical Center's Nursing Office, the Operating Room, diagnostic/therapeutic procedure areas, nursing stations for all inpatient units, and such other patient care areas as necessary to maintain an up-to-date listing of privileges for purposes of scheduling and monitoring to assure that practitioners are appropriately privileged to perform all services rendered.

**5.2**  TEMPORARY PRIVILEGES

Temporary privileges are allowed under two circumstances only:

1.  when an applicant for new privileges has submitted a complete application that raises no concerns and is waiting for review and approval by the Executive Committee and the Governing Body; and

2.  to address a patient care need.

For the purposes of this Section 5.2, "applicant for new privileges" includes an individual applying for clinical privileges at the Medical Center for the first time; an individual currently holding privileges who is requesting one or more additional privileges; and an individual who is in the reappointment/reprivileging process and is requesting one or more additional privileges.

**5.2-1  Pending Application for Association Membership or Additional Privileges**

Upon receipt of a completed and verified application for Association membership or for additional privileges, the Chief Executive Officer or his/her designee, upon the basis of information then available which may reasonably be relied upon as to the competence and ethical standing of the applicant and with the written concurrence of the chair of the concerned department and the President, or their designees, may grant temporary clinical privileges to the applicant, but in exercising such privileges, the applicant shall act under the supervision of the chair of the department to which he/she is assigned. Such temporary privileges should not exceed a period of one hundred and twenty (120) days in duration and shall terminate immediately if the applicant's membership application or the member's request for additional privileges is withdrawn.

**5.2-2  Care of Specific Patient by Non-Applicant for Association Membership**

Upon receipt of a completed application for temporary clinical privileges, including without limitation, a specific list of desired clinical privileges, and verification that the practitioner has a current California license or Section 2113 certification, and, except in dire emergencies where no qualified Association member is immediately available and where delay will likely result in harm to the patient, verification of his/her current state driver's license or passport or equivalent identification, current Drug Enforcement Administration certificate (for physicians, dentists and podiatrists in order to qualify for certain privileges to prescribe restricted medications), National Practitioner Data Bank report, and status as not excluded or suspended or pending exclusion or suspension as a provider of services to Medicare, Medicaid or any other

37

1744     federally-reimbursed health services program, the Chief Executive Officer or his/her
1745     designee, with the written concurrence of the chair of the concerned department and
1746     the President, or their designees, may, upon the basis of information then available
1747     which may reasonably be relied upon as to the current competence and ethical
1748     standing of the applicant, grant temporary clinical privileges for the care of a specific
1749     patient to a practitioner who is not an applicant for Association membership. If the
1750     available information is inconsistent or casts reasonable doubts on the applicant's
1751     qualifications, action on the request for temporary privileges may be deferred until
1752     the doubts have been satisfactorily resolved.  Such temporary privileges, when
1753     granted, should not exceed a period of thirty (30) days in duration.
1754
1755 **5.2-3   <u>Patient Care Need by Non-Applicant for Association Membership</u>**
1756
1757     Upon receipt of a completed application for temporary clinical privileges, including,
1758     without limitation, a specific list of desired clinical privileges, and verification of
1759     his/her education, training, current California licensure or Section 2113 certification,
1760     current state driver's license or passport or equivalent identification, current Drug
1761     Enforcement Administration certificate (for physicians, dentists and podiatrists in
1762     order to qualify for certain privileges to prescribe restricted medications), National
1763     Practitioner Data Bank report, status as not excluded or suspended or pending
1764     exclusion or suspension as a provider of services to Medicare, Medicaid or any other
1765     federally-reimbursed health services program, current experience, current
1766     competence, at least one (1) reference who has recently worked with the applicant,
1767     has directly observed the applicant's professional performance over a reasonable
1768     time, and provides reliable information regarding the applicant's current professional
1769     competence to perform the privileges requested, ethical character, and ability to work
1770     well with others so as not to adversely affect patient care, and other qualifying
1771     information submitted by primary sources, whenever possible, and where the
1772     temporary clinical privileges will fulfill an important patient care, treatment and
1773     service need, the Chief Executive Officer or his/her designee may, with the written
1774     concurrence of the chair of the concerned department and the President or their
1775     designees, grant temporary clinical privileges to fulfill an important patient care need
1776     to a practitioner who is not an applicant for Association membership. If the available
1777     information is inconsistent or casts reasonable doubts on the applicant's
1778     qualifications, action on the request for temporary privileges may be deferred until
1779     the doubts have been satisfactorily resolved.  Such temporary privileges, when
1780     granted, should not exceed a period of thirty (30) days in duration.
1781
1782
1783 **5.2-5   Visiting Faculty**
1784
1785        **5.2-5.1**   Upon receipt of a completed application for temporary clinical privileges,
1786        including, without limitation, a specific list of desired clinical privileges, and
1787        verification of his/her education, training, current California licensure or
1788        Section 2113 certification, current state drivers license or passport or
1789        equivalent identification, current Drug Enforcement Administration certificate
1790        (for physicians, dentists and podiatrists in order to qualify for certain privileges
1791        to prescribe restricted medications), National Practitioner Data Bank report,
1792        status as not excluded or suspended or pending exclusion or suspension as a
1793        provider of services to Medicare, Medicaid or any other federally-reimbursed
1794        health services program, current experience, current competence, and other

qualifying information submitted by primary sources, whenever possible, and a written recommendation from the President and the chair of the appropriate department stating the applicant's credentials and qualifications and the purpose for which temporary clinical privileges are requested, the Governing Body may grant temporary clinical privileges to a visiting faculty member who is not an applicant for Association membership, to the degree permitted by his/her license, for a period not to exceed thirty (30) days.  Visiting faculty shall consist of faculty members of other universities who are visiting the Professional Schools.

**5.2-5.2**   For out-of-state practitioners who are guests of the Professional School and Medical Center by invitation and whose purpose is to engage in professional education through lectures, clinics or demonstrations, in accordance with Section 2060 of the California Business and Professions Code, such practitioners must be licensed in the state or country of their residence and must submit to the Association Office a request for temporary privileges for the specific activities desired.  After verification of the same information as required in paragraph Section 5.2-5.1 as applicable, including current licensure in the state or country of their residence and with the concurrence of the President and the chair of the concerned department, the Governing Body may grant such visiting faculty temporary clinical privileges to perform the desired activities.

**5.2-6  Monitoring**

Special requirements of supervision, observation and reporting may be imposed by the chair of the concerned department on any practitioner granted temporary privileges.  Temporary privileges shall be immediately terminated by the Governing Body upon notice of any failure by the practitioner to comply with any such special requirements.

**5.3  PROCTORING**

**5.3-1 New Members:** Except as otherwise determined by the Executive Committee, all initial members to the Association shall be subject to a period of proctoring.

**5.3-2 New Privileges of Existing Members:   A**ll members granted new clinical privileges shall be subject to a period of proctoring, in accordance with departmental rules and regulations or policies including at least two proctored cases for each new privilege granted within six months.

**5.3-3 Advancement from Proctoring Requirement:**  The member shall remain subject to such proctoring until the Executive Committee has been furnished with

**5.3-3.1** a report signed by the chair of the department to which the member is assigned describing the types and numbers of cases observed and the evaluation of the applicant's performance, including a statement certifying that the applicant appears to meet all of the qualifications for unsupervised practice in that department, has discharged all of the responsibilities of Association membership, and has not exceeded or abused the prerogatives of the category to which membership was granted;

**5.3-3.2** a report signed by the chair of the other department(s) in which the member may exercise clinical privileges, describing the types and number of cases observed and the evaluation of the applicant's performance, including a statement certifying that the member has satisfactorily demonstrated the ability to exercise the clinical privileges initially granted in those departments; and

**5.3-3.3** a report from the Credentials Committee with a recommendation regarding completion of proctoring.

**5.3-4 Failure to Successfully Complete Proctoring:** If a new member fails within the time of provisional membership to furnish the certification required, or if a member exercising new clinical privileges fails to furnish such certification within the time allowed by the department, those specific clinical privileges shall automatically terminate, and the member shall be entitled to a hearing, upon request, pursuant to Article VII.

**5.4** UNDERLINE EMERGENCY PRIVILEGES

In case of an emergency involving a specific patient, any practitioner who is a member of the Association or who holds a County Civil Service classified position and to the degree permitted by his/her license and regardless of service or Association status or lack of same, shall be permitted and assisted to do everything possible to save the life of a patient or to save a patient from serious harm, using every facility of the Medical Center necessary, including, but not limited to, calling for any consultation necessary or desirable.  The member shall make every reasonable effort to communicate promptly with the department chair concerning the need for emergency care and assistance by members of the Association with appropriate clinical privileges, and once the emergency has passed or assistance has been made available, shall defer to the department chair with respect to further care of the patient at the Medical Center.  When an emergency situation no longer exists, the emergency privileges of such practitioner shall automatically terminate.  For the purpose of this section 5.4, an "emergency" is defined as a condition in which a patient is in imminent danger of serious or permanent harm or death and any delay in administering treatment would add to that danger.

**5.5** DISASTER PRIVILEGES

**5.5-1**  In the case of a disaster where the Chief Medical Officer or the Chief Executive Officer, or their designees, has activated the Medical Center's Emergency Management Plan, the President, the Vice President, or, in their absence,  a department chair, the Chief Medical Officer, the Chief Executive Officer or the Chief Executive Officer's designee, for an individual who indicates a willingness to provide patient care at the Medical Center during the disaster, may 1) grant emergency clinical privileges ("disaster privileges") to any licensed physician, podiatrist, clinical psychologist, or dentist, to the degree permitted by his/her license, who does not possess privileges at the Medical Center, or 2) permit any allied health professional to work under a currently approved standardized procedure for which he/she meets the qualifications.

**5.5-2**  In order for a volunteer practitioner to be considered eligible to act as a licensed independent practitioner, the organization obtains for each volunteer practitioner, at a minimum, a valid government-issued photo identification issued by a state or federal agency (e.g., driver's license or passport) and at least one (1) of the following:

**5.5-2.1**  a current picture hospital identification card identifying professional designation;

**5.5-2.2**  a current license to practice;

**5.5-2.3**  identification indicating that the presenting practitioner is a member of a Disaster Medical Assistance Team, Medical Reserve Corps (MRC) or the Emergency System for Advance Registration of Volunteer Health Professionals (ESAR-VHP) or other recognized state or federal organizations or groups;

**5.5-2.4**  identification indicating that the presenting practitioner has been granted authority to render patient care in disaster circumstances, such authority having been granted by a federal, state, or municipal entity, or

**5.5-2.5**  presentation by current Association member(s) or Medical Center staff with personal knowledge regarding the presenting practitioner's identity.

**5.5-3**  Disaster privileges or permission to work under a standardized procedure may be granted on a case-by-case basis following a review of the above documentation and other requested information, if any.  In exercising disaster privileges or working under a standardized procedure, a practitioner shall act under the supervision of the chair of the department to which he/she is assigned and, if possible, shall be paired with an Association member or allied health professional who has a similar specialty.  An initial grant of disaster privileges or permission to work under a standardized procedure is reviewed by a person authorized to grant disaster privileges or permission to work under a standardized procedure within 72 hours to determine whether the disaster privileges or permission to work under a standardized procedure should be continued.  When the disaster no longer exists, as determined by the Chief Executive Officer or his/her designee, in consultation with the Chief Medical Officer, a practitioner's disaster privileges or permission to work under a standardized procedure shall automatically terminate, and the practitioner must request the privileges necessary to continue to treat patients and shall defer to the appropriate department chair with respect to further care of patients.  In addition, the Chief Executive Officer or his/her designee, on his/her own initiative or upon the recommendation of the President, the Chief Medical Officer, or the chair of the concerned department, may terminate immediately a practitioner's disaster privileges or permission to work under a standardized procedure for any reason or no reason at all, and the practitioner shall not be entitled to a hearing and appellate review under Article VII.

**5.5-4**  Current professional licensure of those providing care under disaster privileges or a standardized procedure is verified from the primary source as soon as the immediate emergency situation is under control or within 72 hours from the time the volunteer licensed independent practitioner presents him- or herself to the Medical Center, whichever comes first. If primary source verification cannot be completed within 72

1948 hours of the practitioner's arrival due to extraordinary circumstances, the Medical
1949 Center documents all of the following:
1950
1951     **5.5-4.1** The reason[s] verification could not be performed within 72 hours of the
1952         practitioner's arrival;
1953     **5.5-4.2** Evidence of the licensed independent practitioner's demonstrated ability
1954         to continue to provide adequate care, treatment and services; and
1955     **5.5-4.3** Evidence of an attempt to perform primary source verification as soon as
1956         possible.
1957
1958 **5.5-5** Licensed independent providers granted disaster privileges or permission to work
1959     under a standardized procedure shall be provided with "volunteer" identification
1960     badges through procedures described in Medical Center policies.
1961
1962 **5.5-6** Members of the Association shall oversee those granted disaster privileges or
1963     permission to work under a standardized procedure.  If possible, the licensed
1964     independent practitioner granted disaster privileges or permission to work under a
1965     standardized procedure should be paired with a member of the Association or an
1966     allied health professional who has a similar specialty, and this pairing shall be
1967     documented.
1968
1969 **5.6**   HISTORY AND PHYSICAL PRIVILEGES
1970
1971 **5.6-1** Histories and physicals can be conducted or updated and documented only
1972     pursuant to specific privileges granted upon request to qualified physicians and other
1973     practitioners who are members of the Association or have been granted such
1974     privileges through the Interdisciplinary Practices Committee or are seeking
1975     temporary privileges acting within their scope of practice.
1976
1977 **5.6-2** Oral and maxillofacial surgeons who have successfully completed a postgraduate
1978     program in oral and maxillofacial surgery accredited by a nationally recognized
1979     accrediting body approved by the U.S. Office of Education and have been determined
1980     by the Association to be competent to do so, may be granted the privileges to perform a
1981     history and physical examination related to oral and maxillofacial surgery. For patients
1982     with existing medical conditions or abnormal findings beyond the surgical indications, a
1983     physician member of the Association with history and physical privileges must conduct
1984     or directly supervise the admitting history and physical examination, except the portion
1985     related to oral and maxillofacial surgery, and assume responsibility for the care of the
1986     patient's medical problems present at the time of admission or which may arise during
1987     hospitalization which are outside of the oral and maxillofacial surgeon's lawful scope of
1988     practice.
1989
1990 **5.6-3** Every patient receives a history and physical within twenty-four (24) hours after
1991     admission, unless a previous history and physical performed within thirty (30) days of
1992     admission (or registration if an outpatient procedure) is on record, in which case that
1993     history and physical will be updated within twenty-four (24) hours after admission.  If the
1994     patient is having surgery or a procedure requiring anesthesia within the first twenty-four
1995     (24) hours after admission, the admission history and physical or update must be
1996     performed prior to the procedure.
1997
1998 **5.7**   TELEMEDICINE PRIVILEGES

**5.7-1** Definition of Telemedicine

Telemedicine involves the use of electronic communication or other communication technologies to provide or support clinical care to patients located at a distant site. Practitioners who render a diagnosis or otherwise provide clinical treatment to a patient at this Medical Center by telemedicine are subject to the Association credentialing and privileging processes.

**5.7-2** Services

Services provided by telemedicine shall be identified by each specific department.

**5.7-3** Qualifications

In order to qualify for telemedicine privileges, the practitioner must meet all the requirements set forth in the Bylaws and Rules for privileges (either temporary or granted in connection with membership).

**5.8**  ORGAN HARVEST TEAMS

Properly licensed practitioners who individually, or as members of a group or entity, have contracted with the Medical Center to participate in organ harvesting activities may perform such activities within the scope of their agreement with the  Medical Center.

**5.9**  MODIFICATION OF CLINICAL PRIVILEGES OR DEPARTMENT ASSIGNMENT

On its own, upon recommendation of the Credentials Committee, or pursuant to a request under Section 4.5, the Executive Committee may recommend a change in the clinical privileges or department assignment(s) of a member. The Executive Committee may also recommend that the granting of additional privileges to a current Association member be made subject to monitoring in accordance with procedures similar to those outlined in Section 5.3.

**5.10** LAPSE OF APPLICATION

If an Association member requesting a modification of clinical privileges or department assignments fails to timely furnish the information reasonably necessary to evaluate the request, the application shall automatically lapse, and the applicant shall not be entitled to a hearing as set forth in Article VII.

ARTICLE VI

EVALUATION AND CORRECTIVE ACTION

**6.1** PEER REVIEW

Peer review, fairly conducted, is essential to preserving the highest standards of medical practice.

**6.1-1** Evaluation of Applicants

All applicants are evaluated for membership and privileges using only those Association peer review criteria adopted consistent with these bylaws, and applied exclusively through the processes established in these bylaws. The Association's peer review process is part of the Medical Center's Patient Safety Evaluation System and is therefore afforded the legal protections provided by the Patient Safety and Quality Improvement Act of 2005 and California Peer Review protection, including Evidence Code Section 1157.

**6.1-2** Ongoing Professional Practice Evaluation

**6.1-2.1 Members are Subject to Evaluation:** All members are subject to evaluation based on Association peer review criteria, adopted consistent with these bylaws. Evaluation results are used in privileging, system improvement and, when warranted, corrective action.

**6.1-2.2 Peer Review Criteria:** Except as otherwise provided for in these Bylaws, departments shall develop and routinely update peer review criteria based on current practices and standards of care, which shall be the primary criteria used in evaluating those applying for membership and privileges and the performance of members and privileges holders. "Patient satisfaction" survey responses shall not be used to evaluate professionals for membership or privileging unless the methodology used is considered reliable by the Association. Included in the departmental peer review criteria are the types of data to be collected for evaluation. In addition, complaints and concerns are analyzed in light of the department peer review criteria using mechanisms determined by the department. Departments shall, where relevant, collect and evaluate department members' data pertaining to:

**6.1-2.2-a** Operative and other clinical procedure(s) performed and their outcomes;

**6.1-2.2-b** Patterns of blood and pharmaceutical usage;

**6.1-2.1-c** Requests for tests or procedures;

**6.1-2.2-d** Patterns of length of stay;

**6.1-2.2-e** Use of consultants;

**6.1-2.2-f** Morbidity and mortality;

**6.1-2.2-g** Complaints; and

**6.1-2.2-h** Findings from individual case review.

Each department shall add and update department-specific criteria at least annually for ongoing peer review of department members.

Department criteria are approved by the Executive Committee through the Professional Performance Panel. Approved criteria as updated are made known and accessible to all members.

**6.1-2.3 Circumstances Requiring Individual Case Peer Review:** The circumstances requiring peer review of individual cases shall include, but not be limited to, cases of:

**6.1-2.3-a** significant patient injury or death;

**6.1-2.3-b** critical clinical events reported to Risk Management;

**6.1-2.3-c** unexpectedly adverse outcomes given severity of illness;

**6.1-2.3-d** performance of a procedure for an inappropriate reason;

**6.1-2-3-e** failure to follow Medical Center or Association policy or Association bylaws and rules and regulations with potential harm to a patient;

**6.1-2.3-f** significant patient or staff complaint/grievance concerning an individual patient;

**6.1-2.3-g** disruptive or inappropriate conduct or activities as described in Section 2.5-2.

**6.1-2.3-h** concerns raised by third-party payers or regulatory agencies; and

**6.1-2.3-i** specific cases meeting hospitalwide quality improvement clinical indicators.

No final adverse determination of the quality of care of an individual patient attributed to a practitioner will be made until that practitioner has had an opportunity to provide input.

**6.1-3** Focused Professional Practice Evaluation

**6.1-3.1** Definition

Focused professional practice evaluation (FPPE) is a process initiated when the conclusions from individual case review or ongoing professional practice evaluation raise questions or concerns regarding a practitioner's ability to provide safe, high quality patient care. The proctoring program, for initial and new privileges, is a component of the FPPE process.

FPPE is not considered an investigation as defined in these Bylaws and is not subject to the requirements and procedures of the investigation process. If an FPPE results in a subsequent plan to perform an investigation, the process outlined in Section 6.2 shall be followed.

**6.1-3.2** Initiation

FPPE is initiated when any of the following criteria are met:

**6.1-3.2-a** When an Association member has been granted initial privileges or an existing Association member has been granted new privileges or is returning from a leave of absence. The proctoring policies described in these Bylaws and in individual department policies will be followed;

**6.1-3.2-b** When case review determines evidence of failed professional skill or judgment or a lack of practitioner knowledge;

**6.1-3.2-c** When patterns or trends of undesirable outcomes are associated with the practitioner; and

**6.1-3.2-d** When evidence exists of unprofessional conduct including inappropriate or disruptive behavior.

When any of the above criteria (other than paragraph a) occurs, an Association officer; a departmental chairperson; a division chief; a departmental quality improvement committee chairperson; the Chief Medical Officer; the Chair, Professional Performance Panel; a member of the Governing Body; the Director; or the Chief Medical Officer of Health Services may request that FPPE be initiated. A FPPE request should be sent to the chair of the department of the Association member or, if the subject of the review is a department chair, to the President.

**6.1-3.3** Procedure and Reporting

FPPE may be conducted by the quality improvement committee of the practitioner's department or by a special panel where membership is determined by the departmental chairperson or, if the subject of the FPPE is a departmental chairperson, by the President. The evaluation will be specific to the individual and requested privileges, if applicable, and may include direct observation. The review body may consider information from individual case reviews, analysis of aggregate data including, but not limited to, clinical indicators, outcomes and length of stay, and material submitted by the subject practitioner. The review body will provide a report to the departmental chairperson and the Chair, Professional Performance Panel within forty-five (45) days of the requested review. FPPE pursuant to paragraph 2a above which requires proctoring will be reported to the departmental chairperson within ninety (90) days of the granting of initial or new privileges and again prior to the completion of the practitioner's 6-month provisional term Within fourteen (14) days of the receipt of the report, the department chairperson, or President, if the subject of the FPPE is a departmental chairperson, must make a determination as to whether further action is warranted, and this decision must be communicated to the Chair of the Professional Performance Panel. If corrective action is proposed, the President must also be so notified.

All activities related to FPPE, except for proctoring of initial or newly granted privileges, will be reported to the Executive Committee as part of the department's quarterly report.

.

**6.1-4  External Peer Review**

External peer review may be used as part of ongoing or focused professional practice evaluation to inform Association peer review as delineated under these bylaws. The Executive Committee, upon request from the Credentials Committee, a department chairperson, the Professional Performance Panel or the Medicolegal Committee, or upon its own accord, in evaluating or investigating an applicant, privilege holder, or member, may obtain external peer review in the following circumstances:

**6.1-4.1** Committee or department review(s) that could affect an individual's membership or privileges do not provide a sufficiently clear basis for action;

**6.1-4.2**  No current Association member can provide the necessary expertise in the clinical procedure or area under review;

**6.1-4.3**  To promote impartial peer review; and

**6.1-4.4** Upon the reasonable request of the practitioner.

**6.1-5  Results of Peer Review**

**6.1-5.1** Actions Resulting from Peer Review

Adverse information resulting from ongoing peer review of members according to the relevant department criteria and analyzed by the process established in these bylaws must be acted upon. The Association officers, department and committees may counsel, educate, issue letters of warning or censure, or recommend focused professional practice evaluation in accordance with Bylaws Section 6.1-3 in the course of carrying out their duties without initiating formal corrective action. Comments, suggestions and warnings may be issued orally or in writing. The practitioner shall be given an opportunity to respond in writing and may be given an opportunity to meet with the officer, department or committee. Any  actions documented in writing shall be maintained in the member's peer review file.  Executive Committee approval is not required for such actions, although  actions related to focused professional practice evaluation shall be reported to the Executive Committee. The actions shall not constitute a restriction of privileges or grounds for any formal hearing or appeal rights under Article VII of these Bylaws.

Resulting action can be, but is not limited to:

**6.1-5.1-a** documenting in the member's peer review file that the member is performing well or within desired expectations;

**6.1-5.1-b** identifying issues that require education, comments or suggestions given orally or in writing;

**6.1-5.1-c** identifying issues that require a focused evaluation without initiating formal corrective action;

**6.1-5.1-d** recommending to the Executive Committee needed changes in Medical Center systems to improve patient safety or the quality of patient care; or

**6.1-5.1-e** recommending corrective action under these bylaws.

**6.1-5.2** Documentation

The fact of the peer review and any recommendations and determinations pertaining to the member shall be included in the member's peer review file and dealt with according to these bylaws.

**6.2** ROUTINE CORRECTIVE ACTION

**6.2-1 Collegial Intervention**

**6.2.1.1** These bylaws encourages the use of progressive steps by Association leaders and Medical Center management, beginning with collegial and educational efforts, to address questions relating to an Association member's clinical practice and/or professional conduct. The goal of these efforts is to arrive at voluntary, responsive actions by the individual to resolve questions that have been raised.

**6.2-1.2** Collegial efforts may include, but are not limited to counseling, sharing of comparative data, monitoring, and additional training or education.

**6.2-1.3** All collegial intervention efforts by Association leaders and Medical Center management are part of the Medical Center's performance improvement and professional and peer review activities.

**6.2-1.4** The relevant Association leader(s) shall determine whether it is appropriate to include documentation of collegial interventional efforts in an Association member's credential file(s) and/or peer review file(s).  The Association member will have an opportunity to review and respond in writing.  The response shall be maintained in that member's credential file(s) and/or peer review file(s) along with the original documentation.

**6.2-1.5** Collegial intervention efforts are encouraged but are not mandatory, and shall be within the discretion of the appropriate Association and Medical Center management.

**6.2-1.6** The President, in conjunction with the Chief Executive Officer or the Chief Medical Officer shall determine whether to direct that a matter be handled in accordance with another policy or to direct to the Executive Committee for further determination.

**6.2-2 Minor Infractions**

**6.2-2.1** The President, any Department Chair, the Executive Committee, or their respective designees shall be empowered, after an investigation, to take appropriate disciplinary action in connection with minor infractions. Such disciplinary action may include, but shall not be limited to, the issuance of a warning, a letter of reprimand or an admonition.

**6.2-2.2** For the purposes of this Section 6.2-2, a "minor infraction" may be any activity or conduct which is lower than the standards or aims of the Association, but which would not ordinarily trigger a recommendation for the denial, reduction, suspension, revocation or termination of privileges or Association membership. A sanction imposed pursuant to this Section 6.2-2 shall constitute grounds for a hearing under Article VII of these bylaws.

**6.2-2.3** At the discretion of the President adverse actions imposed or implemented pursuant to this Section 6.2-2 may be reported to the Executive Committee with a copy transmitted to the Governing Body. If the Executive Committee determines that the violation is not a minor infraction, or that the intended disciplinary action is inappropriate and that other action is necessary, the Executive Committee may institute alternative disciplinary measures in accordance with this Section 6.2-2 or in accordance with other provisions of these bylaws.

**6.2-3 Criteria for Initiation:**  Whenever reliable information indicates a practitioner with clinical privileges may have exhibited any act, statement, demeanor, or professional conduct, either within or outside the Medical Center, which is or is reasonably likely to be

**6.2-3.1** detrimental to patient safety or to the delivery of quality patient care,

**6.2-3.2** disruptive or deleterious to the operations of the Medical Center or improper use of Medical Center resources,

**6.2-3.3** below applicable professional standards,

**6.2-3.4** contrary to the Association's bylaws, rules, regulations, or policies, or

**6.2-3.5** unethical,

then an investigation or corrective action against such practitioner may be requested by any officer of the Association, by the chair of any department, by the chair of any standing committee of the Association, by the Chief Medical Officer, by the Chief Executive Officer, by the Chief Medical Officer of Health Services, by the Director, or by a member of the Governing Body, upon the complaint, request, or suggestion of any person.

**6.2-4 Initiation:**  All requests for an investigation or corrective action shall be in writing, shall be made to the President or his/her designee, and shall be supported by reference to the specific activities or conduct which constitute the grounds for the request.   If the Executive Committee initiates the request, it shall make an appropriate recording of the reason(s).

**6.2-5 Investigation:** If the Executive Committee concludes an investigation is warranted, it shall direct an investigation to be undertaken. The Executive Committee may conduct the investigation itself, assign the task to an appropriate Association officer or standing or *ad hoc* committee of the Association, or may forward such request to the chair of the department(s) wherein the practitioner has such privileges who, upon receipt of such request, shall immediately appoint an *ad hoc* committee to investigate the matter. The Executive Committee in its discretion may appoint practitioners who are not members of the Association as Ad-hoc Staff members of the Association for the sole purpose of serving on a standing or *ad hoc* committee. If the investigation is delegated to an officer, department chair or committee other than the Executive Committee, such officer, department chair or committee shall proceed with the investigation in a prompt manner and shall forward a written report of the investigation to the Executive Committee within thirty (30) days. The report may include recommendations for appropriate corrective action. The member shall be notified that an investigation is being conducted and the general nature of the charges against him/her and shall be given an opportunity to provide information in a manner and upon such terms as the investigating body deems appropriate. The individual or body investigating the matter may, but is not obligated to, conduct interviews with persons involved; however, such investigation shall not constitute a "hearing" as that term is used in Article VII nor shall the procedural rules with respect to hearings or appeals apply. A record of such interview(s) shall be made by the department or investigating body and included with its report to the Executive Committee. Despite the status of any investigation, at all times the Executive Committee shall retain authority and discretion to take whatever action may be warranted by the circumstances, including summary suspension, termination of the investigative process, or other action.

**6.2-6 Corrective Action Against a Chair:** Whenever the request for an investigation or corrective action is directed against the chair of a department, the Executive Committee shall appoint an *ad hoc* investigating committee which shall perform all the functions of the departmental *ad hoc* investigating committee as described in Section 6.2-5.

**6.2-7 Executive Committee Action:** Within sixty (60) days following the receipt of the investigating body's report, the Executive Committee shall take action upon the request for corrective action. In all cases, the affected practitioner shall be permitted to make an appearance at a reasonable time before the Executive Committee prior to its taking action on such request. This appearance shall not constitute a hearing, shall be preliminary in nature, and none of the procedures provided in these bylaws with respect to hearings shall apply thereto. A record of such appearance shall be made by the Executive Committee and included in its recommendation to the Governing Body. As soon as practicable after the conclusion of the investigation, the Executive Committee shall take action which may include, without limitation:

    **6.2-7.1**   Rejection of the request for corrective action;

    **6.2-7.2** Deferring action for a reasonable time where circumstances warrant;

    **6.2-7.3** Referring the member to the Well-Being of Practitioners Committee for evaluation and follow-up as appropriate;

**6.2-7.4** Issuance of a letter of admonition, censure, reprimand, or warning, although nothing herein shall preclude a department chair from issuing informal written or oral warnings outside the corrective action process.  In the event such letter is issued, the affected member may make a written response which shall be placed in the member's peer review file in accordance with Section 15.8-6 of these bylaws;

**6.2-7.5** Imposition of terms of probation or special limitations on continued Association membership or exercise of clinical privileges, including, but not limited to, a requirement for co-admission, mandatory consultation, or monitoring;

**6.2-7.6** Recommending reduction, modification or revocation of clinical privileges;

**6.2-7.7** Termination, modification, or ratification of an already imposed summary suspension of clinical privileges;

**6.2-7.8** Recommending suspension of clinical privileges until satisfactory completion of specific conditions or requirements;

**6.2-7.9** Recommending suspension of Association membership until satisfactory completion of specific conditions or requirement

**6.2-7.10** Reductions of membership status, limitation of any prerogatives directly related to the member's delivery of patient care,

**6.2-7.11**  Recommending revocation of Association membership; and

**6.2-7.12** Taking other actions deemed appropriate under the circumstances.

**6.2-8 Determination of Medical Disciplinary Action:** If the Executive Committee takes any action that would give rise to a hearing pursuant to Article VII of these Bylaws,  it shall also make a determination whether the action is a "medical disciplinary" action or an "administrative disciplinary" action. A medical disciplinary action is one taken for cause or reason that involves that aspect of a practitioner's competence or professional conduct that is reasonably likely to be detrimental to patient safety or to the delivery of patient care. All other actions are deemed administrative disciplinary actions.

