THOMAS M. BROWN (SBN 117449)
tbrown@brownwhitelaw.com
KENNETH P. WHITE (SBN 173993)
kwhite@brownwhitelaw.com
BROWN WHITE & OSBORN LLP
333 South Hope Street, 40th Floor
Los Angeles, California 90071-1406
Telephone:  213.613.0500
Facsimile:   213.613.0550

Attorneys for Plaintiff
Timothy Ryan

# UNITED STATES DISTRICT COURT

## CENTRAL  DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TIMOTHY RYAN, M.D., an individual,<br><br>Plaintiff,<br><br>v.<br><br>BRANT PUTNAM, M.D., an individual, JANINE VINTCH, M.D., an individual, ANISH MAHAJAN, M.D., an individual, CHRISTIAN DE VIRGILIO, M.D., an individual, HAL F. YEE, M.D., an individual, ROGER LEWIS, M.D., an individual, MITCHELL KATZ, M.D., an individual, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.:  17-cv-05752-R-RAO<br><br>Hon. Manuel L. Real<br><br>**PLAINTIFF TIMOTHY RYAN, M.D.'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>*[Concurrently Filed with: Plaintiff's Objection to Request for Judicial Notice]*<br><br>Date:   December 4, 2017<br>Time:  10:00 a.m.<br>Dept.:  880 |

PLAINTIFF TIMOTHY RYAN, M.D. 'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................... 1

II.    FACTS AS ALLEGED BY DR. RYAN'S FAC .................................... 2

    A.    Dr. Ryan Uncovers a Fraudulent Kickback Scheme Harming
        Patients ....................................................................................... 2

    B.    Dr. Ryan Reports the Illegal Scheme to His Superiors, Who Do
        Nothing to Stop the Corruption and Patient Endangerment .................... 4

    C.    Dr. Ryan Reports the Illegal Scheme to NIH and the District
        Attorney's Office ........................................................................ 4

    D.    Dr. White Seeks the MEC's Assistance in Retaliating Against
        Dr. Ryan and the MEC Obliges by Initiating Disciplinary
        Proceedings ................................................................................ 5

    E.    DHS Medical Executives Endorse and Approve Retaliation
        Against Dr. Ryan ......................................................................... 6

    F.    The MEC Retaliates Against Dr. Ryan by Voting to Revoke His
        Professional Staff Membership and Hospital Privileges ...................... 6

    G.    Dr. Ryan Is Informed of the DHS' Intention to Suspend His
        Employment ............................................................................... 7

    H.    Dr. Ryan Sues Defendants for Retaliation Based on Exercise of
        His First Amendment Rights ......................................................... 7

III.   LEGAL STANDARD ............................................................................ 8

IV.    ARGUMENT ......................................................................................... 9

    A.    Dr. Ryan's Speech Is Constitutionally Protected and Clearly
        Established ................................................................................. 9

        1.    Whistleblowing Was Clearly Established as
            Constitutionally Protected Speech In 2013 ................................ 10

# TABLE OF CONTENTS

**Page**

       2.     The Court Cannot Determine Whether Dr. Ryan's Speech
Falls Within the Scope of His Employment at this Stage ............ 13

       3.     Whistleblowing to Outside Agencies Is Outside the
Scope of Dr. Ryan's Job Duties ..................................................... 13

       4.     "Intervening Event" Is Outside the Scope of the
Allegations of the FAC and Does Not Bar Recovery................... 15

  B.    Each Defendant Took Adverse Employment Actions Against
Dr. Ryan ............................................................................................. 16

       1.     Initiation of Disciplinary Proceedings Is Sufficient to
Constitute an Adverse Employment Action ................................. 16

       2.     Approval of an Adverse Employment Action Is
Sufficient to State a Claim ........................................................... 18

  C.    Dr. Ryan Has Stated a Claim for Violation of His First
Amendment Rights Pursuant to Section 1983 ....................................... 19

V.    CONCLUSION ................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**Cases**

*Balistreri v. Pacifica Police Department*,
   901 F.2d 696 (9th Cir. 1988)................................................................8

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................8

*Cahill v. Liberty Mutual Insurance Co.*,
   80 F.3d 336 (9th Cir. 1996)................................................................9

*Coszalter v. City of Salem*,
   320 F.3d 968 (9th Cir. 2003)..............................................................18

*Dahlia v. Rodriguez*,
   735 F.3d 1060 (9th Cir. 2013).............................................11, 12, 13

*De La Cruz v. Tormey*,
   582 F.2d 45, 48 (9th Cir. 1978)............................................................8

*Dible v. City of Chandler*,
   515 F.3d 918 (9th Cir. 2008)..............................................................12

*Freitag v. Ayers*,
   468 F.3d 528 (9th Cir. 2006)..................................................*passim*

*Gilligan v. Jamco Development Corp.*,
   108 F.3d 246 (9th Cir. 1997)................................................................8

*Marable v. Nitchman*,
   511 F.3d 924 (9th Cir. 2007)........................................................10, 12

*Mueller v. Auker*,
   576 F.3d 979 (9th Cir. 2009)................................................................9

*O'Brien v. Welty*,
   818 F.3d 920 (9th Cir. 2016).....................................................9, 13, 15

*Poland v. Chertoff*,
   494 F.3d 1174 (9th Cir. 2007)............................................................17

*Thomas v. City of Beaverton*,
   379 F.3d 802 (9th Cir. 2013)..............................................................10

