1
2
3
4
5

BROWN WHITE & OSBORN LLP
THOMAS M. BROWN (SBN 117449)
KENNETH P. WHITE (SBN 173993)
333 South Hope Street, 40th Floor
Los Angeles, CA 90071-1406
Telephone: 213.613.0500
Facsimile:   213.613.0550
tbrown@brownwhitelaw.com
kwhite@brownwhitelaw.com

6
7

*Attorneys for Plaintiff*
Timothy Ryan

8

## UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11

TIMOTHY RYAN, M.D., an individual,

12

Plaintiff,

13

v.

14
15
16
17
18

BRANT PUTNAM, M.D., an individual,
JANINE VINTCH, M.D., an individual,
ANISH MAHAJAN, M.D., an individual,
CHRISTIAN DE VIRGILIO, M.D., an
individual, HAL F. YEE, M.D., an
individual, ROGER LEWIS, M.D., an
individual, and MITCHELL KATZ, M.D.,
an individual,

19

Defendants.

Case No.:  2:17-cv-05752-CAS(RAOx)

Judge: Hon. Christina A. Snynder

**PLAINTIFF TIMOTHY RYAN,
M.D.'S MEMORANDUM OF
POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT, OR
ALTERNATIVELY, PARTIAL
SUMMARY JUDGMENT**

Date:       December 6, 2021
Time:       10:00 a.m.
Ctrm:       8-D

Action Filed:  August 3, 2017
Trial Date:   April 26, 2022

*[Filed Concurrently Herewith:
Response to Separate Statement;
Objections to Evidence; Declarations
of Timothy Ryan and Kenneth P. White
Thereto]*

20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 2

I. INTRODUCTION ................................................................................. 2

II. FACTUAL AND PROCEDURAL BACKGROUND ....................................... 3

    A. Dr. Ryan Reported Misconduct To The NIH and The District Attorney ..................................................................................... 3

    B. Dr. Putnam and Dr. Vintch Retaliated Against Dr. Ryan For His Reports ..................................................................................... 5

        1. Dr. White's Initial Complaint ............................................. 5

        2. Dr. White's Request For Corrective Action .................................. 6

        3. Dr. White's Addendum To His Complaint ................................. 8

        4. The FPPE Process Violated PSA Practices And Yielded A Knowingly Inaccurate Report About Dr. Ryan .............................. 8

        5. The PSA Demanded That Dr. Ryan Accept A "Behavioral Contract" Based On False Accusations ......................................... 10

        6. Dr. Putnam's Letters To Dr. Ryan About The Plan To Suspend Him ................................................................... 11

III. ARGUMENT ................................................................................. 12

    A. Legal Standard ......................................................................... 12

    B. Dr. Ryan's Reports of Misconduct Are on a Subject of Public Concern ................................................................................... 13

    C. Genuine Disputes of Material Fact Preclude Summary Judgment On Motive .............................................................................. 15

        1. Proximity In Time Shows Defendants' Retaliatory Motive ........ 16

        2. Opposition To Dr. Ryan's Speech Shows Retaliatory Motive .... 17

        3. Evidence Shows Defendants' Proffered Reasons Were Pretextual ..................................................................... 18

    D. Genuine Disputes Of Material Fact Preclude Summary Judgment on Defendants' Justification And Inevitability Arguments ........................ 22

    E. As The Ninth Circuit Previously Found, Defendants Are Not Entitled To Qualified Immunity .............................................................. 23

    F. Genuine Disputes of Material Fact Preclude Summary Adjudication of Punitive Damages Against Dr. Putnam ......................... 26

IV. CONCLUSION ............................................................................. 27

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................12

*Bull v. City & Cnty. of San Francisco*,
595 F.3d 964 (9th Cir.2010) (en banc) ......................................................25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...................................................................................12

*Connick v. Myers*,
461 U.S. 138 (1983)...................................................................................13

*Coszalter v. City of Salem*,
320 F.3d 968 (9th Cir. 2003) ............................................................ *passim*

*Dahlia v. Rodriguez*,
735 F.3d 1060 (9th Cir. 2013) ............................................................13, 26

*Ellins v. City of Sierra Madre*,
710 F.3d 1049 (9th Cir. 2013) .......................................................... *passim*

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)...................................................................................14

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) ...................................................................26

*Johnson v. Multnomah Cnty.*,
48 F.3d 420 (9th Cir.1995). ................................................................13, 15

*Knickerbocker v. City of Stockton*,
81 F.3d 907 (9th Cir. 1996) .......................................................................16

*Lambert v. Richard*,
59 F.3d 136 (9th Cir. 1995) .......................................................................13

*Mabey v. Reagan*,
537 F.2d 1036 (9th Cir. 1976) ...................................................................22

*Marable v. Nitchman*,
511 F.3d 924 (9th Cir. 2007) .....................................................................14

*McKinley v. City of Eloy*,
705 F.2d 1110 (9th Cir. 1983) ...................................................................13

*Mueller v. Auker*,
57 F.3d 979 (9th Cir. 2009) .......................................................................23

*Mullenix v. Luna*,
136 S.Ct. 305 (2015)..................................................................................26

## <u>TABLE OF AUTHORITIES CONT'D</u>

Page(s)

*Nissan Fire & Marine Ins. v. Fritz Cos.*,
  210 F.3d 1099 (9th Cir. 2000) ................................................................12

*Passantino v. Johnson Consumer Prods., Inc.*,
  212 F.3d 493 (9th Cir. 2000) ..................................................................26

*Poland v. Chertoff*,
  494 F.3d 1174 ..........................................................................................25

*Roth v. Veteran's Admin.*,
  856 F.2d 1401 (9th Cir.1988) ..................................................................14

*Smith v. Wade*,
  461 U.S. 30 (1983)....................................................................................26

*Stender v. Lucky Stores, Inc.*,
  803 F.Supp. 259 (N.D. Cal. 1992)...........................................................26

*Thomas v. City of Beaverton*,
  379 F.3d 802 (9th Cir.2004) ........................................................13, 14, 15

*Tolan v. Cotton*
  (2014) 572 U.S. 650..........................................................................23, 24

*Twentieth Century-Fox Film Corp. v. MCA*,
  715 F.2d 1327 (9th Cir. 1983) .................................................................12

*Ulrich v. City & Cty. of San Francisco*,
  308 F.3d 968 (9th Cir. 2002) ........................................................... *passim*

### <u>Rules</u>

Fed.R.Civ.P. 45(a) ........................................................................................12

Fed.R.Civ.P. 56(c)(2) ...................................................................................12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BROWN WHITE & OSBORN LLP
A T T O R N E Y S

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

Dr. Timothy Ryan ("Dr. Ryan"), a vascular surgeon at Harbor-UCLA Medical Center ("Harbor"), detected two serious forms of fraud by his colleagues –falsifying qualifications related to a study the National Institute of Health ("NIH") sponsored, and a scheme to use stent grafts in patients in exchange for kickbacks from a device manufacturer. When his supervisors did not take his reports seriously, Dr. Ryan exercised his First Amendment right to petition his government by reporting the misconduct to outside authorities. He reported his colleagues to the NIH for falsifying their qualifications and to the District Attorney's Office for the kickback scheme.

