1  BROWN WHITE & OSBORN LLP
   THOMAS M. BROWN (SBN 117449)
2  KENNETH P. WHITE (SBN 173993)
   333 South Hope Street, 40th Floor
3  Los Angeles, CA 90071-1406
   Telephone:  213.613.0500
4  Facsimile:   213.613.0550
   tbrown@brownwhitelaw.com
5  kwhite@brownwhitelaw.com

6  *Attorneys for Plaintiff*
   Timothy Ryan
7

8              **UNITED STATES DISTRICT COURT**

9       **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  TIMOTHY RYAN, M.D., an individual,          Case No.:  2:17-cv-05752-CAS(RAOx)

12          Plaintiff,                          Judge: Hon. Christina A. Snyder

13  v.                                          **PLAINTIFF TIMOTHY RYAN,**
                                                **M.D.'S STATEMENT OF GENUINE**
14  BRANT PUTNAM, M.D., an individual,          **DISPUTES OF MATERIAL FACT**
    JANINE VINTCH, M.D., an individual,         **IN OPPOSITION TO MOTION**
15  ANISH MAHAJAN, M.D., an individual,         **FOR SUMMARY JUDGMENT**
    CHRISTIAN DE VIRGILIO, M.D., an
16  individual, HAL F. YEE, M.D., an            Date:      December 6, 2021
    individual, ROGER LEWIS, M.D., an          Time:      10:00 a.m.
17  individual, and MITCHELL KATZ, M.D.,        Ctrm:      8-D
    an individual,
18
            Defendants.                         Action Filed:  August 3, 2017
19                                              Trial Date:   April 26, 2022

20

21                                             *[Filed Concurrently Herewith:*
                                               *Opposition to Defendants' Motion for*
22                                             *Summary Judgment, or Alternatively,*
                                               *Partial Summary Judgment; Objections*
23                                             *to Evidence; and Declarations of*
                                               *Timothy Ryan and Kenneth P. White*
24                                             *Thereto]*

25

26

27

28

                                        1

Plaintiff Timothy Ryan ("Plaintiff") respectfully submits this Statement of Genuine Disputed of Material Fact in response to Defendants' Brant Putnam, M.D. and Janine Vintch, M.D. ("Defendants' Statement of Uncontroverted Facts and Conclusions of Law in Opposition to Defendants' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment.

## I.   Statement of Uncontroverted Facts

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| **1.** Harbor-UCLA Medical Center ("Harbor-UCLA") is owned by the County of Los Angeles ("County") and operated by the County's Department of Health Services ("DHS").<br><br>Declaration of Brant Putnam, M.D. ("Putnam Decl.") ¶ 2; Declaration of Janine Vintch, M.D. ("Vintch Decl.") ¶ 2; Doc. 14 (1st Am. Cmplt.) ¶ 5. | Undisputed. |
| **2.** In order for any physician to practice and treat patients at Harbor-UCLA, they must hold a license issued by the California Medical Board, and separately must hold medical staff privileges to practice and treat patients at Harbor-UCLA, which are granted by the Harbor-UCLA Professional Staff Association ("PSA") and must be renewed every two years.<br><br>Putnam Decl. ¶ 2; Vintch Decl. ¶ 2; Deposition of Timothy Ryan, M.D. ("Ryan Depo.") 103:9-12; Ex. 301 §§ 4.1-3, 6.4-2. | Disputed that the PSA grants privileges. The Credentials Committee of the Medical Executive Committee ("MEC") does so. Otherwise undisputed.<br><br>Deposition of Brant Putnam, attached as Exhibit C to Declaration of Kenneth White ("White Decl.") ("Putnam Depo."), 8:2-9; Deposition of Janine Vintch, attached as Exhibit D to White Decl. ("Vintch Depo."), 15:5-16:2. |
| **3.** Harbor-UCLA's PSA functions in accordance with Bylaws, which were adopted to organize Harbor-UCLA's medical staff, and provide a framework for the medical staff's self-governance, appointment, credentialing, privileging, and | Disputed to the extent the statement implies that these are the only rules governing the PSA.  The PSA is also governed by California law.  Otherwise undisputed. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| oversight, as well as its peer review policies and due process rights guarantees.<br><br>Putnam Decl. ¶ 6; Vintch Decl. ¶ 6; Ex. 301 at 3. | Cal. Evid. Code § 1157, Cal. Bus. & Prof. Code §§ 809 *et seq.* |
| **4.** Among other things, the PSA monitors physicians' compliance with credentialing requirements, and evaluates all members and applicants in accordance with peer review criteria, adopted consistent with the Bylaws and the PSA's peer review process.<br><br>Putnam Decl. ¶ 7; Vintch Decl. ¶ 7; Ex. 301 § 6.1. | Undisputed this is what the PSA is supposed to do. Disputed this is what it does.<br><br>Here, the PSA ignored and failed to follow its own bylaws and practices about counseling physicians before initiating FPPE proceedings against them and by altering minutes to conceal information. Plaintiff's Exh. 301 at 48 [Bylaws on progressive steps]; Ryan Decl. at ¶ 18 [lack of any counseling prior to FPPE action]; Putnam Depo., 72:10-73:2, 75: 9-76:4, 76:5-7 [normal practice of counseling and lack of counseling of Dr. Ryan]; De Virgilio Depo., 44:6-17, 44:18-45:2, 74:22-75:7 [lack of counseling of Dr. Ryan]. In addition, Defendants altered minutes of MEC meetings to remove information contradicting its approach. White Decl., Exh. 365 [unedited September 28, 2015 minutes], Exh. 360 at 1 [email circulating edited minutes for revision in December 2016], 360 at 4287 [altered minutes of September 28, 2015], Exh. 362 [original April 25, 2016 minutes], Exh. 360 at 4270-71 [altered April 25, 2016 minutes]. |
| **5.** The PSA has a Medical Executive Committee ("MEC"), which includes the PSA's Officers and the Chair of each PSA Department (*e.g.*, Roger Lewis, M.D., as Chair of Emergency Medicine from 2013 to | Undisputed. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| 2020), among others, as well as several *ex officio* members without voting privileges, including Harbor-UCLA's Chief Medical Officer ("CMO")—but did not include Hal Yee, M.D. after 2013, or Mitchell Katz, M.D. at any time.<br><br>Putnam Decl. ¶¶ 4-5; Vintch Decl. ¶¶ 4-5; Ex. 301 §§ 9.1, 10.1, 11.2; Doc. 14 ¶¶ 6-12. | |
| **6.** Brant Putnam, M.D. was a member of the MEC from 2011 to 2021, and served as President of the PSA and Chair of the MEC from July 1, 2015 to June 30, 2018.<br><br>Putnam Decl. ¶ 4; Vintch Decl. ¶ 5; Ex. 301 § 11.2-2; Ryan Depo. 26:14-17, 215:3-13. | Undisputed. |
| **7.** Janine Vintch, M.D. has been a member of the MEC since 2006; she was Vice President of the PSA and Vice Chair of the MEC from July 1, 2015 to June 30, 2018, and President of the PSA and Chair of the PSA from July 1, 2018 to June 30, 2021.<br><br>Putnam Decl. ¶ 4; Vintch Decl. ¶ 5. | Undisputed. |
| **8.** Christian de Virgilio, M.D. has been Chair of Harbor-UCLA's Department of Surgery since January 2016, after serving one year as Interim Chair, and has been a member of the MEC as Chair and Interim Chair.<br><br>Putnam Decl. ¶ 5; Vintch Decl. ¶ 5; Ryan Depo. 79:24-80:4, 244:15-245:25; Doc. 14 ¶ 9. | Undisputed. |
| **9.** Timothy Ryan, M.D. was employed by DHS at Harbor-UCLA as a Staff | Undisputed. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| Vascular Surgeon, Physician Specialist, from October 2013 to October 2018, and first obtained medical staff privileges in 2013.<br><br>Putnam Decl. ¶ 9; Vintch Decl. ¶ 9; Ryan Depo. 248:2-12; Doc. 14 ¶¶ 1, 5. | |
| **10.** Dr. Ryan applied for renewal of his medical staff privileges in September 2015, which required the approval of Dr. de Virgilio as Department Chair; Dr. de Virgilio gave his approval without qualification, and Dr. Ryan's renewal application was approved for the period from October 1, 2015 through September 30, 2017.<br><br>Putnam Decl. ¶ 9; Vintch Decl. ¶ 9; Exs. 8, 9. | Disputed. Dr. De Virgilio qualified his recommendation with a notation that Dr. Ryan was being investigated based on Dr. White's complaints. Dr. De Virgilio also qualified the approval with a claim that Dr. Ryan "says he was convicted of a crime, not explained," even though Dr. Ryan had explained that he pled no contest to a Malicious Mischief misdemeanor 30 years earlier. Otherwise undisputed.<br><br>Appendix of Exhibits in Support of Defendants' Motions For Summary Judgment ("Defendants' Exhibits"), Exh. 8; Declaration of Dr. Timothy Ryan ("Ryan Decl.") at ¶ 19.) |
| **11.** Rodney White, M.D., was Harbor-UCLA's Chief of the Division of Vascular Surgery during Dr. Ryan's employment until Dr. White retired at the end of April 2016; from September 2013 to August 2015, Dr. White supervised Dr. Ryan and was supervised by the Department Chair, Dr. de Virgilio.<br><br>Putnam Decl. ¶¶ 11, 18; Vintch Decl. ¶¶ 11, 18; Doc. 14 ¶ 16. | Disputed. Dr. Ryan did not begin work until October 4, 2013. Otherwise undisputed.<br><br>Ryan Decl. at ¶ 2. |
| **12.** In August 2015, after Dr. White filed a lawsuit against Dr. Ryan (Los Angeles Superior Court No. BC589493, filed July | Undisputed. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| 29, 2015), it was decided that Dr. Ryan would instead report directly to Dr. de Virgilio.<br><br>Putnam Decl. ¶¶ 11, 18; Vintch Decl. ¶¶ 11, 18; Ryan Depo. 211:5-212:2; Doc. 14 ¶ 16; Decl. of John J. Manier ("Manier Decl."), Ex. 25. | |
| **13.**   Dr. Ryan participated in a Focused Professional Practice Evaluation ("FPPE") concerning Dr. White in late August or early September 2014, after Dr. Ryan had made a complaint against Dr. White.<br><br>Ryan Depo. 45:24-46:5, 56:15-60:13, 141:4-11, 164:2-6. | Undisputed. |
| **14.**   Dr. White made a Request for Corrective Action to be taken against Dr. Ryan to the PSA on August 25, 2015, in which Dr. White claimed, *inter alia*, that Dr. Ryan "engaged in conduct detrimental to the delivery of quality patient care, disruptive and deleterious to the operations of the Medical Center, the improper use of Medical Center resources, and below applicable professional standards," and specifically alleged Dr. Ryan invaded his personal privacy, and violated both the Health Insurance Portability and Accountability Act ("HIPAA") and California's Confidentiality of Medical Information Act, by accessing confidential patient information in Dr. White's office.<br><br>Putnam Decl. ¶ 11; Vintch Decl. ¶ 11; Ex. 351; Ryan Depo. 36:2-37:2, 214:12-15, 217:25-218:13. | Disputed to the extent it implies this was Dr. White's first complaint.  Dr. White made his first complaint on the same basis on January 26, 2015 and February 4, 2015.  The MEC believed it investigated the issue "adequately" and investigation determined "no HIPAA violation occurred on the part of Dr. Ryan." Otherwise undisputed.<br><br>White Decl., Exh. 340, 341, 365 at p.3. |
| **15.**   The MEC discussed Dr. White's | Disputed.  This recitation is based on the altered version of the minutes of the |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| Corrective Action Request at its meeting on September 28, 2015; MEC members felt the behavior reported by Dr. White, if confirmed, would be considered unprofessional, and that Dr. White's allegations met the PSA Bylaws' criteria for initiation of an investigation; but the MEC concluded each issue needed to be thoroughly investigated by the appropriate County bodies, so the PSA initially did not participate in reviewing any of Dr. White's allegations.<br><br>Putnam Decl. ¶ 12; Vintch Decl. ¶ 12; Ex. 11. | September 28, 2015 MEC meeting.  The original minutes show that the MEC discussed and acknowledged the following:<br><br>• That Dr. White had previously complained about Dr. Ryan six to nine months before;<br>• That Dr. Ryan "somehow found out or looked up how many cases Dr. White had completed and contacted the NIH saying that Dr. White is committing medical fraud for being a participant in the study while he had not completed enough cases in order to participate";<br>• That Dr. White "said that Dr. Ryan committed a HIPAA violation because he must have gone through medical records to find out what his cases and case quality was";<br>• That an investigation found that Dr. White had not conducted the number of cases he represented in his application to the study;<br>• That the PSA had "spent months and worked very diligently on this and ultimately there was no resolution" and "now we are being asked to investigate this again,"<br>• That the PSA had referred the alleged HIPAA violation to the Compliance Officer, who concluded based on their review there was no HIPAA violation;<br>• That "these complaints were taken seriously and went appropriately to HR Performance Management and the HIPAA Compliance Officer and the difference now is that there are attorneys involved and litigation"; |

7

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| | • That "We had a recognized HIPAA Compliance Officer review the case and it was found that no HIPAA violation occurred on the part of Dr. Ryan. About six months later Dr. White decided to bring his own attorney in and sue Dr. Ryan. Concurrently Dr. White sent an email to Dr. Van Natta and Dr. Putnam Requesting PSA corrective action against Dr. Ryan."<br>• That "Dr. Ryan considers himself a whistleblower because he thought this bad thing happened and he wanted to do right. He further believes that any action taken against him, by us, would be considered retaliation."<br>• That "To take a corrective action beyond the investigation could be considered retaliation because we feel this issue has been investigated adequately. On the other hand it is not necessarily under the purview of the whistleblower to do their own investigation and start digging into whatever they want."<br><br>White Decl., Exh 365 at p.3. |
| **16.**    In or about December 2015, Dr. White submitted an Addendum to the Request for Corrective Action, in which he alleged that Dr. Ryan was "continuing to engage in conduct which is detrimental to the delivery of quality patient care, disruptive and deleterious to the operations of the Medical Center, and below applicable professional standards"; Dr. White also alleged that a "continuing pattern of harassment, and unscrupulous conduct by Dr. Ryan, is having a severe impact on me, as a member of the medical | Undisputed that this was part of the language.  The full second paragraph reads:<br><br>"On November 19, 2015 I was advised by the County's Intake Specialist Unit that Dr. Ryan filed a complaint against me. On November 24, 2015, I received another letter from that same unit, that the complaint had been initially investigated, that the allegations would not be investigated further and that the matter was considered closed. Enclosed |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| staff, and on my personal and professional life," and cited a complaint by Dr. Ryan against Dr. White with the County Intake Specialist Unit ("CISU"), which "had been initially investigated" but "was considered closed" as of November 24, 2015.<br><br>Putnam Decl. ¶ 13; Vintch Decl. ¶ 13; Declaration of Benjamin Stormer ("Stormer Decl.") ¶ 9; Exs. 22, 23, 359. | are copies of both letters. This continuing pattern of harassment, and unscrupulous conduct by Dr. Ryan, is having a severe adverse impact on me, as a member of the medical staff, and on my personal and professional life."<br><br>Defendants' Exhibits, Exh. 359. |
| 17.    The allegations in Dr. Ryan's November 13, 2015 CISU complaint against Dr. White were the same as those asserted in Dr. Ryan's March 17, 2015 CISU complaint against Dr. White; both were closed after an initial investigation because neither alleged or involved any protected basis jurisdictional to the County Policy of Equity (which protects employees' right to be free from discrimination, sexual harassment, retaliation, and other harassment or inappropriate conduct toward based on a state or federally-protected characteristic).<br><br>Stormer Decl. ¶¶ 1-9; Exs. 20, 21, 22, 23. | Undisputed that the County closed both investigations without action.  Disputed that the complaints did not allege or involve any protected basis jurisdictional to the County Policy of Equity.  Dr. Ryan reported retaliation against him for reporting violations of the law, which is expressly forbidden under the County Policy on Equity.<br><br><br>Defendants' Exhibits, Exh. 20 at pages 5-2, 5-4 ["Retaliation for purposes of this Policy is an adverse employment action against another for reporting a protected incident or filing a complaint of conduct that violates this Policy or the law or participating in an investigation, administrative proceeding, or otherwise exercising their rights or performing their duties under this Policy or the law."], 5-5; Exh. 21, 22 [reporting retaliation for reporting violations of law]. |
| 18.    Dr. White's allegations against Dr. Ryan in the Corrective Action Request and Addendum (collectively the "Corrective | Disputed.  The PSA had investigated Dr. White's allegations months before, believed that its investigation was |

9

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| Action Request" or "Request") met the PSA Bylaws' criteria for initiation of an investigation, which include a physician's disruptive and inappropriate conduct.<br><br>Putnam Decl. ¶¶ 12-14; Vintch Decl. ¶¶ 12-14; Ex. 301 §§ 2.5-2, 2.5-3, 6.1-3.2-d, 6.2-3. | investigated adequately, and determined they were without merit.<br><br>White Decl., Exh 365 at p.3. |
| **19.**    The MEC discussed Dr. White's Corrective Action Request at a special session on December 28, 2015, which was attended by Drs. Putnam and de Virgilio but no other Defendants, and at which the MEC noted the next step would be to complete an FPPE on Dr. Ryan because of the allegations of questionable conduct, it would be necessary and fair to conduct fact-finding before any corrective action was considered against Dr. Ryan, and such fact-finding was warranted under the Bylaws.<br><br>Putnam Decl. ¶ 14; Vintch Decl. ¶ 14; Ex. 12; Ex. 301 §§ 2.5-2, 2.5-3, 6.1-3.2-d, 6.2-3, 6.2-5. | Undisputed. |
| **20.**    FPPE is not disciplinary in and of itself, but rather is a peer review process, subject to strict confidentiality, with no preordained course; if FPPE fact-finding reveals adverse information, then various actions may be taken under the Bylaws, varying in degree from placing documentation in the member's peer review file up to recommending corrective action under the Bylaws.<br><br>Putnam Decl. ¶ 15; Vintch Decl. ¶ 15; Ex. 301 § 6.1-5.1; Cal. Evid. Code § 1157. | Disputed that an FPPE is not "disciplinary," except in a contrived meaning of that word.  The MEC identified and understood an FPPE to be an investigation of alleged misconduct.<br><br>White Decl., Exh. 360 at p. DEF004265 (recommending an FPPE "to evaluate Dr. Ryan's behavior and develop a recommended course of action"). |

BROWN WHITE & OSBORN
ATTORNEYS

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| **21.**    Pursuant to the PSA Bylaws, on December 28, 2015, the MEC directed a FPPE to be undertaken by an "Ad Hoc Committee," which included the following five members appointed by Dr. de Virgilio as Department Chair: Drs. Jeanette Derdemezi (Chair of the Department of Anesthesiology), Adam Jonas (Chair of Pediatrics), Robert Hockberger (Emergency Medicine), Ravin Kumar (Chief of Colorectal Surgery, and Chair of the Ad Hoc Committee), and Bassam Omari (Cardiac Surgery).<br><br>Putnam Decl. ¶ 16; Vintch Decl. ¶ 16; Ryan Depo. 79:6-80:4, 80:18-82:7, 226:23-227:7, 244:15-247:16; Ex. 12; Ex. 301 § 6.2-5. | Undisputed that the MEC directed the FPPE be undertaken and these individuals were appointed.  Disputed that it was "pursuant to the PSA Bylaws," in that the MEC believed it investigated the issue "adequately" and the previous investigation determined "no HIPAA violation occurred on the part of Dr. Ryan."<br><br>White Decl., Exh 365 at p.3. |
| **22.**    None of the Ad Hoc Committee members were members of Dr. Ryan's division (Vascular Surgery); the MEC viewed each of the members as neutral in connection with Dr. Ryan and Dr. White; and none of these members allegedly harbored retaliatory motives against Dr. Ryan based on constitutionally-protected speech.<br><br>Putnam Decl. ¶ 16; Vintch Decl. ¶ 16; Ryan Depo. 45:24-52:20. | Disputed.  The MEC knew that several members of the Ad Hoc Committee were not neutral.  Dr. Kumar was a friend of Dr. White and Dr. Dermedezi and Dr. Jonas were on the MEC when it failed to act on Dr. Ryan's complaints about Dr. White.<br><br>Ryan Decl. at ¶ 23. |
| **23.**    Dr. Ryan refused to meet with the Ad Hoc Committee after it rejected his demands that he be provided all questions in writing or be allowed to bring his lawyer.<br><br>Ryan Depo. 223:17-224:14; Putnam Decl. ¶ 17; Vintch Decl. ¶ 17; Ex. 5 at 1. | Disputed.  Dr. Ryan, fearing that he would not be treated fairly, requested (not demanded) that he be given the questions in writing or that he be allowed to have an attorney present, but Dr. Kumar refused.<br><br>Ryan Dec. at ¶ 15. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| **24.**   After engaging in fact-finding and interviewing 13 witnesses, on February 26, 2016, the Ad Hoc Committee issued a FPPE report for the MEC's review, which included unanimous committee findings and recommendations with respect to Dr. Ryan's conduct, which it found to be unprofessional, and also included the following summary: | Undisputed that the FPPE report asserted this.  Disputed that it was true. |
| | Dr. Ryan has not, as the FPPE claimed, yelled at patients, and has only raised his voice in the operating room when someone is doing something that risks imminent harm to patients.  Ryan Decl. at ¶ 16.  Moreover, the FPPE and its supporting witness statements repeatedly assert that the NIH found Dr. Ryan's complaint without merit, when in fact the NIH investigation found that doctors had falsified their qualifications and halted Harbor from admitting patients to the trial.  Defendants' Exhibits, Exh. 356 at 2 [White statement], 4 [De Virgilio Statement], 9 [Donayre statement]; Exs. 24 [Result of BEST-CLI investigation]; White Decl., Exh. 331 [result of BEST-CLI investigation], 365 [MEC acknowledgement of result of BEST-CLI investigation.] |
| The Ad Hoc Committee believes that Dr. Ryan's behavior is well below expected standards for professional conduct. Further, the committee believes that Dr. Ryan's behavior has had serious adverse impacts on the wellbeing of many health care professionals including attending physicians, physician trainees, nurses and other ancillary staff. His unauthorized access of the files of patients enrolled in studies or under the care of other physicians may constitute a violation of HIPAA. Finally, it appears that despite Dr. Ryan's acknowledged technical expertise, he is adversely impacting patient care through his behavior. The MEC is advised that the Ad Hoc committee believes that disciplinary action is justified to safe guard Harbor employees, trainees, and patients. | |
| We recommend that MEC should explore possible actions to remedy the underlying chaotic situation in vascular division created by Dr. Ryan's unprofessional behavior. Dismissal from the medical staff or discontinuation of medical | |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| privileges are options that can considered but the committee is not knowledgeable regarding standards or precedents for such as action based solely on a lack of professionalism. <br><br> At a minimum, we believe that Dr. Ryan should receive professional counseling regarding his behavior, that behavioral limits should be set, and that ongoing monitoring of his interactions with others should take place until the problem is believed to be resolved. The Department Chair, residency/fellowship program directors and nursing directors are suggested as the monitoring team for such action. This report reflects a unanimous consensus among committee members. <br><br> Putnam Decl. ¶ 17; Vintch Decl. ¶ 17; Ryan Depo. 79:6-25, 80:18-83:25, 111:24-118:12, 142:19-143:3, 155:4-11, 168:17-169:14, 186:9-189:3, 203:8-20, 215:14-216:22, 227:18-21, 230:4-235:23, 238:8-239:22, 241:7-242:9, 243:16-24, 248:22-253:17; Ex. 5 at 4-5; Ex. 301 § 6.1-3. | |
| **25.**   The PSA Bylaws authorize use of "a final written warning, or corrective action pursuant to Article VI"—which may include recommending "revocation of clinical privileges" or any "other actions deemed appropriate under the circumstances"—for disruptive behavior. <br><br> Vintch Decl., Ex. 301 §§ 2.5-3, 6.1-3.2-d. 6.1-3.3, 6.2-5, 6.2-7. | Undisputed. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| **26.**   The MEC discussed the FPPE report at its meetings on March 28 and April 25, 2016, rejected issuing a summary suspension of Dr. Ryan's privileges at the March 28 meeting, voted unanimously at the April 25 meeting to inform Dr. Ryan that it was contemplating taking action against him, and asked Dr. Ryan to appear before the MEC to give his perspective and answer questions.<br><br>Putnam Decl. ¶ 19; Vintch Decl. ¶ 19; Exs. 13, 14. | Undisputed. |
| **27.**   Dr. Ryan agreed to the PSA's request to appear before the MEC on June 27, 2016, but because his attorney was not available, he asked to reschedule his appearance, and the MEC agreed.<br><br>Putnam Decl. ¶ 20; Vintch Decl. ¶ 20; Ex. 16. | Disputed.  When invited to the June 27, 2016 meeting, Dr. Ryan asked to bring his attorney.  He was told he could not.  The morning of the meeting, he was told that he could after all, by which time his attorney was not available.  Dr. Putnam altered the minutes of the April 25, 2016 meeting to make it appear that the MEC had decided in advance to prohibit attorney attendance.  Otherwise undisputed.<br><br>Ryan Dec., ¶ 20, White Decl., Exh. 360 at DEF004271, Exh. 366, 367. |
| **28.**   Dr. Ryan attended the July 25, 2016 MEC meeting with his attorney, at which Dr. Putnam read excerpts from the summary of findings in the FPPE report, and Dr. Ryan responded as follows: he did not yell at a patient; he may have spoken sternly to fellows because he expects more from them; he corrected fellows when they did something wrong; without specific dates he could not answer regarding lack of communication with other vascular surgeons; he believed he communicated | Undisputed. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| well; he was not responsible for Dr. White's retirement or the departure of another vascular surgeon (Carlos Donayre, M.D.); and he would consider a behavioral or anger management program.<br><br>Putnam Decl. ¶ 21; Vintch Decl. ¶ 21; Ex. 15; Ryan Depo. 73:20-75:24, 77:14-78:6, 251:20-25. | |
| **29.**    After Dr. Ryan and his counsel left the July 25, 2016 meeting, the MEC deliberated and voted on the next course of action, but Dr. de Virgilio left before this vote took place.<br><br>Putnam Decl. ¶ 22; Vintch Decl. ¶ 22; Ex. 15. | Undisputed. |
| **30.**    At the July 25, 2016 meeting, the MEC voted on four options for disciplinary action, which were narrowed down to two: (1) develop a Behavioral Contract, requiring Dr. Ryan to complete anger management courses, be followed by the Well-Being Committee, and adhere to strict professional behaviors without further intimidating behaviors; or (2) immediately revoke Dr. Ryan's PSA membership and clinical privileges at Harbor-UCLA; a majority of the MEC voted to recommend a Behavioral Contract and proceed with revocation of Dr. Ryan's privileges and membership only if he either did not agree to the Behavioral Contract or breached its terms.<br><br>Putnam Decl. ¶¶ 22-23; Vintch Decl. ¶¶ 22-23; Ex. 15; Ex. 301 § 6.2-7. | Undisputed. |
| **31.**    The MEC has offered Behavioral | Undisputed that the MEC has offered Behavioral Agreements to other Harbor- |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| Agreements to other Harbor-UCLA practitioners, and it has terminated the Agreements once the concerns underlying the Agreements were successfully resolved.<br><br>Putnam Decl. ¶ 23; Vintch Decl. ¶ 23. | UCLA practitioners.  Disputed that it has offered Behavioral Agreements with the same terms.  For instance, only Dr. Ryan's Behavioral Agreement included a waiver of claims.<br><br>White Decl., Exh. 371, Putnam Depo., 153:25-154:2, Vintch Depo., 137:21-139:9. |
| **32.**   Dr. Ryan was provided with the proposed Behavioral Agreement, dated September 6, 2016, which included the following:<br>● listed specific behavioral requirements, including that he not access computers or other documents belonging to other PSA members, faculty, or others without authorization, or medical records of patients for whom he is not directly involved in treatment without express permission by his Department Chair;<br>● required Plaintiff to address concerns regarding individuals at Harbor-UCLA "in private to the appropriate supervisor, administrator, faculty or PSA leader in a courteous manner, or in written reports using the established Hospital reporting forms and procedures," and prohibited "unconstructive criticism" calculated "to intimidate, undermine confidence, belittle or imply stupidity or incompetence";<br>● required Dr. Ryan to participate in one of two listed anger management programs;<br>● included a waiver of "claims resulting" from any actions or communications "consistent with the terms of this Agreement," or regarding the anger management program; | Undisputed the Behavioral Agreement includes those terms. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| ● required Dr. Ryan to cooperate with the PSA's Well-Being Committee as specified;<br>● required Dr. Ryan to "consult with a psychologist or psychiatrist" (or use a therapist if he is currently engaged with one) "for the purposes of discussing the scope of the evaluation and the therapeutic goals," and "to undertake therapy if recommended by the consultant," and required any consulted mental health clinician "to provide progress reports" to the Well-Being Committee;<br>● provided that upon Dr. Ryan's failure to comply with the Agreement, he "shall be subject to corrective action" as authorized by the PSA Bylaws, "subject to any hearing rights provided in Article VII of the Bylaws, or its successor, for such corrective action," provided that a single arbitrator qualified to serve as a hearing officer under Article VII may serve as trier of fact in the MEC's discretion;<br>● the Agreement may be terminated by either party; and<br>● entering into the Agreement would "not constitute an action or recommendation taken for a medical disciplinary cause or reason" and would not "in and of itself … require a report to the Medical Board of California or any other federal or state agency."<br><br>Putnam Decl. ¶ 24; Vintch Decl. ¶ 24; Ryan Depo. 21:19-24:1, 76:19-77:2, 251:20-254:22, 259:14-262:18, 264:17-266:5, 268:5-272:17, 275:15-279:21, 283:13-284:7, 288:11-289:20, 294:10-295:16; Ex. 7; Ex. 301 § 11.15. | |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| 33.   Dr. Ryan, who continued to be represented by counsel, was given two weeks plus an extra 10 days to sign the Behavioral Agreement, but he refused to do so, and he did not provide the MEC any reasons for not signing or suggested revisions to the Agreement.<br><br>Putnam Decl. ¶ 24; Vintch Decl. ¶ 24; Ryan Depo. 21:19-24:1, 76:19-77:2, 251:20-254:22, 259:14-262:18, 264:17-266:5, 268:5-272:17, 275:15-279:21, 283:13-284:7, 288:11-289:20, 294:10-295:16; Ex. 7. | Disputed.  Dr. Ryan told Dr. De Virgilio that the Behavioral Contract required him to admit to things that were not true, and that it was illegal in that it purported to restrict him from reporting misconduct to entities outside of Harbor, and forced him to waive claims against the MEC and Hospital.  In addition, through his attorney, Dr. Ryan suggested changes to the Behavioral Contract, but Dr. Putnam refused them.<br><br>Ryan Dec. at ¶ 21; White Decl. Exh. 420 [Putnam email reading "I have reluctantly agreed to the two-week extension but insisted that the language in the behavioral contract (including that in which he does not deny wrongdoing) remain unchanged."], Putnam Depo., 141:14-24. |
| 34.   Based on Dr. Ryan's refusal to sign a Behavioral Agreement, and in accordance with the MEC's decision at the July 25, 2016 meeting, the PSA issued Dr. Ryan the MEC's Notice of Proposed Action and Hearing Rights, dated October 5, 2016, which stated as follows:<br>● the FPPE report found Dr. Ryan "acted aggressively" and was "verbally abusive to other practitioners, nurses, fellows, and in some instances, patients," that he created "a hostile work environment" where some people "felt threatened" and "intimidated" to the point where they desired to leave "the vascular work team" or their jobs, and that he publicly criticized "the patient management of other members of the team," which adversely affected well-being of other healthcare officials; | Undisputed that the MEC issued the Notice and it had those terms, disputed that the assertions in the Notice were true.<br><br>Ryan Decl. at ¶ 16. |

18

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| ● the FPPE report found "at least one key physician confirmed" he left Harbor-UCLA due to Dr. Ryan's behavior, which could have adversely impacted the vascular program's "future educational development," and several fellows reported Dr. Ryan yelled at them and intimidated them, which would make it "hard to recommend Harbor to future fellows" due to this environment, and that they did not trust Dr. Ryan or want to ask him for recommendation letters; <br> ● despite Dr. Ryan's technical expertise, the FPPE report found his behavior adversely impacted patient care, because he yelled at several fellows in front of patients, his behavior contributed to poor communications with other vascular attending physicians, separate operating room suits had to be run to give Dr. Ryan his own operative area, and the impending loss of experienced faculty "may also impair patient care"; <br> ● the FPPE report found Dr. Ryan's behavior was "well below expected standards for professional conduct" and violated the PSA Bylaws (§§ 2.2-2.2, 2.4-2, 2.4-3, 2.4-7, 2.5-2, and 2.5-2.4), and that disciplinary action was justified to safeguard employees, trainees, and patients; <br> ● because Dr. Ryan did not sign and return the Behavioral Agreement, the MEC proceeded with the final proposed action to revoke Dr. Ryan's professional staff membership and privileges at Harbor-UCLA pursuant to Article VI of the PSA Bylaws; <br> ● this action would not become final until Dr. Ryan exhausted or waived his hearing | |

19

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| and appeal rights under Article VII of the Bylaws, and that his membership and privileges would remain in place until the action became final; and<br>● if the action became final, California Business & Professions Code § 805 would require the filing of a report with the Medical Board of California, and a report also would be filed with the National Practitioner Data Bank ("NPDB") pursuant to 42 U.S.C. § 11101 *et seq.*<br><br>Putnam Decl. ¶ 24; Vintch Decl. ¶ 24; Ryan Depo. 77:2-13; Ex. 380. | |
| **35.**   Dr. Ryan exercised his appeal rights in October 2016 and requested a hearing before a Judicial Review Committee ("JRC") on the recommendation to revoke his privileges.<br><br>Putnam Decl. ¶ 25; Vintch Decl. ¶ 25; Ryan Depo. 77:2-13. | Undisputed. |
| **36.**   The PSA issued an initial Notice of Charges dated November 10, 2016, which included the following non-exclusive specification of inappropriate, unprofessional, and disruptive conduct as found by the Ad Hoc Committee in the FPPE report that fell "well below expected standards for professional conduct" and violated the PSA Bylaws:<br>● "Openly and loudly criticizing other PSA members in front of multiple Medical Center and PSA staff in a disruptive manner";<br>● "Openly threatening to call external agencies to conduct investigations";<br>● "Openly making unfounded accusations in an angry manner"; | Undisputed. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| ● "Openly making belittling and berating statements"; <br> ● "Openly making degrading and demeaning statements"; <br> ● "Refusing to answer questions regarding patient care"; <br> ● "Openly and angrily telling Medical Center staff to do what he says without offering any explanation"; <br> ● "Refusing to acknowledge other patient care team members; <br> ● "Approaching and addressing staff in an angry and intimidating manner"; and <br> ● "Failure to work cooperatively and professionally together as a member of the patient care team." <br><br> Putnam Decl. ¶ 25; Vintch Decl. ¶ 25; Ex. 301 §§ 7.4-1, 7.4-4, 7.6; Exs. 381, 382; Ryan Depo. 77:2-13. | |
| **37.** Dr. Ryan's appeal was to be heard by a JRC composed of five impartial active staff members who "have not actively participated in the consideration of the matter involved at any previous level," and before a judge—each of whom were appointed by the MEC and approved by Dr. Ryan's attorneys; after a JRC hearing concludes, the JRC shall deliberate and render a recommended decision by majority vote and an accompanying report, which shall include findings of fact and be based on the evidence presented and inferences therefrom, and shall determine whether the MEC's recommended decision was reasonable and warranted. <br><br> Putnam Decl. ¶ 25; Vintch Decl. ¶ 25; Ex. 301 §§ 7.4-1, 7.4-4, 7.6; Exs. 381, 382. | Undisputed. |

21

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| **38.** A JRC decision is final but subject to appellate review by the Governing Body (Board of Supervisors), which shall appoint a five-person Appeal Board (three from the PSA and two from Harbor-UCLA administrative staff, but no prior hearing participants or decisionmakers in the matter) to recommend whether the JRC's decision should be affirmed (if based on substantial evidence following a fair procedure), reversed, or remanded to the JRC.<br><br>Putnam Decl. ¶ 25; Vintch Decl. ¶ 25; Ex. 301 §§ 7.6-5, 7.7. | Undisputed. |
| **39.** Counsel for the PSA and Dr. Ryan jointly submitted a letter dated June 20, 2018, which requested dismissal of the JRC hearing on Dr. Ryan's appeal without determination of the merits, and stated that the matter became moot because Dr. Ryan's PSA membership and privileges had lapsed.<br><br>Putnam Decl. ¶¶ 26-27; Vintch Decl. ¶¶ 26-30; Ryan Depo. 290:3-294:9; Ex. 19; Request for Judicial Notice ¶¶ 3-4, Ex. A at 17 ¶ 9, Ex. B. | Undisputed. |
| **40.** After deeming Dr. Ryan's privileges and membership to have lapsed, the PSA did not file a report regarding Dr. Ryan with the California Medical Board or with the NPDB.<br><br>Putnam Decl. ¶ 27; Vintch Decl. ¶ 30; Ryan Depo. 290:3-294:9. | Disputed. Harbor did submit a NPDB report in November 2020.<br><br>Vintch Decl. at ¶ 30. |
| **41.** Dr. White's lawsuit against Dr. Ryan, filed July 29, 2015, alleged that Dr. | Undisputed. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| Ryan "engaged in a course of conduct of seeking out and viewing Dr. White's personal records and the private records of Dr. White's patients," "continued to engage in harassing conduct by entering Dr. White's office without permission and viewing his private records and private mail," and "made in-person inquiries to Hospital personnel concerning Dr. White and his patients" without legal authority, and asserted claims for violations of the CMIA and the right to privacy and for harassment.<br><br>Manier Decl., Ex. 25 ¶¶ 5, 8, 10, 12-39. | |
| **42.**     Dr. Ryan demanded that the County indemnify and defend him against Dr. White's lawsuit, allegedly filed "in retaliation for Dr. Ryan's reporting of Dr. White's conduct," and claimed the County was legally obligated to do so under California Government Code § 825 because "the reporting of such fraud falls well within the scope of my employment"; the County eventually agreed to defend Dr. Ryan in this lawsuit, which was later dismissed in exchange for Dr. Ryan's dismissal of his lawsuit against Dr. White.<br><br>Ryan Depo. 11:4-16, 16:24-17:8, 210:16-212:21, 213:19-214:2; Ex. 6; Ex. 26 ¶ 12(j); Cal. Gov't Code § 825(a). | Undisputed. |
| **43.**    The National Institutes of Health ("NIH"), part of the Department of Health and Human Services ("HHS"), is the world's largest biomedical research agency, and funds the "Best Endovascular vs. Best Surgical Therapy in Patients with Critical Limb Ischemia" ("BEST-CLI Trial"), | Undisputed. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| which "is an international research study" that is "aimed at figuring out the best treatment for people with peripheral arterial disease," *i.e.*, "poor blood flow."<br><br>Request for Judicial Notice ¶¶ 1-2. | |
| **44.** Plaintiff made a report to the NIH which "raised concerns about misrepresentation of procedural volume histories by team members" at Harbor-UCLA, in connection with the BEST-CLI Trial for which Dr. White and other physicians sought NIH funding; Plaintiff allegedly learned of these matters "in or about April-June 2014."<br><br>Manier Decl., Exs. 24, 26 at 6 [¶ 10]; Doc. 14 ¶¶ 23, 27. | Undisputed. |
| **45.** NIH's Extramural Research Integrity Officer, Dr. Patricia Valdez, stated in a March 30, 2015 email to Plaintiff—which Plaintiff forwarded to Dr. de Virgilio on April 2, 2015—that "the Surgical and Interventional Management Committee (SIMC) for the BEST-CLI Trial" responded to Plaintiff's concerns by auditing the site "and found that several members of the Harbor-UCLA team misrepresented their procedural volume histories to meet the criterial of independent endovascular operator," but Dr. Valdez stated her understanding "that the SIMC's concerns have now been addressed," and that HHS's Office of Research Integrity ("ORI") "advised that falsification of information in this situation would not constitute research misconduct. ORI will not investigate this matter further." | Disputed to the extent the statement implies this was the only finding. The investigation also determined:<br><br>"[N]o one at the site currently meets the criteria to serve as an independent endovascular operator. We encourage the group to reach out to other potential investigators at their site who might meet the endovascular criteria. When and if that occurs, the site could be reconsidered. Until then, the site should no longer enroll patients in the BEST-CLI Trial." Otherwise undisputed.<br><br>White Decl., Exh. 331. |

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| Manier Decl., Ex. 24. | |
| **46.** Dr. Putnam did not act with malice or conscious disregard for Dr. Ryan's rights.<br><br>Putnam Decl. ¶ 29. | Disputed. The evidence shows that Dr. Putnam deliberately retaliated against Dr. Ryan.<br>Dr. Putnam altered MEC minutes to conceal admissions that showed that the MEC's retaliatory motive and guilty knowledge, proceeded based on a FPPE that he knew contained false statements, and proceeded with the FPPE against Dr. Ryan despite the MEC's and his own normal practices to give physicians counseling before official proceedings.<br><br>Defendants' Exhibits, Exh. 356 at 2 [White statement], 4 [De Virgilio Statement], 9 [Donayre statement]; Exs. 24 [Result of BEST-CLI investigation]; White Decl., Exh. 331 [result of BEST-CLI investigation], 365 [MEC acknowledgement of result of BEST-CLI investigation;] Plaintiff's Exh. 301 at 48 [Bylaws on progressive steps]; Ryan Decl. at ¶ 18 [lack of any counseling prior to FPPE action]; Putnam Depo., 72:10-73:2, 75: 9-76:4, 76:5-7 [normal practice of counseling and lack of counseling of Dr. Ryan]; De Virgilio Depo., 44:6-17, 44:18-45:2, 74:22-75:7 [lack of counseling of Dr. Ryan]; White Decl., Exh. 365 [unedited September 28, 2015 minutes], Exh. 360 at 1 [email circulating edited minutes for revision in December 2016], 360 at 4287 [altered minutes of September 28, 2015], Exh. 362 [original April 25, 2016 minutes], Exh. 360 at 4270-71 [altered April 25, 2016 minutes]. |

## ADDITIONAL MATERIAL FACTS

| Defendants' Response: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| 47. | Dr. Timothy Ryan ("Dr. Ryan") began working at Harbor-UCLA Medical Center ("Harbor") in October 2013.<br><br>Ryan Decl. at ¶ 2. |
| 48. | In 2014, Dr. Ryan became aware of a clinical trial sponsored by the National Institute of Health ("NIH") called BEST-CLI, which stands for Best Endovascular vs. Best Surgical Therapy in Patients with Critical Limb Ischemia.  The clinical trial was designed to evaluate what procedures on patients with critical limb ischemia led to the best results, comparing endovascular surgery (which uses catheters and is less invasive) with open surgery.  Some Harbor surgeons participated in the trial.<br><br>Ryan Decl. at ¶ 3. |
| 49. | Based on Dr. Ryan's review of the clinical trial documentation, he knew that the trial required participants to have completed a set number of surgeries to be qualified.  He became concerned that some Harbor surgeons – including Dr. Rodney White ("Dr. White") and Dr. Carlos Donayre ("Dr. Donayre") – had not completed the requisite number of surgeries to qualify for the trial, and that they had therefore falsified the attestation in their applications in order to participate.<br><br>Ryan Decl. at ¶ 4. |
| 50. | On December 4, 2014, Dr. Ryan reported his concerns about the BEST-CLI trial to Dr. Timothy Van Natta ("Dr. Van Natta"), Chief Medical Officer at Harbor, and Dr. Christian De Virgilio, a senior vascular surgeon, and asked them to investigate. |

| | |
|---|---|
| | Ryan Decl. at ¶ 4. |
| **51.** | Based on Dr. Van Natta's and Dr. De Virgilio's response, Dr. Ryan did not believe they were seriously investigating whether Harbor surgeons had falsely inflated their surgical experience in order to qualify for the BEST-CLI trial.<br><br>Ryan Decl. at ¶ 5. |
| **52.** | The failure to investigate concerned Dr. Ryan because he believed that public employees had falsified an application to a clinical trial, that they were not qualified to participate in the trial, that their lack of qualifications would impact the reliability or the results of the trial, and that patients would be put at risk by being enticed to enroll in a trial conducted by unqualified physicians.<br><br>Ryan Decl. at ¶ 5. |
| **53.** | Therefore, on December 4, 2014, Dr. Ryan contacted the NIH and reported his concerns, providing his basis for believing that Dr. White and Dr. Donayre, among others, had falsified their attestations in their application to participate in the BEST-CLI trial.<br><br>Ryan Decl. at ¶ 5. |
| **54.** | Dr. Ryan informed Dr. Van Natta that he had made a report to NIH on approximately December 9, 2014.<br><br>Ryan Decl. at ¶ 5. |
| **55.** | In response to Dr. Ryan's report to NIH, the Surgical and Interventional Management Committee for the BEST-CLI trial "conducted an audit of the site and found that several members of the Harbor-UCLA team misrepresented their procedural volume histories to meet the criterial of independent endovascular operator," but that "falsification of information in this situation would not constitute research |

27

| | |
|---|---|
| | misconduct." The investigation found that the surgeons at Harbor, including Dr. White and Dr. Donayre, were not qualified to conduct endovascular surgeries in the trial and that Harbor could not admit more patients to the trial.<br><br>Plaintiff's Exh. 24; White Decl., Exh. 331. |
| 56. | On April 23, 2015, Dr. Van Natta told Dr. Putnam that Dr. Ryan contacted the NIH to report Dr. White for "acting fraudulently" in the Best-CLI trial, and that the result was that Harbor's participation in the trial was suspended.<br><br>White Decl., Exhibit 337. |
| 57. | In December 2013, Dr. Ryan treated a patient "BH" for an aortic dissection. He treated her with medication, which he believed to be the appropriate course.<br><br>Ryan Decl. at ¶ 6. |
| 58. | Shortly after treating BH, Dr. White's nurse Rowena Buwalda copied Dr. Ryan on an email reporting that she had instructed BH to come to the hospital the following day and to complain of chest pains when she did so.<br><br>Ryan Decl. at ¶ 6; Exhibit A to Ryan Decl. |
| 59. | Dr. Ryan discovered that Dr. White had re-admitted BH to Harbor under the false pretense of her having chest pains to make her admission appear to be an emergency, thus guaranteeing insurance payment for her stay.<br><br>Ryan Decl. at ¶ 6. |
| 60. | Dr. Ryan further learned that Dr. White had performed surgery on BH, implanting a stent graft manufactured by Medtronic.<br><br>Ryan Decl. ¶ 6. |

| 61. | Dr. Ryan firmly believed that BH had responded well to non-surgical management and that she had no need for the stent graft procedure.<br><br>Ryan Decl. at ¶ 6. |
|---|---|
| 62. | Dr. Ryan later learned that BH had suffered a serious aortic injury as a result of the stent graft surgery, resulting in a major stroke that impaired her ability to speak.<br><br>Ryan Decl. at ¶ 6. |
| 63. | Dr. Ryan reviewed BH's medical records and noted that Dr. White had falsified them by describing symptoms to justify the stent graft, symptoms inconsistent with what Dr. Ryan had observed.<br><br>Ryan Decl. at ¶ 6. |
| 64. | Dr. Ryan investigated medical records further and concluded that Dr. White, Dr. Donayre, and others were implanting stent grafts manufactured by Medtronic in patients where they were not medically warranted.<br><br>Ryan Decl. at ¶ 7. |
| 65. | Dr. Ryan discovered that Medtronic was paying the doctors thousands of dollars each time they implanted a stent graft, under the fiction that they were conducting a "teaching course" on how to perform the implant.  Medtronic offered the same deal to Dr. Ryan, who refused, because he knew from personal observation that there were no other physicians present to "learn" from the "course."<br><br>Ryan Decl. at ¶ 7 |
| 66. | Dr. Ryan discovered that the doctors received several thousand dollars for each Medtronic stent graft they implanted, and Medtronic was paid tens of thousands of dollars per stent graft procedure. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| | Ryan Decl. at ¶ 7. |
| **67.** | Dr. Ryan confronted Dr. Donayre about this after the incident with Dr. Ryan's patient BH.  Dr. Donayre admitted to me that Medtronic paid him and Dr. White for these "courses," and said Dr. Ryan would have to learn to live with it.<br><br>Ryan Decl. at ¶ 7. |
| **68.** | Dr. Ryan was gravely concerned by this development, because he believed it represented doctors getting kickbacks from a device manufacturer for using their product, that it compromised medical judgment about whether the devices were medically indicated, and that it threatened the health and safety of patients for whom the stent grafts were not medically indicated, as in the case of BH.<br><br>Ryan Decl. at ¶ 7. |
| **69.** | Dr. Ryan first reported his concerns to Dr. DeVirgilio in January 2014.  When nothing had happened by February 2014, Dr. Ryan approached Dr. Bruce Stabile, who was then the Chief of Surgery at Harbor.  Dr. Stabile told Dr. Ryan that he should find a way to "restore harmony in the vascular division by finding a way to share fees" with Dr. White.<br><br>Ryan Decl. at ¶ 8. |
| **70.** | Dr. Stabile's response was shocking and unacceptable to Dr. Ryan, so he went to Dr. Van Natta and repeated his concerns to him in late February 2014 or early March 2014.  Dr. Van Natta told Dr. Ryan that he should "keep [his] head down" during his six-month probationary period, which would end in April 2014.<br><br>Ryan Decl. at ¶ 8. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| 71. | In Fall of 2014, Dr. Ryan personally expressed his concerns about the Medtronic issue to Dr. Brant Putnam.<br><br>Ryan Decl. at ¶ 8. |
|---|---|
| 72. | Dr. Putnam did not give Dr. Ryan any updates concerning Dr. Ryan's complaints about Dr. White.<br><br>Putnam Depo. 35:2-22. |
| 73. | Dr. Ryan was aware that the Harbor Professional Staff Association ("PSA") conducted a Focused Professional Performance Evaluation ("FPPE") of Doctor White in 2014 in response to Dr. Ryan's complaint because the FPPE team interviewed Dr. Ryan.  Dr. Ryan told that team – which included Dr. DeVirgilio – about his concerns and conclusions about Dr. White and the Medtronic kickbacks, and provided them with documentation including BH's medical records.<br><br>Ryan Decl. at ¶ 9 |
| 74. | When Dr. Ryan saw no action that suggested that Harbor was doing anything about his complaint by the end of 2014, he decided to report the issue to outside criminal authorities.<br><br>Ryan Decl. at ¶ 10. |
| 75. | Dr. Ryan called the Los Angeles District Attorney's Office and spoke to a Deputy District Attorney on approximately January 12, 2015, describing his concerns that Harbor physicians were getting kickbacks for implanting devices that were not medically indicated.  Dr. Ryan provided the Deputy District Attorney with Exhibit A and suggested that she interview BH. The Deputy District Attorney told Dr. Ryan that the District Attorney's Office would investigate, and later interviewed Dr. Ryan. |

31

BROWN WHITE & OSBORN LLP
ATTORNEYS

| | |
|---|---|
| | Ryan Decl. at ¶ 10. |
| **76.** | Shortly after his call with the Deputy District Attorney, Dr. Ryan told Dr. De Virgilio that he had reported his concerns to the District Attorney's Office and they would be investigating.<br><br>Ryan Decl. at ¶ 11; White Decl. Exh. 332, Deposition of Christian De Virgilio, Exh. E to White Decl. ("De Virgilio Depo."), 22:8-22. |
| **77.** | On January 15, 2015, Dr. DeVirgilio informed Chief Medical Officer Timothy Van Natta that the District Attorney's Office was investigating Harbor based on allegations that Dr. White was involved in Medicare fraud, and Dr. Van Natta immediately  informed DHS Chief Medical Officer Hal Yee.<br><br>White Decl., Exhibit 332. |
| **78.** | In the Summer of 2015, shortly after Dr. Ryan's report to the District Attorney's Office, he observed that Medtronic stopped offering its "courses" at Harbor, and payments for the courses ceased.<br><br>Ryan Decl. at ¶ 12. |
| **79.** | On January 26, 2015, Dr. White submitted an email to Human Resources, Dr. Van Natta, and Dr. DeVirgilio "to report invasion of personal privacy, and potential federal (HIPPA) and state (California Medical Privacy Act) patient privacy violations by Dr. Timothy Ryan."<br><br>White Decl., Exh. 340 |
| **80.** | On February 4, 2015, Dr. White submitted a package of information in support of his January 26, 2015 complaint, including an affidavit and several exhibits.<br><br>White Decl., Exhibit 341 |

| | |
|---|---|
| **81.** | Dr. White's February 4, 2015 affidavit complained that Dr. Ryan had improperly reviewed medical records and operative reports and approached Harbor personnel to collect information regarding Dr. White and his patients.<br><br>White Decl., Exhibit 341 at 5. |
| **82.** | Dr. White's complaint and affidavit referred to actions Dr. Ryan took to gather information about Harbor doctors for his report to the NIH or his report to the District Attorney's Office.<br><br>Ryan Decl. at ¶ 13. |
| **83.** | Dr. White's February 4, 2015 affidavit attached a computerized report of surgeries which he claimed Dr. Ryan had asked an assistant to print for him.<br><br>White Decl., Exhibit 341 at 5, 7. |
| **84.** | The report Dr. White attached to his February 4, 2015 affidavit, which he represented to be something Dr. Ryan asked for from an assistant, showed a creation date of January 30, 2015, *after* Dr. White's complaint, *after* Dr. Ryan's report to NIH, and *after* the BEST-CLI audit was complete.<br><br>White Decl., Exhibit 341 at 7, Ryan Decl. at ¶ 14. |
| **85.** | The MEC believed that it "adequately" investigated Dr. White's January 28, 2015 complaint and determined that no discipline of Dr. Ryan was warranted.<br><br>White Decl., Exh, 365 at 3-4. |
| **86.** | On March 31, 2015, Dr. Van Natta solicited Dr. Putnam's help to "tie up lose ends with regards to Rod White, the PSA investigation, and Tim Ryan's allegations."<br><br>White Decl., Exh. 334 at 1. |

| 87. | On March 31, 2015, Dr. Putnam discussed circumstances under which Dr. White's privileges  should be limited and whether that would be reported to the California Medical Board. <br><br> White Decl., Exh. 334 at 1. |
|---|---|
| 88. | Dr. Putnam helped Dr. Van Natta "tie up lose ends" about the PSA investigation of Dr. White. <br><br> White Decl., Exh. 337. |
| 89. | In response to Dr. Ryan's complaints about Dr. White having a conflict of interest as a result of receiving payments from Medtronic in exchange for implanting stent grafts, the MEC's Ad Hoc Committee found that the subject was "essentially beyond the PSA's investigatory purview." <br><br> White Decl., Exh. 337. |
| 90. | On April 23, 2015, Dr. Van Natta told Dr. Putnam that Dr. Ryan was alleging that Dr. White was retaliating against Dr. Ryan for Dr. Ryan's reports about Dr. White. <br><br> White Decl., Exh. 337. |
| 91. | On April 23, 2015, Dr. Van Natta told Dr. Putnam that Dr. Van Natta was concerned that Dr. Ryan would "take it upon himself to pursue other avenues that could be damaging to DHS" if the investigation of Dr. White was insufficiently vigorous. <br><br> White Decl., Exh. 337. |
| 92. | On April 23, 2015, Dr. Van Natta told Dr. Putnam that Harbor's Focused Professional Practice Evaluation of Dr. White "originated from a complaint presented" by Dr. Ryan. <br><br> White Decl., Exhibit 337. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

BROWN WHITE & OSBORN ᴸᴸᴾ
A T T O R N E Y S

| 93. | In his April 23, 2015 email to Dr. Putnam regarding the investigation of Dr. Ryan's complaints about Dr. White, Dr. Van Natta abruptly raised a claim of complaints by nurses against Dr. Ryan.<br><br>White Decl., Exh. 337. |
|---|---|
| 94. | On June 8, 2015, Dr. Putnam learned from Dr. De Virgilio that there were "ongoing issues" between Dr. Ryan and Dr. White.<br><br>White Decl., Exh. 333. |
| 95. | Prior to January 31, 2015, Dr. DeVirgilio was not aware of any Harbor personnel submitting a report about Dr. Ryan's interpersonal behavior.<br><br>DeVirgilio Depo. 35:19-36:5; exhibit 347. |
| 96. | On August 24, 2015, Dr. White sent Dr. Putnam a "Request for Corrective Action" demanding that the Professional Staff Association take action under the Medical Staff bylaws.<br><br>White Decl., Exh. 350, 351. |
| 97. | In his Request for Corrective Action, Dr. White accused Dr. Ryan of invading Dr. White's privacy and the privacy of his patients, and violating HIPAA and the Confidentiality of Medical Information Act, by reviewing medical records and asking for records about Dr. White's cases.<br><br>White Decl., Exh. 351 |
| 98. | Dr. White's Request for Corrective Action described Dr. Ryan's activities asking for and reviewing records to make reports to the NIH and District Attorney's Office.<br><br>Ryan Decl., ¶ 13. |
| 99. | Dr. Putnam circulated Dr. White's Request for Corrective Action to Dr. Vintch and Dr. Dan Castro. |

35

|  |  |
|---|---|
|  | White Decl., Exh. 350 |
| **100.** | Dr. Castro counseled Dr. Putnam and Dr. Vintch that "this particular complaint seems steeped in historical interactions that may never be fully understood." |
|  | White Decl., Exh. 353. |
| **101.** | On September 28, Dr. Putnam presided over a meeting of the Harbor PSA with Dr. Vintch present.  The draft of the minutes reflect that the PSA acknowledged:<br><br>• That Dr. White had previously complained about Dr. Ryan six to nine months before;<br><br>• That Dr. Ryan "somehow found out or looked up how many cases Dr. White had completed and contacted the NIH saying that Dr. White is committing medical fraud for being a participant in the study while he had not completed enough cases in order to participate";<br><br>• That Dr. White "said that Dr. Ryan committed a HIPAA violation because he must have gone through medical records to find out what his cases and case quality was";<br><br>• That an investigation found that Dr. White had not conducted the number of cases he represented in his application to the study;<br><br>• That the PSA had "spent months and worked very diligently on this and ultimately there was no resolution" and "now we are being asked to investigate this again,"<br><br>• That the PSA had referred the alleged HIPAA violation to the Compliance Officer, who concluded based on their review there was no HIPAA violation; |

|  |  |
|---|---|
|  | • That "these complaints were taken seriously and went appropriately to HR Performance Management and the HIPAA Compliance Officer and the difference now is that there are attorneys involved and litigation"; |
|  | • That "We had a recognized HIPAA Compliance Officer review the case and it was found that no HIPAA violation occurred on the part of Dr. Ryan. About six months later Dr. White decided to bring his own attorney in and sue Dr. Ryan. Concurrently Dr. White sent an email to Dr. Van Natta and Dr. Putnam Requesting PSA corrective action against Dr. Ryan." |
|  | • That "Dr. Ryan considers himself a whistleblower because he thought this bad thing happened and he wanted to do right. He further believes that any action taken against him, by us, would be considered retaliation." |
|  | • That "To take a corrective action beyond the investigation could be considered retaliation because we feel this issue has been investigated adequately. On the other hand it is not necessarily under the purview of the whistleblower to do their own investigation and start digging into whatever they want." |
|  | • That the MEC would reach out again to the HIPAA Compliance Officer "to get more details." |
|  | White Decl., Exh 365 at p.3. |
| 102. | On December 13, 2016, more than a year after September 28, 2015 meeting, Dr. Putnam sent Dr. Vintch a set of altered minutes of MEC executive sessions concerning Dr. Ryan to send |

BROWN WHITE & OSBORN LLP
ATTORNEYS

| | |
|---|---|
| | to attorneys to be used in litigation, and asked her to "look them over." |
| | |
| | White Decl., Exh. 360 at 1. |
| **103.** | In the minutes Dr. Putnam circulated to be used in litigation, the minutes of the September 28, 2015 meeting had been substantially altered: |
| | • The altered minutes were a page shorter; |
| | • The altered minutes omitted the discussion of Dr. Ryan's allegations against Dr. White; |
| | • The altered minutes omitted the discussion of Dr. White's accusations of HIPAA violations being based on Dr. Ryan's investigation of Dr. White's false statements in the BEST-CLI trial; |
| | • The altered minutes removed references to a previous investigation determining that Dr. Ryan did not violate HIPAA; |
| | • The altered minutes omitted the statement that proceeding against Dr. Ryan could be retaliation because the PSA feels the matter was already adequately investigated. |
| | |
| | White Decl., Exh. 360 at 4287. |
| **104.** | Defendants submitted the altered version of the September 28, 2015 minutes to the Court in support of this motion. |
| | |
| | Defendants' Exhibits, Exh. 11. |
| **105.** | Dr. Putnam submitted this altered version of the minutes to the Medical Staff Office to act as the official record of the meeting, and said he would come to the Medical Staff Office to sign them. |
| | |
| | White Decl., Exh. 361. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| **106.** | Dr. Vintch could not explain why Dr. Putnam was circulating unsigned minutes of prior meetings for her review in December 2016.<br><br>Vintch Depo., 81:3-9. |
| **107.** | Dr. Vintch knew, when she received Dr. White's Request for Corrective Action, that Dr. Ryan had previously made allegations about Dr. White.<br><br>Vintch Depo., 62:14-63:7. |
| **108.** | When Dr. Putnam and Dr. Vintch were part of the leadership of the PSA, they would share draft minutes of MEC meetings with each other to verify their accuracy.<br><br>Vintch Depo. 68:15-69:2, 69:22-70:4, 70:5-12, Putnam Depo. 89:12-90:8. |
| **109.** | During the time that Dr. Putnam and Dr. Vintch were part of the leadership of the PSA, whoever led the PSA meeting would draft the minutes.<br><br>Vintch Depo. 69:12-21, Putnam Depo. 87:25-88:22. |
| **110.** | When Dr. Putnam and Dr. Vintch were part of the leadership of the PSA, their general practice was to sign minutes for a meeting after they were circulated at the next meeting.<br><br>Vintch 76:8-16. |
| **111.** | When Dr. Putnam and Dr. Vintch were part of the leadership of the PSA, they would circulate the minutes of each MEC meeting at the next meeting, make any changes requested by the MEC members, and then ask for them to be approved.<br><br>Vintch Depo. 77:25-79:7, Putnam Depo. 90:9-91:16. |
| **112.** | Dr. Putnam testified that in general the MEC minutes would be signed and dated once they were approved, and tried to do so routinely. |

| | |
|---|---|
| | Putnam Depo., 91:13-19. |
| **113.** | After MEC meeting minutes were signed and dated, Dr. Putnam would submit them to the Medical Staff Office to be filed and maintained.<br><br>Putnam Depo. 91:20-92:6 |
| **114.** | Dr. Vintch testified that she and Dr. Putnam would "absolutely" would not alter minutes after they had been voted upon and approved by the committee.<br><br>Vintch Depo. 80:19-81:2. |
| **115.** | On November 3, 2015, Dr. Putnam and Dr. Vintch sought out Dr. Van Natta to talk to him "concerning Tim Ryan and his current activities at Harbor."<br><br>White Decl., Exh. 392. |
| **116.** | On that same day, November 3, 2015, Dr. Putnam circulated LA Biomed tax returns to Dr. Vintch, Dr. Van Natta, and DHS Chief Medical Officer Hal Yee.<br><br>White Decl., Exh. 338. |
| **117.** | In November 2015, Dr. White submitted an Addendum to his Request for Corrective Action, reading in full:<br><br>"I am writing to supplement my Request For Corrective Action (dated 8/25/15) pertaining to Dr. Timothy Ryan because he is continuing to engage in conduct which is detrimental to the delivery of quality patient care, disruptive and deleterious to the operations of the Medical Center, and below applicable professional standards."<br><br>"On November 19, 2015 I was advised by the County`s Intake Specialist Unit that Dr. Ryan |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

filed a complaint against me. On November 24, 2015, I received another letter from that same unit, that the complaint had been initially investigated, that the allegations would not be investigated further and that the matter was considered closed. Enclosed are copies of both letters. This continuing pattern of harassment, and

unscrupulous conduct by Dr. Ryan, is having a severe adverse impact on me, as a member of the medical staff, and on my personal and professional life."

Aside from making a report, he addendum did not specify any other "unprofessional" behavior.

Defendants' Exhibits, Exh. 359.

| | |
|---|---|
| **118.** | Dr. Putnam did not understand Dr. White's Addendum to refer to any specific behavior by Dr. Ryan other than filing a complaint with the County Intake Specialist Unit.<br><br>Putnam Depo., 85:3-86:4. |
| **119.** | On December 28, 2015, Dr. Putnam wrote to Dr. White in response to his Addendum to Request for Corrective Action, advising him that the MEC had recommended a further investigation of the behavior, and that the PSA would form an FPPE.<br><br>White Decl., Exh. 336. |
| **120.** | On December 28, 2015, Dr. Putnam presided over a MEC meeting to discuss Dr. White's Addendum to his Request for Corrective Action, and recommended that an FPPE be formed to evaluate Dr. Ryan's behavior.<br><br>White Decl., Exh. 360, p. DEF004262-DEF004265. |
| **121.** | On December 31, 2015, Dr. White wrote to Dr. De Virgilio complaining that Dr. Ryan had |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| | violated HIPAA by gathering data "to initiate the Fraud investigation against Harbor (me) with the trial Steering Committee, and the NIH." <br><br> White Decl., Exh.. 379 |
| **122.** | The PSA assigned Dr. De Virgilio, as the Chair of the Surgery Department, to form the FPPE Ad Hoc Committee to investigate Dr. Ryan. <br><br> De Virglio Depo., 54:8-15, 61:6-11. |
| **123.** | Dr. De Virglio does not know how the members of the FPPE Committee received its scope of work, whether he gave them instructions or anything in writing about the scope of their inquiry, or what he had in mind about their scope of work. <br><br> De Virglio Depo., 56:3-19, 61:20-24. |
| **124.** | Dr. De Virgilio does not remember how anything beyond the scope of Dr. White's Request for Corrective Action became part of the scope of the FPPE. <br><br> De Virgilio Depo., 62:6-24. |
| **125.** | Dr. Putnam does not recall ever reviewing Dr. White's FPPE. <br><br> Putnam Depo. 39:6-13. |
| **126.** | Dr. Putnam and Dr. Vintch received Dr. White's FPPE on January 4, 2016. <br><br> Exhibit 330 at p. 2. |
| **127.** | Dr. Ryan's FPPE accused him of accessing and requesting medical records improperly, but did not discuss or disclose that he was doing so to gather information to provide to the NIH, even though the MEC had previously acknowledged this. <br><br> Defendants' Exhibits, Exh. 5, pp. 2, 4; White Decl., Exh. 365 [PSA Minutes noting that Dr. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | | |
|---|---|---|
| | | Ryan "somehow found out or looked up how many cases Dr. White had completed and contacted the NIH saying that Dr. White is committing medical fraud for being a participant in the study while he had not completed enough cases in order to participate" and Dr. White "said that Dr. Ryan committed a HIPAA violation because he must have gone through medical records to find out what his cases and case quality was"] |
| 128. | | Dr. Ryan's FPPE asserted that Dr. White and Dr. Donayre were leaving Harbor because of Dr. Ryan, but did not discuss or disclose that Dr. Ryan's report to the NIH had resulted in Dr. White and Dr. Donayre being disqualified for participation in endovascular procedures in the BEST-CLI trial and had led to Medtronic no longer paying for them to give "courses" surrounding use of Medtronic stent grafts. |
| | | Defendants' Exhibits, Exh. 5, pp 3; Exh. 24; White Decl., Exh. 331. |
| 129. | | The Ad Hoc Committee supplied witness statements to accompany Dr. Ryan's FPPE. |
| | | Defendants' Exhibits, Exh. 356. |
| 130. | | Dr. Ryan's FPPE witness statements quoted Dr. White as saying "Per Dr. White the BEST trial is a big national trial costing over 20 million dollars, and Harbor's site was chosen based on his previous work and studies. This study was stopped after Dr. Ryan's complaint. This complaint was investigated and Dr. White was cleared of allegations and Harbor-UCLA was approved to continue the research study."  This was untrue, as the MEC knew: the investigators found that Dr. White and others had misstated their qualifications to do endovascular surgery and could not continue to enroll patients to the BEST-CLI trial. |

43

| | |
|---|---|
| | Defendants' Exhibits, Exh. 356 at 2 [White statement]; Exs. 24 [Result of BEST-CLI investigation]; White Decl., Exh. 331 [result of BEST-CLI investigation], 365 [MEC acknowledgement of result of BEST-CLI investigation.] |
| **131.** | Dr. Ryan's FPPE witness statements quoted Dr. De Virgilio as saying, "He feels that Dr. Ryan looked at private patient information that belonged to Drs. White, Donayre and deVirgilio for the purpose of finding information to shut the study down at Harbor-UCLA. The NIH subsequently investigated Dr Ryan's complaint and determined that it was unfounded and Harbor-UCLA continues to take part in the study." This was untrue, as the MEC knew: the investigators found that Dr. White and others had misstated their qualifications to do endovascular surgery and could not continue to enroll patients to the BEST-CLI trial.<br><br>Defendants' Exhibits, Exh. 356 at 4 [DeVirgilio statement]; Defendants' Exhibits, Exs. 24 [Result of BEST-CLI investigation]; White Decl., Exh. 331 [result of BEST-CLI investigation], 365 [MEC acknowledgement of result of BEST-CLI investigation.] |
| **132.** | Dr. Ryan's FPPE witness statements quoted Dr. De Virgilio as saying "DHS is auditing income of Dr. White's research team because of Dr. Ryan's complaints."<br><br>Defendants' Exhibits, Exh. 356 at 4 [DeVirgilio statement]. |
| **133.** | Dr. Ryan's FPPE witness statements quoted Dr. Donayre as saying "Dr. Ryan made a complaint about Dr. White's case experience by looking at private patient medical records without Dr. White's or Dr. Donayre's knowledge. They |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| | only found this out from the hospital scheduler. This is out of line because he was not part of this study group. NIH put the study on hold and investigated and cleared Drs. White and Donayre of any serious violations." |
| | Defendants' Exhibits, Exh. 356 at 9 [Dr. Donayre statement] |
| **134.** | Dr. Ryan's FPPE witness statements quoted Dr. Donayre as saying that as a result of Dr. Ryan's report to the NIH, "Dr. Donayre felt the need to constantly look over his shoulders all the time because of Dr. Ryan . For this reason Dr. Donayre decided to leave Harbor-UCLA." |
| | Defendants' Exhibits, Exh. 356 at 9 [Dr. Donayre statement] |
| **135.** | Dr. Putnam circulated Dr. Ryan's FPPE to Dr. Vintch and Dr. Van Natta on February 26, 2016. |
| | White Decl., Exh. 354 |
| **136.** | When other physicians have been accused of raising their voices in the operating room, Dr. Putnam has dealt with it by counseling the surgeons to make sure it doesn't happen again before elevating it to the level of a FPPE. |
| | Putnam Depo., 72:10-73:2 |
| **137.** | When Dr. Putnam led the PSA and a physician was accused of unprofessional behavior, his first approach has always been to make sure the physician's supervisor has been involved and done the appropriate counseling of the physician, and get the department chair involved to counsel the physician, before having the PSA take action. |
| | Putnam Depo. 75: 9-76:4. |
| **138.** | Under Section 6.2, "Routine Corrective Action," and Subsection 6.2.1.1, "Collegial Intervention," Section 6.2.1.1 of the PSA Bylaws provide "These bylaws encourages [sic] the use of |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

BROWN WHITE & OSBORN
A T T O R N E Y S

| | |
|---|---|
| | progressive steps by Association leaders and Medical Center management, beginning with collegial and educational efforts, to address questions relating to an Association Member's clinical practice and/or professional conduct. The goal of these efforts is to arrive at voluntary, responsive actions by the individual to resolve questions that have been raised."<br><br>Plaintiff's Exh. 301 at 48. |
| **139.** | Dr. Putnam was not aware of any efforts made to counsel Dr. Ryan prior to the FPPE.<br><br>Putnam Depo. 76:5-7. |
| **140.** | Nobody counseled Dr. Ryan about yelling at people.<br><br>Ryan Decl. at ¶ 18. |
| **141.** | Dr. Ryan has repeatedly observed other physicians at Harbor yelling and swearing on the premises, yelling and swearing at nurses and fellow doctors in the operating room, and yelling and swearing at or berating nurses  or other doctors in clinical settings without being disciplined.<br><br>Ryan Decl. at ¶ 17. |
| **142.** | Dr. Putnam and Dr. Donayre have yelled in the operating room and has not been counseled for it or been the subject of a PSA proceeding for it.<br><br>Putnam Depo. at 76:8-16, Ryan Decl. at ¶ 17. |
| **143.** | When Dr. De Virgilio received Dr. White's January 26, 2015 complaint about Dr. Ryan, he did not seek to counsel Dr. Ryan about it.<br><br>De Virgilio Depo., 44:6-17. |
| **144.** | Nobody attempted to counsel Dr. Ryan about the subject of Dr. White's January 26, 2015 emailed complaint, his Request for Corrective Action, or |

| | his Addendum to his Request for Corrective Action.<br><br>Ryan Decl., ¶ 18 |
|---|---|
| **145.** | Dr. De Virgilio did not offer Dr. Ryan any sort of "formal counsel" about Dr. Ryan's "anger issues" or make any "series of recommendations" about his behavior.<br><br>De Virgilio Depo., 44:18-45:2, 74:22-75:7. |
| **146.** | Nobody attempted to counsel Dr. Ryan about any of the incidents described in the FPPE concerning Dr. Ryan.<br><br>Ryan Decl, ¶ 18. |
| **147.** | Dr. Putnam presided over the MEC's April 25, 2016 meeting with Dr. Vintch present.<br><br>White Decl., Exh. 362, p. 2. |
| **148.** | The version of the April 25, 2016 minutes that Dr. Putnam signed and dated in May 2015 included the following:<br><br>• "A meeting with Dr. Hal Yee was held to discuss any action that might be taken against Dr. Ryan that might compromise the County.  Any action that we take will be separate from any action taken by LA County."<br><br>• "The fear was that any action we take might comprise [sic] what the county is doing or might create a medical-legal action against us.  Dr. Yee suggested we proceed with caution because there was concern about whistleblowing as there were two parts of the lawsuit."<br><br>• "Louis Valentin, HIPAA Privacy Officer provided the following report:  On January 19, 2016 County Counsel reviewed the case.  The initial findings were: |

| | |
|---|---|
| | 1) Dr. Ryan did not receive APHI based on a document they have. |
| | 2) The actual document with CPT codes was the document that Dr. Ryan provided to the clerk. |
| | 3) When the clerk was asked for the actual form that was submitted, she could not produce it.  She stated that when Dr. Ryan made the request, she did not question him because he was a person of authority. |
| | 4) We have a policy in place that needs to be completed and we are obligated to report Dr. Ryan to the state. |
| | 5) The last part of this investigation will be performed by Alma Smith, who is currently on vacation. |
| | White Decl., Exh. 362 3-4. |
| **149.** | The version of the minutes that Dr. Putnam circulated to Dr. Vintch and the Medical Staff office in December 2016 for future use was radically altered:<br><br>• The references to "compromising" the County were removed;<br><br>• Dr. Yee's caution about whistleblowing was removed;<br><br>• A substantial narrative about the FPPE was inserted;<br><br>• The discussion of Mr. Valentin's report was altered to assert that Dr. Ryan *had* requested protected health information inappropriately, and the reference to the clerk not being able to produce the key document was removed.<br><br>White Decl., Exh. 360, DEF004270-DEF004271. |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| **150.** | Dr. Putnam doesn't know who made edits to the two versions of the April 25, 2016 minutes.<br><br>Putnam Depo., 104:12-22. |
| **151.** | Dr. Vintch could not explain why there were different versions of the minutes of the April 25, 2016 PSA meeting.<br><br>Vintch Depo., 88:14-90:10. |
| **152.** | Dr. White's complaint that Dr. Ryan falsely accused the Director of Research at LA Biomed of plagiarism is not the sort of accusation that the MEC would normally evaluate itself.<br><br>Vintch 59:1-12. |
| **153.** | The MEC, including Dr. Putnam and Dr. Vintch, did not expect Dr. Ryan to accept their proposed Behavioral Contract.<br><br>White Decl., Exh. 360 at DEF004291 [Minutes reflecting plan to send Notification of Proposed Final Action "in the likely event that Dr. Ryan does not sign the Behavioral Contract."] |
| **154.** | Dr. Ryan never admitted to the MEC the things that the Behavioral Agreement asked him to admit.<br><br>Vintch Depo. 148:19-149:11. |
| **155.** | When the PSA proposed Behavioral Agreements to doctors, the MEC would review the drafts for revisions and arrive at final terms.<br><br>Vintch Depo. 152:2-152:25. |
| **156.** | Dr. Putnam and Dr. Vintch don't know if any other Behavioral Agreements included a waiver of claims.<br><br>Putnam Depo., 153:25-154:2; Vintch Depo., 137:21-139:9. |
| **157.** | When another doctor, S.K., was offered a behavioral contract for "unprofessional, |

Brown White & Osborn
ATTORNEYS

| | |
|---|---|
| | intimidating, and disruptive" behavior towards staff including demeaning behavior towards peers, Dr. Putnam and Dr. Vintch offered him a Behavioral Contract that did not include the waiver of claims or psychiatric counseling they demanded of Dr. Ryan.<br><br>White Decl., Exh. 371. |
| 158. | In October 2015, Dr. Putnam investigated Dr. De Virgilio's assertion that Dr. Ryan had been convicted of a felony.<br><br>White Decl., Exh. 411. |
| 159. | In fact, Dr. Ryan had disclosed in his application for hospital privileges that 30 years previously he had pled no contest to misdemeanor malicious mischief after he and his friends had been playing roughly on outside tables at a fast-food restaurant.<br><br>Ryan Decl., Exh. B. |
| 160. | Nonetheless, Dr. Putnam presided over a PSA meeting at which Dr. De Virgilio told the PSA that Dr. Ryan had been convicted of a felony, did not correct him, and circulated minutes with that false statement in them.<br><br>White Decl., Exh. 360, p. 4260. |
| 161. | On October 5, 2016, Dr. Putnam sent Dr. Ryan a "Notice of Proposed Adverse Action and Hearing Rights." That notice did not cite HIPAA vilations as a basis for discipline, but did assert that a basis for discipline was that a doctor was leaving Harbor because of Dr. Ryan's behavior.<br><br>Manier Decl., Exh. 360 at 1-2. |
| 162. | On November 10, 2016, Dr. Putnam sent Dr. Ryan a "Notice of Charges" outlining the PSA's accusations against him. That letter listed |

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT

| | |
|---|---|
| | "Openly threatening to call external agencies to conduct investigations" and "Openly making unfounded accusations in an angry manner" as some of Dr. Ryan's violations.  It did not mention HIPAA violations.<br><br>Manier Decl., Exh. 381 at 3. |
| **163.** | Dr. Putnam does not know what unfounded accusations Dr. Ryan made, and doesn't know if he knew at the time he reviewed the Notice of Charges, and doesn't know if the Ad Hoc Committee that performed the FPPE determined whether any of Dr. Ryan's accusations were unfounded.<br><br>Putnam Depo., 166:20-167:16. |
| **164.** | On December 13, 2016, after sending Dr. Ryan the Notice of Charges, Dr. Putnam sent Dr. Vintch past PSA minutes and invited her to "look them over."<br><br>White Decl., Exh. 360 at 1. |
| **165.** | On February 27, 2017, Dr. Putnam sent Dr. Ryan a First Amended Notice of Charges setting forth the PSA's accusations against him.  The Amended notice deleted the allegations that Dr. Ryan "Openly threatening to call external agencies to conduct investigations" and "Openly making unfounded accusations in an angry manner", leaving an empty bullet point where those allegations had been.  The amended notice still didn't mention HIPAA.<br><br>Manier Decl., Exh. 382 at 3. |
| **166.** | Dr. Putnam testified that he did not consider whether Dr. Ryan make any false allegations against Dr. White in voting on PSA measures against Dr. Ryan.<br><br>Putnam Depo. 131:2-132:7. |

51

| 167. | Dr. Vintch testified that the accusation that Dr. Ryan "openly threatened to call external agencies to conduct investigations" was accurate based on all of the agencies she has had to respond to.<br><br>Vintch Depo., 170:11-171:3 |
|------|---|
| 168. | Dr. Vintch doesn't remember if Dr. Ryan "openly made unfounded accusations in an angry manner.<br><br>Vintch Depo, 171:18-172:2. |
| 169. | Since the PSA's proceedings against Dr. Ryan in 2016, he has applied to dozens of surgeon positions. Those applications require him to disclose whether he have ever been investigated by a Professional Staff Association.<br><br>Ryan Decl. at ¶ 22. |
| 170. | Dr. Ryan has not received any response from the vast majority of his dozens job applications. In all but three or four occasions in which he has received a request for follow-up information, the process has stopped short of an interview. This is consistent with his understanding and professional experience over his career that hospitals and practices will not hire surgeons who are the subject of peer review investigations regarding their privileges.<br><br>Ryan Decl. at ¶ 22. |
| 171. | The Behavioral Agreement offered to Dr. Ryan including a term purporting to limit to whom Dr. Ryan could complain about misconduct:<br><br>"Dr. Ryan shall address any criticisms of, or concerns about, nurse, residents, interns, faculty, employees, PSA members, administrative staff, patients, visitors, or other individuals in the Hospital in private to the appropriate supervisor, administrator, faculty or PSA leader in a |

BROWN WHITE & OSBORN ᴸᴸᴾ
ATTORNEYS

| | | |
|---|---|---|
| | | courteous manner, or in written reports using the established Hospital reporting forms and procedures.  Dr. Ryan shall not engage in unconstructive criticism addressed to any person in such a way as to intimidate, undermine confidence, belittle or imply stupidity or incompetence."<br><br>Defendants' Exhibits, Exh. 370 at 3. |
| **172.** | | The Behavioral Agreement that the MEC offered Dr. Ryan included a waiver of claims reading "Dry Ryan agrees to hold free and harmless the Hospital, members of the EC or authorized committees of the Hospital's Professional Staff, the Programs, and any and all representatives of any of them, from and against any and all claims resulting from any and all actions taken, or communications made, consistent with the terms of this Agreement.  Dr. Ryan further acknowledges that there shall be no monetary liability on the part of, and no cause of action for damages shall arise against, the EC, members of the EC or authorized committees of the PSA, the Hospital, or any and all representatives of any of them, for any acts performed or communications made regarding the subject matter of this Paragraph 3.2(ii).<br><br>Defendants' Exhibits, Exh. 370 at 5. |
| **173.** | | Nobody from Harbor ever reported Dr. Ryan to any state agency for violating patient privacy rules by reviewing medical records.<br><br>Ryan Decl., ¶ 21. |

DATED:  November 15, 2021          BROWN WHITE & OSBORN LLP

By   *s/Kenneth P. White*
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
THOMAS M. BROWN
KENNETH P. WHITE
Attorneys for Plaintiff
TIMOTHY RYAN, M.D.

4874-9677-6962, v. 1

PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT