BROWN WHITE & OSBORN LLP
THOMAS M. BROWN (SBN 117449)
KENNETH P. WHITE (SBN 173993)
333 South Hope Street, 40th Floor
Los Angeles, CA 90071-1406
Telephone:  213.613.0500
Facsimile:   213.613.0550
tbrown@brownwhitelaw.com
kwhite@brownwhitelaw.com

*Attorneys for Plaintiff*
Timothy Ryan

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TIMOTHY RYAN, M.D., an individual, | Case No.:  2:17-cv-05752-CAS(RAOx) |
| Plaintiff, | Judge: Hon. Christina A. Synder |
| v. | |
| BRANT PUTNAM, M.D., an individual, JANINE VINTCH, M.D., an individual, ANISH MAHAJAN, M.D., an individual, CHRISTIAN DE VIRGILIO, M.D., an individual, HAL F. YEE, M.D., an individual, ROGER LEWIS, M.D., an individual, and MITCHELL KATZ, M.D., an individual, | **DECLARATION OF KENNETH P. WHITE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** |
| Defendants. | Date:      December 6, 2021<br>Time:      10:00 a.m.<br>Ctrm:      8-D |
| | Action Filed:  August 3, 2017<br>Trial Date:   April 26, 2022 |
| | *[Filed Concurrently Herewith: Opposition to Defendants' Motion for Summary Judgment, or Alternatively, Partial Summary Judgment; Response to Separate Statement; Objections to Evidence; Declaration of Timothy Ryan Thereto]* |

BROWN WHITE & OSBORN
ATTORNEYS

## DECLARATION OF KENNETH P. WHITE

I, KENNETH P. WHITE, hereby declare as follows:

1.      I am an attorney admitted to practice in the State of California.  I am a founding partner and General Counsel at Brown White & Osborn LLP ("BWO"), and represent Plaintiff Timothy Ryan, M.D.("Plaintiff") in this matter.  I make this declaration from personal knowledge, and if called as a witness, could and would testify competently to the matters set forth herein.  This declaration is for a limited purpose and therefore does not contain all of the information I know about the case.

2.      Attached as Exhibit "C" are true and correct copies of excerpts of the transcript of the deposition of Defendant Brant Putnam.

3.      Attached as Exhibit "D" are true and correct copies of excerpts of the transcript of the deposition of Janine Vintch.

4.      Attached as Exhibit "E" are true and correct copies of excerpts of the transcript of the deposition of Christian De Virgilio.

5.      The remaining exhibits bear the exhibit numbers they were given in depositions in this matter.

6.      Exhibit 331 is a true and correct copy of a letter produced in discovery by Defendants and introduced in depositions in this matter.

7.      Exhibit 332 is a true and correct copy of an email produced in discovery by Defendants and introduced in depositions in this matter

8.      Exhibit 333 is a true and correct copy of an email produced in discovery by Defendants and introduced in depositions in this matter.

9.      Exhibit 334 is a true and correct copy of an email produced in discovery by defendants and introduced in depositions in this matter.

10.      Exhibit 336 is a true and correct copy of an email produced in discovery by defendants and introduced in depositions in this matter.

11.      Exhibit 341 is a true and correct copy of an email produced in discovery by defendants with its attachments and introduced in depositions in this matter.  The final

2

page has been redacted to remove confidential patient information, with Defendants' written assent.

12.     Exhibit 347 is a true and correct copy of an email produced in discovery by defendants and introduced in depositions in this matter.

13.     Exhibit 350 is a true and correct copy of an email produced in discovery by defendants and introduced in depositions in this matter.

14.     Exhibit 351 is a true and correct copy of a Request for Corrective Action produced in discovery by Defendants and introduced in depositions in this matter.

15.     Exhibit 353 is a true and correct copy of an email produced in discovery by defendants and introduced in depositions in this matter.

16.     Exhibit 354 is a true and correct copy of an email produced in discovery by defendants and introduced in depositions in this matter.

17.     Exhibit 356 is a true and correct copy of the witness statements in support of Dr. Ryan's FPPE produced in discovery by defendants in this matter.

18.     Exhibit 360 is a true and correct copy of an email and exhibits produced by defendants in this matter and introduced in depositions in this matter.

19.     Exhibit 361 is a true and correct copy of an email and attachments produced by defendants and introduced in depositions in this matter.

20.     Exhibit 362 is a true and correct copy of a certification of records produced by defendants and introduced at depositions in this matter.

21.     Exhibit 365 is a true and correct copy of a draft of minutes produced by defendants and introduced in depositions in this matter.

22.     Exhibit 366 is a true and correct copy of an email produced by defendants and introduced in depositions in this matter.

23.     Exhibit 367 is a true and correct copy of minutes that were attached to the email in Exhibit 366, produced by defendants in discovery, and introduced in deposition in this matter.

3

24.     Exhibit 371 is a true and correct copy of an email with an attached Behavioral Contract produced by defendants in discovery and introduced at depositions in this matter.  It has been redacted to remove of the non-party doctor, with Defendants' written assent.

25.     Exhibit 379 is a true and correct copy of an email produced by defendants and introduced in depositions in this matter.

26.     Exhibit 392 is a true and correct copy of an email produced by defendants and introduced at depositions in this matter.

27.     Exhibit 411 is a true and correct copy of an email produced by defendants and introduced at depositions in this matter.

28.     Exhibit 420 is a true and correct copy of an email produced by defendants and introduced at depositions in this matter.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed on November 15, 2021 in Los Angeles, California.

_____
KENNETH P. WHITE

4872-3719-5522, v. 1

DECLARATION OF KENNETH P. WHITE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

# EXHIBIT C

```
 1               UNITED STATES DISTRICT COURT

 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

 3

 4

 5     TIMOTHY RYAN, M.D., AN INDIVIDUAL,      )
                                              )
 6                    PLAINTIFF,               )  CASE NO.
                                              )  2:17-cv-05752-
 7            VS.                              )  CAS(RAOx)
                                              )
 8                                            )
       BRANT PUTNAM, M.D., AN INDIVIDUAL,      )
 9     JANINE VINTCH, M.D., AN INDIVIDUAL,     )
       ANISH MAHAJAN, M.D., AN INDIVIDUAL,     )
10     CHRISTIAN DE VIRGILIO, M.D., AN         )
       INDIVIDUAL, HAL F. YEE, M.D., AN        )
11     INDIVIDUAL, ROGER LEWIS, M.D., AN       )
       INDIVIDUAL, AND MITCHELL KATZ, M.D.,    )
12     AN INDIVIDUAL,                          )
                                              )
13                    DEFENDANTS.             )
       _____)

14

15

16              DEPOSITION OF BRANT PUTNAM, M.D.

17                 FRIDAY, OCTOBER 22, 2021

18

       LOCATION:  REMOTE PROCEEDING - CALIFORNIA
19

20     REPORTED REMOTELY BY:  SUSAN S. HENRIQUEZ, CERTIFIED
       SHORTHAND REPORTER NO. 13763
21

22     JOB NO. 4849701

23

24

25

                                                    Page 1
```

```
 1      time.
 2          Q    Okay.   And did you also have any other positions
 3      with the PSA, for instance the chair of any committees?
 4          A    I was the chair -- by the fact of being the
 5      president of the PSA, I was also chair of the Credentials
 6      Committee at that time.
 7          Q    And what does the Credentials Committee do?
 8          A    The Credentials Committee evaluates both new and
 9      renewal applications for membership in the PSA.
10          Q    Do you remember when you became president of the
11      PSA?
12          A    I believe it was in July of 2015.
13          Q    All right.  Who was before you?
14          A    Before me, I think, was Dan Castro.
15          Q    I'd like to ask you some questions about my
16      client Dr. Timothy Ryan and the first time that you had
17      heard he had made any complaints or reports about
18      Dr. Rodney White, all right?
19               When is the first time you heard that Dr. Ryan
20      had made complaints or reports about Dr. White?
21          A    I don't have an exact recollection, but I can
22      give you a rough estimate.
23          Q    That's fine.
24          A    It was in roughly, probably, late August of that
25      year, 2015, or early September.
```

Page 8

```
1       BY MR. WHITE:

2           Q   All right.   Did you ever send Dr. Ryan an update

3       like this one concerning the progress of any response to

4       his complaints about Dr. White?

5               MS. HUREVITZ:   Objection.   That assumes facts not

6       in evidence and lacks foundation in terms of the timing.

7               MR. WHITE:   You may answer, Doctor.

8               THE WITNESS:   I didn't receive any complaints

9       from Dr. Ryan about Dr. White during this time frame.

10      Again, we just had the two verbal conversations to the

11      best of my recollection.   I don't specifically remember

12      whether I gave Dr. Ryan any verbal followup of what was

13      going on during this time period or not.

14      BY MR. WHITE:

15          Q   Well, we saw earlier an e-mail where you describe

16      something as Dr. Ryan having filed a complaint about

17      Dr. White.

18              Do you recall that?

19          A   Yes, sir.

20          Q   Did you give Dr. Ryan any written updates

21      regarding that?

22          A   No, not to the best of my knowledge.

23          Q   All right.

24          A   But again, I did not receive any complaints in

25      writing.  All I knew of was the two verbal conversations
```

Page 35

1        Q    On January 5, 2016.  It's on Page 2629.

2        A    Yes, I have it.

3        Q    So do you recall why this was being circulated at

4    that time, in connection with what?

5        A    I do not specifically remember, no.

6        Q    Do you recall reviewing Dr. White's FPPE in

7    connection with his complaint against Dr. Ryan?

8        A    I don't specifically recall reviewing Dr. White's

9    FPPE ever.

10       Q    All right.  Do you ever recall seeking to review

11   it in connection with dealing with his complaint or Dr.

12   Ryan's complaint?

13       A    Not that I can recall, no.

14       Q    But you knew that he had had an FPPE; correct?

15       A    I can't specifically remember, but looking at

16   this e-mail, I mean, I don't know the contents of what's

17   under the privacy blacked out areas, but it appears that I

18   may have been aware that there was an FPPE done at some

19   point.  That was before my time as the president.  I was

20   not part of that FPPE evaluation and I'm not sure I ever

21   was aware of any of the results of it.  I was not part of

22   that process.

23       Q    All right.  I'm going to introduce Exhibit 333.

24   (Whereupon Exhibit No. 333 was marked for identification

25                   and is attached hereto)

                                                    Page 39

1       the hospital.

2            Q   How about swearing in the operating room, is it

3       unusual for surgeons to swear in general or at the people

4       they're operating with?

5            A   I would say it's unusual and it usually is -- at

6       least when I'm made aware of it as a supervisor we check

7       that.  We make sure that we counsel that person that they

8       should not be using that language particularly toward

9       another staff member.

10           Q   All right.  But this is -- you have had other

11      cases of surgeons being accused of raising their voice in

12      the operating room; correct?

13           A   I have personally dealt with it as a supervisor

14      and I've counseled those surgeons to make sure that that

15      doesn't happen again and I make sure that it doesn't

16      continue to happen.

17           Q   So do you do an FPPE every time there's an

18      instance of someone yelling or swearing in the operating

19      room?

20           A   If they do it once, maybe twice, and I speak to

21      them and they behave more professionally after that, then

22      usually there's no FPPE.  If there's a pattern of behavior

23      from multiple staff in multiple areas that is concerning

24      and potentially disruptive to the care of patients, then

25      that's where it raises to the level of concern that I

                                                        Page 72

1   might bring that up to either my boss, the department

2   chair, or to the PSA.

3        Q   So during this time period when you were the

4   president of the PSA, would you be the one making the

5   decision about whether or not this type of conduct rises

6   to an FPPE level?

7        A   I would just clarify that an FPPE is a fact

8   finding process that usually is carried out by the

9   department in which the PSA member belongs in order to

10   gather more information so that both the department

11   chair -- so the department chair can make a recommendation

12   to the PSA about any further action as they feel is

13   warranted.

14        Q   So let me rephrase the question, and thank you

15   for clarification.

16        During this time when you were the president of

17   the PSA, would you be the one deciding whether or not to

18   request or suggest an FPPE?

19        A   I may be.  It depends upon the -- depends upon a

20   lot of things.  Depends upon the nature of the complaint,

21   depends on how it came to the MEC, depends on how serious

22   the issues brought up were.  I would say it depends.  Is

23   it possible that the PSA president can request that a

24   department carry out an FPPE?  Yes.

25        Q   All right.  So during the time that you were

Page 73

```
 1      supervisor or the department chair at least would sit down

 2      with the individual and make a first even a second attempt

 3      sometimes at counseling the individual to try and curb

 4      that unprofessional behavior.

 5          Q   Do you know in Dr. Ryan's case whether any such

 6      efforts were made prior to the FPPE?

 7          A   I don't know.

 8          Q   All right.  Doctor You've yelled in the operating

 9      room, haven't you?

10          A   I have.

11          Q   You perhaps have sworn on occasion?

12          A   Perhaps.

13          Q   And have you ever been counseled for that?

14          A   Not that I can recall, no.

15          Q   And you've never had a PSA proceeding about it?

16          A   No, not that I'm aware of.

17          Q   All right.  You're aware that Dr. Donayre has on

18      occasion yelled in the operating room; correct?

19              MS. HUREVITZ:  Objection.  That calls for

20      speculation.  Lacks foundation.  It's also irrelevant.

21              THE WITNESS:  I'm not typically, or I wasn't

22      typically, in the OR with Dr. Donayre during the majority

23      of his cases.  I did not personally -- I do not personally

24      recall him using any expletives during a case that I did

25      do with him.
```

Page 76

1          MR. WHITE:  I want to know -- yes.

2    BY MR. WHITE:

3        Q    What conduct of Dr. Ryan's do you understand this

4    complained about?

5        A    My understanding was that Dr. White was concerned

6    that Dr. Ryan's behavior continued to be disruptive within

7    the division.

8        Q    But what specific conduct did you understand this

9    referred to?

10         MS. HUREVITZ:  The question is vague and

11    ambiguous.

12         THE WITNESS:  My understanding is that the

13    behavior was both disruptive to Dr. White personally and

14    professionally and from the PSA standpoint more

15    importantly to the delivery of patient care.

16    BY MR. WHITE:

17        Q    All right.  Is it -- do you understand this

18    addendum to cite any specific action other than Dr. Ryan

19    filing a complaint with the county intake specialist unit?

20        A    Not specifically in this writing that I know of,

21    no.

22        Q    Is there anything else in here that tells you

23    what Dr. Ryan specifically did?

24        A    Well, this is a supervisor who's observing his

25    direct activities and he's concerned that there is

1    continued disruptive and deleterious behavior to the

2    providing of patient care and the operations of the

3    medical center.  Other than that, there's no specific

4    mention of incidents.

5        Q   Okay did you think it was appropriate to request

6    corrective action against Dr. Ryan for filing a complaint

7    with a county intake specialist unit?

8            MS. HUREVITZ:  Objection.  It calls for -- lacks

9    foundation.  Calls for speculation.  It calls for a legal

10   conclusion.

11           THE WITNESS:  I believe I received this in

12   November, late November 2015 or December 2015 and the

13   concerns, I think, at the time was, as I stated before,

14   that this represented reports of continued disruptive

15   behavior by Dr. Ryan that needed to be looked into

16   further.

17   BY MR. WHITE:

18       Q   Okay.  What specific disruptive behavior?

19       A   Again, behavior that was disruptive to the

20   quality of patient care and operations at the medical

21   center.  There is no specific incident noted in this

22   particular letter, but that was the concern brought

23   forward by Dr. White.

24       Q   All right.  Did you understand this to be asking

25   to discipline Dr. Ryan for making a complaint to the

Page 86

1      county intake specialist unit?

2          A    No.

3          Q    Would it be appropriate to do so, in your mind?

4              MS. HUREVITZ:   Objection.   That's an incomplete

5      hypothetical assumes facts not in evidence lacks

6      foundation.

7              THE WITNESS:   Can you rephrase the question?

8      BY MR. WHITE:

9          Q    Sure.   Is it your understanding that filing a

10     complaint with the county's intake specialist unit is

11     something that could appropriately result in corrective

12     action against the person who filed it?

13         A    No, no.

14         Q    All right.   Okay I'm going to be transitioning to

15     a new subject area.   But what are preferences for our

16     lunch both by our reporter and by counsel and the witness?

17             MS. HUREVITZ:   We'll do whatever the court

18     reporter wants to.

19     BY MR. WHITE:

20         Q    Doctor, you're familiar with the minutes kept of

21     medical executive committee meetings in the PSA; correct?

22         A    Yes, I am.

23         Q    So who in general prepares the minutes?

24         A    Are you asking about currently or historically.

25         Q    Fair enough.   So let's take during the time you

Page 87

1      were president and who during that time prepared the

2      minutes?

3              A   It was variable depending upon the meeting and

4      who was available.  The staffing of the medical staff

5      office was quite variable at this time, and we had both

6      temporary staff and permanent staff that were kind of

7      coming and going so our ability to rely on them to provide

8      minutes consistently was spotty at best.  As a result I

9      ended up in the meetings that we didn't have someone else

10     like a secretary available -- I ended up taking notes and

11     creating minutes based on those notes for some of the

12     meetings as did Dr. Vintch.

13             Q   Would it depend on who was running the meeting or

14     was it just whoever had time or was it just more random

15     than that?

16             A   It depended upon -- yeah, not so much who was

17     running the meeting but who was available, who was not

18     having to do part of the presentation, who was not having

19     any clinical responsibilities where they might be in and

20     out of the room.  So it was a little scattered here and

21     there but we did our best to keep the minutes for each

22     meeting.

23             Q   Were the meetings during this time, again we're

24     talking about when you were president, tape recorded?

25             A   No, they weren't tape recorded that time.  We had

                                                    Page 88

```
1        initially tried and it didn't work out.
2            Q   When you say you initially tried, approximately
3        when was that?
4            A   I have no idea.  It involved, again, the variable
5        staff in the medical staff office.
6            Q   All right but it was before the time that you
7        were president?
8            A   Even after I was president, there was plenty of
9        times where we had inconsistency of who was taking the
10       minutes and to the best of my recollection, none of those
11       minutes were recorded.
12           Q   All right.  After minutes were taken, what would
13       happen to them next?
14           A   Well, you're asking about the notes that one of
15       us would take?
16           Q   Sure.  Let me make it a more specific question.
17       If you took notes at a meeting, how would those get turned
18       into minutes?
19           A   At my earliest convenience and whenever possible
20       before the next meeting, we would sit down and write out
21       formal minutes, type them out on our computers.  We would
22       often send those minutes to each other, Dr. Vintch and
23       myself, try and edit them for both content and grammar and
24       those kinds of things to make them as accurate as
25       possible.
```

Page 89

1          Q     Okay.  When you say edit them for content, what

2     do you mean?  Just for accuracy and completeness or for

3     some other reason?

4          A     Completeness, making sure that the description

5     that we have in there is as close to what was being said

6     and how it was being said as we could recall, given our

7     limited abilities to, you know, have someone at the

8     meetings actually recording everything.

9          Q     All right.  And then would they -- after you

10    produced that draft, what would happen to it next?

11         A     In general, once we sort of agreed that the

12    minutes were accurate, then we would typically try and

13    have those approved at the next MEC meeting and then get

14    them formally submitted to the medical staff office to be

15    part of the record.

16         Q     All right.  So when you say get them approved at

17    the next meeting, does that mean distributing the draft

18    minutes and have everyone read them and vote to approve

19    them?

20         A     Yes, sometimes that was done electronically,

21    sometimes that was done via paper.  Sometimes they were

22    shown on a projector screen during the meeting and

23    everybody would have a few minutes to review them at the

24    beginning of the meeting before there was a motion invoked

25    for approval.

1          Q    And would there ever be corrections or

2    modifications based on feedback during that process?

3          A    You're referring to the process at the subsequent

4    meetings?

5          Q    Yes, during the process after you've shown people

6    the draft by whatever method would there ever be revisions

7    to the minutes based on feedback?

8          A    Oh, yeah, definitely.

9          Q    All right.  And who would do that?  Whoever

10   drafted them initially?

11         A    Or whoever was available taking notes for that

12   meeting.

13         Q    All right.  So at what point in this process

14   would the minutes be signed and dated?

15         A    In general, they would be signed and dated once

16   they were approved.

17         Q    All right.  Did -- is that something that you did

18   routinely?

19         A    I tried to do routinely, yes.

20         Q    And then I think you said after that they would

21   be formally submitted to the MSO, is that what you said?

22         A    I did say that, yes.

23         Q    And what does that mean?

24         A    That I would just send them to whoever happened

25   to be working in the medical staff office at that time and

1      say these are the minutes for this month, can you file

2      them.

3              Q   All right.   And where would they then be kept or

4      maintained?

5              A   As far as I know in the medical staff office

6      somewhere.

7              Q   All right.   Can you please look at Exhibit 360.

8      (Whereupon Previously Marked Exhibit No. 360 was discussed

9                          and is attached hereto)

10             THE WITNESS:   Yes, I have it.

11     BY MR. WHITE:

12             Q   Okay.   So 360 is an e-mail from you to Dr. Vintch

13     in December 2016; correct?

14             A   Yes.

15             Q   And you say can you look over these executive

16     session minutes for September 2015 to October 2016.   I

17     only included the months that we had executive sessions

18     and talked about Dr. Ryan.   I will sign them and send them

19     to the attorneys once you look them over.

20             Do you recall why you needed to send this, what

21     the occasion for doing this was?

22             A   Let's see this was in December 2016, I don't

23     specifically remember.   But clearly one of the attorneys,

24     either on the LA County side or the outside attorneys, was

25     requesting that we produce these.

Page 92

1          Q    All right.  Thousand, that's a different version

2     of minutes at that meeting; correct?

3          A    Yes, it does look a little different.

4          Q    And at the end of it, is that your signature?

5          A    It appears to be but -- it appears to be but with

6     the caveat that the medical staff office did have a stamp

7     signature of mine for use in stamping provided files.

8          Q    Okay.  And then it's dated May 23rd, 2018;

9     correct?

10         A    Yeah, I can't quite see the year but that looks

11    to be correct.

12         Q    And so for an April 26 -- you're right.  I can't

13    see whether that's an 8 or a 6 at the end.

14              Can you?

15         A    No, I cannot.

16         Q    All right.  So this, signing it, is consistent

17    with what you described before as to how the process is

18    supposed to work; right?

19         A    It's consistent with the process, yes.

20         Q    All right.  Do you know who made the edits to

21    these two different versions of the minutes?

22         A    I don't know.

23         Q    Do you remember whether you made any of these

24    edits?

25         A    I might have, Dr. Vintch might have, someone in

                                                    Page 104

1        about whether it was investigated.

2            Q    Okay.  Do you remember coming to any conclusion

3        that Dr. Ryan's accusations about Medtronic or about the

4        BEST-CLI trial were false?

5                 MS. HUREVITZ:  Did he personally ever come to

6        that conclusion?

7                 MR. WHITE:  Yes.

8                 MS. HUREVITZ:  Lacks foundation.  Calls for

9        speculation.

10                THE WITNESS:  Honestly, you know, any of that

11       information about Medtronics or separately about the

12       trial, I didn't consider any of that in anything that the

13       MEC did as far as Dr. Ryan goes.

14       BY MR. WHITE:

15            Q    Okay.  So it's your testimony you didn't consider

16       whether -- in terms of what the PSA MEC did you didn't

17       consider whether or not Dr. Ryan had made false

18       allegations?

19                MS. HUREVITZ:  Well, that assumes facts not in

20       evidence.  Lacks foundation.  Calls for speculation.

21                THE WITNESS:  Can you ask the question one more

22       time, Mr. White?  I'm sorry.

23       BY MR. WHITE:

24            Q    Did I understand you to testify that in taking

25       the action it took against Dr. Ryan, the MEC did not

1    consider the theory that he made false allegations?

2            MS. HUREVITZ:  Same objections.

3            THE WITNESS:  The MEC may have had that as part

4    of the discussion.  I cannot attest to the frame of mind

5    of other MEC members.  I personally did not consider that

6    in voting for or making any recommendations for any

7    corrective actions for Dr. Ryan.

8    BY MR. WHITE:

9        Q   Okay.  Please look at the bottom of Page 3 of

10   this date's minutes.  Do you see at the bottom there it

11   says (as read):

12            "Dr. Coil will again attempt to contact the

13            County HIPAA compliance officer to obtain further

14            information from their investigation before action

15            can be taken because their preliminary finding

16            determined there was no HIPAA violation"?

17        Do you see that?

18       A   I do.

19       Q   And does that accurately reflect your memory of

20   what happened?

21           MS. HUREVITZ:  I'm going to object.  That's a

22   misrepresentation of what the document says.  The document

23   continues and explains.

24           MR. WHITE:  I'm only asking him about that

25   particular part of it.

                                              Page 132

```
 1              extension but insist that the language in the

 2              behavioral contract, including that which he does

 3              not deny the wrongdoing, remain unchanged."

 4               Do you see that?

 5     A    Yes, I see it.

 6     Q    So Dr. Ryan's counsel requested some changes and

 7  you refused them; correct?

 8              MS. HUREVITZ:  Where are we referring?

 9              MR. WHITE:  The middle of the paragraph starting

10  "I reluctantly agreed."

11              THE WITNESS:  I do see what you're referring to,

12  yes.  I'm sorry, what was your question?

13  BY MR. WHITE:

14     Q    So Dr. Ryan's counsel requested some changes to

15  the contract and you refused them; is that correct?

16     A    I believe there was some discussion with the MEC.

17  I don't know exactly what date that was but during the

18  drafting of the behavioral contract prior to his

19  presentation to him that if he wanted to change

20  significant portions of the language, then we likely would

21  not approve that.  I did agree to give them a two-week

22  extension, but I didn't -- I don't know exactly what

23  happened after that to any changes in the contract if

24  that's what you're asking.

25     Q    Okay.  So is this where it says that you insist
```

Page 141

```
 1          Q    Do you have any understanding about whether

 2     imposing this term is legal or not?

 3               MS. HUREVITZ:  Objection.  Calls for a legal

 4     conclusion.  Lacks foundation.

 5               THE WITNESS:  I don't specifically know about the

 6     legality of these terms.  I know our intent was to be able

 7     to help the members of the professional staff in terms of

 8     their well being and being able to return to being

 9     productive members of the professional staff.

10     BY MR. WHITE:

11          Q    All right.  Did you discuss with anyone other

12     than the attorneys whether or not requiring psychological

13     counseling as a term was legal?

14               MS. HUREVITZ:  I'm sorry.  Can that question get

15     read back.  I didn't hear the end of it.

16                         (Record read.)

17               THE WITNESS:  Other than members of the MEC and

18     attorneys, County Counsel, I don't think that that was

19     discussed with anyone else outside of those two groups.

20     BY MR. WHITE:

21          Q    All right.  Please scroll down to 3.2 that says

22     "AMP Program Details."

23               Do you see that?

24          A    Yes.

25          Q    This would be much easier if we had page numbers
```

Page 153

1   that we could read.  So if you move on to the next page,

2   there's a Sub 2 at the top of the next page starting (as

3   read) "Dr. Ryan agrees to hold free."

4           Do you see that?

5       A   Yes.

6       Q   So who decided to put this clause, this term,

7   into the behavioral contract?

8           MS. HUREVITZ:  Calls for speculation.

9           You can answer if you know.

10          THE WITNESS:  I don't specifically recall.  I

11  know Dr. Vintch and I worked on this as well as County

12  Counsel.

13  BY MR. WHITE:

14      Q   Okay.  Do you remember discussing this term with

15  anybody?

16      A   Not specifically, no.

17      Q   Do you know whether any of the other behavioral

18  contracts out of that handful that you've talked about

19  before, of people, had this waiver in them?

20      A   I don't know specifically, but I would assume

21  that since this went through County Counsel's office,

22  there is some similar language in each of the behavioral

23  contracts.

24      Q   Okay.  But aside from your assumption, do you

25  remember any specific contract that has it?

                                        Page 154

1          A    No, but again, I don't have those in front of me

2     to compare.

3          Q    Okay.  Please keep going down to point 3.5.

4          A    Okay.

5          Q    So this says (as read) "Psychological and

6     Psychiatric Evaluation and Counseling."

7               So this required Dr. Ryan to be evaluated by a

8     psychiatrist; correct?

9          A    Or a psychologist, yes.

10         Q    All right.  On this one, do you recall whose idea

11    this particular term was?

12         A    No, not specifically.

13         Q    So this is distinct from the anger management and

14    counseling term we looked at before; right?

15         A    It appears to be part of the same contract.  I

16    don't know how much of a distinction I would say.  I think

17    the MEC discussion, you know, with which included a

18    psychiatrist, I might add, was that there was a concern

19    for Dr. Ryan's well being based on that FPPE report.  So I

20    think we were trying to ensure that if he needed any help

21    in terms of his well being, that that would be part of his

22    corrective action plan.

23         Q    All right.  So of that handful that we've talked

24    about that is the other doctors that have had PSA action

25    against them based on yelling or swearing or conduct like

                                                   Page 155

1    especially one untrue you weren't meaning to characterize

2    anything that Dr. Ryan said or did?

3        A    That's correct.

4        Q    All right.  The next bullet point is openly

5    making unfounded accusations in an angry manner.

6            Did that accurately reflect one of the things

7    that the PSA determined was a violation justifying

8    discipline?

9        A    So, again, I would say that in our discussions

10   during the MEC there was a review of information from the

11   FPPE report in which there were accusations made in an

12   angry manner and some cases in which the staff members

13   reported those were not true accusations and we felt that

14   that was part of a pattern of unprofessional behavior.

15   Specific to your question, we were recommending a

16   behavioral contract, which is what this is which again I

17   see as a corrective action to try and make sure staff act

18   professionally rather than as a form of discipline which

19   is a word that you used.

20       Q    Okay what accusations did Dr. Ryan make that were

21   unfounded?

22            MS. HUREVITZ:  I will object.  That lacks

23   foundation and calls for speculation.  He's already

24   testified he was not part of the FPPE Committee.

25   //

                                                    Page 166

1    BY MR. WHITE:

2          Q   You can answer the question?

3          A   I don't specifically remember.

4          Q   Do you know if he knew what they were at the time

5    that you reviewed this letter?

6          A   I don't specifically know, no.

7          Q   Okay.  Are you aware of whether anyone, the FPPE

8    or the PSA, went through and made a determination which of

9    Dr. Ryan's accusations were founded or unfounded?

10          MS. HUREVITZ:  I'm sorry.  Can I hear the

11    question back, please.

12                    (Record read.)

13          THE WITNESS:  That was part of the responsibility

14    of the FPPE Committee, was to find out the facts.  I don't

15    know specifically with regard to your question about

16    accusations.

17    BY MR. WHITE:

18          Q   Okay.  Let's look at Exhibit 382, please.

19     (Whereupon Exhibit No. 382 was marked for identification

20                and is attached hereto)

21          THE WITNESS:  Okay.

22    BY MR. WHITE:

23          Q   This is a February 27th, 2017 First Amended

24    Notice of Charges; correct?

25          A   Yes, it looks like it.

                                        Page 167

```
1      STATE OF CALIFORNIA       )

2      COUNTY OF LOS ANGELES     ) ss.

3

4            I, Susan S. Henriquez, C.S.R. No. 13763, in and

5      for the State of California, do hereby certify:

6            That prior to being examined, the witness named in

7      the foregoing deposition was by me duly sworn to testify

8      to the truth, the whole truth, and nothing but the truth;

9            That said deposition was taken down by me,

10     remotely, in shorthand, at the time therein named and

11     thereafter reduced to typewriting under my direction, and

12     the same is a true, correct, and complete transcript of

13     said proceedings;

14           That if the foregoing pertains to the original

15     transcript of a deposition in a Federal Case, before

16     completion of the proceedings, review of the transcript

17     { } was { } was not required.

18           I further certify that I am not interested in the

19     event of this action.

20           Witness my hand this 10th day of November, 2021.

21

22

23                     Certified Shorthand Reporter

24                     for the State of California

25
```

                                                          Page 180

EXHIBIT D

1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4       TIMOTHY RYAN, M.D., an individual,

5              Plaintiff,

6          vs.                              No. 2:17-cv-05752
                                               -CAS(RAOx)

7       BRANT PUTNAM, M.D., an individual,
        JANINE VINTCH, M.D., an individual,

8       ANISH MAHAJAN, M.D., an individual,
        CHRISTIAN DE VIRGILIO, M.D., an

9       individual, HAL F. YEE, M.D., an
        individual, ROGER LEWIS, M.D., an

10      individual, and MITCHELL KATZ, M.D.,
        an individual,

11

               Defendants.

12      _____

13

14              DEPOSITION OF JANINE VINTCH, M.D.

15                  Torrance, California

16               Thursday, October 14, 2021

17                      VOLUME I

18      (All parties appearing remotely via video conference.)

19

20

21      Reported by:
        WINDY PICARD

22      CSR No. 12879

23      Job No. 4827328

24

25      PAGES 1 - 206

                                                    Page 1

```
 1            Q    So when -- during the times when you were the

 2       president of the PSA, you were also the chair of the

 3       credentialing committee?

 4            A    That would be correct.

 5            Q    What are the general duties of the

 6       credentialing committee?

 7            A    The credentialing committee actually has a set

 8       committee that's called the credentialing advisory

 9       subcommittee.

10            That's the working committee that prepares all

11       of the new applications for PSA membership, the

12       reappointment applications for PSA memberships, any

13       issues that may have arisen, during that process, for

14       any of our providers or anything that comes to our

15       attention outside of the credentialing period, that --

16       such as a --

17            We've had a few people who have reported

18       things that have come up to the PSA that we need to be

19       aware of.

20            That goes through that committee.  And all

21       proctoring and advancement of privileges gets vetted

22       through that committee.

23            They then submit a report formally to the

24       credentialing committee that then is charged with

25       approving all applications, reappointments, proctoring,
```

Page 15

1    forms, and advancement and privileging for the PSA

2    membership at Harbor.

3         Q    All right.  And is the credentialing

4    committee -- other than the president, who's the chair,

5    who else is on it?

6              Is it set based on their roles in the PSA, or

7    is it elected, or how does that work?

8         A    The way we have it set up at Harbor is, our

9    medical executive committee is also our credentialing

10   committee.

11             So the committees are held consecutively, on

12   the same day, and the -- the membership is the same as

13   the medical executive committee.

14        Q    Okay.  During this time we were talking about,

15   2013 through 2018, were you -- are you familiar with

16   how the medical executive committee was selected?

17        A    The medical executive committee is defined by

18   our PSA bylaws.  It includes the chairs of all 12 of

19   our departments.  It includes the three members at

20   large.  It includes the PSA membership.  It includes --

21             There's a handful of other individuals it

22   includes as well.  I believe -- I don't -- may miss a

23   few of them off the top of my head.

24             But the CMO, the CNO, our chief information

25   officer is on the committee.  Our patient safety

Page 16

1          Q   All right.   The last paragraph talks about

2    Dr. Ryan falsely accusing the director of research at

3    LA BioMed of plagiarism.

4              And was this something that you saw as an MEC

5    issue?

6          A   I don't recall.   But reading this now, I don't

7    think that it -- again, this would be something we

8    would evaluate.

9              We might ask our -- LA BioMed, if they

10   evaluated this, to provide us with that information,

11   but this wouldn't have been something we would have

12   evaluated on our own.

13         Q   Okay.   So, again, having not gone through the

14   whole thing, can you identify the part of it that you

15   think raises an MEC issue?

16             MS. HUREVITZ:   In just this paragraph?

17             MR. WHITE:   In the entire document that we've

18   just read.

19             MS. HUREVITZ:   Well, she's already asked and

20   answered that question.

21             THE WITNESS:   It was what I pointed out in the

22   beginning, which was the very first paragraph, where he

23   states that there's conduct detrimental to delivery of

24   quality patient care and disruptive and deleterious to

25   the operations of the medical center.

Page 59

```
 1          A   My impression is that most of the issues he
 2     brought forth were professional behavior, but we also
 3     know that, when professional interactions become
 4     tangled, like they appeared to be, they can impact on
 5     patient care.
 6              So we've actually seen a lot of
 7     professionalism issues bleed over into changing the
 8     patient care environment.
 9              So I'd say that, if there are professional
10     behavior concerns, we, often times, also thought it
11     could link to a patient care issue over time, even if
12     it wasn't grossly apparent by the -- the complaint
13     brought forward.
14          Q   Okay.   And the next sentence reads, "I would
15     caution that this particular complaint seems steeped in
16     historical interactions that may never be fully
17     understood."
18              Did you have an understanding of what that
19     meant when you received that?
20          A   I believe he was referring to the fact that we
21     had evaluated Dr. White based on a concern that
22     Dr. Ryan had brought up and now we seem to be having
23     Dr. White bringing us his own set of concerns about
24     Dr. Ryan.
25              So I believe it was the interactions with
```

                                                        Page 62

1      these two individuals and that -- the FPPE that we had

2      previously done based on a concern that was raised by

3      Dr. Ryan, is what he's referring to.

4          Q   So you understood, at this time, that Dr. Ryan

5      had previously made allegations about Dr. White?

6          A   I believe our FPPE on Dr. White had preceded

7      this document.

8          Q   So --

9          A   And the timing, I don't recall off of the top

10     of my head.

11         Q   And so you knew that there was even a -- an

12     inquiry as a result of Dr. Ryan's complaints about

13     Dr. White?

14             MS. HUREVITZ:  Vague and ambiguous as to the

15     term "inquiry."

16             MR. WHITE:  I'll rephrase.  Honestly, I just

17     thought you would get mad at me for "investigation"

18     again.

19             So I will --

20             MS. HUREVITZ:  I'll object to that one too so

21     you don't feel left out.

22             MR. WHITE:  That's good.

23         Q   You were aware that, by this time, Dr. Ryan's

24     complaints had already resulted in a MEC proceeding

25     concerning Dr. White, involving an FPPE?

                                                Page 63

1     Exhibit 360.  It's a fair sized file, so it's going to

2     take a minute to load.

3          Q    Would you let me know, when it's loaded, if

4     you can see the top page?

5          A    Okay.

6               (Exhibit 360.)

7          Q    So 360 is an email with attachments from

8     Dr. Putnam, to you, on December 13th, 2016; correct?

9          A    That is what the email states, yes.

10         Q    And he says he's attaching executive session

11    minutes from September 15, 2015 to October, 2016,

12    specifically ones that talk about Dr. Ryan.

13              Do you see that?

14         A    Yes.

15         Q    So what was your understanding of what he

16    wanted you to do when he asked you to look over them?

17         A    We frequently -- because we didn't have

18    secretarial support for our minutes, unfortunately,

19    providing minutes fell onto the PSA leadership to do.

20              So, frequently, one of us would do the

21    minutes, and the other one would look them over to make

22    sure we didn't leave out any sections and that we

23    captured the information the way we both thought we

24    heard it.

25              So it was just our opportunity to be sure that

                                                    Page 68

1    the minutes were as reflective of both of our -- our

2    recall of the main meetings.

3          So I'm assuming he just wanted to be sure that

4    he hadn't left out anything in those minutes from the

5    meetings that I had attended.

6       Q    Do you know why he was specifically having

7    them looked over for that time period in

8    December of 2016?

9       A    No, I do not.

10      Q    Would the usual practice be -- well, let me

11   break it down a little bit.

12         Would the -- the responsibility to take

13   minutes rotate, or how would it get assigned?

14      A    Usually, the president would do the minutes,

15   but, occasionally, when they weren't there, if I filled

16   in for -- for them, I would do them.

17         It would be, whoever ran the meeting typically

18   did the minutes.  We would sometimes, though, just be

19   sure that we ran them by the other people -- the other

20   leadership person just to make sure we didn't miss

21   anything.

22         It's really hard to run a meeting and to

23   remember all the details of the discussion because

24   you're also trying to be in the moment, so that's why

25   we, often times, refer to each other to make sure the

                                                Page 69

1    minutes reflected the conversation.

2         Because the one running the meeting -- the one

3    who wasn't, often times, was able to absorb what was

4    happening a little bit better.

5         Q    Okay.  So the one who runs the meeting,

6    whether that's the president or vice president, whoever

7    it happens to be that -- that time, takes the minutes

8    and then refers them to others for review?

9         A    When I say "others," it was usually just the

10   two of us.  It was a practice Brant and I did over the

11   years just because I, often times, felt that I would

12   miss pieces.

13        It's not a standing practice.  I don't know

14   what Dr. -- our current PSA -- actually, we now have a

15   secretary treasurer who actually takes the minutes.

16        But they do, often times, send the minutes to

17   the other PSA leadership to be sure they captured all

18   the information before they're finalized and then

19   brought to the MEC for approval.

20        Q    So is it your understanding that, here,

21   Dr. Putnam was asking you to review these minutes going

22   back -- back to September, 2015 for that purpose?

23        A    I -- I don't --

24        MS. HUREVITZ:  That's September, 2015 here.

25        THE WITNESS:  I don't recall what the intent

Page 70

```
 1                    THE WITNESS:  It's the new name for the same

 2        entity.

 3        BY MR. WHITE:

 4             Q   Now, going down a bit further on -- on this

 5        page, page 4288, that we were reading on, it's

 6        unsigned; correct?

 7             A   Yes.  There's no signature on that page.

 8             Q   When, typically, would the minutes be signed

 9        during the time when you and Dr. Putnam were -- were

10        working on these responsibilities?

11                    MS. HUREVITZ:  Objection, that calls for

12        speculation.

13                    To the extent you know, you can answer.

14                    THE WITNESS:  The typical practice is that

15        they're supposed to be signed after they're approved at

16        the following month's meeting.

17                    That's why it says "Approval" and the

18        signature is blank.

19                    Unfortunately, I don't know that we -- because

20        a lot of it was run through us and we didn't have the

21        staff to support them, the signatures sometimes,

22        unfortunately, were not always applied timely.

23                    But the process --

24                    (Technical difficulties.)

25                    THE REPORTER:  I'm sorry.  Did she freeze for
```

Page 76

```
 1        you, Mr. White?

 2                   MR. WHITE:  She did.  They both did.

 3                   THE REPORTER:  Yes, they did.  Let's go off

 4        the record until they come back.

 5                   MR. WHITE:  Sure.

 6                   (Discussion held off the record.)

 7                   THE REPORTER:  On the record.

 8                   I'll read the last question and answer.

 9        Q    "When, typically, would the minutes be signed

10        during the time when you and Dr. Putnam were -- were

11        working on these responsibilities?"

12                   MS. HUREVITZ:  "Objection, that calls for

13        speculation.

14                   To the extent you know, you can answer."

15                   THE WITNESS:  "The typical practice is that

16        they're supposed to be signed after they're approved at

17        the following month's meeting.

18                   That's why it says "Approval" and the

19        signature is blank.

20                   Unfortunately, I don't know that we -- because

21        a lot of it was run through us and we didn't have the

22        staff to support them, the signatures sometimes,

23        unfortunately, were not always applied timely.

24                   But the process" --

25                   THE WITNESS:  Okay.  So the process is that
```

```
 1        the minutes would come to the MEC at the next meeting.

 2        The members would have an opportunity to review them,

 3        make any changes or corrections that they saw fit.

 4              And then, at that time, it would be

 5        approved -- voted upon, approved.  And then after that,

 6        our signatures would be applied to the final minutes.

 7        BY MR. WHITE:

 8           Q   All right.  So let's say a set of minutes from

 9        last month's meeting came to this month's meeting and

10        people wanted changes.

11              How would that be accomplished, would people

12        submit handwritten or typed suggested changes, would it

13        be done verbally, how did that happen?

14           A   Well, what we do now and what we did then --

15        I'm not quite sure since we have new online programs.

16              What we did then is, the minutes would come to

17        the meeting itself.  So they wouldn't get circulated

18        electronically.

19              They would have the opportunity -- especially

20        the executive session meeting minutes.  We actually had

21        them in pre-numbered folders.  So we would collect them

22        all back so that they wouldn't leak out of the area.

23              They'd be passed out at the beginning of

24        executive session only.  We would pause and allow the

25        membership to read them.
```

Page 78

1            At that point, we would have a discussion, if

2     there was any, about any corrections.  We would make a

3     note of any corrections that needed to be made.  We

4     would then correct the minutes.

5            And then those would be voted upon to be

6     approved with those changes, should any have been made,

7     and then signed off on.

8        Q   And would those corrected versions be kept?

9        A   They are kept.  They're -- a copy is generally

10    kept in the medical staff office, in a separate binder.

11       Q   Okay.

12       A   But for a while, we didn't have staffing up

13    there, so they may have been kept on -- on Dr. Putnam's

14    computer or whoever our secretary was at the time of

15    the final version.

16       Q   Okay.  So going back to Exhibit 360 that we've

17    been looking at, so you can't tell me why Dr. Putnam is

18    sending these for you to review in December of 2016; is

19    that correct?

20       A   That's correct.

21       Q   And you don't know why they wouldn't have been

22    previously approved for accuracy?

23       A   I -- I don't recall.

24       Q   Would these represent minutes that had already

25    been voted on, or would these represent ones that

                                                    Page 79

```
 1      haven't yet been brought back and voted on?

 2              MS. HUREVITZ:  Calls for speculation.

 3              If you know, you can answer.

 4              THE WITNESS:  By our process, these should

 5      have been voted on at the meeting following the date of

 6      these minutes.

 7              Unfortunately, because we often times had

 8      several drafts of the minutes, it may have been that it

 9      was making sure that this was the final draft, in case

10      I had any copies on my computer, but I -- I couldn't --

11      couldn't tell you for sure that was his intent.

12      BY MR. WHITE:

13          Q   Okay.  When you and Dr. Putnam exchanged

14      minutes like this to check each other for accuracy, did

15      either of you ever make any changes?

16          A   Occasionally, I would assume, I believe we

17      did.  I -- but I couldn't tell you on which documents

18      and on which dates.

19          Q   Okay.  But would that be after the minutes had

20      been voted upon?

21          A   That would absolutely not be the case.  We

22      would never amend a minute after -- a set of minutes

23      after they had been approved and voted upon by the

24      committee.

25              Any of our draft changes would have taken
```

Page 80

1    place before they were finally approved by the

2    committee.

3        Q    Okay.  So then if that's the case and

4    Dr. Putnam is sending these for you to review in

5    December of 2016, how can he be sending them to you for

6    potential editing, if -- if they're prior meetings?

7            MS. HUREVITZ:  Well, objection, argumentative,

8    calls for speculation, assumes facts not in evidence.

9            THE WITNESS:  I don't know.

10           MR. WHITE:  All right.  Let's look at a

11   different exhibit, at least for a moment.  Okay.  I've

12   just published Exhibit 361.

13       Q    Okay.  So is -- 361 is an email from

14   Dr. Putnam, to Patricia Arevalo.

15           Who is that?

16       A    Patricia Arevalo is our new medical staff

17   coordinator.

18           (Exhibit 361.)

19       Q    Okay.  And what does a medical staff

20   coordinator do?

21       A    She oversees our medical staff office, which

22   includes all of our credentialing specialists.  We have

23   another add -- two administrative staff members.

24           So she -- she oversees the credentialing and

25   privileging files.  She's the keeper of all of our

                                                    Page 81

1        Q    Who is that?

2        A    I used to call her by K.D. 'cause I can't

3    pronounce her first name very well.  It's

4    Kawajalen de Mervin.  She was our medical staff

5    coordinator at the time.

6        Q    Okay.  And she is certifying as accurate

7    attached documents; correct?

8        A    I'd have to read what she's certifying to -- I

9    understand -- it appears that that is what she's

10   certifying to.

11       Q    Okay.  Please scroll to the next page.

12       A    Okay.  It's a ways for me.

13       Q    Right.  For me too.

14            This is -- these are minutes of the

15   April 25th, 2016 meeting again; right?

16       A    They're dated April 25th, 2016, yes.

17       Q    Okay.  If you scroll down to the next

18   two pages, you'll see that it's a different version of

19   those minutes.

20            Please take a look at DEF 11958.

21            Do you see that?

22       A    I'm trying to get to it.  I see that page.

23       Q    Yeah.  When you get to that page, please --

24       A    Okay.

25       Q    So the -- this version is signed by Dr. Putnam

Page 88

1    in May of 2018; right?

2         A    That is the date that's stamped on it.

3         Q    So do you know how or why the minutes were

4    changed between those two versions?

5         A    I do not know.

6         Q    Did you ever discuss with anybody changing the

7    content of the minutes in connection with any claims by

8    Dr. Ryan?

9         A    No.

10        Q    Did anyone ever suggest to you that any of the

11   minutes be changed in order to change the narrative of

12   what the PSA did in connection with Dr. Ryan?

13        A    Are you referring to minutes that had been

14   approved?

15        Q    Yes, minutes that had already been approved in

16   session.

17        A    I've never been approached about changing

18   minutes that have already been signed off and approved.

19        Q    And have you ever observed minutes having had

20   a change after you previously seen them?

21        A    As I stated before, we had multiple drafts of

22   our minutes, at times, in figuring out what the final

23   version was.

24             Sometimes it became very difficult for us, and

25   we didn't always have staff that collected all of our

Page 89

1   minutes.

2          That's why we, often times, sent them in big

3   groups to the medical staff office, to make sure they

4   had the minutes.

5          But all I can imagine is that they -- we had

6   multiple drafts and, for whatever reason, didn't keep

7   track of which one was the final version.

8      Q   So other than that, can you offer any

9   explanation for why these drafts are different?

10     A   I cannot offer a different explanation.

11     Q   Was there any -- ever any discussion of what

12  the minutes should or shouldn't say given Dr. Ryan's

13  litigation against the hospital and doctors?

14     A   I don't recall us being that descriptive as to

15  what we captured in the minutes, other than to try to

16  capture the essence of what the discussions really

17  were.

18     Q   Okay.  That was kind of a general answer about

19  what, generally, you didn't do.  I'm talking about

20  specifically.

21          Do you remember a specific discussion of what

22  should or shouldn't be in the minutes because of the

23  pendency of litigation?

24     A   You're asking me to recall conversations that

25  took place six years ago.  And I do not recall any

                                              Page 90

```
 1        we've talked about, it's a four or five, in that range?
 2            A    Four or five that we've had come before the
 3        MEC for concerns about professionalism --
 4            Q    All right.
 5            A    -- yes.
 6            Q    Okay.  And of those, how many were offered
 7        behavioral contracts?
 8            A    Three, that I can think of off the top of my
 9        head --
10            Q    Okay.
11            A    -- but not -- not including Dr. Ryan.
12            Q    Not including Dr. Ryan.  Thank you.
13                 And of those, how many required psychological
14        counseling as part of the behavioral contract?
15            A    I'd have to look at all of them.  But I can --
16        off the top of my head, I know for sure that two
17        definitely did.  I -- I'm not sure about the other
18        ones.
19            Q    Okay.  And of those, how many included --
20        sorry.  I'm having a computer glitch here.
21                 Of those, how many included a waiver of
22        claims?
23                 MS. HUREVITZ:  What do you mean "a waiver of
24        claims"?  The question is vague and ambiguous.
25                 MR. WHITE:  Sure.  Let me explain.
```

Page 137

1              Q   In how many, to your knowledge, of those

2   behavioral agreements did it include a requirement that

3   the physician in question waive all claims against the

4   PSA and the people involved?

5              MS. HUREVITZ:   Objection, that is -- assumes

6   facts not in evidence that there's any requirement in a

7   behavioral agreement for a waiver.

8   BY MR. WHITE:

9              Q   Doctor, do you know the answer?

10             A   I haven't reviewed the behavioral contracts in

11  quite a few years, so I don't recall whether we had a

12  waiver in them.

13             Our language was pretty consistent from one

14  contract to the other.   When we learned how to use

15  that, when it was recommended during our first

16  individuals, then we used that almost as a template,

17  but then individualized it to the individual concerns

18  for each provider.

19             So I don't recall if we had added to that a

20  waiver piece.   I -- I -- I'm not remembering.

21             Q   So you can't -- you can't recall -- leaving

22  Dr. Ryan aside, you can't recall any of the behavioral

23  contracts having a waiver of any claims against the

24  county or -- or the PSA or anything like that?

25             MS. HUREVITZ:   Misstates her testimony, and it

1      assumes facts not in evidence.  She said she hasn't

2      read one of the behavioral agreements to remember one

3      way or the other, so you're misstating her testimony.

4              MR. WHITE:  Well, I'm just making sure,

5      actually, that she doesn't have any independent memory

6      and closing that out.

7          Q    Doctor, do you have the question in mind?

8          A    I do not recall whether or not we included a

9      waiver in each -- in -- in our behavioral contracts.

10         Q    All right.  Where did you get the original

11     behavioral contract the first time you worked on one or

12     used one?

13         A    I believe we actually asked for county counsel

14     to help us, sort of, with a template that, sort of,

15     brought -- a document to start with once we came up

16     with a list of areas that we wanted the individual

17     to -- to work on.

18             And so we worked with county counsel in, sort

19     of, creating our first behavioral contract.

20         Q    All right.  And would you consult with county

21     counsel every time you did a new one for a new

22     physician?

23         A    We generally did, yes.  However, after we

24     learned how to do it the first time, the next time

25     around, we usually would pre-populate it with the

Page 139

```
1          have been linked together with anger management.
2              Q    Okay.  So in -- who made the decision about
3          the terms that should go into this agreement?
4              A    The members of the medical executive
5          committee.  We went through our bylaws, we saw what the
6          options were.
7                   We had also discussed with counsel what other
8          options we had for providers that we had concerns about
9          so that we could explore ways that we could try to help
10         bring that provider into the fold and really try to get
11         them on track with what we expected with all of our
12         providers.
13             Q    Okay.  What I'm asking is, when you get down
14         to this level of detail, was that the entire executive
15         committee, or was that, like, a subset of you making
16         that level of decision about the language of the
17         agreement?
18             A    We would draft it, and then we would present
19         it to the MEC.  They would then revise it.  We would
20         draft it again.
21                  So it went through -- most of the time, these
22         behavioral agreements would go through the MEC on
23         multiple occasions to come up with the final language
24         and term to be sure that it represented what the group
25         wanted.
```

Page 152

```
 1        the information we had.

 2               I don't recall this versus all of the other

 3        documents.  But I'm sure I had a part in reviewing it

 4        and providing feedback.

 5          Q    Okay.  Would you please turn to the

 6        third page, under the section that says "Background"?

 7          A    Okay.

 8          Q    Do you see there's a list of bullet points at

 9        the bottom of the page?

10          A    Yes.

11          Q    Okay.  The second bullet point is, "Openly

12        threatening to call external agencies to conduct

13        investigations."

14               Do you see that?

15          A    I do.

16          Q    Was that one of the things that Dr. Ryan did

17        that the PSA thought should be a basis for discipline?

18          A    I don't remember where we got that information

19        from.

20          Q    Okay.  Do you remember any discussion of the

21        inclusion of that in there?

22          A    I do not recall.

23          Q    Is it accurate?

24          A    From my personal experience, it is, based on

25        all of the agencies I've had to respond to.  But I
```

Page 170

1    don't recall, at the time back at -- in this year that

2    this was crafted, whether or not I was aware of

3    anything at that time.

4         Q    All right.  The next bullet point -- the next

5    bullet point says, "Openly making unfounded accusations

6    in an angry manner."

7              Do you recall how that one got there?

8         A    No, I do not.

9         Q    And do you -- do you believe that it was

10   accurate?

11             MS. HUREVITZ:  Calls for speculation.  She was

12   not on the FPPE committee, and she did not draft this

13   document.

14   BY MR. WHITE:

15        Q    Doctor, do you understand the question?

16        A    Can you please repeat it?

17        Q    Sure.

18             Do you believe that line, "Openly threatening

19   to go call external agencies" -- excuse me -- "Openly

20   making unfounded accusations in an angry manner,"

21   accurately reflects one of the things the PSA was

22   saying Dr. Ryan should be disciplined for doing?

23        A    I don't recall.  It may have been in the

24   documents with all of the information we got from the

25   individual interviews themselves.

1              But this particular item, I don't recall

2       discussing this -- this incident or issue.

3          Q   So if it was in there, you didn't review the

4       documents carefully enough to see it?

5          A   I didn't say that.

6              MS. HUREVITZ:   Objection, argumentative.

7              (Multiple speakers.)

8              THE WITNESS:   I didn't state that.   I'm

9       stating, you're asking me questions about a document

10      from six years ago, asking me, point by point, do I

11      recall where we got this information?

12             Unfortunately, life has been quite challenging

13      over the past few years, and I cannot recall every

14      single item and how we came to these conclusions and

15      decision.

16             So we clearly came to these decisions, put

17      them in a document.   Where we came to each point, I,

18      unfortunately, cannot provide you with that information

19      at this time because I do not remember.

20      BY MR. WHITE:

21         Q   Okay.   Let me add another one.   Okay.   I'm

22      introducing 382.   Please let me know when you have it.

23         A   Okay.   Dated February 27th, 2017?

24             (Exhibit 382.)

25         Q   Yes.   It appears to say

                                              Page 172

1

2

3

4            I, the undersigned, a Certified Shorthand

5     Reporter of the State of California, do hereby certify:

6            That the foregoing proceedings were taken

7     before me at the time and place herein set forth; that

8     any witnesses in the foregoing proceedings, prior to

9     testifying, were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further; that the foregoing is an accurate

13    transcription thereof.

14            I further certify that I am neither

15    financially interested in the action nor a relative or

16    employee of any attorney of any of the parties.

17            IN WITNESS WHEREOF, I have this date

18    subscribed my name.

19    Date:   10/28/2021

20

21

22

23

24

             WINDY PICARD

25           CSR No. 12879

                                       Page 203

EXHIBIT E

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                     WESTERN DIVISION
 4
 5   TIMOTHY RYAN, M.D.,                )
                                        )
 6              Plaintiff,              )
                                        ) Case No.
 7         vs.                          ) 2:17-CV-05752
                                        ) CAS(RAOx)
 8   BRANT PUTNAM, M.D., an             )
     individual; JANINE VINTCH, M.D. )
 9   an individual, ANISH MAHAJAN,      )
     M.D., an individual, CHRISTIAN     )
10   DE VIRGILIO, M.D., an             )
     individual, HAL F. YEE, M.D.,     )
11   an individual, ROGER LEWIS, M.D.)
     an individual, and MITCHELL       )
12   KATZ, M.D., an individual,        )
                                        )
13              Defendants.             )
     _____)
14
15
16
17
18           DEPOSITION OF CHRISTIAN De VIRGILIO, M.D.
19                  TUESDAY, OCTOBER 26, 2021
20
21
22
23   JOB NO.:  4849715
24   REPORTED BY TARA SANDFORD, CSR NO. 3374, RPR
25   PAGES 1 - 182
```

                                                    Page 1

1        Q.    Did Dr. Tim Ryan ever tell you that he had

2    reported his concerns about fraud to the District

3    Attorney's Office?

4        A.    Which fraud?

5        Q.    The fraud you testified about earlier.  So did

6    Tim Ryan --

7              Let me rephrase the question.

8              Did Tim Ryan ever tell you he had reported

9    concerns about Dr. White to the District Attorney's

10   office?

11       A.    He did mention at some point -- he did mention

12   at some point he had gone to the District Attorney's

13   office to complain in relation to this complaint

14   regarding the nurse and Dr. White and the concerns about

15   fraud.

16       Q.    Did he tell you there was a District Attorney's

17   office investigation as a result of his complaint?

18       A.    I don't know for sure if he said -- if he said

19   they were looking into it or investigating.  I don't

20   remember the exact -- I guess I assume they were

21   investigating, but I don't remember exactly what the

22   outcome of that was.

23       Q.    Would you please take a look at Exhibit 332.

24             (Whereupon, Exhibit 332 was marked

25               for identification by the Court Reporter

                                              Page 22

```
 1    time, or is this only before he became chair?

 2              MR. WHITE:  Before he became chair.

 3              THE WITNESS:  I'd have to think back to -- I'd

 4    have to think back because there were situations where

 5    he got very angry at me.  And I just can't recall the

 6    date of that event.  It could have been before -- it

 7    could have been before 2015.

 8              There were several events where he became very

 9    angry and, you know, by inference, that type of anger

10    can create a very negative work environment.  So if

11    there's a negative work environment, that can affect

12    patient safety.  So it's a little bit of a vague

13    question, I guess, is my point.

14         Q.   BY MR. WHITE:  Did you do anything before you

15    became chair to seek to have Dr. Ryan's behavior in any

16    way corrected?

17         A.   I did not, as I recall, do -- submit a

18    complaint or anything like that.

19         Q.   Are you aware of anyone else prior to this

20    complaint reflected in this email that we're just

21    looking at, Exhibit 347, hear of anyone else submitting

22    a complaint about Dr. Ryan's interpersonal behavior?

23              MS. HUREVITZ:  Calls for speculation.

24              You can answer, if you know.

25              THE WITNESS:  I wouldn't -- before being chair,
```

Page 35

```
 1     I wouldn't be privy to that, typically, so I really
 2     wouldn't know.
 3          Q.   BY MR. WHITE:   I am just wondering -- asking if
 4     you heard about it.
 5          A.   I don't recall hearing it.
 6          Q.   Was Dr. Ryan -- did you have any concerns about
 7     his skills as a surgeon?
 8          A.   What do you mean by that?
 9          Q.   Were his patient outcomes good?
10          MS. HUREVITZ:   Well, I am going to object that
11     it lacks foundation and calls for speculation.
12          But you can answer to the extent you know.
13          THE WITNESS:   I think we're all -- as a
14     surgeon, we all have adverse outcomes for patients.   So
15     if you ask are his surgical outcomes good, it is a bit
16     vague to say that.
17          Q.   BY MR. WHITE:  Did you have any concerns during
18     this time, before you became chair, about Dr. Ryan's
19     technical abilities as a surgeon?
20          A.   I think as far as his technical abilities as a
21     surgeon, my feeling was that his technical skills were
22     appropriate.
23          Q.   Would you please turn to Exhibit 341.
24          (Whereupon, Exhibit 341 was marked
25           for identification by the Court Reporter
```

Page 36

```
 1    623 to 633 is the narrative on Exhibit 341.  It's under

 2    the label, "Invasion of privacy report."  If you would

 3    like to read that, then I'll re-ask the question.

 4        A.   I keep having trouble.  This whole thing just

 5    keeps --

 6              MS. HUREVITZ:  Let me show you.  Are you in

 7    Exhibit 341?  Go back to 340 -- you are in Exhibit 341;

 8    right, Ken?

 9              MR. WHITE:  Yes.

10              MS. HUREVITZ:  341.

11              MR. WHITE:  Correct.

12              THE WITNESS:  What is your question now then?

13        Q.   BY MR. WHITE:  My question was, did you counsel

14    Dr. Ryan about any of these issues as a result of

15    receiving this complaint?

16        A.   I don't believe that I counseled him, no, as a

17    result of this complaint.

18        Q.   And when you became chair, did you begin to

19    counsel him about the --

20        A.   Counsel who?

21        Q.   Did you begin to counsel Dr. Ryan about the

22    anger issues that you described earlier?

23        A.   I do know at one point I spoke to him about his

24    sometimes explosive temper by offering to send him a

25    book to try to help with being more positive.  And I
```

Page  44

1     tried to talk to him about it, but there wasn't -- there

2     wasn't sort of a formal counsel.

3          Q.   Did you offer him the book and try to talk to

4     him in the context of telling him that his behavior was

5     a problem?

6          A.   I remember that he told me that he wasn't able

7     to be like me in terms of holding things in.  And I

8     tried to talk to him about just being a little more,

9     sort of, collaborative.

10         Q.   But my question was, in these discussions

11    you're describing, did you tell him that his behavior

12    was a problem that needed to be corrected?

13              MS. HUREVITZ:  More than what he already

14    testified to?

15              MR. WHITE:  More than what he's already

16    testified to.

17              THE WITNESS:  I think, again, these were -- one

18    has to -- I tried once to also -- I don't remember the

19    date -- to meet with him to go over his teaching

20    evaluations.  This was probably later because he had a

21    lot of negative teaching evaluations from the medical

22    students.  And it was challenging to provide counseling

23    because he would get angry and sort of flip the script,

24    so to speak.

25              So when I met with him to go over his medical

Page 45

1     A.   Yes.

2     Q.   How did you hear that?

3     A.   Through the PSA.

4     Q.   Was it from being in a meeting, or did someone

5  come talk to you about it?

6     A.   That would have happened at the closed session

7  of the MEC.

8     Q.   Did anyone ask you to do anything in connection

9  with the FPPE of Dr. Ryan?

10     A.   I believe as department chair I am asked to put

11  together a committee.

12     Q.   That is what I mean by do things or an action

13  or be involved with.  So did you, in fact, put together

14  a committee?

15     A.   I believe I did.

16     Q.   How did you select the members of the

17  committee?

18     A.   I don't recall the exact methodology, but I

19  think in general terms, the goal was to choose people

20  who were not directly involved with the division of

21  vascular to have a broad representation from different

22  specialties also outside of surgery, but to also have

23  someone within surgery because Dr. Ryan is a surgeon.

24     Q.   Did anyone suggest to you who should be part of

25  this group?

1    blanche to interview who they felt were appropriate to

2    interview.

3         Q.    How did the group receive its scope of work,

4    its instructions about what to investigate and what to

5    do?

6         A.    I don't remember specifically how they received

7    that.

8         Q.    Do you know if you provided them with any sort

9    of instructions?

10        A.    I don't remember at the moment.

11        Q.    Were any members of the group already on the

12   MEC, if you remember?

13        A.    I'd have to look at the list, but there may

14   have been some that were.

15        Q.    Do you remember whether or not --

16              When you formed the group, did you have in your

17   mind an idea of what the scope of the inquiry should be?

18        A.    I don't remember what I had in mind at the

19   moment at that time.

20              MR. WHITE:  Why don't we take a restroom break,

21   please.  It's 10:52.  Let's take it until 11:00.

22              MS. HUREVITZ:  Okay.

23              MR. WHITE:  Thank you.

24              (Recess taken at 10:52 a.m. - 11:01 a.m.)

25        Q.   BY MR. WHITE:  Doctor, let's turn to Exhibit

                                              Page 56

1    me to say whether this was, in fact, the full content or

2    not the full content of the meeting.

3        Q.   BY MR. WHITE:  Do you remember when you began

4    to put together the group for the FPPE?

5        A.   No, I do not.

6        Q.   So this shows that the department of surgery

7    formed the FPPE committee.  And you were the chair of

8    the department of surgery; right?

9        A.   I was the department of surgery chair, and it

10   was my understanding that I would put together the

11   members of the group.

12       Q.   What I'm asking, that's how this task wound up

13   on your plate, because they directed it to the

14   department of surgery, and you're the chair.  Is my

15   understanding correct?

16       A.   My understanding is as department chair, when

17   an FPPE is requested to be put together by the MEC, the

18   department chair is then given the task of assigning

19   people to be part of the group.

20       Q.   All right.  Once you assigned people to the

21   group, do you remember whether you gave them anything in

22   writing describing the scope of what their inquiry

23   should be?

24       A.   I don't at the moment recall.

25       Q.   Do you recall whether you arranged for them to

Page 61

1    talk to anyone, to explain to them what the scope of the

2    inquiry should be?

3        A.   I don't recall if it was -- if it was me or who

4    gave them the instructions of who to speak to.  But I

5    don't recall the specifics.

6        Q.   All right.  Do you recall whether the scope of

7    the FPPE was anything broader than the complaints

8    Dr. White had brought to the PSA?

9        A.   Well, I do recall that there were concerns

10   about his profess- -- around this time there were

11   concerns about his professionalism and his treatment of

12   nurses, and so I know that that was part of what was

13   looked at, but I don't recall the timing of that.

14       Q.   Do you recall how that concern became part of

15   the scope of the FPPE?

16       A.   I don't remember specifically.  I'd have to

17   look back at all the minutes and the timing of those

18   things.

19       Q.   All right.  The --

20       A.   I can't remember.  I would have to recall, for

21   example, when the nursing issues arose and whether it

22   arose before the FPPE committee was put together, while

23   it was put together, while it was being conducted.

24            I'd have to look back at those issues.

25       Q.   Let me ask you this.  We earlier looked at an

                                                    Page 62

```
 1              about his temper?
 2              "A   At conferences he would get
 3              very angry if people disagreed
 4              with his approach.  He would,
 5              basically, kind of dominate the
 6              conversation, and put down
 7              other people who disagreed with
 8              his approach to doing things.")
 9         Q.   BY MR. WHITE:  Tell me what you mean by a
10    conference.
11         A.   We have a vascular conference.  It is a
12    once-a-week Wednesday conference where the vascular
13    surgeons, the residents, and the students, and the
14    nurses usually sit in a room, preCOVID, of course, and
15    then review cases and discuss cases.
16         Q.   These were happening before you became chair of
17    the department?
18         A.   Yes, these were going on for many years.
19         Q.   Did you observe this behavior you described
20    before you became chair?
21         A.   Yes.
22         Q.   What did you do about this behavior?
23         A.   What do you mean?
24         Q.   Before you became chair, did you ever report it
25    or ask that someone correct it?
```

Page 74

1  A. No.

2  Q. Once you became chair did you take any steps to

3 counsel Dr. Ryan about it?

4  A. Again, as I said before, the times where I told

5 him to sort of take a deep breath, try to be more

6 optimistic, but there were not a series of

7 recommendations, no.

8  Q. I appreciate that you've referred to that

9 before.  What I'm wondering is if you ever approached

10 him in the mode of your behavior is a problem; I need

11 you to change it, a directive from his boss.

12  A. You have to recognize that many people were

13 afraid of him.  And he would often, if things weren't

14 done as he wanted, he would start issuing threats.

15  Q. Were you afraid of him?

16  A. He was intimidating, yes.  I wouldn't say

17 that -- I wouldn't say that I had this fear, but he was

18 very intimidating every time -- not every time, but

19 there were times where I met with him that he would say

20 threatening things, not to my personal health but make

21 threats that I can give you examples of.

22  Q. Yes, let's get the examples.  What time period

23 are we talking about here when you're talking about

24 these interactions when he's making threats?

25  A. Throughout his time.

Page 75

1    STATE OF CALIFORNIA,            )

2    COUNTY OF SANTA BARBARA.         ) ss.

3

4        I, TARA SANDFORD, RPR, CSR No. 3374, in and for the

5    State of California, hereby certify:

6        That prior to being examined, the witness named in

7    the foregoing deposition was duly sworn by me to testify

8    the truth, the whole truth, and nothing but the truth;

9        That said deposition was taken down by me in

10   shorthand at the time and place therein named, and

11   thereafter reduced to typewriting under my direction,

12   and the same is a true, correct and complete transcript

13   of said proceedings;

14       That if the foregoing pertains to the original

15   transcript of an examination in a Federal Case, before

16   completion of the proceedings, review of the transcript

17   { } was   {  } was not required.

18       I further certify that I am not interested in the

19   event of the action.

20       Witness my hand this 9th day of November, 2021,

21   at Santa Barbara, California.

22

23

24

25           TARA SANDFORD, CSR NO. 3374

                                              Page  179