BROWN WHITE & OSBORN LLP
THOMAS M. BROWN (SBN 117449)
KENNETH P. WHITE (SBN 173993)
333 South Hope Street, 40th Floor
Los Angeles, CA 90071-1406
Telephone: 213.613.0500
Facsimile: 213.613.0550
tbrown@brownwhitelaw.com
kwhite@brownwhitelaw.com

*Attorneys for Plaintiff*
Timothy Ryan

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TIMOTHY RYAN, M.D., an individual, | Case No.: 2:17-cv-05752-CAS(RAOx) |
| Plaintiff, | Judge: Hon. Christina A. Synder |
| v. | |
| BRANT PUTNAM, M.D., an individual, JANINE VINTCH, M.D., an individual, ANISH MAHAJAN, M.D., an individual, CHRISTIAN DE VIRGILIO, M.D., an individual, HAL F. YEE, M.D., an individual, ROGER LEWIS, M.D., an individual, and MITCHELL KATZ, M.D., an individual, | **DECLARATION OF PLAINTIFF TIMOTHY RYAN, M.D IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** |
| | Date: December 6, 2021<br>Time: 10:00 a.m.<br>Ctrm: 8-D |
| Defendants. | |
| | Action Filed: August 3, 2017<br>Trial Date: April 26, 2022 |
| | *[Filed Concurrently Herewith: Opposition to Defendants' Motion for Summary Judgment, or Alternatively, Partial Summary Judgment; Response to Separate Statement; Objections to Evidence; Declaration of Kenneth P. White Thereto]* |

1

DECLARATION OF PLAINTIFF TIMOTHY RYAN, M.D IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

**DECLARATION OF PLAINTIFF TIMOTHY RYAN, M.D.**

I, TIMOTHY RYAN, hereby declare as follows:

1. I am the Plaintiff in this action. I make this declaration from personal knowledge, and if called as a witness, could and would testify competently to the matters set forth herein. Because this declaration is for a limited purpose it does not include all of the information I have about this matter.

2. I began working as a surgeon at Harbor-UCLA Medical Center ("Harbor") in October 2013.

3. In 2014, I became aware of a clinical trial sponsored by the National Institute of Health ("NIH") called BEST-CLI, which stands for Best Endovascular vs. Best Surgical Therapy in Patients with Critical Limb Ischemia. The clinical trial was designed to evaluate what procedures on patients with critical limb ischemia led to the best results, comparing endovascular surgery (which uses catheters and is less invasive) with open surgery. Some Harbor surgeons participated in the trial.

4. Based on my review of the clinical trial documentation, I knew that the trial required participants to have completed a set number of surgeries to be qualified. I became concerned that some Harbor surgeons – including Dr. Rodney White and Dr. Carlos Donayre – had not completed the requisite number of surgeries to qualify for the trial, and that they had therefore falsified the attestation in their applications in order to participate. In early December 2014, I reported my concerns to Harbor supervisors including Dr. Timothy Van Natta, Chief Medical Officer at Harbor, and Dr. Christian De Virgilio, a senior vascular surgeon, and asked them to investigate.

5. Based on Dr. Van Natta's and Dr. De Virgilio's response to me, I did not believe that they were seriously investigating whether Harbor surgeons had falsely inflated their surgical experience in order to qualify for the BEST-CLI trial. This concerned me on many levels: it suggested that public employees had falsified an application to a clinical trial, that they were not qualified to participate in the trial, and that their lack of qualifications would impact the reliability of the results of the trial and

2

therefore the value of the scientific conclusions it reached.  I was concerned that patients would be put at risk by being enticed to enroll in human subjects experimentation conducted by unqualified physicians. On approximately December 4, 2014, I contacted the NIH and reported my concerns, providing my basis for believing that Dr. White and Dr. Donayre, among others, had falsified their attestations in the application to participate in the BEST-CLI trial.  I informed Dr. Van Natta that I had done so on approximately December 9, 2014.

6.  In December 2013, I treated a patient I will refer to as "BH" for an aortic dissection.  I treated her with medication, which I believed to be the appropriate course.  Shortly thereafter, I was copied on an email that Dr. White's nurse, Rowena Buwalda, sent reporting that she and Dr. White had instructed BH to come to the hospital *the following day* and complain of chest pains.  **Exhibit A** to this declaration is a true and correct copy of that email redacted to protect BH's identity.  When one of the trainees asked me to review BH's CT scans, I discovered that Dr. White had re-admitted BH to Harbor under false pretenses by making her admission appear to be an emergency, thus guaranteeing insurance payment for the stay.  I further learned that Dr. Donayre had then performed surgery on BH, implanting a stent graft manufactured by Medtronic.  I firmly believed that she had responded well to non-surgical management and that she had no need for the stent graft procedure.  I later learned from BH's medical records that BH had suffered a serious aortic injury as a result of the stent graft surgery resulting in a major stroke that impaired her ability to speak.  Based on my review of BH's medical records, I noted that Dr. White had falsified the medical record to justify the stent graft, describing symptoms inconsistent with what I had observed.

7.  I concluded that Dr. White, Dr. Donayre, and others were implanting stent grafts manufactured by Medtronic in patients where they were not medically warranted, and that they had a financial incentive to do so.  The device manufacturer Medtronic was paying them thousands of dollars each time they implanted one of Medtronic's stent grafts under the guise that they were conducting a "teaching course" on how to do

3

DECLARATION OF PLAINTIFF TIMOTHY RYAN, M.D IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

so when they implanted the stent graft. I knew this because in December 2013 Medtronic offered to pay me to participate in these "courses." I declined. Based on my direct observation of the operations associated with these supposed "courses," I know there were no physicians present to observe the procedure, so no one to "learn" from the "course." Based on my investigation I concluded that the doctors received several thousand dollars per implant; Medtronic was paid tens of thousands of dollars per case where Medtronic devices were implanted. I confronted Dr. Donayre about this after the incident with my patient BH. Dr. Donayre admitted to me that Medtronic paid him and Dr. White for these "courses," and said I would have to learn to live with it. I was gravely concerned by this development, because I believed it represented doctors getting kickbacks from a device manufacturer for using their product, that it compromised medical judgment about whether the devices were medically indicated, and that it threatened the health and safety of patients for whom the stent grafts were not medically indicated, as in the case of BH.

8. I first reported my concerns to Dr. DeVirgilio in January 2014. When nothing had happened by February 2014, I approached Dr. Bruce Stabile, who was then the Chief of Surgery at Harbor. Dr. Stabile told me that I should find a way to "restore harmony in the vascular division by finding a way to share fees" with Dr. White. That response was shocking and unacceptable to me, so I went to Dr. Van Natta and repeated my concerns to him in late February 2014 or early March 2014. Dr. Van Natta told me that I should "keep my head down" during my six-month probationary period, which would end in April 2014. In the Fall of 2014, I personally explained my concerns to Dr. Brant Putnam.

9. I was aware that the Harbor Professional Staff Association ("PSA") conducted a Focused Professional Performance Evaluation ("FPPE") of Doctor White in 2014 because the FPPE team interviewed me. I told that team – which included Dr. DeVirgilio – about my concerns and conclusions about Dr. White and the Medtronic kickbacks, and provided them with documentation including BH's medical records

10. However, as 2014 drew to an end, I saw no action that suggested that Harbor was doing anything to stop Dr. White and his team from conducting medically unwarranted stent graft implants or collecting money from Medtronic for doing so. In January 2015, I decided to report the issue to outside criminal authorities. I called the Los Angeles District Attorney's Office and spoke to a Deputy District Attorney on approximately January 12, 2015, describing my concerns that Harbor physicians were getting kickbacks for implanting devices that were not medically indicated. I provided the Deputy District Attorney with Exhibit A and suggested she interview BH. The Deputy District Attorney told me that the District Attorney's Office would investigate, and later interviewed me.

11. Shortly after my call with the Deputy District Attorney in January 2015, I told Dr. DeVirgilio that I had reported my concerns to the District Attorney's Office and that they would be investigating.

12. In the Summer of 2015, shortly after Dr. Ryan's report to the District Attorney's Office, I observed that Medtronic stopped offering its "courses" at Harbor, and payments for the courses ceased.

13. I have reviewed Dr. White's January 26, 2015 email accusing me of violations of privacy (Exhibit 340), his February 4th affidavit and materials expanding on that accusation (Exhibit 341), his Request for Corrective Action (Exhibit 351), and his Addendum to his Request for Corrective Action (Exhibit 359). All of the requests for information that Dr. White complains about in those documents refer either to my gathering of information about Harbor doctors' surgical records to provide to the NIH or gathering of documents showing unwarranted implantation of stent grafts that I provided to the District Attorney and other authorities.

14. The patient records Dr. White attached to his affidavit, Exhibit 341 -- purporting to be a patient list created at my request – has a creation date of January 30, 2015, which is well after I gathered *different* information in December 2014 to submit to the NIH and even after the completion of the BEST-CLI audit. In other words, it was

falsely presented as something I asked for.

15. When the Ad Hoc Committee handling my FPPE contacted me and asked to interview me, I was concerned that I would not be treated fairly. I first asked that I be permitted to bring my attorney to the meeting; that request was refused by Dr Ravin Kumar. I then asked that the questions be provided to me in writing. Dr Kumar refused that request and so I declined to meet with him.

16. I have reviewed the FPPE that the MEC commissioned regarding me. All of the complaints in the FPPE accusing me of accessing or requesting medical records relate to my gathering of information to provide to the NIH and the District Attorney's Office. The allegations regarding my interpersonal behavior are exaggerated or untrue. I have not yelled at patients. I have raised my voice, arguably to a yell, in the operating room on rare occasions when I believe someone is doing something that risks immediate harm to the patient. I have not yelled at colleagues about "stealing patients."

17. Moreover, I have repeatedly observed other physicians at Harbor yelling and swearing on the premises: yelling and swearing at nurses and fellow doctors in the operating room, and yelling and swearing at other doctors in clinical settings. I have personally observed Dr. Putnam and Dr. Donayre yell in the operating room. I have never seen any of these doctors be disciplined by any entity for this behavior.

18. Prior to the FPPE, nobody at Harbor ever counseled or advised me about yelling or raising my voice in the operating room. In fact, nobody counseled me about any of the conduct complained of in the FPPE or any of Dr. White's complaints, Request for Corrective Action, or Addendum to the same.

19. In approximately 1983, 30 years before applying for privileges at Harbor, I pleaded no contest to misdemeanor Malicious Mischief after some friends and I damaged some outdoor furniture at a fast food restaurant while playing rough. I served community service and paid to have the furniture fixed. I disclosed all of that in writing in my 2013 application for privileges at Harbor. **Exhibit B** is a true and correct page of my privileges application making the disclosure. That page was in my privilege file

produced by defendants in discovery in this action.

20. The MEC invited me to attend a June 27, 2016 meeting to respond to their charges. I responded that I would come with my attorney. Initially Dr. Putnam told me I could not bring my attorney. However, on the morning of the meeting, they abruptly told me I could, by which time my attorney was no longer available. I therefore asked to reschedule a time when my attorney was available.

21. When the MEC presented me with its proposed Behavioral Contract, I reviewed it with my attorneys. I promptly visited Dr. De Virgilio and told him that I could not sign the Behavioral Contract because it required me to admit to things that were not true, that it was illegal in that it purported to restrict me from reporting misconduct to entities outside of Harbor, and that it was illegal because it forced me to waive claims against the MEC and Hospital. I have never been informed that anyone at Harbor filed any breach report with the California Department of Public Health related to a violation of HIPAA or the Confidentiality of Medical Information Act or otherwise notifying any external agency accusing me of unlawful access to patient information.

22. Since the PSA's proceedings against me in 2016, I have applied to dozens of surgeon positions. Those applications require me to disclose whether I have ever been investigated by a Professional Staff Association. I have not received any response from the vast majority of my job applications. In all but three or four occasions in which I have received a request for follow-up information, the process has stopped short of an interview. This is consistent with my understanding and professional experience over my career that hospitals and practices will not hire surgeons who are the subject of peer review investigations regarding their privileges.

23. In their Motion, Defendants assert that the Ad Hoc Committee that conducted my FPPE was neutral and none were known to harbor retaliatory motives. In fact, Dr. Kumar was openly a friend of Dr. White, and Dr's. Derdemezi and Jonas were on the MEC when the MEC rescinded Dr. White's opens surgical privileges based on my complaints against him regarding the Medtronic fraud and the NIH application

fraud. Dr's Jonas and Derdemezi- and Dr's Putnam and Vintch all knew that my allegations supported and resulted in Dr. White losing open surgical privileges. Despite this knowledge, Dr's Jonas, Derdemezi, Putnam and Vintch endorsed the statements in my FPPE claiming that Dr White had been "cleared".

 I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed on November 15, 2021 in Los Angeles, California.

                TIMOTHY RYAN, M.D.

# EXHIBIT A

# EXHIBIT B

Timothy Ryan, MD PSA Application

Supplement to Attestation

1. Thirty years ago, I pleaded Nolo Contendere to misdemeanor Malicious Mischief.
Some friends and I had been playing rough at the outside tables at a fast-food restaurant. Some of the furniture was bent. We were assigned some community service, paid a fine, and paid to have the furniture repaired.

*[signature]*
7/5/13

DEF011581



Tim Ryan <tjryanmd@gmail.com>

**Rowena Buwalda** <rbuwalda@dhs.lacounty.gov>  Wed, Jan 8, 2014 at 4:34 PM
To: "j_galovich@yahoo.com" <j_galovich@yahoo.com>
Cc: "tjryanmd@gmail.com" <tjryanmd@gmail.com>, Rodney white <rawhite@ucla.edu>, "cdonayre@cox.net" <cdonayre@cox.net>, "guptamd02@aol.com" <guptamd02@aol.com>

Hi Justin,

Just wanted to inform you that we informed ▮▮▮▮▮▮ to come through the ER tomorrow morning complaining of chest pain. She has Health Net HMO. We would not be able to get authorization in time for us to do the CT scan.

Dr. White & I spoke with the patient earlier this afternoon. This is our best option at this point.


Thanks,

Rowena