1  LINDA MILLER SAVITT, SBN 94164
   lsavitt@brgslaw.com
2  JOHN J. MANIER, SBN 145701
   jmanier@brgslaw.com
3  LINDA B. HUREVITZ, SBN 127337
   lhurevitz@brgslaw.com
4  BALLARD ROSENBERG GOLPER & SAVITT, LLP
   15760 Ventura Boulevard, Eighteenth Floor
5  Encino, California 91436
   T: (818) 508-3700 | F: (818) 506-4827
6
   Attorneys for Defendants BRANT PUTNAM,
7  M.D., JANINE VINTCH, M.D., ANISH
   MAHAJAN, M.D., CHRISTIAN DE VIRGILIO,
8  M.D., HAL F. YEE, M.D., ROGER LEWIS, M.D.,
   and MITCHELL KATZ, M.D.
9

10              **UNITED STATES DISTRICT COURT**

11     **CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION**

12

13  TIMOTHY D. RYAN, M.D., an           Case No. 2:17-cv-05752-CAS-RAO
    individual,
14                                      [*Hon. Christina A. Snyder*]
              Plaintiff,
15                                      **RESPONSE TO PLAINTIFF'S**
         vs.                            **STATEMENT OF GENUINE**
16                                      **DISPUTES OF MATERIAL FACT**
    BRANT PUTNAM, M.D., an              **RE: MOTION OF DEFENDANTS**
17  individual, JANINE VINTCH, M.D., an **BRANT PUTNAM, M.D. AND**
    individual, ANISH MAHAJAN, M.D.,    **JANINE VINTCH, M.D. FOR**
18  an individual, CHRISTIAN DE         **SUMMARY JUDGMENT OR,**
    VIRGILIO, M.D., an individual, HAL  **ALTERNATIVELY, PARTIAL**
19  F. YEE, M.D., an individual, ROGER  **SUMMARY JUDGMENT**
    LEWIS, M.D., an individual, and
20  MITCHELL KATZ, M.D., an             Date:      December 6, 2021
    individual,                         Time:      10:00 a.m.
21                                      Ctrm:      8-D
              Defendants.
22                                      Action Filed:  August 3, 2017
                                        Trial Date:    April 26, 2022
23

24         Defendants Brant Putnam, M.D. and Janine Vintch, M.D. respond to Plaintiff

25  Timothy Ryan, M.D.'s Statement of Genuine Disputes of Material Fact in Opposi-

26  tion to Summary Judgment. Part I of this Response ("RSF") replies to Plaintiff's

27  responses to Defendants' 46 Uncontroverted Facts and Supporting Evidence, and

28  Part II responds to his Additional Material Facts and Supporting Evidence.

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

# I.    Reply to Plaintiff's Responses to Defendants' Uncontroverted Facts and Supporting Evidence

| Defendants' Uncontroverted Facts and Supporting Evidence: | Plaintiff's Response and Supporting Evidence |
|---|---|
| **1.**    Harbor-UCLA Medical Center ("Harbor-UCLA") is owned by the County of Los Angeles ("County") and operated by the County's Department of Health Services ("DHS").<br><br>Declaration of Brant Putnam, M.D. ("Putnam Decl.") ¶ 2; Declaration of Janine Vintch, M.D. ("Vintch Decl.") ¶ 2; Doc. 14 (1st Am. Cmplt.) ¶ 5. | Undisputed. |
| **2.**    In order for any physician to practice and treat patients at Harbor-UCLA, they must hold a license issued by the California Medical Board, and separately must hold medical staff privileges to practice and treat patients at Harbor-UCLA, which are granted by the Harbor-UCLA Professional Staff Association ("PSA") and must be renewed every two years.<br><br>Putnam Decl. ¶ 2; Vintch Decl. ¶ 2; Deposition of Timothy Ryan, M.D. ("Ryan Depo.") 103:9-12; Ex. 301 §§ 4.1-3, 6.4-2. | Disputed that the PSA grants privileges. The Credentials Committee of the Medical Executive Committee ("MEC") does so. Otherwise undisputed.<br><br>Deposition of Brant Putnam, attached as Exhibit C to Declaration of Kenneth White ("White Decl.") ("Putnam Depo."), 8:2-9; Deposition of Janine Vintch, attached as Exhibit D to White Decl. ("Vintch Depo."), 15:5-16:2. |
| **DEFENDANTS' REPLY:** Plaintiff raises no genuine dispute. The MEC is part of the PSA. (*See* RSF 5, *infra*.) ||
| **3.**    Harbor-UCLA's PSA functions in accordance with Bylaws, which were adopted to organize Harbor-UCLA's medical staff, and provide a framework for the medical staff's self-governance, appointment, credentialing, privileging, and oversight, as well as its peer review | Disputed to the extent the statement implies that these are the only rules governing the PSA.  The PSA is also governed by California law.  Otherwise undisputed. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| policies and due process rights guarantees.<br><br>Putnam Decl. ¶ 6; Vintch Decl. ¶ 6; Ex. 301 at 3. | Cal. Evid. Code § 1157, Cal. Bus. & Prof. Code §§ 809 *et seq.* |

**DEFENDANTS' REPLY:** Plaintiff raises no genuine dispute, as RSF 3 obviously does not suggest California law is somehow inapplicable to the PSA.

| | |
|---|---|
| **4.**    Among other things, the PSA monitors physicians' compliance with credentialing requirements, and evaluates all members and applicants in accordance with peer review criteria, adopted consistent with the Bylaws and the PSA's peer review process.<br><br>Putnam Decl. ¶ 7; Vintch Decl. ¶ 7; Ex. 301 § 6.1. | Undisputed this is what the PSA is supposed to do.  Disputed this is what it does.<br><br>Here, the PSA ignored and failed to follow its own bylaws and practices about counseling physicians before initiating FPPE proceedings against them and by altering minutes to conceal information.   Plaintiff's Exh. 301 at 48 [Bylaws on progressive steps]; Ryan Decl. at ¶ 18 [lack of any counseling prior to FPPE action]; Putnam Depo., 72:10-73:2, 75: 9-76:4, 76:5-7 [normal practice of counseling and lack of counseling of Dr. Ryan]; De Virgilio Depo., 44:6-17, 44:18-45:2, 74:22-75:7 [lack of counseling of Dr. Ryan].  In addition, Defendants altered minutes of MEC meetings to remove information contradicting its approach.  White Decl., Exh. 365 [unedited September 28, 2015 minutes], Exh. 360 at 1 [email circulating edited minutes for revision in December 2016], 360 at 4287 [altered minutes of September 28, 2015], Exh. 362 [original April 25, 2016 minutes], Exh. 360 at 4270-71 [altered April 25, 2016 minutes]. |

**DEFENDANTS' REPLY:** Plaintiff egregiously misstates the evidence and raises no genuine dispute. The PSA did not ignore or fail to follow its Bylaws, which specify that "collegial intervention efforts are encouraged but are not mandatory,

and shall be within the discretion of the appropriate Association and Medical Center management." (Doc. 61-7, D-Ex. 301 at 48, § 6.2-1.5.)

When asked in his deposition if an FPPE was done whenever someone yelled or screamed in the operating room, Dr. Putnam responded: "If they do it once, maybe twice, and I speak to them and they behave more professionally after that, then usually there's no FPPE. If there's a pattern of behavior from multiple staff in multiple areas that is concerning and potentially disruptive to the care of patients, then that's where it raises to the level of concern that I might bring that up to either my boss, the department chair, or to the PSA." (Doc. 62-3, Putnam Depo. 72:10-73:2.)

Dr. de Virgilio testified that although he didn't give Plaintiff "sort of a formal counsel" in general or specifically as to Dr. White's invasion of privacy complaint made to human resources (Doc. 62-5, P-Ex. 341), Dr. de Virgilio did speak to Plaintiff "about his sometimes explosive temper"—including by "offering to send him a book to try to help with being more positive" and trying "to talk to him about just being a little more … collaborative," but Plaintiff told Dr. de Virgilio "that he wasn't able to be like [Dr. de Virgilio] in terms of holding things in." Dr. de Virgilio added that "it was challenging but "it was challenging to provide counseling because he would get angry and sort of flip the script," "was intimidating," and "would say threatening things"—including by warning Dr. de Virgilio to get his "own personal attorney because things were not looking good for [him]." (Supplemental Decl. of J. Manier ("Supp. Manier Decl."), de Virgilio Depo. 41:25-46:5, 73:20-78:4, submitted herewith.)

There also is no evidence the PSA "altered minutes to conceal information" supposedly "contradicting its [sic] approach." Plaintiff's Exhibit 365 (Doc. 62-5) has a watermark explicitly stating it is merely a "DRAFT" of minutes from September 28, 2015, not "unedited … minutes." Plaintiff's Exhibit 360 at 1 (Doc. 62-5) says nothing about "edited minutes for revision" and raises no such inference. Exhibit 360 at 4287 (same as Doc. 61-7, D-Ex. 11) does not represent "altered minutes," but merely varies from the "DRAFT" and excludes discussion of topics other than Dr. White's Corrective Action Request that were included in the draft. No signed version of the September 2015 minutes has been located by Defendants or produced in this case. (Supp. Manier Decl. ¶¶ 4-5.)

Moreover, the first three pages of Plaintiff's Exhibit 362 were submitted with Defendants' Motion as the "original April 25, 2016 minutes." (Doc. 61-7, D-Ex. 14.) Defendants' Motion did not include what Plaintiff baselessly calls "altered" minutes (Doc. 62-5, P-Ex. 360 at 4270-71.)

In a portion of his deposition transcript omitted from Plaintiff's opposition, Dr. Putnam testified that "clearly one of the attorneys … was requesting" production of

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

minutes in December 2016, and that he asked Dr. Vintch to look them over to confirm "that they're accurate with regard to the content of the meeting." Dr. Putnam added that this "should have been done earlier but … there was a lot of variability and moving people in a medical staff office," so he surmised there were "probably some difficulties in locating the minutes." Not surprisingly, Dr. Putnam did not recall five years later whether any changes were made to the minutes. (Supp. Manier Decl., Putnam Depo. 92:7-95:7.) Although there are items included from one set of minutes and excluded from the other, and *vice versa*, Plaintiff has not identified any material contradictions in the documents. (*See* RSF 103, 149, *infra*.)

| | |
|---|---|
| **5.**   The PSA has a Medical Executive Committee ("MEC"), which includes the PSA's Officers and the Chair of each PSA Department (*e.g.*, Roger Lewis, M.D., as Chair of Emergency Medicine from 2013 to 2020), among others, as well as several *ex officio* members without voting privileges, including Harbor-UCLA's Chief Medical Officer ("CMO")—but did not include Hal Yee, M.D. after 2013, or Mitchell Katz, M.D. at any time.<br><br>Putnam Decl. ¶¶ 4-5; Vintch Decl. ¶¶ 4-5; Ex. 301 §§ 9.1, 10.1, 11.2; Doc. 14 ¶¶ 6-12. | Undisputed. |
| **6.**   Brant Putnam, M.D. was a member of the MEC from 2011 to 2021, and served as President of the PSA and Chair of the MEC from July 1, 2015 to June 30, 2018.<br><br>Putnam Decl. ¶ 4; Vintch Decl. ¶ 5; Ex. 301 § 11.2-2; Ryan Depo. 26:14-17, 215:3-13. | Undisputed. |
| **7.**   Janine Vintch, M.D. has been a member of the MEC since 2006; she was Vice President of the PSA and Vice Chair of the MEC from July 1, 2015 to June 30, 2018, and President of the PSA | Undisputed. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| and Chair of the PSA from July 1, 2018 to June 30, 2021.<br><br>Putnam Decl. ¶ 4; Vintch Decl. ¶ 5. | |
| **8.** Christian de Virgilio, M.D. has been Chair of Harbor-UCLA's Department of Surgery since January 2016, after serving one year as Interim Chair, and has been a member of the MEC as Chair and Interim Chair.<br><br>Putnam Decl. ¶ 5; Vintch Decl. ¶ 5; Ryan Depo. 79:24-80:4, 244:15-245:25; Doc. 14 ¶ 9. | Undisputed. |
| **9.** Timothy Ryan, M.D. was employed by DHS at Harbor-UCLA as a Staff Vascular Surgeon, Physician Specialist, from October 2013 to October 2018, and first obtained medical staff privileges in 2013.<br><br>Putnam Decl. ¶ 9; Vintch Decl. ¶ 9; Ryan Depo. 248:2-12; Doc. 14 ¶¶ 1, 5. | Undisputed. |
| **10.** Dr. Ryan applied for renewal of his medical staff privileges in September 2015, which required the approval of Dr. de Virgilio as Department Chair; Dr. de Virgilio gave his approval without qualification, and Dr. Ryan's renewal application was approved for the period from October 1, 2015 through September 30, 2017.<br><br>Putnam Decl. ¶ 9; Vintch Decl. ¶ 9; Exs. 8, 9. | Disputed. Dr. De Virgilio qualified his recommendation with a notation that Dr. Ryan was being investigated based on Dr. White's complaints. Dr. De Virgilio also qualified the approval with a claim that Dr. Ryan "says he was convicted of a crime, not explained," even though Dr. Ryan had explained that he pled no contest to a Malicious Mischief misdemeanor 30 years earlier. Otherwise undisputed.<br><br>Appendix of Exhibits in Support of Defendants' Motions For Summary Judgment ("Defendants' Exhibits"), Exh. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| | 8; Declaration of Dr. Timothy Ryan ("Ryan Decl.") at ¶ 19.) |
| **DEFENDANTS' REPLY**: Plaintiff raises no genuine dispute. He partially quotes from the "COMMENTS REQUIRED FOR ALL" section of the reappointment evaluation, which did not qualify Dr. de Virgilio's approval of Plaintiff's renewal of privileges. Plaintiff also quotes from his original 2013 application regarding his misdemeanor conviction, but does not offer evidence that Dr. de Virgilio saw this "explanation" or cared about the conviction. | |
| **11.**     Rodney White, M.D., was Harbor-UCLA's Chief of the Division of Vascular Surgery during Dr. Ryan's employment until Dr. White retired at the end of April 2016; from September 2013 to August 2015, Dr. White supervised Dr. Ryan and was supervised by the Department Chair, Dr. de Virgilio.<br><br>Putnam Decl. ¶¶ 11, 18; Vintch Decl. ¶¶ 11, 18; Doc. 14 ¶ 16. | Disputed.  Dr. Ryan did not begin work until October 4, 2013.  Otherwise undisputed.<br><br>Ryan Decl. at ¶ 2. |
| **DEFENDANTS' REPLY**: The one-month error in this fact is immaterial, as is the erroneous implication that Dr. de Virgilio was Department Chair before 2015. (*See* RSF 8-9, *supra*.) | |
| **12.**     In August 2015, after Dr. White filed a lawsuit against Dr. Ryan (Los Angeles Superior Court No. BC589493, filed July 29, 2015), it was decided that Dr. Ryan would instead report directly to Dr. de Virgilio.<br><br>Putnam Decl. ¶¶ 11, 18; Vintch Decl. ¶¶ 11, 18; Ryan Depo. 211:5-212:2; Doc. 14 ¶ 16; Decl. of John J. Manier ("Manier Decl."), Ex. 25. | Undisputed. |
| **13.**     Dr. Ryan participated in a Focused Professional Practice Evaluation ("FPPE") concerning Dr. White in late August or early September 2014, after | Undisputed. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| Dr. Ryan had made a complaint against Dr. White. <br><br> Ryan Depo. 45:24-46:5, 56:15-60:13, 141:4-11, 164:2-6. | |
| **14.** Dr. White made a Request for Corrective Action to be taken against Dr. Ryan to the PSA on August 25, 2015, in which Dr. White claimed, *inter alia*, that Dr. Ryan "engaged in conduct detrimental to the delivery of quality patient care, disruptive and deleterious to the operations of the Medical Center, the improper use of Medical Center resources, and below applicable professional standards," and specifically alleged Dr. Ryan invaded his personal privacy, and violated both the Health Insurance Portability and Accountability Act ("HIPAA") and California's Confidentiality of Medical Information Act, by accessing confidential patient information in Dr. White's office. <br><br> Putnam Decl. ¶ 11; Vintch Decl. ¶ 11; Ex. 351; Ryan Depo. 36:2-37:2, 214:12-15, 217:25-218:13. | Disputed to the extent it implies this was Dr. White's first complaint. Dr. White made his first complaint on the same basis on January 26, 2015 and February 4, 2015. The MEC believed it investigated the issue "adequately" and investigation determined "no HIPAA violation occurred on the part of Dr. Ryan." Otherwise undisputed. <br><br> White Decl., Exh. 340, 341, 365 at p.3. |

**DEFENDANTS' REPLY:** Plaintiff egregiously misstates the evidence and raises no genuine dispute. Exhibit 340 is not included with Plaintiff's Opposition. Exhibit 341 shows that Dr. White's complaint of January-February 2015 was explicitly directed to DHS, not the MEC. And page 3 of Exhibit 365 states that "this was taken to Performance Management in DHS for investigation." (Doc. 62-5, P-Ex. 365 at 2361.) There is no evidence the MEC investigated the January-February 2015 complaint or "believed" it had done so.

| | |
|---|---|
| **15.** The MEC discussed Dr. White's Corrective Action Request at its meeting on September 28, 2015; MEC members felt the behavior reported by Dr. White, | Disputed. This recitation is based on the altered version of the minutes of the September 28, 2015 MEC meeting. The original minutes show that the MEC |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

if confirmed, would be considered unprofessional, and that Dr. White's allegations met the PSA Bylaws' criteria for initiation of an investigation; but the MEC concluded each issue needed to be thoroughly investigated by the appropriate County bodies, so the PSA initially did not participate in reviewing any of Dr. White's allegations.

Putnam Decl. ¶ 12; Vintch Decl. ¶ 12; Ex. 11.

discussed and acknowledged the following:

• That Dr. White had previously complained about Dr. Ryan six to nine months before;

• That Dr. Ryan "somehow found out or looked up how many cases Dr. White had completed and contacted the NIH saying that Dr. White is committing medical fraud for being a participant in the study while he had not completed enough cases in order to participate";

• That Dr. White "said that Dr. Ryan committed a HIPAA violation because he must have gone through medical records to find out what his cases and case quality was";

• That an investigation found that Dr. White had not conducted the number of cases he represented in his application to the study;

• That the PSA had "spent months and worked very diligently on this and ultimately there was no resolution" and "now we are being asked to investigate this again,"

• That the PSA had referred the alleged HIPAA violation to the Compliance Officer, who concluded based on their review there was no HIPAA violation;

• That "these complaints were taken seriously and went appropriately to HR Performance Management and the HIPAA Compliance Officer and the difference now is that there are attorneys involved and litigation";

• That "We had a recognized HIPAA Compliance Officer review the case and it was found that no HIPAA violation occurred on the part of Dr. Ryan. About

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| | six months later Dr. White decided to bring his own attorney in and sue Dr. Ryan.  Concurrently Dr. White sent an email to Dr. Van Natta and Dr. Putnam Requesting PSA corrective action against Dr. Ryan."<br><br>• That "Dr. Ryan considers himself a whistleblower because he thought this bad thing happened and he wanted to do right.  He further believes that any action taken against him, by us, would be considered retaliation."<br><br>• That "To take a corrective action beyond the investigation could be considered retaliation because we feel this issue has been investigated adequately.  On the other hand it is not necessarily under the purview of the whistleblower to do their own investigation and start digging into whatever they want."<br><br>White Decl., Exh 365 at p.3. |

**DEFENDANTS' REPLY:** Plaintiff egregiously misstates the evidence and raises no genuine dispute. There is no evidence of an "altered version of the minutes." Plaintiff's Exhibit 365 (Doc. 62-5) has a watermark explicitly stating it is merely a "DRAFT" of minutes from September 28, 2015. Plaintiff partially quotes the draft minutes, but omits material portions—including the statement that "this was taken to Performance Management in DHS for investigation." (Doc. 62-5, P-Ex. 365 at 2361.) This refutes Plaintiff's false assertion that the MEC itself conducted that earlier investigation. (*See* RSF 14, *supra*, and RSF 18, 21, 85, 101, *infra*.)

The draft minutes include discussion of not only Dr. White's Corrective Action Request, but also Dr. Ryan's request to amend the PSA bylaws and a redacted portion pertaining to another physician. (*See* P-Ex. 365 at 2359-66.) By comparison, the non-draft minutes included with the moving papers pertain only to discussion of Dr. White's Request. (*See* Doc. 61-7, D-Ex. 11.)

| | |
|---|---|
| **16.**   In or about December 2015, Dr. White submitted an Addendum to the Request for Corrective Action, in which he alleged that Dr. Ryan was "continuing | Undisputed that this was part of the language.  The full second paragraph reads: |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| to engage in conduct which is detrimental to the delivery of quality patient care, disruptive and deleterious to the operations of the Medical Center, and below applicable professional standards"; Dr. White also alleged that a "continuing pattern of harassment, and unscrupulous conduct by Dr. Ryan, is having a severe impact on me, as a member of the medical staff, and on my personal and professional life," and cited a complaint by Dr. Ryan against Dr. White with the County Intake Specialist Unit ("CISU"), which "had been initially investigated" but "was considered closed" as of November 24, 2015.<br><br>Putnam Decl. ¶ 13; Vintch Decl. ¶ 13; Declaration of Benjamin Stormer ("Stormer Decl.") ¶ 9; Exs. 22, 23, 359. | "On November 19, 2015 I was advised by the County's Intake Specialist Unit that Dr. Ryan filed a complaint against me. On November 24, 2015, I received another letter from that same unit, that the complaint had been initially investigated, that the allegations would not be investigated further and that the matter was considered closed. Enclosed are copies of both letters. This continuing pattern of harassment, and unscrupulous conduct by Dr. Ryan, is having a severe adverse impact on me, as a member of the medical staff, and on my personal and professional life."<br><br>Defendants' Exhibits, Exh. 359. |

**DEFENDANTS' REPLY:** Plaintiff raises no genuine dispute, but fully quotes a paragraph that Defendants had accurately summarized.

| | |
|---|---|
| **17.**   The allegations in Dr. Ryan's November 13, 2015 CISU complaint against Dr. White were the same as those asserted in Dr. Ryan's March 17, 2015 CISU complaint against Dr. White; both were closed after an initial investigation because neither alleged or involved any protected basis jurisdictional to the County Policy of Equity (which protects employees' right to be free from discrimination, sexual harassment, retaliation, and other harassment or inappropriate conduct toward based on a state or federally-protected characteristic). | Undisputed that the County closed both investigations without action.  Disputed that the complaints did not allege or involve any protected basis jurisdictional to the County Policy of Equity.  Dr. Ryan reported retaliation against him for reporting violations of the law, which is expressly forbidden under the County Policy on Equity.<br><br>Defendants' Exhibits, Exh. 20 at pages 5-2, 5-4 ["Retaliation for purposes of this Policy is an adverse employment action against another for reporting a protected incident or filing a complaint of conduct that violates this Policy or the law or participating in an investigation, administrative proceeding, or otherwise |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| Stormer Decl. ¶¶ 1-9; Exs. 20, 21, 22, 23. | exercising their rights or performing their duties under this Policy or the law."], 5-5; Exh. 21, 22 [reporting retaliation for reporting violations of law]. |

**DEFENDANTS' REPLY:** Plaintiff misconstrues the County Policy of Equity and raises no genuine dispute. Plaintiff alleged retaliation based on his report that Dr. White allegedly conspired to commit fraud and performed unnecessary surgery. The Policy of Equity's references to "retaliation" are within the context of the Policy's protections against discrimination and harassment based on a state or federally-protected characteristic, and do not refer to whistleblower retaliation. In any event, it is undisputed the CISU complaints were closed based on no-jurisdiction findings.

| | |
|---|---|
| 18.     Dr. White's allegations against Dr. Ryan in the Corrective Action Request and Addendum (collectively the "Corrective Action Request" or "Request") met the PSA Bylaws' criteria for initiation of an investigation, which include a physician's disruptive and inappropriate conduct.<br><br>Putnam Decl. ¶¶ 12-14; Vintch Decl. ¶¶ 12-14; Ex. 301 §§ 2.5-2, 2.5-3, 6.1-3.2-d, 6.2-3. | Disputed.  The PSA had investigated Dr. White's allegations months before, believed that its investigation was investigated adequately, and determined they were without merit.<br><br>White Decl., Exh 365 at p.3. |

**DEFENDANTS' REPLY:** Plaintiff egregiously misstates the evidence and raises no genuine dispute. The cited evidence states that "this was taken to Performance Management in DHS for investigation"—not the PSA. (Doc. 62-5, P-Ex. 365 at 2361; *accord* P-Ex. 341 (Jan.-Feb. 2015 complaint directed to DHS, not MEC).) There is no evidence the PSA investigated the earlier complaint or "believed" it had done so.  And even if one were to briefly indulge Plaintiff's false premise, the Bylaws do not prohibit or even discourage a second investigation under PSA auspices.

| | |
|---|---|
| 19.     The MEC discussed Dr. White's Corrective Action Request at a special session on December 28, 2015, which was attended by Drs. Putnam and de Virgilio but no other Defendants, and at which the MEC noted the next step | Undisputed. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| would be to complete an FPPE on Dr. Ryan because of the allegations of questionable conduct, it would be necessary and fair to conduct fact-finding before any corrective action was considered against Dr. Ryan, and such fact-finding was warranted under the Bylaws.<br><br>Putnam Decl. ¶ 14; Vintch Decl. ¶ 14; Ex. 12; Ex. 301 §§ 2.5-2, 2.5-3, 6.1-3.2-d, 6.2-3, 6.2-5. | |
| **20.**   FPPE is not disciplinary in and of itself, but rather is a peer review process, subject to strict confidentiality, with no preordained course; if FPPE fact-finding reveals adverse information, then various actions may be taken under the Bylaws, varying in degree from placing documentation in the member's peer review file up to recommending corrective action under the Bylaws.<br><br>Putnam Decl. ¶ 15; Vintch Decl. ¶ 15; Ex. 301 § 6.1-5.1; Cal. Evid. Code § 1157. | Disputed that an FPPE is not "disciplinary," except in a contrived meaning of that word.  The MEC identified and understood an FPPE to be an investigation of alleged misconduct.<br><br>White Decl., Exh. 360 at p. DEF004265 (recommending an FPPE "to evaluate Dr. Ryan's behavior and develop a recommended course of action"). |
| **DEFENDANTS' REPLY:** Plaintiff misconstrues the evidence and raises no genuine dispute. The quotation from the cited minutes—recommending an FPPE "to evaluate Dr. Ryan's behavior and develop a recommended course of action"—is entirely consistent with FPPE being a peer review process which *may result* in corrective action (*e.g.*, discipline), but is not disciplinary in and of itself and has no preordained course. Plaintiff himself was not subject to recommended discipline until after he rejected the Behavioral Contract. (*See* RSF 30-34, *infra*.) | |
| **21.**   Pursuant to the PSA Bylaws, on December 28, 2015, the MEC directed a FPPE to be undertaken by an "Ad Hoc Committee," which included the following five members appointed by | Undisputed that the MEC directed the FPPE be undertaken and these individuals were appointed.  Disputed that it was "pursuant to the PSA Bylaws," in that the MEC believed it |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| Dr. de Virgilio as Department Chair: Drs. Jeanette Derdemezi (Chair of the Department of Anesthesiology), Adam Jonas (Chair of Pediatrics), Robert Hockberger (Emergency Medicine), Ravin Kumar (Chief of Colorectal Surgery, and Chair of the Ad Hoc Committee), and Bassam Omari (Cardiac Surgery).<br><br>Putnam Decl. ¶ 16; Vintch Decl. ¶ 16; Ryan Depo. 79:6-80:4, 80:18-82:7, 226:23-227:7, 244:15-247:16; Ex. 12; Ex. 301 § 6.2-5. | investigated the issue "adequately" and the previous investigation determined "no HIPAA violation occurred on the part of Dr. Ryan."<br><br>White Decl., Exh 365 at p.3. |

**DEFENDANTS' REPLY:** Plaintiff egregiously misstates the evidence and raises no genuine dispute. The cited evidence states that "this was taken to Performance Management in DHS for investigation"—not the MEC. (Doc. 62-5, P-Ex. 365 at 2361; *accord* P-Ex. 341 (Jan.-Feb. 2015 complaint directed to DHS, not MEC).) There is no evidence the MEC investigated the earlier complaint or "believed" it had done so.

| | |
|---|---|
| 22.   None of the Ad Hoc Committee members were members of Dr. Ryan's division (Vascular Surgery); the MEC viewed each of the members as neutral in connection with Dr. Ryan and Dr. White; and none of these members allegedly harbored retaliatory motives against Dr. Ryan based on constitutionally-protected speech.<br><br>Putnam Decl. ¶ 16; Vintch Decl. ¶ 16; Ryan Depo. 45:24-52:20. | Disputed.  The MEC knew that several members of the Ad Hoc Committee were not neutral.  Dr. Kumar was a friend of Dr. White and Dr. Dermedezi [*sic*] and Dr. Jonas were on the MEC when it failed to act on Dr. Ryan's complaints about Dr. White.<br><br>Ryan Decl. at ¶ 23. |

**DEFENDANTS' REPLY:** Plaintiff misstates the evidence and raises no genuine dispute. He provides no competent foundation for his conclusory declaration assertion that "Dr. Kumar was a friend of Dr. White." And far from claiming the MEC "failed to act" on his complaints against Dr. White, Plaintiff testifies that "the MEC rescinded Dr. White's opens [*sic*] surgical privileges" based on those complaints, while Drs. Derdemezi and Jonas were on the MEC. (Doc. 62-4, Ryan

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

Decl. ¶ 23; *see* Deft's Objections to Ryan Decl., submitted herewith.) Most importantly, Plaintiff does not purport to dispute that *none* of the Ad Hoc Committee members allegedly harbored retaliatory motives against Dr. Ryan based on constitutionally-protected speech.

| | |
|---|---|
| **23.** Dr. Ryan refused to meet with the Ad Hoc Committee after it rejected his demands that he be provided all questions in writing or be allowed to bring his lawyer.<br><br>Ryan Depo. 223:17-224:14; Putnam Decl. ¶ 17; Vintch Decl. ¶ 17; Ex. 5 at 1. | Disputed. Dr. Ryan, fearing that he would not be treated fairly, requested (not demanded) that he be given the questions in writing or that he be allowed to have an attorney present, but Dr. Kumar refused.<br><br>Ryan Dec. at ¶ 15. |

**DEFENDANTS' REPLY:** Plaintiff raises no genuine dispute, but merely adds his own subjective reasons for admittedly refusing to meet with the Ad Hoc Committee, and states a patently disingenuous preference for the word "requested" rather than "demanded." Plaintiff admittedly placed alternative conditions on meeting with the Committee, and when they were rejected, he refused to meet. Those are "demands" by any reasonable definition.

| | |
|---|---|
| **24.** After engaging in fact-finding and interviewing 13 witnesses, on February 26, 2016, the Ad Hoc Committee issued a FPPE report for the MEC's review, which included unanimous committee findings and recommendations with respect to Dr. Ryan's conduct, which it found to be unprofessional, and also included the following summary:<br><br>    The Ad Hoc Committee believes that Dr. Ryan's behavior is well below expected standards for professional conduct. Further, the committee believes that Dr. Ryan's behavior has had serious adverse impacts on the wellbeing of many health care professionals including attending physicians, physician trainees, nurses and other ancillary staff. His unauthorized access of the | Undisputed that the FPPE report asserted this. Disputed that it was true.<br><br>Dr. Ryan has not, as the FPPE claimed, yelled at patients, and has only raised his voice in the operating room when someone is doing something that risks imminent harm to patients. Ryan Decl. at ¶ 16. Moreover, the FPPE and its supporting witness statements repeatedly assert that the NIH found Dr. Ryan's complaint without merit, when in fact the NIH investigation found that doctors had falsified their qualifications and halted Harbor from admitting patients to the trial. Defendants' Exhibits, Exh. 356 at 2 [White statement], 4 [De Virgilio Statement], 9 [Donayre statement]; Exs. 24 [Result of BEST-CLI investigation]; White Decl., Exh. 331 [result of BEST-CLI investigation], 365 [MEC |

files of patients enrolled in studies or under the care of other physicians may constitute a violation of HIPAA. Finally, it appears that despite Dr. Ryan's acknowledged technical expertise, he is adversely impacting patient care through his behavior. The MEC is advised that the Ad Hoc committee believes that disciplinary action is justified to safe guard Harbor employees, trainees, and patients.

We recommend that MEC should explore possible actions to remedy the underlying chaotic situation in vascular division created by Dr. Ryan's unprofessional behavior. Dismissal from the medical staff or discontinuation of medical privileges are options that can considered but the committee is not knowledgeable regarding standards or precedents for such as action based solely on a lack of professionalism.

At a minimum, we believe that Dr. Ryan should receive professional counseling regarding his behavior, that behavioral limits should be set, and that ongoing monitoring of his interactions with others should take place until the problem is believed to be resolved. The Department Chair, residency/fellowship program directors and nursing directors are suggested as the monitoring team for such action. This report reflects a unanimous consensus among committee members.

Putnam Decl. ¶ 17; Vintch Decl. ¶ 17; Ryan Depo. 79:6-25, 80:18-83:25,

acknowledgement of result of BEST-CLI investigation.]

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| 111:24-118:12, 142:19-143:3, 155:4-11, 168:17-169:14, 186:9-189:3, 203:8-20, 215:14-216:22, 227:18-21, 230:4-235:23, 238:8-239:22, 241:7-242:9, 243:16-24, 248:22-253:17; Ex. 5 at 4-5; Ex. 301 § 6.1-3. | |
| **DEFENDANTS' REPLY:** Plaintiff raises no genuine dispute. The MEC was entitled to rely on the FPPE report. And contrary to Plaintiff's misleading assertions, the FPPE report did not state that Plaintiff "yelled at patients" or even refer to the NIH or its findings. It is immaterial whether or some witness statements included such assertions which were excluded from the FPPE report itself. | |
| **25.**    The PSA Bylaws authorize use of "a final written warning, or corrective action pursuant to Article VI"—which may include recommending "revocation of clinical privileges" or any "other actions deemed appropriate under the circumstances"—for disruptive behavior.<br><br>Vintch Decl., Ex. 301 §§ 2.5-3, 6.1-3.2-d. 6.1-3.3, 6.2-5, 6.2-7. | Undisputed. |
| **26.**    The MEC discussed the FPPE report at its meetings on March 28 and April 25, 2016, rejected issuing a summary suspension of Dr. Ryan's privileges at the March 28 meeting, voted unanimously at the April 25 meeting to inform Dr. Ryan that it was contemplating taking action against him, and asked Dr. Ryan to appear before the MEC to give his perspective and answer questions.<br><br>Putnam Decl. ¶ 19; Vintch Decl. ¶ 19; Exs. 13, 14. | Undisputed. |
| **27.**    Dr. Ryan agreed to the PSA's request to appear before the MEC on June 27, 2016, but because his attorney | Disputed.  When invited to the June 27, 2016 meeting, Dr. Ryan asked to bring his attorney.  He was told he could not. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| was not available, he asked to reschedule his appearance, and the MEC agreed.<br><br>Putnam Decl. ¶ 20; Vintch Decl. ¶ 20; Ex. 16. | The morning of the meeting, he was told that he could after all, by which time his attorney was not available.  Dr. Putnam altered the minutes of the April 25, 2016 meeting to make it appear that the MEC had decided in advance to prohibit attorney attendance.  Otherwise undisputed.<br><br>Ryan Dec., ¶ 20, White Decl., Exh. 360 at DEF004271, Exh. 366, 367. |

**DEFENDANTS' REPLY:** Plaintiff raises no genuine dispute. His accusation that "Dr. Putnam altered the minutes of the April 25, 2016 meeting to make it appear that the MEC had decided in advance to prohibit attorney attendance" is not only baseless but patently nonsensical, given that Plaintiff's lawyer *did*, in fact, attend the MEC meeting, and it is utterly immaterial when Plaintiff was told he could.

| | |
|---|---|
| **28.**     Dr. Ryan attended the July 25, 2016 MEC meeting with his attorney, at which Dr. Putnam read excerpts from the summary of findings in the FPPE report, and Dr. Ryan responded as follows: he did not yell at a patient; he may have spoken sternly to fellows because he expects more from them; he corrected fellows when they did something wrong; without specific dates he could not answer regarding lack of communication with other vascular surgeons; he believed he communicated well; he was not responsible for Dr. White's retirement or the departure of another vascular surgeon (Carlos Donayre, M.D.); and he would consider a behavioral or anger management program.<br><br>Putnam Decl. ¶ 21; Vintch Decl. ¶ 21; Ex. 15; Ryan Depo. 73:20-75:24, 77:14-78:6, 251:20-25. | Undisputed. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| **29.** After Dr. Ryan and his counsel left the July 25, 2016 meeting, the MEC deliberated and voted on the next course of action, but Dr. de Virgilio left before this vote took place.<br><br>Putnam Decl. ¶ 22; Vintch Decl. ¶ 22; Ex. 15. | Undisputed. |
| **30.** At the July 25, 2016 meeting, the MEC voted on four options for disciplinary action, which were narrowed down to two: (1) develop a Behavioral Contract, requiring Dr. Ryan to complete anger management courses, be followed by the Well-Being Committee, and adhere to strict professional behaviors without further intimidating behaviors; or (2) immediately revoke Dr. Ryan's PSA membership and clinical privileges at Harbor-UCLA; a majority of the MEC voted to recommend a Behavioral Contract and proceed with revocation of Dr. Ryan's privileges and membership only if he either did not agree to the Behavioral Contract or breached its terms.<br><br>Putnam Decl. ¶¶ 22-23; Vintch Decl. ¶¶ 22-23; Ex. 15; Ex. 301 § 6.2-7. | Undisputed. |
| **31.** The MEC has offered Behavioral Agreements to other Harbor-UCLA practitioners, and it has terminated the Agreements once the concerns underlying the Agreements were successfully resolved.<br><br>Putnam Decl. ¶ 23; Vintch Decl. ¶ 23. | Undisputed that the MEC has offered Behavioral Agreements to other Harbor-UCLA practitioners. Disputed that it has offered Behavioral Agreements with the same terms. For instance, only Dr. Ryan's Behavioral Agreement included a waiver of claims. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| | White Decl., Exh. 371, Putnam Depo., 153:25-154:2, Vinch Depo., 137:21-139:9. |
| **DEFENDANTS' REPLY:** Plaintiff misstates the evidence and raises no genuine dispute. It is immaterial whether other Behavioral Agreements included the same waiver language as the one proposed to Plaintiff—which was limited to "claims resulting" from any actions or communications "consistent with the terms of this Agreement," or regarding the anger management program. (Doc. 61-7, D-Ex. 7.) In any event, the cited testimony only shows Drs. Putnam and Vinch could not recall whether or not any such language was in other Behavioral Agreements. (*See* RSF 156, *infra*.) | |
| **32.** Dr. Ryan was provided with the proposed Behavioral Agreement, dated September 6, 2016, which included the following:<br>● listed specific behavioral requirements, including that he not access computers or other documents belonging to other PSA members, faculty, or others without authorization, or medical records of patients for whom he is not directly involved in treatment without express permission by his Department Chair;<br>● required Plaintiff to address concerns regarding individuals at Harbor-UCLA "in private to the appropriate supervisor, administrator, faculty or PSA leader in a courteous manner, or in written reports using the established Hospital reporting forms and procedures," and prohibited "unconstructive criticism" calculated "to intimidate, undermine confidence, belittle or imply stupidity or incompetence";<br>● required Dr. Ryan to participate in one of two listed anger management programs; | Undisputed the Behavioral Agreement includes those terms. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

- included a waiver of "claims resulting" from any actions or communications "consistent with the terms of this Agreement," or regarding the anger management program;
- required Dr. Ryan to cooperate with the PSA's Well-Being Committee as specified;
- required Dr. Ryan to "consult with a psychologist or psychiatrist" (or use a therapist if he is currently engaged with one) "for the purposes of discussing the scope of the evaluation and the therapeutic goals," and "to undertake therapy if recommended by the consultant," and required any consulted mental health clinician "to provide progress reports" to the Well-Being Committee;
- provided that upon Dr. Ryan's failure to comply with the Agreement, he "shall be subject to corrective action" as authorized by the PSA Bylaws, "subject to any hearing rights provided in Article VII of the Bylaws, or its successor, for such corrective action," provided that a single arbitrator qualified to serve as a hearing officer under Article VII may serve as trier of fact in the MEC's discretion;
- the Agreement may be terminated by either party; and
- entering into the Agreement would "not constitute an action or recommendation taken for a medical disciplinary cause or reason" and would not "in and of itself … require a report to the Medical Board of California or any other federal or state agency."

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| Putnam Decl. ¶ 24; Vintch Decl. ¶ 24; Ryan Depo. 21:19-24:1, 76:19-77:2, 251:20-254:22, 259:14-262:18, 264:17-266:5, 268:5-272:17, 275:15-279:21, 283:13-284:7, 288:11-289:20, 294:10-295:16; Ex. 7; Ex. 301 § 11.15. | |
| **33.**    Dr. Ryan, who continued to be represented by counsel, was given two weeks plus an extra 10 days to sign the Behavioral Agreement, but he refused to do so, and he did not provide the MEC any reasons for not signing or suggested revisions to the Agreement. Putnam Decl. ¶ 24; Vintch Decl. ¶ 24; Ryan Depo. 21:19-24:1, 76:19-77:2, 251:20-254:22, 259:14-262:18, 264:17-266:5, 268:5-272:17, 275:15-279:21, 283:13-284:7, 288:11-289:20, 294:10-295:16; Ex. 7. | Disputed.  Dr. Ryan told Dr. De Virgilio that the Behavioral Contract required him to admit to things that were not true, and that it was illegal in that it purported to restrict him from reporting misconduct to entities outside of Harbor, and forced him to waive claims against the MEC and Hospital.  In addition, through his attorney, Dr. Ryan suggested changes to the Behavioral Contract, but Dr. Putnam refused them. Ryan Dec. at ¶ 21; White Decl. Exh. 420 [Putnam email reading "I have reluctantly agreed to the two-week extension but insisted that the language in the behavioral contract (including that in which he does not deny wrongdoing) remain unchanged."], Putnam Depo., 141:14-24. |

**DEFENDANTS' REPLY:** Plaintiff egregiously misstates the evidence and raises no genuine dispute. It is immaterial whether Plaintiff made the alleged statements to Dr. de Virgilio, who did not participate in the MEC's decision to propose a Behavioral Agreement. (*See* RSF 29-30, *supra*.) There is *no evidence* that Plaintiff suggested changes to the Agreement, through his counsel or otherwise. To the contrary, Dr. Putnam's email came on September 20, 2016—*after* Plaintiff had changed attorneys, *after* the original deadline for accepting the Agreement had arrived, and *after* and his new counsel requested more time "to review" the Agreement "and try to talk Dr. Ryan down (he is very angry)." (Doc. 62-5, P-Ex. 420.) The email referenced Dr. Putnam's conference call "with Ed and Erin"—*i.e.*, Edward Morrissey of the Office of County Counsel and Erin Muellenberg, then counsel for the PSA. The email states Dr. Putnam told these County and PSA attorneys he "reluctantly agreed to the two week extension" but insisted on no changes to the language—not that Plaintiff's new attorney had somehow suggested changes before he reviewed the Agreement, or that his former attorney made

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

suggestions that would have merited discussion after that attorney was replaced. (Doc. 62-5, P-Ex. 420; *see* P-Ex. 360 at 4291; Doc. 61-7, D-Ex. 380 at 3678.)

| | |
|---|---|
| 34. Based on Dr. Ryan's refusal to sign a Behavioral Agreement, and in accordance with the MEC's decision at the July 25, 2016 meeting, the PSA issued Dr. Ryan the MEC's Notice of Proposed Action and Hearing Rights, dated October 5, 2016, which stated as follows:<br>● the FPPE report found Dr. Ryan "acted aggressively" and was "verbally abusive to other practitioners, nurses, fellows, and in some instances, patients," that he created "a hostile work environment" where some people "felt threatened" and "intimidated" to the point where they desired to leave "the vascular work team" or their jobs, and that he publicly criticized "the patient management of other members of the team," which adversely affected well-being of other healthcare officials;<br>● the FPPE report found "at least one key physician confirmed" he left Harbor-UCLA due to Dr. Ryan's behavior, which could have adversely impacted the vascular program's "future educational development," and several fellows reported Dr. Ryan yelled at them and intimidated them, which would make it "hard to recommend Harbor to future fellows" due to this environment, and that they did not trust Dr. Ryan or want to ask him for recommendation letters;<br>● despite Dr. Ryan's technical expertise, the FPPE report found his behavior adversely impacted patient care, because he yelled at several fellows in front of patients, his behavior contributed to poor | Undisputed that the MEC issued the Notice and it had those terms, disputed that the assertions in the Notice were true.<br><br>Ryan Decl. at ¶ 16. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

communications with other vascular attending physicians, separate operating room suits had to be run to give Dr. Ryan his own operative area, and the impending loss of experienced faculty "may also impair patient care";

● the FPPE report found Dr. Ryan's behavior was "well below expected standards for professional conduct" and violated the PSA Bylaws (§§ 2.2-2.2, 2.4-2, 2.4-3, 2.4-7, 2.5-2, and 2.5-2.4), and that disciplinary action was justified to safeguard employees, trainees, and patients;

● because Dr. Ryan did not sign and return the Behavioral Agreement, the MEC proceeded with the final proposed action to revoke Dr. Ryan's professional staff membership and privileges at Harbor-UCLA pursuant to Article VI of the PSA Bylaws;

● this action would not become final until Dr. Ryan exhausted or waived his hearing and appeal rights under Article VII of the Bylaws, and that his membership and privileges would remain in place until the action became final; and

● if the action became final, California Business & Professions Code § 805 would require the filing of a report with the Medical Board of California, and a report also would be filed with the National Practitioner Data Bank ("NPDB") pursuant to 42 U.S.C. § 11101 *et seq.*

Putnam Decl. ¶ 24; Vintch Decl. ¶ 24; Ryan Depo. 77:2-13; Ex. 380.

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

**DEFENDANTS' REPLY:** Plaintiff raises no genuine dispute. He denies having "yelled at patients" (Doc. 62-4, Ryan Decl. ¶ 16), but the Notice of Charges did not state otherwise.

| | |
|---|---|
| **35.** Dr. Ryan exercised his appeal rights in October 2016 and requested a hearing before a Judicial Review Committee ("JRC") on the recommendation to revoke his privileges.<br><br>Putnam Decl. ¶ 25; Vintch Decl. ¶ 25; Ryan Depo. 77:2-13. | Undisputed. |
| **36.** The PSA issued an initial Notice of Charges dated November 10, 2016, which included the following non-exclusive specification of inappropriate, unprofessional, and disruptive conduct as found by the Ad Hoc Committee in the FPPE report that fell "well below expected standards for professional conduct" and violated the PSA Bylaws:<br>● "Openly and loudly criticizing other PSA members in front of multiple Medical Center and PSA staff in a disruptive manner";<br>● "Openly threatening to call external agencies to conduct investigations";<br>● "Openly making unfounded accusations in an angry manner";<br>● "Openly making belittling and berating statements";<br>● "Openly making degrading and demeaning statements";<br>● "Refusing to answer questions regarding patient care";<br>● "Openly and angrily telling Medical Center staff to do what he says without offering any explanation";<br>● "Refusing to acknowledge other patient care team members; | Undisputed. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| • "Approaching and addressing staff in an angry and intimidating manner"; and<br>• "Failure to work cooperatively and professionally together as a member of the patient care team."<br><br>Putnam Decl. ¶ 25; Vintch Decl. ¶ 25; Ex. 301 §§ 7.4-1, 7.4-4, 7.6; Exs. 381, 382; Ryan Depo. 77:2-13. | |
| **37.**    Dr. Ryan's appeal was to be heard by a JRC composed of five impartial active staff members who "have not actively participated in the consideration of the matter involved at any previous level," and before a judge—each of whom were appointed by the MEC and approved by Dr. Ryan's attorneys; after a JRC hearing concludes, the JRC shall deliberate and render a recommended decision by majority vote and an accompanying report, which shall include findings of fact and be based on the evidence presented and inferences therefrom, and shall determine whether the MEC's recommended decision was reasonable and warranted.<br><br>Putnam Decl. ¶ 25; Vintch Decl. ¶ 25; Ex. 301 §§ 7.4-1, 7.4-4, 7.6; Exs. 381, 382. | Undisputed. |
| **38.**    A JRC decision is final but subject to appellate review by the Governing Body (Board of Supervisors), which shall appoint a five-person Appeal Board (three from the PSA and two from Harbor-UCLA administrative staff, but no prior hearing participants or decisionmakers in the matter) to recommend whether the JRC's decision | Undisputed. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| should be affirmed (if based on substantial evidence following a fair procedure), reversed, or remanded to the JRC.<br><br>Putnam Decl. ¶ 25; Vintch Decl. ¶ 25; Ex. 301 §§ 7.6-5, 7.7. | |
| **39.**    Counsel for the PSA and Dr. Ryan jointly submitted a letter dated June 20, 2018, which requested dismissal of the JRC hearing on Dr. Ryan's appeal without determination of the merits, and stated that the matter became moot because Dr. Ryan's PSA membership and privileges had lapsed.<br><br>Putnam Decl. ¶¶ 26-27; Vintch Decl. ¶¶ 26-30; Ryan Depo. 290:3-294:9; Ex. 19; Request for Judicial Notice ¶¶ 3-4, Ex. A at 17 ¶ 9, Ex. B. | Undisputed. |
| **40.**    After deeming Dr. Ryan's privileges and membership to have lapsed, the PSA did not file a report regarding Dr. Ryan with the California Medical Board or with the NPDB.<br><br>Putnam Decl. ¶ 27; Vintch Decl. ¶ 30; Ryan Depo. 290:3-294:9. | Disputed.  Harbor did submit a NPDB report in November 2020.<br><br>Vintch Decl. at ¶ 30. |
| **DEFENDANTS' REPLY:** The undersigned counsel should have corrected this fact to state the PSA did not file an NPDB report "at that time" in 2018, as stated in Dr. Vintch's declaration. Two years later, Dr. Vintch was informed an NPDB databank report was required because Dr. Ryan was deemed to have voluntarily surrendered his clinical privileges while the JRC proceeding was pending. (Vintch Decl. ¶ 30.) | |
| **41.**    Dr. White's lawsuit against Dr. Ryan, filed July 29, 2015, alleged that Dr. Ryan "engaged in a course of conduct of seeking out and viewing Dr. | Undisputed. |

| | |
|---|---|
| White's personal records and the private records of Dr. White's patients," "continued to engage in harassing conduct by entering Dr. White's office without permission and viewing his private records and private mail," and "made in-person inquiries to Hospital personnel concerning Dr. White and his patients" without legal authority, and asserted claims for violations of the CMIA and the right to privacy and for harassment.<br><br>Manier Decl., Ex. 25 ¶¶ 5, 8, 10, 12-39. | |
| **42.** Dr. Ryan demanded that the County indemnify and defend him against Dr. White's lawsuit, allegedly filed "in retaliation for Dr. Ryan's reporting of Dr. White's conduct," and claimed the County was legally obligated to do so under California Government Code § 825 because "the reporting of such fraud falls well within the scope of my employment"; the County eventually agreed to defend Dr. Ryan in this lawsuit, which was later dismissed in exchange for Dr. Ryan's dismissal of his lawsuit against Dr. White.<br><br>Ryan Depo. 11:4-16, 16:24-17:8, 210:16-212:21, 213:19-214:2; Ex. 6; Ex. 26 ¶ 12(j); Cal. Gov't Code § 825(a). | Undisputed. |
| **43.** The National Institutes of Health ("NIH"), part of the Department of Health and Human Services ("HHS"), is the world's largest biomedical research agency, and funds the "Best Endovascular vs. Best Surgical Therapy in Patients with Critical Limb Ischemia" | Undisputed. |

Response to Plaintiff's Statement of GDMF re: MSJ of Defendants Putnam & Vintch

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | |
|---|---|
| ("BEST-CLI Trial"), which "is an international research study" that is "aimed at figuring out the best treatment for people with peripheral arterial disease," *i.e.*, "poor blood flow."<br><br>Request for Judicial Notice ¶¶ 1-2. | |
| **44.** Plaintiff made a report to the NIH which "raised concerns about misrepresentation of procedural volume histories by team members" at Harbor-UCLA, in connection with the BEST-CLI Trial for which Dr. White and other physicians sought NIH funding; Plaintiff allegedly learned of these matters "in or about April-June 2014."<br><br>Manier Decl., Exs. 24, 26 at 6 [¶ 10]; Doc. 14 ¶¶ 23, 27. | Undisputed. |
| **45.** NIH's Extramural Research Integrity Officer, Dr. Patricia Valdez, stated in a March 30, 2015 email to Plaintiff—which Plaintiff forwarded to Dr. de Virgilio on April 2, 2015—that "the Surgical and Interventional Management Committee (SIMC) for the BEST-CLI Trial" responded to Plaintiff's concerns by auditing the site "and found that several members of the Harbor-UCLA team misrepresented their procedural volume histories to meet the criterial of independent endovascular operator," but Dr. Valdez stated her understanding "that the SIMC's concerns have now been addressed," and that HHS's Office of Research Integrity ("ORI") "advised that falsification of information in this situation would not | Disputed to the extent the statement implies this was the only finding. The investigation also determined:<br><br>"[N]o one at the site currently meets the criteria to serve as an independent endovascular operator. We encourage the group to reach out to other potential investigators at their site who might meet the endovascular criteria. When and if that occurs, the site could be reconsidered. Until then, the site should no longer enroll patients in the BEST-CLI Trial." Otherwise undisputed.<br><br>White Decl., Exh. 331. |

| | |
|---|---|
| constitute research misconduct. ORI will not investigate this matter further." | |
| Manier Decl., Ex. 24. | |

**DEFENDANTS' REPLY:** Plaintiff misstates the evidence and raises no genuine dispute. Plaintiff's Exhibit 331 is a February 12, 2015 letter to Dr. White from the SIMC. It does not purport to dispute the later communication of March 30, 2015 stating "that the SIMC's concerns have now been addressed." (Doc. 61-7, D-Ex. 24.)

| | |
|---|---|
| **46.** Dr. Putnam did not act with malice or conscious disregard for Dr. Ryan's rights.<br><br>Putnam Decl. ¶ 29. | Disputed. The evidence shows that Dr. Putnam deliberately retaliated against Dr. Ryan.<br>Dr. Putnam altered MEC minutes to conceal admissions that showed that the MEC's retaliatory motive and guilty knowledge, proceeded based on a FPPE that he knew contained false statements, and proceeded with the FPPE against Dr. Ryan despite the MEC's and his own normal practices to give physicians counseling before official proceedings.<br><br>Defendants' Exhibits, Exh. 356 at 2 [White statement], 4 [De Virgilio Statement], 9 [Donayre statement]; Exs. 24 [Result of BEST-CLI investigation]; White Decl., Exh. 331 [result of BEST-CLI investigation], 365 [MEC acknowledgement of result of BEST-CLI investigation;] Plaintiff's Exh. 301 at 48 [Bylaws on progressive steps]; Ryan Decl. at ¶ 18 [lack of any counseling prior to FPPE action]; Putnam Depo., 72:10-73:2, 75: 9-76:4, 76:5-7 [normal practice of counseling and lack of counseling of Dr. Ryan]; De Virgilio Depo., 44:6-17, 44:18-45:2, 74:22-75:7 [lack of counseling of Dr. Ryan]; White Decl., Exh. 365 [unedited September 28, 2015 minutes], Exh. 360 at 1 [email |

BALLARD ROSENBERG GOLPER & SAVITT, LLP<br>15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR<br>ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| | circulating edited minutes for revision in December 2016], 360 at 4287 [altered minutes of September 28, 2015], Exh. 362 [original April 25, 2016 minutes], Exh. 360 at 4270-71 [altered April 25, 2016 minutes]. |
|---|---|

**DEFENDANTS' REPLY:** Plaintiff egregiously misstates the evidence—none of which raises any material issues of deliberate retaliation or malice. There is no evidence that Dr. Putnam intentionally "altered MEC minutes to conceal admissions that showed that the MEC's retaliatory motive and guilty knowledge." Plaintiff's Exhibit 365 (Doc. 62-5) has a watermark explicitly stating it is merely a "DRAFT" of minutes from September 28, 2015, not "unedited … minutes." Plaintiff's Exhibit 360 at 1 (Doc. 62-5) says nothing about "edited minutes for revision" and raises no such inference. Exhibit 360 at 4287 (same as Doc. 61-7, D-Ex. 11) does not represent "altered minutes," but merely varies from the "DRAFT" and excludes discussion of topics other than Dr. White's Corrective Action Request that were included in the draft. Moreover, the first three pages of Plaintiff's Exhibit 362 were submitted with Defendants' Motion as the "original April 25, 2016 minutes." (Doc. 61-7, D-Ex. 14.) Defendants' Motion did not include what Plaintiff calls "altered" minutes (Doc. 62-5, P-Ex. 360 at 4270-71).

Dr. Putnam testified in his deposition that "clearly one of the attorneys … was requesting" production of minutes in December 2016, and that he asked Dr. Vintch to look them over to confirm "that they're accurate with regard to the content of the meeting." Dr. Putnam added that this "should have been done earlier but … there was a lot of variability and moving people in a medical staff office," so he surmised there were "probably some difficulties in locating the minutes." Not surprisingly, Dr. Putnam did not recall five years later whether any changes were made to the minutes. (Supp. Manier Decl., Putnam Depo. 92:7-95:7.) Although there are items included from one set of minutes and excluded from the other, and *vice versa*, Plaintiff has not identified any material contradictions in the documents. (See RSF 103, 149, *infra*.)

There is absolutely no evidence that Dr. Putnam somehow "knew" that the FPPE "contained false statements." In fact, Plaintiff does not identify "false" statements at all. Contrary to Plaintiff's misleading assertions elsewhere, it is true that Drs. White and Donayre were "cleared" of the allegations of research misconduct, which NIH explicitly determined to be unfounded—as opposed to the lesser allegation of "misrepresentation of procedural volume histories," a concern which was later "addressed" sufficiently to warrant termination of NIH's investigation and resumption of the BEST-CLI Trial at Harbor-UCLA. (*See* RSF 45, *supra*, and RSF

130-31, *infra*; Doc. 61-7, D-Ex. 24; Supp. Manier Decl., de Virgilio Depo. 102:10-103:4, 107:7-16.)

Although the MEC may give physicians counseling in "normal" cases, the PSA Bylaws specify that "collegial intervention efforts are encouraged but are not mandatory, and shall be within the discretion of the appropriate Association and Medical Center management." (Doc. 61-7, D-Ex. 301 at 48, § 6.2-1.5.) When asked in his deposition if an FPPE was done whenever someone yelled or screamed in the operating room, Dr. Putnam responded: "If they do it once, maybe twice, and I speak to them and they behave more professionally after that, then usually there's no FPPE. If there's a pattern of behavior from multiple staff in multiple areas that is concerning and potentially disruptive to the care of patients, then that's where it raises to the level of concern that I might bring that up to either my boss, the department chair, or to the PSA." (Doc. 62-3, Putnam Depo. 72:10-73:2.) Dr. de Virgilio testified that although he didn't give Plaintiff "sort of a formal counsel" in general or specifically as to Dr. White's invasion of privacy complaint made to human resources (Doc. 62-5, P-Ex. 341), Dr. de Virgilio did speak to Plaintiff "about his sometimes explosive temper"—including by "offering to send him a book to try to help with being more positive" and trying "to talk to him about just being a little more … collaborative," but Plaintiff told Dr. de Virgilio "that he wasn't able to be like [Dr. de Virgilio] in terms of holding things in." Dr. de Virgilio added that "it was challenging to provide counseling because he would get angry and sort of flip the script," "was intimidating," and "would say threatening things"—including by warning Dr. de Virgilio to get his "own personal attorney because things were not looking good for [him]." (Supp. Manier Decl., de Virgilio Depo. 41:25-46:5, 73:20-78:4.)

## II.   Defendants' Response to Plaintiff's Additional Material Facts and Supporting Evidence

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| 47.  Undisputed. *See RSF 9, supra*. | Dr. Timothy Ryan ("Dr. Ryan") began working at Harbor-UCLA Medical Center ("Harbor") in October 2013.<br><br>Ryan Decl. at ¶ 2. |
| 48. Assumed true only for purposes of summary judgment. | In 2014, Dr. Ryan became aware of a clinical trial sponsored by the National Institute of Health ("NIH") called |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | BEST-CLI, which stands for Best Endovascular vs. Best Surgical Therapy in Patients with Critical Limb Ischemia. The clinical trial was designed to evaluate what procedures on patients with critical limb ischemia led to the best results, comparing endovascular surgery (which uses catheters and is less invasive) with open surgery.  Some Harbor surgeons participated in the trial.<br><br>Ryan Decl. at ¶ 3. |
| 49. Assumed true only for purposes of summary judgment. | Based on Dr. Ryan's review of the clinical trial documentation, he knew that the trial required participants to have completed a set number of surgeries to be qualified.  He became concerned that some Harbor surgeons – including Dr. Rodney White ("Dr. White") and Dr. Carlos Donayre ("Dr. Donayre") – had not completed the requisite number of surgeries to qualify for the trial, and that they had therefore falsified the attestation in their applications in order to participate.<br><br>Ryan Decl. at ¶ 4. |
| 50. Assumed true only for purposes of summary judgment. | On December 4, 2014, Dr. Ryan reported his concerns about the BEST-CLI trial to Dr. Timothy Van Natta ("Dr. Van Natta"), Chief Medical Officer at Harbor, and Dr. Christian De Virgilio, a senior vascular surgeon, and asked them to investigate.<br><br>Ryan Decl. at ¶ 4. |
| 51. Assumed true only for purposes of summary judgment. | Based on Dr. Van Natta's and Dr. De Virgilio's response, Dr. Ryan did not |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | believe they were seriously investigating whether Harbor surgeons had falsely inflated their surgical experience in order to qualify for the BEST-CLI trial.<br><br>Ryan Decl. at ¶ 5. |
| 52. Assumed true only for purposes of summary judgment. | The failure to investigate concerned Dr. Ryan because he believed that public employees had falsified an application to a clinical trial, that they were not qualified to participate in the trial, that their lack of qualifications would impact the reliability or the results of the trial, and that patients would be put at risk by being enticed to enroll in a trial conducted by unqualified physicians.<br><br>Ryan Decl. at ¶ 5. |
| 53. Assumed true only for purposes of summary judgment. | Therefore, on December 4, 2014, Dr. Ryan contacted the NIH and reported his concerns, providing his basis for believing that Dr. White and Dr. Donayre, among others, had falsified their attestations in their application to participate in the BEST-CLI trial.<br><br>Ryan Decl. at ¶ 5. |
| 54. Assumed true only for purposes of summary judgment. | Dr. Ryan informed Dr. Van Natta that he had made a report to NIH on approximately December 9, 2014.<br><br>Ryan Decl. at ¶ 5. |
| 55. Assumed true only for purposes of summary judgment. (*But see* RSF 45, *supra*.) | In response to Dr. Ryan's report to NIH, the Surgical and Interventional Management Committee for the BEST-CLI trial "conducted an audit of the site and found that several members of the |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | Harbor-UCLA team misrepresented their procedural volume histories to meet the criterial of independent endovascular operator," but that "falsification of information in this situation would not constitute research misconduct." The investigation found that the surgeons at Harbor, including Dr. White and Dr. Donayre, were not qualified to conduct endovascular surgeries in the trial and that Harbor could not admit more patients to the trial.<br><br>Plaintiff's Exh. 24; White Decl., Exh. 331. |
| **56. Unsupported by the record**. Exhibit 337 is not included with Plaintiff's Opposition or Defendants' Motion. | On April 23, 2015, Dr. Van Natta told Dr. Putnam that Dr. Ryan contacted the NIH to report Dr. White for "acting fraudulently" in the Best-CLI trial, and that the result was that Harbor's participation in the trial was suspended.<br><br>White Decl., Exhibit 337. |
| 57. Assumed true only for purposes of summary judgment. | In December 2013, Dr. Ryan treated a patient "BH" for an aortic dissection. He treated her with medication, which he believed to be the appropriate course.<br><br>Ryan Decl. at ¶ 6. |
| 58. Assumed true only for purposes of summary judgment. | Shortly after treating BH, Dr. White's nurse Rowena Buwalda copied Dr. Ryan on an email reporting that she had instructed BH to come to the hospital the following day and to complain of chest pains when she did so. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | Ryan Decl. at ¶ 6; Exhibit A to Ryan Decl. |
| **59. Objection:** Lacks personal knowledge or other foundation, improper opinion, speculation. (*See* Deft's Objections to Ryan Decl. for all objections.) Assumed only for purposes of summary judgment that this reflects Plaintiff's state of mind. | Dr. Ryan discovered that Dr. White had re-admitted BH to Harbor under the false pretense of her having chest pains to make her admission appear to be an emergency, thus guaranteeing insurance payment for her stay.<br><br>Ryan Decl. at ¶ 6. |
| 60. Assumed true only for purposes of summary judgment. | Dr. Ryan further learned that Dr. White had performed surgery on BH, implanting a stent graft manufactured by Medtronic.<br><br>Ryan Decl. ¶ 6. |
| 61. Assumed true only for purposes of summary judgment. | Dr. Ryan firmly believed that BH had responded well to non-surgical management and that she had no need for the stent graft procedure.<br><br>Ryan Decl. at ¶ 6. |
| 62. Assumed true only for purposes of summary judgment. | Dr. Ryan later learned that BH had suffered a serious aortic injury as a result of the stent graft surgery, resulting in a major stroke that impaired her ability to speak.<br><br>Ryan Decl. at ¶ 6. |
| **63. Objection:** Lacks personal knowledge or other foundation, improper opinion, speculation. Assumed only for purposes of summary judgment that this reflects Plaintiff's state of mind. | Dr. Ryan reviewed BH's medical records and noted that Dr. White had falsified them by describing symptoms to justify the stent graft, symptoms inconsistent with what Dr. Ryan had observed.<br><br>Ryan Decl. at ¶ 6. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| 64. Assumed true only for purposes of summary judgment. | Dr. Ryan investigated medical records further and concluded that Dr. White, Dr. Donayre, and others were implanting stent grafts manufactured by Medtronic in patients where they were not medically warranted.<br><br>Ryan Decl. at ¶ 7. |
| **65. Objection:** Lacks personal knowledge or other foundation, improper opinion, speculation. Assumed only for purposes of summary judgment that this reflects Plaintiff's state of mind. | Dr. Ryan discovered that Medtronic was paying the doctors thousands of dollars each time they implanted a stent graft, under the fiction that they were conducting a "teaching course" on how to perform the implant.  Medtronic offered the same deal to Dr. Ryan, who refused, because he knew from personal observation that there were no other physicians present to "learn" from the "course."<br><br>Ryan Decl. at ¶ 7 |
| **66. Objection:** Lacks personal knowledge or other foundation, improper opinion, speculation. Assumed only for purposes of summary judgment that this reflects Plaintiff's state of mind. | Dr. Ryan discovered that the doctors received several thousand dollars for each Medtronic stent graft they implanted, and Medtronic was paid tens of thousands of dollars per stent graft procedure.<br><br>Ryan Decl. at ¶ 7. |
| **67. Objection:** Hearsay. | Dr. Ryan confronted Dr. Donayre about this after the incident with Dr. Ryan's patient BH.  Dr. Donayre admitted to me that Medtronic paid him and Dr. White for these "courses," and said Dr. Ryan would have to learn to live with it.<br><br>Ryan Decl. at ¶ 7. |

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| 68. Assumed true only for purposes of summary judgment. | Dr. Ryan was gravely concerned by this development, because he believed it represented doctors getting kickbacks from a device manufacturer for using their product, that it compromised medical judgment about whether the devices were medically indicated, and that it threatened the health and safety of patients for whom the stent grafts were not medically indicated, as in the case of BH.<br><br>Ryan Decl. at ¶ 7. |
| **69. Objection**: Hearsay. | Dr. Ryan first reported his concerns to Dr. DeVirgilio in January 2014.  When nothing had happened by February 2014, Dr. Ryan approached Dr. Bruce Stabile, who was then the Chief of Surgery at Harbor.  Dr. Stabile told Dr. Ryan that he should find a way to "restore harmony in the vascular division by finding a way to share fees" with Dr. White.<br><br>Ryan Decl. at ¶ 8. |
| **70. Objection**: Hearsay. | Dr. Stabile's response was shocking and unacceptable to Dr. Ryan, so he went to Dr. Van Natta and repeated his concerns to him in late February 2014 or early March 2014.  Dr. Van Natta told Dr. Ryan that he should "keep [his] head down" during his six-month probationary period, which would end in April 2014.<br><br>Ryan Decl. at ¶ 8. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| **71. Misstates the evidence.** Plaintiff testifies he explained his concerns to Dr. Putnam, but he does not identify which concerns. | In Fall of 2014, Dr. Ryan personally expressed his concerns about the Medtronic issue to Dr. Brant Putnam.<br><br>Ryan Decl. at ¶ 8. |
| 72. Assumed true only for purposes of summary judgment, but patently immaterial. Dr. Putnam was not PSA President or MEC Chair until July 2015—several months *after* the FPPE arising from Plaintiff's complaints about Dr. White—so he obviously was in no position to give Plaintiff "updates." (Doc. 61-3, Putnam Decl. ¶ 4; Doc. 61-6, Ryan Depo. 45:24-46:5, 56:15-60:13, 141:4-11, 164:2-6; RSF 6, 13, *supra*.) | Dr. Putnam did not give Dr. Ryan any updates concerning Dr. Ryan's complaints about Dr. White.<br><br>Putnam Depo. 35:2-22. |
| 73. Assumed true only for purposes of summary judgment. | Dr. Ryan was aware that the Harbor Professional Staff Association ("PSA") conducted a Focused Professional Performance Evaluation ("FPPE") of Doctor White in 2014 in response to Dr. Ryan's complaint because the FPPE team interviewed Dr. Ryan.  Dr. Ryan told that team – which included Dr. DeVirgilio – about his concerns and conclusions about Dr. White and the Medtronic kickbacks, and provided them with documentation including BH's medical records.<br><br>Ryan Decl. at ¶ 9 |
| 74. Assumed true only for purposes of summary judgment. | When Dr. Ryan saw no action that suggested that Harbor was doing anything about his complaint by the end of 2014, he decided to report the issue to outside criminal authorities.<br><br>Ryan Decl. at ¶ 10. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| 75. Assumed true only for purposes of summary judgment. | Dr. Ryan called the Los Angeles District Attorney's Office and spoke to a Deputy District Attorney on approximately January 12, 2015, describing his concerns that Harbor physicians were getting kickbacks for implanting devices that were not medically indicated.  Dr. Ryan provided the Deputy District Attorney with Exhibit A and suggested that she interview BH.  The Deputy District Attorney told Dr. Ryan that the District Attorney's Office would investigate, and later interviewed Dr. Ryan.<br><br>Ryan Decl. at ¶ 10. |
| 76. Assumed true only for purposes of summary judgment. | Shortly after his call with the Deputy District Attorney, Dr. Ryan told Dr. De Virgilio that he had reported his concerns to the District Attorney's Office and they would be investigating.<br><br>Ryan Decl. at ¶ 11; White Decl. Exh. 332, Deposition of Christian De Virgilio, Exh. E to White Decl. ("De Virgilio Depo."), 22:8-22. |
| 77. Assumed true only for purposes of summary judgment. | On January 15, 2015, Dr. DeVirgilio informed Chief Medical Officer Timothy Van Natta that the District Attorney's Office was investigating Harbor based on allegations that Dr. White was involved in Medicare fraud, and Dr. Van Natta immediately informed DHS Chief Medical Officer Hal Yee.<br><br>White Decl., Exhibit 332. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| **78. Objection:** Lacks personal knowledge or other foundation, improper opinion, speculation. | In the Summer of 2015, shortly after Dr. Ryan's report to the District Attorney's Office, he observed that Medtronic stopped offering its "courses" at Harbor, and payments for the courses ceased.<br><br>Ryan Decl. at ¶ 12. |
| **79. Unsupported by the record**. Exhibit 340 is not included with Plaintiff's Opposition or Defendants' Motion. | On January 26, 2015, Dr. White submitted an email to Human Resources, Dr. Van Natta, and Dr. DeVirgilio "to report invasion of personal privacy, and potential federal (HIPPA) and state (California Medical Privacy Act) patient privacy violations by Dr. Timothy Ryan."<br><br>White Decl., Exh. 340 |
| 80. Assumed true only for purposes of summary judgment. | On February 4, 2015, Dr. White submitted a package of information in support of his January 26, 2015 complaint, including an affidavit and several exhibits.<br><br>White Decl., Exhibit 341 |
| 81. Assumed true only for purposes of summary judgment. | Dr. White's February 4, 2015 affidavit complained that Dr. Ryan had improperly reviewed medical records and operative reports and approached Harbor personnel to collect information regarding Dr. White and his patients.<br><br>White Decl., Exhibit 341 at 5. |
| **82. Objection**: Contradicts Plaintiff's deposition testimony, conclusory, lacks foundation, improper opinion. In his deposition, Plaintiff admitted he gave the same list attached to Dr. White's | Dr. White's complaint and affidavit referred to actions Dr. Ryan took to gather information about Harbor doctors for his report to the NIH or his report to the District Attorney's Office. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| complaint to Amanda Flores in December 2014 to prove Drs. White and Donayre weren't qualified to participate in the BEST-CLI Trial—the information Plaintiff claims he gave to the NIH. (Supp. Manier Decl., Ryan Depo. 87:7-94:16.) Plaintiff also references this in paragraph 14 of his declaration. (*See* RSF 84, *infra*.) But his deposition testimony contradicts his declaration suggestion that Dr. White's complaint about his review of medical records and operative reports pertained to Plaintiff's gathering of information for his report to the District Attorney's Office. | Ryan Decl. at ¶ 13. |
| 83. Assumed true only for purposes of summary judgment. | Dr. White's February 4, 2015 affidavit attached a computerized report of surgeries which he claimed Dr. Ryan had asked an assistant to print for him.<br><br>White Decl., Exhibit 341 at 5, 7. |
| **84. Misstates the evidence.** Although a tiny-font footer at the bottom of the last page of Plaintiff's Exhibit 341 shows the date "1/30/15," Plaintiff offers no evidence that this was when the report itself originally was "created," as opposed to when that specific document was printed or reprinted. In any event, this purported discrepancy is immaterial given Plaintiff's declaration admission that Dr. White's complaint and affidavit referred to actions Plaintiff took to gather information about Harbor-UCLA doctors. (Ryan Decl. ¶ 13.) | The report Dr. White attached to his February 4, 2015 affidavit, which he represented to be something Dr. Ryan asked for from an assistant, showed a creation date of January 30, 2015, *after* Dr. White's complaint, *after* Dr. Ryan's report to NIH, and *after* the BEST-CLI audit was complete.<br><br>White Decl., Exhibit 341 at 7, Ryan Decl. at ¶ 14. |
| **85. Misstates the evidence.** Plaintiff's Exhibit 341 shows that Dr. White's complaint of January-February 2015 was | The MEC believed that it "adequately" investigated Dr. White's January 28, |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| explicitly directed to DHS, not the MEC. And page 3 of Exhibit 365 states that "this was taken to Performance Management in DHS for investigation." (Doc. 62-5, P-Ex. 365 at 2361.) There is no evidence the MEC investigated the January-February 2015 complaint or "believed" it had done so. | 2015 complaint and determined that no discipline of Dr. Ryan was warranted.<br><br>White Decl., Exh, 365 at 3-4. |
| 86. Assumed true only for purposes of summary judgment. | On March 31, 2015, Dr. Van Natta solicited Dr. Putnam's help to "tie up lose [*sic*] ends with regards to Rod White, the PSA investigation, and Tim Ryan's allegations."<br><br>White Decl., Exh. 334 at 1. |
| 87. Assumed true only for purposes of summary judgment. | On March 31, 2015, Dr. Putnam discussed circumstances under which Dr. White's privileges should be limited and whether that would be reported to the California Medical Board.<br><br>White Decl., Exh. 334 at 1. |
| **88. Unsupported by the record.** Exhibit 337 is not included with Plaintiff's Opposition or Defendants' Motion. | Dr. Putnam helped Dr. Van Natta "tie up lose [*sic*] ends" about the PSA investigation of Dr. White.<br><br>White Decl., Exh. 337. |
| **89. Unsupported by the record.** Exhibit 337 is not included with Plaintiff's Opposition or Defendants' Motion. | In response to Dr. Ryan's complaints about Dr. White having a conflict of interest as a result of receiving payments from Medtronic in exchange for implanting stent grafts, the MEC's Ad Hoc Committee found that the subject was "essentially beyond the PSA's investigatory purview." |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | White Decl., Exh. 337. |
| **90. Unsupported by the record.** Exhibit 337 is not included with Plaintiff's Opposition or Defendants' Motion. | On April 23, 2015, Dr. Van Natta told Dr. Putnam that Dr. Ryan was alleging that Dr. White was retaliating against Dr. Ryan for Dr. Ryan's reports about Dr. White.<br><br>White Decl., Exh. 337. |
| **91. Unsupported by the record.** Exhibit 337 is not included with Plaintiff's Opposition or Defendants' Motion. | On April 23, 2015, Dr. Van Natta told Dr. Putnam that Dr. Van Natta was concerned that Dr. Ryan would "take it upon himself to pursue other avenues that could be damaging to DHS" if the investigation of Dr. White was insufficiently vigorous.<br><br>White Decl., Exh. 337. |
| **92. Unsupported by the record.** Exhibit 337 is not included with Plaintiff's Opposition or Defendants' Motion. | On April 23, 2015, Dr. Van Natta told Dr. Putnam that Harbor's Focused Professional Practice Evaluation of Dr. White "originated from a complaint presented" by Dr. Ryan.<br><br>White Decl., Exhibit 337. |
| **93. Unsupported by the record.** Exhibit 337 is not included with Plaintiff's Opposition or Defendants' Motion. | In his April 23, 2015 email to Dr. Putnam regarding the investigation of Dr. Ryan's complaints about Dr. White, Dr. Van Natta abruptly raised a claim of complaints by nurses against Dr. Ryan.<br><br>White Decl., Exh. 337. |
| 94. Assumed true only for purposes of summary judgment, but "ongoing issues" is far too vague to be material. | On June 8, 2015, Dr. Putnam learned from Dr. De Virgilio that there were "ongoing issues" between Dr. Ryan and Dr. White.<br><br>White Decl., Exh. 333. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| 95. Assumed true only for purposes of summary judgment. | Prior to January 31, 2015, Dr. DeVirgilio was not aware of any Harbor personnel submitting a report about Dr. Ryan's interpersonal behavior.<br><br>DeVirgilio Depo. 35:19-36:5; exhibit 347. |
| 96. Undisputed, except that Dr. White explicitly wrote this as a "request" and never used or implied the word "demand." (*See* RSF 14, *supra*; *cf.* RSF 23, 42, *supra*.) | On August 24, 2015, Dr. White sent Dr. Putnam a "Request for Corrective Action" demanding that the Professional Staff Association take action under the Medical Staff bylaws.<br><br>White Decl., Exh. 350, 351. |
| 97. Undisputed. (*See* RSF 14, *supra*.) | In his Request for Corrective Action, Dr. White accused Dr. Ryan of invading Dr. White's privacy and the privacy of his patients, and violating HIPAA and the Confidentiality of Medical Information Act, by reviewing medical records and asking for records about Dr. White's cases.<br><br>White Decl., Exh. 351 |
| 98. **Objection**: Contradicts Plaintiff's deposition testimony, conclusory, lacks foundation, improper opinion. The Request for Corrective Action involves the same activities referenced in Dr. White's complaint to DHS Performance Management in January-February 2015. (*See* RSF 80-84, *supra*.) In his deposition, Plaintiff admitted he gave the same list attached to Dr. White's complaint to Amanda Flores in December 2014 to prove Drs. White and Donayre weren't qualified to participate in the BEST-CLI Trial—the information Plaintiff claims he | Dr. White's Request for Corrective Action described Dr. Ryan's activities asking for and reviewing records to make reports to the NIH and District Attorney's Office.<br><br>Ryan Decl., ¶ 13. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| gave to the NIH. (Supp. Manier Decl., Ryan Depo. 87:7-94:16.) Plaintiff also references this in paragraph 14 of his declaration. But his deposition testimony contradicts his declaration suggestion that Dr. White's Request for Corrective Action pertained to Plaintiff's gathering of information for his report to the District Attorney's Office. | |
| 99. Undisputed. Dr. Putnam stated that he did not think the issues raised—"patient privacy/HIPAA, alleged harassment, and alleged making of false accusations against Dr. White"—had "direct patient care impact, but may involve issues of disruptive conduct covered under section 2.5-2 of our bylaws," and questioned whether they warranted an FPPE or other PSA investigation. (Doc. 62-5, P-Ex. 350.) | Dr. Putnam circulated Dr. White's Request for Corrective Action to Dr. Vintch and Dr. Dan Castro.<br><br>White Decl., Exh. 350 |
| 100. Assumed true only for purposes of summary judgment. | Dr. Castro counseled Dr. Putnam and Dr. Vintch that "this particular complaint seems steeped in historical interactions that may never be fully understood."<br><br>White Decl., Exh. 353. |
| **101. Misstates the evidence**. On September 28, 2015, Dr. Putnam presided over an executive session meeting of the PSA's MEC, but although Dr. Vintch attended at least a portion of this meeting, she has no specific recollection of being present for the discussion of Dr. White's Corrective Action Request against Dr. Ryan. (*See* Doc. 61-4, Vintch Decl. ¶ 12.) The "DRAFT" minutes reflect that Dr. Vintch attended the meeting, but they | On September 28, Dr. Putnam presided over a meeting of the Harbor PSA with Dr. Vintch present.  The draft of the minutes reflect that the PSA acknowledged:<br><br>• That Dr. White had previously complained about Dr. Ryan six to nine months before;<br><br>• That Dr. Ryan "somehow found out or looked up how many cases |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| include discussion of not only Dr. White's Corrective Action Request, but also Dr. Ryan's request to amend the PSA bylaws and a redacted portion pertaining to another physician. (*See* P-Ex. 365 at 2359-66.) By comparison, the non-draft minutes included with the moving papers pertain only to discussion of Dr. White's Request, and list Dr. Vintch as absent. (*See* Doc. 61-7, D-Ex. 11.) There is no evidence Dr. Vintch attended the portion of the September 2015 MEC meeting at which Dr. White's Request was discussed.<br><br>Plaintiff partially quotes the draft minutes, but omits material portions—including the statement that "this was taken to Performance Management in DHS for investigation." (Doc. 62-5, P-Ex. 365 at 2361.) This refutes Plaintiff's false assertion that the MEC itself conducted that earlier investigation. (*See* RSF 14, 18.) | Dr. White had completed and contacted the NIH saying that Dr. White is committing medical fraud for being a participant in the study while he had not completed enough cases in order to participate";<br><br>• That Dr. White "said that Dr. Ryan committed a HIPAA violation because he must have gone through medical records to find out what his cases and case quality was";<br><br>• That an investigation found that Dr. White had not conducted the number of cases he represented in his application to the study;<br><br>• That the PSA had "spent months and worked very diligently on this and ultimately there was no resolution" and "now we are being asked to investigate this again,"<br><br>• That the PSA had referred the alleged HIPAA violation to the Compliance Officer, who concluded based on their review there was no HIPAA violation;<br><br>• That "these complaints were taken seriously and went appropriately to HR Performance Management and the HIPAA Compliance Officer and the difference now is that there are attorneys involved and litigation"; |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | • That "We had a recognized HIPAA Compliance Officer review the case and it was found that no HIPAA violation occurred on the part of Dr. Ryan.  About six months later Dr. White decided to bring his own attorney in and sue Dr. Ryan.  Concurrently Dr. White sent an email to Dr. Van Natta and Dr. Putnam Requesting PSA corrective action against Dr. Ryan." |
| | • That "Dr. Ryan considers himself a whistleblower because he thought this bad thing happened and he wanted to do right.  He further believes that any action taken against him, by us, would be considered retaliation." |
| | • That "To take a corrective action beyond the investigation could be considered retaliation because we feel this issue has been investigated adequately.  On the other hand it is not necessarily under the purview of the whistleblower to do their own investigation and start digging into whatever they want." |
| | • That the MEC would reach out again to the HIPAA Compliance Officer "to get more details." |
| | White Decl., Exh 365 at p.3. |
| **102. Misstates the evidence**. The term "altered" is argumentative. Otherwise | On December 13, 2016, more than a year after September 28, 2015 meeting, |

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| assumed true only for purposes of summary judgment. | Dr. Putnam sent Dr. Vintch a set of altered minutes of MEC executive sessions concerning Dr. Ryan to send to attorneys to be used in litigation, and asked her to "look them over." |
|  | White Decl., Exh. 360 at 1. |
| **103**. **Misstates the evidence**. Plaintiff's Exhibit 365 (Doc. 62-5) has a watermark explicitly stating it is merely a "DRAFT" of minutes from September 28, 2015, not "unedited … minutes." Plaintiff's Exhibit 360 at 4287 (Doc. 62-5, same as Doc. 61-7, D-Ex. 11) does not represent "substantially altered" minutes. In fact, Plaintiff identifies no contradictions or material differences between the "DRAFT" and the non-draft minutes included with the moving papers.<br><br>The non-draft minutes are "a page shorter" in part because they are limited to one subject—Dr. White's Corrective Action Request—whereas the "DRAFT" minutes additionally include discussions of Dr. Ryan's request to amend the PSA bylaws and a redacted portion pertaining to another physician. (*See* Doc. 62-5, P-Ex. 365 at 2359-66.)<br><br>All of the topics Plaintiff depicts as "omitted" from the non-draft minutes for September 2015 *were discussed in other MEC documents "used in litigation" and included with Defendants' moving papers*, thus refuting Plaintiff's baseless assertion that Defendants sought to conceal such items. In particular: | In the minutes Dr. Putnam circulated to be used in litigation, the minutes of the September 28, 2015 meeting had been substantially altered:<br><br>• The altered minutes were a page shorter;<br><br>• The altered minutes omitted the discussion of Dr. Ryan's allegations against Dr. White;<br><br>• The altered minutes omitted the discussion of Dr. White's accusations of HIPAA violations being based on Dr. Ryan's investigation of Dr. White's false statements in the BEST-CLI trial;<br><br>• The altered minutes removed references to a previous investigation determining that Dr. Ryan did not violate HIPAA;<br><br>• The altered minutes omitted the statement that proceeding against Dr. Ryan could be retaliation because the PSA feels the matter was already adequately investigated.<br><br>White Decl., Exh. 360 at 4287. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| ● "Dr. Ryan's allegations against Dr. White" were discussed in the MEC minutes of December 28, 2015 (Doc. 61-7, D-Ex. 12 at 12105-07), March 28, 2016 (D-Ex. 13 at 12110-11), and April 25, 2016 (D-Ex. 14 at 11957), and in FPPE witness statements (D-Ex. 356 at 1757-60, 1762, 1765-67);<br><br>● "Dr. White's accusations of HIPAA violations being based on Dr. Ryan's investigation of Dr. White's false statements in the BEST-CLI trial" were discussed in FPPE witness statements (D-Ex. 356 at 1757-58, 1760, 1762, 1766);<br><br>● the previous DHS "investigation determining that Dr. Ryan did not violate HIPAA" was discussed in the MEC minutes of December 28, 2015 (D-Ex. 12 at 12105-07) and April 25, 2016 (D-Ex. 14 at 11957-58); and<br><br>● the concern about perceptions of potential retaliation was referenced in the MEC minutes of April 25, 2016 (D-Ex. 14 at 11957), and indirectly in the March 28 minutes (D-Ex. 13 at 12111). | |
| **104**. **Misstates the evidence**. (*See* RSF 103, *supra*.) | Defendants submitted the altered version of the September 28, 2015 minutes to the Court in support of this motion.<br><br>Defendants' Exhibits, Exh. 11. |
| **105**. **Misstates the evidence**. Dr. Putnam testified in his deposition that "clearly one of the attorneys … was requesting" production of minutes in December 2016, and that he asked Dr. Vintch to look them over to confirm "that they're accurate | Dr. Putnam submitted this altered version of the minutes to the Medical Staff Office to act as the official record of the meeting, and said he would come to the Medical Staff Office to sign them. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| with regard to the content of the meeting." Dr. Putnam added that this "should have been done earlier but … there was a lot of variability and moving people in a medical staff office," so he surmised there were "probably some difficulties in locating the minutes." Not surprisingly, Dr. Putnam did not recall five years later whether any changes were made to the minutes. (Supp. Manier Decl., Putnam Depo. 92:7-95:7; *see* RSF 103, *supra*.) | White Decl., Exh. 361. |
| **106**. **Misstates the evidence**. Dr. Vintch testified that although she did not know why Dr. Putnam specifically had minutes looked over in December 2016, "providing minutes fell onto the PSA leadership to do" because they "didn't have secretarial support" for this, so "frequently" one of them would prepare the minutes "and the other one would look them over" for accuracy. She assumed Dr. Putnam "wanted to be sure that he hadn't left out anything in those minutes" from meetings Dr. Vintch had attended. (Vintch Depo. 68:7-69:9; *see* RSF 105, *supra*.) | Dr. Vintch could not explain why Dr. Putnam was circulating unsigned minutes of prior meetings for her review in December 2016.<br><br>Vintch Depo., 81:3-9. |
| **107**. **Misstates the evidence**. Dr. Vintch believed a reference in Dr. Castro's email regarding Dr. White's Request for Corrective Act referred to the evaluation of Dr. White based on a concern Dr. Ryan had raised, but she did not recall the timing off the top of her head. (Vintch Depo. 62:14-63:10.) In any event, this is immaterial, because Plaintiff has presented no specific evidence that Dr. Vintch was aware of the only speech | Dr. Vintch knew, when she received Dr. White's Request for Corrective Action, that Dr. Ryan had previously made allegations about Dr. White.<br><br>Vintch Depo., 62:14-63:7. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| Plaintiff claims to have been protected by the First Amendment—namely, his reports to the DA's office and to the NIH. | |
| **108**. **Misstates the evidence**. This "frequently" occurred (Vintch Depo. 68:15-69:2), but "it was a little scattered here and there" so they did their best (Putnam Depo. 88:13-22). | When Dr. Putnam and Dr. Vintch were part of the leadership of the PSA, they would share draft minutes of MEC meetings with each other to verify their accuracy.<br><br>Vintch Depo. 68:15-69:2, 69:22-70:4, 70:5-12, Putnam Depo. 89:12-90:8. |
| **109**. **Misstates the evidence**. Whoever led the meeting "typically did the minutes," although "it's really hard to run a meeting and to remember all the details of the discussion because you're also trying to be in the moment," which is why Drs. Putnam and Vintch often referred to one another to ensure "the minutes reflected the conversation." (Vintch Depo. 69:12-70:19; Putnam Depo. 87:20-88:22.) | During the time that Dr. Putnam and Dr. Vintch were part of the leadership of the PSA, whoever led the PSA meeting would draft the minutes.<br><br>Vintch Depo. 69:12-21, Putnam Depo. 87:25-88:22. |
| 110. This partially reflects Dr. Vintch's testimony, but she added: "because a lot of it was run through us and we didn't have the staff to support them, the signatures sometimes, unfortunately, were not always applied timely." (Vintch Depo. 76:19-22.) | When Dr. Putnam and Dr. Vintch were part of the leadership of the PSA, their general practice was to sign minutes for a meeting after they were circulated at the next meeting.<br><br>Vintch 76:8-16. |
| **111**. **Misstates the evidence**. This was the "typical" and "general" practice. (Vintch Depo. 77:8-79:15; Putnam Depo. 87:20-91:16.) | When Dr. Putnam and Dr. Vintch were part of the leadership of the PSA, they would circulate the minutes of each MEC meeting at the next meeting, make any changes requested by the MEC members, and then ask for them to be approved. |

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | Vintch Depo. 77:25-79:7, Putnam Depo. 90:9-91:16. |
| 112. This accurately summarizes the cited testimony. | Dr. Putnam testified that in general the MEC minutes would be signed and dated once they were approved, and tried to do so routinely.<br><br>Putnam Depo., 91:13-19. |
| **113**. **Misstates the evidence**. Dr. Putnam testified he would send signed and dated minutes "to whoever happened to be working in the medical staff office at the time" and ask that they be filed, and as far as Dr. Putnam knew, they would be kept or maintained "in the medical staff office somewhere." (Putnam Depo. 91:20-92:6.) However, Dr. Vintch added that this was the general practice, "but for a while, we didn't have staffing up there, so they may have been kept on – on Dr. Putnam's computer or whoever our secretary was at the time of the final version." (Vintch Depo. 79:8-15.) | After MEC meeting minutes were signed and dated, Dr. Putnam would submit them to the Medical Staff Office to be filed and maintained.<br><br>Putnam Depo. 91:20-92:6 |
| 114. This accurately summarizes the cited testimony. And there is no evidence that any minutes were altered after they were voted upon and approved by the MEC. Of the two alterations baselessly alleged by Plaintiff, one concerned "DRAFT" minutes from September 28, 2015 which were not allegedly voted upon or approved (Doc. 62-5, P-Ex. 365), and the other concerned April 25, 2016 minutes Dr. Putnam sent to Dr. Vintch in December 2016 (Doc. 62-5, P-Ex. 360 at 4249, 4270-71)—but the latter document was not signed, and only the signed minutes from April 25, 2016 were | Dr. Vintch testified that she and Dr. Putnam would "absolutely" would not alter minutes after they had been voted upon and approved by the committee.<br><br>Vintch Depo. 80:19-81:2. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP<br>15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR<br>ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| submitted with Defendants' Motion. (Doc. 61-7, D-Ex. 14; *see* RSF 26, *supra*.) | |
| **115**. **Misstates the evidence and unsupported by the record**. Exhibit 392 is an email string from April 23 to August 5, 2015. No email dated November 3, 2015 is included with Plaintiff's Opposition or Defendants' Motion. | On November 3, 2015, Dr. Putnam and Dr. Vintch sought out Dr. Van Natta to talk to him "concerning Tim Ryan and his current activities at Harbor." <br><br> White Decl., Exh. 392. |
| **116**. **Unsupported by the record**. Exhibit 338 is not included with Plaintiff's Opposition or Defendants' Motion. | On that same day, November 3, 2015, Dr. Putnam circulated LA Biomed tax returns to Dr. Vintch, Dr. Van Natta, and DHS Chief Medical Officer Hal Yee. <br><br> White Decl., Exh. 338. |
| **117**. **Misstates the evidence**. Plaintiff accurately quotes the Addendum, but the document is undated, and it does not specify Plaintiff's CISU complaint as unprofessional behavior. (*See* RSF 16, *supra*; P-Ex. 336 (stating Dr. Putnam read the "Addendum" on December 17, 2015).) | In November 2015, Dr. White submitted an Addendum to his Request for Corrective Action, reading in full: <br><br> "I am writing to supplement my Request For Corrective Action (dated 8/25/15) pertaining to Dr. Timothy Ryan because he is continuing to engage in conduct which is detrimental to the delivery of quality patient care, disruptive and deleterious to the operations of the Medical Center, and below applicable professional standards." <br><br> "On November 19, 2015 I was advised by the County`s Intake Specialist Unit that Dr. Ryan filed a complaint against me. On November 24, 2015, I received another letter from that same unit, that the complaint had been initially investigated, that the allegations would |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | not be investigated further and that the matter was considered closed. Enclosed are copies of both letters. This continuing pattern of harassment, and unscrupulous conduct by Dr. Ryan, is having a severe adverse impact on me, as a member of the medical staff, and on my personal and professional life." |
| | Aside from making a report, he [*sic*] addendum did not specify any other "unprofessional" behavior. |
| | Defendants' Exhibits, Exh. 359. |
| **118**. **Misstates the evidence**. Dr. Putnam read the Addendum as generally alleging disruptive behavior by Plaintiff, but he did not identify Plaintiff's CISU complaint as "behavior" (Putnam Depo. 85:3-86:23), and did not understand Dr. White to be asking for discipline of Plaintiff because of his CISU complaint. (Doc. 61-3, Putnam Decl. ¶ 14.) | Dr. Putnam did not understand Dr. White's Addendum to refer to any specific behavior by Dr. Ryan other than filing a complaint with the County Intake Specialist Unit.

Putnam Depo., 85:3-86:4. |
| **119**. **Misstates the evidence**. The email does not state it was a response to the Addendum. It states that Dr. Putnam read the Addendum on December 17, 2015, 11 days before the email; that the original Request for Corrective Action was discussed at the September MEC meeting, whereupon the MEC felt it "should await the results" of investigations by other "appropriate bodies" before making any determinations; and that after receiving the Addendum, "the MEC again discussed the allegation of unprofessional | On December 28, 2015, Dr. Putnam wrote to Dr. White in response to his Addendum to Request for Corrective Action, advising him that the MEC had recommended a further investigation of the behavior, and that the PSA would form an FPPE.

White Decl., Exh. 336. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| behavior" at its December 28 meeting. The email continued:<br><br>There was concern by MEC members that Dr. Ryan's behavior toward you may continue to be unprofessional and possibly in violation of the PSA bylaws. Hence, the MEC recommended further investigation of this behavior by the department through the formation of ad-hoc committee. As the department chair, Dr. DeVirgilio will appoint the members of this committee, and the committee's report will be provided to the department and MEC upon completion of their investigation.<br><br>(Doc. 62-5, P-Ex. 336.) | |
| **120**. **Misstates the evidence**. The recommendation was made by the MEC members in attendance at the December 28, 2015 meeting, not Dr. Putnam personally, although he agreed with the MEC's determinations and the bases for them—including "undue and unnecessary friction within the department" attributed to Plaintiff. (Doc. 61-3, Putnam Decl. ¶ 14; Doc. 61-7, D-Ex. 12.) | On December 28, 2015, Dr. Putnam presided over a MEC meeting to discuss Dr. White's Addendum to his Request for Corrective Action, and recommended that an FPPE be formed to evaluate Dr. Ryan's behavior.<br><br>White Decl., Exh. 360, p. DEF004262-DEF004265. |
| 121. Assumed true only for purposes of summary judgment. | On December 31, 2015, Dr. White wrote to Dr. De Virgilio complaining that Dr. Ryan had violated HIPAA by gathering data "to initiate the Fraud investigation against Harbor (me) with the trial Steering Committee, and the NIH."<br><br>White Decl., Exh.. 379 |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| **122**. **Misstates the evidence**. Undisputed that as Chair of Surgery, it was Dr. de Virgilio's responsibility under the PSA Bylaws to form the Ad Hoc Committee to undertake the FPPE—which entails fact-finding but "is not considered an investigation as defined in these Bylaws." (Doc. 61-7, D-Ex. 301 §§ 2.5-2, 2.5-3, 6.1-3.1, 6.1-3.2-d, 6.1-5.1, 6.2-3, 6.2-5.) Dr. de Virgilio did not testify that the PSA "assigned" him. (De Virgilio Depo. 54:8-15, 61:6-11.) | The PSA assigned Dr. De Virgilio, as the Chair of the Surgery Department, to form the FPPE Ad Hoc Committee to investigate Dr. Ryan.<br><br>De Virglio Depo., 54:8-15, 61:6-11. |
| **123**. **Misstates the evidence**. Dr. de Virgilio testified he did not remember these matters, not that he did not know or never did. (De Virgilio Depo. 56:3-19, 61:20-24.) As one of the witnesses interviewed by the Committee, it would have been appropriate for Dr. de Virgilio *not* to direct the Committee on how to perform its work. (Doc. 61-7, D-Ex. 5.) | Dr. De Virglio does not know how the members of the FPPE Committee received its scope of work, whether he gave them instructions or anything in writing about the scope of their inquiry, or what he had in mind about their scope of work.<br><br>De Virglio Depo., 56:3-19, 61:20-24. |
| 124. Assumes facts not in evidence, namely, that anything beyond the Corrective Action Request became part of the FPPE scope. Otherwise, assumed true only for purposes of summary judgment. | Dr. De Virgilio does not remember how anything beyond the scope of Dr. White's Request for Corrective Action became part of the scope of the FPPE.<br><br>De Virgilio Depo., 62:6-24. |
| 125. Assumed true only for purposes of summary judgment, but immaterial; Dr. Putnam was not MEC Chair during Dr. White's FPPE. (RSF 6, 13.) | Dr. Putnam does not recall ever reviewing Dr. White's FPPE.<br><br>Putnam Depo. 39:6-13. |
| **126. Unsupported by the record.** Exhibit 330 is not included with Plaintiff's Opposition or Defendants' Motion. | Dr. Putnam and Dr. Vintch received Dr. White's FPPE on January 4, 2016.<br><br>Exhibit 330 at p. 2. |
| **127**. **Argumentative, misstates the evidence**. The FPPE report stated that | Dr. Ryan's FPPE accused him of accessing and requesting medical |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| multiple Vascular Division members indicated they had witnessed Plaintiff improperly accessing and requesting medical records, that Plaintiff "was neither authorized to perform quality assurance reviews of the care of these patients nor did he have privileges for research studies involving these patients," that Plaintiff's "efforts to view, collect, or alter medical records of patients under the care of Dr. White appear to be well below applicable professional standards," and that "there is concern that Dr. Ryan's actions in this regard may constitute a violation of HIPAA." (Doc. 61-7, D-Ex. 5 at 2-4.) Plaintiff's only defense to this admitted conduct—"that he was doing so to gather information to provide to the NIH"—was discussed in FPPE witness statements (Doc. 61-7, D-Ex. 356 at 1757, 1760, 1766) as well as the "DRAFT" minutes cited by Plaintiff (Doc. 62-5, P-Ex. 365). However, this not a legally valid defense under HIPAA regulations, which identify permissible use and disclosures of protected health information ("PHI") but do not permit a physician to *access* PHI, even if the ostensible purpose is to disclose it to the NIH. *See* 45 C.F.R. § 164.512(f), (j) (cited at Doc. 61-1 at 23). Plaintiff's underlying premise—that his reason for accessing the PHI should have been noted in the FPPE report—is therefore demonstrably invalid. | records improperly, but did not discuss or disclose that he was doing so to gather information to provide to the NIH, even though the MEC had previously acknowledged this.<br><br>Defendants' Exhibits, Exh. 5, pp. 2, 4; White Decl., Exh. 365 [PSA Minutes noting that Dr. Ryan "somehow found out or looked up how many cases Dr. White had completed and contacted the NIH saying that Dr. White is committing medical fraud for being a participant in the study while he had not completed enough cases in order to participate" and Dr. White "said that Dr. Ryan committed a HIPAA violation because he must have gone through medical records to find out what his cases and case quality was"] |
| **128**. **Argumentative, misstates the evidence**. The FPPE report states "Dr. Donayre confirmed that he is leaving | Dr. Ryan's FPPE asserted that Dr. White and Dr. Donayre were leaving Harbor because of Dr. Ryan, but did not |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| Harbor due to the behavior of Dr. Ryan," and discussed what might happen "*if* Dr. White leaves this program," but did not depict such a decision or the reason for it. (Doc. 61-7, D-Ex. 5 at 3, italics added.) This is not surprising, since Dr. White left Harbor-UCLA at the end of April 2016—two months *after* the FPPE report was issued. (RSF 11, 24, *supra*.)<br><br>The FPPE report did not include what Plaintiff states it did not include. However, Plaintiff does not assert that Drs. White or Donayre left Harbor-UCLA because of the ostensible results of Plaintiff's report to the NIH. And the cited evidence says nothing at all about "Medtronic no longer paying for them to give 'courses' surrounding use of Medtronic stent grafts." | discuss or disclose that Dr. Ryan's report to the NIH had resulted in Dr. White and Dr. Donayre being disqualified for participation in endovascular procedures in the BEST-CLI trial and had led to Medtronic no longer paying for them to give "courses" surrounding use of Medtronic stent grafts.<br><br>Defendants' Exhibits, Exh. 5, pp 3; Exh. 24; White Decl., Exh. 331. |
| 129. Undisputed. (*See* RSF 24, *supra*; Doc. 61-7, D-Ex. 5 at 2.) | The Ad Hoc Committee supplied witness statements to accompany Dr. Ryan's FPPE.<br><br>Defendants' Exhibits, Exh. 356. |
| **130**. **Argumentative, misstates the evidence**. Dr. White was, in fact, "cleared of allegations"—specifically allegations of research misconduct, which NIH explicitly determined to be unfounded, as opposed to the lesser allegation of "misrepresentation of procedural volume histories," a concern which was later "addressed" sufficiently to warrant termination of NIH's investigation and resumption of the BEST-CLI Trial at Harbor-UCLA. (*See* RSF 45, *supra*; Doc. 61-7, D-Ex. 24; Supp. Manier Decl., de Virgilio Depo. 102:10-103:4, 107:7-16.) | Dr. Ryan's FPPE witness statements quoted Dr. White as saying "Per Dr. White the BEST trial is a big national trial costing over 20 million dollars, and Harbor's site was chosen based on his previous work and studies. This study was stopped after Dr. Ryan's complaint. This complaint was investigated and Dr. White was cleared of allegations and Harbor-UCLA was approved to continue the research study." This was untrue, as the MEC knew: the investigators found that Dr. White and others had misstated their |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| Moreover, there is no evidence that MEC members in general, or Drs. Vintch or Putnam in particular, reviewed the FPPE witness statements to such a degree that they would have discerned the truth or falsity of every assertion made by every witness. The FPPE report itself did not assert that Dr. White was "cleared" of anything. (Doc. 61-7, D-Ex. 5.) | qualifications to do endovascular surgery and could not continue to enroll patients to the BEST-CLI trial.<br><br>Defendants' Exhibits, Exh. 356 at 2 [White statement]; Exs. 24 [Result of BEST-CLI investigation]; White Decl., Exh. 331 [result of BEST-CLI investigation], 365 [MEC acknowledgement of result of BEST-CLI investigation.] |
| **131**. **Argumentative, misstates the evidence**. Plaintiff essentially concedes that he *did* look "at private patient information that belonged to Drs. White, Donayre and de Virgilio for the purpose of finding information to shut the study down at Harbor-UCLA." The NIH *did* determine that Plaintiff's complaint "was unfounded" to the extent it alleged or suggested research misconduct. Plaintiff's Exhibit 331 is a February 12, 2015 letter from the SIMC to Dr. White from the SIMC stating that *until* it reaches out "to other potential investigators at their site who might meet the endovascular criteria," Harbor-UCLA "should no longer enroll patients into the BEST-CLI Trial." However, the later communication of March 30, 2015 stated "that the SIMC's concerns have now been addressed." (Doc. 61-7, D-Ex. 24.) Although Dr. de Virgilio did not recall telling the Ad Hoc Committee that Harbor-UCLA continued to take part in the BEST-CLI study, he understood this to be the case, and Plaintiff offers no contrary evidence. (Supp. Manier Decl., | Dr. Ryan's FPPE witness statements quoted Dr. De Virgilio as saying, "He feels that Dr. Ryan looked at private patient information that belonged to Drs. White, Donayre and deVirgilio for the purpose of finding information to shut the study down at Harbor-UCLA. The NIH subsequently investigated Dr Ryan's complaint and determined that it was unfounded and Harbor-UCLA continues to take part in the study." This was untrue, as the MEC knew: the investigators found that Dr. White and others had misstated their qualifications to do endovascular surgery and could not continue to enroll patients to the BEST-CLI trial.<br><br>Defendants' Exhibits, Exh. 356 at 4 [DeVirgilio statement]; Defendants' Exhibits, Exs. 24 [Result of BEST-CLI investigation]; White Decl., Exh. 331 [result of BEST-CLI investigation], 365 [MEC acknowledgement of result of BEST-CLI investigation.] |

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| de Virgilio Depo. 102:10-103:4, 107:7-16.) | |
| 132. Assumed true only for purposes of summary judgment, but immaterial. Among other things, Plaintiff concedes his internal complaints are not protected by the First Amendment. (*See* Doc. 62 at 18.) | Dr. Ryan's FPPE witness statements quoted Dr. De Virgilio as saying "DHS is auditing income of Dr. White's research team because of Dr. Ryan's complaints."<br><br>Defendants' Exhibits, Exh. 356 at 4 [DeVirgilio statement]. |
| 133. Assumed true only for purposes of summary judgment. (*See* RSF 130-31, *supra*.) | Dr. Ryan's FPPE witness statements quoted Dr. Donayre as saying "Dr. Ryan made a complaint about Dr. White's case experience by looking at private patient medical records without Dr. White's or Dr. Donayre's knowledge. They only found this out from the hospital scheduler. This is out of line because he was not part of this study group. NIH put the study on hold and investigated and cleared Drs. White and Donayre of any serious violations."<br><br>Defendants' Exhibits, Exh. 356 at 9 [Dr. Donayre statement] |
| 134. Assumed true only for purposes of summary judgment. (*See* RSF 130, *supra*.) | Dr. Ryan's FPPE witness statements quoted Dr. Donayre as saying that as a result of Dr. Ryan's report to the NIH, "Dr. Donayre felt the need to constantly look over his shoulders all the time because of Dr. Ryan. For this reason Dr. Donayre decided to leave Harbor-UCLA."<br><br>Defendants' Exhibits, Exh. 356 at 9 [Dr. Donayre statement] |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| 135. Undisputed. (*See* RSF 24, *supra*.) | Dr. Putnam circulated Dr. Ryan's FPPE to Dr. Vintch and Dr. Van Natta on February 26, 2016.<br><br>White Decl., Exh. 354 |
| 136. **Misstates the evidence**. When asked in his deposition if an FPPE was done whenever someone yelled or screamed in the operating room, Dr. Putnam responded: "If they do it once, maybe twice, and I speak to them and they behave more professionally after that, then usually there's no FPPE. If there'' a pattern of behavior from multiple staff in multiple areas that is concerning and potentially disruptive to the care of patients, then that's where it raises to the level of concern that I might bring that up to either my boss, the department chair, or to the PSA." (Putnam Depo. 72:10-73:2.) | When other physicians have been accused of raising their voices in the operating room, Dr. Putnam has dealt with it by counseling the surgeons to make sure it doesn't happen again before elevating it to the level of a FPPE.<br><br>Putnam Depo., 72:10-73:2 |
| 137. **Misstates the evidence**. Dr. Putnam testified that "typically when there are concerns brought forward either from a department chair or independently to the PSA leadership about unprofessional behavior, our first approach is always to make sure the staff member's correct supervisor has been involved, has done the appropriate counseling, and the department chair would definitely get involved if the initial supervisor counseling had not improved things. If all that has failed, then in a few instances it did make it to the level of the PSA leadership, and we would discuss each of those staff members and the concerns brought forward." (Putnam Depo. 75:9- | When Dr. Putnam led the PSA and a physician was accused of unprofessional behavior, his first approach has always been to make sure the physician's supervisor has been involved and done the appropriate counseling of the physician, and get the department chair involved to counsel the physician, before having the PSA take action.<br><br>Putnam Depo. 75: 9-76:4. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
| --- | --- |
| 76:4.) By the time the MEC directed an FPPE on Plaintiff, his direct supervisor already had changed from Dr. White to Dr. de Virgilio, the Department Chair. (*See* RSF 12, 19-21, *supra*.) Dr. de Virgilio testified that although he didn't give Plaintiff "sort of a formal counsel," he did speak to Plaintiff "about his sometimes explosive temper"—including by "offering to send him a book to try to help with being more positive" and trying "to talk to him about just being a little more … collaborative," but Plaintiff told Dr. de Virgilio "that he wasn't able to be like [Dr. de Virgilio] in terms of holding things in." Dr. de Virgilio added that "it was challenging to provide counseling because he would get angry and sort of flip the script," "was intimidating," and "would say threatening things"—including by warning Dr. de Virgilio to get his "own personal attorney because things were not looking good for [him]." (Supp. Manier Decl., de Virgilio Depo. 41:25-46:5, 73:20-78:4.) | |
| 138. Undisputed that this is a partial quotation from the PSA Bylaws. (Doc. 61-7, D-Ex. 301 at 48, § 6.2-1.1.) However, the Bylaws also provide that "collegial intervention efforts are encouraged but are not mandatory, and shall be within the discretion of the appropriate Association and Medical Center management." (*Id*., § 6.2-1.5.) | Under Section 6.2, "Routine Corrective Action," and Subsection 6.2.1.1, "Collegial Intervention," Section 6.2.1.1 of the PSA Bylaws provide "These bylaws encourages [sic] the use of progressive steps by Association leaders and Medical Center management, beginning with collegial and educational efforts, to address questions relating to an Association Member's clinical practice and/or professional conduct.  The goal of these efforts is to arrive at voluntary, responsive actions |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | by the individual to resolve questions that have been raised." <br><br> Plaintiff's [*sic*] Exh. 301 at 48. |
| 139. Assumed true only for purposes of summary judgment. | Dr. Putnam was not aware of any efforts made to counsel Dr. Ryan prior to the FPPE. <br><br> Putnam Depo. 76:5-7. |
| 140. Assumed true only for purposes of summary judgment. | Nobody counseled Dr. Ryan about yelling at people. <br><br> Ryan Decl. at ¶ 18. |
| **141. Misstates the evidence**. Plaintiff testified he has "never seen any of these doctors be disciplined by any entity for this behavior"—which is patently immaterial, given that FPPE and disciplinary proceedings are kept confidential. Otherwise assumed true only for purposes of summary judgment. | Dr. Ryan has repeatedly observed other physicians at Harbor yelling and swearing on the premises, yelling and swearing at nurses and fellow doctors in the operating room, and yelling and swearing at or berating nurses or other doctors in clinical settings without being disciplined. <br><br> Ryan Decl. at ¶ 17. |
| **142. Misstates the evidence**. Plaintiff testified he has "never seen any of these doctors be disciplined by any entity for this behavior"—which is patently immaterial, given that FPPE and disciplinary proceedings are kept confidential. Assumed true only for purposes of summary judgment that Dr. Putnam has yelled in the operating room and has not been counseled or been the subject of a PSA proceeding for that. There is no admissible evidence one way or the other as to whether Dr. Donayre was counseled or subjected to a PSA | Dr. Putnam and Dr. Donayre have yelled in the operating room and has [*sic*] not been counseled for it or been the subject of a PSA proceeding for it. <br><br> Putnam Depo. at 76:8-16, Ryan Decl. at ¶ 17. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| proceeding for yelling in the operating room. | |
| 143. **Misstates the evidence**. Dr. de Virgilio was asked whether he counseled Plaintiff about the issues in Dr. White's January 26, 2015 complaint, and Dr. de Virgilio answered, "I don't believe that I counseled him, no, as a result of this complaint." He was not asked whether he "sought" to counsel Plaintiff. (De Virgilio Depo. 44:6-17.) | When Dr. De Virgilio received Dr. White's January 26, 2015 complaint about Dr. Ryan, he did not seek to counsel Dr. Ryan about it.<br><br>De Virgilio Depo., 44:6-17. |
| 144. **Misstates the evidence**. Plaintiff testifies he was not counseled—not that nobody "attempted" to do so. (Doc. 62-4, Ryan Decl. ¶ 18.) | Nobody attempted to counsel Dr. Ryan about the subject of Dr. White's January 26, 2015 emailed complaint, his Request for Corrective Action, or his Addendum to his Request for Corrective Action.<br><br>Ryan Decl., ¶ 18 |
| 145. **Misstates the evidence**. Dr. de Virgilio testified that although he didn't give Plaintiff "sort of a formal counsel," he did speak to Plaintiff "about his sometimes explosive temper"—including by "offering to send him a book to try to help with being more positive" and trying "to talk to him about just being a little more … collaborative," but Plaintiff told Dr. de Virgilio "that he wasn't able to be like [Dr. de Virgilio] in terms of holding things in." Dr. de Virgilio added that "it was challenging to provide counseling because he would get angry and sort of flip the script," "was intimidating," and "would say threatening things"— including by warning Dr. de Virgilio to get his "own personal attorney because things were not looking good for [him]." | Dr. De Virgilio did not offer Dr. Ryan any sort of "formal counsel" about Dr. Ryan's "anger issues" or make any "series of recommendations" about his behavior.<br><br>De Virgilio Depo., 44:18-45:2, 74:22-75:7. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| (Supp. Manier Decl., de Virgilio Depo. 41:25-46:5, 73:20-78:4.) | |
| **146**. **Misstates the evidence**. Plaintiff testifies he was not counseled—not that nobody "attempted" to do so. (Doc. 62-4, Ryan Decl. ¶ 18.) | Nobody attempted to counsel Dr. Ryan about any of the incidents described in the FPPE concerning Dr. Ryan.<br><br>Ryan Decl, ¶ 18. |
| 147. Undisputed. (*See* RSF 26, *supra*; Doc. 61-3, Putnam Decl. ¶ 19; Doc. 61-4, Vintch Decl. ¶ 19.) | Dr. Putnam presided over the MEC's April 25, 2016 meeting with Dr. Vintch present.<br><br>White Decl., Exh. 362, p. 2. |
| 148. Undisputed that these quotations are included in the April 25, 2016 MEC executive session minutes, which were included with the moving papers, except that Mr. Valentin's first name is correctly spelled "Luis," and Dr. Putnam signed the minutes on May 23, 2016, not 2015. (Doc. 61-7, D-Ex. 14; *see* RSF 26, *supra*.) | The version of the April 25, 2016 minutes that Dr. Putnam signed and dated in May 2015 [*sic*] included the following:<br><br>• "A meeting with Dr. Hal Yee was held to discuss any action that might be taken against Dr. Ryan that might compromise the County. Any action that we take will be separate from any action taken by LA County."<br><br>• "The fear was that any action we take might comprise [*sic*] what the county is doing or might create a medical-legal action against us. Dr. Yee suggested we proceed with caution because there was concern about whistleblowing as there were two parts of the lawsuit."<br><br>• "Louis [*sic*] Valentin, HIPAA Privacy Officer provided the following report: On January 19, 2016 County Counsel reviewed |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | the case. The initial findings were: |
| | 1) Dr. Ryan did not receive APHI based on a document they have. |
| | 2) The actual document with CPT codes was the document that Dr. Ryan provided to the clerk. |
| | 3) When the clerk was asked for the actual form that was submitted, she could not produce it. She stated that when Dr. Ryan made the request, she did not question him because he was a person of authority. |
| | 4) We have a policy in place that needs to be completed and we are obligated to report Dr. Ryan to the state. |
| | 5) The last part of this investigation will be performed by Alma Smith, who is currently on vacation. |
| | White Decl., Exh. 362 3-4. |
| **149**. **Argumentative, misstates the evidence**. Defendants did not make any "future use" of the version of the April 25, 2016 minutes included within Exhibit 360, nor were those "radically altered" from the minutes signed by Dr. Putnam—which were the only ones included with Defendants' moving papers (Doc. 61-7, D-Ex. 14).<br><br>In a portion of his deposition transcript omitted from Plaintiff's opposition, Dr. Putnam testified that "clearly one of the | The version of the minutes that Dr. Putnam circulated to Dr. Vintch and the Medical Staff office in December 2016 for future use was radically altered:<br><br>• The references to "compromising" the County were removed;<br><br>• Dr. Yee's caution about whistleblowing was removed;<br><br>• A substantial narrative about the FPPE was inserted; |

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| attorneys … was requesting" production of minutes in December 2016, and that he asked Dr. Vintch to look them over to confirm "that they're accurate with regard to the content of the meeting." Dr. Putnam added that this "should have been done earlier but … there was a lot of variability and moving people in a medical staff office," so he surmised there were "probably some difficulties in locating the minutes." Not surprisingly, Dr. Putnam did not recall five years later whether any changes were made to the minutes. (Supp. Manier Decl., Putnam Depo. 92:7-95:7.)<br><br>Plaintiff argues that "references to "compromising" the County" and "Dr. Yee's caution about whistleblowing" that were in the signed minutes (Doc. 61-7, D-Ex. 14) were "removed" from the unsigned version. But he disregards the statement that during a meeting with Dr. Yee about "any potential action taken by the PSA against Dr. Ryan … the concerns that such action might be seen as potential retaliation for whistleblowing were noted." (Doc. 62-5, P-Ex. 360 at 4270.) This is hardly surprising, since Plaintiff's lawsuit against the County was filed on January 8, 2016, and has been pending ever since. (Supp. Manier Decl. ¶ 4.)<br><br>Plaintiff also contends "a substantial narrative about the FPPE was inserted" into the unsigned version. But while the signed version did not contain the acronym FPPE, it did state that "two complaints were filed stating that Dr. | • The discussion of Mr. Valentin's report was altered to assert that Dr. Ryan *had* requested protected health information inappropriately, and the reference to the clerk not being able to produce the key document was removed.<br><br>White Decl., Exh. 360, DEF004270-DEF004271. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| Ryan was yelling at nurses" and that "the providers that have been affected by Dr. Ryan's actions have since left the facility" (Doc. 61-7, D-Ex. 14 at 11957)—which were among the issues raised in the FPPE (Doc. 61-7, D-Ex. 5 at 1-3) and the unsigned minutes (Doc. 62-5, P-Ex. 360 at 4270).<br><br>Plaintiff further argues "the discussion of Mr. Valentin's report was altered to assert that Dr. Ryan had requested protected health information inappropriately." But the signed minutes stated only that "the initial findings" were that Plaintiff did not receive PHI. (Doc. 61-7, D-Ex. 14 at 11957-58.) Dr. Putnam testified that Mr. Valentin did "an initial investigation" which found no HIPAA violation, and then "some further investigation." (Supp. Manier Decl., Putnam Depo. 101:5-24.) As explained in the December 28, 2015 minutes, the initial findings were based on the faulty premise that Plaintiff's activities were "research connected," when in fact he "was not authorized to conduct research." (Doc. 61-7, D-Ex. 12 at 12106; *accord* Ryan Decl. ¶¶ 13-14 (claiming he accessed information to provide to the NIH, not for medical research).)<br><br>It is unclear why "the reference to the clerk not being able to produce the key document was removed," but Plaintiff makes no attempt to show this is material. | |
| 150. Assumes facts not in evidence, namely, that edits were made to both | Dr. Putnam doesn't know who made edits to the two versions of the April 25, 2016 minutes. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| documents. Otherwise, assumed true only for purposes of summary judgment. | Putnam Depo., 104:12-22. |
| **151**. **Misstates the evidence**. Dr. Vintch testified "we had multiple drafts of our minutes, at times, in figuring out what the final version was," that it was sometimes "very difficult" because "we didn't always have staff that collected all of our minutes," and "for whatever reason" they "keep track of which" of "multiple drafts … was the final version." (Vintch Depo. 88:14-90:10.) | Dr. Vintch could not explain why there were different versions of the minutes of the April 25, 2016 PSA meeting. <br><br> Vintch Depo., 88:14-90:10. |
| 152. Assumed true only for purposes of summary judgment, but immaterial, because there is no evidence the MEC investigated plagiarism allegations. | Dr. White's complaint that Dr. Ryan falsely accused the Director of Research at LA Biomed of plagiarism is not the sort of accusation that the MEC would normally evaluate itself. <br><br> Vintch 59:1-12. |
| **153**. **Misstates the evidence**. The only time the MEC did not expect Plaintiff to accept the Behavioral Agreement was *after the original deadline for acceptance already had expired*. This is explained in the cited portion Plaintiff's Exhibit 360, which reflect unsigned minutes from an executive session on September 26, 2016: <br><br> Dr. Ryan was given his Behavioral Contract and it was due to be signed by 5:00 p.m. on September 20th. He did not sign the contract. Evidently Dr. Ryan recently retained a new attorney, David Robinson, Esq., who has requested some additional time to review the Contract and confer with Dr. Ryan…. County Counsel and outside counsel Erin Muellenberg are | The MEC, including Dr. Putnam and Dr. Vintch, did not expect Dr. Ryan to accept their proposed Behavioral Contract. <br><br> White Decl., Exh. 360 at DEF004291 [Minutes reflecting plan to send Notification of Proposed Final Action "in the likely event that Dr. Ryan does not sign the Behavioral Contract."] |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| drafting a Notification of Proposed Final Action in the likely event that Dr. Ryan does not sign the Behavioral Contract….<br><br>(Doc. 62-5, P-Ex. 360 at 4291.) In addition, Dr. Putnam's September 20, 2016 email stated that Plaintiff's new counsel requested more time "to review" the Agreement "and try to talk Dr. Ryan down (he is very angry)"—hardly the frame of mind consistent with one who would be expected to sign a Behavioral Agreement. (Doc. 62-5, P-Ex. 420.) | |
| **154**. **Unsupported by the record**. These transcript pages are not included with Plaintiff's Opposition or Defendants' Motion. | Dr. Ryan never admitted to the MEC the things that the Behavioral Agreement asked him to admit.<br><br>Vintch Depo. 148:19-149:11. |
| 155. This is a partial summary of the cited testimony. Dr. Vintch added that the MEC "discussed with counsel what other options we had for providers that we had concerns about so that we could explore ways that we could try to help bring that provider into the fold and really try to get them on track with what we expected with all of our providers." (Vintch Depo. 152:2-25.) | When the PSA proposed Behavioral Agreements to doctors, the MEC would review the drafts for revisions and arrive at final terms.<br><br>Vintch Depo. 152:2-152:25. |
| **156**. **Misstates the evidence**. The cited testimony only shows Drs. Putnam and Vintch could not recall whether or not any such language was in other Behavioral Agreements. | Dr. Putnam and Dr. Vintch don't know if any other Behavioral Agreements included a waiver of claims.<br><br>Putnam Depo., 153:25-154:2; Vintch Depo., 137:21-139:9. |
| 157. Assumed true only for purposes of summary judgment, but immaterial and incomplete. The unsigned draft states that | When another doctor, S.K., was offered a behavioral contract for "unprofessional, intimidating, and |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| "as a result of two cases," the physician Plaintiff identifies as S.K. "was placed on summary suspension" which was later not upheld by the MEC. (Doc. 62-5, P-Ex. 371.) Plaintiff was never placed on summary suspension. (Doc. 61-7, D-Ex. 13.) Both Agreements reference "unprofessional" and "intimidating" behavior, but Plaintiff's Agreement adds numerous further details not included in the one offered to S.K.—including that Plaintiff's behavior was "abusive," "retaliatory," and "harassing," occurred in the presence of patients, and was "reported by several Hospital areas/departments." (Compare D-Ex. 7 with P-Ex. 371.) | disruptive" behavior towards staff including demeaning behavior towards peers, Dr. Putnam and Dr. Vintch offered him a Behavioral Contract that did not include the waiver of claims or psychiatric counseling they demanded of Dr. Ryan.<br><br>White Decl., Exh. 371. |
| **158**. **Misstates the evidence**. The October 16, 2015 email states as follows:<br><br>    Dr. DeVirgilio asked me about one of the questions on Tim Ryan's PSA re-credentialing application. Evidently Dr. Ryan noted that he had been convicted of a felony. Can you tell me if this is new since his last application? Did he provide an explanation? If he has not provided an explanation, then the MSO [medical staff office] needs to request one from Dr. Ryan as part of the re-credentialing review.<br><br>(Doc. 62-5, P-Ex. 411.) On the Reappointment Evaluation dated September 14, 2015, Dr. de Virgilio simply noted that Plaintiff "states he was convicted of crime, was not explained," | In October 2015, Dr. Putnam investigated Dr. De Virgilio's assertion that Dr. Ryan had been convicted of a felony.<br><br>White Decl., Exh. 411. |

72

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| and made no reference to a felony. (Doc. 61-7, D-Ex. 8.) | |
| 159. Assumed true only for purposes of summary judgment, but this was Plaintiff's original application for hospital privileges in 2013, not his application for reappointment. | In fact, Dr. Ryan had disclosed in his application for hospital privileges that 30 years previously he had pled no contest to misdemeanor malicious mischief after he and his friends had been playing roughly on outside tables at a fast-food restaurant.<br><br>Ryan Decl., Exh. B. |
| 160. **Argumentative and misstates the evidence**. Plaintiff refers to minutes of the March 28, 2016 MEC meeting, which Dr. Putnam signed on April 25, 2016 (Doc. 61-7, D-Ex. 13)—more than six months after the email discussing his criminal history (Doc. 62-5, P-Ex. 411). Dr. de Virgilio does not recall referring to a "felony" as opposed to a generic criminal charge (which Plaintiff reported as a misdemeanor). The context of this ostensible discussion at the March 2016 meeting shows that Dr. de Virgilio minimized any importance of Plaintiff's prior conviction, irrespective of its designation:<br><br>Dr. DeVirgilio relayed to the MEC that Dr. Ryan was accusing Dr. White of plagiarism in his research studies. The MEC asked whether there had been any indication of such unprofessional behavior by Dr. Ryan prior to him coming to Harbor. Dr. DeVirgilio had reviewed Dr. Ryan's credentials file and found only that Dr. Ryan had previously been charged with felony destruction of | Nonetheless, Dr. Putnam presided over a PSA meeting at which Dr. De Virgilio told the PSA that Dr. Ryan had been convicted of a felony, did not correct him, and circulated minutes with that false statement in them.<br><br>White Decl., Exh. 360, p. 4260. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| property, to which he pled "no contest". <br><br> (Doc. 61-7, D-Ex. 13 at 12111; Doc. 62-5, P-Ex. 360 at 4260.) | |
| **161. Misstates the evidence.** The bases for recommended discipline are stated in the Notice of Charges. (Doc. 61-7, D-Ex. 381.) The Notice of Proposed Action and Hearing Rights, by comparison, lists the Ad Hoc Committee's Findings and Recommendations, including that "at least one key physician confirmed he is leaving Harbor-UCLA" due to Plaintiff's behavior" and that several others "often think about leaving their jobs" due to Plaintiff's behavior. (Doc. 61-7, D-Ex. 380 at 3676-77.) Undisputed that HIPAA violations were not listed. (*See* RSF 34, *supra*.) | On October 5, 2016, Dr. Putnam sent Dr. Ryan a "Notice of Proposed Adverse Action and Hearing Rights." That notice did not cite HIPAA vilations [*sic*] as a basis for discipline, but did assert that a basis for discipline was that a doctor was leaving Harbor because of Dr. Ryan's behavior. <br><br> Manier Decl., Exh. 360 [*sic*] at 1-2. |
| 162. Undisputed. (*See* RSF 36, *supra*.) | On November 10, 2016, Dr. Putnam sent Dr. Ryan a "Notice of Charges" outlining the PSA's accusations against him. That letter listed "Openly threatening to call external agencies to conduct investigations" and "Openly making unfounded accusations in an angry manner" as some of Dr. Ryan's violations. It did not mention HIPAA violations. <br><br> Manier Decl., Exh. 381 at 3. |
| **163. Misstates the evidence.** In his deposition taken more than five and one-half years after the FPPE report was issued, Dr. Putnam testified he did not "specifically remember" what accusations Plaintiff made that were unfounded. Dr. | Dr. Putnam does not know what unfounded accusations Dr. Ryan made, and doesn't know if he knew at the time he reviewed the Notice of Charges, and doesn't know if the Ad Hoc Committee that performed the FPPE determined |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| Putnam was then asked, "Do you know if he [*sic*] knew what they were at the time that you reviewed this letter," and answered, "I don't specifically know, no." When asked if he was aware of "a determination which of Dr. Ryan's accusations were founded or unfounded," Dr. Putnam responded: "That was part of the responsibility of the FPPE Committee, was to find out the facts. I don't know specifically with regard to your question about accusations." (Putnam Depo. 166:20-167:16.) | whether any of Dr. Ryan's accusations were unfounded.<br><br>Putnam Depo., 166:20-167:16. |
| 164. Assumed true only for purposes of summary judgment. | On December 13, 2016, after sending Dr. Ryan the Notice of Charges, Dr. Putnam sent Dr. Vintch past PSA minutes and invited her to "look them over."<br><br>White Decl., Exh. 360 at 1. |
| 165. Undisputed. | On February 27, 2017, Dr. Putnam sent Dr. Ryan a First Amended Notice of Charges setting forth the PSA's accusations against him. The Amended notice deleted the allegations that Dr. Ryan "Openly threatening to call external agencies to conduct investigations" and "Openly making unfounded accusations in an angry manner", leaving an empty bullet point where those allegations had been. The amended notice still didn't mention HIPAA.<br><br>Manier Decl., Exh. 382 at 3. |
| 166. Assumed true only for purposes of summary judgment. | Dr. Putnam testified that he did not consider whether Dr. Ryan make any false allegations against Dr. White in |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | voting on PSA measures against Dr. Ryan.<br><br>Putnam Depo. 131:2-132:7. |
| 167. Assumed true only for purposes of summary judgment. | Dr. Vintch testified that the accusation that Dr. Ryan "openly threatened to call external agencies to conduct investigations" was accurate based on all of the agencies she has had to respond to.<br><br>Vintch Depo., 170:11-171:3 |
| 168. Assumed true only for purposes of summary judgment. | Dr. Vintch doesn't remember if Dr. Ryan "openly made unfounded accusations in an angry manner. [*sic*]<br><br>Vintch Depo, 171:18-172:2. |
| **169. Objection**: Hearsay, lacks foundation, conclusory, improper opinion. Assumed true only for purposes of summary judgment that Plaintiff has "applied to [*sic*] dozens of surgeon positions." | Since the PSA's proceedings against Dr. Ryan in 2016, he has applied to dozens of surgeon positions.  Those applications require him to disclose whether he have ever been investigated by a Professional Staff Association.<br><br>Ryan Decl. at ¶ 22. |
| **170. Objection**: Lacks personal knowledge or other foundation, conclusory, improper opinion. Assumed true only for purposes of summary judgment that Plaintiff has not received any response from the vast majority of his dozens job applications, and that in all but three or four occasions in which he has received a request for follow-up information, the process has stopped short of an interview. | Dr. Ryan has not received any response from the vast majority of his dozens job applications.  In all but three or four occasions in which he has received a request for follow-up information, the process has stopped short of an interview.  This is consistent with his understanding and professional experience over his career that hospitals and practices will not hire surgeons who are the subject of peer review investigations regarding their privileges. |

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | Ryan Decl. at ¶ 22. |
| **171. Argumentative and misstates the evidence.** Undisputed that the Behavioral Agreement includes the quoted provision, but it pertains only to internal complaints of misconduct. Nothing in the Agreement purports to limit Plaintiff's reports outside his job duties about matters of public concern. (*See* RSF 32, *supra*.) | The Behavioral Agreement offered to Dr. Ryan including a term purporting to limit to whom Dr. Ryan could complain about misconduct:<br><br>"Dr. Ryan shall address any criticisms of, or concerns about, nurse, residents, interns, faculty, employees, PSA members, administrative staff, patients, visitors, or other individuals in the Hospital in private to the appropriate supervisor, administrator, faculty or PSA leader in a courteous manner, or in written reports using the established Hospital reporting forms and procedures.  Dr. Ryan shall not engage in unconstructive criticism addressed to any person in such a way as to intimidate, undermine confidence, belittle or imply stupidity or incompetence."<br><br>Defendants' Exhibits, Exh. 370 [*sic*] at 3. |
| 172. Undisputed, except for the typographical errors. (*See* RSF 32, *supra*.) | The Behavioral Agreement that the MEC offered Dr. Ryan included a waiver of claims reading "Dry [*sic*] Ryan agrees to hold free and harmless the Hospital, members of the EC or authorized committees of the Hospital's Professional Staff, the Programs, and any and all representatives of any of them, from and against any and all claims resulting from any and all actions taken, or communications made, consistent with the terms of this Agreement.  Dr. Ryan further |

| Defendants' Response and Supporting Evidence: | Plaintiffs' Additional Material Facts and Supporting Evidence: |
|---|---|
| | acknowledges that there shall be no monetary liability on the part of, and no cause of action for damages shall arise against, the EC, members of the EC or authorized committees of the PSA, the Hospital, or any and all representatives of any of them, for any acts performed or communications made regarding the subject matter of this Paragraph 3.2(ii). [*sic*]  Defendants' Exhibits, Exh. 370 [*sic*] at 5. |
| **173**. **Misstates the evidence**. Plaintiff testifies that he has "never been informed" of any such report. | Nobody from Harbor ever reported Dr. Ryan to any state agency for violating patient privacy rules by reviewing medical records.  Ryan Decl., ¶ 21. |

DATED:  November 22, 2021            BALLARD ROSENBERG
                                     GOLPER & SAVITT, LLP

                                     By: _____
                                          John J. Manier
                                     Attorneys for Defendants BRANT PUTNAM,
                                     M.D., JANINE VINTCH, M.D., ANISH
                                     MAHAJAN, M.D., CHRISTIAN DE
                                     VIRGILIO, M.D., HAL F. YEE, M.D., ROGER
                                     LEWIS, M.D., and MITCHELL KATZ, M.D.

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 15760 Ventura Boulevard, Eighteenth Floor, Encino, CA 91436.

On November 22, 2021, I served true copies of the following document(s) described as **RESPONSE TO PLAINTIFF'S STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT RE: MOTION OF DEFENDANTS BRANT PUTNAM, M.D. AND JANINE VINTCH, M.D. FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

☐ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List.  I am "readily familiar" with Ballard Rosenberg Golper & Savitt, LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Encino, California, on that same day following ordinary business practices.

☐ **BY FEDEX:** I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List.  I deposited such document(s) in a box or other facility regularly maintained by FedEx, or delivered such document(s) to a courier or driver authorized by FedEx to receive documents, in an envelope or package designated by FedEx with delivery fees paid or provided for, addressed to the person(s) being served.

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:** By electronic mail transmission, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 22, 2021, at Encino, California.

_____
Darla Salter

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

1

**SERVICE LIST**

2

3   Mark T. Quigley, Esq.                         Jeffrey M. Hausman, Esq.
    Aaron L. Osten, Esq.                          Law Offices of Hausman & Sosa LLP
                                                  20750 Ventura Blvd., Suite 105
4   Greene Broillet & Wheeler, LLP                Woodland Hills, CA 91364
    222 No. Pacific Coast Highway,  Suite 2100    Tel: (818) 654-9000
5   P.O. Box 955                                  Fax: (818) 654-9050
    El Segundo, CA 90245
6   Telephone: (310) 576-1200                     e-mail:  JHausman@hausmansosa.com
    Email: mquigley@gbw.law
7          aosten@gbw.law                         ***Attorneys for Defendant***
                                                  ***County of Los Angeles***
8   Courtesy cc:
    VWinn@gbw.law
9

10  ***Attorneys for Plaintiff and Appellant***
    ***Timothy Ryan, M.D.***

11

12

13  Stuart Esner, Esq.
    Law Offices of Esner, Chang & Boyer
14  234 E. Colorado Boulevard, Suite 975
    Pasadena, CA 91101-2262
15  Tel.:  (626) 535-9860
    sesner@ecbappeal.com
16
    ***Attorneys for Plaintiff***
17

18

19

20

21

22

23

24

25

26

27

28

Response to Plaintiff's Statement of GDMF re: MSJ of Defendants Putnam & Vintch