LINDA MILLER SAVITT, SBN 94164
lsavitt@brgslaw.com
JOHN J. MANIER, SBN 145701
jmanier@brgslaw.com
LINDA B. HUREVITZ, SBN 127337
lhurevitz@brgslaw.com
BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 Ventura Boulevard, Eighteenth Floor
Encino, California 91436
T: (818) 508-3700 | F: (818) 506-4827

Attorneys for Defendants BRANT PUTNAM,
M.D., JANINE VINTCH, M.D., ANISH
MAHAJAN, M.D., CHRISTIAN DE VIRGILIO,
M.D., HAL F. YEE, M.D., ROGER LEWIS, M.D.,
and MITCHELL KATZ, M.D.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

TIMOTHY D. RYAN, M.D., an
individual,

        Plaintiff,

    vs.

BRANT PUTNAM, M.D., an
individual, JANINE VINTCH, M.D., an
individual, ANISH MAHAJAN, M.D.,
an individual, CHRISTIAN DE
VIRGILIO, M.D., an individual, HAL
F. YEE, M.D., an individual, ROGER
LEWIS, M.D., an individual, and
MITCHELL KATZ, M.D., an
individual,

        Defendants.

Case No. 2:17-cv-05752-CAS-RAO

[*Hon. Christina A. Snyder*]

**SUPPLEMENTAL DECLARATION
OF JOHN J. MANIER**

Action Filed:   August 3, 2017
Trial Date:     April 26, 2022

/ / /

/ / /

/ / /

/ / /

/ / /

*Sidebar (vertical text):* BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

1705517.1

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

I, John J. Manier, declare as follows:

1.      I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

2.      I am a member of the State Bar of California and am admitted to practice as an attorney before the Supreme Court of the United States, the United States Courts of Appeals for the Third, Ninth, Tenth, and District of Columbia Circuits, and all state and federal courts in California. I am a Senior Counsel with the law firm of Ballard Rosenberg Golper & Savitt, LLP, counsel of record for all Defendants in the above-captioned lawsuit filed by Plaintiff Timothy Ryan, M.D.

3.      Attached to this declaration are relevant excerpts from the following depositions taken in the above-captioned matter:

- Timothy D. Ryan, M.D., taken by Defendants on March 18, 2021
- Brant Putnam, M.D., taken by Plaintiff on October 22, 2021
- Christian de Virgilio, M.D., taken by Plaintiff on October 26, 2021

4.      As stated in my Declaration of October 29, 2021, Ballard Rosenberg Golper & Savitt, LLP, also serves as counsel of record for Defendant County of Los Angeles (the "County") in another lawsuit filed by Dr. Ryan on January 8, 2016, currently pending in the Superior Court of California, County of Los Angeles, No. BC606535. I have worked on Dr. Ryan's state court lawsuit and am therefore familiar with the documents produced and exhibits marked for trial by the parties.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

5. None of the parties to the above-captioned lawsuit or Dr. Ryan's state court lawsuit have produced a signed version of Medical Executive Committee ("MEC") meeting minutes for September 28, 2015. Our firm and our clients have searched extensively for signed versions of minutes for all MEC meetings produced in the above-captioned lawsuit and in the state court lawsuit, but have been unable to locate a signed version of the minutes for September 28, 2015.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 22, 2021, at Sherman Oaks, California.

_____
John J. Manier

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

```
 1              UNITED STATES DISTRICT COURT
 2        CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION
 3
    _____
 4  TIMOTHY D. RYAN, M.D., an     )
    individual,                   )
 5                                )
              Plaintiff,          )
 6                                )
        vs.                       )No.
 7                                )2:17-cv-05752-CAS-RAO
    BRANT PUTNAM, M.D., an        )
 8  individual, et al.,           )
                                  )
 9            Defendants.         )
                                  )
10                                )
                                  )
11  _____)
12
13           REMOTE VIDEOTAPED DEPOSITION OF
14                TIMOTHY J. RYAN, M.D.
15               Los Angeles, California
16               Thursday, March 18, 2021
17                     Volume I
18
19
20
21  Reported by:
    NANCY A. MORROW
22  CSR No. 11977
23  Job No. 4462534
24
25  PAGES 1 - 315
```

Page 1

1    the date of August -- of January 30th, 2015, was

2    that document ever given to you?

3        A   It was shown to me but not given to me.

4        Q   Okay.  Did you ever --

5        A   I take that back.  No, I got it through        11:34:22

6    discovery in the state case eventually.

7        Q   Okay.  Did you ever request a list or an

8    ORSOS report for patients in 2015 or 2014?

9        A   In 2014, yes; in 2015, no.

10       Q   Okay.  So when in 2014 did you request a list   11:34:54

11   of patients?

12       A   Twice.

13           (Discussion off the record.)

14   BY MS. SAVITT:

15       Q   Okay.  So when in 2014 did you request a list   11:35:16

16   of patients?

17       A   When I was preparing my own paperwork for the

18   BEST-CLI trial, I went to the surgery scheduling

19   office and asked for all of my cases from October

20   2013 through October 2014, so it would have been end   11:35:53

21   of October or early November, sometime in that time

22   frame.

23       Q   Okay.  Did you ask for it orally or in

24   writing?

25       A   Orally.                                         11:36:08

1    Q   Did you provide anybody any documentation of

2    what you were looking for?

3    A   No, I just said I want all my cases.

4    Q   Who did you speak to?

5    A   Her first name was Cathy.  I think it's          11:36:21

6    Cathy.  She was Amanda's boss.  I can't remember her

7    last name, Amanda's boss.

8    Q   Okay.  And --

9    A   -- she's a supervisor in the surgery

10   scheduling office.                                    11:36:41

11   Q   Okay.  So the -- and what was the purpose of

12   requesting all your surgery cases?

13   A   Well one purpose is to maintain

14   certification.  A surgeon needs to keep a case log

15   and submit it to the American Board of Surgery to     11:37:10

16   maintain your board certification.  And another

17   purpose was to count my cases to be sure that I had

18   the requisite number of open and endovascular cases

19   to qualify to enroll patients in the BEST-CLI trial.

20   Q   Okay.  And what was the other purpose, if        11:37:31

21   any, for asking for all your cases?

22   A   I told you the two purposes.  That was it.

23   Q   Okay.  Did you ask for any cases prior to

24   your start date at Harbor-UCLA?

25   A   No.                                               11:37:48

Page 88

1      Q    Okay.   What were you given when --

2      A    So there were two requests.   Are you talking

3   about the first request or the second request?

4      Q    Let's start with the first request.

5      A    So the first request, I received an 80-page          11:38:02

6   document that had 335 cases done by me.

7      Q    Okay.   And the second request, what did you

8   get?

9      A    The second request, I went to Amanda and I

10   asked her if she could run a list based on the CPT          11:38:20

11   codes that would qualify anybody to participate in

12   BEST-CLI and give me a total of the number of cases

13   done.

14          MS. SAVITT:   Okay.   Okay.   Let's go off the

15   record for just a second.   Okay.   Let me see if I          11:38:40

16   can figure out what's going on here and then --

17          Is that okay with you, Ken?

18          MR. WHITE:   Of course.

19          MS. SAVITT:   Okay.   Thanks.

20          THE VIDEOGRAPHER:   Okay.   We're going off the          11:38:47

21   record.   The time is 11:38 a.m.

22          (Recess.)

23          THE VIDEOGRAPHER:   Okay.   We're back on the

24   record at 11:43 a.m.

25   BY MS. SAVITT:                                                11:43:19

Page 89

1        Q    Dr. Ryan, I'm going to put up an exhibit.

2    I'm going to see if this works.

3        A    Okay.

4        Q    Do you see that?

5        A    I do.                                    11:43:24

6        Q    Do you know what this --

7             Let's mark this as Exhibit 1.

8             (Exhibit 1 was marked for identification

9    by the court reporter and is attached hereto.)

10   BY MS. SAVITT:                                    11:43:30

11       Q    Do you know what this document is?

12       A    Yes.

13       Q    What is this exhibit?  What is Exhibit 1?

14       A    So that document appears to be a copy of a

15   list that I gave Amanda in the fall of 2014.       11:43:42

16       Q    Okay.  And what was the purpose -- now that

17   we have it on the screen, I can ask a more

18   intelligible question.

19             What was the purpose of giving her this list

20   of CPT codes?                                      11:44:03

21       A    To confirm my suspicion or confirm my

22   knowledge, provide proof of the fact that Dr. White

23   and Dr. Donayre were unqualified to enroll patients

24   in the BEST-CLI trial, to protect patients from them

25   enrolling patients.                                11:44:30

Page  90

1    Q   Why did you think they were unqualified to

2    enroll patients in the BEST trial?

3    A   Because I had been there and I had operated

4    with both of them and I knew that the BEST trial had

5    very strict case volume requirements and I knew that    11:44:45

6    neither of them did any of the procedures that would

7    qualify them for the endovascular arm and I knew

8    that Dr. White hadn't done any of the open surgical

9    cases in the last year and I suspected, and was

10   proven right, that he hadn't done enough over the    11:45:11

11   previous two or five years to qualify.

12   Q   So why didn't you just go to Dr. White and

13   say have you done these procedures?  You know, I'm

14   curious.  Why didn't you just go ask him?

15   A   I didn't use those words, but I did go to    11:45:30

16   him.

17   Q   Okay.  What did he say?

18   A   I went to him -- what did he say?  He said

19   something -- it was in -- I think it was an e-mail

20   and he said something like, well, we'll just get the    11:45:43

21   trial up and running and see what happens.

22   Q   So why didn't you say but you haven't done

23   these procedures?

24   A   I did.

25   Q   And what did he say in response to that?    11:45:58

Page 91

1        A    He said, "Let's just get the trial up and

2    running and we'll see what happens."

3        Q    And you didn't pursue it further?

4        A    He was my boss.   He had demon- -- he had

5    shown me that he didn't want to have that                    11:46:08

6    discussion.

7        Q    He was also a peer, wasn't he, Doctor?

8        A    He was, but he was my boss.

9        Q    So you went back to 2012.   What did you get

10   in response to giving Amanda this document?                  11:46:23

11       A    Well, initially I got nothing because there

12   are actually two versions of that document in front

13   of you.   The first document was just the typewritten

14   text on the left with the black line in the middle

15   and it says "Bypasses" and then "Endovascular"              11:46:42

16   below.

17       Q    Okay.

18       A    And those -- I think they're five digits.   I

19   don't have my cheaters.   Are those five-digit

20   numbers?                                                     11:46:54

21       Q    Yes, they are five digits.

22       A    So those five-digit numbers are CPT codes,

23   which is current procedural technique, which is a

24   number that's generated by the American Medical

25   Association and is used by most insurance companies         11:47:04

Page 92

1  and Medicare to identify procedures to determine

2  reimbursement both for hospital stays and for

3  physicians.   And so I gave her those codes because

4  those are the universally used codes and she came

5  back with nothing, which I was puzzled by because I      11:47:22

6  had -- I knew that I had done a lot of these

7  procedures in the last year.

8         And she said, "Well, that's because we use

9  our own codes here.   We don't use the CPT codes."

10 And then she gave me a catalogue of the Harbor codes     11:47:37

11 with the description, and so I translated from the

12 CPT code on the left that you see there into those

13 handwritten numbers on the right.   Those are the

14 Harbor codes.

15    Q    Okay.   And then what did you do with the        11:47:52

16 Harbor codes?

17    A    I gave them to Amanda.

18    Q    Okay.   And after -- you have to help me

19 because I don't really know all this medical jargon

20 stuff.                                                    11:48:11

21         So what did you ask her to do with this --

22 with the handwritten Harbor codes?

23    A    I said, "Can you tell me how many of these

24 cases have been done?"

25    Q    And you wanted it by all physicians, right?      11:48:26

Page  93

1    A    Yes.

2    Q    And what did you get in response?

3    A    Well, she said she couldn't -- she didn't

4  have a way or she didn't know how to manipulate the

5  system to get me just a case count, so she gave me a          11:48:39

6  list of -- I think it was 12 pages long -- 111 --

7  111 patients, if my memory serves me correctly.

8    Q    And what did the 12 pages look like?

9    A    It looked like the same sort of format as

10  White's fraudulent leader list.                                11:49:08

11    Q    Do you still have that document?

12    A    Yes.

13    Q    And was it an ORSOS quality assessment and

14  research management report?

15    A    I don't know how it was labeled, but it          11:49:26

16  looked the same format as the January 30th report.

17    Q    Okay.  So let me go to --

18         MR. WHITE:  While you're doing that, was I

19  hearing a rooster earlier?

20         THE WITNESS:  Yes.                                 11:49:51

21         MR. WHITE:  Oh, thank god.  I thought I was

22  having a stroke.

23         THE WITNESS:  Sorry.  I'm used to it now.

24         MS. SAVITT:  Okay.  Let's mark this as

25  Exhibit 2.                                                 11:50:03

                                                    Page 94

1                    UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

4

5       TIMOTHY RYAN, M.D., AN INDIVIDUAL,       )
                                                 )
6                        PLAINTIFF,              )  CASE NO.
                                                 )  2:17-cv-05752-
7                  VS.                           )  CAS(RAOx)
                                                 )
8                                                )
        BRANT PUTNAM, M.D., AN INDIVIDUAL,        )
9       JANINE VINTCH, M.D., AN INDIVIDUAL,       )
        ANISH MAHAJAN, M.D., AN INDIVIDUAL,       )
10      CHRISTIAN DE VIRGILIO, M.D., AN           )
        INDIVIDUAL, HAL F. YEE, M.D., AN          )
11      INDIVIDUAL, ROGER LEWIS, M.D., AN         )
        INDIVIDUAL, AND MITCHELL KATZ, M.D.,      )
12      AN INDIVIDUAL,                            )
                                                 )
13                      DEFENDANTS.              )
        _____)

14

15

16              DEPOSITION OF BRANT PUTNAM, M.D.

17                  FRIDAY, OCTOBER 22, 2021

18

        LOCATION:  REMOTE PROCEEDING - CALIFORNIA

19

20      REPORTED REMOTELY BY:  SUSAN S. HENRIQUEZ, CERTIFIED
        SHORTHAND REPORTER NO. 13763

21

22      JOB NO. 4849701

23

24

25

                                                    Page 1

```
 1     say these are the minutes for this month, can you file
 2     them.
 3          Q    All right.  And where would they then be kept or
 4     maintained?
 5          A    As far as I know in the medical staff office
 6     somewhere.
 7          Q    All right.  Can you please look at Exhibit 360.
 8     (Whereupon Previously Marked Exhibit No. 360 was discussed
 9                      and is attached hereto)
10          THE WITNESS:  Yes, I have it.
11     BY MR. WHITE:
12          Q    Okay.  So 360 is an e-mail from you to Dr. Vintch
13     in December 2016; correct?
14          A    Yes.
15          Q    And you say can you look over these executive
16     session minutes for September 2015 to October 2016.  I
17     only included the months that we had executive sessions
18     and talked about Dr. Ryan.  I will sign them and send them
19     to the attorneys once you look them over.
20               Do you recall why you needed to send this, what
21     the occasion for doing this was?
22          A    Let's see this was in December 2016, I don't
23     specifically remember.  But clearly one of the attorneys,
24     either on the LA County side or the outside attorneys, was
25     requesting that we produce these.
```

Page 92

1      Q    Okay.  So if you scroll down a bit, these minutes

2   appear not to be signed; correct?

3      A    The ones I'm seeing, correct, have not been

4   signed.

5      Q    Okay.  So what would be the purpose of Dr. Vintch

6   looking them over?

7      A    Again, same as I mentioned before, that to the

8   best of both of our recollections, that they're accurate

9   with regard to the content of the meeting, the accuracy of

10  how things were presented in any discussion or actions

11  that we took as well as sort of the grammar.

12     Q    Okay.

13     A    You know other aspects.

14     Q    But this is being sent in December 2016; right?

15     A    Yes.

16     Q    For minutes going back to September 2015?

17     A    Right.

18     Q    So wouldn't that already have been done as to all

19  those minutes?

20     A    It should have been but as I stated before there

21  was a lot of variability and moving people in a medical

22  staff office so I would surmise that there was probably

23  some difficulties in locating the minutes from the medical

24  staff office.  I don't know.  But I was providing what I

25  thought were the accurate minutes at that time to Dr.

Page  93

1      Vintch to make sure these were indeed accurate.

2          Q   Okay.  So did you yourself search for the minutes

3      or did you task someone to do it?

4          A   I'm sorry.  I'm not understanding.  Search what?

5          Q   Well, did you yourself look around in the medical

6      staff office to try to find the minutes in order to

7      produce them?

8          A   I didn't personally, no.

9          Q   Did you instruct someone else to do that?

10         A   I might have.  I don't specifically recall.

11         Q   Okay.  And as to these minutes, do you know

12     whether or not there were prior signed versions?

13         A   I don't know.

14         Q   Okay.  Do you know whether or not you had

15     previously gone over these with Dr. Vintch for accuracy,

16     et cetera?

17         A   I don't specifically recall.  I think that was

18     part of the frustration, is I couldn't get a straight

19     answer one way or another about whether -- what minutes

20     were what meetings and did we have those finalized and on

21     file.  And somebody was now asking us for them, so I was

22     honestly trying to do my best to provide what I had and

23     making sure with Dr. Vintch that they were accurate and

24     sending them to whomever was asking for them.

25         Q   All right.  Once you pulled these minutes and

Page  94

1    shared them with Dr. Vintch, do you recall if she made

2    changes to them?

3         A   I don't honestly recall.

4         Q   All right.  Did you make changes to them at this

5    time in December of 2016?

6         A   I don't recall that either, to be honest with

7    you.

8         Q   All right.  Let's take our lunch break here.

9         (Luncheon recess from 12:15 to 12:40 p.m. PDT)

10   BY MR. WHITE:

11        Q   Okay.  Doctor, would you please turn to

12   Exhibit 361 and let me know when you're there, please.

13   (Whereupon Previously Marked Exhibit No. 361 was discussed

14                    and is attached hereto)

15        THE WITNESS:  Okay, I'm here.

16   BY MR. WHITE:

17        Q   All right.  So this appears to be an e-mail from

18   you and Patricia Arevalo.  Is she with the medical staff

19   office?

20        A   Yes.

21        Q   All right and this is December 182016 so this is

22   after you had circulated the minutes to Dr. Vintch;

23   correct?

24        A   Yes.

25        Q   As I recall you couldn't remember whether or not

                                                    Page 95

1     remember the date at which -- you know, some of that

2     information, I believe that was in early 2016 that we came

3     to -- or I came to know about some of that information.

4     BY MR. WHITE:

5          Q   All right.  So the next section talks about a

6     Luis Valentin, the Harbor UCLA HIPAA privacy officer?

7          A   Yes.

8          Q   Now, he did two different HIPAA inquiries, didn't

9     he?

10           MS. HUREVITZ:  Who?

11           MR. WHITE:  Dr. Valentin, the person I just asked

12     about.

13           MS. HUREVITZ:  Calls for speculation.  Lacks

14     foundation.

15           THE WITNESS:  To the best of my knowledge he did

16     an initial investigation and did some further

17     investigation.  I don't know if it was separate or not.

18     You would have to ask him that.

19     BY MR. WHITE:

20          Q   Okay.  Well the result of the initial

21     investigation there was a finding there was no HIPAA

22     violation; correct?

23          A   I did see a preliminary report at some point

24     that, yes, that that was accurate.

25          Q   All right.  So in this discussion here of

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3                    WESTERN DIVISION
 4
 5    TIMOTHY RYAN, M.D.,              )
                                       )
 6              Plaintiff,            )
                                       ) Case No.
 7         vs.                        ) 2:17-CV-05752
                                       ) CAS(RAOx)
 8    BRANT PUTNAM, M.D., an           )
      individual; JANINE VINTCH, M.D. )
 9    an individual, ANISH MAHAJAN,    )
      M.D., an individual, CHRISTIAN   )
10    DE VIRGILIO, M.D., an            )
      individual, HAL F. YEE, M.D.,    )
11    an individual, ROGER LEWIS, M.D.)
      an individual, and MITCHELL      )
12    KATZ, M.D., an individual,       )
                                       )
13              Defendants.           )
      _____)
14
15
16
17
18         DEPOSITION OF CHRISTIAN De VIRGILIO, M.D.
19              TUESDAY, OCTOBER 26, 2021
20
21
22
23    JOB NO.:  4849715
24    REPORTED BY TARA SANDFORD, CSR NO. 3374, RPR
25    PAGES 1 - 182
```

                                              Page 1

 1    document?

 2         A.   I'm not sure what that means.

 3              MS. HUREVITZ:  Objection; assumes facts not in

 4    evidence, that Dr. White made claims about when this

 5    document was printed.

 6         Q.   BY MR. WHITE:  I didn't catch your answer,

 7    Doctor.

 8         A.   I'm not really sure what you're asking.

 9         Q.   Dr. White's initial email making his complaint

10    was on January 26, 2015; correct?

11         A.   I don't know.  I'd have to --

12         Q.   Let's go back to Exhibit 340.

13         A.   Yeah.

14         Q.   Do you have Exhibit 340?

15         A.   It's twirling.  Okay.  Right.

16              So the date here is January 26, 2015.  Okay.

17         Q.   Okay.  So that's his initial complaint;

18    correct?

19              MS. HUREVITZ:  Well, I'm going to object that

20    misstates the evidence.

21         Q.   BY MR. WHITE:  Doctor, do you have an answer?

22         A.   I don't know this is the initial complaint.

23    All I know is there is a complaint here.  I can say

24    there is a complaint here on the 26th.

25         Q.   And then the document we were just looking at,

                                              Page 41

1    Exhibit 341, is an email dated February 4 with

2    attachments; correct?

3         A.   Correct.

4         Q.   And on the last page of that exhibit is the

5    printout we were just talking about; correct?

6         A.   There's a date down there.

7         Q.   Yes.  And that date, 1/30/15, is after the date

8    of Dr. White's initial email that we just looked at?

9              MS. HUREVITZ:  The document will speak for

10   itself.

11        Q.   BY MR. WHITE:  Is that correct, Doctor?

12        A.   If you're just asking me is the date

13   1/30/15 after the date 1/26/15, yes.  That date is a

14   different date, and it is after the other date.

15        Q.   Did you ever investigate or consider how this

16   document could be something produced at Dr. Ryan's

17   request if -- as Dr. Ryan was complaining if it was

18   produced after Dr. Ryan complained?

19        A.   I'm confused by the question.

20        Q.   Dr. White was complaining about some things Dr.

21   Ryan did; right?

22        A.   Yes.

23        Q.   And this document is dated after he submitted

24   his complaint; correct?

25        A.   Okay.

Page  42

1    Q.   Did you ever investigate whether this could
2  possibly be something Dr. Ryan had asked for before the
3  26th when it is dated on the 30th?
4    A.   The document was sent to HR, so it wasn't my
5  role at that point to investigate.   And I don't know
6  that I saw that there was a date at the bottom.
7    Q.   Did it ever become part of your role to
8  investigate any of these allegations in this complaint
9  package from Dr. White?
10    MS. HUREVITZ:   Objection; the question is
11  overbroad; vague and ambiguous.
12    If you can answer it, go ahead.
13    THE WITNESS:   As I understand, this complaint
14  was submitted to HR.   And I would expect that HR would
15  do the investigation.
16    Q.   BY MR. WHITE:   Did you do anything to counsel
17  Dr. Ryan about any of the issues reflected in this
18  complaint at this time?
19    A.   I would have to read through the whole detail
20  and then think about it.
21    Do you want me to do that?
22    Q.   Well, let's --
23    A.   I would have to go back to it and read -- you
24  didn't give me a chance to read through it.
25    Q.   Okay.   Why don't you read Bates number pages

Page  43

1      623 to 633 is the narrative on Exhibit 341.  It's under

2      the label, "Invasion of privacy report."  If you would

3      like to read that, then I'll re-ask the question.

4           A.   I keep having trouble.  This whole thing just

5      keeps --

6                MS. HUREVITZ:  Let me show you.  Are you in

7      Exhibit 341?  Go back to 340 -- you are in Exhibit 341;

8      right, Ken?

9                MR. WHITE:  Yes.

10               MS. HUREVITZ:  341.

11               MR. WHITE:  Correct.

12               THE WITNESS:  What is your question now then?

13          Q.   BY MR. WHITE:  My question was, did you counsel

14     Dr. Ryan about any of these issues as a result of

15     receiving this complaint?

16          A.   I don't believe that I counseled him, no, as a

17     result of this complaint.

18          Q.   And when you became chair, did you begin to

19     counsel him about the --

20          A.   Counsel who?

21          Q.   Did you begin to counsel Dr. Ryan about the

22     anger issues that you described earlier?

23          A.   I do know at one point I spoke to him about his

24     sometimes explosive temper by offering to send him a

25     book to try to help with being more positive.  And I

1    tried to talk to him about it, but there wasn't -- there

2    wasn't sort of a formal counsel.

3        Q.   Did you offer him the book and try to talk to

4    him in the context of telling him that his behavior was

5    a problem?

6        A.   I remember that he told me that he wasn't able

7    to be like me in terms of holding things in.  And I

8    tried to talk to him about just being a little more,

9    sort of, collaborative.

10       Q.   But my question was, in these discussions

11   you're describing, did you tell him that his behavior

12   was a problem that needed to be corrected?

13            MS. HUREVITZ:  More than what he already

14   testified to?

15            MR. WHITE:  More than what he's already

16   testified to.

17            THE WITNESS:  I think, again, these were -- one

18   has to -- I tried once to also -- I don't remember the

19   date -- to meet with him to go over his teaching

20   evaluations.  This was probably later because he had a

21   lot of negative teaching evaluations from the medical

22   students.  And it was challenging to provide counseling

23   because he would get angry and sort of flip the script,

24   so to speak.

25            So when I met with him to go over his medical

1    school student evaluations, he basically said I don't

2    want to hear about it.  And he began to talk about the

3    lawsuit instead, and basically warned me I should get my

4    own personal attorney because things were not looking

5    good for me.

6        Q.   BY MR. WHITE:  When you say talking about the

7    lawsuit, about a lawsuit that he had brought?

8        A.   Yes.

9        Q.   This discussion you're describing now was after

10   he had sued; is that correct?

11       A.   I believe it was after the county lawsuit.

12       Q.   All right.  Thank you.

13       MR. WHITE:  Next I'd like you, please, to look

14   at Exhibit 350.

15            (Whereupon, Exhibit 350 was marked

16             for identification by the Court Reporter

17             and attached hereto.)

18            THE WITNESS:  Okay.

19       Q.   BY MR. WHITE:  So --

20       A.   This is the one from September 2?

21       Q.   Yes.  Starting from the bottom, there is an

22   email from Dr. White to a number of people cc'd to you,

23   correct, dated August 25, 2015?

24       A.   Yes.

25       Q.   It says it is "attaching a request for

Page 46

```
 1        A.    He doesn't -- he didn't answer.

 2        Q.    Did you report that incident to anyone?

 3        A.    No.

 4        Q.    What's the next instance you can remember when

 5   you are talking about other instances about his temper?

 6        A.    At conferences he would get very angry if

 7   people disagreed with his approach.  He would,

 8   basically, kind of dominate the conversation, and put

 9   down other people who disagreed with his approach to

10   doing things.

11        Q.    First of all, so we're clear, tell me what you

12   mean by --

13        A.    Can I apologize?  I have been drinking a lot of

14   water.  I need to take a little restroom break.

15              MR. WHITE:  Five minutes?

16              MS. HUREVITZ:  Yes.

17              MR. WHITE:  Thank you.

18              Off the record, please.

19              (Recess taken at 11:33 a.m. - 11:38 a.m.)

20              MR. WHITE:  Would you read back the last

21   question and answer?

22              (Record read as follows:

23              "Q  What's the next instance

24              you can remember when you are

25              talking about other instances
```

Page 73

1           about his temper?
2               "A   At conferences he would get
3           very angry if people disagreed
4           with his approach.   He would,
5           basically, kind of dominate the
6           conversation, and put down
7           other people who disagreed with
8           his approach to doing things.")
9       Q.   BY MR. WHITE:   Tell me what you mean by a
10   conference.
11      A.   We have a vascular conference.   It is a
12   once-a-week Wednesday conference where the vascular
13   surgeons, the residents, and the students, and the
14   nurses usually sit in a room, preCOVID, of course, and
15   then review cases and discuss cases.
16      Q.   These were happening before you became chair of
17   the department?
18      A.   Yes, these were going on for many years.
19      Q.   Did you observe this behavior you described
20   before you became chair?
21      A.   Yes.
22      Q.   What did you do about this behavior?
23      A.   What do you mean?
24      Q.   Before you became chair, did you ever report it
25   or ask that someone correct it?

1        A.   No.

2        Q.   Once you became chair did you take any steps to

3   counsel Dr. Ryan about it?

4        A.   Again, as I said before, the times where I told

5   him to sort of take a deep breath, try to be more

6   optimistic, but there were not a series of

7   recommendations, no.

8        Q.   I appreciate that you've referred to that

9   before.  What I'm wondering is if you ever approached

10  him in the mode of your behavior is a problem; I need

11  you to change it, a directive from his boss.

12       A.   You have to recognize that many people were

13  afraid of him.  And he would often, if things weren't

14  done as he wanted, he would start issuing threats.

15       Q.   Were you afraid of him?

16       A.   He was intimidating, yes.  I wouldn't say

17  that -- I wouldn't say that I had this fear, but he was

18  very intimidating every time -- not every time, but

19  there were times where I met with him that he would say

20  threatening things, not to my personal health but make

21  threats that I can give you examples of.

22       Q.   Yes, let's get the examples.  What time period

23  are we talking about here when you're talking about

24  these interactions when he's making threats?

25       A.   Throughout his time.

Page 75

1        Q.    Give me some examples of some threats.

2        A.    One example is there was a patient that

3    Dr. White and Dr. Donayre, who are two vascular

4    surgeons, were scheduled to do a carotid stent

5    procedure.   And the patient was scheduled the following

6    day to go to the operating room.   Somehow Dr. Ryan found

7    out that Dr. White and Donayre were planning this

8    operation, which I'm not sure how he came to know it.

9    He also apparently thought this was his patient and they

10   were stealing this patient from him.   Keep in mind, we

11   don't get any financial reimbursement for doing the

12   surgery.

13          He came to my office saying this operation

14   needs to be stopped because this is my patient; I should

15   be doing this operation tomorrow.

16       Q.    Okay.

17       A.    So, I, of course, was concerned about it by the

18   allegation, so I immediately called our CMO to inform

19   him.

20          And I then had to do a quick investigation.   So

21   I went to the medical records as the chair and could not

22   find any evidence of Dr. Ryan having been assigned to

23   this patient or by having any notes from him.

24          I then called the referring physician to ask

25   them, "Did you refer this patient to Dr. Ryan?"

1        She said, "No, I referred this patient to the

2   vascular clinic and to Dr. White and Donayre."

3        As we were talking -- before this I was talking

4   to Dr. Ryan, and he said, "If you don't do something

5   about this now, I'm going to go to the L.A. Times and

6   tell them that there's timecard fraud going on here at

7   Harbor."

8        I'm like, "What timecard fraud?"

9        "There are several surgeons who are committing

10  timecard fraud who are not here as much as they are

11  supposed to be.  If you don't look at this now and get

12  this stopped, I'm going to go to the L.A. Times."

13       I became anxious.  And I am thinking, gee, Drs.

14  White and Donayre have stolen this patient, and I have

15  literally 12 hours or 6 hours to figure this out.

16       I went to the medical record.  I spoke to the

17  referral physician.  The medical record didn't have a

18  note of Dr. Ryan.  The physician said I didn't refer him

19  to Dr. Ryan.

20       I then called -- or I emailed Dr. Ryan back and

21  said, "Based on my investigation, I don't see that you

22  were involved in the care."

23       He said, "Okay, thanks.  But I still think it

24  was my patient."

25       And then what happened is Dr. White and Donayre

Veritext Legal Solutions
866 299-5127

1    got upset and they said we don't feel comfortable

2    operating tomorrow.  We ended up canceling the patient's

3    surgery because they got really distraught at getting

4    accused.

5        Q.   Did you take any steps as a result of that

6    incident?  For instance --

7             MS. HUREVITZ:  I'm sorry.  I didn't mean to

8    interrupt you.

9        Q.   BY MR. WHITE:  As a result of what you just

10   described, did you make any report to anyone about Dr.

11   Ryan?

12       A.   Again, I brought this to Dr. -- to the CMO's

13   attention.  And again, this may have been something that

14   was discussed at the MEC.  I'd have to look back at the

15   notes.

16       Q.   You don't have any independent recollection?

17       A.   I can't recall at the moment.

18       Q.   What's the next instance of him making a

19   threat, the way you used that term, that you can recall?

20       A.   Well, he -- one other situation was when one of

21   our new vascular surgeons, her name is Dr. Nina Bowens,

22   when she came aboard, Dr. Ryan was criticizing her in

23   our conferences, would criticize her management and

24   interrupt her as she was trying to talk.

25             And then a patient came in with an injury that

                                                    Page 78

```
 1    saying that.
 2         Q.   Is it a correct statement of what you feel?
 3         A.   I don't feel that it was -- no, I don't think
 4    it was -- I don't feel that way either, no.
 5         Q.   So if it wasn't for that purpose, what purpose
 6    would you say Dr. Ryan looked at the private patient
 7    information for?
 8         A.   I really can't -- I can't speculate what he's
 9    thinking about.
10         Q.   All right.  The next sentence says, "The NIH
11    subsequently investigated Dr. Ryan's complaint and
12    determined that it was unfounded.  And Harbor UCLA
13    continues to take part in the study."
14              Did you tell them that?
15         A.   Yeah.  I don't recall that either.
16         Q.   Do you believe that's correct?
17         A.   My understanding was that the study was still
18    going because Dr. Koopman did have provisional --
19    provisional -- my understanding is Dr. Koopman still had
20    provisional approval to do the study, so I thought that
21    the study was still continuing.
22         Q.   Did you understand that the investigation
23    determined that some people did not have the
24    qualifications to do the endovascular portion of the
25    study?
```

Page 102

1    A.   I was aware that some people did not, but I was

2    not aware that the study was halted.   Because, as I

3    remember, Dr. Koopman I thought was still doing the

4    study.

5    Q.   The next sentence says, "He stated that Dr.

6    Ryan also accused Dr. Koopman of plagiarism and academic

7    fraud on an abstract he submitted from Dr. White's

8    research work, another unfounded complaint."

9         Is that something you told them?

10   A.   I may have said to him that Dr. Ryan accused

11   them of plagiarism and fraud.   But what I would have

12   said is that this was reported to L.A. BioMed, and that

13   Dr. Ryan was asked by L.A. BioMed to submit a formal

14   complaint, and that Dr. Ryan responded that I will do so

15   when my lawyers are ready to do so.

16   Q.   All right.

17   A.   I don't -- I don't believe I would have

18   concluded that it was unfounded.   It may be them

19   misinterpreting the information I gave them.

20   Q.   You are not aware of anyone determining that it

21   was unfounded?

22   A.   I don't think -- my recollection was that I

23   submitted the complaint to L.A. BioMed, and then L.A.

24   BioMed asked Dr. Ryan for information.   And my

25   understanding is he didn't provide the information is

Page 103

1          Q.    In the middle there is a sentence that says,

2     "This study was stopped before Dr. Ryan's complaint."

3               To the best of your knowledge, is that correct?

4          A.    My understanding was that the study was halted

5     so that the folks at NIH could investigate the

6     allegations of whether there was a problem with it.

7          Q.    How about the next sentence, "This complaint

8     was investigated and Dr. White was cleared of

9     allegations and Harbor UCLA was approved to continue the

10    research study."

11              Is that, to your knowledge, correct?

12         A.    Again, I don't recall the specifics, but my

13    understanding, as I mentioned, I thought we did.   In

14    fact, we were still allowed to continue the study

15    because I thought we actually at some point resumed --

16    we did resume the study.

17         Q.    Did you have an understanding Dr. White was

18    found not qualified to participate in the study?

19              MS. HUREVITZ:   Objection; that misstates the

20    evidence.

21              THE WITNESS:   Again, my understanding was that

22    Dr. White was allowed to do one arm of the study but not

23    the other arm.   I wasn't aware that he was told that he

24    could not participate.

25         Q.    BY MR. WHITE:   Let me publish a new exhibit for

                                                    Page 107

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 15760 Ventura Boulevard, Eighteenth Floor, Encino, CA 91436.

On November 22, 2021, I served true copies of the following document(s) described as **SUPPLEMENTAL DECLARATION OF JOHN J. MANIER** on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

☐ **BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List.  I am "readily familiar" with Ballard Rosenberg Golper & Savitt, LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Encino, California, on that same day following ordinary business practices.

☐ **BY FEDEX:**  I enclosed said document(s) in an envelope or package provided by FedEx and addressed to the persons at the addresses listed in the Service List.  I deposited such document(s) in a box or other facility regularly maintained by FedEx, or delivered such document(s) to a courier or driver authorized by FedEx to receive documents, in an envelope or package designated by FedEx with delivery fees paid or provided for, addressed to the person(s) being served.

☒ **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  By electronic mail transmission, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 22, 2021, at Encino, California.

_____
Darla Salter

**SERVICE LIST**

Mark T. Quigley, Esq.
Aaron L. Osten, Esq.
Greene Broillet & Wheeler, LLP
222 No. Pacific Coast Highway,  Suite 2100
P.O. Box 955
El Segundo, CA 90245
Telephone: (310) 576-1200
Email: mquigley@gbw.law
          aosten@gbw.law

Courtesy cc:
VWinn@gbw.law

***Attorneys for Plaintiff and Appellant
Timothy Ryan, M.D.***


Stuart Esner, Esq.
Law Offices of Esner, Chang & Boyer
234 E. Colorado Boulevard, Suite 975
Pasadena, CA 91101-2262
Tel.:  (626) 535-9860
sesner@ecbappeal.com

***Attorneys for Plaintiff***

Jeffrey M. Hausman, Esq.
Law Offices of Hausman & Sosa LLP
20750 Ventura Blvd., Suite 105
Woodland Hills, CA 91364
Tel: (818) 654-9000
Fax: (818) 654-9050

e-mail:  JHausman@hausmansosa.com

***Attorneys for Defendant
County of Los Angeles***

BALLARD ROSENBERG GOLPER & SAVITT, LLP
15760 VENTURA BOULEVARD, EIGHTEENTH FLOOR
ENCINO, CALIFORNIA 91436