1   BROWN WHITE & OSBORN LLP
    THOMAS M. BROWN (SBN 117449)
2   KENNETH P. WHITE (SBN 173993)
    333 South Hope Street, 40th Floor
3   Los Angeles, CA 90071-1406
    Telephone: 213.613.0500
4   Facsimile:  213.613.0550
    tbrown@brownwhitelaw.com
5   kwhite@brownwhitelaw.com

6   *Attorneys for Plaintiff*
    Timothy Ryan
7

8                   **UNITED STATES DISTRICT COURT**

9         **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  TIMOTHY RYAN, M.D., an individual,          Case No.:  2:17-cv-05752-CAS(RAOx)

12              Plaintiff,                       Judge: Hon. Christina A. Snyder

13  v.                                          **PLAINTIFF TIMOTHY RYAN,**
                                                **M.D.'S MEMORANDUM OF**
14  BRANT PUTNAM, M.D., an individual,          **POINTS AND AUTHORITIES IN**
    JANINE VINTCH, M.D., an individual,         **OPPOSITION TO DEFENDANTS'**
15  ANISH MAHAJAN, M.D., an individual,         **HALL F. YEE, M.D., ANISH**
    CHRISTIAN DE VIRGILIO, M.D., an             **MAHAJAN, M.D., MITCHELL**
16  individual, HAL F. YEE, M.D., an            **KATZ, M.D., CHRISTIAN DE**
    individual, ROGER LEWIS, M.D., an           **VIRGILIO, M.D., AND ROGER**
17  individual, and MITCHELL KATZ, M.D.,        **LEWIS, M.D.'S MOTION FOR**
    an individual,                              **SUMMARY JUDGMENT, OR**
18                                              **ALTERNATIVELY, PARTIAL**
                Defendants.                     **SUMMARY JUDGMENT**
19

20                                              Date:     March 21, 2022
                                                Time:     10:00 a.m.
21                                              Ctrm:     8-D

22

23                                              Action Filed:  August 3, 2017
                                                Trial Date:   April 26, 2022
24

25                                              *[Filed Concurrently Herewith:*
                                                *Response to Separate Statement;*
26                                              *Objections to Evidence; Supplemental*
                                                *Declarations of Timothy Ryan and*
27                                              *Kenneth P. White Thereto]*

28

---

                                    1
       PLAINTIFF'S MEMO OR POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO
     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY, PARTIES
                              SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ........................................................................................................... 1

   II.   FACTUAL AND PROCEDURAL BACKGROUND ..................................... 3

      A.   Dr. Ryan's Reports and the MEC's Retaliation ............................................. 4

      B.   Dr. Yee's, Dr. Katz's and Dr. Mahajan's Approval and Endorsement of the MEC's Retaliatory Actions ................................................................. 6

   III.   ARGUMENT ............................................................................................... 10

      A.   Legal Standard ............................................................................................. 10

      B.   Drs. Yee and Katz Took Approved and Endorsed Adverse Employment Action Against Dr. Ryan ........................................................ 11

      C.   Genuine Disputes of Material Fact Preclude Summary Judgment On Dr. Yee's and Dr. Katz's Motive ................................................................. 14

      D.   Genuine Disputes of Material Fact Preclude Summary Judgment On Dr. Yee's and Dr.Katz's Theories of Inevitability ........................................ 16

      E.   Dr. Yee and Dr. Katz are Not Entitled To Summary Judgment On Their Claims or Qualified Immunity ................................................................ 17

      F.   Genuine Disputes of Material Fact Preclude Summary Judgment as to Dr. Mahajan ...................................................................................................... 19

      G.   Genuine Issues of Material Fact Preclude Summary Judgment As to Dr. Lewis and Dr. de Virgilio ............................................................................. 22

         1.   Dr. de Virgilio Took Adverse Employment Action ................................. 22

         2.   Dr. Ryan Has Presented Evidence That Dr. de Virgilio and Dr. Lewis Had Retaliatory Motive ............................................................................ 22

         3.   Dr. Ryan Has Presented Evidence Creating a Genuine Dispute of Material Fact on Defendants' Justification and Inevitability Defenses ... 25

         4.   Dr. de Virgilio and Dr. Lewis Are Not Entitled To Summary Judgment On A Qualified Immunity Theory ........................................................... 25

      H.   Genuine Disputes of Material Fact Preclude Summary Adjudication of Punitive Damages Against the Moving Defendants ................................... 25

   IV.   CONCLUSION ........................................................................................... 27

PLAINTIFF'S MEMORANDUM OR POINTS AND AUTHORITIES IN SUPPORT OF
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR
ALTERNATIVELY, PARTIES SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

Page

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................... 11

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................... 11

*Coszalter v. City of Salem*,
  320 F.3d 968 (9th Cir. 2003) .............................................................. 16, 17

*Dahlia v. Rodriguez*,
  735 F.3d 1060 (9th Cir. 2013) ................................................................... 21

*Ellins v. City of Sierra Madre*,
  710 F.3d 1049 (9th Cir. 2013) ............................................................. 12, 19

*Freitag v. Ayers*,
  468 F.3d 528 (9th Cir. 2006 ................................................................ 12, 15

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) ................................................................... 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................ 11, 15

*Mueller v. Auker*,
  57 F.3d 979 (9th Cir. 2009) ....................................................................... 20

*Nissan Fire & Marine Ins. v. Fritz Cos.*,
  210 F.3d 1099 (9th Cir. 2000) ................................................................... 11

*Passantino v. Johnson Consumer Prods., Inc.*,
  212 F.3d 493 (9th Cir. 2000) ..................................................................... 29

*Ryan v. Putnam*,
  777 F. App'x 245 (9th Cir. 2019)............................................................... 12

*Smith v. Wade*,
  461 U.S. 30 (1983)....................................................................................... 29

*Stender v. Lucky Stores, Inc.*,
  803 F.Supp. 259 (N.D. Cal. 1992).............................................................. 29

*Tolan v. Cotton*
  (2014) 572 U.S. 650 .................................................................................... 20

*Twentieth Century-Fox Film Corp. v. MCA*,
  715 F.2d 1327 (9th Cir. 1983) ................................................................... 11

BROWN WHITE & OSBORN
A T T O R N E Y S

ii

PLAINTIFF'S MEMORANDUM OR POINTS AND AUTHORITIES IN SUPPORT OF
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR
ALTERNATIVELY. PARTIES SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>TABLE OF AUTHORITIES</u>**

<u>Page</u>

**<u>Statutes</u>**

28 U.S.C. § 1983 ............................................................................................. 2

**<u>Other Authorities</u>**

California Health & Safety Code § 1280.15(b)........................................ 10, 23

**<u>Rules</u>**

Fed.R.Civ.P. 45(a) ........................................................................................ 11

Fed.R.Civ.P. 56(c)(2) ................................................................................... 11

PLAINTIFF'S MEMORANDUM OR POINTS AND AUTHORITIES IN SUPPORT OF
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR
ALTERNATIVELY, PARTIES SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In its comprehensive and well-reasoned Order issued on January 10, 2022 (Docket No. 70, "the Summary Judgment Order"), this Court denied the Motion for Summary Judgment Dr. Brant Putnam and Dr. Janine Vintch filed.  Codefendants Dr. Hal. F. Yee, Dr. Mitchell Katz, Dr. Anish Mahajan, Dr. Roger Lewis, and Dr. Christian de Virgilio (collectively, "Defendants") have now filed their own similar Motion for Summary Judgment ("Motion").  For the same reasons, this almost mirror-image Motion fails just like the previous motion because genuine disputes of material fact preclude summary judgment and because Defendants' legal assertions are simply wrong.

Plaintiff Dr. Timothy Ryan ("Dr. Ryan"), a vascular surgeon at Harbor-UCLA Medical Center ("Harbor-UCLA"), demonstrated in his opposition to the prior motion that he detected two serious forms of fraud by his colleagues –falsifying qualifications related to a study the National Institute of Health ("NIH") sponsored, and a scheme to use stent grafts in patients in exchange for kickbacks from a device manufacturer. When his supervisors did not take his reports seriously, Dr. Ryan exercised his First Amendment right to petition his government by reporting the misconduct to outside authorities. He reported his colleagues to the NIH for falsifying their qualifications and to the District Attorney's Office for the kickback scheme.

Dr. Ryan's colleagues at Harbor retaliated trying to suspend his surgical privileges, which ended up destroying his career. Acting directly at the demands of Dr. Rodney White, whose misconduct Dr. Ryan reported, doctors on Harbor's Professional Staff Association's ("PSA's") Medical Executive Committee ("MEC") launched an investigation of Dr. Ryan, circulated false assertions about his conduct, demanded that he confess falsely as a price of keeping his surgical privileges at Harbor, and began to strip him of those medical privileges.  As MEC members are employees of the County of Los Angeles and acted in retaliation against Dr. Ryan's First Amendment rights, their actions violated 28 U.S.C. § 1983 ("Section 1983").

1

The Court agreed with Dr. Ryan that he had demonstrated genuine disputes of material fact precluding summary judgment on his claims against Dr. Putnam and Dr. Vintch.  Now Dr. Yee, Dr. Katz, Dr. Mahajan, Dr. Lewis, and Dr. de Virgilio offer the same meritless arguments:

- Dr. Yee, Dr. Katz, and Dr. Mahajan argue that they are not part of the MEC and did not do anything to retaliate against Dr. Ryan.  But the evidence shows otherwise:  they endorsed and approved the MEC's retaliatory actions, which is sufficient to trigger Section 1983 liability.  Dr. Yee expressly told the MEC to move forward with its investigation despite knowing that it appeared retaliatory, and Dr. Yee and Dr. Mahajan responded to Dr. Ryan's complaints of retaliation by scheming to reassure MEC members that the County would indemnify them for their "appropriate and approved" work.  Reasonable inferences support that Dr. Katz, the Director of Los Angeles County's Department of Health Services, joined Dr. Yee's approval of the MEC's actions.

- All moving Defendants argue that there is no proof they had retaliatory motive, that their actions were justified even if based on Dr. Ryan's speech, and that they would have taken the same actions whether or not Dr. Ryan had engaged in protected speech.  But as the Court has already specifically concluded, Dr. Ryan has presented sufficient evidence to create a genuine dispute of material fact about whether the MEC's actions – which Dr. Yee, Dr. Katz, and Dr. Mahajan approved, and in which Dr. de Virgilio and Dr. Lewis participated  – were retaliatory and its stated claims against Dr. Ryan pretextual.

- The moving Defendants claim they are entitled to qualified immunity.  But as this Court has already found, they misstate the legal standard for determining whether it was "clearly established" that the MEC's actions violated Dr. Ryan's rights.  In fact, the Ninth Circuit has made it perfectly clear that state

PLAINTIFF'S MEMORANDUM OR POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY, PARTIES SUMMARY JUDGMENT

employers cannot initiate investigations of doctors for reporting misconduct to outside agencies.

- Dr. Mahajan argues that he's entitled to summary judgment because all he did was send a Notice of Suspension to Dr. Ryan in 2017, well after the MEC's investigation. In fact, Dr. Mahajan misstates Dr. Ryan's claim, which is premised on Dr. Mahajan's approval and endorsement of the MEC's actions. Moreover, Dr. Mahajan's actions demonstrates that his claims about Dr. Ryan's conduct were pretextual.

- Dr. de Virgilio claims he did not engage in adverse employment actions against Dr. Ryan, but he did. He led the FPPE, he contributed statements to it explicitly hostile to Dr. Ryan's protected speech, and he participated in subsequent MEC proceedings confirming the MEC's decision to force Dr. Ryan to decide between a Behavioral Contract or revocation of privileges.

- All moving Defendants argue that Dr. Ryan has no evidence sufficient to support punitive damages against them. In fact, under well-established Ninth Circuit precedent, the evidence that shows that they disregarded Dr. Ryan's rights is sufficient to support punitive damages.

Both genuine disputes of material fact and clear legal authority preclude summary judgment. This Court should deny the Motion.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

In the Summary Judgment Order, the Court reviewed the facts and evidence submitted by the parties in great detail. (Summary Judgment Order at 3-16.) The parties have incorporated those previously presented facts in the Defendants' Statement of Uncontroverted Facts and Dr. Ryan's Statement of Genuine Disputes of Material Fact

//

//

PLAINTIFF'S MEMORANDUM OR POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR ALTERNATIVELY, PARTIES SUMMARY JUDGMENT

1    ("DF[1]").  Rather than repeat them at length, Dr. Ryan will summarize the key facts and

2    set forth the new facts relevant to this Motion, as Defendants have.

3    **A.    Dr. Ryan's Reports and the MEC's Retaliation**

4          In 2014, Dr. Ryan learned that other physicians at Harbor-UCLA, a government-

5    owned and operated facility, had falsified their credentials in applications to participate

6    in a clinical trial sponsored by the National Institutes of Health ("NIH").  DF 100-103.

7    Concerned that this public malfeasance and fraud threatened patient safety and the

8    reliability of the study, Dr. Ryan gathered information about his colleagues'

9    qualifications and reported it to the NIH.  DF 104-105.  The NIH conducted an audit and

10   concluded that the doctors in question – including Dr. Rodney White ("Dr. White") –

11   had misrepresented their qualifications and that Harbor-UCLA could not admit more

12   patients to the study as a result.  DF 107.

13         Also in 2014, Dr. Ryan learned that national medical device company Medtronic

14   was paying Harbor-UCLA physicians including Dr. White thousands of dollars each

15   time they implanted one of Medtronic's stent grafts, using the guise that they were

16   paying for "teaching" a "course" on how to do so.  DF 109-119.  Dr. Ryan believed that

17   Dr. White had conducted an unnecessary surgery on one of Dr. Ryan's patients to profit

18   from implanting such a stent, and had falsified medical records in order to do so.  DF

19   109-119.  When his superiors at Harbor-UCLA did not respond to his concerns, Dr.

20   Ryan reported this conduct to the Los Angeles County District Attorney's Office, and

21   told his superiors he had done so.  DF 126-129.  The District Attorney's Office opened

22   an investigation as a result.  DF 127-128.

---

[1] "DF" refers to Dr. Ryan's Statement of Genuine Disputes of Material Fact, followed by the fact number.  Dr. Ryan's Statement contains all citations to the factual record. Disputed Facts ("DF") Nos. 1-45, and the responses thereto, are nearly identical to the DFs and responses set forth in Dr. Ryan's Statement of Genuine Disputes of Material Fact in the prior Motion, Docket No. 62-1.  DFs 47-98 are new, in response to Defendants' new "Undisputed Facts" in connection with this new Motion.  DF 99 – 225 correspond to Dr. Ryan's additional Disputed Facts Nos. 47-173 in Docket No. 62-1. DF 226 – 243 are additional facts new to this motion.

4

BROWN WHITE & OSBORN
A T T O R N E Y S

In January 2016, Dr. White complained to Harbor-UCLA that Dr. Ryan had violated patient confidentiality and HIPAA by investigating and reporting to NIH about Dr. White's surgical record. DF 133-136. The MEC of the PSA directed what it deemed an "adequate" investigation of Dr. White's complaint and found that no discipline of Dr. Ryan was warranted. DF 137.

On August 24, 2015, Dr. White sent Dr. Brant Putnam, a member of the MEC, a Request for Corrective Action demanding the PSA take action against Dr. Ryan for allegedly violating HIPAA, the Confidentiality of Medical Information Act, and Dr. White's privacy by asking for and reviewing medical records while reporting misconduct to the NIH and District Attorney's Office. (DF 148-150.) The MEC met on September 28, 2015, acknowledged that it had previously adequately considered and rejected Dr. White's complaints, acknowledged that taking action against Dr. Ryan could be seen as retaliatory, but decided to reopen its investigation of Dr. Ryan. DF 153. On December 28, 2015, the MEC directed Dr. Christian De Virgilio, the Chair of Surgery, form an Ad Hoc Committee to conduct a Focused Professional Performance Evaluation ("FPPE") of Dr. Ryan. DF 272. Dr. White complained to Dr. De Virgilio that Dr. Ryan had violated HIPAA by gathering data "to initiate the Fraud investigation against Harbor (me) with the trial Steering Committee, and the NIH." DF 173.

The resulting FPPE report accused Dr. Ryan of accessing and requesting medical records improperly, but did not discuss or disclose that he was doing so to gather information to provide to the NIH, even though the MEC had previously acknowledged that was the case. (DF 179.) The FPPE report quoted Dr. White and Dr. Donayre complaining about Dr. Ryan's report to NIH, and also made false statements that Dr. White had been "cleared" by the NIH and repeated his complaints about Dr. Ryan's reports without noting the NIH's findings. (DF 182-186.) The FPPE quoted Dr. de Virgilio as complaining that Dr. Ryan had made reports to the NIH and falsely stating that the NIH had determined Dr. Ryan's complaints were unfounded and that Harbor-UCLA could continue to participate in the study. (DF 183.) The FPPE also quoted Dr.

5

de Virgilio as complaining that DHS was investigating as a result of Dr. Ryan's fraud complaints. (DF 184.)

The MEC eventually voted to offer Dr. Ryan a "Behavioral Contract" and revoke his privileges if he did not accept it. (DF 30.) Though Dr. de Virgilio did not participate in that initial vote, he led the creation of the FPPE, gave the FPPE team quotes complaining about Dr. Ryan's report to NIH and falsely stating it had been deemed unfounded, and participated in multiple subsequent MEC meetings at which the MEC discussed Dr. Ryan's response to the Behavioral Contract and reaffirmed that Dr. Ryan's privileges should be revoked if he did not accept it. (DF 54, 99, 184-185.) Dr. Lewis was present for the MEC's meetings discussing Dr. Ryan, including the meetings discussing Dr. Ryan's reports to outside authorities and Dr. White's complaints about those reports, and for the decision to impose the Behavioral Contract on Dr. Ryan and revoke his privileges if he did not accept it. (DF 93, 97-98.)

When Dr. Ryan refused to accept the Behavior Contract, Dr. Putnam wrote Dr. Ryan a letter on behalf of the MEC announcing the MEC's intent to suspend him, mentioning "Openly threatening to call external agencies to conduct investigations" and "Openly making unfounded accusations in an angry manner" as some of Dr. Ryan's violations. (DF 217.) MEC members did not recall what unfounded accusations Dr. Ryan made. (DF 215, 220.)

Dr. Ryan has been unable to obtain a job interview for a surgeon position, let alone a job, because he must disclose in applications the MEC's investigation and effort to suspend his privileges. (DF 221-222.)

**B.** **Dr. Yee's, Dr. Katz's, and Dr. Mahajan's Approval and Endorsement of the MEC's Retaliatory Actions**

During this time period, Dr. Yee was the Chief Medical Office of Los Angeles County's Department of Health Services ("DHS"), Dr. Katz was the Director of DHS, and beginning in August 2016 Dr. Mahajan was Harbor-UCLA's Chief Medical Officer.

In 2014 and 2015, Dr. Yee and Dr. Katz learned of Dr. Ryan's complaints about Dr. White contemporaneously.  In June 2014, Dr. Yee learned that Dr. Ryan had accused Dr. White of misconduct, and discussed a plan to handle the matter by letting the PSA investigate so he didn't have to do so.  (DF 226.)  By September 2014, Dr. Yee learned that Dr. Ryan was complaining that Dr. White was retaliating against him for his complaints, was asking for protection from retaliation, and that Dr. Ryan was threatening to "blow the whistle," a situation Dr. Yee described as "problematic."  (DF 227.)  In December 2014, Dr. Timothy Van Natta – then Harbor UCLA's Chief Medical Officer – told Dr. Katz that Dr. Ryan would be approaching him to discuss his concerns about Dr. White.  (DF 283.)   In January 2015, Dr. Yee learned that the District Attorney's Office had launched an apparent investigation based on Dr. Ryan's reports, and that Dr. Ryan had made a report to the NIH.  (DF 229.)  In October 2015, Dr. Ryan wrote to Dr. Katz complaining that Dr. White had sued him based on "fabrications and outright lies" based on Dr. Ryan's reports of Dr. White's misconduct.  (DF 230.)

In 2015, Dr. Yee began to bring up Dr. Ryan's past complaints and reports when Dr. Ryan raised new concerns.  For instance, when Dr. Ryan came to Dr. Yee with concerns that research company LA Biomed had a conflict of interest, Dr. Yee forwarded Dr. Ryan's comments to Dr. Van Natta "given issues you've raised about [Dr. Ryan]." (DF 231).  Dr. Yee also asked Dr. Van Natta to "stay on top" of Dr. Ryan's complaints about conflicts of interest because "I hear some rumblings of a Ryan v. White claim."  (DF 232.)

Moreover, throughout 2015 and 2016, MEC members consistently sought Dr. Yee's input about their ongoing efforts to investigate Dr. Ryan.  In November 2015, after Dr. White's Request for Corrective Action (DF 14), Dr. Putnam wrote Dr. Yee regarding a meeting with Dr. Ryan (UF 235), and Dr. Van Natta set up a "roundtable" with Dr. Yee and MEC members Dr. Putnam, Dr. Vintch, and Dr. De Virgilio "to discuss recent developments concerning Tim Ryan."  (DF 234.)  Moreover, Dr. Van Natta asked to meet with Dr. Yee about concerns MEC members Dr. Putnam and Dr.

BROWN WHITE & OSBORN
A T T O R N E Y S

1    Janice Vintch had expressed "concerning Tim Ryan and his current activities at Harbor."

2    (DF 233.)  In March 2016, about a week after receiving Dr. Ryan's FPPE report, Dr.

3    Putnam wrote to Dr. Yee once again about Dr. Ryan.  (DF 236.)  When Dr. Ryan had a

4    dispute with the MEC about meeting with them without his attorney in June 2016 to

5    discuss the proposed Behavioral Agreement, (DF 27), Dr. Putnam wrote to Dr. Yee

6    about Dr. Ryan's proposed meeting with the MEC.  (DF 238.)

7         In April 2016 Members of the MEC met with Dr. Yee to "discuss any action that

8    might be taken against Dr. Ryan that might compromise the County."  (DF 200.)  In

9    response to the MEC's "fear that any action we take might comprise [sic] what the

10   County is doing or might create a medical-legal action against us," Dr. Yee "suggested

11   that we proceed with caution because there was concern about whistleblowing as there

12   were two parts of the lawsuit."  (DF 200.)  Nevertheless, Dr. Yee told the MEC it

13   "should proceed" as it saw fit.  (DF 52.)

14        In September 2016, when Dr. Putnam wrote to Dr. Ryan and informed him that

15   the MEC was demanding that he sign a Behavioral Contract, union representative Jake

16   Baxter wrote to Harbor-UCLA executives pointing out that the MEC was retaliating

17   against Dr. Ryan.  (DF 239-240.)  Dr. Mahajan responded, claiming that the MEC's

18   actions were independent of DHS – yet Dr. Mahajan also forwarded the union

19   representative's complaint to Dr. Yee.  (DF 240, 241.)  Dr. Majahan and Dr. Yee

20   discussed the claims of retaliation, and Dr. Mahajan acknowledged that they had

21   previously discussed concerns about retaliation with counsel.  (DF 242.)  Dr. Yee

22   instructed Dr. Mahajan to handle the MEC's concerns about Dr. Ryan's claim of

23   retaliation by having County Counsel reassure the MEC "that they are indeed

24   indemnified by the County for their appropriate and approved work as physicians at

25   Harbor, and as such are covered for their work on the PSA as medical staff themselves.

26   Also, it is the case that except in egregious and criminal or near criminal situations the

27   County will expand substantial effort to remove any individual names from any

28   litigation or settlements.".  (DF 243.)

BROWN WHITE & OSBORN
ATTORNEYS

In 2017, Dr. Mahajan issued a Notice of Intent to Suspend to Dr. Ryan on behalf of Harbor-UCLA, asserting among other things that Dr. Ryan had improperly accessed, used, and disclosed confidential patient information in the course of his reports about Dr. White.  (DF 73.)  Dr. Mahajan rejected Dr. Ryan's explanation that he was lawfully gathering information to report misconduct to government authorities, as permitted by HIPAA.  (DF 81-82.)  Dr. Mahajan then issued a Notice of Suspension without engaging Dr. Ryan's stated reasons for accessing the patient information. (DF 83.)  Even though Dr. Mahajan concluded that Dr. Ryan had unlawfully accessed, used, and disclosed confidential patient information, he did not make a report to the California Medical Board, as required by California law.  (DF 225.)  *See* California Health & Safety Code § 1280.15(b) (health facility "shall report any unlawful or unauthorized access to, or use or disclosure of, a patient's medical information to the department no later than 15 business days after the unlawful or unauthorized access, use, or disclosure has been detected").  Nor, curiously, did Dr. Mahajan's letter cite or consider pertinent language in the same Los Angeles County policies on which he relied to discipline Dr. Ryan, showing that County policies permit access and disclosure of protected health information for whistleblower purposes:

> Disciplinary action will not be applied to a workforce member who discloses protected health information (PHI) to a health oversight agency or an attorney while in the process of reporting either an allegation of unlawful conduct by the entity, a violation of professional or clinical standards, or conditions in the entity that endanger patients (whistleblower).
>
> Additionally, disciplinary action will not be applied for filing complaints, testifying, participating in Investigations, compliance reviews, proceedings or hearings, or for opposing real or perceived unlawful acts or practices that violate patient medical information privacy and security laws, regulations, and OHS policies provided the report is made in good faith.  (Exhibit 34 to Defendant's Third Appendix of Exhibits at page 54 of 151; DF 73, 83.)

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   ARGUMENT

### A.   Legal Standard

Summary judgment is proper only where the pleadings and materials demonstrate that "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one "that might affect the outcome of the suit under the governing law." *Id*. The moving party has the initial burden to show that no genuine issue of material fact exists. Fed.R.Civ.P. 45(a); *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). In ruling on a motion for summary judgment, the court must view the evidence, and any inferences based on underlying facts, in the light most favorable to the opposing party. *Twentieth Century-Fox Film Corp. v. MCA*, 715 F.2d 1327, 1328-29 (9th Cir. 1983). If a genuine dispute of material fact exists, the court must deny summary judgment. *Anderson*, 477 U.S. at 248.  Inferences to be drawn from facts "must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). *See* Summary Judgment Order at 17.

To prove Defendants retaliated against Plaintiff's protected speech in violation of Section 1983, Dr. Ryan must prove "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; and (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action . . . ." *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013). The burden then shifts to Defendants to show "(4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech."  *Id.*  (Summary Judgment Order at 18-19.)

**B.** **Drs. Yee and Katz Took Approved And Endorsed Adverse Employment Action Against Dr. Ryan**

Defendants first argue that Dr. Yee and Dr. Katz didn't take any adverse employment actions against Dr. Ryan.  (Motion at 22.)  But Dr. Ryan has presented sufficient evidence to create, at a minimum, a genuine dispute of material fact about whether Dr. Yee and Dr. Katz approved and endorsed adverse employment actions against him.

As Defendants concede (Motion at 22), a state actor can be liable for *approving* a retaliatory adverse employment action the actor does not themselves commit.  *Freitag v. Ayers*, 468 F.3d 528, 543 (9th Cir. 2006) (state actors who "approved her suspension and termination" liable for retaliation).  Here, there is ample evidence that Dr. Yee and Dr. Katz endorsed and approved the PSA's retaliatory investigation against Dr. Ryan.

As a preliminary matter, and as this Court has found (Summary Judgment Order at 33-34), it's clear that the MEC's investigation of Dr. Ryan and threat to suspend his privileges was an adverse employment action.  "Since 2002, we have recognized that an employer's decision to initiate disciplinary proceedings against a doctor that threaten to revoke staff privileges, when combined with a negative effect on employment prospects, is enough to satisfy the 'adverse employment action' requirement."  *Ryan v. Putnam*, 777 F. App'x 245, 246 (9th Cir. 2019), citing *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 977 (9th Cir. 2002).

Admissible evidence creates a genuine dispute of material fact about whether Dr. Yee and Dr. Katz approved that adverse employment action:

- Both Dr. Yee and Dr. Katz were aware in 2014 that Dr. Ryan had accused Dr. White of misconduct.  (DF 226, 228, 230.)  Dr. Yee learned in January 2015 that the District Attorney's Office had launched an apparent investigation based on Dr. Ryan's reports, and that Dr. Ryan had made a report to the NIH. (DF 229.)

BROWN WHITE & OSBORN
A T T O R N E Y S

- Dr. Yee knew that Dr. Ryan was complaining that Dr. White was retaliating against him for his reports, which Dr. Yee viewed as "problematic." (DF 227.)

- Dr. Yee went out of his way to bring up the MEC's concerns about Dr. Ryan when discussing *other* complaints by Dr. Ryan. For instance, Dr. Yee forwarded Dr. Ryan's comments about LA Biomed's conflicts of interest to Dr. Van Natta "given issues you've raised about [Dr. Ryan]," (DF 231), and asked Dr. Van Natta to "stay on top" of Dr. Ryan's complaints about conflicts of interest because "I hear some rumblings of a Ryan v. White claim." (DF 232.)

- MEC members consistently sought Dr. Yee's input about their ongoing efforts to investigate Dr. Ryan. In November 2015, after Dr. White's Request for Corrective Action (DF 14), MEC member Dr. Putnam wrote Dr. Yee regarding a meeting with Dr. Ryan (UF 235), and Dr. Van Natta set up a "roundtable" with Dr. Yee and MEC members Dr. Putnam, Dr. Vintch, and Dr. De Virgilio "to discuss recent developments concerning Tim Ryan." (DF 234.) Moreover, Dr. Van Natta asked to meet with Dr. Yee about concerns MEC members Dr. Putnam and Dr. Vintch had expressed "concerning Tim Ryan and his current activities at Harbor." (DF 233.) In March 2016, about a week after receiving Dr. Ryan's FPPE, Dr. Putnam wrote to Dr. Yee once again about Dr. Ryan. (DF 236.) When Dr. Ryan had a dispute with the MEC about meeting with them without his attorney in June 2016 (DF 27), Dr. Putnam wrote to Dr. Yee about Dr. Ryan's proposed meeting with the MEC. (DF 238.)

- In April 2016 Members of the MEC met with Dr. Yee to "discuss any action that might be taken against Dr. Ryan that might compromise the County." (DF 200.) In response to the MEC's "fear that any action we take might comprise [sic] what the County is doing or might create a medical-legal action against us," Dr. Yee "suggested that we proceed with caution because there was concern about whistleblowing as there were two parts of the lawsuit." (DF

12

BROWN WHITE & OSBORN
A T T O R N E Y S

200.)  Nevertheless, Dr. Yee told the MEC it "should proceed" as it saw fit. (DF 52.)

- In September 2016, when Dr. Putnam wrote to Dr. Ryan and informed him that the MEC was demanding that he sign a Behavioral Contract, union representative Jake Baxter wrote to Hospital executives pointing out that the MEC was retaliating against Dr. Ryan.  (DF 239-240.)  Dr. Yee responded by suggesting that Dr. Mahajan arrange for County Counsel to reassure the PSA "that they are indeed indemnified by the County for their appropriate and approved work as physicians at Harbor, and as such are covered for their work on the PSA as medical staff themselves.  Also, it is the case that except in egregious and criminal or near criminal situations the County will expand substantial effort to remove any individual names from any litigation or settlements."  (DF 243.)  This assertion that the MEC's investigation of Dr. Ryan was "appropriate and approved" by the County refutes Defendants' arguments that the MEC's actions are completely separate from Dr. Yee and Dr. Katz.

As to Dr. Yee, this direct evidence is overwhelming – the MEC repeatedly and deeply involved him in the dispute with Dr. Ryan, and Dr. Yee not only told the MEC to "proceed" with its investigation despite knowing that it could be taken as retaliatory, when union representatives *called* it retaliatory, he suggested that County Counsel reassure them that they would be indemnified and that the County would seek to have any suit against them dismissed.  That's clearly approval.  Dr. Katz was the Director of DHS at the time (DF 47), knew that Dr. Ryan had reported Dr. White for misconduct (DF 228) and knew that Dr. Ryan was complaining that Dr. White was making false allegations against him in retaliation for the reports.  (DF 230.)  The reasonable inference from those facts – which this Court must draw in the light most favorable to Dr. Ryan in considering a motion for summary judgment – is that Dr. Katz joined Dr.

Yee in endorsing the MEC's adverse employment actions.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.[2]  Therefore, summary judgment on this basis is inappropriate.

## C.   Genuine Disputes of Material Fact Preclude Summary Judgment On Dr. Yee's and Dr. Katz's Motive

Next, Defendants argue that Dr. Ryan cannot prove that his protected speech was a substantial or motivating factor in any actions Dr. Yee or Dr. Katz took.  (Motion at 24.)  Once again, substantial evidence creates genuine disputes of material fact regarding Defendants' motives.  Proof of motive "may be met with either direct or circumstantial evidence, and involves questions of fact that normally should be left for trial." *Ulrich*, 308 F.3d at 979-80. "[A] plaintiff need only offer 'very little' direct evidence of motivation to survive summary judgment on this element." *Id.*  Dr. Ryan can prove retaliatory motive "with either direct or circumstantial evidence." Dr. Ryan can establish retaliatory motive in three ways: "(1) proximity in time between the protected action and the allegedly retaliatory employment decision, from which a jury logically could infer [that the plaintiff] was terminated in retaliation for his speech."  (2) "evidence that his employer expressed opposition to his speech, either to him or to others"  (3) "evidence that his employer's proffered explanations for the adverse employment action were false and pretextual." *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).

Dr. Ryan has more than enough evidence under this standard to create a genuine dispute of material fact about Defendants' motivation.

First, Dr. Yee's and Dr. Katz' approval of the MEC's retaliation against Dr. Ryan was sufficiently proximate in time to his speech.  As this Court noted, "[t]here is no set time beyond which acts cannot support an inference of retaliation . . . ."  Summary

---

[2] Defendants cite *Freitag* for the proposition that "ostensible inaction (such as failure to intervene) or allegedly tacit encouragement" is not a basis for Section 1983 liability. (Motion at 23.)  But the cite doesn't support that broad proposition – the *Freitag* Court specified that the official they were talking about didn't even *know* about the adverse employment actions in that case, and therefore couldn't have approved them in any sense. *Freitag*, 468 F.3d at 543 n.8.

14

BROWN WHITE & OSBORN ᴸᴸᴾ
A T T O R N E Y S

Judgment Order at 26, citing *Cozalter*, 320 F.3d at 978.  Here, though Dr. Ryan's reports to the NIH and District Attorney were in December 2014 and January 2015, Dr. White did not demand that the MEC discipline him for doing so until August 24, 2015.  (DF 148-150.)  The MEC responded to that demand – which was based on Dr. Ryan's protected speech of reporting misconduct to the government -- immediately decided to launch its investigation of Dr. Ryan in September 2015. (DF 148-50, 153.)  As soon as the MEC met with Dr. Yee in April 2016, he approved their actions by expressly telling them to "proceed" despite retaliation concerns.  (DF 200.)  This proximity – between Dr. White demanding that the MEC punish Dr. Ryan's protected speech, and Dr. Yee approving the MEC doing so – was only seven months, short enough to support an inference of retaliation.  *Coszalter*, 320 F.3d at 978 (gap of a few months between speech and action supported inference of retaliation).

Second, Dr. Yee and Dr. Katz approved MEC actions explicitly premised on disapproval of Dr. Ryan's protected speech.  The MEC first investigated Dr. Ryan in response to a report from Dr. White that expressly complained about Dr. Ryan's investigatory steps in reporting Dr. White to the NIH. (DF 132-134.)  The MEC reopened its investigation of Dr. Ryan based on Dr. White's Request for Corrective Action that once again complained of the measures Dr. Ryan used to investigate and report Dr. White to NIH.  The MEC explicitly discussed Dr. White's complaint that Dr. Ryan had reported him to NIH, and remarked "it is not necessarily under the purview of the whistleblower to do their own investigation and start digging into whatever they want." (DF 153.) The MEC relied on an FPPE report that repeatedly complained about Dr. Ryan's report to NIH and misstated the outcome of the report, and included an explicit complaint that Dr. Ryan's reports had led to an audit. (DF 182-84.)  By approving the MEC's retaliatory investigation based on these facts, Dr. Yee and Dr. Katz approved the MEC expressing opposition to Dr. Ryan's speech, "either to him or to others," through acting upon and endorsing, accepting, and voicing complaints about Dr. Ryan's speech. *Coszalter*, 320 F.3d at 977.

BROWN WHITE & OSBORN
A T T O R N E Y S

1   Third, as this Court has already found, Dr. Ryan "offers evidence that suggests

2   that defendants' explanations for the adverse employment actions of directing the FPPE,

3   voting to propose a Behavioral Agreement, and voting to revoke Dr. Ryan's clinical

4   privileges if he refused the Behavioral Agreement, were pretextual.  (Summary

5   Judgment Order at 25.)  The Court specifically cited evidence that the MEC abandoned

6   its usual approach of progressive discipline, consultation with direct supervisors, and

7   counseling before launching an FPPE of Dr. Ryan (DF 188-192), evidence that the MEC

8   initiated a new investigation of Dr. Ryan even after a prior investigation found that he

9   had not committed a HIPAA violation (DF 153), the fact that the MEC demanded that

10   Dr. Ryan sign a Behavioral Agreement with a waiver of claims even though Dr. Putnam

11   and Dr. Vintch could not identify another instance of requiring a physician to sign such a

12   waiver (DF 208), and the fact that the MEC's Notice of Charges expressly mentioned

13   that Dr. Ryan had threatened "to call external agencies to conduct investigations" and

14   made "unfounded accusations in an angry manner" (DF 214) even though Dr. Putnam

15   and Vintch could not remember any unfounded accusations Dr. Ryan made.  (DF 215,

16   220.)

17   By *approving* a pretextual investigation, Dr. Yee and Dr. Katz acted pretextually

18   as well.  This is further demonstrated by the fact that Dr. Yee told the MEC to approve

19   even though he warned that the investigation had the appearance of retaliation (DF 52,

20   200) and reacted to Dr. Ryan complaining of retaliation not by investigating but by

21   instructing Dr. Mahajan to reassure the MEC members that they would be indemnified

22   in any lawsuit. (DF 243.)

23   Therefore, genuine disputes of material fact preclude summary judgment based on

24   Dr. Yee's and Dr. Katz' motive in approving the MEC's retaliatory actions.

25   **D.   Genuine Disputes of Material Fact Preclude Summary Judgment On Dr.**

26   **Yee's and Dr. Katz's Theories of Inevitability**

27   Dr. Yee and Dr. Katz next argue that their actions were justified even if they were

28   based on protected speech, and that they were inevitable in that they would have taken

16

PLAINTIFF'S MEMORANDUM OR POINTS AND AUTHORITIES IN SUPPORT OF
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR
ALTERNATIVELY, PARTIES SUMMARY JUDGMENT

BROWN WHITE & OSBORN
A T T O R N E Y S

the same actions whether or not Dr. Ryan engaged in protected speech.  (Motion at 27-27.)  The same facts cited above that create a genuine dispute of material fact as to motive also create a genuine dispute of material fact as to those defenses. Whether punitive action would have been taken without protected speech, and whether the punitive action had an adequate justification "are entirely questions of fact" and when the record on them is "not undisputed," summary judgment is inappropriate. *Ellins v. City of Sierra Madre,* 710 F.3d 1049, 1064 (9th Cir. 2013). When "questions of motive predominate in the inquiry about how big a role the protected behavior played in the decision, summary judgment will usually not be appropriate."  *Mabey v. Reagan*, 537 F.2d 1036, 1045 (9th Cir. 1976).

This Court previously found that Dr. Ryan's evidence was sufficient to create "underlying factual disputes" about whether the MEC's actions were justified or inevitable, precluding summary judgment. (Summary Judgment Order at 27-28.)  The same ruling applies here.  Dr. Yee and Dr. Katz attempt to style their "justified" actions as merely "deferring to the MEC," and argue that such deference is justified.  (Motion at 26-27.)  Similarly, they assert that their refusal to intervene and prevent the MEC from taking action was inevitable, whether or not the MEC's action was inevitable.  (Motion at 27.)  This is sophistry.  As is discussed above, Dr. Yee and Dr. Katz did not merely fail to prevent the MEC from acting – they ***approved and endorsed*** its retaliatory action in full knowledge of its retaliatory nature.  *See* Section III(B), *supra*.  The same facts that create a genuine dispute of material fact as to the MEC's actions create a genuine dispute of material facts as to their actions.  The Court therefore cannot grant summary judgment on that basis.

**E.     Dr. Yee and Dr. Katz Are Not Entitled To Summary Judgment On Their Claims of Qualified Immunity**

Like Dr. Putnam and Dr. Vintch before them, Dr. Yee and Dr. Katz claim that they are entitled to qualified immunity.  (Motion at 27.)  As before, Defendants misstate the relevant standard and ignore genuine disputes of material fact.

17

BROWN WHITE & OSBORN LLP
A T T O R N E Y S

When a defendant asserts qualified immunity in a summary judgment motion, courts engage in a two-pronged inquiry. First, courts ask whether the facts "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right [.]" *Tolan v. Cotton* (2014) 572 U.S. 650, 655-56 (citations and internal quotations omitted). Courts "resolve all factual disputes in favor of the party asserting the injury." *Ellins*, 710 F.3d at 1064. Second, courts ask whether the right in question was "clearly established" at the time of the violation – that is, whether the law at the time provided "fair warning" that the conduct was unconstitutional. *Id.* at 655; *Mueller v. Auker*, 57 F.3d 979, 993 (9th Cir. 2009) (rights are "clearly established" when they are "defined at the appropriate level of specificity" to make them clear to a defendant).

Like Dr. Putnam and Dr. Vinch, Dr. Yee and Dr. Katz demand that this Court examine each of the five elements of a Section 1983 claim and determine, separately, whether Dr. Ryan's constitutional rights were clearly established in connection with each element. (Motion at 28-31.)[3] This Court properly rejected this argument even after supplemental briefing on Dr. Putnam's and Dr. Vintch's motion, finding that it "frames the inquiry much too narrowly." (Summary Judgment Order at 28-36, quoting *Ellins*, 710 F.3d at 1064.) The Ninth Circuit found in this case that "[s]ince 2002, we have recognized that an employer's decision to initiate disciplinary proceedings against a doctor that threaten to revoke staff privileges, when combined with a negative effect on employment prospects, is enough to satisfy the 'adverse employment action'

---

[3] This time, Defendants venture even further – they suggest that the Court must find clearly established law on the question of how little time must lapse between speech and adverse employment action to make the action retaliatory. (Motion at 31.) That's entirely incoherent; the lapse of time isn't even an element of a Section 1983 claim, but a methodology for determining if the facts support an inference of retaliatory motive. *Coszalter*, 320 F.3d at 977. Defendants' citation of *Perez v. City of Roseville*, 926 F.3d 511, 525 (9th Cir. 2019) is utterly inapt and misleading. (Motion at 30 n.5) The *Perez* Court discussed temporal nexus, not in the context of determining whether the facts supported an inference of retaliatory motive, but in deciding the completely different test of whether an employee's due process rights were violated by depriving her of the right to refute accusations made temporarily close to her termination. (*Ibid.*)

requirement." *Ryan*, 777 F. App'x at 246, citing *Ulrich*, 308 F.3d at 977.  The Ninth

Circuit's pronouncements on this issue are very clear, and permit no quibble: "[i]n the

classic whistleblower case the state has no legitimate interest in covering up corruption

... as an inevitable result of the Court's jurisprudence and sound public policy, the First

Amendment generally protects public employee whistleblowers from employer

retaliation." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 (9th Cir. 2013).  That's the right

level of specificity, and this Court found that it was sufficient to give Defendants notice

that Dr. Ryan had a First Amendment right to make reports to government authorities

without retaliation.  (Summary Judgment Order at 33-34.)

Defendants attempt, again, to distinguish Dr. Yee and Dr. Katz from Dr. Putnam

and Dr. Vintch by sophistry and sleight of hand.  They argue that the question is whether

it was clearly established that they should not refrain from interfering with the MEC's

actions.  (Motion at 31.)  But as is discussed above, the evidence shows that they didn't

just refrain from preventing retaliation, they affirmatively approved retaliation.  *See*

Section III(B), *supra.*  Defendants also argue that there's no clearly established law that

Dr. Ryan's reports to outside authorities were outside of the scope of his duties, because

he allegedly admitted they were within the scope.  (Motion at 29 n. 4.)  The Court

already specifically and correctly rejected this argument, noting that Dr. Ryan was

talking about Dr. White's lawsuit, which did not discuss his reports to outside authorities

(Summary Judgment Order at 21) and that Defendants had presented no evidence that

Dr. Ryan's duties encompassed making reports to outside authorities (*Id.* at 35.)

F.    **Genuine Disputes of Material Fact Preclude Summary Judgment as To Dr.**
      **Mahajan**

After addressing Dr. Yee and Dr. Katz at length, Defendants briefly repeat their

arguments in connection with Dr. Mahajan.  (Motion at 31-34.)  The same genuine

disputes of material fact once again preclude summary judgment.

First, Defendants argue that Dr. Mahajan was only involved in issuing the Notice

of Suspension, and since Dr. Ryan has admitted that his case does not rely on the Notice

19

BROWN WHITE & OSBORN LLP
A T T O R N E Y S

1    of Suspension, Dr. Mahajan did not commit any adverse employment action.  This is a

2    red herring.  Dr. Ryan has presented evidence that Dr. Majahan, like Dr. Yee and Dr.

3    Katz, approved and endorsed the MEC's retaliatory investigation of him.  When a union

4    representative protested that the MEC was retaliating against Dr. Ryan by demanding he

5    sign a Behavioral Contract, Dr. Mahajan responded, claiming that the MEC's actions

6    were independent of DHS – yet Dr. Mahajan also forwarded the complaint to Dr. Yee.

7    (DF 240, 241.)  Dr. Majahan and Dr. Yee discussed the claims of retaliation, and Dr.

8    Mahajan acknowledged that they had previously discussed concerns about retaliation

9    with counsel.  (DF 242.)  Dr. Yee instructed Dr. Mahajan to handle the MEC's concerns

10   about Dr. Ryan's complaint by having County Counsel reassure the MEC that they

11   would be indemnified by the County for "appropriate and approved" work on the MEC,

12   thus refuting the argument that their actions were independent.  (DF 243.)[4]

13           Second, Defendants argue that Dr. Ryan cannot establish Dr. Mahajan was

14   motivated by opposition to Dr. Ryan's protected speech.  (Motion at 29-30.)  But that

15   argument is based on Defendant's assertion that Dr. Ryan is suing Dr. Majahan for

16   sending the Notice of Suspension in 2017.  (Motion at 29-30.)  As is noted above, Dr.

17   Ryan has established that Dr. Mahajan, together with Dr. Yee and Dr. Katz, approved

18   and endorsed the MEC's retaliatory actions in 2016.  For the same reasons set forth

19   above in Section III(C), *supra*, that's sufficiently proximate in time to Dr. White's

20   demand to punish Dr. Ryan to support an inference of retaliatory motive.  Similarly, just

21   like Dr. Yee and Dr. Katz, Dr. Mahajan approved retaliatory actions that were expressly

22   based on protected speech, satisfying the "expression of opposition to protected speech"

23   prong of the *Coszalter* analysis.  *Coszalter,* 320 F.3d at 977.  Finally, the same evidence

24   of pretext applies to Dr. Mahajan.  Section III(C), *supra.*

25

26

27   [4] Moreover, Defendants' argument misstates Dr. Ryan's position.  Dr. Ryan argued that
     the Ninth Circuit should not take judicial notice of the Suspension Notice because his
     complaint did not rely on it.  (DF 92.)  That doesn't mean it can't be evidence of Dr.

28   Mahajan's intent to assist the other Defendants in their retaliation against Dr. Ryan.

BROWN WHITE & OSBORN
A T T O R N E Y S

In fact, there's even more evidence that Dr. Mahajan employed pretexts against Dr. Ryan.  In his Notice of Intent to Suspend, Dr. Mahajan claimed that Dr. Ryan improperly accessed, used, and disclosed confidential patient information.  (DF 73.) When Dr. Ryan explained that he had accessed information to report misconduct, which was permitted under HIPAA, Dr. Mahajan claims he rejected that explanation as meritless.  (DF 81-83.)  Yet mysteriously, even though he had officially concluded that Dr. Ryan had improperly accessed, used, and disclosed confidential patient information, Dr. Mahajan did not make a report to the California Medical Board, as required by California law.  (DF 225.)  *See* California Health & Safety Code § 1280.15(b) (health facility "shall report any unlawful or unauthorized access to, or use or disclosure of, a patient's medical information to the department no later than 15 business days after the unlawful or unauthorized access, use, or disclosure has been detected").  Nor did he discuss or analyze Dr. Ryan's stated reasons for accessing patient information in his Notice of Suspension, as he surely would have if he were issuing it in good faith.  (DF 82.)  He failed to do so even though County policy expressly provides that employees won't be disciplined for use of protected health information in the course of whistleblowing.  (Defendants' Third Amended Appendix of Exhibits, Exhibit 34, Page 54 of 131.)

Dr. Mahajan argues that his decision to issue the Notice of Suspension was both justified and inevitable.  (Motion at 31-32.)  This argument again relies on the false premise that Dr. Ryan is suing Dr. Mahajan based on his issuance of the Notice of Suspension as opposed to his participation in approving and endorsing the MEC's retaliatory actions.

Finally, Defendants repeat, summarily, their qualified immunity arguments on behalf of Dr. Mahajan.  That argument fails for the reasons discussed in Section III(E), above.

//

BROWN WHITE & OSBORN
ATTORNEYS

### G. Genuine Issues of Material Fact Preclude Summary Judgment As To Dr. Lewis and Dr. de Virgilio

Dr. Lewis and Dr. de Virgilio repeat the same arguments set forth above in connection with Dr. Ryan's claims against them.  (Motion at 34-43.)  Those arguments fail because the facts, as applied to them, also create genuine disputes of material fact precluding summary judgment.

#### 1. Dr. de Virgilio Took Adverse Employment Action

Dr. de Virgilio first argues that he didn't participate in any adverse employment action because he did not personally vote on the recommendation to present Dr. Ryan with the Behavioral Contract.  (Motion at 34-35.)  This is utter nonsense.  Dr. de Virgilio supervised the FPPE process himself.  (DF 174.)  This Court has already found that the FPPE *itself* was an adverse employment action.  (Summary Judgment Order at 34.)

Moreover, Dr. de Virglio participated in the FPPE personally, and the FPPE reflects his explicit complaints that Dr. Ryan reported Dr. White, Dr. Donayre, and Dr. de Virgilio to the NIH – as well as his lie that the NIH found the complaint unfounded.  (DF 183-84.)  Dr. de Virgilio personally presented the FPPE to the MEC.  (DF 98.)  Dr. de Virgilio also participated in subsequent MEC meetings at which the MEC decided to revoke Dr. Ryan's privileges when he did not accept the Behavioral Contract.  (DF 98.)  This is more than enough to create a genuine dispute of material fact about whether Dr. de Virgilio took an adverse employment action.[5]

#### 2. <u>Dr. Ryan Has Presented Evidence That Dr. de Virgilio and Dr. Lewis Had Retaliatory Motive</u>

Dr. de Virgilio and Dr. Lewis repeat the other Defendants' arguments that there's no evidence they had retaliatory motive.  (Motion at 35-39.)  That argument fails for the

---

[5] Defendants tellingly do not argue that Dr. Lewis was not involved in any material adverse action against Dr. Ryan, and for good reason.  The record demonstrates that he did when he participated in meetings in which the MEC decided to impose the Behavioral Contract on Dr. Ryan and revoke his privileges when he did not accept it. (DF 93, 97-98.)

same reasons set forth above.  *See* Sections III(C), III(F) *supra.*

First, Defendants assert that Dr. Lewis did not know that Dr. Ryan had reported misconduct to outside authorities and therefore could not have had a retaliatory motive. (Motion at 35.)  This purported fact is disputed.  (DF 93, 97.)  In fact, Dr. Lewis was present at multiple MEC meetings at which Dr. Ryan's reports to outside authorities were discussed and acted upon.  (DF 93, 97.)  That's more than sufficient to create a genuine dispute of material fact despite his self-serving claims he can't remember any such information.

Second, Dr. de Virgilio and Dr. Lewis repeat the now-familiar refrain that the timing of their actions raises no inference of retaliation.  (Motion at 35.)  But Defendants once again compare the wrong time periods.  The relevant period is the time between Dr. White's demand for retaliatory action against Dr. Ryan and the MEC's actions.  Section III(C).  Dr. White demanded the MEC discipline Dr. Ryan on August 24, 2015.  (DF 148-150.)  The MEC (including Dr. Lewis) responded to that demand – which was based on Dr. Ryan's protected speech of reporting misconduct to the government -- immediately decided to launch its investigation of Dr. Ryan in September 2015.  (DF 148-153.)  The MEC assigned Dr. de Virgilio to lead the FPPE in December 2015 (172-174) and he circulated it in February 2016.  (DF 187.)  This proximity – between Dr. White demanding that the MEC punish Dr. Ryan's protected speech, and the MEC (including Dr. Lewis and Dr. de Virgilio) – was only a few months, short enough to support an inference of retaliation.  *Coszalter*, 320 F.3d at 978 (gap of a few months between speech and action supported inference of retaliation).

Third, Dr. de Virglio and Dr. Lewis claim that they never opposed protected speech.  Not so.  Dr. de Virgilio explicitly submitted his complaints about Dr. Ryan's protected speech as part of the FPPE.  (DF 183.)  Dr. Lewis, as part of the MEC, repeatedly endorsed actions against Dr. Ryan that were explicitly based on Dr. Ryan's protected speech.  (DF 93-97.)

Fourth, Dr. de Virglio and Dr. Lewis claim that Dr. Ryan has no evidence that their stated reasons for action were pretextual.  (Motion at 36-39.)  But as is discussed above (Section III(C)), this Court has already found that Dr. Ryan "offers evidence that suggests that defendants' explanations for the adverse employment actions of directing the FPPE, voting to propose a Behavioral Agreement, and voting to revoke Dr. Ryan's clinical privileges if he refused the Behavioral Agreement, were pretextual."  (Summary Judgment Order at 25.)  The Court specifically cited Dr. Ryan's evidence that the MEC abandoned its usual approach of progressive discipline, consultation with direct supervisors, and counseling before launching an FPPE of Dr. Ryan (DF 188-192), evidence that the MEC initiated a new investigation of Dr. Ryan even after a prior investigation found that he had not committed a HIPAA violation.  (DF 153.)  Those factors apply with equal force to Dr. de Virglio, who both led the FPPE and contributed hostile comments about Dr. Ryan's protected speech to it, and who later participated in MEC meetings confirming the decision to revoke Dr. Ryan's privileges for his failure to accept the Behavioral Contract.  (DF 54, 98, 173, 183-84.)  They also apply with equal force to Dr. Lewis, who participated in the entire MEC process.  (DF 93, 97-98.)

Dr. de Virglio and Dr. Lewis attack this Court's prior rulings, arguing that the progressive discipline rules are mere guidelines, and that Dr. de Virgilio *did* attempt to counsel Dr. Ryan in some form.  (Motion at 37.)  These are distinctions without a difference.  As the Court found, Dr. Ryan presented evidence that the MEC's usual practice was progressive discipline, and deviation from that practice supports an inference of retaliation.  (DF 188, 189, 190, 191, 192, 195, 196, 197.)  Dr. de Virgilio's attempt to suggest he offered *some* sort of counseling does not change the fact that Dr. Ryan has presented evidence that nobody counseled him about his supposed yelling in the operating room, nobody counseled him about Dr. White's complaints, nobody counseled him about the issues set forth in the FPPE, and Dr. de Virgilio did not offer the kind of formal counsel contemplated by the bylaws.  (DF 195, 196, 197, 198.)  Once

again, genuine disputes of material fact preclude summary judgment, as this Court has already found.

Defendants also assert that the Behavioral Contract was not an adverse employment action, and therefore no inferences of retaliatory intent can be drawn in connection with it. (Motion at 38.) As this Court has already found, the initiation of the investigation – which included the FPPE – was an adverse employment action, leading to everything that followed. Both Dr. Lewis and Dr. de Virglio participated in that and in enforcing its consequences.

### 3. Dr. Ryan Has Presented Evidence Creating a Genuine Dispute of Material Fact on Defendants' Justification and Inevitability Defenses

Dr. de Virglio and Dr. Lewis repeat the other Defendants' arguments that their actions were both justified and inevitable. (Motion at 39-40.) This argument fails for them as it has failed for the other Defendants. Section III(D). This Court previously found that Dr. Ryan's evidence was sufficient to create "underlying factual disputes" about whether the MEC's actions were justified or inevitable, precluding summary judgment. (Summary Judgment Order at 27-28.) The same ruling applies here.

### 4. Dr. de Virgilio and Dr. Lewis Are Not Entitled To Summary Judgment On A Qualified Immunity Theory

Dr. de Virglio and Dr. Lewis repeat the same qualified immunity arguments as their codefendants. (Motion at 41-42.) Those arguments fail for the same reasons. Section III(E).

## H. Genuine Disputes of Material Fact Preclude Summary Adjudication of Punitive Damages Against the Moving Defendants

Defendants next argue that they are entitled to partial summary adjudication of Dr. Ryan's claim for punitive damages against Dr. Yee, Dr. Katz, Dr. Lewis, and Dr. de Virgilio because Dr. Ryan cannot prove they acted with malice and conscious disregard for Dr. Ryan's rights. (Motion 43.) Once again Defendants are wrong.

BROWN WHITE & OSBORN LLP
ATTORNEYS

Dr. Ryan can establish a right to punitive damages by proving an evil motive or intent or a reckless or callous indifference to his federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). If Dr. Ryan proves intentional discrimination based on his speech, he will have "by definition have satisfied the requirement of showing the 'reckless indifference' required for an award of punitive damages." *Stender v. Lucky Stores, Inc*., 803 F.Supp. 259, 324 (N.D. Cal. 1992). A finding of retaliation is sufficient to support punitive damages. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1199 (9th Cir. 2002) (evidence that was sufficient to support verdict of harassment and retaliation also sufficient to support punitive damages); *Passantino v. Johnson Consumer Prods., Inc.*, 212 F.3d 493, 514-16 (9th Cir. 2000) (evidence of retaliation was "unquestionably sufficient" to satisfy the "malice or reckless indifference" standard for punitive damages under Title VII).

This Court correctly rejected this argument when Dr. Putnam made it (Summary Judgment Order at 37), and should reject it again. Dr. Ryan has presented evidence that Dr. Yee – and by inference, Dr. Katz – told the MEC to move forward with its retaliatory investigation despite knowing that it could be viewed as retaliatory, and responded to Dr. Ryan's complaints of retaliation by suggesting that counsel reassure the MEC members that they would be indemnified. (DF 52, 200, 243.) Dr. Ryan has presented evidence that even though Dr. Lewis was exposed to repeated statements showing that Dr. Ryan was being targeted for making reports to outside authorities, he still participated in the MEC's actions of initiating the FPPE, demanding that Dr. Ryan sign the Behavioral Contract, and revoking his privileges when he did not. (DF 94, 97-98.) Dr. de Virgilio led the creation of the FPPE, provided quotes to the FPPE complaining that Dr. Ryan had made reports to the NIH and falsely stating that the NIH had found them unfounded, presented the FPPE (complete with its repeated references to Dr. Ryan's protected speech) to the MEC, and participated in subsequent meetings at which the MEC affirmed that Dr. Ryan's privileges should be revoked for not accepting the Behavioral Contract. (DF 54, 98, 174, 179-186.) That's more than sufficient to

26

BROWN WHITE & OSBORN
ATTORNEYS

create a genuine dispute of material fact about whether they showed reckless indifference to Dr. Ryan's constitutional rights. Therefore, the Court should not grant summary adjudication of punitive damages.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment, or alternatively, for summary adjudication.

DATED:  February 28, 2022                    BROWN WHITE & OSBORN LLP


By   *s/Kenneth P. White*
                                   THOMAS M. BROWN
                                   KENNETH P. WHITE
                                   Attorneys for Plaintiff
                                   TIMOTHY RYAN, M.D.

27