If the Executive Committee makes a determination that the action is medical disciplinary, it shall also determine whether the action is taken for any of the reasons required to be reported to the Medical Board of California pursuant to California Business & Professions Code Section 805.01.

**6.2-9 Notification of Corrective Action and Action by the Governing Body:**  If corrective action as set forth in Sections 7.2-1 through 7.2-12 is recommended by the Executive Committee, that recommendation shall be transmitted to the Chief Medical Officer, the Chief Executive Officer, the chief Medical Officer of Health Services, the Director and the Governing Body.  So long as the recommendation is supported by substantial evidence, the recommendation of the Executive Committee

2455   shall be adopted by the Governing Body as final action unless the member requests a
2456   hearing, in which case the final decision shall be determined as set forth in Article VII.
2457

2458   **6.2-10 Initiation by Governing Body:**  If the Governing Body determines that the
2459   Executive Committee has failed to initiate an investigation on a request for corrective
2460   action or to recommend disciplinary action, and that such failure is contrary to the
2461   weight of evidence, the Governing Body may direct the Executive Committee to
2462   initiate an investigation or recommend disciplinary action, but only after consultation
2463   with the Executive Committee and the Director.   In the event the Executive
2464   Committee fails to take action in response to a direction from the Governing Body,
2465   the Governing Body, after notifying the Executive Committee and the Director in
2466   writing, shall have the authority to take action on its own initiative against the
2467   practitioner, but this corrective action must comply with Articles VI and VII of these
2468   Association Bylaws.  If such action is favorable to the member, or constitutes an
2469   admonition, reprimand or warning to the member, it shall become effective as the
2470   final decision of the Governing Body.
2471

2472   **6.3**      SUMMARY RESTRICTION OR SUSPENSION
2473

2474   **6.3-1 Initiation:**  The Executive Committee or, in its absence, the President or the chair
2475   or designee of the department(s) in which the member holds privileges may
2476   immediately suspend or restrict clinical privileges of a licentiate where the failure to
2477   take that action may result in an imminent danger to the health or safety of any
2478   individual, provided that the licentiate is subsequently provided with the special
2479   notice and hearing rights set forth in this Article below.
2480

2481   **6.3-2 Initiation and Action by Governing Body:**  Notwithstanding any other provision
2482   of these bylaws, when no person or body authorized by these bylaws is available to
2483   summarily restrict or suspend clinical privileges, the Governing Body or its designee
2484   may temporarily restrict or suspend all or any portion of the clinical privileges of a
2485   practitioner where there is a substantial likelihood of imminent danger to the health of
2486   any person so long as the Governing Body has, before the restriction or suspension,
2487   made reasonable attempts to contact the President, members of the Executive
2488   Committee, and the appropriate department chair or designee.   A summary
2489   restriction or suspension by the Governing Body which has not been ratified by the
2490   Executive Committee within two (2) working days (excluding weekends and holidays)
2491   after the restriction or suspension, shall automatically terminate.
2492

2493   **6.3-3 Written Notice of Summary Restriction or Suspension:**  The written notice of
2494   restriction or suspension shall include a statement of facts demonstrating that the
2495   suspension was necessary because failure to restrict or suspend the practitioner's
2496   privileges summarily could reasonably result in an imminent danger to the health of
2497   an individual and include a summary of one or more particular incidents giving rise to
2498   the assessment of imminent danger.   The initial notice shall not substitute for, but is
2499   in addition to, the notice required under Section 7.3 (which applies in all cases where
2500   the Executive Committee does not immediately terminate the summary restriction or
2501   suspension).   The notice under Section 7.3 may supplement the initial notice
2502   provided under this Section 6,3-3 by including any additional relevant facts
2503   supporting the need for summary restriction or suspension or other corrective action.
2504

2505   **6.3-4  Executive Committee Action:**   Within one (1) week after such summary

restriction or suspension, a meeting, by telephone or in person or in any combination of the two, of the Executive Committee (or a subcommittee appointed by the President) shall be convened on at least two (2) hours' notice to review and consider the action. Upon request, the member may attend and make a statement concerning the issues under investigation, on such terms and conditions as the Executive Committee may impose, although in no event shall any meeting of the Executive Committee, with or without the member, constitute a "hearing" within the meaning of Article VII, nor shall any procedural rules apply. The Executive Committee may modify, continue, or terminate the summary restriction or suspension, but in any event it shall furnish the member with notice of its decision within two (2) working days of the meeting.

**6.3-5 Procedural Rights:** Unless the Executive Committee promptly terminates the summary restriction or suspension, the member shall be entitled to the procedural rights afforded by Article VII. In addition, the affected practitioner shall have the following rights:

**6.3-5.1** Any practitioner who has properly requested a hearing under Article VII of the Association bylaws may request that the hearing be bifurcated, with the first part of the hearing being devoted exclusively to procedural matters, including the propriety of summary restriction or suspension. Along with any other appropriate requests for rulings, the affected practitioner may request that the Judicial Review Committee stay the summary restriction or suspension, pending the final outcome of the hearing and any appeal.

**6.3-5.2** At the conclusion of the portion of the hearing concerning the propriety of summary restriction or suspension, the Judicial Review Committee shall issue a written opinion on the issues raised, including whether or not the facts stated in the written notice to the affected practitioner adequately support a determination that failure to summarily restrict or suspend could reasonably result in "imminent danger" to an individual. Such written opinion shall be transmitted to both the affected practitioner and the Executive Committee within one (1) week of the date of the hearing concerning the propriety of summary restriction or suspension.

**6.3-5.3** If the Judicial Review Committee's determination is that the facts stated in the notice required by Section 6.3-3 do not support a reasonable determination that failure to summarily restrict or suspend the practitioner's privileges could result in imminent danger, the summary restriction or suspension shall be immediately stayed pending the outcome of the hearing and any appeal.

**6.3-6 Transfer of Patient Care:** Immediately upon the imposition of a summary restriction or suspension, the President or responsible department chair shall have authority to provide for alternative medical coverage for the patients of the restricted or suspended practitioner still in the Medical Center at the time of such restriction or suspension considering, where feasible, the wishes of the patients in the choice of a substitute member.

**6.4** <u>AUTOMATIC SUSPENSION</u>

**6.4-1  General**

In the circumstances described in Sections 6.4-2 through 6.4-8, a practitioner's Association membership and/or clinical privileges shall be terminated, suspended, or limited as described, which action shall be final and shall not be subject to a hearing or appellate review under Article VII, except where a *bona fide* dispute exists as to whether the circumstances have occurred or as required by law.

**6.4-2  License**

**6.4-2.1  Revocation or Expiration**:  Whenever a practitioner's license or other legal credential authorizing him/her to practice in California is revoked or has expired, his/her Association membership and clinical privileges shall be immediately and automatically terminated.

**6.4-2.2  Restriction**:  Whenever a practitioner's license or other legal credential authorizing him/her to practice in California is limited or restricted by the applicable licensing or certifying authority, those clinical privileges which he/she has been granted that are within the scope of such limitation or restriction, as determined by the Executive Committee, shall be immediately and automatically limited or restricted in a similar manner.

**6.4-2.3  Suspension**:  Whenever a practitioner's license or other legal credential authorizing him/her to practice in California is suspended by the applicable licensing or certifying authority, his/her Association membership and clinical privileges shall be automatically suspended effective upon and for at least the term of the suspension.

**6.4-2.4  Probation**:  If a practitioner's license to practice in California is subject to probation by the applicable licensing or certifying authority, his/her applicable Association membership status and clinical privileges shall automatically become subject to the same terms and conditions of the probation effective upon and for at least the term of the probation.

**6.4-3  Drug Enforcement Administration Certificate**

**6.4-3.1  Revocation, Limitation or Suspension**:  Whenever a practitioner's Drug Enforcement Administration certificate is revoked, limited or suspended, he/she shall immediately and automatically be divested of his/her right to prescribe medications covered by the certificate as of the date such action becomes effective and throughout its term.

**6.4-3.2  Probation**:  Whenever a practitioner's Drug Enforcement Administration certificate is subject to probation, his/her right to prescribe medications covered by the certificate shall automatically become subject to the same terms of the probation effective upon and for at least the term of the probation.

**6.4-4  Medical Records**

2607    Members of the Association are required to complete medical records within such
2608    reasonable time as may be prescribed by the Executive Committee. A limited
2609    suspension in the form of withdrawal of admitting and other related privileges until
2610    medical records are completed, shall be imposed by the President or the President's
2611    designee.  Such suspension shall be imposed automatically beginning ten (10)
2612    working days after the mailing by certified mail, return receipt requested, or by
2613    personal service to the affected Association member, at his or her current address as
2614    documented in the Association Office.  During this ten (10) day period, the affected
2615    Association member may explain any extenuating circumstances, including questions
2616    regarding the accuracy of the information regarding the incomplete medical records, to
2617    the President or the President's designee who, in his/her discretion, may extend the
2618    period before the temporary suspension shall begin or lift the suspension.  For the
2619    purpose of this Section 6.4-4, 'related privileges' include scheduling surgery, assisting
2620    in surgery, consulting on hospital cases, and providing professional services within the
2621    hospital for future patients. Bona fide vacation or illness may constitute an excuse
2622    subject to approval by the Executive Committee. Members whose privileges have
2623    been suspended for delinquent records may admit patients only in life-threatening
2624    situations. The suspension shall continue until lifted by the President or the President's
2625    designee.  Nothing in the foregoing shall preclude the implementation, by the
2626    Executive Committee, of a monetary fine for delinquent medical records.
2627
2628 **6.4-5 Professional Liability Insurance**
2629
2630    For any failure to maintain the programs of insurance as described in Article XVII, a
2631    practitioner's Association membership and clinical privileges shall be immediately
2632    and automatically suspended and shall remain suspended until the practitioner
2633    provides evidence satisfactory to the President that he/she has secured such
2634    programs of insurance in the amounts required.  If the practitioner fails to provide
2635    such evidence within ninety (90) days after the date the automatic suspension
2636    became effective, then the practitioner shall be deemed to have voluntarily resigned
2637    his/her Association membership and clinical privileges as of the last date of such
2638    ninety (90) day period.
2639
2640 **6.4-6 Failure to Pay Dues or Assessments**
2641
2642    For any failure, without good cause as determined by the Executive Committee, to
2643    promptly pay annual dues or special assessments to the Association pursuant to
2644    these bylaws, a practitioner's Association membership and clinical privileges shall be
2645    immediately and automatically suspended and shall remain suspended until the
2646    practitioner provides evidence satisfactory to the President that he/she has paid such
2647    dues in the amount required.  If the practitioner fails to provide such evidence within
2648    three (3) months after written warnings of delinquency, the date the automatic
2649    suspension became effective, then the practitioner shall be deemed to have
2650    voluntarily resigned his/her Association membership and clinical privileges as of the
2651    last date of such three (3) month period.
2652
2653 **6.4-6 Failure to Satisfy Special Attendance Requirement**
2654
2655    Failure of a member without good cause to provide information or appear when
2656    requested by an Association committee as described in Section 12.9-4 shall result in
2657    referral to the Executive Committee for action, which may include automatic

suspension of all privileges. The automatic suspension shall remain in effect until the practitioner has provided requested information and/or satisfied the special attendance requirement which has been made by the Association committee.

**6.4-8 Exclusion or Suspension from Participation in Federal or State Health Services Programs**

If a practitioner is excluded or suspended from participation in the Medicare, Medicaid, or any other State or Federal health services program, his/her Association membership and clinical privileges shall be immediately and automatically terminated.

**6.4-9 Executive Committee Deliberation**

As soon as practicable after action is taken as described in Sections 6.4-2, 6.4-3, 6.4-4, 6.4-5, 6.4-7 or 6.4-8, the Executive Committee shall convene to review and consider the facts upon which such action was predicated.  The Executive Committee may request additional corrective action based upon information disclosed or otherwise made available, and, in such event, the corrective action process set forth in Section 6.2 shall be followed as to such additional corrective action.  Except as to any such additional corrective action, the affected practitioner shall not be entitled to a hearing and appellate review under Article VII.

**6.4-10 Notification of Automatic Suspension**

Whenever a practitioner's clinical privileges are automatically suspended or restricted in whole or in part, notice of such suspension or restriction shall be given to the practitioner, the President, the Executive Committee, the Chief Medical Officer, the Chief Executive Officer, the Chief Medical Officer of Health Services, the Director and the Governing Body.  However, the giving of such notice shall not be required in order for any automatic suspension or restriction to become effective.  Upon the effective date of an automatic suspension or restriction, the President or the responsible department chair shall have the authority to provide for alternative medical coverage for the patients of the suspended or restricted practitioner still in the Medical Center at the time of such suspension or restriction.

**6.5** UNDERLINE_EXHAUSTION OF REMEDIES

If any routine corrective action, summary suspension, or automatic suspension, as set forth in Sections 6.2, 6.3 and 6.4, is taken or recommended, the practitioner shall exhaust all the remedies afforded by these bylaws before resorting to any legal action.

**6.6** CONFIDENTIALITY

To maintain confidentiality, participants in the corrective action process shall limit their discussion of the matters involved to the formal avenues provided in these Bylaws for peer review and discipline.

ARTICLE VII

56

HEARING AND APPELLATE REVIEW PROCEDURE

**7.1** UNDERLINE EXHAUSTION OF REMEDIES

If adverse action described in Section 7.2 is taken or recommended, the applicant or member must exhaust the remedies afforded by these bylaws before resorting to legal action.

**7.2   GROUNDS FOR HEARING**

Except as otherwise provided in these bylaws, any one or more of the following actions or recommended actions shall be deemed actual or potential adverse action and constitute grounds for a hearing:

**7.2-1** Denial of Association membership;

**7.2-2** Denial of requested advancement in Association membership category or membership status;

**7.2-3** Denial of Association reappointment;

**7.2-4** Involuntary demotion to lower Association membership category;

**7.2-5** Suspension of Association membership;

**7.2-6** Revocation of Association membership;

**7.2-7** Denial of requested clinical privileges;

**7.2-8** Involuntary reduction of current clinical privileges;

**7.2-9** Suspension of clinical privileges;

**7.2-10** Termination of clinical privileges;

**7.2-11** Involuntary imposition of significant consultation or monitoring requirements (excluding monitoring incidental to provisional status and for new privileges); or

**7.2-12** Any other action which requires a report to be made to the Medical Board of California or other appropriate State licensing agency.

**7.3** NOTICE OF ACTION OR PROPOSED ACTION

In all cases in which  action has been taken or a recommendation has been made as set forth in Section 7.2, the  President or designee on behalf of the Executive Committee shall promptly give the applicant or member written notice of (1) the recommendation or final proposed action and that, except with respect to actions reported to Business & Professions Code §805.01, such action, if adopted, shall be taken and reported to the Medical Board of California and/or to the National Practitioner Data Bank if required; (2) the reasons for the proposed action including the acts or omissions with which the member is charged; (3) the right to request a hearing pursuant to Section 7.4, below and

2760 that such hearing must be requested within thirty (30) days; and (4) a summary of the
2761 rights granted in the hearing pursuant to Article VII of these Bylaws. If the
2762 recommendation or final proposed action is reportable to the Medical Board of California
2763 and/or to the National Practitioner Data Bank, the written notice shall state the proposed
2764 text of the report(s).
2765
2766 **7.4** REQUEST FOR HEARING
2767
2768 **7.4-1 Response to Notice of Action**:  The applicant or member shall have thirty (30)
2769 days following receipt of such notice of such action or recommendation to request a
2770 Judicial Review Committee hearing.  The request shall be in writing addressed to the
2771 Executive Committee.  In the event the applicant or member does not request a
2772 hearing within the time and in the manner described, the applicant or member shall
2773 be deemed to have waived any right to a hearing and accepted the action or
2774 recommendation in question, which shall thereupon become final and binding.
2775
2776
2777 **7.4-2 Action on Request for Hearing**:  Upon receipt of a request for a hearing, the
2778 Executive Committee shall schedule and arrange for a hearing.  The date of the
2779 commencement of the hearing shall not be less than thirty (30) days nor more than
2780 sixty (60) days from the date of receipt of the request by the Executive Committee for
2781 a hearing; provided that when the request is received from a member who is under
2782 suspension which is then in effect, the hearing shall be held as soon as the
2783 arrangements may reasonably be made, so long as the member or applicant has at
2784 least thirty (30) days from the date of notice to prepare for the hearing or waives this
2785 right.
2786
2787 **7.4-3 Notice of Hearing**: Together with the notice stating the place, time and date of the
2788 hearing, the President or designee on behalf of the Executive Committee shall
2789 provide the reasons for the recommended action, including the acts or omissions
2790 with which the member is charged, a list of the charts in question, where applicable,
2791 and a list of the witnesses (if any) expected to testify at the hearing on behalf of the
2792 Executive Committee. The content of this list is subject to update pursuant to Section
2793 7.5, below.
2794
2795 **7.4-4 Judicial Review Committee:**  When a hearing is requested, the Executive
2796 Committee shall appoint a Judicial Review Committee including the designation of
2797 the chair.  The Judicial Review Committee shall be composed of not less than five
2798 (5) members of the Active Staff who shall be impartial, shall gain no direct financial
2799 benefit from the outcome, are not in direct economic competition with the involved
2800 practitioner, and shall not have acted as accusers, investigators, fact finders, initial
2801 decision makers or otherwise have not actively participated in the consideration of
2802 the matter involved at any previous level.  Knowledge of the particular matter in
2803 question shall not preclude a member from serving as a member of the Judicial
2804 Review Committee.  In the event it is not feasible to appoint a Judicial Review
2805 Committee entirely from the active staff, the Executive Committee may appoint
2806 members from other staff categories or practitioners who are not members of the
2807 Association.  Of the Association members who serve on the Judicial Review
2808 Committee, at least one shall be a member who shall have the same healing arts
2809 licensure as the accused, and where feasible, the Committee shall also include an
2810 individual practicing the same specialty as the member.

58

**7.4-5 Failure to Appear:** Failure, without a showing of good cause by the person requesting the hearing, to appear and proceed at such a hearing shall be deemed to constitute voluntary acceptance of the recommendations or actions involved which shall become final and effective immediately.

**7.4-6 Postponements:** Postponements and extensions of time beyond the time expressly permitted in these bylaws may be requested by anyone but shall be permitted by the Judicial Review Committee or the Hearing Officer acting upon its behalf only on a showing of good cause or upon agreement of the parties.

**7.5** HEARING PROCEDURE

**7.5-1 Prehearing Requests for Information:** The applicant or Member shall have the right to inspect and copy at the applicant's or Member's expense documents or other evidence upon which the charges are based, as well as all other evidence relevant to the charges which the peer review body has in its possession or under its control or which will be made available to the Judicial Review Committee, as soon as practicable after the receipt of the applicant's or Member's request for a hearing. The peer review body shall have the right to inspect and copy at the peer review body's expense any documentary information relevant to the charges which the applicant or Member has in his or her possession or control or which will be made available to the Judicial Review Committee as soon as practicable after receipt of the peer review body's request. The failure by either party to provide access to this information at least thirty (30) days before the hearing shall constitute good cause for a continuance. The right to inspect and copy by either party does not extend to confidential information referring solely to individually identifiable licentiates, other than the applicant or Member under review. The Hearing Officer shall consider and rule upon any request for access to information and may impose any safeguards the protection of the peer review process and justice requires. In so doing, the Hearing Officer shall consider:

**7.5-1.1** whether the information sought may be introduced to support or defend the charges;

**7.5-1.2** the exculpatory or inculpatory nature of the information sought, if any;

**7.5-1.3** the burden imposed on the party in possession of the information sought, if access is granted; and

**7.5-1.4** any previous requests for access to information submitted or resisted by the parties to the same proceeding.

**7.5-2 Request for List of Witnesses:** At the request of either side, the parties shall exchange lists of witnesses expected to testify. Failure to disclose the identity of a witness at least ten (10) days before the commencement of the hearing shall constitute good cause for a continuance.

**7.5-3 Notification of Procedural Disputes:** It shall be the duty of the person requesting the hearing and the Executive Committee or its designee to exercise reasonable diligence in notifying the chair of the Judicial Review Committee of any

2862 pending or anticipated procedural disputes as far in advance of the scheduled
2863 hearing as possible, in order that decisions concerning such matters may be made in
2864 advance of the hearing.  Objections to any prehearing decisions may be succinctly
2865 made at the hearing.
2866

2867 **7.5-4 Representation by Legal Counsel:**  The hearings provided for in these bylaws
2868 are for the purpose of intraprofessional resolution of matters bearing on professional
2869 conduct, professional competency or character.  The person requesting the hearing
2870 shall be entitled to representation by legal counsel, at his or her expense, in any
2871 phase of the hearing, if the individual so chooses.  The applicant or Member must
2872 inform the Executive Committee of his/her choice to be represented by counsel in
2873 his/her request for the hearing.  In the absence of legal counsel, the applicant or
2874 member shall be entitled to be accompanied by and represented at the hearing by a
2875 physician, dentist, podiatrist or clinical psychologist licensed in the State of California
2876 of the applicant's or Member's choosing. The Executive Committee shall not be
2877 represented by an attorney at law if the person requesting the hearing is not so
2878 represented.
2879

2880 **7.5-5 Qualifications of Hearing Officer:**  The use of a Hearing Officer to preside at a
2881 hearing is mandatory. The Hearing Officer shall be an attorney at law, qualified to
2882 preside over a quasi-judicial hearing.  Such Hearing Officer may not be from a firm
2883 regularly utilized by Los Angeles County, the Medical Center, the Association or the
2884 person requesting the hearing, for legal advice regarding their affairs.  The Hearing
2885 Officer shall gain no direct financial benefit from the outcome and must not act as a
2886 prosecuting officer or as an advocate for any party.
2887

2888 **7.5-6 Selection of Hearing Officer:**  The appointment of a Hearing Officer shall be by
2889 the Executive Committee, as follows:
2890

2891 **7.5-6.1** Together with the notice of a hearing, the practitioner requesting the
2892 hearing shall be provided a list of at least three (3) but not more than five (5)
2893 potential Hearing Officers,
2894

2895 **7.5-6.2** The practitioner shall have five (5) working days to accept any of the
2896 listed potential Hearing Officers or to propose at least three (3) but not more
2897 than five (5) other names of potential Hearing Officers.
2898

2899 **7.5-6.3** If the practitioner is represented by legal counsel, the parties' legal
2900 counsels may meet and confer in an attempt to reach accord in the selection
2901 of a Hearing Officer from the two parties' lists.
2902

2903 **7.5-6.4** If the parties are not able to reach agreement on the selection of a
2904 Hearing Officer within five (5) working days of receipt of the practitioner's
2905 proposed list, the President shall select an individual from the composite list.
2906

2907 **7.5-7 Hearing Officer's Authority:**  The Hearing Officer shall be the presiding officer at
2908 the hearing.  He/she shall preside over the voir dire process and may question panel
2909 members directly.  The Hearing Officer shall endeavor to ensure that all participants
2910 in the hearing have a reasonable opportunity to be heard, to present relevant oral
2911 and documentary evidence in an efficient and expeditious manner, and that proper
2912 decorum is maintained.  He/she shall be entitled to determine the order of or

60

procedure for presenting evidence and argument during the hearing.  In addition to ruling on prehearing requests for information as described in Section 7.5-1, he/she shall have the authority and discretion, in accordance with these bylaws, to make all rulings on questions which pertain to matters of law and to the admissibility of evidence.

At the commencement of the hearing, the Hearing Officer may also apprise the Judicial Review Committee of its right to terminate the hearing due to the applicant's or member's failure to cooperate with the hearing process, but shall not independently make that determination or otherwise recommend such a termination.

If the Hearing Officer determines that either side in a hearing is not proceeding in an efficient and expeditious manner, the Hearing Officer may recommend that the Judicial Review Committee take such discretionary action as seems warranted by the circumstances including, but not limited to, setting fair and reasonable time limits on either side's presentation of its case.

If requested by the Judicial Review Committee, the Hearing Officer may participate in the deliberations of such body and be a legal advisor to it, but he or she shall not be entitled to vote.

**7.5-8 Challenging Impartiality of Judicial Review Committee and Hearing Officer:** The parties shall be entitled to a reasonable opportunity to question and challenge the impartiality of Judicial Review Committee members and the Hearing Officer. Challenges to the impartiality of any Judicial Review Committee member or the Hearing Officer shall be ruled on by the Hearing Officer.

**7.5-9 Judicial Review Committee Records:** A shorthand reporter shall be present to make a record of the hearing proceedings as well as the pre-hearing proceedings if deemed appropriate by the Hearing Officer.  The cost of attendance of the shorthand reporter shall be borne by the Medical Center, but the cost of the transcript, if any, shall be borne by the requesting party.  Oral evidence shall be taken only on oath administered by any person lawfully authorized to administer such oath.

**7.5-10 Rights of Both Sides at Hearing:**  Within reasonable limitations, both sides at the hearing shall be provided with all of the information made available to the trier of fact, may call, examine, and cross examine witnesses, may present and rebut evidence determined relevant by the hearing officer, and may submit a written statement at the close of the hearing so long as these rights are exercised in an efficient and expeditious manner. The applicant or member may be called by the Medical Executive Committee and examined as if under cross-examination.

**7.5-11 Admission of Evidence:**  The hearing shall not be conducted according to the rules of law relating to procedure, the examination of witnesses or presentation of evidence.   Any relevant evidence, including hearsay, shall be admitted by the Hearing Officer if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs.  The Judicial Review Committee may interrogate the witnesses or call additional witnesses if it deems such action appropriate.

**7.5-12 Burden of Proof**

**7.5-12.1** At the hearing, the Executive Committee shall have the initial duty to present evidence which supports it's the charges or recommended action.

**7.5-12.2** An initial applicant shall bear the burden of persuading the Judicial Review Committee, by a preponderance of the evidence, of the applicant's qualifications by producing information which allows for adequate evaluation and resolution of reasonable doubts concerning the applicant's current qualifications for membership and privileges.  An initial applicant shall not be permitted to introduce information requested by the Association but not produced during the application process unless the applicant establishes that the information could not have been produced previously in the exercise of reasonable diligence.

**7.5-12.3** Except as provided above for initial applicants, the Executive Committee shall bear the burden of persuading the Judicial Review Committee, by a preponderance of the evidence, that its action or recommendation is reasonable and warranted.

## 7.6    ADJOURNMENT AND CONCLUSION

**7.6-1 Conclusion of Hearing:**  After consultation with the chair of the Judicial Review Committee, the Hearing Officer may adjourn the hearing and reconvene the same at the convenience of the participants without special notice at such times and intervals as may be reasonable and warranted, with due consideration for reaching an expeditious conclusion to the hearing. Both the Executive Committee and the applicant or member may submit a written statement at the close of the hearing. Upon conclusion of the presentation of oral and written evidence, or the receipt of closing written arguments, if submitted, the hearing shall be closed.  The Judicial Review Committee shall thereupon conduct its deliberations and render a decision and accompanying report, in the manner and within the time as provided in Section 7.6-4.

**7.6-2 Presence of Judicial Review Committee Members and Vote:**  Each member of the Judicial Review Committee must be present throughout the hearing and deliberations in order to vote absent an agreement by the parties to the contrary. The final decision of the Judicial Review Committee must be sustained by a majority vote**.**

**7.6.3  Basis for Recommendation:** The recommendation of the Judicial Review Committee shall be based on the evidence introduced at the hearing, including all logical and reasonable inferences from the evidence and the testimony.

**7.6-4 Decision of Judicial Review Committee:**  The Judicial Review Committee's duty shall be to determine whether the decision of the body whose decision prompted the hearing was reasonable and warranted.   Within thirty (30) days after final adjournment of the hearing, the Judicial Review Committee shall render a decision, which shall include the Judicial Review Committee's findings of fact with respect to the charges, and a conclusion articulating the connection between evidence produced at the hearing and its recommendation, and its conclusions regarding whether each of the individual charges independently support the action taken or whether they support the charges when taken together.  If the affected applicant or Member is currently under suspension, the time for the decision shall be fifteen (15)

days.   The recommendation of the Judicial Review Committee shall be delivered to the Executive Committee, to the President, to the Chief Medical Officer, to the Chief Executive Officer, to the Director, and to the Governing Body and by special notice to the affected applicant or Member.

**7.6-5 Finality of Decision:**   The decision of the Judicial Review Committee shall be considered final, subject only to the right of appeal as provided in Section 7.7.

**7.6-6 Right to Only One Hearing**: No person who requested the hearing shall be entitled to more than one hearing on any single matter which may be the subject of a hearing.

**7.7**  APPEAL TO GOVERNING BODY

**7.7.1 Time to Appeal:**  Within thirty (30) days after receipt of the decision of the Judicial Review Committee, either the person who requested the hearing or the body whose decision prompted the hearing may request an appellate review by the Governing Body.  Such request shall be in writing to the President or to the Chief Executive Officer and shall be delivered either in person or by certified mail, return receipt requested.  If such appellate review is not requested within such period, both sides shall be deemed to have waived any right to appellate review and accepted the action involved.

**7.7-2 Grounds for Appeal:**   A written request for an appeal shall include an identification of the grounds for appeal, and a clear and concise statement of the facts in support of the appeal.  Grounds for appeal from the decision of the Judicial Review Committee shall be:

    **7.7-2.1** that there was substantial noncompliance with the procedures required by these bylaws, which noncompliance has created demonstrable prejudice; or

    **7.7-2.2** that the decision was not supported by substantial evidence based upon the hearing record or such additional information as may be permitted pursuant to Section 7.4-5 hereof.

**7.7-3 Time, Place and Notice:** In the event of any appeal to the Governing Body, as set forth in the preceding Section 7.7-1, the Appeal Board shall within fifteen (15) days after receipt of such notice of appeal, schedule and arrange for an appellate review.  The Appeal Board shall cause the applicant or member to be given notice of the time, place, and date of the appellate review.  The date of the appellate review shall not be less than thirty (30) days, nor more than sixty (60) days, from the date of receipt of the request for appellate review, provided that when a request for appellate review is from a member who is under suspension which is then in effect, the appellate review shall be held as soon as arrangements may reasonably be made, not to exceed fifteen (15) days from the date of receipt of the request for appellate review.  The time for appellate review may be extended by the Appeal Board upon a showing of good cause.

**7.7-4 Appeal Board:**  When an appellate review is requested, the Governing Body shall appoint an Appeal Board which shall be composed of five (5) Appeal Board

3066    members, two (2) of whom shall be taken from the administrative staff of the Medical
3067    Center and three (3) of whom shall be taken from the Association. One member shall
3068    be designated by the Governing Body as Chair.  Knowledge of the particular matter
3069    on appeal shall not preclude anyone from serving as a member of the Appeal Board
3070    so long as that person did not act as an accuser, investigator, factfinder, or initial
3071    decision maker in the same matter and did not take part in a prior hearing on the same
3072    matter.  The Appeal Board may select an attorney to assist it in the proceeding, but
3073    that attorney shall not be entitled to vote with respect to the appeal.
3074

3075    **7.7-5 Appeal Procedure:**  The proceeding of the Appeal Board is an appellate hearing
3076    based upon the record of the hearing before the Judicial Review Committee,
3077    provided, however, that the Appeal Board may accept additional oral or written
3078    evidence, subject to a foundational showing that such evidence could not have been
3079    made available to the Judicial Review Committee in the exercise of reasonable
3080    diligence and subject to the same rights of cross-examination or confrontation
3081    provided at the Judicial Review Committee hearing; or the Appeal Board may
3082    remand the matter to the Judicial Review Committee for the taking of further
3083    evidence and for decision.  The Appeal Board shall remand the matter to the Judicial
3084    Review Committee where it accepted additional written or oral evidence that could
3085    materially impact its decision.
3086

3087    Each party shall have the right to be represented by legal counsel, or any other
3088    representative designated by that party in connection with the appeal, to present a
3089    written statement in support of his/her position on appeal, and to personally appear
3090    and make oral argument.  At the conclusion of oral argument, the Appeal Board may
3091    thereupon at a time convenient to itself conduct deliberations outside the presence of
3092    the appellant and respondent and their representatives.  The Appeal Board, after its
3093    deliberations, shall recommend, in writing, that the Governing Body affirm or reverse
3094    the decision of the Judicial Review Committee or refer the matter back to the Judicial
3095    Review Committee for further review and recommendation.
3096

3097    **7.7-6 Governing Body's Decision:**  Within thirty (30) days after receipt of the
3098    recommendations of the Appeal Board, the Governing Body shall render a final
3099    decision in writing and shall deliver copies thereof to the applicant or Association
3100    member and to the Executive Committee in person or by certified mail, return receipt
3101    requested.  The Governing Body shall affirm the Judicial Review Committee's
3102    decision if the Judicial Review Committee's decision is supported by substantial
3103    evidence, following a fair procedure.  Should the Appeal Board determine that the
3104    Judicial Review Committee's decision is not supported by substantial evidence, the
3105    Governing Body may reverse the decision of the Judicial Review Committee, or may
3106    instead, or shall, where a fair procedure has not been afforded, remand the matter
3107    back to the Judicial Review Committee for further review and recommendation,
3108    stating the purpose for the referral.
3109

3110    **7.7-7 Decision in Writing:** The final decision shall be in writing, shall specify the
3111    reasons for the action taken, shall include the text of the report which shall be made
3112    to the National Practitioner Data Bank and the Medical Board of California, if any,
3113    and shall be forwarded to the President, Chief Medical Officer, the Executive
3114    Committee, the Chief Executive Officer, and the subject of the hearing at least ten
3115    (10) days prior to submission to the Medical Board of California.
3116

**7.7-8 Right to One Appeal:** Except as otherwise provided in these bylaws, or in circumstances where a new hearing is ordered by the Governing Body or a court because of procedural irregularities or otherwise for reasons not the fault of the applicant or member, no applicant or Association member shall be entitled as a matter of right to more than one appeal to the Governing Body on any single matter which may be the subject of an appeal.

**7.8** CONFIDENTIALITY

To maintain confidentiality in the performance of peer review, disciplinary and creden- tialing functions, participants in any stage of the hearing or appellate review process shall not disclose or discuss the matters involved outside of the formal avenues provided in these Association Bylaws.

**7.9** RELEASE

By requesting a hearing or appellate review under these Bylaws, a practitioner agrees to be bound by the provisions in the Association Bylaws relating to immunity from liability for the participants in the hearing process.

**7.10** EXCEPTION TO HEARING RIGHTS FOR CONTRACT PHYSICIANS

The procedural rights specified in this Article VII shall apply to members who are directly under contract with the Medical Center in a medical administrative capacity or are in a closed department, except with respect to privileges for medical services which are the subject of an exclusive contract or contracts which have been awarded to another physician or physicians. The member shall have no right to a hearing with respect to the termination of the contract itself which shall be governed by the terms of the contract.

**7.11** DISPUTING REPORT LANGUAGE

A member who is the subject of a proposed adverse action report to the Medical Board of California or the National Practitioner Data Bank may request an informal meeting to dispute the text of the report filed. The report dispute meeting shall not constitute a hearing and shall be limited to the issue of whether the report filed is consistent with the final action issued. The meeting shall be attended by the subject of the report, the President, the chair of the subject's department, and the Medical Center's authorized representative, or their respective designees.

**7.12** FAIR REVIEW

**7.12-1** Grounds for Fair Review

Except as expressly provided for otherwise in these bylaws (such exception to include, but not be limited to, any and all automatic actions specified in these bylaws, an Association department rule, regulation or policy, or a Medical Center policy or policy decision that has been approved by the Executive Committee), the taking or recommending of any one or more of the following actions by the Executive Committee for reasons other than a medical disciplinary cause or reason (MDCR)

(except as provided in items 9 and 10 below) shall constitute grounds for a Fair Review:

**7.12-1.1** denial of Association membership.
**7.12-1.2** denial of reappointment.
**7.12-1.3** suspension of Association membership or clinical privileges.
**7.12-1.4** termination of Association membership.
**7.12-1.5** denial of requested clinical privileges, other than temporary privileges.
**7.12-1.6** reduction in clinical privileges.
**7.12-1.7** termination of privileges, other than temporary privileges.
**7.12-1.8** denial of membership in requested Association category or involuntary change in Association category.
**7.12-1.9** summary suspension for fourteen (14) consecutive days or less, for a MDCR.
**7.12-1.10** restriction of privileges for twenty-nine (29) days or less during a twelve (12) month period for a MDCR.

**7.12-2** Notice of Adverse Action or Recommended Action

Whenever any of the actions constituting grounds for a Fair Review under Section 7.12-1 above, has been taken or recommended, the Executive Committee shall give written notice to the affected practitioner.  The notice shall:

**7.12-2.1** describe what action has been taken or recommended.
**7.12-2.2** state the reasons for the action or recommendation.
**7.12-2.3** state that the practitioner is entitled to a Fair Review, which must be requested in writing and the request received by the President or his/her designee within thirty (30) days after the practitioner's receipt of the notice of adverse action or recommended action.

**7.12-3** Fair Review Procedure

The procedure for requesting, arranging for and conducting a fair review shall be the same as for hearings except that:

**7.12-3.1** the hearing shall be before an arbitrator to be designated by the President or his/her designee with pre-procedural rights of voir dire to confirm the proposed arbitrator is qualified and not biased;
**7.12-3.2** the parties must exchange documents and witness lists at least five (5) working days prior to the hearing, and testimony of witnesses and copies of evidence not timely exchanged may be barred;
**7.12-3.3** the body whose decision prompted the hearing has the initial burden of producing evidence to support its action or recommendation, with the burden then shifting to the affected practitioner to produce evidence and demonstrate that the decision was unreasonable; and
**7.12-3.4** neither party has the right to be represented by an attorney at the fair review.
.

<u>ARTICLE VIII</u>
<u>ALLIED HEALTH STAFF</u>

66

**8.1** DEFINITIONS

"Standardized procedure functions" means those functions specified in Business and Professions Code Section 2725 (c ) and (d) which are to be performed according to "standardized procedures".

"Standardized procedures" means policies and protocols formulated by the Medical Center for the performance of standardized procedure functions.

"Service authorization" means the permission granted to an Allied Health Staff member to provide specified patient care services within his or her qualifications and scope of practice as determined by the Executive Committee.

"Allied Health Staff" means those Allied Health Professionals who are not eligible for Association membership pursuant to these bylaws but have been granted a service authorization or are authorized under standardized procedures to provide certain clinical services.

**8.2** QUALIFICATIONS

Although not eligible for Association membership, allied health professionals shall be credentialed through the Association and shall be subject to general Association oversight and to the individual direction of Association members, as set forth below.  An Allied Health Professional is eligible for a service authorization in the Medical Center or to work under a standardized procedure if he or she:

**8.2-1** Holds a license, certificate, or other legal credential in a category of AHPs which the Governing Body has identified as eligible to apply for service authorizations (*see* Section 8.3, below);

**8.2-2** Documents his or her current experience, background, training, current adequate physical and mental health status, current competence, judgment, and ability with sufficient adequacy to demonstrate that any patient treated by him/her will receive care of the generally recognized professional level of quality established by the Association;

**8.2-3**   Is determined, on the basis of documented references:

> **8.2-3.1**  to adhere strictly to the lawful ethics of his or her profession;

> **8.2-3.2**  to work cooperatively with others in the hospital setting so as not to adversely affect patient care; and

> **8.2-3.3**  to be willing to commit to and regularly assist the Association in fulfilling its obligations related to patient care, within the areas of his/her professional competence and credentials;

**8.2-4** Agrees to comply with all Association and Department and Division bylaws, rules and regulations, and protocols to the extent applicable to the AHP; and

**8.2-5** Maintains professional liability insurance as indicated in Article XVII, if applicable.

Although not eligible for Association membership, AHPs shall be credentialed by the Association either through the IDPC or an Association department as described in Section 8.4-3 below and shall be subject to general Association oversight and to the individual direction of Association members, as set forth below.

**8.3**   CATEGORIES OF AHPs ELIGIBLE TO APPLY FOR SERVICE AUTHORIZATIONS OR TO WORK UNDER STANDARDIZED PROCEDURES OR PROTOCOLS

The categories of AHPs, based on occupation or profession, which shall be eligible to apply for Allied Health Staff membership and for service authorization or to work under standardized procedures or protocols in the Medical Center and the corresponding service authorization or standardized procedures prerogatives, terms, and conditions for each such AHP category shall be designated by the Governing Body, upon the recommendation of the Executive Committee, and when approved by the Governing Body, shall be set forth in the Association rules and regulations and/or Medical Center policies. Such actions by the Executive Committee and the Governing Body shall be based upon the recommendations of the relevant departments for the designation of categories of AHPs eligible to apply for service authorization or standardized procedures and the delineation of corresponding service authorization or standardized procedures prerogatives, terms, and conditions for each such AHP category. The Governing Body shall review the designation of categories of AHPs eligible to apply for service authorizations at least annually and at other times within its discretion or upon the recommendation of the Executive Committee.

At present, the following categories have been accepted as eligible for Allied Health Staff membership to apply for service authorization:

   **1.** Optometrists
   **2.** Clinical Pharmacists (Pharm D) providing direct patient care

At present, the following categories have been accepted as eligible for Allied Health Staff membership to apply to work under standardized procedures or Medical Center protocols:

   **1.** Nurse Practitioners
   **2.** Certified Registered Nurse Anesthetists
   **3.** Certified Nurse Midwives
   **4.** Physician Assistants

**8.4** PROCEDURE FOR GRANTING SERVICE AUTHORIZATION OR APPROVAL TO WORK UNDER A STANDARDIZED PROCEDURE OR MEDICAL CENTER PROTOCOL

**8.4-1**  An AHP whose scope of practice as determined by the AHP's department or the Executive Committee allows independent practice must apply and qualify for a service authorization or to work under a standardized procedure or Medical Center protocol and must designate a physician member of the Active Staff who, concurrently with the AHP's application, applies for and is granted privileges to be responsible, to the extent

3319    necessary, for the general medical condition of patients for whom the AHP proposes to
3320    render services in the Medical Center.
3321
3322    **8.4-2**  An AHP whose scope of practice as determined by the AHP's department or the
3323    Executive Committee does not allow independent practice must apply and qualify for
3324    a service authorization or to work under a standardized procedure or Medical Center
3325    protocol and must provide services under the supervision of an Active Staff member
3326    who has applied for, qualified for, and been granted specific privileges in accordance
3327    with the bylaws, rules and regulations, and Medical Center policies, to supervise and
3328    direct the exercise of service authorizations or standardized procedures or Medical
3329    Center protocols by the same category of AHP as that of the applicant. An AHP
3330    under this subsection 8.4-2 may apply to work under the supervision of one Active
3331    Staff member or, within the Executive Committee's discretion, a group of Association
3332    members so long as each of the Association members has separately applied for
3333    and been granted privileges to supervise the AHP or the category of AHPs to which
3334    the applicant belongs. Whenever an AHP will be supervised by more than one Active
3335    Staff member, such supervision must be in strict accordance with rules and
3336    regulations or policies developed by the appropriate department/division and
3337    approved by the Executive Committee.
3338
3339    **8.4-3**  AHP applications for initial granting and renewal of service authorizations or
3340    standardized procedures or Medical Center protocols for Nurse Practitioners, CRNAs
3341    and Physician Assistants shall be submitted to the Interdisciplinary Practice
3342    Committee.   All such applications shall be processed in a parallel manner to that
3343    provided in Articles IV and V for Association members, except that the IDPC shall
3344    perform the function which would otherwise be performed by the Credentials
3345    Committee, unless otherwise specified in the Association rules and regulations.  The
3346    credentialing and granting of service authorizations for all other Allied Health
3347    Practitioners shall be the responsibility of the department to which the AHP's
3348    supervising physician is a member.  These applications shall also be processed in a
3349    parallel manner to that outlined in Articles IV and V.
3350
3351    **8.4-4**  Except as is provided under Section 8.7-3.2, an AHP who
3352
3353        **8.4-4.1** has received a final adverse decision regarding his or her application for
3354            a service authorization, standardized procedure or Medical Center protocol,
3355            or
3356
3357        **8.4-4.2** withdrew his or her application for a service authorization, standardized
3358            procedure or Medical Center protocol following an adverse recommendation
3359            by the Executive Committee, or
3360
3361        **8.4-4.3** after having been granted a service authorization or approval to work
3362            under a standardized procedure or Medical Center protocol has received a
3363            final adverse decision resulting in termination of the authorization or approval,
3364            or
3365
3366        **8.4-4.4** has relinquished his or her service authorization, standardized procedure
3367            or Medical Center protocol following the issuance of an Association or
3368            Governing Body recommendation adverse to his or her service authorization,
3369            standardized procedure or Medical Center protocol,

69

shall not be eligible to reapply for the service authorization, standardized procedure or Medical Center protocol affected by such decision or recommendation for a period of at least 24 months from the date that the adverse decision became final, the application was withdrawn, or the AHP relinquished his or her service authorization, standardized procedure or Medical Center protocol.

**8.4-5** An AHP who does not have licensure or certification in an AHP category identified as eligible for service authorizations pursuant to Section 8.3 may not apply for a service authorization but may submit a written request to the Chief Executive Officer, asking the Governing Body to consider designating the appropriate category of AHPs as eligible to apply for service authorizations. Upon receipt of such a request, the Governing Body shall forward a copy of the request to the Executive Committee for its recommendation, and shall also request the recommendation of any affected department or division. The Governing Body shall consider such request and the Executive Committee's recommendation, as well as the recommendation of any affected department or division, either before or at the time of  its annual review of the categories of AHPs, in accordance with Section 8.3.

**8.4-6** Each AHP who is granted a service authorization or approval to work under a standardized procedure or Medical Center protocol shall be assigned to the clinical department and/or division appropriate to his or her occupational or professional training and, unless otherwise specified in the Association rules and regulations, shall be subject to terms and conditions that parallel those specified in Article II, as they may logically apply to AHPs and may be appropriately tailored to the particular category of AHPs. Each AHP who practices independently must maintain communication with the relevant physician under Sections 8.4-1 through 8.4-3 above in order to enable the physician to assume responsibility, to the extent it is indicated, for the general medical condition of the patient. Each AHP who does not practice independently shall be subject to the supervision of one or more members of the Active Staff who have been granted privileges to provide such supervision or direction by the Governing Body upon recommendation of the Executive Committee.

## 8.5 PREROGATIVES

The prerogatives which may be extended to a member of a particular category of AHP shall be defined in the Association rules and regulations or Medical Center policies. Such prerogatives may include:

1.   Provision of specified patient care services subject to an Association member's responsibility, to the extent indicated, for the patient's general medical condition and under the general oversight of the Association, and, where the AHP does not practice independently, also under the supervision and direction of a member of the Active Staff who has been granted specific privileges to supervise that category of AHP. AHP services must be consistent with the service authorization, standardized procedure or Medical Center protocol granted to the AHP and within the scope of the AHP's licensure or certification.

2.   Service on Association and Medical Center committees except as otherwise expressly provided in the Association bylaws, rules and regulations or Medical

Center policies. An AHP may serve as co-chair of the IDPC Committee but may not serve as chair of any other Association committees.

3.   Attendance at meetings of the department to which he or she is assigned, as permitted by the department rules and regulations or policies, and attendance at Association educational programs in his or her field of practice. An AHP may not vote at department/division meetings.

**8.6** RESPONSIBILITIES

Each AHP shall:

1.   Meet those responsibilities required by Association rules and regulations or policies or Medical Center policies and, if not so specified, meet those responsibilities specified in Section 2.4 as are generally applicable to the more limited practice of the AHP.

2.   Retain appropriate responsibility within his or her area of professional competence for the care of each patient in the Medical Center for whom he or she is providing services.

3.   Participate, when requested, in patient care audit and other quality review, evaluation, and monitoring activities required of AHPs, in evaluating AHP applicants, in supervising initial AHP appointees of his or her same occupation or profession or of an occupation or profession which is governed by a more limited scope of practice statute, and in discharging such other functions as may be required by the Association from time to time.

**8.7** TERMINATION, SUSPENSION OR RESTRICTION OF SERVICE AUTHORIZATIONS OR APPROVAL TO WORK UNDER STANDARDIZED PROCEDURES OR MEDICAL CENTER PROTOCOLS

**8.7-1**   General Procedures

**8.7-1.1** At any time, the President, or chair of the department or division to which the AHP has been assigned, may recommend to the Executive Committee that an AHP's service authorization or approval to work under a standardized procedure or Medical Center protocol be terminated, suspended or restricted. After review by the relevant department, including an interview with the AHP, and including, if appropriate, consultation with the IDPC, if the Executive Committee agrees that corrective action is appropriate, the Executive Committee shall recommend specific corrective action to the Governing Body.  A Notification Letter regarding the recommendation shall be sent by certified mail, return receipt requested, to the subject AHP. The Notification Letter shall inform the AHP of the recommendation and the circumstances giving rise to the recommendation.

**8.7-1.2** The procedure for requesting, arranging for and conducting a fair review shall be the same as for an Article VII hearing, except that (1) there is no right to discovery; (2) the hearing shall be before an arbitrator to be designated by the President with pre-procedural rights of voir dire to confirm the proposed arbitrator is qualified and not biased; (3) the parties must exchange

documents and witness lists at least five (5) working days prior to the hearing, and testimony of witnesses and copies of evidence not timely exchanged may be barred; (4) the body whose decision prompted the hearing has the initial burden of producing evidence to support its action or recommendation, with the burden then shifting to the affected practitioner to produce evidence and demonstrate that the decision was unreasonable; (5) neither party has the right to be represented by an attorney at the fair review; and (6) neither party has that right to personal attendance, oral argument or representation by an attorney at the Governing Body appeal.

**8.7-1.3** Within fifteen (15) days following the Allied Health Staff hearing, the Executive Committee, based on the Allied Health Staff hearing and all other aspects of the investigation, shall make a final recommendation to the Governing Body, which shall be communicated in writing, sent by certified mail, return receipt requested, to the subject AHP. The final recommendation shall discuss the circumstances giving rise to the recommendation and any pertinent information from the interview.  Prior to acting on the matter, the Governing Body may, in its discretion, offer the affected practitioner the right to appeal to a subcommittee delegated by the Governing Body.  The Governing Body shall adopt the Executive Committee's recommendation, so long as it is reasonable, appropriate under the circumstances and supported by substantial evidence. The final decision by the Governing Body shall become effective upon the date of its adoption. The AHP shall be provided promptly with notice of the final action, sent by certified mail, return receipt requested.

**8.7-2**   Summary Suspension

**8.7-2.1** Notwithstanding Section 8.7-1, an AHP's service authorization or approval to work under a standardized procedure or Medical Center protocol may be immediately suspended or restricted where the failure to take such action may result in an imminent danger to the health of any individual. Such summary suspension or restriction may be imposed by the President, the Executive Committee, the Chief Medical Officer, the Chief Executive Officer, or the head of the department (or his/her designee) to which the AHP has been assigned. Unless otherwise stated, the summary action shall become effective immediately upon imposition, and the person responsible for taking such action shall promptly give written notice of the action to the Governing Body, the Director, the Executive Committee, the Chief Medical Officer and the Chief Executive Officer. The notice shall also inform the practitioner of his or her right to file a grievance. The practitioner's right to file a grievance and subsequent interview procedures shall be in accordance with Section 8.7-1, except that all reasonable efforts shall be made to ensure that the practitioner is given an interview and that final action is taken within fifteen (15) days or as promptly thereafter as practicable.

**8.7-2.2** Within one (1) working day of the summary action, the affected practitioner shall be provided with written notice of the action. The notice shall include the reasons for the action and that such action was necessary because of a reasonable probability that failure to take the action could result in imminent danger to the health of an individual.

**8.7-2.3**   Within five (5) working days following the action, the IDPC shall meet to consider the matter and make a recommendation to the Executive Committee as to whether the summary suspension should be vacated or continued pending the outcome of any interview with the affected practitioner. Within eight (8) days following the imposition of the action, the Executive Committee shall meet and consider the matter in light of any recommendation forwarded from the IDPC. Within two (2) working days following the Executive Committee's meeting, the Executive Committee shall provide written notice to the affected practitioner regarding its determination on whether the summary action should be vacated or continued pending the outcome of any interview proceeding.

**8.7-3**   Automatic Suspension, Termination or Restriction

**8.7-3.1**   Notwithstanding Section 8.7-1, an AHP's service authorization or approval to work under a standardized procedure or Medical Center protocol shall automatically terminate in the event that:

**8.7-3.1-a**   The AHP's certification, license, or other legal credential expires or is revoked.

**8.7-3.1-b**   With respect to an AHP who must practice under physician supervision:

**8.7-3.1-b.1**   the Association membership or privileges to supervise the AHP of the supervising physician is terminated, whether such termination is voluntary or involuntary; or

**8.7-3.1-b.2**   the supervising physician no longer agrees to act in such capacity for any reason, or the relationship between the AHP and the supervising physician is otherwise terminated, regardless of the reason therefor;

**8.7-3.2**   Where the AHP's service authorization or approval to work under a standardized procedure or Medical Center protocol is automatically terminated for reasons specified in C-1b (1) or (2) above, the AHP may apply for reinstatement as soon as the AHP has found another physician Active Staff member who agrees to supervise the AHP and receives privileges to do so. In this case, the Executive Committee may, in its discretion, expedite the reapplication process.

**8.7-3.3**   Notwithstanding Section 8.7-1, in the event that the AHP's certification or license is restricted, suspended, or made the subject of an order of probation, the AHP's service authorization or approval to work under a standardized procedure or Medical Center protocol shall automatically be subject to the same restrictions, suspension, or conditions of probation.

**8.7-3.4**   Where the AHP's privileges are automatically terminated, suspended, or restricted pursuant to this subsection 8.7-3, the notice and interview procedures under Section 8.7-1 shall not apply and the AHP shall have no right to an

interview except, within the discretion of the Executive Committee, regarding any factual dispute over whether or not the circumstances giving rise to the automatic termination, suspension, or restriction actually exist.

**8.7-4** Applicability of Section 8.7

The rights afforded by this Section 8.7 shall not apply to any decision regarding whether a category of AHP shall be eligible for a service authorization, standardized procedure or Medical Center protocol and the terms or conditions of such decision pursuant to Section 8.3.

**8.8** REAPPLICATION

Every 2 years, each AHP on the Allied Health Staff must reapply for a renewed service authorization or approval to work under a standardized procedure or Medical Center protocol in accordance with Section 8.4.

ARTICLE IX

OFFICERS

**9.1** OFFICERS OF THE ASSOCIATION

The officers of the Association shall be:

**9.1-1** President
**9.1-2** Vice-President
**9.1-3** Immediate Past-President
**9.1-4** Secretary-Treasurer

**9.2** QUALIFICATIONS

Officers must be members of the Active Staff at the time of nomination and election and must remain Active Staff members in good standing during their term of office. Failure to maintain such status shall immediately create a vacancy in the office involved. The President and Vice-President must be licensed as physicians and surgeons. In addition to exercising their responsibilities, officers shall verbally disclose all actual or potential conflicts of interest pursuant to Section 15.7 in the course of each Association meeting or other event where such a disclosure may be relevant. Any potential conflicts so disclosed shall be resolved as set forth in Section 15.7.

**9.3** NOMINATIONS

**9.3-1** A nominating committee shall consist of at least six (6) members, two (2) from the Executive Committee, including the Immediate Past-President who shall serve as Chair, and four (4) from the Active Staff, appointed by the President subject to the approval of the Executive Committee at least two (2) months prior to the date of the annual meeting. The nominating committee shall formally request names of potential candidates from members of the Association at least sixty-five (65) days prior to the annual meeting. Such a request shall be made to each Association member either

74

by mail or electronically through the Association's Internet-based bulletin board and electronically to those Association members that have provided their e-mail address. The nominating committee shall offer one or more nominees for the offices of President, Vice-President and Secretary-Treasurer.   The nominations of the committee shall be reported to the Executive Committee at least fifteen (15) days prior to the annual meeting and shall be sent to each Association member either by mail or electronically through the Association's Internet-based bulletin board and electronically to those Association members who have provided their e-mail address at least ten (10) days prior to the annual meeting.   The Medical Center Administration and the Governing Body shall have no right to approve the slate of candidates or otherwise participate in the activities of the nominating committee.

**9.3-2** Nominations for the offices of President, Vice-President and Secretary-Treasurer may also be made by petition signed by at least ten (10) members of the Active Staff accompanied by the written consent of the nominee(s) and filed with the Secretary-Treasurer at least ten (10) days prior to the annual meeting.   In this event, the Secretary-Treasurer shall promptly advise the membership of the additional nomination(s) by mail or electronically to those Association members who have provided their e-mail address.

**9.4** ELECTION OF OFFICERS

**9.4-1** The President, Vice-President and Secretary-Treasurer shall be elected for a one (1) year term at the annual Association meeting.   In accordance with Section 15.7, all nominees for election shall disclose in writing to the Association those current or impending personal, professional, or financial affiliations or relationships of which they are reasonably aware, including contractual, employment or other relationships with the hospital, which could foreseeably result in a conflict of interest with their activities or responsibilities on behalf of the Association.   Such disclosure statement shall accompany the ballot.

**9.4-2** The voting for the offices of President, Vice-President and Secretary-Treasurer shall be by secret written ballot, and authenticated sealed mail ballots may be counted.   Only Association members accorded the right to vote as described in Article III shall be eligible to vote.

Election of the offices of President, Vice-President and Secretary-Treasurer shall be by simple majority of the votes cast.   In the event that there are three (3) or more candidates for office and no candidate receives a simple majority, there shall be successive balloting such that the name of the candidate receiving fewest votes is omitted from each successive slate until a simple majority vote is obtained by one candidate.   During such successive balloting, only votes cast at the annual Association meeting will be counted.   If two (2) or more candidates have the same number of least votes, each shall be omitted from the successive slate except that in the event that only one candidate would remain, a separate ballot shall be held among those candidates receiving least votes to determine which one shall be omitted.   At such separate ballot, the presiding officer of the meeting shall vote only if there is a remaining tie among the candidates receiving the least votes.

**9.5** TERM OF OFFICE

Each elected officer shall serve a one (1) year term or until a successor is elected. The President may be reelected twice, for a maximum of three (3) consecutive years. The office of Immediate Past-President shall be assumed by the out-going President. Officers shall take office on the first day of the Association Year following his/her election.

**9.6** <u>VACANCIES IN OFFICE</u>

Vacancies in office occur upon the death or disability, resignation, or removal of the officer, or such officer's loss of membership in the Association. Vacancy during the term of the Vice President or Secretary-Treasurer shall be filled by the Executive Committee. If there is a vacancy in the office of the President, the Vice-President shall serve out the remaining term of the President, and the Executive Committee shall appoint an interim officer to fill this office until the next annual Association meeting.

**9.7** <u>REMOVAL OF OFFICERS</u>

Any Association officer may be removed from office for valid cause including, but not limited to, gross neglect or misfeasance in office, or serious acts of moral turpitude. Except as otherwise provided, removal of an officer may be initiated by the Executive Committee or shall be initiated by a petition signed by at least one-third of the Association members entitled to vote for officers. Removal shall be considered at an annual or special meeting of the Association, noticed to include the specific purpose of removing an officer, at which a quorum is achieved as described in Section 12.5-2. Removal of an officer shall require a two-thirds vote of the Association members present at the meeting who are entitled to vote for officers.

**9.8** <u>DUTIES OF OFFICERS</u>

**9.8-1** President:  the President shall:

**9.8-1.1** Be the chief officer of the Association;

**9.8-1.2** Act in coordination and cooperation with the Governing Body, the Director, the Chief Medical Officer of Health Services, the Chief Executive Officer, the Chief Medical Officer, and the Deans of the Professional Schools, or their duly authorized designees, in all matters of mutual concern within the Medical Center;

**9.8-1.3** Call, preside at and be responsible for the agenda of all meetings of the Association;

**9.8-1.4** Serve as chair of the Executive Committee and calling, presiding at and being responsible for the agenda of all meetings thereof;

**9.8-1.5** Serve as *ex-officio* member of all other Association committees;

**9.8-1.6** Be responsible for the enforcement of the Association bylaws, rules and regulations, and policies, and for the Association's compliance with procedural safeguards in all instances where corrective action has been requested against a practitioner;

**9.8-1.7** Appoint, in consultation with the Executive Committee and, when necessary, the Chief Medical Officer, the Chief Executive Officer, and the Dean of the appropriate Professional School, committee members and the officers thereof to all standing Association committees as listed in Article XI except as otherwise provided in Article XI;

**9.8-1.8** Receive and interpret the policies of the Governing Body for the Association and report to the Governing Body on the performance and maintenance of quality with respect to the health care provided in the Medical Center;

**9.8-1.9** Represent the views, policies, needs and grievances of the Association to the Chief Medical Officer, the Chief Executive Officer, the Governing Body, the Director, and the Chief Medical Officer of Health Services or their duly authorized designees;

**9.8-1.10** Refer appropriate items to the committees of the Association for recommendations;

**9.8-1.11** Serve on any liaison committees with the Governing Body and Medical Center Administration as well as with outside licensing or accreditation organizations;

**9.8-1.12** In the interim between Executive Committee meetings, represent and act on behalf of the Association in the intervals between Association meetings, subject to such limitations as may be imposed by these bylaws;

**9.8-1.13** Be spokesperson for the Association in external professional and public relations; and

**9.8-1.14** Perform such other functions as may be assigned to him/her by these bylaws, by the membership, and by the Executive Committee.

**9.8-2** Vice-President:  In the absence of the President, he/she shall assume all the duties and have the authority of the President.  He/she shall be the vice-chair of the Executive Committee and a member of the Joint Conference Committee and shall perform such other functions as may be assigned to him/her by these bylaws, by the membership, and by the Executive Committee.

**9.8-3** Immediate Past-President:  His/her duties shall be to advise the President in all matters concerning the Association.  He/she shall be a member of the Executive Committee and the Joint Conference Committee and shall perform such other functions as may be assigned to him/her by these bylaws, by the membership, and by the Executive Committee.

**9.8-4** Secretary-Treasurer: The Secretary-Treasurer shall:

**9.8-4.1** Maintain a roster of members;

**9.8-4.2** Keep accurate and complete minutes of all Association meetings and

carry out other secretarial functions;

**9.8-4.3**   Serve as secretary of the Executive Committee;

**9.8-4.4** Perform such other functions as may be assigned to him/her by these bylaws, by the membership or by the Executive Committee; and

**9.8-4.5** Serve as treasurer by receiving and safeguarding all funds of the Association; keeping accurate and complete financial records of all Association activities; providing regular reports to the Association concerning the financial status of the Association; preparing an annual proposed budget of anticipated income and expenditures for approval by the Association; preparing on a quarterly basis a financial statement and recommending, where needed, the creation of a finance subcommittee to assist in these duties.

**9.9**   COMPENSATION OF OFFICERS

The Association may elect to compensate officers for their work spent representing and leading the Association.  Such compensation, if any, shall come from Association funds, for which the Association has sole responsibility. The payment to individual officers, if any, should be in an amount determined by the Executive Committee. If the Medical Center provides any funds specifically earmarked for such compensation, those funds should be requested and accounted for in the Association budget.

ARTICLE X

ORGANIZATION

**10.1** ORGANIZATION OF THE ASSOCIATION

**10.1-1** The Association shall be organized into departments which are reflective of the scope of services provided within the Medical Center.  Each department shall have a chair, selected and entrusted with the authority, duties and responsibilities specified in Section 10.4, who shall be responsible for the overall supervision of the clinical, educational and research activities within his/her department.  The departments may be organized into one or more divisions.  The specified divisions of a department shall be recommended by the department chair to the Executive Committee for action.  Each division shall be organized as a specialty within a department, shall be directly responsible to the department within which it functions, and shall have a division chief who is selected and has the authority, duties and responsibilities as specified in this Article X.

**10.1-2** The current departments are as follows:

   1. Medicine
   2. Surgery
   3. Radiology
   4. Pathology and Laboratory Medicine
   5. Pediatrics

6.  Psychiatry
7.  Obstetrics & Gynecology
8.  Emergency Medicine
9.  Family Medicine
10. Anesthesiology
11. Neurology
12. Orthopedic Surgery

**10.1-3** Notwithstanding the procedures set forth in Article XIX, the organization of the Association, as set forth in this Section 10.1, may be changed from time to time, including, but not limited to, the creation, elimination, consolidation or modification of specific departments of the Association, by the Executive Committee with the advice of Medical Center Administration without the necessity of an amendment to these bylaws.

An Association department can be formed or eliminated only following a determination by the Association of appropriateness of department elimination or formation. The Governing Body shall uphold the Association's determination unless the Governing Body makes specific written findings that the Association's determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

**10.1-3.1** The Association shall determine the formation or elimination of a department to be appropriate based upon consideration of its effects on quality of care in the facility and/or community. A determination of the appropriateness of formation or elimination of a department must be based upon the preponderance of the evidence, viewing the record as a whole, presented by any and all interested parties, following notice and opportunity for comment.

**10.1-3.2** The Association member(s) whose privileges may be adversely affected by an Association's determination of appropriateness of department formation or elimination may request a hearing before the Judicial Review Committee. Such a hearing will be governed by the provisions of Article VII, except that

**10.1-3.2-a** the hearing shall be limited to the following issues:

**10.1-3.2-a.1** whether the Association's determination of appropriateness is supported by the preponderance of the evidence; and

**10.1-3.2-a.2** whether the Association followed its requirements for notice and comment on the issue of appropriateness.

**10.1-3.2-b** all requests for such a hearing will be consolidated.

Should an affected Association member request a hearing under this subsection 10.1-3.2, the Association's recommendation regarding the

3877          department elimination or formation will be deferred, pending the outcome
3878          of the Judicial Review Committee hearing.
3879

3880      **10.1-3.3** Except as specified in this Section 10.1-3, the termination of privileges
3881          pursuant to formation or elimination of a department determined to be
3882          appropriate by the Association shall not be subject to the procedural rights
3883          otherwise set forth in Article VII.
3884

3885 **10.2** <u>ASSIGNMENT TO DEPARTMENTS AND DIVISIONS</u>
3886

3887 Each practitioner shall be assigned membership in only one department and one
3888 division, if appropriate, but may be granted clinical privileges in one or more other
3889 departments or divisions.  The exercise of privileges within each department shall be
3890 subject to the department's rules and regulations and/or departmental policies and to the
3891 authority of the department chair and division chief.
3892

3893 **10.3** <u>APPOINTMENT AND REMOVAL OF DEPARTMENT CHAIRS, VICE CHAIRS</u>
3894      <u>AND DIVISION CHIEFS</u>
3895

3896 **10.3-1** Department chairs, vice chairs and division chiefs shall be Active Staff members
3897      (or members of the Provisional Staff who meet the qualifications of the Active Staff)
3898      and who are qualified by training, experience and demonstrated abilities to be the
3899      chair of the particular department or chief of the particular division and shall be
3900      willing and able to discharge the functions of chair of the particular department or
3901      chief of the particular division, including acting as presiding officer at department or
3902      division meetings. They shall be board certified in a specialty or subspecialty of the
3903      particular department or the particular division or be able to establish, through the
3904      privilege delineation process, that they possess comparable competence.
3905

3906 **10.3-2** Department chairs shall be appointed by the Chief Medical Officer, with
3907      concurrence of the Dean of the applicable professional school or his/her designee.
3908      with concurrent approval by the Executive Committee. Vice chairs and division chiefs
3909      shall be appointed by their department chairs.
3910

3911      Each department chair and division chief shall serve until his/her successor is
3912      appointed, unless he/she shall sooner resign or be removed.  Removal of a
3913      department chair, vice chair or division chief shall be effected by the written approval
3914      of such action by those authorized to make and concur in the initial appointment.   It
3915      shall be the obligation of the President and the Executive Committee, following at
3916      least a two-thirds vote of the Executive Committee, to recommend removal of a
3917      department chair or division chief, if such action is considered appropriate for any
3918      failure of a department chair or division chief to satisfactorily perform his or her
3919      functions or for valid cause, including, but not limited to, gross neglect or
3920      misfeasance in office, or serious acts of moral turpitude, to those authorized to make
3921      and concur in the initial appointment.  .
3922

3923 **10.3-3** In addition to exercising their responsibilities, all department chairs, vice chairs
3924      and division chiefs shall verbally disclose all actual or potential conflicts of interest
3925      pursuant to Section 15.7 in the course of each department meeting or other event
3926      where such a disclosure may be relevant.  Any potential conflicts so disclosed shall
3927      be resolved as set forth in Section 15.7-1.

3928
3929 **10.4** RESPONSIBILITIES OF DEPARTMENT CHAIRS
3930

3931 **10.4.-1** Department chairs shall be responsible for all clinically and academically related
3932 activities of their departments. More specifically, each department chair shall have
3933 the following authority, duties and responsibilities, and the vice-chair, in the absence
3934 of the chair, shall assume all of them and shall otherwise perform such duties as may
3935 be assigned:
3936

3937 **10.4-1.1** Being accountable for and reporting to the Executive Committee and
3938 President regarding the professional and administrative activities within the
3939 department;
3940

3941 **10.4-1.2** Acting as presiding officer at department meetings;
3942

3943 **10.4-1.3** Integration of the department into the primary functions of the
3944 organization;
3945

3946 **10.4-1.4** Coordination and integration of interdepartmental and intradepartmental
3947 services;
3948

3949 **10.4-1.5** Development and implementation of departmental policies and
3950 procedures that guide and support the provision of services and that are
3951 consistent with the goals and scope of patient care services of the
3952 department;
3953

3954 **10.4-1.6** Recommendations for a sufficient number of qualified and competent
3955 persons to provide care/services;
3956

3957 **10.4-1.7** Continuing surveillance of the professional performance of all persons
3958 who have delineated clinical privileges in the department through a planned
3959 and systematic process;
3960

3961 **10.4-1.8** Overseeing and maintaining the effective conduct of the patient care,
3962 evaluation, and monitoring functions delegated to the department by the
3963 Executive Committee in coordination and integration with organization-wide
3964 quality assessment and improvement activities;
3965

3966 **10.4-1.9** Continuous assessment and improvement of the quality of care,
3967 treatment and services;
3968

3969 **10.4-1.10** Making recommendations to the Executive Committee concerning
3970 practitioner membership and classification, the criteria for clinical privileges
3971 relevant to the services provided in the department and monitoring of
3972 specified services;
3973

3974 **10.4-1.11** Recommending delineated clinical privileges for each member of the
3975 department;
3976

**10.4-1.12** Determining the qualifications and competence of department personnel who are not licensed independent practitioners and who provide patient care services;

**10.4-1.13** Enforcing bylaws, rules and policies within the department;

**10.4-1.14** Maintenance of quality control programs, as appropriate;

**10.4-1.15** Orientation and continuing education of all practitioners in the department;

**10.4-1.16** Making recommendations for space and other resources needed by the department;

**10.4-1.17** Making assessments and recommendations to the Medical Center Administration regarding off-site sources needed for patient care services not provided by the department or Medical Center;

**10.4-1.18** Providing written delineation of the qualifications, authority, and administrative and clinical responsibilities of directors of non-medical support staff services in the department;

**10.4-1.19** Making recommendations for appointment of qualified non-medical support staff with appropriate clinical training to be responsible for their particular patient care services;

**10.4-1.20** Providing written goals and scope of patient care services provided in the department;

**10.4-1.21** Implementing within the department appropriate actions taken by the Executive Committee; and

**10.4-1.22** Appointing at least one (1) representative and alternate from his/her department to attend the annual and any special meetings of the Association and provide for their reporting to the department after such meetings. The function of representatives is set forth in Section 12.9-1.

**10.4-2** Each department chair shall be a member of the Executive Committee.

**10.4-3** Each department chair shall report to the PSA President and the Executive Committee for matters pertaining to the Association and to the Chief Medical Officer for matters pertaining to administrative duties. Each division chief shall report to his/her department chair and, indirectly, to the Executive Committee and the President for matters pertaining to the Association and to the Chief Medical Officer for matters pertaining to administrative duties.

**10.4-4** Each division chief shall be responsible for all professional, administrative and educational activities delegated to him/her within his/her division by the chair of his/her department including carrying out the quality review and evaluation and monitoring activities assigned to the division.

**10.5** <u>FUNCTIONS OF DEPARTMENTS</u>

**10.5-1** Each department shall be accountable to the Executive Committee for all professional and Association administrative activities within the department.

**10.5-2** Each department shall establish its own criteria, consistent with the policies of the Medical Center and the Association, for the granting of clinical privileges and performance of specified health services in the department, and such criteria must be reviewed by the Credentials Committee and approved by the Executive Committee.

**10.5-3** Each department shall establish a quality improvement committee or committees, if separate committees are necessary for divisions of departments, which shall be responsible for conducting patient care reviews for the purpose of analyzing and evaluating the quality and appropriateness of care and treatment provided to patients within the department.  The department shall routinely collect information about important aspects of patient care provided in the department, periodically assess this information, and develop objective criteria for use in evaluating patient care.  These criteria should include a consideration of deaths, complications, errors in diagnosis and treatment, and such other circumstances as are believed to be important.

**10.5-4** Each departmental quality improvement committee shall meet at least quarterly and submit a report at least quarterly to the department chair and the Association's Peer Review Oversight Committee detailing departmental analysis of patient care.

**10.5-5** Each department shall propose, through its chair, subject to approval by the Executive Committee and the Governing Body, rules and regulations and/or policies for the department that will apply in practice the general principles set forth in these bylaws.

**10.5-6** Each department shall coordinate the patient care provided by the department's members with the nursing and ancillary patient care services.

**10.5-7** Each department shall conduct or participate in, and make recommendations regarding the need for, continuing education programs pertinent to findings of review, evaluation and monitoring activities.

**10.5-8** Each department shall conduct, participate in and make recommendations regarding graduate medical education and shall establish policies and procedures for supervision of its residents and fellows that take into account the need for physicians in training to participate in providing safe, effective and compassionate care for the patients under supervision of members of the Association who have applied for and been granted clinical privileges.  As they demonstrate progress in attaining the goals and objectives of the residency training program, residents and fellows will be granted increasing responsibility under lesser degrees of supervision by the Association that is consistent with the attained knowledge and documented competence of each resident or fellow.  The department's policies and procedures for supervision of the residents and fellows, including, without limitation, granting residents and fellows graduated responsibility for the evaluation and management of patients, shall be submitted for review and approval by the Graduate Medical Education Committee and the Executive Committee and shall be distributed to all

residents and fellows and members of the Association in the department. The policies and procedures for supervision of residents and fellows shall be reviewed and modified as necessary at the time that the department's faculty periodically assesses the educational effectiveness of the department's physician training programs at intervals established by the Accreditation Council for Graduate Medical Education or other applicable accrediting organization but, in any event, no less than annually. Changes in the policies and procedures for supervision of residents and fellows that are approved by the Executive Committee shall be disseminated to the department's members, residents and fellows.

**10.6** FUNCTIONS OF DIVISIONS

Each division shall perform the functions assigned to it by the department chair. Such functions may include, without limitation, retrospective patient care reviews, evaluation of patient care practices, credentials review and privileges delineation, and continuing education programs. The division shall transmit regular reports to the department chair on the conduct of its assigned functions.

ARTICLE XI

COMMITTEES

**11.1** GENERAL PROVISIONS

**11.1-1 Designation:**

Association committees shall include, but not be limited to, the Association meeting as a committee of the whole, meetings of departments and divisions, meetings of committees established under this Article, and meetings of special or ad hoc committees created by the Executive Committee (pursuant to Section 11.1-7) or by departments (pursuant to Section 10.5-3). There shall be an Executive Committee and such other standing and special committees as from time to time may be necessary and desirable to perform the Association functions described in these bylaws. The Executive Committee may by resolution establish a committee to perform one or more of the required Association functions. The Association's committee activities are directed toward quality assessment and improvement and patient safety and function as part of the Medical Center's Patient Safety Evaluation System and are, therefore, afforded the legal protections provided by the Patient Safety and Quality Improvement Act of 2005. The committees described in this Article XI shall be the standing committees of the Association.

**11.1-2 Members and Reporting:**

Unless otherwise specified, the members of such committees and the chair, vice-chair, and any other officers thereof shall be appointed by the President in consultation with the Executive Committee. The majority of the members of all committees shall be physician members of the Association, unless otherwise specifically provided in these bylaws. Unless otherwise specified, such committees shall be responsible to and report on a regular basis to the Executive Committee,

and all actions of the committees shall be subject to approval by the Executive Committee.

**11.1-3 Terms of Committee Members**

Unless otherwise specified, each committee chair and member shall be appointed for a term of one (1) year and shall serve until the end of this period or until a successor is appointed, whichever occurs later, unless he/she sooner resigns or is removed.

**11.1-4 Removal**

Any committee member, including the chair but not including a committee member serving *ex-officio* as defined in these Bylaws, may be removed by a majority vote of the Executive Committee.

**11.1-5 Vacancy**

Unless otherwise specified, any vacancy on any committee shall be filled in the same manner in which an original appointment to such committee is made.

**11-1-6 Disclosure of Conflict of Interest**

In addition to exercising their responsibilities, committee members shall verbally disclose all actual or potential conflicts of interest in the course of each Association meeting or other event where such a disclosure may be relevant.  Any potential conflicts so disclosed shall be resolved as set forth in Section 15.7-1.

**11.1-7 Addition or Deletion of Committees**

The Executive Committee may recommend the addition, deletion or modification of any standing committee of the Association as may be described in these bylaws or has otherwise been appointed with the exception of the Executive Committee. Whenever these bylaws require that a function be performed by, or that a report or recommendation be submitted to, a named committee but no such committee exists, the Executive Committee shall perform such function or receive such report or recommendation or shall assign the functions of such committee to a new or existing committee of the Association or to the Association as a whole.

**11.1-8 Voting Privileges**

Only committee members who are members in good standing of the Active Staff, the Provisional Staff accorded the right to vote as specified in Section 3.5-2, and the Associate Staff shall be voting members of the committees unless otherwise specified in these Bylaws.

**11.2**   EXECUTIVE COMMITTEE

**11.2-1** Composition:

The Executive Committee shall consist of the following members:

**11.2-1.1** The officers of the Association as described in Section 9-1;

**11.2-1.2** Ex-officio members without vote – the Chief Medical Officer, the Chief Executive Officer; the Medical Director of Quality Improvement, the Medical Center's Chief Nursing Officer, and any and all Associate Medical Directors of the Medical Center;

**11.2-1.3** The chair of each department defined in Section 10.1.  Whenever a new department is created, its chair shall become a member of the Executive Committee;

**11.2-1.4** The physician chair of the Medicolegal Committee;

**11.2-1.5** Three (3) Association Members at Large from three (3) different departments. These members shall be elected at the time of the annual meeting pursuant to Section 11.2-3 and shall serve for one (1) Association year or until a successor is elected; and

**11.2-1.6** A physician member of the Active or Associate Staff whose primary clinical activity is at a community-based County facility.

**11.2-2** The President, Vice-President, and Secretary-Treasurer, if any,shall serve as chair, vice-chair, and secretary, respectively, of the Committee.

**11.2-3** The Association Members at Large shall be elected for a one (1) year term as follows:

**11.2-3.1** The nominating committee as described in Section 9.3-1 shall offer three (3) or more nominees for Association Members at Large at the same time it offers nominees for other elected offices.  Only Association members accorded the right to vote as described in Article III shall be eligible to serve as Association Members at large.

**11.2-3.2** Nominations for Association Members at Large may also be made by petition signed by at least ten (10) members of the Active or Associate Staff accompanied by the written consent of the nominee(s) and filed with the Secretary at least ten (10) days prior to the annual meeting.  In this event, the Secretary shall promptly advise the membership of the additional nomination(s) by mail.

**11.2-3.3** The voting for the Association Members at large shall be at the annual Association meeting by written ballot.  Election of the three (3) positions shall be by plurality of the votes cast with the three (3) candidates receiving the most votes being elected.

Vacancies in the positions of Association Member at Large shall be filled by the Executive Committee.  Removal of an Association Member at Large may be effected by the Executive Committee acting upon its own initiative or by a two-thirds vote of the members eligible to vote for officers.  Such removal shall be based only upon failure to participate appropriately in Committee functions.

**11.2-4** Duties:

The Executive Committee shall be accountable to the Association.  The Association delegates to the Executive Committee broad authority to oversee the operations of the Association.  With the assistance of the President, and without limiting this broad delegation of authority, the Executive Committee shall perform in good faith the duties listed below:

11.2-4.1 To seek out the views of the Association on all appropriate issues;

11.2-4.2 To convey accurately to the Governing Body the views of the Association on all issues, including those relating to safety and quality;

11.2-4.3 To oversee the Medical Center-wide Quality of Care Program, including approval of the Medical Center Quality of Care Plan, and identify opportunities to improve patient care and the organization's performance;

11.2-4.4 To represent and to act on behalf of the Association in the intervals between Association meetings, subject to such limitations as may be imposed by these bylaws;

11.2-4.5 To coordinate and implement the professional and organizational activities and policies of the Association;

11.2-4.6 To coordinate the activities and general policies of the various departments;

11.2-4.7 To designate such committees as may be appropriate or necessary to assist in carrying out the duties and responsibilities of the Association;

11.2-4.8 To receive and act upon reports and recommendations from Association committees, departments, and divisions, and from special staff reports;

11.2-4.9 To formulate and approve policies of the Association not otherwise the responsibility of the departments;

11.2-4.10 To act for the Association as a liaison in the development of all Medical Center policies;

11.2-4.11 To provide the formal liaison for the Association with the Medical Center Administration, the Director, and the Governing Body, including, without limitation, for the purpose of meeting and conferring in good faith to resolve any dispute between the Association and the Medical Center Administration, the Director or the Governing Body;

11.2-4.12 To recommend action to the Chief Medical Officer, Chief Executive Officer, Director and Governing Body on matters of medico-administrative nature;

**11.2-4.13** To make recommendations on Medical Center management matters to the Chief Executive Officer;

**11.2-4.14** To develop and adopt appropriate policies to enable privileges holders to maintain the level of practice required under, and to more specifically implement, these Bylaws;

**11.2-4.15** To establish appropriate criteria for cross-specialty privileges in accordance with Section 5.1-7;

**11.2-4.16** To make recommendations directly to the Governing Body about the Association's structure, the process used to review credentials and delineate privileges, and the ability to recruit and retain qualified members;

**11.2-4.17** To evaluate the medical care rendered to patients in the Medical Center;

**11.2-4.18** To fulfill the Association's accountability to the Governing Body for the health care rendered to patients in the Medical Center and to make recommendations to the Governing Body regarding the need for sufficient resources for the Association to render quality health care;

**11.2-4.19** To ensure that the Association is kept abreast of the licensing and accreditation program and to assist in obtaining and maintaining the licensing and accreditation status for the Medical Center;

**11.2-4.20** To develop and maintain methods for the protection and care of patients and others in the event of internal or external disaster;

**11.2-4.21** To review and approve the designation of the Medical Center's authorized representative for National Practitioner Data Bank purposes;

**11.2-4.22** To review the credentials, performance, professional competence, character and other qualifications of all applicants and make recommendations to the Governing Body for Association membership appointments and reappointments, assignments to departments, delineation of clinical privileges, and corrective actions;

**11.2-4.23** To take all reasonable steps to ensure professionally ethical conduct and competent clinical performance on the part of all members of the Association, including the initiation and recommendation of and/or participation in Association corrective or review measures when warranted;

**11.2-4.24** To report at the annual meeting of the Association;

**11.2-4.25** To take reasonable steps to develop continuing educational activities and programs for the Association;

**11.2-4.26** To determine the amount, if any, of the annual dues/assessments for each category of Association membership; to collect all dues/assessments; to deposit all funds collected as dues/assessments in an account in a bank

located in California; and to expend dues/assessments funds out of such account for Association purposes only, in accordance with Section 15.4;

**11.2-4.27** To retain independent legal counsel to represent the Association in a legal action or otherwise and to make payment of all related attorney fees, costs and expenses, using Association dues/assessments funds only, in accordance with Section 15.5;

**11.2-4.28** To review the job description (e.g., qualifications, responsibilities and reporting relationships) of the Chief Medical Officer for the Medical Center both to assure their adequacy for Association purposes and to avoid a conflict of duties between the Chief Medical Officer and any Association leader.

**11.2-4.29** To participate in the process of recruiting a Chief Medical Officer of the Medical Center including having membership on the Search Committee, and to approve or veto the selection of any such candidates, with any veto being binding upon the Medical Center;

**11.2-4.30** To review the performance of the Chief Medical Officer periodically and transmit the results of that review to the Governing Body for consideration; and

**11.2-4.31** To fulfill such other duties as the Association has delegated to the Executive Committee in these bylaws.

**11.2-5** Removal and/or Reassignment of Duties Delegated to the Executive Committee

Removal and/or reassignment of a duty or duties delegated to the Executive Committee by the Association may only be done by amending these bylaws following the procedures described in Article XIX.

**11.2-6** Meetings:

The Executive Committee shall meet as often as necessary but shall hold at least ten (10) monthly meetings per year, shall maintain a permanent record of its proceedings and actions, and shall submit a quarterly summary report of the general findings and recommendations to the Governing Body as part of the governing body report of the Joint Conference Committee except that routine reports to the Governing Body shall not include peer evaluations related to individual members.

A special meeting of the Executive Committee shall be held to resolve conflicts between the Executive Committee and the Association if requested in writing by a petition signed by at least fifteen (15) Active Staff members addressed to the President and stating the purpose for such meeting. The members signing the petition shall be invited to the meeting.  The parties shall meet and confer in good faith to resolve the conflict including 1) identifying the conflict; 2) gathering information regarding the conflict; 3) working with the parties to manage and, when possible, resolve the conflict; and 4) protecting the quality and safety of care.  In the event the conflict cannot be resolved, either party may follow the process described in Section 12.2-1 to call a special meeting of the Association to discuss the issue.

**11.2-7** Professional Staff Association Review Subcommittee of the Executive Committee (PSA Review Committee)

### 11.2-7.1 Composition

The PSA Review Committee shall consist of the officers of the Association, the Chief Medical Officer, the Associate Medical Director for Ambulatory Care, the Associate Medical Director for Inpatient Care, the Associate Medical Director of for Medical Education, the physician Quality Improvement Director/Chief Quality Officer, and the Patient Safety Officer.

### 11.2-7.2 Duties:

**11.2-7.2-a** To review and evaluate findings and recommendations by the Association committees and departments, and to make recommendations to the Executive Committee related to improving the delivery of patient care;

**11.2-7.2-b** To review the Medical Center's Quality of Care Plan biannually recommending any changes to the Executive Committee;

**11.2-7.2-c** To review reports from the Peer Review Oversight Committee (PROC), the Clinical Data Monitoring Panel, the Medicolegal Committee, the Patient Safety Council and other specified Association committees;

**11.2-7.2-d** To review, evaluate and make recommendations to the Executive Committee on policies requiring Executive Committee approval;

**11.2-7.2-e** To receive and evaluate concerns related to the ability of the Association to be self-governing and report back to the Association;

**11.2-7.2-f** To identify issues requiring clinical operations improvement and charter ad-hoc groups when indicated;

**11.2-7.2-g** To recommend operational improvement issues, with supporting documentation, to the Executive Leadership Council for its consideration.

**11.2-7.2-h** To recommend the appointment of *ad hoc* committees of the PSA Review Committee when indicated; and

**11.1-7.2-i** To submit monthly reports to the Executive Committee of findings and recommendations requiring action by the Executive Committee.

### 11.2-7.3 Meetings:

The PSA Review Committee shall hold at least ten (10) monthly meetings per year, shall maintain a permanent record of its proceedings and actions, and shall submit a report of each meeting (meeting minutes will suffice for this purpose) to the Executive Committee on its activities.

**11.3** CREDENTIALS COMMITTEE

**11.3-1 Composition:** The Credentials Committee shall consist of not less than seven (7) members of the Active Staff selected on a basis that will ensure, insofar as feasible, representation of major clinical specialties. Membership of this Committee is restricted to Association members.

**11.3-2 Duties:**

**11.3-2.1** To review the qualifications and credentials of all applicants for Association membership and/or modification of clinical privileges and to make recommendations for membership appointment and reappointment, assignment to departments, and delineation of clinical privileges in accordance with these bylaws;

**11.3-2.2** To review all information available regarding the current competence of Association members and, as a result of such reviews, to make recommendations for the granting of privileges including, if applicable, completion of proctoring, reappointments, and the assignment of practitioners to the various departments or services in accordance with Articles IV and V;

**11.3-2.3** To make a report to the Executive Committee, in accordance with Articles IV and V, on each applicant for Association membership or clinical privileges, including specific consideration of the recommendations from the departments in which such applicant requests privileges;

**11.3-2.4** To investigate and review matters referred by the President, the Executive Committee, any committee of the Association, or the Chief Medical Officer regarding the qualifications, conduct, professional character or current competence of any applicant or Association member and be advisory to and make recommendations to the Executive Committee on such matters

**11.3-2.5** To consider any matters of controversy between departments regarding Association membership appointments and reappointments or granting of privileges; and

**11.3-2.6** To review and evaluate the use of allied health professional personnel performing specified services and, in connection therewith, obtain and consider the recommendations of the appropriate departments. This requirement shall be performed by the Interdisciplinary Practices Committee, as described in Section 11.35, and by the appropriate department each of which shall report their findings and recommendations to the Credentials Committee.

**11.3-3 Meetings:** The Committee shall meet as needed, but at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least

a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee on its activities and recommendations.

**11.4  JOINT CONFERENCE COMMITTEE**

**11.4-1 Composition:**  The Joint Conference Committee shall be composed of

**11.4-1.1** at least two (2) of the following as representatives of the Association:

**1.** the President
**2.** the Vice President
**3.** the Immediate Past President
**4.** the Secretary-Treasurer;and

**11.4-1.2.** at least two (2) of the following as representatives of the Governing Body:

**1.** a member(s) of the Governing Body
**2.** one (1) health deputy to a member of the Board of Supervisors
**3.** the Director
**4.** the Chief Medical Officer of Health Services;

each of whom shall have a vote.

The Chair, Professional Performance Panel; Peer Review Oversight Committee; the Associate Medical Directors of for Ambulatory Care; the Associate Medical Director for Inpatient Care; the Associate Medical Director of for Medical Education; the Chief Medical Officer; the physician chief Quality Officer; and the Chair, Medicolegal Committee may attend the meeting as required to discuss issues relevant to their responsibilities.   The chairmanship of the Committee shall alternate annually between the Association and the non-Association participants.   A quorum shall consist of at least two (2) representatives as defined in this Section 11.4-1 from both the Association and the Governing Body.

**11.4-2 Duties:**

**11.4-2.1** Discussing matters of Medical Center and Association policy, practice and planning;

**11.4-2.2** Providing a forum for the interaction between the Governing Body and the Association on such matters as may be referred by the Executive Committee or the Governing Body.

**11.4-2.3** Discussing the Quarterly Governing Body Report of the Association on the quality of patient care, findings and actions taken from quality reviews and peer review activities related to potential or actual medical malpractice claims.

**11.4-2.4** Except where there is a resource allocation committee, serving as the review body for Medical Center strategic planning.   The Committee may request additional information from management when considering such

plans.

**11.4-2.5** Serving as the body to handle Association and Governing Body disputes and meeting and conferring in good faith to resolve such disputes including 1) meeting as early as possible to identify the conflict; 2) gathering information regarding the conflict; and 3) working to resolve the conflict.

**11.4-2.6** Exercising any other responsibilities set forth in these bylaws.

**11.4-3 Meetings:** The Joint Conference Committee shall meet on demand when necessary to resolve disputes as determined by the Association or the Governing Body but at least quarterly and shall transmit written reports of its activities to the Executive Committee and the Governing Body except that reports to the Governing Body shall not include peer review information related to individual members.

## 11.5 PEER REVIEW OVERSIGHT COMMITTEE (PROC)

**11.5-1** Composition: The Peer Review Committee Chair of each department or their designee along with a Chair and a Vice-Chair that should be separate from the department representation. Membership is restricted to Association members

**11.5-2** Duties: Assists hospital leadership in assuring that the medical staff departments have effective peer-review programs by providing secondary review of the following types of peer-review cases:

11.5-2.1 All cases in which a category 3 designation has been assigned by a department's peer-review committee (i.e., cases in which care is assessed as not meeting the standard of care and having a high likelihood of causing harm.)To annually review, evaluate, and recommend to the PSA Review Committee revisions of the written Medical Center wide Quality of Care Plan;

11.5-2.2 Any cases referred to the PROC by a department chair or peer-review committee. To make recommendations related to improving clinical practice or clinical or non-clinical processes that require Association or Medical Center leadership or participation;

11.5-2.3 Any case in which a member of the medical staff wishes to formally appeal the category assignment of a department's peer-review committee.

11.5-2.4 Cases in which two or more departments differ in their assessment of QI cases where those differences impact peer-review.

**11.5-2.5** Reviews information about grievances against physicians and surgeons and assures that appropriate peer-review has been performed if indicated. Presents aggregate data about these grievances to the Medical Executive Committee and PSA Review Committee quarterly.

**11.5-3** Meetings: The committee shall meet at least quarterly and shall maintain a permanent record of its proceedings and actions.

## 11.6 CLINICAL DATA MONITORING PANEL

**11.6-1 Composition:**  The Clinical Data Monitoring Panel shall consist of at least three (3) members from three (3) different departments and one (1) representative each from Nursing, the Quality Improvement/Patient Safety and Hospital Administration.  A physician with a leadership role in quality improvement will serve as chair.

**11.6-2 Duties:**

> **11.6-2.1**  To assure that important clinical processes are measured, assessed and improved;

> **11.6-2.2**  To review and evaluate the activities and data collected, reviewed and reported by the following Association and Medical Center committees and services:

>> **11.6-2.2-a** Blood and Tissue Utilization;
>> **11.6-2.2-b** Pharmacy and Therapeutics/Medication Safety;
>> 11.6-2.2-c Utilization Review
>> **11.6-2.2-d** Surgical Case Review;
>> **11.6-2.2-e** Infection Prevention and Control;
>> **11.6-2.2-f** Health Care Information;
>> **11.6-2.2-g** Clinical Laboratory;
>> **11.6-2.2-h** Cancer Coordinating;
>> **11.6-2.2-i** Operating Room;
>> 11.6-2.2-j Patient Safety Council
>> **11.6-2.2-k** Nutrition;
>> **11.6-2.2-l** End Stage Renal Disease;
>> **11.6-2.2-m** Trauma Performance Improvement
>> **11.6-2.2-n** Ambulatory Care Quality Improvement;
>> **11.6-2.2-o** Cardiopulmonary Resuscitation;
>> **11.6-2.2-p** Critical Care; and
>> **11.6-2.2-q** Pediatric Critical Care;
>> **11.6-2.2-r** Other committees, as deemed appropriate

> **11.6-2.3** To ensure that the assessment process includes intensive assessment when undesirable variation in performance may have occurred;

> **11.6-2.4**  To oversee committee analyses of aggregate clinical data, including outcomes data, and make recommendations as necessary;

> **11.6-2.5**  To identify issues requiring medical executive attention;

> **11.6-2.6**  To ensure that improvement opportunities consistent with Medical Center priorities are identified and acted upon;

> **11.6-2.7**  To identify opportunities for interdisciplinary collaboration;

> **11.6-2.8**  To identify potential cost-saving opportunities; and

> **11.6-2.9**  To identify opportunities for continuing medical education.

**11.6-3 Meetings:** The Panel shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit a report of each meeting (meeting minutes will suffice for this purpose) to the Executive Committee through the PSA Review Committee on its activities and recommendations.

**11.7  UTILIZATION REVIEW COMMITTEE**

**11.7-1 Composition:** The Utilization Review Committee shall include at least one (1) member from each department, the Medical Director of Utilization Review t, and one (1) each from Nursing, Medical Center Administration, Medical Records, Clinical Social Services, and Revenue Management.

**11.7-2 Duties:**

**11.7-2.1 Utilization Review Studies:** The Committee shall conduct utilization review studies designed to evaluate the appropriateness of admissions to the Medical Center, using evidence-based criteria, lengths of stay, discharge practices, use of Medical Center services, and all related factors which may contribute to the effective utilization of the Medical Center and physician services. In addition, the Committee shall obtain, review and evaluate information and raw statistical data obtained or generated by the Medical Center's Electronic Health Record, ORCHID, under the Care Management Module. The Committee shall communicate the results of its studies and other pertinent data to the Chief Medical Officer, the Chief Executive Officer, the Chief Medical Officer of Health Services, and the Executive Committee and shall make recommendations for the optimum utilization of Medical Center resources and facilities commensurate with quality of patient care and safety, except that such reports and such recommendations will not include provider-specific information or details on any individual cases.

**11.7-2.2 Written Utilization Review Plan:** The Committee shall formulate a written Utilization Review Plan for the Medical Center. Such Plan, as approved by the Association, the Chief Executive Officer, and the Governing Body, must be in effect at all times and must include all of the following elements:

**11.7-2.2-a** The organization and composition of the committee(s) which will be responsible for the utilization review function;

**11.7-2.2-b** Frequency of meetings;

**11.7-2.2-c** The types of records to be kept;

**11.7-2.2-d** The methods to be used in selecting cases on a sample or other basis;

**11.7-2.2-e** The definition of what constitutes the period of extended duration;

**11.7-2.2-f** The relationship of the Utilization Review Plan to claims administered by a third party;

11.7-3 Meetings:

The Committee shall hold at least ten (10) monthly meetings per year, shall maintain a permanent record of its proceedings and actions, and shall submit a report of each meeting (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.8  PHARMACY AND THERAPEUTICS COMMITTEE**

11.8-1 Composition:  The Committee shall consist of at least one (1) member from each of the following departments:  Medicine Surgery,  Anesthesiology,  Pediatrics, Obstetrics and Gynecology, Emergency Medicine, Family Medicine, and Psychiatry; one (1) each from the  Nursing  Department, Medical  Center  Administration, and the  Ambulatory Care Service; the Medical Center's Director of Pharmacy, and one (1) representative of the residents.

**11.8-2** Duties:

**11.8-2.1** The Committee shall address the major processes involved in medication procurement, storage, distribution, dispensing, and use of drugs and chemicals in the Medical Center.

**11.8-2.2** The Pharmacy Director, in consultation with other appropriate health professionals and administration, is responsible for the development of written policies and procedures for establishment of safe and effective systems for procurement, storage, distribution, dispensing and use of drugs and chemical. Such policies and procedures shall be reviewed, revised, and/or approved by the Committee.

**11.8-2.3** The Pharmacy Director, in consultation with other appropriate health professionals and administration, is responsible for the implementation of procedures.

**11.8–2.4** Committee activities include development and maintenance of a hospital formulary.

11.8–2.4-a The medical staff establishes a formulary system;

11.8–2.4-b The formulary lists medications for dispensing or administration that the hospital maintains;

11.8–2.4-c the medical staff, in consultation with Core DHS P&T and pharmacy service, develops written criteria for determining what medications are available for dispensing or administration. At a minimum, the criteria include the indication for use, effectiveness, risks (including propensity for medication errors, abuse potential, and sentinel events), and costs;

11.8–2.4-d The medical staff, in consultation with the pharmacy service, develops processes and mechanisms to monitor patient

responses to a newly added medication before the medication is made available for dispensing or administration within the hospital;

11.8-2.4-e The medical staff, in consultation with the pharmacy service, develops guidelines for the administration of drugs when given in unusually high dosages or when given for purposes other than those for which the drug is customarily used;

11.8-2.4-f The medical staff, in consultation with the pharmacy service, develops processes to approve and procure medications that are not on the hospital's medication list;

11.8-2.4-g The medical staff, in consultation with the pharmacy service, develops processes to address medication shortages and outages, including the following:

- Communication with appropriate prescribers and staff;
- Developing approved substitution protocols;
- Educating appropriate LIPs, appropriate health care professionals, and staff about these protocols; and,
- Obtaining medications in the event of a disaster.

**11.8-2.5**  The Committee shall address the major processes involved in medication usage, such as prescribing or ordering; preparation or dispensing; administration; monitoring the medication's effect on the patient; safety procedures; and all other matters relating to drugs in the Medical Center, including antibiotic usage.

**11.8-2.6**  The Committee shall oversee the pharmacists prescribing activities.

**11.8-2.7**  The Committee shall be responsible for ensuring the quality of service provided by the pharmacy department.

11.8-2.7-a The Pharmacy Director, in consultation with other appropriate health professionals and administration, is responsible for the development of written policies, procedures, and protocols for establishment of clinical activities to be provided by clinical pharmacists;

11.8-2.7-b The Committee shall review the quality of service;

11.8-2.7-c The quality assurance data shall be submitted to the Medical Executive Committee, through the Clinical Data Monitoring Panel

**11.8-2.8**  The Committee shall also perform the following specific functions:

11.8-2.8-a Periodically review high use and high cost drug items and making appropriate recommendations;

4789         11.8-2.8-b Establish standards concerning the use and control of
4790         investigational drugs and of research in the use of recognized drugs
4791         and make appropriate recommendations for improvement;
4792
4793         11.8-2.8-c Review adverse drug reactions and medication errors.
4794
4795 **11.8-3 Meetings:** The Committee shall meet at least quarterly, shall maintain a
4796 permanent record of its proceedings and actions and the results of actions taken,
4797 and shall submit at least a quarterly report (meeting minutes will suffice for this
4798 purpose) to the Executive Committee through the Clinical Data Monitoring Panel on
4799 its activities and recommendations.
4800
4801 **11.8-4 Antibiotic Review Subcommittee**
4802
4803     **11.8-4.1 Composition:** The Antibiotic Review Committee shall consist of at
4804     least two (2) members from the Division of Infectious Diseases, one (1)
4805     member from the Division of Pediatric Infectious Diseases, one (1) member
4806     from Nursing, one (1) member from Pharmacy Services, and other members
4807     of the Association or Medical Center staff as deemed necessary.
4808
4809     **11.8-4.2 Duties:** The Committee makes recommendations to the Pharmacy and
4810     Therapeutics Committee regarding practices in the use of anti-infective
4811     agents in the Medical Center including, but not necessarily limited to:
4812
4813         **11.8-4.2-a** The indications for antibiotics, antifungals and other anti-
4814         infective agents;
4815
4816         **11.8-4.2-b** Guidelines for selecting, administering and monitoring
4817         use of anti-infective agents;
4818
4819         **11.8-4.2-c** The preferred drug(s) for specific disease states;
4820
4821         **11.8-4.2-d** Collection of data on the use of anti-infective agents,
4822         analyzing the data and making improvements in the use of these
4823         agents;
4824
4825         **11.8-4.2-e** Selection of the most cost-effective agent to manage
4826         infections; and
4827
4828         **11.8-4.2-f** Restrictions in the use of specific anti-infective agents.
4829
4830
4831 11.8-5 Medication Safety Committee
4832
4833     11.8-5.1 Description: Harbor-UCLA Medical Center Medication Safety Committee
4834     (MSC) is a multi-disciplinary Professional Staff Association (PSA) Committee
4835     charged with the promotion of medication safety policies and practices. The
4836     committee will review medication event data, relevant facility policies, Medication
4837     Error Reduction Plan (MERP), and literature/reports in an effort to provide
4838     decisions and guidance to promote overall medication safety. This Committee
4839     will report to the Clinical Data Monitoring Panel (CDMP) and will also provide

4840         data and reports to the Pharmacy & Therapeutics (P&T) Committee.

4842 11.8-5.2 Responsibilities

4844       11.8-5.2-a Review adverse drug event and medication error reports,
4845       analyze statistics and trends;

4847       11.8-5.2-b Develop or follow up on implemented policies that impact
4848       medication safety including the transition to Electronic Health
4849       Record;

4851       11.8-5.2-c Monitor reports on medication safety-related topics
4852       including, but not limited to, Anesthesia Controlled Substance Use,
4853       Medication Storage, Pharmacist Interventions, and Automated
4854       Dispensing Cabinet Overrides/Discrepancies Review, and assess
4855       Medication Error Reduction Plan (MERP) quarterly and annually;

4857       11.8-5.2-d Review DHS system-wide Expected Practice
4858       recommendations and other medication-safety related action plans
4859       and implement, if applicable.

4861       11.8-5.2-e Review current literature pertaining to medication safety,
4862       and update/revise existing policy;

4864       11.8-5.2-f Identify specific technology goals to reduce the incident of
4865       medication errors through the use of proven technology;

4867       11.8-5.2-g Review and follow up with actions for any regulatory
4868       standards and external best practices in relation to medication
4869       safety.
4870       11.8-5.2-h Provide recommendations to CDMP regarding
4871       system/process improvements;

4873       11.8-5.2-i The Committee may conduct additional business
4874       meetings through special committees, conference calls, electronic
4875       mail, and through established workgroups.

4877 11.8-5.3 Membership: The membership will be composed of Medical Staff, Pharmacy,
4878 Nursing, Hospital Administration, Quality Assessment & Resource Management, and
4879 Information System representatives as designated below. The following is a list of
4880 committee members:

4882 Chief Information Officer or designated representative (1)
4883 Clinical Nurse Specialist / Clinical Nurse Educator (1)
4884 Director of Quality Assessment (1)
4885 Hospital Administrator / Nursing Administrator (2)
4886 Medical Staff Co-Chair (1)
4887 Medical Staff representative (2)
4888 Medical Director of Quality Improvement / Patient Safety Officer (1)
4889 Pharmacy Director / Co-Chair (1)
4890 Pharmacy Medication Safety Officer (1)

4891    Staff Nurse (1)
4892
4893    The Committee will be co-chaired by the Pharmacy Director and the designated Medical
4894    Staff member.
4895
4896    11.8-5.4 Meetings: The committee will meet every month according to a pre-established
4897    schedule. Quarterly reports and recommendations will be provided to the Clinical Data
4898    Monitoring Panel (CDMP). Two physician members (or their designee) and a minimum
4899    of 5 permanent members constitute a quorum.
4900
4901    **11.9  INFECTION PREVENTION AND CONTROL COMMITTEE**
4902
4903    **11.9-1  Composition:**  The Committee Chair is the Medical Director of Infection
4904        Prevention and Control.  The Committee shall include at least one (1) member from
4905        each of the following departments:  Medicine, Surgery, Obstetrics and Gynecology,
4906        Pediatrics, and Pathology and Laboratory Medicine; and at least one (1) each from
4907        Nursing, Medical Center Administration, Infection Prevention and Control and
4908        Employee Health, Facilities Management, Environmental Safety and Environmental
4909        Services.  The Chair may include other personnel with the expertise and experience
4910        to make knowledgeable decisions.
4911
4912    **11.9-2  Duties:**
4913
4914        **11.9-2.1**  The primary purpose of the Committee is to provide a safe and high
4915            quality care environment through the prevention and control of Medical
4916            Center-acquired infections in patients, visitors and Medical Center personnel
4917            by maintaining an infection prevention and control program.
4918
4919        **11.9-2.2**  The Committee shall advise and direct the activities of the Infection
4920            Prevention and Control staff professionals who conduct the daily activities of
4921            infection control.  These activities include, but are not limited to:
4922
4923                **11.9-2.2-a** Disease surveillance;
4924
4925                **11.9-2.2-b** Surveillance data analysis and education;
4926
4927                **11.9-2.3-c**  Developing  educational  resources  for  infection
4928                    prevention, control and healthcare epidemiology;
4929
4930                **11.9-2.2-d** Outbreak evaluation;
4931
4932                **11.9-2.2-e** Consultation;
4933
4934                **11.9-2.2-f** Establishing  and  evaluating  aseptic,  isolation  and
4935                    sanitation techniques;
4936
4937                **11.9-2.2-g** Defining indications for transmission-based precautions;
4938
4939                **11.9-2.2-h** Research;
4940
4941                **11.9-2.2-i** Providing advice on all proposed construction;

100

**11.9-2.2-j** Development of infection prevention and control policies and procedures and facilitating departmental compliance; and

**11.9-2.2-k** Enforcement of infection control measures or studies, as needed.

**11.9-3 Meetings:**  The Committee shall meet at least quarterly and also whenever any major outbreak of infection makes a meeting desirable.  The Committee shall maintain a permanent record of its proceedings and actions and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.10 HUMAN SUBJECTS COMMITTEE**

**11.10-1 Composition**

**11.10-1.1**  The Human Subjects Committee refers to the Institutional Review Boards (hereafter "IRBs") of the Los Angeles Biomedical Research Institute at Harbor-UCLA (hereafter "LA BioMed"), and the proceedings and actions of the IRBs shall constitute the proceedings and actions of the Committee.

**11.10-1.1-a**  The IRBs shall be broadly representative bodies comprised of members from varying backgrounds (such as attorneys, medical administrators, nursing staff, Association members, active investigators, community members, etc.) who have maturity, experience and expertise to justify respect for their advice and counsel;

**11.10-1.1-b**  A majority of the IRB members shall be County personnel; and

**11.10-1.1-c**  LA BioMed shall appoint all IRB members in consultation with the Chief Medical Officer.

**11.10-1.2**  In the event that LABioMed has no IRB or any of the three conditions (3) stated above are not satisfied, then the Executive Committee may elect to:

**11.10-1.2-a** appoint the members and officers of the Committee which shall be broadly representative as described above and composed, inter alia, of such Association members and County personnel as deemed necessary by the Executive Committee and mandated by Federal regulations and in compliance with LABioMed's federalwide assurance or

**11.10-1.2-b** grant LABioMed, at its discretion, permission to use properly accredited extramural IRBs.

**11.10-2 Duties:** The Committee shall**:**

**11.10-2.1** Review and approve or disapprove all requests for the performance of any type of medical research involving human subjects to be performed within the Medical Center including, but not limited to, protocols concerned with the use of investigational or experimental drugs, or determine that such research is exempt from further review, and, if approved, indicate whether such research must be performed in accordance with any stated conditions. Such review and approval shall be subject to any additional review and/or approval by other persons or bodies as required under a County contract or by the Association;

**11.10-2.2** Perform ongoing review of all medical research approved by the Committee and require and receive from time to time written progress reports on all approved medical research;

**11.10-2.3** Assure compliance with all Federal and State laws and regulations applicable to the approval, performance, and ongoing review of all medical research involving human subjects including, without limitation, oversight by an institutional review board as required by Federal and State laws and regulations; and

**11.10-2.4** Make an annual written report to the Governing Body, not later than twelve (12) months following the end of each County fiscal year, stating the medical research accomplished, the medical research in progress, and a description of the source and dollar amount of all funds expended at the Medical Center for medical research during the County's previous fiscal year.

**11.10-3    Requests to Conduct Medical Research Involving Human Subjects**

No Association member or other person shall conduct any type of medical research involving human subjects to be performed at the Medical Center without first obtaining the approval of the Human Subjects Committee and any other person or body whose approval is required under a County contract.  No such medical research shall be approved unless the research will contribute to or benefit health care for County patients.  All requests for permission to conduct such medical research in the Medical Center must be in writing and in such form as may be required by the Committee and shall be accompanied by the written approval of the chair of each department involved.

**11.10-4 Meetings:**  The Committee shall meet as necessary but not less than quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Chief Medical Officer, who will then forward this report to the Executive Committee, the Chief Executive Officer, and the Governing Body on its activities and recommendations.

**11.11 RESEARCH COMMITTEE**

The Research Committee is intended to serve in an advisory role to review research activities on the LA BioMed/Harbor-UCLA campus, recognizing the unique relationship

5042   and mutual prioritization of biomedical research among all stakeholders.

5043   **11.11-1 Composition**

5044   _____

5045   **11.11-1.1** The Association's Research Committee refers to the Research Committee of
5046   the Los Angeles Biomedical Research Institute at Harbor-UCLA Medical Center
5047   (hereafter "LABioMed"), and the proceedings and actions of the LABioMed Research
5048   Committee shall constitute the proceedings and actions of the Association's Research
5049   Committee.

5050   **11.11-1.1-a** The Research Committee shall be a broadly representative body;

5051   **11.11-1.1-b** A majority of the Research Committee members shall be County personnel
5052   or LABioMed employees; and

5053   **11.11-1.1-c** LABioMed, in consultation with the Chief Medical Officer, shall appoint all
5054   Research Committee members in a manner that is equitable and representative of
5055   mutual interests..

5056   **11.11-1.2** In the event that LABioMed has no Research Committee or any of the three
5057   (3) conditions stated above are not satisfied, then the Executive Committee may elect to:

5058   **11.11-1.2-a** serve as the Association's Research Committee;

5059   **11.11-1.2-b** appoint the members and officers of the Committee which shall be broadly
5060   representative and composed of such Association members and County personnel as
5061   deemed necessary by the Executive Committee; or

5062   **11.11-1.2-c** remove a member or officer of the Committee when deemed necessary.

5063   **11.11-2 Requests to Conduct Medical Research:** No Association member or other
5064   person shall conduct any type of medical research to be performed on the
5065   LABioMed/Harbor-UCLA campus without first obtaining the approval of the Association's
5066   Research Committee.  All requests for permission to conduct such medical research on
5067   the LABioMed/Harbor-UCLA campus must be in writing and in such form as may be
5068   required by the Committee and shall be accompanied by the written approval of the chair
5069   of each department involved through the use of a Proposal Review, Approval and
5070   Compliance Certification (PRACC) form.

5071   The Committee shall:

5072   **11.11-2.1** Review and approve or disapprove all requests for the performance of any
5073   type of medical research to be performed on the LABioMed/Harbor- UCLA campus and,
5074   if approved, indicate whether such research must be performed in accordance with any
5075   stated conditions other than those normally required by federal or local agencies, and/or
5076   institutional review groups such as the IRB or IACUC.  The Research Committee may
5077   elect to delegate such review to relevant committees (e.g., IRB, IACUC) or authorized
5078   peer review groups (e.g., NIH, DOD, etc.).  Such review and approval shall be subject to
5079   any additional review and/or approval by other persons or bodies as required under a
5080   County contract or by the Association;

5081 **11.11-2.2** Perform ongoing review of all medical research approved by the Committee
5082 and require and receive from time to time written progress reports on all approved
5083 medical research;

5084 **11.11-2.3** Advise the Executive Committee on the development and implementation of
5085 research policies; and

5086 **11.11-2.4** LA BioMed will submit an annual detailed written report to the Governing
5087 Body, not later than twelve (12) months following the end of each County fiscal year,
5088 summarizing the medical research accomplished, via a list of publications and a financial
5089 report detailing research expenditures during the previous fiscal year.

5090
5091 **11.12  BYLAWS COMMITTEE**
5092
5093 **11-12.1    Composition:**   The Bylaws Committee shall consist of at least three (3)
5094 members of the Association including at least the Vice President and Immediate Past
5095 President. Committee membership shall be restricted to Association members.
5096
5097 **11.12-2    Duties:**  The duties of the Bylaws Committee shall include:
5098
5099 **11.12-2.1** Conducting an annual review of the Association bylaws, as well as the
5100 rules and regulations if any, policies and forms promulgated by the
5101 Association, its departments and divisions; and
5102
5103 **11.12-2.2** Developing and submitting recommendations to the Association for
5104 changes in Association documents and operations as necessary to reflect or
5105 improve current Association practices.
5106
5107 **11.12-3 Meetings:**  The Committee shall meet as often as necessary at the call of its
5108 chair but at least annually, shall maintain a permanent record of its proceedings and
5109 actions, and shall submit at least an annual report (meeting minutes will suffice for
5110 this purpose) to the Executive Committee (or the Association at the annual meeting)
5111 on its activities and recommendations.
5112
5113 **11.13  SURGICAL CASE REVIEW COMMITTEE**
5114
5115 **11.13-1 Composition:**  The Surgical Case Review Committee shall consist of at least
5116 one (1) member each from the departments of Pathology and Laboratory Medicine,
5117 Surgery, and Obstetrics and Gynecology; the Chair of the PROC, and members from
5118 other departments as desired.
5119
5120 **11.13-2 Duties:** To review tissue and non-tissue cases performed in the operating room
5121 and in outpatient areas for:
5122
5123 **11.13-2.1** Appropriateness of procedure;
5124
5125 **11.13-2.2** Appropriateness for lack of tissue (a screening mechanism based upon
5126 pre-established criteria may be used);
5127

**11.13-2.3** Significant discrepancies between pre- and postoperative (including pathologic) diagnoses; and

**11.13-2.4** Adequate follow-up of unexpected findings.

**11.13-3 Meetings:** The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions and the results of actions taken, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.14** CONTINUING MEDICAL EDUCATION COMMITTEE

**11.14-1 Composition:** The Continuing Medical Education Committee shall consist of at least one (1) member from each department that participates in continuing medical education; at least one (1) representative from the Los Angeles Biomedical Research Institute at Harbor-UCLA Medical Center; the Medical Center's Medical Staff Coordinator; the Medical Center's Director of Library Services; and the Chair of the Professional Performance Panel. The Associate Medical Director for Medical Education or designee shall serve as chair.

**11.14-2 Duties:**

**11.14-2.1** To formulate policies and standards of continuing medical education;

**11.14-2.2** To plan and approve continuing medical education activities proposed by the various departments by evaluating for the:

**11.14-2.2-a** identification of educational needs and practice gaps for licensed physicians;
**11.14-2.2-b** identification of desirable physician attributes and competencies to be improved by the activity;
**11.14-2.2-c** formulation of clear statements of objectives for each activity;
**11.14-2.2-d** assessment of the effectiveness of each activity;
**11.14-2.2-e** choice of appropriate teaching methods and knowledgeable faculty for each activity;
**11.14-2.2-f** documentation of staff attendance at each activity; and
**11.14-2.2-g** assurance of compliance with the Institute of Medical Quality's accreditation standards for each activity;

**11.14-2.3** To cooperate with the medical community as a resource for quality continuing medical education;

**11.14-2.4** To develop continuing medical education programs based on the results of quality improvement studies and related institutional goals;

**11.14-2.5** To ensure that the Medical Center's continuing medical education program is in compliance with the Institute of Medical Quality's CME accreditation standards;

**11.14-2.6** To make recommendations to the Executive Committee regarding library needs of the Association; and

**11.14-2.7** To advise the Chief Executive Officer of the financial needs of the continuing medical education program.

**11.14-3 Meetings:** The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee on its activities and recommendations.

**11.15 WELL BEING OF PRACTITIONERS COMMITTEE**

**11.15-1 Composition:** The Well Being of Practitioners Committee shall consist of at least five (5) members selected from any of the departments. Insofar as possible, members of this committee shall not serve as active participants on other peer review or quality assessment and improvement committees while serving on this committee.

**11.15-2 Duties:**

**11.15-2.1** To recommend policies and procedures for recognizing practitioners who have problems with substance abuse and/or physical or mental illness which may impair their ability to practice safely and effectively;

**11.15-2.2** To consider general matters related to the health and well-being of the medical staff and develop educational programs or related activities; and

**11.15-2.3** To receive reports related to the physical and mental health, well-being, or impairment (e.g., substance abuse, physical or mental illness) of Association members and, as it deems appropriate, to evaluate such reports and assist such practitioners to obtain necessary rehabilitation services, including recommending to the Executive Committee that the practitioner be required to submit to a medical or psychological examination in order to assure that the practitioner will practice safely, at the practitioner's expense, if deemed appropriate by the Executive Committee. The applicant or member may select the examining physician from an outside panel of three (3) physicians chosen by the Executive Committee. With respect to matters involving individual Association applicants or members, the committee may, on a voluntary basis, provide such advice, counseling, or referrals as may seem appropriate. Such activities shall be confidential. However, in the event information received by the Committee clearly demonstrates that the health or known impairment of an Association applicant or member poses an unreasonable risk of harm to patients, that information may be referred for corrective action.

**11.15-3 Meetings:** The Committee shall meet as needed, shall maintain a permanent record of its proceedings and actions as it deems advisable, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Professional Performance Panel on its activities.

**11.16  BLOOD AND TISSUE UTILIZATION COMMITTEE**

**11.16-1  Composition:**  The Blood and Tissue Utilization Committee shall consist of at least one (1) member from each of the departments of Surgery, Medicine, Obstetrics and Gynecology, Pediatrics and Anesthesiology; one (1) member from the Nursing Department; and the Chair of the Professional Performance Panel.  The Director of the Medical Center's Blood and Tissue Bank shall be the Chair of the Committee.

**11.16-2  Duties:**

The Committee shall address the major processes involved in blood and tissue usage such as storing, qualifying vendors, ordering, distributing, handling, dispensing, administering and monitoring the product's effect on patients.  The Committee shall also perform the following specific functions:

**11.16-2.1** Reviewing, revising and approving policies and procedures on storing, ordering, distributing, handling, dispensing, and administering blood, blood components and tissue;

**11.16-2.2** Evaluating periodically the appropriateness and usage of selected blood and tissue components;

**11.16-2.3** Evaluating blood and tissue wastage statistics;

**11.16-2.4** Reviewing transfusion reactions and other adverse reactions; and

**11.16-2.5** Making appropriate recommendations for improvement.

**11.16-3  Meetings:**  The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions and the results of actions taken, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.17  HEALTH CARE INFORMATION COMMITTEE**

**11.17-1  Composition:**  The Health Care Information Committee shall be a multidisciplinary team comprised of at least one (1) representative from each of the following departments:  Medicine, Surgery, Family Medicine, Emergency Medicine, Neurology, Pediatrics and Radiology; one (1) from Nursing Department; one (1) from Medical Center Administration; one (1) from Clinical Social Services; one (1) from the Health Information Management Department; one (1) from Quality Assessment Resource Management; one (1) from Utilization Review; and other physician and non-physician members as deemed necessary.

**11.17-2  Duties:**

**11.17-2.1** To review and approve all Medical Center policies and procedures related to paper-based medical records and electronic health record documents, including completion, forms and formats, appropriate chart organization, printing of electronic documents, availability and methods of

enforcement;

**11.17-2.2** To assure that the security, privacy, confidentiality and integrity of paper-based medical records and electronic health record documents are consistent with laws and regulations;

**11.17-2.3** To review medical records brought to the attention of the Committee by the Health Information Management Department which do not meet accepted criteria;

**11.17-2.4** To develop measures for and assess findings from monitoring activities and take actions to improve identified deficiencies. The monitoring activities shall include, but not be limited to:

**11.17-2.4-a** Timeliness of completion of history and physical examinations, operative reports and discharge summaries;

**11.17-2.4-b** Completeness and accuracy of paper-based and electronic health record entries;

**11.17-2.4-c** Proper description of the patient's condition, diagnosis and progress during hospitalization and at the time of discharge;

**11.17-2.4-d** Documentation of treatment and tests provided and the results thereof;

**11.17-2.4-e** The adequate identification of individuals responsible for orders given and treatment rendered;

**11.17-2.4-f** Availability of paper-based medical records and/or electronic health records in patient care areas; and

**11.17-2.4-g** Organization and contents of the medical record.

**11.17-2.5** To assure that the Medical Center meets The Joint Commission's requirements related to paper-based medical records and electronic health records.

**11.17-3 Meetings:** The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions and the results of actions taken, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.18 MULTIDISCIPLINARY TRAUMA SYSTEMS / OPERATIONS COMMITTEE (MTSOC)**

**11.18-1 Composition:** The Multidisciplinary Trauma Systems / Operations Committee (MTSOC) shall consist of at least six (6) members from the departments of Emergency Medicine, Surgery (General Surgery and Neurosurgery), Orthopedic Surgery, Radiology, and Anesthesiology; at least one (1) representative each from

the Nursing Department, Trauma Service staff and Medical Center Administration; and other physician and non-physician members as deemed necessary.

**11.18-2 Duties**:

    **11-18-2.1** Establish policies and procedures for the management of trauma patients at the Medical Center;

    **11.18-2.2** Collect and provide multidisciplinary review of data regarding the management of trauma patients; and

    **11.18-2.3** Monitor performance within the community-wide and national trauma systems.

**11.18-3 Meetings:** The Committee shall meet monthly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Surgery Quality Improvement Committee and the Executive Committee through the Performance Review Oversight Committee on its activities and recommendations and shall share findings and recommendations with individual clinical departments or divisions as deemed necessary.

**11.19  BIOETHICS COMMITTEE**

**11.19-1 Composition:**  The Bioethics Committee shall consist of at least ten (10) members from the departments of Pediatrics, Neurology, Emergency Medicine, Surgery, Obstetrics and Gynecology, Medicine, Family Medicine, and Psychiatry; at least one (1) from the Nursing Department; one (1) from Clinical Social Services; one (1) from Medical Center Administration; and such other members as the Executive Committee may deem appropriate. It may include lay representatives, clergy, representatives from the Governing Body, ethicists, and attorneys, although a majority shall be physician members of the Association.

**11.19-2 Duties:**

    **11.19-2.1** Establish bioethical policy guidelines for the Medical Center;

    **11.19-2.2** Retrospectively review treatment decisions for the purpose of refining bioethical policy guidelines;

    **11.19-2.3** Facilitate communication and education among departments regarding the bioethical consequences of treatment decisions;

    **11.19-2.4** Provide a forum for discussion of bioethical questions when they arise; and

    **11.19-2.5** Serve in an educational role for faculty, housestaff, and nursing staff concerning current ethical issues.

**11.19-3 Meetings:**  The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a

quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee on its activities and recommendations.

**11.20  OPERATING ROOM COMMITTEE**

**11.20-1 Composition:** The Operating Room Committee shall consist of members from the departments of Surgery, Anesthesiology, Obstetrics and Gynecology; Orthopedic Surgery; Radiology; and Pathology and Laboratory Medicine; and representatives from the Nursing Department and Medical Center Administration.

**11.20-2 Duties:**

   **11.20-2.1** To develop policies and procedures for the effective operation of the Operating Room Suites including the 7th floor Operating Room and the Endovascular Room in the Patient Care Diagnostic Center; and

   **11.20-2.2** To monitor overall Operating Room performance and utilization.

**11.20-3 Meetings:**  The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.21** MEDICOLEGAL COMMITTEE

**11.21-1 Composition:**  The Medicolegal Committee shall consist of at least four (4) Association members and at least one (1) representative each from the Nursing Department, the Health Information Management Department, Medical Administration; ***the Hospital Risk Manager, the Chief Quality Officer,*** the Peer Review Oversight Committee; and other members as desired.

**11.21-2 Duties:**

   **11.21-2.1** To review all cases in which there is actual or potential risk of medical malpractice liability to ensure that systems issues that may need correction are identified;

   **11.21-2.2** To review medicolegal issues and make recommendations relating to policies and procedures of the Medical Center;

   **11.21-2.3** To develop strategies for educating Medical Center staff on medico-legal and risk management issues; and

   **11.21-2.4** ***To have the physician members of the Committee meet in Executive Session, upon request of an Association member, to review and assure that an apportionment determination is reasonable, accurate, consistent with the law, and protective of peer review confidentiality.***

**11.21.-3 Meetings:**  The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a

5434      quarterly report (meeting minutes will suffice for this purpose) to the Executive
5435      Committee through the PSA Review Committee on its activities and
5436      recommendations.
5437

5438 **11.22** CANCER COORDINATING COMMITTEE

5439

5440 **11.22-1 Composition:** The Cancer Coordinating Committee shall consist of at least the
5441      following:

5442

5443      **11.22-1.1** one medical oncologist;
5444      **11.22-1.2** one general surgeon;
5445      **11.22-1.3** one pathologist;
5446      **11.22-1.4** one diagnostic radiologist;
5447      **11.22-1.5** one radiation oncologist;
5448      **11.22-1.6** one pain control/palliative care physician or specialist;
5449      **11.22-1.7** physician representatives from Family Medicine, Obstetrics and
5450      Gynecology; Pediatrics and Psychiatry;
5451      **11.22-1.8** the Cancer Program Administrator;
5452      **11.22-1.9** one oncology nurse;
5453      **11.22-1.10** one clinical research data manager or nurse;
5454      **11.22-1.11** one clinical social worker or case manager;
5455      **11.22-1.12** one certified tumor registrar;
5456      **11.22-1.13** one performance improvement professional;
5457      **11.22-1.14** the Medical Center's Director of Library Services;
5458      **11.22-1.15** representatives from Health Information Management, Pharmacy,
5459      and Food and Nutrition Services; and
5460      **11.22-1.16** other members as needed.

5461

5462 **11.22-2 Duties:**

5463

5464      **11.22-2.1** To develop and evaluate the annual goals and objectives related to
5465      cancer care;

5466

5467      **11.22-2.2** To establish cancer conference/tumor board frequency, format and
5468      multidisciplinary attendance requirements;

5469

5470      **11.22-2.3** To ensure that the required number of cases are discussed at the
5471      cancer conference/tumor board;

5472

5473      **11.22-2.4** To evaluate and document cancer conference/tumor board frequency,
5474      attendance, and total and prospective case presentations;

5475

5476      **11.22-2.5** To supervise the activities of the Medical Center's Tumor Registry
5477      including, but not limited to:

5478

5479         **11.22-2.5-a** Establishing and implementing a plan to evaluate the
5480         quality of cancer registry data and activity;

5481

5482         **11.22-2.5-b** Ensuring accurate and timely collection of cancer
5483         patient data;

5484

**11.22-2.5-c** Analyzing patient outcomes and disseminating results of the analysis;

**11.22-2.5-d** Identifying opportunities for improvement; and

**11.22-2.5-e** Evaluating the quality of abstracting, staging and reporting;

**11.22-2.6** To designate coordinators for the following cancer program activities:

**11.22-2.6-a** Cancer conference/tumor board

**11.22-2.6-b** Quality of cancer registry data

**11.22-2.6-c** Quality improvement

**11.22-2.6-d** Community education and outreach

**11.22-2.7** To designate a Commission on Cancer (CoC) Cancer Liaison Physician;

**11.22-2.8** To promote advancement in cancer treatment through provision of clinical trial information and patient accrual to cancer-related clinical trials;

**11.22-2.9** To ensure that patients have access to consultative services in all disciplines;

**11.22-2.10** To ensure that supportive services, prevention and early detection opportunities are provided to cancer patients and their families;

**11.22-2.11** To promote increased knowledge through educational programs. Conferences and other clinical activities covering the entire spectrum of cancer care;

**11.22-2.12** To ensure that cancer services, care and patient outcomes are evaluated and improved so that care meets or exceeds patient expectations and the standards of the American College of Surgeons Commission on Cancer;

**11.22-2.13** To audit data provided to the Committee to evaluate the cancer program and trends in the treatment of cancer patients at the Medical Center; and

**11.22.2.14** To assist the Medical Center in complying with the CoC Cancer Program Standards and triennial survey requirements in order to achieve and maintain certification as a Teaching Hospital Cancer Program by the CoC.

**11.22-3 Meetings:** The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive

5535  Committee through the Clinical Data Monitoring Panel on its activities and
5536  recommendations.
5537
5538  **11.23** GRADUATE MEDICAL EDUCATION COMMITTEE
5539
5540  **11.23-1 Composition:**   The Committee shall consist of the Harbor-UCLA Medical
5541  Center's postgraduate training program directors of Internal Medicine, Pediatrics,
5542  General Surgery, Psychiatry, Anesthesiology, Emergency Medicine, Obstetrics and
5543  Gynecology, Radiology, Family Medicine, Neurology, Pathology and Laboratory
5544  Medicine and Orthopedic Surgery; and at least three (3) peer-selected residents; the
5545  Administrative Director for Graduate Medical Education; a representative from the
5546  professional schools; and one (1) representative from Medical Center Administration.
5547  The Associate Medical Director for Medical Education shall serve as Chair of the
5548  Committee and is also appointed as the Designated Institutional Official.
5549
5550  **11.23-2 Duties:**
5551
5552  **11.23-2.1** To establish Medical Center policies for postgraduate medical
5553  education such as quality assessment and improvement, resident supervision
5554  and working environment, ancillary support, conditions of resident
5555  employment, and counseling and support services;
5556
5557  **11.23-2.2** To assure that postgraduate training programs comply with
5558  accreditation standards and policies and procedures of the Accreditation
5559  Council for Graduate Medical Education (ACGME),  the American Board of
5560  Obstetrics and Gynecology (ABOG) and the Council on Dental Accreditation
5561  (CODA);
5562
5563  **11.23-2.3** To review and approve all official communication with accreditation
5564  agencies including:   progress reports, request for change in resident
5565  complement, appointment of program director, major changes in curriculum,
5566  etc.;
5567
5568  **11.23-2.4** To develop interinstitutional agreements for the purpose of enhancing
5569  postgraduate medical education programs, including liaison with institutions
5570  and faculty participating in programs sponsored by the Medical Center;
5571
5572  **11.23-2.5** To regularly review all postgraduate training programs in relation to
5573  their compliance with Medical Center policies and ACGME, ABOG or CODA
5574  requirements;
5575
5576  **11.23-2.6** To advise and monitor all aspects of postgraduate medical education
5577  which include, but are not limited to:
5578
5579  **11.23-2.6-a** The establishment and implementation of policies and
5580  procedures for the selection, evaluation, promotion and
5581  dismissal of residents;
5582
5583  **11.23-2.6-b** Making recommendations regarding the establishment
5584  and implementation of Medical Center policies for discipline and
5585  the review of complaints and grievances relevant to the graduate

113

medical education programs;

**11.23-2.6-c** The appropriate and equitable funding for resident positions including benefits and support services;

**11.23-2.6-d** The working conditions and duty hours of residents; and

**11.23-2.6-e** Reviewing the ethical, socioeconomic, risk management and cost-containment issues that affect postgraduate medical education; and

**11.23-2.7** To present an Annual Report to the Executive Committee before September 15th of each year for approval prior to submission to the Governing Body and all Major Participating Institutions.

**11.23-3 Meetings:** The Committee shall meet bimonthly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a bimonthly report (meeting minutes will suffice for this purpose) to the Executive Committee on its activities and recommendations.

## 11.24  PATIENT SAFETY COUNCIL

**11.24-1 Composition:** The Patient Safety Council shall consist of representatives from Medical Center Administration, Medical Administration, Nursing Administration, Clinical Quality and Safety, Risk Management, as well as the Patient Safety Officer, the Coordinator of Nursing Quality Improvement, a representative of the Environment of Care Committee, and other clinical and administrative representatives as needed. The Council is co-chaired by the Patient Safety Officer and another Council member.

**11.24-2  Duties:**

**11.24-2.1** To provide oversight and coordination of the Patient Safety Program;

**11.24-2.2** To review the National Patient Safety Goals and provide   oversight for implementation facility-wide;

**11.24-2.3** To work collaboratively with other bodies to identify opportunities for improvement as related to patient safety including, but not limited to, performing patient safety rounds and receiving reports from Failure Mode Effects Analysis (FMEA) teams;

**11.24-2.4** To receive and analyze patient and staff recommendations regarding patient safety;

**11.24-2.5** To sponsor or make recommendations to the appropriate body(s) for initiatives to support ongoing patient safety that are consistent with the strategic direction of the organization;

**11.24-2.6** To facilitate team involvement and performance improvement initiatives based on findings when indicated;

**11.24-2.7** To sponsor educational programs for staff to improve patient safety;

**11.24-2.8** To review statistics on event notification and claims reports;

**11.24-2.9** To provide for the integration of patient safety into the hospitalwide quality improvement program; and

**11.24-2.10** To communicate improvements to clinical and administrative leadership as well as facility staff as appropriate.

**11.24-2.11** To annually review the patient safety section of the Harbor-UCLA Quality and Patient Safety Plan.

**11.24-3 Meetings:**   The Council shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the PSA Review Committee on its activities and recommendations.

**11.25   CLINICAL LABORATORY COMMITTEE**

**11.25-1 Composition:** The Clinical Laboratory Committee shall have two Co-Chairs, one of whom is a pathologist and the other who is a faculty physician from a clinical department.  Members of the Committee shall include, but not be limited to, faculty physician representatives from at least three (3) of the departments of Internal Medicine, Pediatrics, Obstetrics and Gynecology, Emergency Medicine and Anesthesiology and at least one (1) housestaff physician representative from Internal Medicine, Pediatrics and/or Pathology and Laboratory Medicine.  The Committee shall also include representatives from Medical Center Administration, Health Information Management, Nursing, Quality Improvement and Pathology and Laboratory Medicine Administration.

**11.25-2 Duties:**

**11.25-2.1** To discuss laboratory performance data and to provide input regarding resolution of problems and/or improvement of services;

**11.25-2.2** To recommend which tests require critical value reporting and levels at which test results should be considered critical values;

**11.25-2.3** To periodically review tests which may be overutilized or obsolete and recommend changes;

**11.25-2.4** To review and approve or disapprove requests to perform Point of Care Testing;

**11.25-2.5** To recommend addition of new tests when indicated;

**11.25-2.6** To assist the laboratory in cost containment by recommending reductions in specific in-house tests or reference laboratory send-out tests; and

**11.25-2.7** To discuss any problems concerning laboratory services.

**11.25-3 Meetings:**  The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

## 11.26  CRITICAL CARE COMMITTEE

**11.26-1   Composition:**  The Critical Care Committee shall have two Co-Chairs, one of whom is a physician and the other a nurse.  Members of the Committee shall include, but not be limited to, the medical directors and nurse managers of each critical care unit; a broad representation of the specialties using the critical care units; and at least one representative each from Anesthesiology, Medical Center Administration and Clinical Social Work.

**11.26-2   Duties:**

**11.26-2.1** To provide a forum for Association members and Medical Center personnel to discuss issues related to critical care;

**11.26-2.2** To recommend policies, procedures and process improvements for appropriate delivery of critical care services including formulation of physician order sets;

**11.26-2.3** To collect data on important critical care processes, analyze the data and make recommendations for improvement in patient care;

**11.26-2.4** To assess equipment needs; and

**11.26-2.5** To participate in the long-range planning and physical development of the critical care units.

**11.26-3 Meetings:**  The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

## 11.27  PEDIATRIC CRITICAL CARE COMMITTEE

**11.27-1 Composition:**  The Pediatric Critical Care Committee shall consist of at least physician representatives from the Neonatal Intensive Care Unit, the Pediatric Intensive Care Unit, the Pediatric Emergency Department and Anesthesiology; Nurse Managers from the Neonatal Intensive Care Unit, the Pediatric Intensive Care Unit, the Pediatric Emergency Department and the Pediatric Ward; Clinical Nurse Specialists assigned to the Neonatal Intensive Care Unit, Pediatric Intensive Care Unit and Pediatric Emergency Department;  representatives from Pharmacy and

116

Respiratory Therapy Services; and other clinical and administrative representatives as needed.  The Committee is co-chaired by one of the physician representatives and one of the Nurse Managers.

**11.27-2 Duties**

    **11.27-2.1** To propose, develop, revise and/or implement procedures and policies for improving care of neonates, infants and children;

    **11.27-2.2** To review actions proposed by other Committees, both those within the Institution and within DHS, analyze how these will impact the care of neonates, infants and children and make recommendations as needed;

    **11.27-2.3** To improve communication among the various services and units that provide care for neonates, infants and children;

    **11.27-2.4** To review policies that impact the care of neonates, infants and children;

    **11.27-2.5** To work with other Committees to improve the care of neonates, infants and children; and

    **11.27-2.6** To analyze specific patient safety issues, sharing findings with appropriate bodies and taking corrective action when indicated.

**11.27-3 Meetings:**  The Pediatric Critical Care Committee shall meet at least once quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Pediatrics Quality Improvement Committee and the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.28 CARDIOPULMONARY RESUSCITATION COMMITTEE**

**11.28-1  Composition:**  The Cardiopulmonary Resuscitation Committee shall include at least two (2) members of the Association, at least one (1) of whom is a specialist in critical care or emergency medicine, and at least one (1) representative from Nursing.

**11.28-2  Duties:**

    **11.28-2.1** To collect data on those patients for whom Code Blue and Code White calls are made;

    **11.28-2.2** To use the data on individual codes to evaluate the processes taken in managing resuscitation efforts including the appropriateness of care provided and documentation;

    **11.28-2.3** To refer individual cases to departments for peer review when the findings indicate more intensive analysis is required;

**11.28-2.4** To make recommendations for improvement in systems problems identified from the review of codes; and

**11.28-2.5** To assess resuscitation equipment needs and make recommendations if any deficiencies are identified.

**11.28-3 Meetings:** The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.28 NUTRITION COMMITTEE**

**11.29-1   Composition:**   The Nutrition Committee shall consist of at least one (1) member each from Medicine, Surgery, Pediatrics, Family Medicine and Obstetrics and Gynecology and at least one (1) representative from Nursing, Pharmacy and Medical Center Administration, and at least two (2) representatives from contractor(s) who provide nutritional services.   The members are selected to represent the major clinical departments as well as ambulatory, inpatient and intensive care areas. In general, Committee members have special interest and expertise in nutritional support.

**11.29-2   Duties:**  The duties of the Committee include, but are not necessarily limited to the following:

**11.29-2.1** To oversee provision of food for patients, Medical Center staff and the public;

**11.29-2.2** To formulate institutional standards of care and cost-effectiveness policies and guidelines for nutritional services including the use of parenteral and enteral nutrition;

**11.29-2.3** To integrate and review policies and procedures for all departments that participate in the provision of food, nutrition services and education;

**11.29-2.4** To provide resources for educating Association and Medical Center staff about nutritional science, including parenteral and enteral nutrition therapy;

**11.29-2.5** To evaluate and approve parenteral and enteral products ("Nutrition Formulary") as well as delivery systems for use in the Medical Center;

**11.29-2.6** To participate in performance improvement activities and maintain a reporting structure to identify and resolve issues related to nutrition; and

**11.29-2.7** To assist Medical Center Administration in reviewing proposals and making recommendations for provision of contract nutritional services;

**11.29-3 Meetings:**   The Committee shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a

quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.30 ORGAN AND TISSUE DONOR COUNCIL**

**11.30-1 Composition**

The Organ and Tissue Donor Council is a multi-disciplinary committee comprised of individuals who work together to facilitate end-of-life decisions and the organ donation process. Representatives from each of the following disciplines are represented:

**11.30-1.1** Physicians from each critical care unit of the Medical Center, the Trauma Service, and the Emergency Department;
**11.30-1.2** Transplant Nephrology;
**11.30-1.3** Nursing Management from the areas listed above and the Operating Room;
**11.30-1.4** Medical Center Administration
**11.30-1.5** Quality Assessment Resource Management;
**11.30-1.6** Clinical Social Work;
**11.30-1.7** Ethics;
**11.30-1.8** Tissue Bank/Pathology and Laboratory Medicine; and
**11.30-1.9** Organ Procurement Organization (OPO)

**11.30-2 Purpose**

The purpose of the Council is to oversee the organ, eye, and tissue donation process at the Medical Center with these specific aims:

**11.30-2.1** Optimizing the donor process to maximize organ recovery with the ultimate goal of saving recipient lives;

**11.30-2.2** Ensuring compliance with state and national guidelines for tissue and organ donation;

**11.30-2.3** Making donation a priority and part of the fabric and culture of the Medical Center;

**11.30-2.4** Providing education regarding organ donation to Medical Center staff, patients, and families; and

**11.30-2.5** Fostering a humane, supportive end of life process for grieving families.

**11.30-3 Duties and Responsibilities:**

**11.30-3.1** Providing leadership for the organ donation process at the Medical Center;

**11.30-3.2** Ensuring that donation practices are in compliance with standards set by the  Center for Medicare/ Medicaid Services, Joint Commission, FDA, United Network for Organ Sharing (UNOS), Los Angeles County Department of Health Services and California Health and Safety codes;

**11.30-3.3** Reviewing the Medical Center's compliance with OPO referrals for all patient mortalities.  Data is benchmarked to national best practices with the aims of continued quality improvement of the organ donation process;

**11.30-3.4** Reviewing all cases where an organ donation approach is performed (whether it proceeds to donation or not).  The social aspects and clinical management of each case are analyzed to ensure smoothness in the process and/or identify areas of care which could be improved;

**11.30-3.5** Becoming familiar with clinical best practices for the management of the potential organ donor and working to ensure these practices are upheld at the Medical Center;

**11.30-3.6** Spearheading educational efforts related to organ donation.  This includes the ongoing education of medical staff, providing CME and CEU opportunities, orienting new employees, and organizing or promoting local educational conferences;

**11.30-3.7** Serving as the community liaison for the Medical Center and helping to promote National Donate Life Month and community events celebrating donors and their families; and

**11.30-3.8** Working to provide support for grieving families in conjunction with the Medical Center's Palliative Care program as needed.

**11.30-4 Meetings**

The Council shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

**11.31  END STAGE RENAL DISEASE COMMITTEE**

**11.31-1 Composition:**  The End Stage Renal Disease Committee shall consist of at least two (2) members from the Division of Nephrology and at least one (1) representative each from the Dialysis Unit, Nursing, Clinical Social Work, the Urology and Vascular Surgery divisions, Medical Center Administration and Nutrition Services.

**11.31-2  Duties:**

**11.31-2.1**   Serve as a forum for discussing issues related to end stage renal disease, chronic dialysis management and transplantation;

5940    **11.31-2.2**    Collect and analyze data related to chronic dialysis treatment
5941    performed in the Medical Center;
5942

5943    **11.31-2.3**    Make recommendations for improvement of care given to patients
5944    including, but not limited to, vascular access, temporary dialysis catheters,
5945    peritoneal dialysis catheters and dialysis treatments (including nutritional
5946    management, blood pressure control, and dialysis water cultures);
5947

5948    **11.31-2.4**  Collect and analyze data related to the living and deceased donor
5949    renal transplant program including the initial three (3) month care rendered to
5950    patients, complications of surgery and medications, transplant evaluations,
5951    transplant workups in progress, and re-evaluations of listed patients; and
5952

5953    **11.31-2.5**  Review, analyze and make recommendations for improvement related
5954    to the OPO reports of organ donations at the Medical Center, donors
5955    referred, donors recovered, educational activities and other quality
5956    improvement studies.
5957

5958    **11.31-3 Meetings:**    The Committee shall meet at least quarterly, shall maintain a
5959    permanent record of its proceedings and actions, and shall submit at least a
5960    quarterly report (meeting minutes will suffice for this purpose) to the Executive
5961    Committee through the Clinical Data Monitoring Panel on its activities and
5962    recommendations.
5963

5964    **11.32 MULTIDISCIPLINARY TRAUMA PEER REVIEW COMMITTEE**
5965

5966    **11.32-1 Composition:**  The Trauma Performance Improvement Committee shall consist
5967    of at least eight (8) members from the departments of Emergency Medicine
5968    (Pediatric and Adult), Surgery (General Surgery and Neurosurgery), Orthopaedic
5969    Surgery, Radiology and Anesthesiology; at least one (1) representative each from
5970    the Nursing Department, Trauma Service staff and Medical Center Administration;
5971    and other physician and non-physician members as deemed necessary.
5972

5973    **11.32-2 Duties:**
5974

5975    **11.32-2.1**  Collect and provide multidisciplinary review of data regarding the
5976    management of trauma patients;
5977

5978    **11.32-2.2**  Develop and discuss methods to improve both the process and
5979    outcomes of care of trauma patients at the Medical Center in a
5980    multidisciplinary fashion; and
5981

5982    **11.32-2.3**  Monitor performance within the community-wide and national trauma
5983    system.
5984

5985    **11.32-3 Meetings:**    The Committee shall meet at least quarterly, shall maintain a
5986    permanent record of its proceedings and actions, shall submit at least a quarterly
5987    report (meeting minutes will suffice for this purpose) to the Surgery Quality
5988    Improvement Committee and the Executive Committee through the Professional
5989    Performance Panel on its activities and recommendations and shall share findings

and recommendations with and refer issues for peer review to individual clinical departments or divisions as deemed necessary.

## 11.33 AMBULATORY CARE QUALITY IMPROVEMENT COMMITTEE

**11.33-1 Composition:**  The Ambulatory Care Quality Improvement Committee shall consist of at least the Associate Medical Director for Ambulatory Care, who shall serve as chair, representative clinic medical directors, representative clinic nurse managers, the Ambulatory Care Quality Improvement Coordinator, and a representative from Hospital Information Management.

**11.33-2 Duties:**  The Committee has oversight responsibility for the Medical Center's Ambulatory Care Quality Improvement Plan.  The Committee receives, reviews and analyzes ambulatory care performance improvement findings.

**11.33-3 Meetings:**  The Committee meets at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Clinical Data Monitoring Panel on its activities and recommendations.

## 11.35 INTERDISCIPLINARY PRACTICES COMMITTEE

**11.35-1 Composition:**  The Interdisciplinary Practices Committee (IDPC) shall consist of, at a minimum, the Chief Nursing Officer or his/her designee, the Chief Executive Officer or designee, and an equal number of physicians appointed by the Executive Committee and registered nurses appointed by the Chief Nursing Officer, each of whom shall have a vote.  Licensed or certified health professionals other than registered nurses who perform functions requiring standardized procedures or who are granted service authorizations shall be included in the Committee with vote only for matters under the scope of their license.  The chair of the Committee shall be a physician member of the Active Staff.

**11.35-2 Duties:**

**11.35-2.1** To recommend policies and procedures for the granting of expanded practice privileges including, but not limited to, the following:

**11.35-2.1-a** evaluating the need for and appropriateness of the performance of in-hospital services by allied health professionals (AHPs);

**11.35-2.1-b** determining which disciplines will be allowed to practice in the expanded roles;

**11.35-2.1-c** developing departmental procedures for reviewing credentials and granting or rescinding practice privileges;

**11.35-2.1-d** identifying functions and/or procedures which require the formulation and adoption of standardized procedures under Section 2725 of the Business and Professions Code in order for them to be performed by expanded role practitioners;

**11.35-2.1-e** securing recommendations from members of the Association in the medical specialty, or clinical field of practice under review, and from persons in the appropriate non-physician category who practice in the clinical field or specialty under review when developing and evaluating practice protocols; and

**11.35-2.1-f** maintaining clear lines of responsibility of the Department of Nursing for nursing care of patients of the Association for medical services in the Medical Center;

**11.35-2.2** To encourage and initiate the preparation and approval of standardized procedures by appropriate groups in each department;

**11.35-2.3** To review standardized procedures and recommend approval by the Credentials and Executive Committees;

**11.35-2.4** To ensure the appropriate monitoring, evaluation and documentation of clinical competency of expanded role practitioners by the departments;

**11.35-2.5** To evaluate and make recommendations regarding:

**11.35-2.5-a** the mechanism for evaluating the qualifications and credentials of AHPs who are eligible to apply for and provide in-hospital services;

**11.35-2.5-b** the minimum standards of training, education, character, competence, and overall fitness of AHPs eligible to apply for the opportunity to perform in-hospital services;

**11.35-2.5-c** identification of in-hospital services which may be performed by an AHP, or category of AHPs, as well as any applicable terms and conditions thereon; and

**11.35-2.5-d** the professional responsibilities of AHPs who have been determined eligible to perform in-hospital services.

**11.35-2.6** To evaluate and report on whether in-hospital services proposed to be performed or actually performed by AHPs are inconsistent with the rendering of quality medical care and with the responsibilities of members of the Association;

**11.35-2.7** To evaluate and report on the effectiveness of supervision requirements imposed upon AHPs who are rendering in-hospital services;

**11.35-2.8** To periodically evaluate and report on the efficiency and effectiveness of in-hospital services performed by AHPs; and

**11.35-2.9** To perform additional functions consistent with the requirements of law and regulation.

**11.35-3 Meetings:** The IDPC shall meet at least quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit at least a quarterly report (meeting minutes will suffice for this purpose) to the Executive Committee through the Credentials Committee on its activities and recommendations.

**11.36 MEDICAL STAFF CONTRACTS REVIEW COMMITTEE**

**11.36-1 Composition**

The Medical Staff Contract Review Committee shall be composed of no less than three (3) members of the Active Staff who do not hold exclusive contracts, including at least one officer.

**11.36-2 Duties**

**11.36-2.1** The Committee shall review and make recommendations to the Governing Body regarding quality of care issues related to exclusive arrangements for physician and/or professional services, prior to any decision being made, in the following situations:

**11.36-2.1-a** the decision to execute an exclusive contract in a previously open department or service;

**11.36-2.1-b** the decision to renew or modify an exclusive contract in a particular department or service;

**11.36-2.1-c** the decision to terminate an exclusive contract in a particular department or service.

**11.36-2.2** The Committee shall also review and make recommendations to the Governing Body regarding quality of care issues related to the selection, performance evaluation, and any change in retention or replacement of physicians with whom the hospital has a contract. Prior to any decision being made, the Governing Body shall be required to review and approve the recommendations of the Committee regarding these contracts, which approval shall not be unreasonably withheld.

**11.36-2.3** When reviewing contracts within the purview of the Medical Staff Contracts Review Committee, the Committee shall request the Medical Center to present to it evidence of the need for a contract by:

**11.36-2.3-a** identifying in writing the patient care needs to be met by the contract;

**11.36-2.3-b** discussing with the affected Association department, division or committee potential alternatives to a contract that may be equally effective in meeting patient care needs, and if none are acceptable to the Administration;

**11.36-2.3-c** inviting the chairs of the affected Association departments, divisions or committees to the Committee meeting to discuss the need for a contract.

**11.36-2.4** The Committee shall report on the status of its work at each annual Association meeting.

**11.36-3 Meetings**

The Committee shall hold meetings at such intervals as the chair or the Executive Committee may deem appropriate, shall maintain a permanent record of its proceedings and actions, and shall submit a report (meeting minutes will suffice for this purpose) to the Executive Committee on its activities and recommendations.

**11.37  PROCEDURAL SEDATION OVERSIGHT COMMITTEE**

**11.37-1 Composition:**  The Procedural Sedation Committee shall consist of at least physician representatives from the Departments of Anesthesiology, Emergency Medicine, Medicine, Pediatrics, Surgery and Radiology, Pharmacy and at least one representative from the Department of Nursing. The Committee is chaired by a representative from the Department of Anesthesiology.

**11.37-2 Duties**

**11.37-2.1** To propose, develop, revise and/or implement procedures and policies for procedural sedation;

**11.37-2.2** To review actions related to procedural sedation proposed by other Committees, both those within the Institution and within DHS, analyze how these will impact patient care and make a recommendation;

**11.37-2.3** To review and approve resident and faculty training for procedural sedation;

**11.37-2.4** To delineate the criteria for privileging procedural sedation;

**11.37-2.5** To monitor procedural sedation in the Medical Center, including any complications related to procedural sedation and make recommendations as appropriate; and

**11.37-2.6** To analyze specific procedural sedation patient safety issues and sharing findings with other Medical Staff Committees, including the Department of Anesthesiology Quality Improvement Committee.

**11.37-3 Meetings**

The Procedural Sedation Committee shall meet at least once quarterly, shall maintain a permanent record of its proceedings and actions, and shall submit reports to the Clinical Data Monitoring Panel on its activities. The Committee will also provide a report regarding the complications of procedural sedation to the Department of Anesthesiology Quality Improvement Committee.

**11.38 OTHER COMMITTEES**

The President and/or Executive Committee, in mutual consultation, may establish and appoint other standing committees and/or special or *ad hoc* committees when deemed necessary.  The appointment of such committees shall include the following:

**11.38-1** The members of the committee and its chair;

**11.38-2** The exact charge for which the committee is formed;

**11.38-3** To whom and when the committee shall report concerning its deliberations and/or actions and recommendations; and

**11.38-4** The duration of service of the committee.


ARTICLE XII

MEETINGS

**12.1   ANNUAL ASSOCIATION MEETING**

**12.1-1 Notice**

There shall be an annual meeting of the members of the Association held annually. The election of officers of the Association and Association Members at Large shall take place at this meeting.  Notice of this meeting and its agenda items (including reference to executive session but excluding the items to be discussed) shall be given to the members at least ten (10) days prior to the meeting.

**12.1-2 Agenda**

The agenda for the annual meeting shall be determined by the President and Executive Committee and shall include, insofar as feasible:

    **12.1-2.1** Call to order;

    **12.1-2.2** Acceptance of the minutes as amended, if needed, of the last annual and of all intervening special meetings;

    **12.1.2-3** Unfinished business;

    **12.1-2.4** Report from the Chief Medical Officer and/or Chief Executive Officer;

    **12.1-2.5** Report from the President;

    **12.1-2.6** Report from the Secretary-Treasurer;

    **12.1-2.7** Reports on the overall results of quality review;

**12.1-2.8** Adoption and amendment of bylaws and other Association documents, as needed;

**12.1-2.9** New business;

**12.1-2.10** Election of officers and Association Members at Large; and

**12.1-2.11** Adjournment

Where the Association is being asked to consider or review a document, a copy of the document shall be appended to the agenda accompanying the notice of the annual or special Association meeting. Drafts of any documents considered or to be considered at any Association meeting shall be available to any Association member upon request. Further, any proposal considered at the meeting shall be accompanied by a clear explanation as to the source of the proposal and why that proposal is needed.

Except as otherwise stated in these Bylaws, no business shall be transacted at any Association meeting unless it is identified in the agenda accompanying the notice calling the meeting. In the event an emergent or urgent issue arises after the agenda is set, and action on that issue is necessary, any action taken shall be ratified by the Association at the next properly constituted meeting.

## 12.2    SPECIAL ASSOCIATION MEETINGS

### 12.2-1 Calling of Special Meeting

Special meetings of the Association may be called at any time by the President or the Executive Committee. The President shall call a special meeting within thirty (30) days after receipt by him/her of a written request for same signed by at least twenty percent (20%) of Active Staff members addressed to the President and stating the purpose for such meeting. Notice including the stated purpose of the meeting shall be provided as in Section 12.4 below. No business shall be transacted at any special meeting except that stated in the notice calling the meeting.

### 12.2-2 Agenda

The agenda at a special meeting shall be:

**12.2-2.1** Reading of the notice calling the meeting;

**12.2-2.2** Transaction of business for which the meeting was called; and

**12.2-2.3** Adjournment.

## 12.3 COMMITTEE AND DEPARTMENT MEETINGS

### 12.3-1 Regular Meetings

Committees and departments may, by resolution, provide the time for holding regular meetings, and no notice other than such resolution shall then be required. Each department shall hold regular meetings at least quarterly to review and evaluate the clinical activities of the department.

**12.3-2 Special Meetings**

A special meeting of any committee or department may be called by, or at the request of, the chair thereof, the President, or by one-third of the group's current members eligible to vote but not less than two (2) members.

## 12.4 NOTICE OF MEETINGS

Except as otherwise specified in these bylaws, written or printed notice stating the place, day, and hour of any Association meeting or of any committee or department meeting not held pursuant to resolution shall be delivered either personally or by email, facsimile, United States mail or County mail to each person entitled to be present no less than seven (7) days nor more than twenty (20) days before the date of such meeting, except that notice of the annual Association meeting shall be delivered at least ten (10) days prior to the meeting. If mailed by email, the notice of the meeting shall be deemed delivered when the email is submitted and addressed to any identified or preferred email address submitted by the member on file in the Association Office. If sent by facsimile, the notice of the meeting shall be deemed delivered when the facsimile is submitted and directed to the facsimile number on file in the Association Office. If mailed by United States mail, the notice of the meeting shall be deemed delivered when deposited, postage prepaid, in the United States mail addressed to each person entitled to such notice at his/her address as it appears on file in the Association Office. If mailed by County mail, the notice of the meeting shall be deemed delivered when deposited in the Medical Center Mail Distribution Center addressed to each person entitled to such notice at his/her address as it appears on the records of the Medical Center

## 12.5 QUORUM

**12.5-1 Amending these Bylaws**

The presence of ten (10) Association members accorded the right to vote as described in Article III responding in person at any annual or special meeting of the Association shall be required for the purpose of amending these bylaws pursuant to the procedure described in Article XIX.

**12.5-2 Election or Removal of Officers or Association Members at Large**

The presence of ten (10) Association members accorded the right to vote as described in Article III responding in person at any annual or special meeting of the Association shall be required for the purpose of the election or removal of Association officers pursuant to the procedures described in Sections 9.4, 9.7 or 11.2-3.

**12.5-3 Reduction or Elimination of Dues or Assessments**

The presence of ten (10) Association members accorded the right to vote as described in Article III responding in person at any special meeting of the Association shall be required for the purpose of reducing or eliminating any dues or assessments pursuant to the procedures described in Section 15.4.

**12.5-4 Actions at Executive and Credentials Committees**

The presence of at least 50% of the voting members shall be required for any actions taken at the Credentials or Executive Committees.

**12.5-5 Actions at Other Meetings**

Except as provided for in Subsections 12.5-1 through 12.5-4, the presence of at least three (3) voting members of the Association shall constitute a quorum for all actions taken at Association, department or committee meetings.

**12.6  CONDUCT OF MEETINGS**

All meetings shall be conducted according to these bylaws.  Where not otherwise specified, the latest edition of Robert's Rules of Order or The Standard Code of Parliamentary Procedure, the choice of which to be at the discretion of the presiding officer of the meeting, shall prevail, provided that any technical departure from such rules, as determined in the sole judgment of the presiding officer, shall not invalidate any action taken at a meeting.

**12.7  VOTING AND MANNER OF ACTION**

**12.7-1  Voting**

Unless otherwise specified in these bylaws, only members of the Association accorded the right to vote as described in Article III may vote in Association or department elections and at Association, department and committee meetings except as may otherwise be specified in these bylaws.  With the exception for matters voted upon by the Executive Committee, voting may be accomplished by email or other electronic and/or telephone means where permitted by the chair of the meeting, so long as adequate precautions are in place to ensure authentication and security.

**12.7-2  Manner of Action**

Except as otherwise specified in these bylaws, the action of a majority of the voting members present and voting at any meeting at which a quorum is present shall be the action of the group.  Members may be present at a meeting by electronic or telephonic means where permitted by the chair of the meeting.  A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of members, if any action taken is approved by at least a majority of the required quorum for such meeting, or such greater number as may be specifically required by these bylaws. Committee action may be conducted by telephone conference or other electronic communication which shall be deemed to constitute a meeting for the matters discussed in that telephone or virtual conference.

**12.8  MINUTES**

Minutes of all meetings shall be prepared and maintained in a permanent record and shall include a record of attendance and the vote taken on each matter.  Further, the minutes shall include the names of those who disclosed potential conflicts of interest and those who recused themselves.  Minutes of all Association meetings (except the minutes relating to peer review and matters discussed in executive session), shall be available to any Association member upon request.  The minutes shall be signed by the presiding officer and forwarded to the Executive Committee.  The Association Office shall maintain a permanent file of the minutes of Association and committee meetings, and each department shall maintain a permanent file of the minutes of department meetings.

**12.9  ATTENDANCE REQUIREMENTS**

**12.9-1  Association Meetings**

The representatives of each department or the representative's alternate, as appointed pursuant to Section 10.4-1.22, shall be required to attend all annual and special Association meetings during their term of office.  They shall have the duty of reporting to their departments on the proceedings and actions of such meetings.  All other Association members are encouraged to attend all annual and special Association meetings.  Other interested persons may also attend at the discretion of the President.  Attendance via web conferencing or electronic means shall be accepted.

**12.9-2  Committee and Department Meetings**

Each member in the Active Staff category and each member in the Provisional Staff category who

1. is employed at least forty (40) hours per week as a County Civil Service employee, whether classified or unclassified;

2. provides health services at the Medical Center at least forty (40) hours per week under a contract which he/she has entered into with the County to provide health services at the Medical Center; or

3. provides health services at the Medical Center at least forty (40) hours per week under a contract of a non-County entity to provide health services at the Medical Center

shall be required to attend not less than fifty (50) percent of all meetings of each committee or department of which he/she is a member in each Association Year.

**12.9-3  Absence from Meetings**

Any member so required to attend who is compelled to be absent from any Association, committee, department or division meeting shall submit to the presiding officer thereof the reason for such absence.  Failure to meet the attendance requirements of Subsections 12.9-1 or 12.9-2, unless excused by such presiding officer for good cause shown, may be grounds for corrective action as set forth in

Article VI, and including, in addition, removal from such committee, department or division.  Presiding officers of such meetings shall report all such failures to the Executive Committee.  Reinstatement of an Association member whose membership has been revoked because of absence from meetings shall be made only on application, and any such application shall be processed in the same manner as an application for initial appointment.

**12.9-4** Special Appearance

At the discretion of the chair or presiding officer, when a member's practice or conduct is scheduled for discussion at a committee, department or division meeting, the member shall be so notified by the committee or department chair or division chief and shall be required to attend.  Whenever apparent or suspected deviation from standard clinical practice is involved, the notice to the member shall so state, shall state the time and place of the meeting, shall be given by certified mail, return receipt requested, at least seven (7) days prior to the meeting, and shall include a statement that his/her attendance at the meeting at which the alleged deviation is to be discussed is mandatory. The member shall be provided access to clinical information relating to the meeting no later than five (5) days before any such meeting.

Failure of a member to attend any meeting with respect to which he/she was given notice that attendance is mandatory, unless excused by the President or the Executive Committee upon a showing of good cause, shall be a basis for corrective action.  If the practitioner makes a written request for postponement, which is received by the President within five (5) days after the date of the notice and which is supported by an adequate showing that his/her absence will be unavoidable, his/her attendance and presentation may be excused and postponed by the committee or department chair or division chief, or by the President if the chair or chief is the practitioner involved, until not later than the next regular committee, department or division meeting; otherwise, the pertinent clinical information shall be presented and discussed as scheduled.

**12.10** EXECUTIVE SESSION

Executive session is a meeting of an Association committee, department, or division, or of the Association as a whole which only voting members of the relevant committee, department, division or Association as a whole who are members of the Association attend, unless others are expressly requested to attend by the member presiding at the meeting. Executive session may be called by the presiding member at the request of any Association member and shall be called by the presiding member pursuant to a duly adopted motion. Executive session may be called to discuss peer review issues, personnel issues, or any other sensitive issues requiring confidentiality.

ARTICLE XIII

CONFIDENTIALITY, IMMUNITY AND RELEASES

**13.1 SPECIAL DEFINITIONS**

For the purposes of this Article, the following definitions shall apply:

**13.1-1** INFORMATION means records of proceedings, minutes, records, files, communications, reports, memoranda, statements, recommendations, data and other disclosures, whether in written or oral form, relating to professional qualifications, clinical ability, judgment, character, adequate physical and mental health status, emotional stability, professional ethics, or any other matter that might directly or indirectly affect patient care.

**13.1-2** REPRESENTATIVE means Los Angeles County and any officer, employee or agent thereof; the Association and any member, officer, department, division, service, board, council or committee thereof; any other medical staff organization and any member, officer, department, service, division, board, council, or committee thereof; any other health care facility or organization and any officer, department, service, division, board, council, or committee thereof; and any person authorized by any of the foregoing to perform specific information gathering or disseminating functions.

**13.1-3** THIRD PARTY means any person or organization providing information to any representative.

**13.2** AUTHORIZATIONS AND CONDITIONS

By applying for, or exercising, clinical privileges or providing specified patient care services within the Medical Center, a practitioner:

**13.2-1** Authorizes representatives of the County of Los Angeles, the Medical Center, and the Association to solicit, provide and act upon any information bearing upon, or reasonably believed to bear upon, his/her professional ability and qualifications;

**13.2-2** Authorizes representatives and third parties to provide any information, including otherwise privileged or confidential information, concerning the practitioner to the Medical Center and the Association;

**13.2-3** Agrees to be bound by the provisions of this Article and to waive all legal claims against any representative of the Association or third party who acts in accordance with the provisions of this Article and would be immune from liability under Section 13.3; and

**13.2-4** Acknowledges that the provisions of this Article are express conditions to his/her application for, and acceptance of, Association membership, the continuation of such membership and the exercise of clinical privileges or provision of specified patient care services at the Medical Center.

**13.3** IMMUNITY FROM LIABILITY

**13.3-1** For Action Taken

Each representative of the County of Los Angeles, the Medical Center, or the Association, and all third parties, shall, to the fullest extent permitted by law, be indemnified and held harmless by the County of Los Angeles from any liability to any practitioner for any damages or other relief for any action taken or statements or

recommendations made within the scope of his/her duties exercised as a representative of the County of Los Angeles, the Medical Center, or the Association.

**13.3-2** For Providing Information

Each representative of the County of Los Angeles, the Medical Center, or the Association, and all third parties, shall, to the fullest extent permitted by law, be indemnified and held harmless by the County of Los Angeles from any liability to any practitioner for any damages or other relief by reason of providing information, within the scope of his/her duties exercised as a representative of the County of Los Angeles, the Medical Center, or the Association, to a representative of the County of Los Angeles, the Medical Center, or the Association, or to any other health care facility or organization or medical staff organization concerning any practitioner who is, or has been, an applicant to or member of the Association or who did, or does, exercise clinical privileges or provide specified patient care services at the Medical Center.

**13.4**    CONFIDENTIALITY OF INFORMATION

**13.4-1**  General

Association, Department, Division or Committee minutes, files and records, including information regarding any member or applicant to this Association, shall, to the fullest extent permitted by law, be confidential.  Dissemination of such information and records shall only be made where expressly required by law, or as otherwise provided in these bylaws.

**13.4-2**  Breach of Confidentiality

Inasmuch as effective peer review, the consideration of the qualifications of Association members and applicants to perform specific procedures, and the evaluation and improvement of the quality of patient care rendered in the Medical Center must be based on free and candid discussions, any breach of confidentiality of the discussions or deliberations of the Association, departments, divisions, or committees, except in conjunction with another medical staff organization or health care facility, professional society or licensing authority, is outside appropriate standards of conduct for the Association, violates the Association bylaws and shall be deemed disruptive to the operations of the Association and the Medical Center.  If it is determined that such a breach has occurred or is likely to occur, the Medical Center or the Executive Committee may undertake such corrective action as it deems appropriate.

**13.4-3**  Activities and Information Covered

The confidentiality and immunity provisions of this Article shall apply to all acts, communications, reports, recommendations, and disclosures of any kind performed or made in connection with the activities of the Medical Center, the Association, or any other health care facility or organization or medical staff organization, concerning, but not limited to:

**13.4-3.1** Applications for appointment, clinical privileges, or specified patient care services;

**13.4-3.2** Periodic reappraisals for reappointment, clinical privileges or specified patient care services;

**13.4-3.3** Corrective action;

**13.4-3.4** Hearings and appellate reviews;

**13.4-3.5** Performance data from the quality assessment and improvement program;

**13.4-3.6** Utilization reviews;

**13.4-3.7** Other Medical Center, Association, department, division, or committee activities related to monitoring and/or maintaining quality patient care and appropriate professional conduct; and

**13.4-3.8** Queries and reports concerning the National Practitioner Data Bank, peer review organizations, the Medical Board of California, and similar queries and reports.

**13.5** RELEASES

Each applicant or member shall, upon request of the Association or Medical Center, execute general and specific releases in accordance with the express provisions and general intent of this Article.  Execution of such releases shall not be deemed a prerequisite to the effectiveness of this Article.

**13.6** INDEMNIFICATION OF THE ASSOCIATION

Los Angeles County and the Medical Center shall indemnify, defend and hold harmless the Association and its individual members from and against losses and expenses (including attorneys' fees, judgments, settlements, and all other costs, direct or indirect) incurred or suffered by reason of or based upon any threatened, pending or completed action, suit, proceeding, investigation, or other dispute relating or pertaining to any alleged act or failure to act within the scope of peer review or quality assessment activities including, but not limited to,

**13.6-1** acting as a member of or witness for an Association department, division, committee or hearing panel;

**13.6-2** acting as a member of or witness for the Medical Center or any Medical Center or governing body task force, group, or committee; and

**13.6-3** acting as a person providing information to any Association or Medical Center group, officer, Governing Body member or employee for the purpose of aiding in the evaluation of the qualifications, fitness or character of an Association member or applicant.

6649   The Association or member may seek indemnification for such losses and expenses
6650   under this bylaws provision, statutory and case law, any available liability insurance or
6651   otherwise as the Association or member sees fit, and concurrently or in such sequence
6652   as the Association or member may choose. Payment of any losses or expenses by the
6653   Association or member is not a condition precedent to Los Angeles County's or the
6654   Medical Center's indemnification obligations hereunder.
6655
6656   The County shall retain responsibility for the sole management and defense of any such
6657   claims, suits, investigations or other disputes against Indemnities including, but not
6658   limited to, the selection of legal counsel to defend against any such action.  The
6659   indemnity set forth in this section 13.6 is expressly conditioned on Indemnities' good faith
6660   belief that their actions and/or communications are reasonable and warranted and in
6661   furtherance of the Association's peer review, quality assurance or quality improvement
6662   responsibilities in accordance with the purpose of the Association as set forth in these
6663   bylaws.  In no event will the County indemnify any Indemnity for acts or omissions taken,
6664   or not taken, in bad faith or in pursuit of the Indemnities' private economic interests.
6665
6666                               <u>ARTICLE XIV</u>
6667
6668                    <u>RULES AND REGULATIONS AND POLICIES</u>
6669
6670   **14.1 <u>ASSOCIATION RULES AND REGULATIONS</u>**
6671
6672   **14.1-1   Two Ways for Approval of Rules and Regulations**
6673
6674        Upon the request of a member of the Executive Committee, the President, any
6675        Association committee or Medical Center Administration, consideration shall be given by
6676        the Executive Committee to the adoption, amendment, or repeal of the Association rules
6677        and regulations subject to the approval of the Governing Body.  Alternatively, upon
6678        timely written petition signed by at least  thirty percent (30%) of the members of the
6679        Association in good standing who are entitled to vote as described in Article III,
6680        consideration shall be given at the next annual Association meeting or at a special
6681        meeting of the Association called for such purpose pursuant to Section 12.2-1, to the
6682        adoption, amendment, or repeal of the Association rules and regulations subject to the
6683        approval of the Governing Body.
6684
6685   **14.1-2   Nature of Rules and Regulations**
6686
6687        Such rules and regulations shall be limited to procedural details and processes
6688        implementing these bylaws, shall not affect the organizational structure of the
6689        Association to be self-governing and shall not be inconsistent with these bylaws,
6690        Association policies or other policies of the Medical Center approved by the
6691        Executive Committee.
6692
6693   **14.1-3   Notification of Association Prior to Creating or Amending Rule**
6694
6695        Except as provided in Section 14.1-4, prior to the approval of an amendment to the rules
6696        and regulations, the Association members shall be notified and given an opportunity to
6697        review and comment on the proposed rule.  This review and comment opportunity may
6698        be accomplished by posting proposed Rules in Association common areas such as
6699        Association offices, dining rooms and lounges, and on the Association website at

6700    least ten (10) days prior to the scheduled Executive Committee meeting together
6701    with instructions how interested members may communicate comments. All
6702    comments shall be summarized and provided to the Executive Committee prior to
6703    Executive Committee action on the proposed Rule.
6704
6705    **14.1-4  Urgent Amendment to Rules**
6706
6707    When there is a documented need for an urgent amendment to the rules and regulations
6708    in order to comply with law or regulation, the Executive Committee may provisionally
6709    adopt and the Governing Body may provisionally approve an urgent amendment without
6710    prior notification to Association members.  When such urgent amendment to the rules
6711    and regulations has been provisionally approved, the Association members shall be
6712    notified immediately and offered an opportunity to request a special meeting of the
6713    Association pursuant to the procedure provided in Section 12.2-1 to discuss the
6714    provisionally approved amendment.  If there is no conflict between the Association
6715    and the Executive Committee regarding the provisional amendment, the amendment
6716    shall stand.  If there is conflict over the provisional amendment, the members present
6717    at the special meeting of the Association entitled to vote shall vote to keep the
6718    amendment as stated or to modify the amendment and submit it to the Governing
6719    Body for action.
6720
6721    **14.1-5  Rule Generated by Petition**
6722
6723    Executive Committee approval is required to adopt, amend, or repeal such rules and
6724    regulations of the Association unless the proposed rule is one generated by petition
6725    of at least thirty-three (33) percent of the voting members of the Association.  In this
6726    latter circumstance, if the Executive Committee fails to approve the proposed Rule, it
6727    shall notify the Association.  The Executive Committee and the Association shall
6728    each have the option of invoking or waiving the conflict management provisions of
6729    Section 15.10. In the event of conflict between the Executive Committee and the
6730    Association (as represented by written petition signed by at least thirty-three (33)
6731    percent of the voting members of the Association) regarding a rule or policy
6732    proposed or adopted by the Executive Committee, the procedure described in
6733    Section 15.10-1 shall be followed.
6734
6735    **14.1-5.1** If conflict management is not invoked within thirty (30) days, it shall be
6736    deemed waived.  In this circumstance, the Association's proposed Rule shall
6737    be submitted for vote, and, if approved by the Association, the proposed Rule
6738    shall be forwarded to the Governing Body for action.  The Executive
6739    Committee may forward comments to the Governing Body regarding the
6740    reasons it declined to approve the proposed Rule.
6741
6742    **14.1.-5.2** If conflict management is invoked, the proposed Rule shall not be voted
6743    upon or forwarded to the Governing Body until the conflict management
6744    process has been completed, and the results of the conflict management
6745    process shall be communicated to the Governing Body.
6746
6747    **14.1-5.3** With respect to proposed Rules generated by petition of the Association,
6748    approval of the Association requires the affirmative vote of a majority of the
6749    Association members eligible to vote voting on the matter by mailed secret
6750    ballot, provided at least ten (10) days advance written notice, accompanied

136

by the proposed Rule, has been given, and at least a number in excess of fifty (50) percent of the eligible votes has been cast.

**14.1-6  Governing Body Approval**

Following Executive Committee action, or whenever an Association rule or regulation has been adopted, amended, or repealed by the Association pursuant to the procedure described in Section 14.1-5, such rules and regulations shall become effective upon approval of the Governing Body, which approval shall not be withheld unreasonably, or automatically after thirty (30) days if no action is taken by the Governing Body.  In the latter event, the Governing Body shall be deemed to have approved the rule(s) and regulation(s) adopted by the Association.

**14.1-7 Communication of Rule Changes to Members**

If changes are made in the rules and regulations, as determined by the Executive Committee, then the Association members and other persons with clinical privileges shall be provided with revised texts.

**14.1-8 Periodic Review of Rules**

Rules and regulations shall be reviewed and may be revised if necessary every two (2) years at a minimum. The mechanism described herein shall be the sole method for the initiation, adoption, amendment, or repeal of the Association rules and regulations.

**14.2   POLICIES RELATED TO ASSOCIATION MATTERS**

Upon the request of the President, an Association Committee, or Medical Center Administration, consideration shall be given by the Executive Committee to the adoption, amendment, or repeal of Association policies including departmental policies and policies related to Association matters.  If approved by the Executive Committee, such policies shall become official policies of the Association. Alternatively, upon timely written petition signed by at least thirty (30) percent of the members of the Association in good standing who are entitled to vote as described in Article III, consideration shall be given at the next annual Association meeting or at a special meeting of the Association called for such purpose pursuant to Section 12.2-1 to the adoption, amendment, or repeal of Association policies.  Following approval by the Executive Committee or the Association, such policies shall become effective after which they are communicated to Association members.

Medical Center policies related to providing or monitoring patient care shall be submitted to the Executive Committee for approval.  If approved by the Executive Committee, such policies shall become official policies of the Medical Center. Following approval by the Executive Committee, such policies shall become effective after which they are communicated to Association members.

**14.3**  EFFECT OF ASSOCIATION RULES AND REGULATIONS, ASSOCIATION POLICIES AND MEDICAL CENTER POLICIES APPROVED BY THE EXECUTIVE COMMITTEE

Applicants and members of the Association shall be governed by properly initiated and adopted Association rules and regulations, Association policies and Medical Center policies approved by the Executive Committee. If there is any conflict between the bylaws and the rules and regulations or Association or Medical Center policies approved by the Executive Committee, the bylaws shall prevail.  If there is any conflict between the rules and regulations and Association or Medical Center policies approved by the Executive Committee, the rules and regulations shall govern.  If there is any conflict between Association policies and Medical Center policies approved by the Executive Committee, the Association policies shall prevail.

**14.4** <u>DEPARTMENTAL RULES AND REGULATIONS OR POLICIES</u>

Subject to the approval of the Executive Committee and the Governing Body, each department shall adopt, amend, or repeal its own rules and regulations or policies for the conduct of its affairs and the discharge of its responsibilities.  Such rules and regulations and policies shall not be inconsistent with these bylaws, the rules and regulations or policies of the Association, or other policies of the Medical Center approved by the Executive Committee.  If there is any conflict between these bylaws, the Association Rules and Regulations or Association policies and such departmental rules and regulations or policies, the bylaws, Association Rules and Regulations or Association policies shall govern.

<u>ARTICLE XV</u>

<u>GENERAL PROVISIONS</u>

**15.1  CONSTRUCTION OF TERMS AND HEADINGS**

Words used in these bylaws shall be read as the masculine or feminine gender and as the singular or plural, as the context requires.  The captions or headings in these bylaws are for convenience only and are not intended to limit or define the scope or effect of any provision of these bylaws.

**15.2  EXECUTIVE COMMITTEE ACTION**

Whenever these bylaws require or authorize action by the Executive Committee, such action may be taken by the PSA Review Committee or any other subcommittee of the Executive Committee to which the Executive Committee has delegated the responsibility and authority to act for it on the particular subject matter, activity or function involved.

**15.3  AUTHORITY TO ACT**

Action of the Association in relation to any person other than the members thereof shall be expressed only through the President or the Executive Committee or their designee, and they shall first confer with the Chief Executive Officer.  Any member who acts in the name of the Association without proper authority shall be subject to such disciplinary action as the Executive Committee may deem appropriate.

**15.4  DUES OR ASSESSMENTS**

**15.4-1 Annual Determination of Dues or Assessments**

The Executive Committee shall have the power to determine the amount, if any, of the annual dues or special assessments for each Department and/or for each category of Association membership and to determine the manner of expenditure of such funds received.  Such power shall include the ability to assess dues or assessments for each Department and/or member on a sliding scale basis, depending on the level of participation in Association activities by the Association member. The amount of annual dues charged will not exceed $100 per member for each 2-year re-application cycle without convening a Special Meeting of the PSA with a vote supporting such action. The President shall notify all members of any approved dues or special assessments in writing, which will become effective thirty (30) days from the date of the President's letter unless the President receives a written request for a special meeting of the Association pursuant to the procedure provided in Section 12.2-1 to discuss the dues or assessments prior to the date they are scheduled to be effective.  In that event, the dues or assessment will become effective on the day following the special meeting unless at that meeting, at which a quorum is achieved as described in Section 12.5-3, a simple majority of members present vote to reduce or eliminate the dues or assessment or to modify the sliding scale basis.

**15.4-2   Prompt Payment of Dues or Assessments**

Each Department member of the Association shall promptly pay annual dues or special assessments to the Association, if any dues or special assessments are approved and assessed pursuant to these bylaws.

**15.4-3   Control of Association Funds**

Association funds, regardless from what source (i.e., Association dues/assessments, Medical Center funds) shall be under the sole control of the Association.  The Executive Committee shall collect all dues/assessments and shall deposit all dues/assessments and other funds in an account in a financial institution located in California to assure the Association the financial ability to solely administer those functions required under the bylaws.  All Association members may at all reasonable times copy and inspect all bank statements and the quarterly financial statements prepared pursuant to Section 9.8-4.5.

The Association, through the Executive Committee, shall expend dues/assessment funds only for Association purposes as deemed appropriate and approved by the Executive Committee, provided that all expenditures of dues/assessment funds shall require the signature of the President or an individual authorized by the Executive Committee and, for expenditures over $1,000, the Secretary-Treasurer, if any, or a second individual authorized by the Executive Committee.

**15.5** ASSOCIATION REPRESENTATION BY LEGAL COUNSEL

Notwithstanding any other provision of these bylaws,

**15.5-1** Upon the authorization of the Association, or of the Executive Committee acting on its behalf, the Association may retain and be represented by independent legal counsel of its own choosing when necessary in order for the Association to exercise

its rights, obligations or responsibilities as described in California Business and Professions Code Section 2282.5. Such counsel, to the extent practicable, shall not be employed by a law firm representing the Medical Center or the County;

**15.5-2** The Association shall enter into a written engagement letter with the individual selected to be independent legal counsel affirming that the Association, not the Medical Center or the County, is the counsel's client, that the counsel represents solely the interests of the Association, and that the attorney-client privilege of confidentiality applicable to all communications between the counsel and the Association is held solely by the Association, regardless of whether the Association or a third party pays the counsel's fees.  In the event the counsel is paid for by a third party, the counsel shall also provide a written assurance to the Association that he/she will permit no interference by the third party with his/her independence of professional judgment or with the attorney-client relationship, as required by State Bar of California Rules of Professional Conduct, Rule 3-310;

**15.5-3** The Association shall be solely liable and responsible for the independent legal counsel, including, without limitation, for payment of all related attorney fees, costs and expenses; and

**15.5-4** The County of Los Angeles shall have no liability or responsibility for the independent legal counsel, including, without limitation, for payment of any related attorney fees, costs and expenses.

## 15.6  NOTICES

Except where specific notice provisions are otherwise provided in these bylaws, any and all notices, demands, requests required or permitted to be mailed shall be in writing properly sealed, and shall be sent through the United States Postal Service, first-class postage prepaid. An alternative delivery mechanism may be used if it is reliable, as expeditious, and if evidence of its use is obtained. Notice to the Association or officers or committees thereof shall be addressed as follows:

  Name and proper title of addressee, if known or applicable
  Name of department, division or committee
  [c/o Medical Staff Office, President]
  Harbor-UCLA Medical Center
  1000 West Carson Street, Box 2
  Torrance, California 90502

Mailed notices to a member, applicant or other party, shall be to the addressee at the address as it last appears in the official records of the Association or the Medical Center.

## 15.7  DISCLOSURE OF INTEREST AND CONFLICT OF INTEREST RESOLUTION

For the purposes of these bylaws, CONFLICT OF INTEREST means a personal or financial interest or conflicting fiduciary obligation that makes it impossible, as a practical matter, for the individual to act in the best interests of the Association without regard to the individual's private or personal interest.  Such an interest may also be held by an immediate family member of that individual, including that individual's spouse, domestic partner, child or parent.

**15.7-1  Conflict Resolution**

**15.7-1.1** Not all disclosures of a potential conflict of interest require the member's abstention or recusal. However, a member may abstain from voting on any issue. A member shall recuse himself/herself if the member reasonably believes that his/her ability to render a fair and independent decision is or may be affected by a conflict of interest. A recused member shall not be counted in determining the quorum for that vote but may answer questions or otherwise provide information about the matter after disclosing the conflict. A recused member must not be present for the remainder of the deliberations or the vote.

**15.7-1.2** If a member has not voluntarily recused him/herself and a majority of voting members of the committee or in the staff meeting vote that the member should be excused from discussion or voting due to conflict of interest, the chair shall excuse the member.

**15.7-1-3** If a member discloses a potential conflict of interest and requests a vote regarding excusing that member, the member shall leave the room while the issue is being discussed and voted upon.

**15.7-1.4** The minutes of the meeting shall include the names of those who disclosed potential conflicts and those who abstained and/or recused themselves.

**15.7-2  Corrective Action**

Association members who fail to comply with all provisions of these bylaws concerning actual or potential conflicts of interest shall be subject to corrective action under these bylaws including, but not limited to, removal from the Association position.

**15.8  ASSOCIATION CREDENTIALS AND PEER REVIEW FILES**

**15.8-1  Location of Association Credentials Files and Peer Review Files**

**15.8-1.1  Association Credentials File**

The Credentials File, paper or electronic, for each member of the Association shall be kept in the Association Office and/or in peer review and Association electronic databases. These files shall be part of the records of the Credentials Committee.

**15.8-1.2  Association Peer Review File**

A separate Association Peer Review File(s), paper or electronic, for each member of the Association shall be kept in the office of the chairperson(s) of the member's assigned department and other departments in which the member holds privileges and/or in peer review and Association electronic databases except that the chairperson's own paper Peer Review File shall be kept in the Association Office. These files shall be part of the records of the Credentials Committee.

**15.8-2 Information to be Included in Association Credentials Files and Peer Review Files**

### 15.8-2.1  Association Credentials File

Information to be included in each member's Credentials Files shall consist of:

**15.8-2.1-a** The completed and verified application for Association membership including, but not limited to, current licensure or section 2113 certification, Drug Enforcement Administration (DEA) registration, National Practitioner Data Bank documents, state licensing board(s) documents, and information on training, experience, physical and mental health status, references, previous and current professional liability claims, and request for clinical privileges.

**15.8-2.1-b**  Evidence that the Association evaluated and acted upon the information in a. above.

**15.8-2.1-c**  Evidence that the Association evaluated and acted upon the findings from proctoring for initial membership and for additional privileges.

**15.8-2.1-d** Specific and current clinical privileges recommended by the Association and approved by the Governing Body.

**15.8-2.1-e** Information pertinent to reappraisal and reappointment including, but not limited to, completed and verified reapplication form, current licensure, Drug Enforcement Administration registration, National Practitioner Data Bank documents, state licensing board(s) documents, and information on additional training, current experience, continuing medical education, attendance at required meetings, physical and mental health status, professional liability claims, special professional commendations, honors and awards, and, where appropriate, compelling evidence of public-spirited, health-related activities and dedication to the welfare and interest of the community.

**15.8-2.1-f** Evidence that OPPE was completed and FPPE performed, if applicable.

**15.8-2.1-g** Evidence that the Association evaluated all the above information as well as assessed the current clinical competence for membership and privileges requested, and evidence that appropriate action was taken on reappointment and renewal of privileges.

**15.8-2.1-h** Evidence of any corrective action initiated including a summary by the Executive Committee of the resultant findings, recommendations and final outcome.

**15.8-2.2 Peer Review File**

Information to be included in each member's Peer Review File(s) shall consist of:

**15.8-2.2-a** Practitioner-specific data from Association monitoring and evaluation of clinical care which may include, but is not limited to, the member's statistical clinical activity profile, findings from peer review activities, outcome from clinical indicator review, blood and drug use review, medical record documentation and completeness reports, surgical indications monitoring, and individual proctoring reports.

**15.8-2.2-b** All records, including, but not limited to, letters, notices, reports, exhibits, transcripts, findings, and recommendations, relating to any corrective action instituted pursuant to Article VI (Evaluation and Corrective Action) of these bylaws.

**15.8-2.2-c** All records, including, but not limited to, letters, notices, reports, exhibits, transcripts, findings, and recommendations, relating to any hearing and appellate review instituted pursuant to Article VII (Hearing and Appellate Review Procedure) of these bylaws.

**15.8-2.2-d** Other information deemed pertinent by the chairperson(s) of the member's assigned department and other departments in which the member holds privileges or the President including, but not limited to, complaints or other adverse information related to the professional competence or professional conduct of a member, departmental findings and recommendations concerning such complaints or adverse information and results of member satisfaction surveys and managed care site reviews.

**15.8-2.2-e** OPPE documentation and, if applicable, FPPE reports.

**15.8-2.2-f** Statements provided by the member responding to any information contained in his/her Peer Review File(s).

**15.8-3 Insertion of Adverse Information into Credentials and Peer Review Files**

The following applies to actions relating to requests for insertion of adverse information into the member's Credentials or Peer Review File(s):

**15.8-3.1** As described in Section 6.2-3, any person may provide information to the Association about the conduct, performance or competence of its members.

143

**15.8-3.2**  When a request is made for insertion of adverse information into the Association member's Credentials or Peer Review File, the respective department chair and President shall review such a request.

**15.8-3.3**  After such review, a decision will be made by the respective department chair and President to:

    **15.8-3.3-a** not insert the information;

    **15.8-3.3-b** notify the member of the adverse information by a written summary and offer the opportunity to rebut this adverse information before it is entered into the member's file; or

    **15.8-3.3-c** insert the information along with a notation that a request has been made to the Executive Committee for an investigation as outlined in Section 6.2-3 of these bylaws.

**15.8-3.4** This decision shall be reported to the Executive Committee.  The Executive Committee, when so informed, may either ratify or initiate contrary actions to this decision by a majority vote.

**15.8-3.5** If corrective action is deemed appropriate in light of the information to be included in the file, then the procedures in Article VI of these bylaws shall be followed.

## 15.8-4 Review of Adverse Information in the Credentials File and Peer Review File(s) at the Time of Reappointment

The following applies to the review of adverse information in a member's Credentials File and Peer Review File(s) at the time of reappointment.

**15.8-4.1** Following the procedures in Section 4.4 of these Bylaws, the member's department chairperson(s), as part of his/her/their reappraisal function, or the President, if the member is the department chairperson, shall review information in the member's Credentials File and Peer Review File(s) before making recommendations regarding reappointment and delineation of privileges to the Credentials Committee.

**15.8-4.2** If there is adverse information in the member's Credentials File or Peer Review File(s), this shall be included in the report to the Credentials Committee.

**15.8-4.3** Prior to its recommendation on reappointment, the Credentials Committee shall review any adverse information in the Credentials or Peer Review File(s) and determine whether documentation in the file warrants further action.  With respect to such adverse information, if it does not appear that an investigation and/or adverse action at the time of reappointment is warranted, the Credentials Committee shall so inform the Executive Committee.   However, if an investigation and/or adverse action at the time of

reappointment is warranted, the Credentials Committee shall so inform the
Executive Committee.

**15.8-4.4** No later than sixty (60) days following the Credentials Committee report
to the Executive Committee on the member's reappointment, the Executive
Committee shall, except as provided in 6) below:

**15.8-4.4-a** initiate a request for corrective action, based on such
adverse information and on the Credentials Committee
recommendation relating thereto, or

**15.8-4.4-b** cause the substance of such adverse information to be
summarized and disclosed to the member.

**15.8-4.5** The member shall have the right to respond thereto in writing, and the
Executive Committee may elect to remove such adverse information on the
basis of such response.

**15.8-4.6** In the event that adverse information is not utilized as the basis for a
request for corrective action, or disclosed to the members as provided herein,
it shall be removed from the file and discarded, unless the Executive
Committee, by a majority vote, determines that such information is required
for continuing evaluation of the member's:

**15.8-4.6-a** character;

**15.8-4.6-b** current competence; or

**15.8-4.6-c** professional performance.

**15.8-5 Confidentiality**

The following applies to records of the Association and its departments, divisions and
committees responsible for the evaluation and improvement of patient care:

**15.8-5.1** The records of the Association and its departments and committees
responsible for the evaluation and improvement of the quality of patient care
rendered in the Medical Center shall be maintained as confidential.  These
records include, but are not limited to, the Association Credentials Files and
the Peer Review Files.

**15.8-5.2** Access to such records of the Association shall be limited to duly
appointed officers and committees of the Association for the sole purpose of
discharging Association responsibilities and subject to the requirement that
confidentiality be maintained.

**15.8-5.2-a** Access to information in a member's Credentials File
shall be limited to:

**15.8-5.2-a.1** the chairperson(s) of the member's assigned
department and other departments in which the

member holds privileges; the President or his/her designee; the Credentials Committee; the Executive Committee; the Chair, Professional Performance Panel; and the Governing Body for the sole purpose of discharging Association responsibilities as determined by the President or the Executive Committee subject to the requirement that confidentiality shall be maintained,

**15.8-5.2-a.2** the particular member subject to the provisions in Section 15.8-5.3, and

**15.8-5.2-a.3** other persons or entities as required by law.

**15.8-5.2-b** Access to information in a member's Peer Review File(s) shall be limited to:

**15.8-5.2-b.1** the chairperson(s) of the member's assigned department and other departments in which the member holds privileges; the President or his/her designee; the Credentials Committee; the Executive Committee; and the Chair, Professional Performance Panel for the sole purpose of discharging Association responsibilities as determined by the President or the Executive Committee subject to the requirement that confidentiality shall be maintained,

**15.8-5.2-b.2** the particular member subject to the provisions in Section 15.8-5.3, and

**15.8-5.2-b.3** other persons or entities as required by law.

**15.8-5.3** A member shall be granted access to his/her own Credentials File or Peer Review File(s), subject to the following provisions:

**15.8-5.3-a** The member shall provide thirty (30) days prior written notice to the President or designated officer.

**15.8-5.3-b** The member may review, and receive a copy of, only those documents provided by or addressed personally to the member. In addition, the member may review his/her statistical clinical activity profile, statistics provided by the Quality Assessment Resource Management Department, and medical record deficiency reports. A summary of all other information, including, but not limited to, Association committee findings, letters of reference, proctoring reports, and complaints, shall be provided to the member, in writing, by the designated officer of the Association within thirty (30) days of the member's written request. Such summary shall disclose the substance, but not the source, of the information summarized.

**15.8-5.3-c** The review by the member shall take place in the Association Office during normal work hours with an Association officer or his/her designee present.

**15.8-5.3-d** In the event a notice of action or proposed action is filed against a member, access to the member's Credential and Peer Review File(s) shall be governed by Section 7.5-1.

**15.8-5.4** Information which is disclosed to the Governing Body or its appointed representatives—in order that the Governing Body may discharge its lawful obligations and responsibilities—shall be maintained by that body as confidential.

### 15.8-5.4-a Routine Reporting by Association Leadership

During the regular quarterly Joint Conference Committee meetings as described in Section 11.4, there will be a verbal report by the Association of its quality assessment and improvement activities including peer review. The quarterly report regarding the peer review process will include aggregate information on the number of cases or events reviewed broken down by department, the number of external reviews conducted, conclusions from these reviews broken down by categories, the number of practitioners for whom a focused review or investigation was performed, and the outcome of any such focused reviews or investigations completed during the quarter.

### 15.8-5.4-b Association Leadership Response to Inquiry by Governing Body

In the event the Governing Body should have concerns whether the Association has failed to fulfill a substantive duty or responsibility in matters pertaining to the quality of care in peer review, the Governing Body shall send a request to the President for information regarding the peer review activities regarding a specific physician or event(s) identified.

The President and/or his/her designee(s) shall meet with the Governing Body to address the specific concerns, describe the process involved in the peer review and respond to questions regarding the process and outcome of peer review. This meeting shall be held in closed session with the Governing Body as a subcommittee of the Joint Conference Committee.

**15.8-5.4-b.1** The President shall report on such procedural events as relevant and may include some or all of the following:

**15.8-5.4-b.1-a** Complaints, event reports or surveillance screen triggers received;

147

**15.8-5.4-b.1-b** Whether cases were reviewed;

**15.8-5.4-b.1-c** Whether ongoing professional practice evaluation, focused professional practice evaluation, investigation or any other review of a practitioner took place;

**15.8-5.4-b.1-d** Whether department, division or Executive Committee meetings considered the issues; and

**15.8-5.4-b.1-e** The description and outcome of the peer review process; e.g., written or verbal counseling, corrective actions done, policy changes enacted, etc.

**15.8-5.4-b.2**  Questions by the Governing Body might include:

**15.8-5.4-b.2-a** Whether certain facts were available to the reviewers;

**15.8-5.4-b.2-b** Whether certain events occurred, e.g., outside review of cases; and

**15.8-5.4-b.2-c** Whether certain procedures were followed, e.g., departmental review

**15.8-5.4-b.3**  Such questions shall not require the disclosure of peer review confidential information.

.

**15.8-5.4-c** Concerns of Governing Body Regarding Peer Review Activities

In the event the review of the peer review process, including after any follow-up meetings, does not resolve the question of whether the Governing Body has reasonable concerns regarding whether the Association has failed to fulfill a substantive duty or responsibility in matters pertaining to the quality of patient care in peer review, an independent review shall be conducted.

The Governing Body will convey in writing the failure to fulfill a substantive duty or responsibility that is the subject for its concern and the basis upon which this conclusion was formed. These written concerns will be the bases for independent review.

The independent review shall be performed by an individual acceptable to both the Governing Body and the Association

and shall be a physician licensed to practice medicine in California with expertise in peer review and, if appropriate, be a specialist in the area of medicine related to the Governing Body's concern.  The independent reviewer must qualify for and be appointed to the Adhoc Staff of the Association prior to performing the review.  The reviewer shall have access to Association Credentials and Peer Review Files.

The reviewer shall report verbally to the Governing Body. Specifically, the report shall be limited to a discussion of the process, response to questions about the process and an opinion as to whether the Association has either fulfilled or failed to fulfill a substantive duty or responsibility in matters pertaining to the quality of patient care in peer review.  The reviewer shall provide a similar report both verbally and in writing to the Association which may also include identified opportunities and recommendations to improve the peer review process.

**15.8-5.4-d** Actions By Governing Body When Association Fails to Fulfill Substantive Duty Related to Peer Review

If the independent reviewer concludes that the Association has failed to fulfill a substantive duty or responsibility in matters pertaining to the quality of patient care in peer review, the Governing Body shall act in conformance with California Business and Professions Code Sections 809.05(c) and 2282.5

**15.8-5.5**  Confidential information contained in the credentials file of any member may be disclosed with the member's consent to any medical staff or professional licensing board. However, any disclosure outside of the Association shall require the authorization of the President.

**15.8-5.6** Members of the secretarial support staff and the Medical Center's Quality Assessment Resource Management Department who may have access to this information in performing their duties shall be informed of the confidential nature of the information and shall follow a procedure to assure their confidentiality.

**15.8-6 Member's Opportunity to Request Correction/Deletion of and to Make Addition to Information in His/Her Association Credentials File and Peer Review File(s)**

**15.8-6.1** After a member has received notification of the insertion of information in his/her Credentials File or Peer Review File(s) as provided in Section 15.8-3.3, or has reviewed information in his/her Credentials File or Peer Review File(s) as provided in Section 15.8-5.3, he/she may address to the President a written request for correction or deletion of information in his/her file(s).  Such request shall include a statement of the specific information concerned and the basis for the action requested.

**15.8-6.2** The President shall review such a request within thirty (30) days and shall recommend to the Executive Committee whether or not to make the correction or deletion requested. The Executive Committee, when so informed, shall either ratify or initiate action contrary to this recommendation by a majority vote.

**15.8-6.3** The member shall be notified promptly, in writing, of the decision of the Executive Committee.

**15.8-6.4** In any case, a member shall have the right to add to his/her Credentials File or Peer Review File(s), upon written request to the Executive Committee, a statement responding to any information contained in the File.

## 15.9   RETALIATION PROHIBITED

### 15.9-1 Prohibition

Neither the Association, its members, committees or department heads, the Governing Body, its Chief Administrative Officer, the Chief Medical Officer, Chief Executive Officer, Director or any other employee or agent of the Medical Center or Association, may engage in any punitive or retaliatory action against any member of the Association because that member claims a right or privilege afforded by, or seeks implementation of any provision of, these Association bylaws.

### 15.9-2  Public Policy for Advocacy

The Association recognizes and embraces that it is the public policy of the State of California that a physician and surgeon be encouraged to advocate for medically appropriate health care for his or her patients. To advocate for medically appropriate health care includes, but is not limited to, the ability of a physician to protest a decision, policy, or practice that the physician, consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care, reasonably believes impairs the physician's ability to provide medically appropriate health care to his or her patients. No person, including, but not limited to, the Association, the Medical Center, its employees, agents, or members of the Governing Body, shall retaliate against or penalize any member for such advocacy or prohibit, restrict, or in any way discourage such advocacy, nor shall any person prohibit, restrict, or in any way discourage a member from communicating to a patient information in furtherance of medically appropriate health care.

### 15.9-3  Corrective Action Not Precluded

This Section 15.9 does not preclude corrective and/or disciplinary action as authorized by these Association bylaws.

## 15.10   CONFLICT MANAGEMENT

**15.10-1**   In the event of a conflict between the Executive Committee and the Association (as represented by written petition signed by at least thirty-three (33) percent of the voting members of the Association) regarding a proposed or adopted Rule, policy or

other issue of significance to the Association, the President shall convene a meeting with the petitioners' representative(s). The foregoing petition shall include a designation of up to five voting members of the Association who shall serve as the petitioners' representative(s). The Executive Committee shall be represented by an equal number of Executive Committee members. The Executive Committee's and the petitioners' representative(s) shall exchange information relevant to the conflict and shall work in good faith to resolve differences in a manner that respects the positions of the Association, the leadership responsibilities of the Executive Committee, and the safety and quality of patient care at the Medical Center. Resolution at this level requires a majority vote of the Executive Committee's representatives at the meeting and a majority vote of the petitioner's representatives. Unresolved differences shall be submitted to a vote of the Association, with at least a majority of voting members necessary to overrule the Executive Committee's decision with respect to the proposed Rule, policy, or issue.

**15.10-2** Except for matters involving access to peer review documents which is managed following the procedures described in Section 15.8-5.4, in the event of a dispute between the Association and the Governing Body relating to the independent rights of the Association, as further described in California Business & Professions Code Section 2282.5, the following procedures shall apply

### 15.10-2.1 Invoking the Dispute Resolution Process

**15.10-2.1-a** The Executive Committee may invoke formal dispute resolution, upon its own initiative, or upon written request of twenty-five (25) percent of the voting members of the Association.

**15.10-2.1-b** In the event the Executive Committee declines to invoke formal dispute resolution, such process shall be invoked upon written petition of fifty (50) percent of the voting members of the Association.

### 15.10-2.2 Dispute Resolution Forum

**15.10-2.2-a** Ordinarily, the initial forum for dispute resolution shall be the Joint Conference Committee, which shall meet and confer as further described in Section 11.4.

**15.10-2.2-b** However, upon request of at least two-thirds (2/3) of the members of the Executive Committee, the meet and confer will be conducted by a meeting of the full Executive Committee and the full Governing Body. A neutral mediator acceptable to both the Governing Body and the Executive Committee may be engaged to further assist in dispute resolution upon request of:

**15.10-2.2-b.1** At least a majority of the Executive Committee plus two (2) members of the Governing Body; or

**15.10-2.2-b.2** At least a majority of the Governing Body plus two (2) members of the Executive Committee.

**15.10-2.2-c** The parties' representatives shall convene as early as possible, shall gather and share relevant information, and shall work in good faith to manage and, if possible, resolve the conflict. If the parties are unable to resolve the dispute, the Governing Body shall make its final determination giving great weight to the actions and recommendations of the Executive Committee. Further, the Governing Body determination shall not be arbitrary or capricious, and shall be in keeping with its legal responsibilities to act to protect the quality of medical care provided and the competency of the Association, and to ensure the responsible governance of the Medical Center.

ARTICLE XVI

FEES AND PROFITS

## 16.1   GENERAL RULES

Except as otherwise provided by County contract, no member of the Association shall bill, accept, or receive any fee or gratuity for any type of service rendered to any patient under the jurisdiction of the Medical Center, except as to those patients who are designated as private patients of that member upon admission, or where that member is called as a consultant for a private patient of another member.

## 16.2   DIVISION OF FEES

The practice of the division of fees under any guise whatsoever is forbidden, and any such division of fees shall be cause for expulsion or exclusion from the Association.

## 16.3   RESEARCH

No member of the Association shall receive any direct pecuniary gain from any patient or sources on behalf of any patient as a result of any research conducted in the Medical Center.

ARTICLE  XVII

INDEMNIFICATION AND INSURANCE

## 17.1   INDEMNIFICATION OF THE COUNTY

Notwithstanding any other provision of these bylaws, each practitioner (other than a practitioner who (1) provides health services to a patient at the Medical Center within the scope of his/her employment as a County Civil Service employee, whether classified or unclassified, (2) provides health services to a patient at the Medical Center within the scope of a contract which he/she has entered into with the County and which has been

approved by the Governing Body, or (3) provides health services to a patient at the Medical Center within the scope of a contract which has been entered into between a non-County entity and the County and which has been approved by the Governing Body) who renders services to and bills patients in the Medical Center shall indemnify, defend and hold harmless County, and its Special Districts, elected and appointed officers, employees, and agents from and against any and all liability, including, but not limited to, demands, claims, actions, fees, costs, and expenses (including attorney and expert witness fees), arising from or connected with practitioner's acts and/or omissions arising from and/or relating to the services provided to such patients by such practitioner.

## 17.2   GENERAL INSURANCE REQUIREMENTS

Without limiting any such practitioner's indemnification of County, each such practitioner shall provide and maintain the programs of insurance specified in this Article XVII.  Such insurance shall be primary to and not contributing with any other insurance or self-insurance programs maintained by County, and such coverage shall be provided and maintained at the practitioner's own expense.

### 17.2-1  Evidence of Insurance

Certificate(s) or other evidence of coverage satisfactory to County shall be delivered to the Chief Medical Officer prior to any such practitioner rendering any services to any patient at the Medical Center.  Such certificates or other evidence shall:

**17.2-1.1** Specifically reference these bylaws;

**17.2-1.2** Clearly evidence all required coverages;

**17.2-1.3** Contain the express condition that County is to be given written notice by mail at least thirty (30) days in advance of cancellation for all policies evidenced on the certificate of insurance;

**17.2-1.4** Include copies of the additional insured endorsement to the commercial general liability policy, adding the County of Los Angeles, its Special Districts, its officials, officers and employees as additional insureds for all activities arising from and/or relating to the services provided by the practitioner; and

**17.2-1.5** Identify any deductibles or self-insured retentions for County's approval. The County retains the right to require the practitioner to reduce or eliminate such deductibles or self-insured retentions as they apply to County or require the practitioner to provide a bond guaranteeing payment of all such retained losses and related costs including, but not limited to, expenses or fees, or both, related to investigations, claims administrations, and legal defense. Such bond shall be executed by a corporate surety licensed to transact business in the State of California.

### 17.2-2 Insurer Financial Ratings

Insurance shall be provided by an insurance company acceptable to the County with an A.M. Best rating of not less than A:VII, unless otherwise approved by County.

**17.2-3 Failure to Maintain Coverage**

Any failure by any such practitioner to provide and maintain the required insurance, or to provide evidence of insurance coverage acceptable to County, shall constitute a material violation of these bylaws and shall result in the immediate and automatic suspension of the practitioner's Association membership and clinical privileges as provided in Section 6.4-5.  County, at its sole option, may obtain damages from the practitioner resulting from such breach.

**17.2-4 Notification of Incidents, Claims or Suits**

Each such practitioner shall notify the County, or its authorized claims representative, by Department of Health Services Event Notification Report of any occurrence of disease, illness, death, injury to persons or destruction of property, or any malpractice, error, or event that is potentially compensable (e.g., any adverse event related to hospitalization or treatment, any deviation from expected outcomes). If a claim is made or suit is brought against the practitioner and/or the County, the practitioner shall immediately forward to the County, or its authorized claims representative, copies of every demand, notice, summons or other process received by him/her or his/her representative.   In addition, each such practitioner shall cooperate with and assist the County, or its authorized representatives, in accordance with County and Medical Center procedures.

**17.2-5 Compensation for County Costs**

In the event that any such practitioner fails to comply with any of the indemnification or insurance requirements of these bylaws, and such failure to comply results in any costs to County, the practitioner shall pay full compensation to County for all costs incurred by County.

**17.3  <u>INSURANCE COVERAGE REQUIREMENTS</u>**:

**17.3-1** Workers' Compensation and Employers' Liability insurance providing workers' compensation benefits, as required by the Labor Code of the State of California or by any other state, and for which such practitioner is responsible.  This insurance also shall include Employers' Liability coverage with limits of not less than the following:

| | |
|---|---|
| Each Accident: | $1 million |
| Disease - policy limit: | $1 million |
| Disease - each employee: | $1 million |

**17.3-2** Professional Liability Insurance covering liability arising from any error, omission, negligent or wrongful act of the practitioner, its officers or employees with limits of not less than $1 million per occurrence and $3 million aggregate.  The coverage also shall provide an extended two year reporting period commencing upon termination or cancellation of clinical privileges.

<u>ARTICLE  XVIII</u>

<u>CONFLICT OF INTERESTS IN RESEARCH</u>

Investigators at the Medical Center must avoid conflicts of interest with respect to their research.  Claims of either fraud or conflicts of interest related to research shall be determined by the Office of Compliance of the Los Angeles Biomedical Research Institute at Harbor-UCLA (LABioMed) and the appropriate committee(s) of LABioMed. The President and the Chief Medical Officer shall be advised of all claims of fraud or conflict of interest and shall be apprised of the investigation and findings of the LABioMed determination.

## ARTICLE XIX

## AMENDMENT OF BYLAWS

### 19.1 PROCEDURE

Upon the request of (1) the Executive Committee, (2) the President or (3) upon timely written petition signed by at least thirty percent (30%) of the Association members in good standing entitled to vote as described in Article III, consideration shall be given to the adoption, amendment or repeal of these Bylaws.

### 19.2 APPROVAL

These bylaws may be amended at any annual or special meeting of the Association, provided that notice of such business is sent to all members no later than ten (10) days before such meeting.  The notice shall include the exact wording of the proposed amendment(s) and the time and place of the meeting.  The wording may be sent in electronic form.  To be adopted, an amendment shall require an affirmative majority vote of those present and eligible to vote, provided that a quorum exists as described in Section 12.5-1. Amendments shall be effective only if and when approved by the Governing Body, which approval shall not be withheld unreasonably.  If approval is withheld, the reasons for doing so shall be specified by the Governing Body, in writing, and shall be forwarded to the President, the Executive Committee and the Bylaws Committee.

### 19.3 EXCLUSIVITY

The mechanism described herein shall be the sole method for the initiation, adoption, amendment, or repeal of the Association bylaws.

### 19.4   EFFECT OF THE BYLAWS

#### 19.4-1 Contractual Relationship

Upon adoption and approval as provided in this Article XIX, in consideration of the mutual promises and agreements contained in these bylaws, the Medical Center and the Association, intending to be legally bound, agree that these bylaws shall constitute part of the contractual relationship existing between the Medical Center and the Association members, both individually and collectively.

#### 19.4-2 Prohibition Against Unilateral Amendment

These bylaws may not be unilaterally amended or repealed by the  Association  or the Governing Body.

No Association governing document and no Medical Center corporate bylaws or other Medical Center governing document shall include any provision purporting to allow unilateral amendment of the Association bylaws or other Association governing document.

### 19.4-3  Conflicting Governing Body or Medical Center Bylaws or Policies

Medical Center corporate bylaws, policy, rules, or other Medical Center requirements that conflict with Association bylaw provisions, rules, regulations and/or policies and procedures, shall not be given effect and shall not be applied to the Association or its individual members

### 19.5    SUCCESSOR IN INTEREST

### 19.5-1  Successor in Interest

These bylaws, and privileges of individual members of the Association accorded under these bylaws, will be binding upon the Association and the Governing Body of any successor in interest in this Medical Center, except where hospital medical staffs are being combined. In the event that the staffs are being combined, the medical staffs shall work together to develop new bylaws which will govern the combined medical staffs, subject to the approval of the Governing Body or its successor in interest. Until such time as the new bylaws are approved, the existing bylaws of each institution will remain in effect.

### 19.5-2  Affiliations

Affiliations between the Medical Center and other hospitals, health care systems or other entities shall not, in and of themselves, affect these bylaws.

### 19.6    CONSTRUCTION OF TERMS AND HEADINGS

The captions or headings in these bylaws are for convenience only and are not intended to limit or define the scope of or affect any of the substantive provisions of these bylaws. These bylaws apply with equal force to both genders wherever either term is used.