*Ulrich v. City and County of San Francisco*,
   308 F.3d 968 (9th Cir. 2002).......................................................16, 17

*Van Buskirk v. Cable News Network, Inc.*
   284 F.3d 970 (9th Cir. 1988).......................................................9, 15

*Walling v. Beverly Enterprises*,
   476 F.2d 393 (9th Cir. 1973)................................................................9

# TABLE OF AUTHORITIES

**Page**

*Waters v. Churchill*,
   511 U.S. 661 (1994) .................................................................................................... 11

**Statutes**

42 U.S.C. § 1983 ................................................................................................*passim*

**Rules**

Fed. R. Civ. P. 8(a)(2) .................................................................................................... 8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Defendants' Motion to Dismiss is a meritless attack on a valid and straightforward pled First Amendment retaliation claim under 42 U.S.C. § 1983 ("Section 1983").  In late 2013 and 2014, Plaintiff Tim Ryan, M.D. ("Dr. Ryan"), a vascular surgeon, uncovered a startling fraudulent scheme at Harbor-UCLA Medical Center, where he was employed.  That scheme involved surgeons performing medically unnecessary surgical procedures on patients in exchange for financial kickbacks from a national medical device manufacturer.  Dr. Ryan reported this fraudulent scheme to his to his superiors at Harbor-UCLA, but his discovery fell on deaf ears.  Dr. Ryan then reported his findings to the National Institute of Health ("NIH") in 2014, and to the Los Angeles County District Attorney's Office in January 2015.  He informed several of his colleagues at Harbor-UCLA of his outside reporting.

After the NIH conducted a site audit of Harbor-UCLA and the District Attorney's Office opened a criminal investigation, one of the surgeons implicated in the scheme demanded that the Medical Executive Committee ("MEC") take retaliatory action against Dr. Ryan for his reporting of the fraudulent scheme to outside authorities.  With full knowledge of the nature of Dr. Ryan's actions, the MEC initiated disciplinary proceedings against Dr. Ryan for his whistleblowing under various pretexts.  On October 5, 2016, the MEC—with the full approval and endorsement of Harbor-UCLA's medical executives—informed Dr. Ryan that it had voted to revoke his Professional Staff membership and privileges at Harbor-UCLA. That retaliatory process continues to this day.  In response, Dr. Ryan filed an action for retaliation in violation of his First Amendment rights under Section 1983.

1

Defendants'[1] Motion to Dismiss Dr. Ryan's First Amended Complaint is without merit.  Defendants assert that they are entitled to qualified immunity because no Defendant subjected Dr. Ryan to an adverse employment action because (1) the First Amendment rights he asserted were not clearly established, and (2) Dr. Ryan spoke pursuant to his professional responsibilities as a public employee rather than as a private citizen.  Given Dr. Ryan's clear and specific factual allegations and well-established Ninth Circuit law, Defendants are wrong.

Dr. Ryan's reporting of the fraudulent kickback scheme to the NIH and District Attorney's Office is a textbook example of whistleblowing, a right which is constitutionally protected under clearly established law and outside the scope of a public employee's job duties.  Furthermore, each Defendant is responsible for taking adverse employment actions against Dr. Ryan, either by initiating unfounded and retaliatory disciplinary proceedings against Dr. Ryan, or by fully endorsing and approving the retaliatory actions.  For these reasons, the Court should deny Defendants' Motion to Dismiss.

## II.

### FACTS AS ALLEGED BY DR. RYAN'S FAC

**A.   Dr. Ryan Uncovers a Fraudulent Kickback Scheme Harming Patients**

Dr. Ryan, an accomplished vascular surgeon, is employed by the Los Angeles County Department of Health Services ("DHS") at Harbor-UCLA Medical Center, a designated public hospital and a Medicare and Medicaid certified hospital.  FAC, ¶ 5.  In December 2013, Dr. Ryan treated Patient BH who presented with acute type B aortic dissection.  *Id.*, ¶ 18.  Dr. Ryan appropriately treated Patient BH with beta-blockers and anti-hypertensives, and once Patient BH was symptom free, discharged her home.  *Id.*

---

[1] "Defendants" collectively refers to Brant Putnam, M.D.; Janine Vintch, M.D.; Anish Mahajan, M.D.; Christian de Virgilio, M.D.; Hal F. Yee, M.D.; Roger Lewis, M.D.; and Mitchell Katz, M.D.

At the time, Rodney White, M.D. ("Dr. White") served as Chief of Vascular Surgery at Harbor-UCLA and as Vice Chair of Harbor-UCLA's LA BioMed Research Committee. *Id.*, ¶ 16. Dr. White had an agreement with a manufacturer of aortic stent grafts wherein the manufacturer agreed to pay Dr. White to put on "courses" during which the manufacturer's employees could observe stent graft procedures. *Id.* These "courses" were in fact a sham designed to disguise unlawful kickbacks to Dr. White for use of the manufacturer's stent graft. *Id.* Dr. White and other surgeons at Harbor-UCLA thus had financial incentive to seek out opportunities to perform procedures so they would be paid to implant the manufacturer's stent grafts, whether they were medically necessary or not. *Id.*, ¶ 17.

In December 2013, Dr. White had no patients who needed a stent graft. *Id.* However, in order to receive payment from the stent graft manufacturer for teaching a "course," Dr. White contacted Patient BH after Dr. Ryan discharged her and coerced her to agree to a medically unnecessary stent graft procedure. *Id.* Specifically, Dr. White and his nurse Rowena Buwalda contacted Patient BH and instructed her to report to Harbor-UCLA's emergency room claiming she had "chest pains" so she would be admitted to the hospital, and then Dr. White could perform the stent graft procedure. *Id.*, ¶ 19. Patient BH did as she was told and was admitted to Harbor-UCLA under Dr. White's care—even though Dr. Ryan, and not Dr. White, was Patient BH's medical specialist on vascular issues. *Id.*, ¶ 20. Dr. White performed a medically unnecessary stent graft procedure, and Patient BH suffered serious complications in the form of a retrograde dissection and stroke. *Id.*, ¶ 21. Patient BH now suffers from complete expressive aphasia (complete language impairment). *Id.*

Dr. Ryan reviewed medical and payment records and discovered that Dr. White's treatment of Patient BH was only part of a larger fraudulent scheme to undertake medically unnecessary implantation of stents to financially benefit Dr. White and other surgeons at Harbor-UCLA, which risked patient safety. *Id.*, ¶ 22. Between April and November 2014, Dr. Ryan discovered additional illegal and

3

unethical conduct by Dr. White, including falsification of patient case records to appear eligible to participate in NIH-sponsored clinical trials and falsely certifying medical needs of patients Dr. White had not examined, including some of Dr. Ryan's patients.  *Id.*, ¶ 23.

**B.    Dr. Ryan Reports the Illegal Scheme to His Superiors, Who Do Nothing to Stop the Corruption and Patient Endangerment**

After discovering Dr. White and the other surgeons' fraudulent kickback scheme, Dr. Ryan reported his findings to (1) Dr. Timothy Van Natta, Chief Medical Officer of Harbor-UCLA; (2) Dr. Bruce Stabile, then Chief of Surgery; (3) Defendant Dr. De Virgilio, then a senior vascular surgeon; (4) Defendant Dr. Yee, Chief Medical Officer of DHS; and (5) Delvecchio Finley, then CEO of Harbor-UCLA.  *Id.*, ¶ 24. Dr. Ryan's superiors did nothing, and by January 2015, Dr. Ryan had lost confidence that Harbor-UCLA's management would investigate and stop the fraudulent scheme and patient endangerment.  *Id.*, ¶ 26.

**C.    Dr. Ryan Reports the Illegal Scheme to NIH and the District Attorney's Office**

In or around November 2014, Dr. Ryan reported Dr. White's falsification of patient case records and false certifications of medical need to an NIH compliance officer.  *Id.* ¶ 25.  Dr. Ryan informed Dr. Van Natta and Defendant Dr. De Virgilio that he had reported his concerns to NIH.  *Id.*  Additionally, in January 2015, Dr. Ryan contacted Deputy District Attorney Jennifer Lenz Snyder ("DDA Snyder"), head of the Los Angeles County District Attorney's Healthcare Fraud Division.  *Id.*, ¶ 26.  Dr. Ryan informed DDA Snyder of the ongoing fraudulent kickback scheme.  *Id.*  On April 9, 2015, DDA Snyder contacted Dr. Ryan and informed him that the investigation was being transferred to the California Department of Justice.  *Id.*  Dr. Ryan informed Defendants Dr. Putnam and Dr. De Virgilio, as well as Dr. Van Natta, that a criminal investigation was underway.  *Id.*  Word of Dr. Ryan's reporting of the

4

illegal scheme to NIH and DDA Snyder spread through Harbor-UCLA's personnel, including to all Defendants.  *Id.*

In March 2015, NIH conducted a site audit of Harbor-UCLA.  *Id.*, ¶ 27.  The NIH compliance officer informed Dr. Ryan via email that several members of the Harbor-UCLA team had misrepresented their procedural volume histories to appear eligible to participate in NIH-sponsored clinical trials—confirming Dr. Ryan's allegations of improper conduct.  *Id.*  Additionally, in May 2015, Deputy Attorney General Sue Melton Bartholomew informed Dr. Ryan that the California Department of Justice had opened a criminal investigation into Dr. White's illegal scheme.  *Id.*, ¶ 28.  Dr. Ryan cooperated with the Department of Justice, and provided further information on Dr. White's kickback scheme.  *Id.*

## D.  <u>Dr. White Seeks the MEC's Assistance in Retaliating Against Dr. Ryan and the MEC Obliges by Initiating Disciplinary Proceedings</u>

On August 25, 2016, Dr. White sent a letter to Defendant Dr. De Virgilio and Dr. Van Natta, demanding that Harbor-UCLA take corrective action against Dr. Ryan. *Id.*, ¶ 29.  Dr. White alleged that Dr. Ryan's collection of information concerning the fraudulent kickback scheme, which Dr. Ryan had disclosed to NIH, violated the Health Insurance Portability and Accountability Act ("HIPAA") and California's Confidentiality of Medical Information Act ("CMIA").  *Id.*  Dr. White additionally claimed that Dr. Ryan's collection and disclosure of Dr. White's illegal scheme "adversely affected [his] personal and professional life."  *Id.*

As a direct result of Dr. Ryan's reporting of Dr. White's illegal scheme to NIH and law enforcement, the MEC initiated internal disciplinary procedures against Dr. Ryan which sought to revoke his Professional Staff membership and privileges at Harbor-UCLA.  *Id.*, ¶ 30.  The MEC is responsible for initiating disciplinary actions against medical staff, and where appropriate, dismissing medical staff and discontinuing their medical privileges.  *Id.*  Defendants Drs. Putnam, Vintch, Mahajan, De Virgilio, and Lewis all participated in this decision.  *Id.*, ¶¶ 6-9, 11.

5

**E.      DHS Medical Executives Endorse and Approve Retaliation Against Dr. Ryan**

As part of the MEC's internal disciplinary procedures, the MEC met with Defendant Dr. Yee, Los Angeles County's Chief Medical Officer.  *Id.* ¶ 31.  The MEC and Dr. Yee discussed Dr. Ryan's disclosure of the fraudulent kickback scheme to NIH and the District Attorney's Office, and then asked Dr. Yee to ratify the MEC's proposed retaliatory employment action.  *Id.*  In or about April 2016, with full knowledge of Dr. Ryan's disclosures to outside authorities and that those disclosures formed the basis of the MEC's proposed disciplinary actions, Dr. Yee endorsed, ratified, encouraged, and approved the MEC's proposed disciplinary actions against Dr. Ryan.  *Id.*

In 2014, Defendant and DHS Director Dr. Katz was informed by Dr. Van Natta of Dr. Ryan's reporting of the illegal kickback scheme.  *Id.*, ¶ 32.  Dr. Katz further knew that Dr. Ryan's whistleblowing formed the basis of the MEC's proposed disciplinary action.  *Id.*  Despite this knowledge, Dr. Katz endorsed, encouraged, and permitted the MEC's retaliatory actions.  *Id.*  Even after Dr. Stuart Bussey, President of the Union of American Physicians and Dentists, confronted Dr. Katz with the fact that Dr. Ryan was being improperly subjected to retaliatory actions for his whistleblowing and that Dr. Katz should stop the retaliation, Dr. Katz just replied that he would "let nature take its course."  *Id.*

**F.      The MEC Retaliates Against Dr. Ryan by Voting to Revoke His Professional Staff Membership and Hospital Privileges**

On October 5, 2016, Defendant Dr. Putnam informed Dr. Ryan via letter that the MEC had voted to revoke Plaintiff's Professional Staff membership and privileges at Harbor-UCLA.  *Id.*, ¶ 33.  Defendants Drs. Putnam, Vintch, Mahajan, and Lewis all voted in favor of the retaliatory discipline, and Dr. Lewis specifically argued that Dr. Ryan should be punished for his whistleblowing.  *Id.*  The MEC's letter stated that the reason for the MEC's proposed action was that Dr. Ryan had allegedly exhibited

6

"unprofessional behavior" which purportedly created "a chaotic situation in the vascular division," listing various pretexts. *Id.* The MEC's allegations are patently false, and a mere pretext for taking retaliatory action against Dr. Ryan for informing outside authorities of the illegal kickback scheme. *Id.*, ¶ 34. Pursuant to Harbor-UCLA's bylaws, Dr. Ryan requested a hearing. *Id.*

On November 10, 2016, Dr. Ryan received from Defendant Dr. Putnam a "Notice of Charges" informing Dr. Ryan that a hearing would be conducted on the proposed disciplinary action of the MEC. *Id.*, ¶ 35. The "Notice of Charges" again falsely alleged that Dr. Ryan had exhibited "unprofessional and uncooperative conduct and interactions with other Medical Staff members and support staff." *Id.* It also specifically cited as a reason for the proposed discipline was Dr. Ryan's "threatening to call external agencies to conduct investigations." *Id.*, ¶ 36. The MEC made this frank confession of retaliatory motive knowing full well that Dr. Ryan had already reported the fraudulent kickback scheme to NIH and the District Attorney's Office. *Id.*

**G.   <u>Dr. Ryan Is Informed of the DHS' Intention to Suspend His Employment</u>**

On April 4, 2017, Defendant Dr. Mahajan hand-delivered a letter to Dr. Ryan, which indicated the DHS' intention to suspend Dr. Ryan's employment for 25 days. (*Id.*, ¶ 37.) Dr. Mahajan signed the letter. *Id.* The letter cited, among other things, multiple unfounded HIPAA and CMIA violations related to Dr. Ryan's reporting of Dr. White's illegal scheme to NIH and the District Attorney's Office. *Id.* The letter alleged that Dr. Ryan's actions violated DHS' Discipline Manual and Guidelines because the actions were outside the scope of his employment duties. *Id.*

**H.   <u>Dr. Ryan Sues Defendants for Retaliation Based on Exercise of His First Amendment Rights</u>**

On August 3, 2017, Dr. Ryan filed a Complaint against Defendants Drs. Putnam, Vintch, Mahajan, De Virgilio, and Yee, asserting one cause of action for retaliation based on Dr. Ryan's exercise of his First Amendment rights pursuant to 42

7

U.S.C. § 1983.  (Doc. 1.)  On October 6, 2017, Dr. Ryan filed his FAC against the same Defendants, and added Defendants Drs. Lewis and Katz.  (Doc. 14.)  Dr. Ryan asserts that he exercised his constitutional right to free speech and to petition the government by reporting Dr. White's and other physicians' fraudulent and unlawful conduct to NIH, the District Attorney's Office and the California Attorney General's Office.  (FAC, ¶ 41.)  As a direct result of Dr. Ryan's exercise of his constitutionally protected right, each Defendant retaliated against him through adverse employment actions.  *Id.*  Dr. Ryan's speech activities were related to matters of public concern and were not taken pursuant to any official job duties.  *Id.*, ¶ 42.  Defendants' retaliatory acts violated Dr. Ryan's rights under the First Amendment to the United States Constitution to freedom of speech and petition, and directly caused Dr. Ryan to suffer economic and noneconomic damages.  *Id.*, ¶¶ 43-43.

## III.

## **LEGAL STANDARD**

The Federal Rules of Civil Procedure require only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). Rule 8 contains a "powerful presumption against rejecting pleadings for failure to state a claim."  *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted).  A complaint should not be found deficient even if it is apparent that "a recovery is very remote and unlikely."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Rule 12(b)(6) motions are "viewed with disfavor in the federal courts."  *De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978).  Dismissal of a claim is permitted only in "extraordinary" cases, where there is either a "lack of a cognizable legal theory" or the "absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1988).  In ruling on a Rule 12(b)(6) motion, the court looks only to the face of the complaint and documents attached thereto.  *Van Buskirk v. Cable News Network, Inc.* 284 F.3d 970,

8

977 (9th Cir. 1988).  The court must construe the complaint in a light most favorable
to plaintiff, presume that all factual allegations are true, and draw all reasonable
inferences in plaintiff's favor.  *Cahill v. Liberty Mutual Insurance Co.*, 80 F.3d 336,
337-38 (9th Cir. 1996).  Moreover, ambiguities are resolved in favor of upholding the
pleading.  *Walling v. Beverly Enterprises*, 476 F.2d 393, 396 (9th Cir. 1973).

**IV.**

**ARGUMENT**

**A.**   **Dr. Ryan's Speech Is Constitutionally Protected and Clearly Established**

"Qualified immunity shields public officials from civil damages for
performance of discretionary functions . . . .  Under qualified immunity, a [public
employee] will be protected from suit when he or she makes a decision that, even if
constitutionally deficient, reasonably misapprehends the law governing the
circumstances."  *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009).  In resolving a
defendants' claim of qualified immunity at the motion to dismiss stage, "dismissal is
not appropriate unless we can determine, based on the complaint itself, that qualified
immunity applies."  *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016).  In resolving
a claim of qualified immunity, a court must determine whether, taken in the light most
favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if
so, whether the right was clearly established.  *Mueller*, 576 F.3d at 993.

Defendants assert that they are entitled to qualified immunity because Dr.
Ryan's reporting of the fraudulent kickback scheme was not protected speech, even it
was protected speech its protected nature was not clearly established, and because the
speech was made within the scope of Dr. Ryan's job duties.  Motion, 20:6-25:27.
Both the law and the facts alleged in the FAC thoroughly refute Defendants'
arguments.

Dr. Ryan's whistleblowing is unequivocally speech the First Amendment
protects and authorities prohibiting such retaliation against whistleblowing was clearly
established by the time of Defendants' actions.  Furthermore, determination of

9

whether the speech was within the scope of Dr. Ryan's job duties is inappropriate at the motion to dismiss stage. Dr. Ryan has specifically alleged facts showing that it was outside the scope of his duties (including Defendants' admission in the April 4, 2017 letter notifying Dr. Ryan of the intended 25-day suspension, which stated that his conduct was outside the scope of his employment duties), and Ninth Circuit law clearly shows that outside whistleblowing is not part of a public employee's duties.

### 1.    Whistleblowing Was Clearly Established as Constitutionally Protected Speech In 2013

It is abundantly clear that Dr. Ryan's speech is constitutionally protected expression on a matter of public concern. Dr. Ryan has alleged facts showing that he reported fraud by Harbor-UCLA surgeons to the NIH and the District Attorney's Office. FAC, ¶¶ 25-26, 28. As the Ninth Circuit has stated, "an employee's charge of high level corruption in a government agency has all of the hallmarks that we normally associate with constitutionally protected speech. The matter challenged was a matter of intense public interest . . . and criticisms of the government lie at or near the core of what the First Amendment aims to protect." *Marable v. Nitchman*, 511 F.3d 924, 932 (9th Cir. 2007) (reversing grant of summary judgment in § 1983 action when plaintiff acted as a whistleblower). Indeed, it is well settled that "[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern." *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2013) (reversing grant of summary judgment in § 1983 action when plaintiff refused to go along with racially discriminatory hiring practices of public agency). Dr. White, an employee of public agency DHS, was engaged in a fraudulent kickback scheme that encouraged him to perform medically unnecessary procedures risking patient safety and excessively charging Medicare and MediCal for the procedures. FAC, ¶¶ 16-17, 22. Dr. Ryan's disclosure of the illegal scheme to outside authorities was thus speech on a matter of public concern. *Id.*, ¶¶ 25-26, 28.

The Ninth Circuit has recognized conduct like Dr. Ryan's reporting of Dr. White's illegal and unethical scheme to NIH and the District Attorney's Office as speech protected from retaliation.  In *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013), the plaintiff was a police officer of the Burbank Police Department ("BPD") who reported physical beatings of suspects at the hands of other BPD employees to Internal Affairs and to the Los Angeles Sheriff's Department and then faced retaliation for reporting the conduct.  *Id.* at 1063-65.  Officer Dahlia then sued BPD and the individual actors under section1983 for First Amendment retaliation.  *Id.* at 1063.  The district court dismissed as to all defendants, finding in part that the plaintiff spoke pursuant to his official duties and therefore was not constitutionally protected speech.  *Id.* at 1066.  The Ninth Circuit reversed the ruling, finding that:

> [T]he public has a strong interest in hearing from public employees, especially because 'government employees are often in the best position to know what ails the agencies for which they work…It may often be the case that, unless public employees are willing to blow the whistle, government corruption and abuse would persist undetected and undeterred.

*Id.* at 1066-67 (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994)).  The Ninth Circuit further found that "[i]n the classic whistleblower case the state has no legitimate interest in covering up corruption…as an inevitable result of the Court's jurisprudence and sound public policy, the First Amendment generally protects public employee whistleblowers from employer retaliation." *Dahlia,* 735 F.3d at 1067.

Dr. Ryan uncovered Dr. White's (and others') corruption, and informed his superiors at Harbor-UCLA and DHS.  FAC, ¶ 24.  When Dr. Ryan's superiors failed to conduct any investigation into Dr. White's illegal scheme, Dr. Ryan disclosed it to NIH and the District Attorney's Office.  *Id.*, ¶¶ 25-26.  Just like the *Dahlia* plaintiff, who reported the conduct of her fellow employees to outside law enforcement agencies, Dr. Ryan's reporting is specifically and unequivocally protected from employer retaliation.

11

1    Furthermore, there is no doubt that Dr. Ryan's constitutional right to be

2    protected from retaliation for his whistleblowing was clearly established at the time

3    Defendants retaliated against him.  As stated above, *Dahlia* unequivocally states that

4    whistleblowing by a public employee is protected speech, and was decided in 2013—a

5    full year before Dr. Ryan first reported the illegal kickback scheme to outside

6    authorities.  *Dahlia*, 735 F.3d at 1067; FAC, ¶¶ 25-26, 28.  *Marable*, decided in 2007,

7    overturned a ruling granting the defendant summary judgment on ground that there

8    was a genuine issue of material fact as to whether public employee plaintiff's

9    whistleblowing activities were within the scope of his employment duties.  *Marable*,

10   511 F.3d at 932-33.  This demonstrated that the Ninth Circuit believed that whether

11   the *Marable* plaintiff's speech was constitutionally protected and whether the

12   protection was clearly established was *not even at issue*.  In *Freitag v. Ayers*, 468 F.3d

13   528 (9th Cir. 2006), the Ninth Circuit held that a jailer reporting sexual harassment to

14   outside authorities was constitutionally protected.  *Id.* at 546 ("For these reasons, we

15   hold that Freitag's communications with Senator Polanco and the California Inspector

16   General constitute constitutionally protected speech.")  Just so here.

17   Defendants cite *Dible v. City of Chandler*, 515 F.3d 918 (9th Cir. 2008) to

18   assert that Dr. Ryan's retaliation claim is not one of the "rare claims" that are clearly

19   established.  Motion, 21:18-23.  But *Dible* is readily distinguishable.  Ronald Dible

20   was a police officer for the city of Chandler, Arizona.  *Id.* at 922.  He was terminated

21   when it was discovered he was "participating in (performing in, recording and

22   purveying) a sexually explicit website with his wife."  *Id.*  The Ninth Circuit held

23   specifically that Dible's speech was not related to his employment: "[Dible's

24   activities] did not give the public any information about the operations, mission or

25   function of the police department, and were not even close to the kind of private

26   remarks that the Court has countenanced.  His activities were simply vulgar and

27   indecent.  They did not contribute speech on a matter of public concern."  *Id.* at 927.

28   *Dible* never even reached the issue of whether the law "protecting" Dible's speech

12

was clearly established, as the Ninth Circuit's "disposition of the Dibles' First Amendment claims demonstrates that Police Chief Harris did not violate the Dibles' constitutional rights, and that is enough to end the inquiry." *Id.* at p. 930.

In sum, Dr. Ryan's speech was clearly established as protected by the First Amendment. Defendants' argument to the contrary is meritless and defies Ninth Circuit law.

### 2. The Court Cannot Determine Whether Dr. Ryan's Speech Falls Within the Scope of His Employment at this Stage

Defendants assert that even if Dr. Ryan's whistleblowing was protected, the speech falls within the scope of his employment and therefore Dr. Ryan cannot state a claim. Motion, 23:23-25:18. To determine whether Dr. Ryan's speech fell within the scope of his employment at the motion to dismiss stage is simply inappropriate. The Ninth Circuit stated in *Dahlia* that "after *Garcetti* the inquiry into the protected status of speech presents a mixed question of fact and law, and specifically that the question of the scope and content of a plaintiff's job responsibilities is a question of fact." *Dahlia*, 735 F.3d at 1073. Defendants' argument requests that the Court make a factual determination outside of what Dr. Ryan's FAC alleges. Such an argument is more appropriate for a motion for summary judgment, and should not be considered at this early stage in the litigation. Dr. Ryan's FAC clearly alleges facts sufficient to establish that his whistleblowing was outside the scope of his employment – including an admission to that effect by Defendants. FAC, ¶¶ 25-26, 28, 36-37. That is more than enough at this stage. *O'Brien*, 818 F.3d at 936.

### 3. Whistleblowing to Outside Agencies Is Outside the Scope of Dr. Ryan's Job Duties

Moreover, Ninth Circuit law flatly refutes Defendants' argument. When a public employee reports misconduct to outside agencies as a whistleblower, that act is considered outside the scope of the employee's job duties. In *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), a correctional officer at Pelican Bay sued the California

13

Department of Corrections and Rehabilitation and three administrators for retaliation after she made complaints to the California Department of Fair Employment and Housing and to a California State Senator (who contacted the Office of the Inspector General on the plaintiff's behalf) about being sexually harassed by the inmates after her internal complaints were ignored.  *Id.* at 532-35.  In response to the plaintiff's complaints to outside agencies, Pelican Bay administrators initiated two internal affairs investigations against the plaintiff, and requested initiation of at least two more investigations.  *Id.* at 535.  After a jury verdict in favor of the plaintiff, the defendant administrators appealed, arguing that the plaintiff's speech was made within the scope of her job duties.  *Id.* at 536-37.

The Ninth Circuit found, at least as to the plaintiff's reporting of the sexual harassment to the California Department of Fair Employment and Housing and to the State Senator, that:

> It was certainly not part of her official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly, and specifically its failure to take corrective action to eliminate sexual harassment in its workplace.  Rather, it was [plaintiff's] responsibility *as a citizen* to expose such official malfeasance to broader scrutiny.  Accordingly, in these instances, for purposes of the First Amendment she spoke as a citizen.

*Id.* at 545 (emphasis in original).  The Ninth Circuit "[held] that Freitag's communications with Senator Polanco and the California Inspector General constitute constitutionally protected speech."  *Id.* at 546.  Like Freitag, Dr. Ryan has alleged that he reported the fraudulent kickback scheme to outside agencies NIH and the District Attorney's Office.  FAC, ¶¶ 25-26.  Additionally, the April 4, 2017 letter hand-delivered by Defendant Dr. Mahajan, which informed Dr. Ryan of DHS' intention to suspend his employment for 25 days, ***stated specifically that Dr. Ryan's reporting to outside agencies violated its Discipline Manual and Guidelines because it was outside the scope of his employment duties***.  *Id.*, ¶ 37.  Thus, Dr. Ryan has more than adequately pled that his speech fell outside the scope of his employment duties.

14

### 4. "Intervening Event" Is Outside the Scope of the Allegations of the FAC and Does Not Bar Recovery

Defendants superficially argue that Dr. White's August 2015 letter is an intervening event "which breaks the causal nexus" and prevents Dr. Ryan from being able to state a claim. (Motion, 22:15-24.) Not surprisingly, they cite no authority for this strange proposition. They're wrong.

First, this argument asks the Court to make a factual determination on causation, which is forbidden by the motion to dismiss standards. *Van Buskirk*, 284 F.3d at 977. Second, the existence of both legitimate and illegitimate motives to punish a plaintiff is not a bar to stating a claim for section 1983 for First Amendment retaliation at the motion to dismiss stage. The Ninth Circuit has "previously made it clear that there is a right to be free from retaliation even if a non-retaliatory justification exists for the defendants' action." *O'Brien*, 818 F.3d at 936 (reversing trial court's granting of motion to dismiss).

In *O'Brien*, a college student sued his university for retaliation after he had made posts online against the university's support of undocumented immigrants, and later had tried to engage professors in conversations on video in their offices that resulted in campus police being called. *Id.* at 924-25. The university deleted many of O'Brien's online posts and blocked him from posting again, and held disciplinary proceedings concerning the videotaping incident, where the university found he had violated the student conduct code. *Id.* at 925, 927. The Ninth Circuit reversed the trial court's dismissal of O'Brien's section 1983 claim for retaliation of his First Amendment rights. *Id.* at 932 ("Therefore, though O'Brien was appropriately subject to discipline for his confrontation of Dr. Torres and Dr. Lopes, he may state a claim under § 1983…"). Thus, even if there was a legitimate reason to discipline Dr. Ryan, that would not bar recovery under Ninth Circuit law. Certainly, it does not bar Dr. Ryan's ability to state a claim for retaliation under section 1983.

**B.** **Each Defendant Took Adverse Employment Actions Against Dr. Ryan**

Next, Defendants argue that because Dr. Ryan asserted his rights to challenge both the MEC's retaliatory recommendation to revoke his Professional Staff membership and privileges and DHS' intention to suspend his employment for 25 days, no Defendant has taken adverse employment action against Dr. Ryan. Motion, 16:17-20:2. However, Dr. Ryan has adequately alleged that each Defendant took adverse employment actions against him. Defendants ignore well-established precedent that *initiation* of disciplinary proceedings is sufficient to be considered an adverse employment action. Specifically, the mere threat of revoking a physician's clinical privileges can constitute an adverse employment action. Additionally, approval of adverse employment actions is also sufficient to maintain a claim for retaliation.

**1.** **Initiation of Disciplinary Proceedings Is Sufficient to Constitute an Adverse Employment Action**

The crux of Defendants' argument is that the MEC's recommendation to revoke Dr. Ryan's Professional Staff membership and privileges has not been implemented, and therefore Defendants have not taken any adverse employment action against Dr. Ryan. Motion, 16:17-19:1. However, longstanding precedent establishes that *initiation* of disciplinary proceedings is sufficient to constitute an adverse employment action—particularly when the proceedings threaten to revoke a physician's medical privileges.

In *Ulrich v. City and County of San Francisco*, 308 F.3d 968 (9th Cir. 2002), a physician and employee of the San Francisco Department of Health spoke out against budget layoffs at the hospital. *Id.* at 972. Shortly thereafter, the physician received written notice "stating that the hospital's Credentials/Peer Review Committee was opening a formal investigation of him into allegations of professional incompetence." *Id.* The physician resigned his position prior to conclusion of the investigation and sued his employer under section 1983 for retaliation, including two members of the

16

1  Peer Review Committee and its chairperson as defendants. *Id.* at 972 fn. 2; 973.  The

2  trial court granted the individual defendants summary judgment on his section 1983

3  claim, finding the physician had failed to create a triable issue of material fact. *Id.* at

4  974.

5        The Ninth Circuit reversed the trial court's ruling.  *Id.* at 972.  As to the issue of

6  whether the individual defendants had taken adverse employment actions against the

7  plaintiff, the Ninth Circuit found, "Dr. Ulrich was subjected to more than trivial

8  adverse employment actions.  The hospital subjected him to an investigation that

9  threatened to revoke his clinical privileges." *Id.* at 977.  In other words, mere

10  *initiation* of an investigation is sufficient to constitute an adverse employment action,

11  particularly in the fact-specific context of revoking a physician's medical privileges.

12  Other Ninth Circuit precedent also confirms that initiation of an investigation is

13  actionable in other contexts.  *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007)

14  ("The adverse employment actions Poland suffered in this case were: (1) Hillberry's

15  initiation of the administrative inquiry against him…"); *Freitag*, 468 F.3d at 543

16  ("There can be no serious dispute that the second and third elements [adverse

17  employment action and causation] were met with respect to Ayers and Schwartz.

18  Ayers initiated several IA investigations…and Schwartz requested at least one IA

19  investigation…").

20        Dr. Ryan has alleged that the MEC initiated an investigation into his actions,

21  and stated its intention to revoke his privileges.  FAC, ¶¶ 30, 33.  He has alleged that

22  Defendant Drs. Putnam, Vintch, Mahajan, and Lewis voted in favor of revoking his

23  privileges, and also alleged that Defendant Dr. De Virgilio was a member of the MEC.

24  (*Id.*, ¶¶ 9, 33.)  Dr. Ryan has thus adequately alleged that the MEC member

25  Defendants took adverse employment actions against him.

26

27

28

17

### 2.      Approval of an Adverse Employment Action Is Sufficient to State a Claim

Defendants Drs. Yee and Dr. Katz argue that because they are not members of the MEC, they did not subject Dr. Ryan to adverse employment actions.  Motion 19:2-22.  But approval and endorsement of another's adverse employment actions can constitute its own adverse employment action.  In *Freitag*, the Ninth Circuit noted that substantial evidence supported the jury's findings that adverse employment actions were taken against the plaintiff in part because the individuals "approved [plaintiff's] suspension and termination…"  468 F.3d at 543.

Dr. Ryan has alleged that Dr. Yee met with the MEC prior to their recommendation to revoke Dr. Ryan's privileges, and with full knowledge of the basis of the investigation and the MEC's intentions, Dr. Yee endorsed, ratified, encouraged, and approved the MEC's proposed disciplinary actions against Dr. Ryan.  FAC, ¶ 31.  Similarly, Dr. Ryan has alleged that Dr. Katz endorsed, encouraged, and permitted the MEC's retaliatory actions with full knowledge of the basis for the MEC's recommendation.  *Id.*, ¶ 32.  Dr. Katz was also confronted by Dr. Stuart Bussey, President of the Union of American Physicians and Dentists, with the fact that Dr. Ryan was being improperly subjected to retaliatory actions for his whistleblowing and asked Dr. Katz to stop the retaliation.  *Id.*  Dr. Katz refused, replying that he would "let nature take its course."  *Id.*  These allegations are sufficient to support a claim for retaliation under section 1983 against Drs. Yee and Katz.

Defendants also conveniently ignore that DHS took its own independent retaliatory actions against Dr. Ryan by informing him of their intention to suspend his employment for 25 days for alleged HIPAA and CMIA violations related to Dr. Ryan's whistleblowing.  *Id.*, ¶ 37.  Drs. Yee and Katz are both DHS executives who were directly involved in DHS' decision.  *Id.*  Thus, Dr. Ryan has also alleged a separate and independent adverse employment action against Drs. Yee and Katz.  *Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003) (to qualify as an adverse

employment action, a plaintiff must simply show that defendant's actions were "reasonably likely to deter [him] from engaging in protected activity under the First Amendment.").

**C.  Dr. Ryan Has Stated a Claim for Violation of His First Amendment Rights Pursuant to Section 1983**

Defendants assert that Dr. Ryan has failed to state a claim pursuant to Rule 12(b)(6) for the reasons stated in their qualified immunity arguments.  Motion, 26:2-10.  Defendants' argument fails for the same reasons detailed above.  Dr. Ryan has alleged sufficient facts to adequately state a claim pursuant to section 1983 for retaliation in violation of his First Amendment rights.

**V.**

**CONCLUSION**

For the foregoing reasons, Dr. Ryan has adequately stated a claim for retaliation against each Defendant, and no Defendant is entitled to qualified immunity. Defendants' Motion to Dismiss should be denied.


DATED:  November 13, 2017                    Respectfully submitted,

BROWN WHITE & OSBORN LLP


By   _s/Kenneth P. White_

THOMAS M. BROWN
KENNETH P. WHITE
Attorneys for Plaintiff
Timothy Ryan

4844-7565-3716, v. 1

19