Dr. Ryan's colleagues at Harbor retaliated with an effort to suspend his surgical privileges that destroyed his career. Acting directly at the demands of Dr. Rodney White, whose misconduct Dr. Ryan reported, doctors on Harbor's Professional Staff Association's ("PSA") Medical Executive Committee ("MEC") launched an investigation of Dr. Ryan, circulated false assertions about his conduct, demanded that he confess falsely as a price of keeping his surgical privileges at Harbor, and began to strip him of those medical privileges.  As MEC members are employees of the County of Los Angeles and acted in retaliation against Dr. Ryan's First Amendment rights, their actions violated 28 U.S.C. § 1983 ("Section 1983").

Two Defendants – Drs. Brant Putnam and Janice Vintch (collectively "Defendants") – move for summary judgment ("Motion"), asserting that Dr. Ryan cannot prove his Section 1983 claim.  Each of their arguments is patently meritless. Defendants claim that Dr. Ryan did not speak on a subject of public interest, but Dr. Ryan's reports of official misconduct to outside authorities were quintessentially on a matter of public concern.  Defendants claim that Dr. Ryan cannot prove that they were motived by retaliation against his speech, and that they would have imposed the same discipline whether or not he reported misconduct, but Dr. Ryan has submitted extensive admissible evidence showing their improper retaliatory motive, and creating a genuine

dispute of material fact precluding summary judgment. Defendants claim that qualified immunity protects them, a theory the Ninth Circuit previously rejected in this case.  But Ninth Circuit precedent shows that their retaliation violated clearly established First Amendment rights.  Dr. Putnam claims that Dr. Ryan cannot show he is liable for punitive damages.  Evidence that shows Dr. Putnam engaged in retaliation also shows Dr. Ryan is entitled to punitive damages.

Both genuine disputes of material fact and clear legal authority preclude summary judgment.  This Court should deny the motion.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    Dr. Ryan Reported Misconduct To The NIH and The District Attorney

Dr. Ryan began working at Harbor as a Staff Vascular Surgeon in 2013. (DF[1] 9, 47.)  In 2014, Dr. Ryan became aware of a clinical trial the NIH sponsored called BEST-CLI.  (DF 48) The trial required participants to have completed a set number of surgeries to be qualified.  (DF 49.)  Dr. Ryan doubted that some Harbor surgeons – including Drs. Rodney White and Carlos Donayre – had the requisite number of surgeries, and believed they falsified their applications in order to participate. (DF 49.) On December 4, 2014, Dr. Ryan reported his concerns to senior physicians at Harbor. (DF 50.) Based on their responses, Dr. Ryan believed they were not seriously investigating. (DF 51.)  Dr. Ryan was concerned because he believed that public employees had falsified an application to a clinical trial, were not qualified to participate in the trial, their lack of qualifications would impact the reliability of the trial, and patients would be put at risk. (DF 52.)  On December 4, 2014, Dr. Ryan contacted the NIH and reported his concerns. (DF 53.)

In response to Dr. Ryan's report to the NIH, the BEST-CLI trial management conducted an audit and found that "several members of the Harbor-UCLA team misrepresented their procedural volume histories to meet the criterial of independent

---

[1] "DF" refers to Plaintiff's Statement of Genuine Disputes of Material Fact, followed by the fact number.  Plaintiff's Statement contains all citations to the factual record.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

endovascular operator." (DF 45, 55.) The investigation further found that the surgeons at Harbor, including Drs. White and Donayre, were not qualified to conduct endovascular surgeries in the trial and could not enroll more patients. (DF 45, 55.) Defendants Drs. Putnam and Vintch were aware of this development. (DF 56, 99.)

In December 2013, Dr. Ryan treated patient "BH" for an aortic dissection through medication, which he believed to be the correct course. (DF 57.) Shortly thereafter, Dr. White's nurse Rowena Buwalda copied Dr. Ryan on an email reporting that she had instructed BH to come to the hospital the following day and to complain of chest pains when she did so. (DF 58.) Dr. Ryan discovered that Dr. White had re-admitted BH to Harbor under the false pretense of her having chest pains to make her admission appear to be an emergency, guaranteeing insurance payment. (DF 59.) Dr. Ryan also learned that Dr. Donayre had performed surgery on BH, implanting a stent graft Medtronic manufactured (DF 60), and that BH suffered a serious aortic injury from the stent graft surgery, resulting in a major stroke. (DF 62.)

Dr. Ryan learned that Medtronic was paying Harbor physicians thousands per Medtronic stent implant surgery under the ruse of their teaching a "course" on how to perform the implant, even though no other physicians were present for these supposed "courses." (DF 64-66.) The physicians were making thousands of dollars per surgery and Medtronic was being paid tens of thousands of dollars for the stents. (DF 66.) Dr. Ryan believed this represented doctors getting kickbacks from a device manufacturer to use their product, compromised medical judgment, and it threatened the health and safety of patients for whom the stent grafts were not indicated, as in the case of BH. (DR 68.) Dr. Ryan confronted Dr. Donayre about this, and Dr. Donayre admitted that Medtronic paid him and Dr. White for these "courses," and Dr. Ryan had to learn to live with it. (DF 67.)

Dr. Ryan first reported his concerns to superiors in January 2014. (DF 69.) Dr. Ryan approached Dr. Bruce Stabile, Chief of Surgery, who told Dr. Ryan that he should find a way to "restore harmony in the vascular division by finding a way to share fees" with Dr. White. (DF 69.) This response was shocking and unacceptable to Dr. Ryan, so

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

he went to Dr. Van Natta and repeated his concerns to him. (DF 70.) Dr. Van Natta told Dr. Ryan he should "keep [his] head down" during his six-month probationary period. (DF 70.) In Fall 2014, Dr. Ryan expressed his concerns to Dr. Putnam. (DF 71.)

Dr. Ryan knew that the MEC conducted a Focused Professional Performance Evaluation ("FPPE") of Doctor White in 2014 in response to Dr. Ryan's complaint because the FPPE team interviewed Dr. Ryan. (DF 73.) Dr. Ryan told that team – which included Dr. DeVirgilio – about his concerns and conclusions about Dr. White and the Medtronic kickbacks. (DF 73.) But when Dr. Ryan saw Harbor taking no action about his complaint through the FPPE, he reported to criminal authorities. (DF 74.)

Dr. Ryan to a Deputy District Attorney ("DDA") on January 12, 2015, describing his concerns that Harbor physicians were getting kickbacks for implanting devices that were not indicated. (DF 75.)  The DDA told Dr. Ryan that the DA's would investigate, and later interviewed Dr. Ryan. (DF 75.) Shortly after his call with the DDA, Dr. Ryan told Dr. De Virgilio that he reported to the DA's Office who would investigate. (DF 76.) In the Summer 2015, shortly after Dr. Ryan's report to the DA's Office, Medtronic "courses" at Harbor ceased. (DF 78.)

## B. Dr. Putnam and Dr. Vintch Retaliated Against Dr. Ryan For His Reports

### 1. Dr. White's Initial Complaint

On January 26, 2015, shortly after NIH's audit of the BEST-CLI trial, Dr. White submitted an email to Harbor leadership "to report invasion of personal privacy, and potential federal (HIPPA) and state (California Medical Privacy Act) patient privacy violations by Dr. Timothy Ryan." (DF 79.) On February 4, 2015, Dr. White submitted a package of information in support of his complaint. (DF 80.) Dr. White's February 4, 2015 affidavit complained Dr. Ryan had improperly reviewed medical records and approached Harbor personnel to collect information regarding Dr. White and his patients. (DF 81.) This was a reference to information Dr. Ryan gathered for his report to the NIH and the DA's Office. (DF 82.) Dr. White included a report of surgeries that Dr. Ryan supposedly asked an assistant to provide. (DF 83.) In fact, the report showed it was

4

BROWN WHITE & OSBORN LLP
ATTORNEYS
BW

created on January 30, 2015, after Dr. Ryan investigated, after the NIH's audit, and after Dr. White's complaint. (DF 84.)

The MEC, of which both Drs. Putnam and Vintch were members, investigated Dr. White's complaint before September 2015. (DF 6-7, 101.) The MEC knew Dr. White was complaining Dr. Ryan had gathered patient information to send it to the NIH and that the NIH had determined that Dr. White had falsified his experience to participate in the study. (DF 101.) The MEC referred the issue to Harbor's HIPAA Compliance Officer, who found no HIPAA violation. (DF 101.) Having "spent months and worked very diligently" on the investigation and believed it had "investigated adequately," the MEC took no action against Dr. Ryan. (DF 85, 101.)

### 2.    Dr. White's Request For Corrective Action

Dr. White was not satisfied. On August 24, 2015, Dr. White sent Dr. Putnam a Request for Corrective Action demanding the PSA take action against Dr. Ryan (DF 96) for allegedly violating HIPAA, the Confidentiality of Medical Information Act, and Dr. White's privacy by asking for and reviewing medical records. (DF 97.) Once again, Dr. White was describing Dr. Ryan's actions asking for and reviewing medical records to make a report to the NIH and DA's Office.  (DF 98.)

Dr. Putnam circulated Dr. White's request to Drs. Vintch and Dan Castro. (DF 99.) Dr. Castro counseled Drs. Putnam and Vintch that "this particular complaint seems steeped in historical interactions that may never be fully understood." Nevertheless, on September 28, 2015, Dr. Putnam presided over a MEC meeting with Dr. Vintch present to discuss Dr. White's request. At this time, Dr. Putnam, the person leading the meeting, would generally draft the minutes. (DF 109.) The minutes of the September 28, 2015 meeting show that the MEC acknowledged that the MEC had previously adequately considered and rejected Dr. White's claims and that revisiting them could be seen as retaliatory.[2]  Nevertheless, the MEC decided to reopen its investigation reach out to

---

[2] The minutes reflected the MEC found that "Dr. White had previously complained about Dr. Ryan six to nine months before; Dr. Ryan "somehow found out or looked up

BROWN WHITE & OSBORN LLP
ATTORNEYS

Harbor's HIPAA compliance officer "to get more details." (DF 101.)

More than a year after the September 28, 2015 meeting, Dr. Putnam sent Dr. Vintch a package of all MEC minutes concerning Dr. Ryan and asked her to "look them over." (DF 102.) *In this package, the minutes of the September 28, 2015 MEC meeting were substantially altered.* They were shorter, removed the references to Dr. Ryan's claims against Dr. White, removed the admission that Dr. White's complaints were based on Dr. Ryan's investigations of the BEST-CLI trial, and omitted the statement that taking further action could be seen as retaliation because the MEC felt it had already investigated adequately. (DF 103.) Dr. Putnam sent this version of the minutes to the MSO to act as the official minutes of the MEC meeting, and said he would come sign them. (DF 105.) Defendants submitted that *altered* version of the minutes to this Court in this Motion. (DF 104.)[3]

---

how many cases Dr. White had completed and contacted the NIH saying that Dr. White is committing medical fraud for being a participant in the study while he had not completed enough cases in order to participate"; Dr. White "said that Dr. Ryan committed a HIPAA violation because he must have gone through medical records to find out what his cases and case quality was"; an investigation found that Dr. White had not conducted the number of cases he represented in his application to the study; that the PSA had "spent months and worked very diligently on this and ultimately there was no resolution" and "now we are being asked to investigate this again"; the PSA had referred the alleged HIPAA violation to the Compliance Officer, who concluded based on their review there was no HIPAA violation; "these complaints were taken seriously and went appropriately to HR Performance Management and the HIPAA Compliance Officer and the difference now is that there are attorneys involved and litigation"; "We had a recognized HIPAA Compliance Officer review the case and it was found that no HIPAA violation occurred on the part of Dr. Ryan. About six months later Dr. White decided to bring his own attorney in and sue Dr. Ryan. Concurrently Dr. White sent an email to Drs. Van Natta and Putnam Requesting PSA corrective action against Dr. Ryan"; and that "Dr. Ryan considers himself a whistleblower because he thought this bad thing happened and he wanted to do right. He further believes that any action taken against him, by us, would be considered retaliation"; that "To take a corrective action beyond the investigation could be considered retaliation because we feel this issue has been investigated adequately.  On the other hand, it is not necessarily under the purview of the whistleblower to do their own investigation and start digging into whatever they want." (DF 101.)

[3] It is clear that Drs. Putnam and Vintch were responsible for these alterations to the minutes. Drs. Vintch and Putnam admitted that when they were part of the PSA leadership, they would exchange draft minutes of meetings to verify their accuracy. (DF 108.) They would circulate the minutes at the next meeting, make any changes MEC members requested, ask the MEC to approve the minutes, sign and date them. (DF 108-12.) After Dr. Putnam signed the minutes, which he tried to do "routinely," he would

6

### 3.   Dr. White's Addendum To His Complaint

In November 2015, Dr. White submitted an "Addendum" to his Request for Corrective Action complaining that Dr. Ryan filed a complaint against him with the County. (DF 117.) Dr. Putnam did not understand Dr. White's Addendum to refer to any specific behavior by Dr. Ryan other than filing a complaint with the County. (DF 118.) Nevertheless, Dr. Putnam presided over a MEC meeting on December 28, 2015 to discuss the Addendum, and MEC recommended that Dr. De Virgilio, the Chair of Surgery, form an Ad Hoc Committee to conduct a Focused Professional Performance Evaluation ("FPPE") of Dr. Ryan. (DF 120.) Dr. Putnam immediately wrote to Dr. White to inform him that MEC formed a committee to conduct an FPPE on Dr. Ryan. (DF 119, 122.) Dr. White openly complained to Harbor leaders that Dr. Ryan had violated HIPAA by gathering data "to initiate the Fraud investigation against Harbor (me) with the trial Steering Committee, and the NIH." (DF 121.)

### 4.   The FPPE Process Violated PSA Practices And Yielded A Knowingly Inaccurate Report About Dr. Ryan

The FPPE report accused Dr. Ryan of accessing and requesting medical records improperly, but did not discuss or disclose that he was doing so to gather information to provide to the NIH, even though the MEC had previously acknowledged that was the case. (DF 101, 127.) The FPPE asserted that Dr. White and Dr. Donayre were leaving Harbor because of Dr. Ryan, but did not discuss or disclose that Dr. Ryan's report to the NIH had resulted in Dr. White and Dr. Donayre being disqualified for participation in endovascular procedures in the BEST-CLI trial and had led to Medtronic no longer paying for them to give "courses" surrounding use of Medtronic stent grafts. (DF 128.)

The FPPE also accused Dr. Ryan of yelling and other "unprofessional behavior"

---

submit them to the MSO to be maintained. (DF 112-13.) Minutes were "absolutely" not to be altered after they had been signed and submitted. (DF 114.) Drs. Putnam and Vintch could not explain why Dr. Putnam circulated unsigned minutes concerning Dr. Ryan more than a year after the meeting for later signing and submission to the MSO. (DR 106.)

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

BROWN WHITE & OSBORN LLP
ATTORNEYS

towards medical staff. (DF 24.) Those accusations were not true. (DF 24.) More importantly, the PSA did not address the allegations consistently with its rules and normal practices. The PSA's bylaws encourage physician discipline through "progressive steps" beginning with "collegial and educational efforts." (DF 138.) When other physicians have been accused of raising their voices in the operating room, Dr. Putnam managed it by counseling them before resorting to an FPPE. (DF 136.) Indeed, Dr. Putnam's "first approach" to a physician accused of unprofessional behavior is to get the physician's supervisor involved and pursue appropriate counseling before getting the PSA involved. (DF 137.) Neither Dr. Putnam nor Dr. Ryan's supervisor, Dr. De Virgilio was not aware of any counseling of Dr. Ryan before the FPPE. (DF 139, 143, 145.) That is because there were no such efforts. Nobody counseled Dr. Ryan about any of Dr. White's complaints described in the FPPE. (DF 140, 144, 146.) Moreover, Dr. Ryan had observed other doctors yelling and swearing at nurses and doctors without being disciplined. (DF 141.) Drs. Putnam and Donayre have yelled in the operating room and not been disciplined. (DF 142.)

The FPPE also included witness statements that Defendants and MEC knew to be untrue, and that expressed anger at Dr. Ryan's report to the NIH and District Attorney. The statements quoted Dr. White as saying that he was "cleared of allegations" by the NIH report, though as the MEC know, the investigators found that Dr. White and others had falsified their qualifications to do endovascular surgery and could not continue to enroll patients to the BEST-CLI trial. (DF 130.) The statements quoted Dr. De Virgilio as saying that the NIH found Dr. Ryan's complaint and determined it was unfounded, untrue for the same reasons. (DF 131.) The witness statements quoted Dr. De Virgilio as saying, "DHS is auditing income of Dr. White's research team because of Dr. Ryan's complaints." (DF 132.) The statements quoted Dr. Donayre as complaining about Dr. Ryan's report to the NIH and saying the NIH audit "cleared" him and Dr. Donayre, which was untrue. (DF 133.) The statements quoted Dr. Donayre as saying that as a result of Dr. Ryan's report to the NIH, "Dr. Donayre felt the need to constantly look

8

over his shoulders all the time because of Dr. Ryan. For this reason, Dr. Donayre decided to leave Harbor-UCLA."  (DF 134.)

Dr. Putnam circulated the FPPE to Dr. Vintch on February 26, 2016.  (DF 135.)

**5.      The PSA Demanded That Dr. Ryan Accept A "Behavioral Contract" Based On False Accusations**

On April 25, 2016, Dr. Putnam presided over an MEC meeting. (DF 147.) The original minutes of that meeting, which Dr. Putnam signed and dated in May 2015, included damning admissions by the MEC (DF 148): "A meeting with Dr. Hal Yee was held to discuss any action that might be taken against Dr. Ryan that might compromise the County.  Any action that we take will be separate from any action taken by LA County."  "The fear was that any action we take might comprise [sic] what the county is doing or might create a medical-legal action against us.  Dr. Yee suggested we proceed with caution because there was concern about whistleblowing as there were two parts of the law suit." The minutes also cited Harbor's HIPAA Privacy Officer, who reported that County Counsel's initial findings on January 19, 2016 were that "Dr. Ryan did not receive APHI [Protected Health Information] based on a document they have," and "when the clerk was asked for the actual form that was submitted, she could not produce it.  She stated that when Dr. Ryan made the request, she did not question him because he was a person of authority," and "we have a policy in place that needs to be completed and we are obligated to report Dr. Ryan to the state."  (DF 148.)

Dr. Putnam removed these harmful admissions from the altered version of the minutes that Dr. Putnam circulated to Dr. Vintch in December 2016 and then submitted to the MSO as the official record of the meeting. (DF 146.) He removed references to "compromising" the County and Dr. Yee's caution about whistleblowing, a substantial narrative about the FPPE was inserted, the discussion of Mr. Valentin's report was altered to assert that Dr. Ryan *had* requested protected health information inappropriately, and deleted the reference to the clerk not being able to produce the key document. (DF 149.) Once again, Drs. Putnam and Vintch could not explain why there

9

were different versions of the minutes. (DF 150, 151.)

On July 25, 2016, the MEC voted to develop a Behavioral Contract for Dr. Ryan and revoke his privileges at Harbor if he did not agree to it. (DF 30.) The proposed contract required Dr. Ryan to admit to wrongdoing he had not committed. (DF 33, 154.) The contract included a term requiring Dr. Ryan to make complaints about other physicians only within Harbor channels (DF 171) and a waiver of claims against everyone involved in the Agreement. (DF 172.) Drs. Vintch and Putnam were not aware of any other Behavioral Agreement with a waiver of claims. (DF 156.) Moreover, another doctor given a Behavioral Agreement for "unprofessional, intimidating, disruptive" behavior did not include any such waiver. (DF 157.)

The MEC, including Drs. Putnam and Vintch, did not expect Dr. Ryan to accept the proposed Behavioral Contract. (DF 153.) Dr. Ryan told Dr. De Virgilio that the proposed Behavioral Contract was unacceptable because it required him to admit to things he did not do and restricted him from reporting misconduct outside Harbor and forced him to waive claims. (DF 33.) Dr. Putnam and the MEC refused to make any changes to the proposed Behavioral Agreement. (DF 33.)

### 6. Dr. Putnam's Letters To Dr. Ryan About The Plan To Suspend Him

On October 5, 2016, Dr. Putnam sent Dr. Ryan a Notice of Proposed Adverse Action and Hearing Rights informing him of the intent to suspend his privileges because he refused to sign the Behavioral Agreement. (DF 161.) On November 10, 2016, Dr. Putnam sent Dr. Ryan a "Notice of Charges" outlining the PSA's accusations against him. (DF 162.) That Notice listed "Openly threatening to call external agencies to conduct investigations" and "Openly making unfounded accusations in an angry manner" as some of Dr. Ryan's violations. (DF 162.) It did not mention HIPAA violations. (DF 162.) It was in December 2016, immediately after that Notice, that Dr. Putnam circulated the altered MEC minutes to Dr. Vintch for her comment. (DF 164.) On February 27, 2017, Dr. Putnam sent Dr. Ryan a First Amended Notice of Charges setting forth the PSA's accusations against him. (DF 165.) The Amended Notice deleted

10

BROWN WHITE & OSBORN LLP
A T T O R N E Y S

the allegations that Dr. Ryan "Openly threaten[ed] to call external agencies to conduct investigations" and "Openly ma[de] unfounded accusations in an angry manner", leaving an empty bullet point where those allegations had been. (DF 165.) The Amended Notice still did not mention HIPAA. (DF 165.)

### III. ARGUMENT

### A.   Legal Standard

Summary judgment is proper only where the pleadings and materials demonstrate that "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Id*. The moving party has the initial burden to show that no genuine issue of material fact exists. Fed.R.Civ.P. 45(a); *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). In ruling on a motion for summary judgment, the court must view the evidence, and any inferences based on underlying facts, in the light most favorable to the opposing party. *Twentieth Century-Fox Film Corp. v. MCA*, 715 F.2d 1327, 1328-29 (9th Cir. 1983). If a genuine dispute of material fact exists the court must deny summary judgment. *Anderson*, 477 U.S. at 248.

To prove Defendants retaliated against Plaintiff's protected speech in violation of Section 1983, Dr. Ryan must prove "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; and (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action . . . ." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013). The burden then shifts to Defendants to show "(4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech."  *Id.*

11

B. **Dr. Ryan's Reports of Misconduct Are on a Subject of Public Concern**

Defendants first argue that Dr. Ryan did not speak on a subject of public concern when he made his reports to the NIH and the DA's Office. (Motion 18-19.) This assertion is clearly wrong as a matter of law.

Whether speech is on an issue of public concern is a matter of law. *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983).  Though speech "focused solely on internal policy and personal grievances" is not a matter of public concern, *Lambert v. Richard*, 59 F.3d at 134, 136 (9th Cir. 1995), when speech "can fairly be considered to relate to 'any matter of political, social, or other concern to the community'" it is a matter of public concern. *Ellins*, 710 F.3d at 1057, *quoting Johnson v. Multnomah Cnty*., 48 F.3d 420, 422 (9th Cir.1995). Such speech can only be classified as private if it is "clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies." *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983). "The scope of the public concern element is defined broadly in recognition that 'one of the fundamental purposes of the first amendment is to permit the public to decide for itself which issues and viewpoints merit its concern.'" *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 978 (9th Cir. 2002), quoting *McKinley*, 705 F.2d at 1114.  Speech is especially likely to be a matter of public concern when it deals with alleged government misconduct.  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067-68 (9th Cir. 2013), ("reporting police abuse and the attempts to suppress its disclosure—is quintessentially a matter of public concern"); *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir.2004) ("[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern").

Here, the evidence shows that Dr. Ryan's reports were inescapably matters of public interest. First, Dr. Ryan's report to the NIH alone satisfies this standard. He believed doctors were falsifying their qualifications to participate in a medical study. (DF 45, 55.) He was right – the audit "found that several members of the Harbor-UCLA

team *misrepresented their procedural volume histories to meet the criteria* of independent endovascular operator," and that the doctors at Harbor were not qualified to conduct endoscopic surgeries in the trial and could not enroll more patients to the trial until they recruited other doctors. (DF 45 [emphasis added].) Though the NIH determined that this misrepresentation "would not constitute research misconduct" (DF 45), the fact that government employees misrepresented their qualifications and the NIH instructed Harbor to stop enrolling patients to a clinical trial is clearly a matter of public interest. *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1411 (9th Cir.1988) [doctor who raised ethics complaints at hospital spoke on matter of public interest, as "[i]t can hardly be doubted that the efficient and ethical operation of the VA and the VA's compliance with applicable rules and regulations are inherently of interest to the public."], *overruled on other grounds by Garcetti v. Ceballos*, 547 U.S. 410 (2006).

Moreover, Defendants' argument completely ignores Dr. Ryan's reports about kickbacks and improper implantation of medical devices, which is even more clearly a matter of public interest. (Motion 18-19.) Dr. Ryan reported to the DA's Office that government employees were *implanting unneeded stent grafts in patients in exchange for payments from the device manufacturer*. (DF 64-79.) It is difficult to imagine a starker case of fraud, misconduct, and threat to public health. *Defendants own cases* require this conclusion. *Marable v. Nitchman*, 511 F.3d 924, 927 (9th Cir. 2007) (speech claiming public employees made false statements about overtime and improperly supplemented their pay were matters of public concern); *Thomas*, 379 F.3d at 809 ("[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern.").

Defendants imply that Dr. Ryan's complaints were not matters of public interest because they were mistaken or exaggerated. (Motion 18-19.)  But the NIH determined that Harbor doctors had misrepresented their qualifications and that Harbor could no longer enroll patients in the trial as a result. (DF 45.) More importantly, it is irrelevant. In considering whether a government employee's complaints about misconduct are

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

matters of public concern, courts do not consider whether they were accurate or false. *Johnson*, 48 F.3d at 424 (even "recklessly false statements are not per se unprotected by the First Amendment when they substantially relate to matters of public concern"); *Thomas*, 379 F.3d at 809 (employee's complaints about perceived unlawful conduct were protected even if the conduct was not actually unlawful).

Finally, Defendants argue that Dr. Ryan's *internal* reports within Harbor are not protected speech. (Motion 19-20.) As Dr. Ryan's First Amended Complaint ("FAC") makes clear, those purely *internal* reports are not the basis of his claim. Rather, his claim is based on the retaliation for his reports to the NIH, the DA's Office, and Attorney General's Office. (FAC at ¶ 41.)

## C.   **Genuine Disputes of Material Fact Preclude Summary Judgment On Motive**

Defendants next argue that Dr. Ryan cannot prove that his protected speech was a substantial or motivating factor in the actions Defendants took against him. Substantial evidence creates genuine disputes of material fact regarding Defendants' motives. Proof of motive "may be met with either direct or circumstantial evidence, and involves questions of fact that normally should be left for trial." *Ulrich*, 308 F.3d at 979-80. "[A] plaintiff need only offer 'very little' direct evidence of motivation to survive summary judgment on this element." *Id.* Dr. Ryan can prove retaliatory motive "with either direct or circumstantial evidence." Dr. Ryan can establish retaliatory motive in three ways: "(1) proximity in time between the protected action and the allegedly retaliatory employment decision, from which a jury logically could infer [that the plaintiff] was terminated in retaliation for his speech." (2) "evidence that his employer expressed opposition to his speech, either to him or to others. (3) "evidence that his employer's proffered explanations for the adverse employment action were false and pretextual." *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).

Dr. Ryan has more than enough evidence under this standard to create a genuine dispute of material fact about Defendants' motivation.

BROWN WHITE & OSBORN LLP
ATTORNEYS

1    **1.    <u>Proximity In Time Shows Defendants' Retaliatory Motive</u>**

2        Defendants argue that that Dr. Ryan's reports to the NIH and DA's Office are too

3    removed in time from the discipline they undertook against him. (Motion 20-21.)

4    Defendants' argument is based on misrepresentation of the timeline of relevant events.

5    The relevant comparison is not the very beginning of the process – Dr. Ryan's reports in

6    December 2014 and January 2015 – and the very end, the Notice of Charges in

7    November 2016. The relevant comparison is between the time that Dr. White demanded

8    that the PSA punish Dr. Ryan for making reports to outside authorities, and the time that

9    the Defendants began to do so. The PSA initially rejected Dr. White's complaints. (DF

10   101.) But when Dr. White escalated with his August 24, 2015 Request for Corrective

11   Action in which he complained again of the things Dr. Ryan did to investigate him and

12   report him to the NIH (DF 96-98), the MEC – then led by Drs. Putnam and Vintch (DF

13   6-7) – immediately held a meeting on September 28, 2015, acknowledged that they had

14   previously adequately investigated the matter, but agreed to start investigating again.

15   (DF 101.) When Dr. White sent an "Addendum" in November 2015 that focused

16   explicitly and *only* on Dr. Ryan filing a complaint against him (DF 117-118),

17   Defendants again *immediately* acted in December 2015 by voting to form an Ad Hoc

18   Committee to conduct an FPPE against Dr. Ryan, and assured Dr. White that they had

19   done so. (DF 119-20.)  The fact that the rest of the process then took many months to

20   play out does not matter. The relevant inferences arise from Dr. White demanding

21   retaliation for reporting him to the NIH and the MEC – under Drs. Putnam and Vintch –

22   immediately doing so.  That gap was only weeks, which is short enough to support an

23   inference of retaliatory intent.  *Coszalter*, 320 F.3d at 978 (gap of a few months between

24   speech and action supported inference of retaliation).

25        Defendants also cite *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911-12 (9th

26   Cir. 1996), for the proposition that a short time between speech and response does not

27   support an inference of retaliation when there are other plausible explanations for the

28   response.  But in *Knickerbocker* the parties did not dispute that the employer was

Brown White & Osborn LLP
ATTORNEYS

motivated at least in part by unprotected behavior, and the timing was the plaintiff's *only* proof of retaliatory motive. *Id.* Here, by contrast, there is no such concession by Dr. Ryan, and Dr. Ryan has presented extensive evidence of motive beyond timing.

### 2.      Opposition To Dr. Ryan's Speech Shows Retaliatory Motive

Dr. Ryan can prove retaliatory motive with "evidence that his employer expressed opposition to his speech, either to him or to others." *Coszalter*, 320 F.3d at 977. Trecord is replete with such evidence, often in the form of Defendants endorsing Dr. White's explicit complaints about protected speech. The MEC first investigated Dr. Ryan in response to a report from Dr. Putnam that expressly complained about Dr. Ryan's investigatory steps in reporting Dr. White to the NIH. (DF 81-82.) Dr. Van Natta told Dr. Putnam that he was concerned that Dr. Ryan would "take it upon himself to pursue other avenues that could be damaging to DHS" if the investigation of Dr. White was insufficiently vigorous. (DF 91.) The MEC reopened its investigation of Dr. Ryan based on Dr. White's Request for Corrective Action that once again complained of the measures Dr. Ryan used to investigate and report Dr. White to NIH (DF 97-98), and an Addendum that complained *solely* of Dr. Ryan filing a complaint about Dr. White. (117-18.) The unaltered MEC minutes showed explicit discussions of Dr. White's complaint that Dr. Ryan had reported him to NIH, and remarked "it is not necessarily under the purview of the whistleblower to do their own investigation and start digging into whatever they want." (DF 101.) The MEC relied on an FPPE report that repeatedly complained about Dr. Ryan's report to NIH and misstated the outcome of the report, and included an explicit complaint that Dr. Ryan's reports had led to an audit. (DF 131-34.) The MEC, through Dr. Putnam, sent Dr. Ryan a Notice of Charges accusing him of "Openly threatening to call external agencies to conduct investigations" and "Openly making unfounded accusations in an angry manner," then deleted those admissions. (DF 162, 165.) These all reflect Defendants expressing opposition to Dr. Ryan's speech, "either to him or to others," through acting upon and endorsing, accepting, and voicing complaints about Dr. Ryan's speech. *Coszalter*, 320 F.3d at 977.

### 3.   <u>Evidence Shows Defendants' Proffered Reasons Were Pretextual</u>

Defendants claim that Dr. Ryan has no evidence of pretext. (Motion 21.) That claim is nonsense.  Dr. Ryan presented extensive evidence that the reasons Drs. Putnam and Vintch offered to investigate Dr. Ryan, order a FPPE of him, demand he sign a Behavioral Agreement, and seek to suspend him for not signing it were all pretextual.

First, Drs. Putnam and Vintch participated in altering minutes to conceal the MEC's knowledge that it was acting out of retaliation. Drs. Vintch and Putnam admitted that they drafted the minutes, exchanged them with each other for comments, had the MEC approve them, signed and submitted them. (DF 108-113.) Dr. Vintch said that they would never alter them after they had been signed. (DF 114.)  But in 2016 Dr. Putnam circulated *unsigned* minutes from all of the past MEC meetings about Dr. Ryan to Dr. Vintch for comment, and then submitted those minutes to the MSO as the official record. (DF 102, 104.) Those minutes had been altered on at least two crucial dates: September 28, 2015 and April 26, 2016. The first had been altered to remove references to the discussion of Dr. Ryan's allegations against Dr. White, remove the acknowledgement that Dr. White's complaints were based on Dr. Ryan's investigation and report to the NIH, remove reference to the prior investigation clearing Dr. Ryan of HIPAA violations, and remove the warning that restarting the investigation could be retaliation because they had already investigated adequately. (DF 100, 103.) The April 25, 2016 minutes were altered to remove references to the MEC's investigation "compromising" the county, to Dr. Yee's statement that they proceed with caution because of the perception of whistleblowing, and the admission that a prior investigation showed that Dr. Ryan had not received protected health information. (DF 148, 149.) In its place they inserted language about Dr. Ryan's FPPE and inserted assertions that Dr. Ryan *had* improperly accessed patient information.  (DF 148, 149.)

Second, Drs. Putnam and Vintch abandoned the PSA's normal approach to physician discipline in pursuing Dr. Ryan. The FPPE accused Dr. Ryan of yelling and other "unprofessional behavior" towards members of the medical staff. (DF 24.)  The

17

PSA did not address the allegations consistently with its rules and normal practices. The PSA's bylaws encourage physician discipline through "progressive steps" beginning with "collegial and educational efforts." (DF 138.) When other physicians have been accused of raising their voices in the operating room, Dr. Putnam has handled it by counseling before resorting to an FPPE.  (DF 136.)  Indeed, Dr. Putnam's "first approach" to a physician accused of unprofessional behavior has always been to get the physician's supervisor involved and pursue appropriate counseling before getting the PSA involved.  (DF 137.) But Dr. Putnam and Dr. De Virgilio were not aware of any counseling of Dr. Ryan before the FPPE. (DF 139, 143, 145.)  In fact, nobody counseled Dr. Ryan about any of Dr. White's complaints, nor of the yelling or "unprofessional behavior" described in the FPPE.  (DF 140, 144, 146.)  Moreover, Dr. Ryan had observed other doctors yelling and swearing at nurses and doctors without being disciplined. (DF 141.) Drs. Putnam and Donayre have yelled in the operating room and not disciplined. (DF 142.) Dr. Ryan was therefore disciplined for conduct that did not result in discipline against others.

Third, Dr. Putnam and Dr. Vintch led the MEC's investigation of Dr. Ryan even though they knew that by doing so they were advancing Dr. White's retaliatory scheme against him. The MEC, through Drs. Putnam and Vintch, led an investigation based on Dr. White's initial explicitly retaliatory complaint and cleared Dr. Ryan after doing what it thought was an "adequate" investigation. (DF 79-85.) Dr. Putnam knew at the time that there were "ongoing issues" between Dr. White and Dr. Ryan (DF 94).  When Dr. White doubled down with his expressly retaliatory "Request for Corrective Action," Drs. Putnam and Vintch proceeded with it even in the face of Dr. Castro's warning that "this particular complaint seems steeped in historical interactions that may never be fully understood." (DF 96-100.) At the resulting MEC meeting Dr. Putnam led, the MEC acknowledged that it had previously adequately investigated Dr. White's claims and that responding could therefore be retaliatory. (DF 101.) Shortly thereafter, Dr. Putnam and Dr. Vintch sought out Dr. Van Natta to talk to him about "Tim Ryan and his current

18

BROWN WHITE & OSBORN LLP
A T T O R N E Y S

activities at Harbor." (DF 105.) Later, when Dr. White submitted his Addendum – which explicitly complained *only* about Dr. Ryan filing a complaint against him – Drs. Putnam and Vintch advanced the investigation further in response, ordering a FPPE of Dr. Ryan, notwithstanding Dr. Yee's caution that the investigation could be perceived as retaliatory. (DF 117-118. 120, 148.) Dr. Putnam even updated Dr. White on the steps they were taking in response to his explicitly retaliatory demand, though he never updated Dr. Ryan on his complaints about Dr. White. (DF 71-72, 119.)

Fourth, Drs. Putnam and Vintch pursued the investigation against Dr. Ryan in the face of information they knew to be false. Dr. White submitted a clearly fabricated report that Dr. White claimed Dr. Ryan had requested in the course of his NIH investigation, but which was dated *after* Dr. White's complaint. (DF 84.) The FPPE accused Dr. Ryan of misappropriating patient information but conspicuously failed to mention, as Defendants knew, that this allegation referred to Dr. Ryan's investigation of records to provide to the NIH. (DF 127.) The FPPE complained that Drs. White and Donayre were leaving Harbor because of Dr. White, again omitting that Dr. Ryan's report to the NIH had led to them being disqualified for participating in the BEST-CLI trial. (DF 128.) The FPPE included multiple false statements from Drs. White and Donayre suggesting that Dr. Ryan's reports to NIH were false, even though Defendants knew that Dr. Ryan's reports led to the disqualification of Drs. White and Donayre. (DF 130-131, 134.) Dr. Putnam investigated Dr. De Virgilio's false claims that Dr. Ryan had been convicted of a felony, and knew them to be false, but allowed Dr. De Virgilio to make the claims in the official minutes of the MEC without correction. (DF 158-60.) Finally Dr. Putnam's letters to Dr. Ryan accused him of "openly making unfounded accusations in an angry manner" (DF 162), even though Drs. Putnam and Vintch could not say what unfounded accusations Dr. Ryan made (DF 163, 168), and even though they knew that Dr. Ryan's reports of Dr. White had led to the FPPE of Dr. White led to discussions of Dr. White's privileges being restricted, and led to the NHI disqualifying Drs. White and Donayre from the BEST-CLI trial, and even though they knew that Dr.

19

Ryan's fraud reports were not disproven but were passed along as "beyond the PSA's investigatory purview." (DF 86-89, 92.)

Fifth, Defendants' justifications for pursing Dr. Ryan were shifting and inconsistent. Dr. White's complaints concerned Dr. Ryan's review of medical files when preparing reports to the NIH and DA's Office. (DF 81-82, 97-98.) The MEC's minutes reflect that was their expressed reason for investigating Dr. Ryan. (DF 101.) Before Dr. Ryan's complaints about Dr. White, Defendants were not aware of any other complaints against Dr. Ryan based on "unprofessional behavior." (DF95.) In fact, complaints about Dr. Ryan's supposedly unprofessional behavior were raised for the first time in discussions of Dr. Ryan's complaints about Dr. White. (DF 93.) As Defendants emphasize, the FPPE focused on Dr. Ryan's supposed "unprofessional conduct" towards other members of the medical staff. (DF  24.) Dr. De Virgilio, who formed the Ad Hoc Committee that investigated and drafted Dr. Ryan's FPPE, does not know how the Ad Hoc Committee was instructed on the scope of their work or how they expanded beyond the issues raised by in Dr. White's complaints. (DF 122-24.) Moreover, though the MEC's initial focus was Dr. Ryan's supposed HIPAA violations, and though the MEC asserted that it had a duty to report those supposed violations to authorities (DF 148), nobody at Harbor ever reported Dr. Ryan for those supposed HIPAA violations (DF 173), and Dr. Putnam's "Notice of Proposed Adverse Action and Hearing Rights" and "Notice of Charges" did not list HIPAA violations as a reason for its action. (DF 161-162.)

Finally, though Defendants claim that they offered Dr. Ryan a Behavioral Contract in good faith and hoped he would accept it to resolve the matter, the evidence shows otherwise. The proposed contract required Dr. Ryan to admit to wrongdoing that he had not committed. (DF 33, 154.) The contract also included a term requiring Dr. Ryan to only make complaints about other physicians within Harbor channels – a term that on its face would prevent the very reports to outside authorities that Dr. Ryan made in this case. (DF 171.) They also demanded a waiver of claims against everyone

20

involved in the Agreement (DF 172) even though Drs. Vintch and Putnam were not aware of any other Behavioral Agreement with a waiver of claims. (DF 156-57.) Moreover, another doctor given a Behavioral Agreement for "unprofessional, intimidating, disruptive" behavior did not include any such waiver. (DF 157.) The MEC, including Dr. Putnam and Dr. Vintch, did not expect Dr. Ryan to accept the proposed Behavioral Contract (DF 153) and refused to make any changes to the proposed Behavioral Agreement based on Dr. Ryan's objections.  (DF 33.)

This evidence creates a genuine dispute of material fact about whether Drs. Putnam's and Vintch's stated justifications for their actions were pretextual. *Ellins*, 710 F.3d at 1064 (disputes of fact make summary judgment on motivation inappropriate); *Mabey v. Reagan*, 537 F.2d 1036, 1045 (9th Cir. 1976) (same).

## D. Genuine Disputes Of Material Fact Preclude Summary Judgment on Defendants' Justification And Inevitability Arguments

Defendants argue that they are entitled to summary judgment because their actions were justified and because the MEC would have reached the same decision whether or not Dr. Ryan had engaged in protected speech. (Motion 24-27.)  The same facts cited above that create a genuine dispute of material fact as to motive also create a genuine dispute of material fact as to those defenses. Whether punitive action would have been taken without protected speech, and whether the punitive action had an adequate justification "are entirely questions of fact" and when the record on them is "not undisputed," summary judgment is inappropriate. *Ellins*, 710 F.3d at 1064. When "questions of motive predominate in the inquiry about how big a role the protected behavior played in the decision, summary judgment will usually not be appropriate." *Mabey*, 537 F.2d at 1045. Here, the evidence discussed above shows that Drs. Putnam and Vintch acted in response to Dr. White's demands that the PSA punish Dr. Ryan for his report to the NIH, acted based on an FPPE that made assertions they knew were untrue, proceeded with the FPPE without counseling Dr. Ryan first as was their normal practice, and demanded Dr. Ryan accept a Behavior Contract that included a waiver of

21

claims that they could not remember being used elsewhere.  *See* Section C3, *supra*.  In fact, Drs. Putnam and Vintch, leading the MEC, were worried that taking action would be retaliatory because it felt it had already investigated Dr. Ryan adequately and found nothing worthy of discipline (DF 101), and then scrubbed those damaging admissions from the minutes. (DF 102, 104.) Those disputed facts are more than enough to preclude summary judgment on justification or inevitability.

**E.    As The Ninth Circuit Previously Found, Defendants Are Not Entitled To Qualified Immunity**

Defendants also assert that they are entitled to summary judgment on the basis of qualified immunity. When a defendant asserts qualified immunity in a summary judgment motion, courts engage in a two-pronged inquiry. First, courts ask whether the facts "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right [.]" *Tolan v. Cotton* (2014) 572 U.S. 650, 655-56 (citations and internal quotations omitted). Courts "resolve all factual disputes in favor of the party asserting the injury." *Ellins,* 710 F.3d at 1064. Second, courts ask whether the right in question was "clearly established" at the time of the violation – that is, whether the law at the time provided "fair warning" that the conduct was unconstitutional. *Id*. at 655; *Mueller v. Auker*, 57 F.3d 979, 993 (9th Cir. 2009) (rights are "clearly established" when they are "defined at the appropriate level of specificity" to make them clear to a defendant).  Under this test, Defendants' argument fails.

The Ninth Circuit has already rejected Defendants' assertion in this very case. When the Hon. Judge Real previously dismissed the FAC on the grounds of qualified immunity, the Ninth Circuit reversed, finding that Dr. Ryan's right to be free of a retaliatory PSA investigation was well established.[4]

---

[4] The Ninth Circuit ruled:

> An adverse employment action is action "reasonably likely to deter [the plaintiff] from engaging in protected activity under the First Amendment." Coszalter v. City of Salem, 320 F.3d 968, 976 (9th Cir. 2003) (internal quotation marks and alteration omitted). Since 2002, we have recognized that an employer's decision

22

Nothing material has changed.  Defendants fail both prongs of the two-prong test. First, as is set forth in detail above, Dr. Ryan's evidence demonstrates that Defendants violated his First Amendment rights by retaliating against him for petitioning the government, an activity the First Amendment protects. Resolving all disputes in Dr. Ryan's favor and considering all evidence in the light most favorable to Dr. Ryan, this is more than sufficient to defeat summary judgment. *Tolan*, 572 U.S. at 655.

Second, Defendants violated a "clearly established" First Amendment right. As the Ninth Circuit found *in this very case*, it is clearly established that hospital officials violate the First Amendment by "initiat[ing] disciplinary proceedings against a doctor that threaten to revoke staff privileges, when combined with a negative effect on employment prospects" in retaliation for protected speech. *Ryan*, 777 F. App'x at 246. That is exactly what the Ninth Circuit found nearly 20 years ago in *Ulrich. Ulrich,* 308 F.3d at 977. Defendants attempt to brush this clear law aside suggesting that Dr. Ryan has not shown a "negative effect on employment prospects." But Dr. Ryan has shown that the investigation destroyed his career, and that being forced to disclose it in employment applications has led to rejection of dozens of job applications. (DF 170.) Moreover, "it was also clearly established under both Supreme Court and Ninth Circuit precedent that 'the type of sanction ... 'need not be particularly great in order to find that rights have been violated.'" *Ellins*, 710 F.3d at 1065.

---

to initiate disciplinary proceedings against a doctor that threaten to revoke staff privileges, when combined with a negative effect on employment prospects, is enough to satisfy the "adverse employment action" requirement. Ulrich v. City & Cty. of San Francisco, 308 F.3d 968, 977 (9th Cir. 2002).

We find the allegations here sufficiently similar to Ulrich to satisfy the clearly established prong of the qualified immunity analysis at this early stage.

Construing all allegations in Dr. Ryan's favor, he has alleged that the doctors initiated disciplinary proceedings which sought to revoke his staff privileges, voted to revoke those privileges, and served him with a notice of intent to suspend. He has also alleged that these decisions "will permanently impair [his] ability to seek and secure employment" in the future. Accordingly, qualified immunity is not warranted at this stage.  Ryan v. Putnam, 777 F. App'x 245, 246 (9th Cir. 2019).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

1        Defendants also claim that it is not clearly established that they can be held

2  individually responsible based merely on votes on the MEC. (Motion 31.) But that is not

3  all that the facts, viewed in the light most favorable to Dr. Ryan, show that they did.  Dr.

4  Ryan has shown that Drs. Putnam and Vintch, did not merely issue passive votes, but led

5  the MEC actions against Dr. Ryan as President and Vice-President of the PSA (DF 6, 7),

6  altered minutes of MEC meetings to hide damaging admissions showing that the MEC

7  knew its actions were retaliatory (DF 101-104), deliberately ignored information in the

8  FPPE they knew misstated the evidence (DF 130-134), proceeded against Dr. Ryan

9  without engaging in the counseling extended to other doctors (DF 136-146), and

10  proceeded against Dr. Ryan in the face of indications that he was singled out for

11  protected speech. (RF 79-85, 94, 96-101, 117-120, 148.).) This is exactly the individual

12  deliberate retaliation against speech well-established precedent prohibits.  *Ulrich*, 308

13  F.3d 972-74 (supervisor filing adverse reports and making decisions about resignation);

14  *Poland v. Chertoff*, 494 F.3d 1174, 1178-79 (supervisor initiating retaliatory inquiry).

15        Defendants also attempt to spin the qualified immunity inquiry into an extended

16  discussion of whether Defendants were aware they were violating each and every

17  element of Section 1983 based on specific precedent regarding each element. (Motion

18  30-33.) That's the wrong inquiry. "The question is not whether an earlier case mirrors

19  the specific facts here. Rather, the relevant question is whether 'the state of the law at the

20  time gives officials fair warning that their conduct is unconstitutional.'" *Ellins*, 710 F.3d

21  at 1064 (overturning summary judgment based on qualified immunity in First

22  Amendment retaliation case), quoting *Bull v. City & Cnty. of San Francisco*, 595 F.3d

23  964, 1003 (9th Cir.2010) (en banc) ("[T]he specific facts of previous cases need not be

24  materially or fundamentally similar to the situation in question.") Defendants attempt to

25  obfuscate the issue by relying extensively on qualified immunity cases concerning

26  violations of *Fourth Amendment rights* by police officers, where the Supreme Court "has

27  recognized that it is sometimes difficult for an officer to determine how the relevant

28  legal doctrine ... will apply to the factual situation the officer confronts." *Mullenix v.*

BROWN WHITE & OSBORN LLP
A T T O R N E Y S

*Luna*, 136 S.Ct. 305, 308 (2015). That is not the case in First Amendment cases, where the Courts have put the matter far more broadly: "[i]n the classic whistleblower case the state has no legitimate interest in covering up corruption ... as an inevitable result of the Court's jurisprudence and sound public policy, the First Amendment generally protects public employee whistleblowers from employer retaliation." *Dahlia*, 735 F.3d at 1067.

Dr. Ryan's right to be free of retaliation for his protected speech was well-established, and Defendants' qualified immunity arguments are without merit.

## F.   Genuine Disputes of Material Fact Preclude Summary Adjudication of Punitive Damages Against Dr. Putnam

Defendants argue that they are entitled to partial summary adjudication of Dr. Ryan's claim for punitive damages against Dr. Putnam because Dr. Ryan cannot prove Dr. Putnam acted with malice and conscious disregard for Dr. Ryan's rights.  (Motion 33.)  Once again Defendants are wrong.

If Dr. Ryan proves that Dr. Putnam intentionally retaliated against him for protected speech, he satisfies the requirements of punitive damages. To be entitled to punitive damages in a Section 1983 case, Dr. Ryan must show that Dr. Putnam was motivated by an evil motive or intent or a reckless or callous indifference to Dr. Ryan's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). If Dr. Ryan proves intentional discrimination based on his speech, he will have "by definition have satisfied the requirement of showing the 'reckless indifference' required for an award of punitive damages." *Stender v. Lucky Stores, Inc*., 803 F.Supp. 259, 324 (N.D. Cal. 1992). A finding of retaliation is sufficient to support punitive damages. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1199 (9th Cir. 2002) (evidence that was sufficient to support verdict of harassment and retaliation also sufficient to support punitive damages); *Passantino v. Johnson Consumer Prods., Inc.*, 212 F.3d 493, 514-16 (9th Cir. 2000) (evidence of retaliation was "unquestionably sufficient" to satisfy the "malice or reckless indifference" standard for punitive damages under Title VII).  Therefore, because Dr. Ryan can prove retaliation, he can also prove punitive damages.

25

1

## IV. CONCLUSION

2

For the foregoing reasons, the Court should deny Defendants' motion for summary

3

judgment, or alternatively, for summary adjudication.

4

DATED:  November 15, 2021                    BROWN WHITE & OSBORN LLP

5

6

By   *s/Kenneth P. White*

7

THOMAS M. BROWN
KENNETH P. WHITE
Attorneys for Plaintiff
TIMOTHY RYAN, M.D.

8

4847-5493-7577, v. 1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT