UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
| Catherine Jeang | Laura Elias | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Kenneth White | John Manier |
| | Linda Hurevitz |

**Proceedings:**   MOTION OF DEFENDANTS HAL YEE, JR., M.D, ANISH MAHAJAN, M.D., MITCHELL KATZ, M.D., CHRISTIAN DE VIRGILIO, M.D., AND ROGER LEWIS, M.D. FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT (Dkt. 75, filed on February 14, 2022)

## I.    INTRODUCTION

On August 3, 2017, plaintiff Timothy Ryan, M.D., formerly a vascular surgeon at Harbor-UCLA Medical Center ("Harbor-UCLA"), filed this action against defendants Brant Putnam, M.D., Janine Vintch, M.D., Anish Mahajan, M.D., Christian De Virgilio, M.D., Hal F. Yee, M.D, and Does 1-50. Dkt. 1 ("Compl."). On October 6, 2017, Ryan filed the operative first amended complaint ("FAC"), which adds Roger Lewis, M.D., and Mitchell Katz, M.D., as defendants. Dkt. 14 (FAC). Ryan's FAC alleges that defendants violated his First Amendment rights by disciplining him for reporting physician misconduct at Harbor-UCLA to federal, state, and local government agencies. Id. Ryan's FAC alleges a single claim for relief, against all defendants: retaliation based on exercise of right to free speech, in violation of 42 U.S.C. § 1983. Id. The FAC seeks punitive damages against defendants Putnam, Yee, Lewis, Katz, and de Virgilio. Id.

On October 27, 2017, defendants moved to dismiss plaintiff's FAC. Dkt. 15. On February 15, 2018, the Hon. Manuel L. Real, now deceased, granted defendants' motion to dismiss, finding that defendants were entitled to qualified immunity. Dkt. 22 ("MTD Order"). On February 23, 2018, Ryan provided notice of his appeal of the MTD Order to the United States Court of Appeals for the Ninth Circuit. Dkt. 23. On September 18, 2019, the Ninth Circuit reversed and remanded the MTD Order, finding that "qualified immunity [was] not warranted at [that] stage." Dkt. 26. Specifically, the Ninth Circuit stated that "[a]n adverse employment action is [an] action 'reasonably likely to deter [the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                                    **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

plaintiff] from engaging in protected activity under the First Amendment'" (quoting
Coszalter v. City of Salem, 320 F.3d 968, 976 (9th Cir. 2003)), and found that "[s]ince
2002, [the Ninth Circuit has] recognized that an employer's decision to initiate
disciplinary proceedings against a doctor that threaten to revoke staff privileges, when
combined with a negative effect on employment prospects, is enough to satisfy the
'adverse employment action' requirement." Dkt. 26 at 2-3 (citing Ulrich v. City & Cty.
of San Francisco, 308 F.3d 968, 977 (9th Cir. 2002)). In light of that background, the
Ninth Circuit found Ryan's allegations "sufficiently similar to Ulrich to satisfy the clearly
established prong of the qualified immunity analysis at [that] early stage." Dkt. 26 at 3.

On October 15, 2019, the case was randomly reassigned to this Court. Dkt. 28.
On April 17, 2020, defendants submitted their answer to the FAC. Dkt. 36.

On October 29, 2021, defendants Putnam and Vintch filed a motion for summary
judgment or, alternatively, partial summary judgment. Dkt. 61. On January 10, 2022, the
Court denied the motion of defendants Putman and Vintch for summary judgment or
partial summary judgment. Dkt. 70. On February 4, 2022, Putnam and Vintch informed
the Court of their appeal, to the Ninth Circuit, of the Court's January 10, 2022 summary
judgment order. Dkt. 72.

On February 14, 2022, defendants Yee, Mahajan, Katz, de Virgilio, and Lewis
("defendants") filed the instant motion for summary judgment. Dkt 75-1 ("Mot."). 
Defendants also filed a statement of uncontroverted facts. Dkt. 75-2 ("SUF"). On
February 28, 2022, Ryan submitted his opposition to defendants' motion for summary
judgment. Dkt. 79 ("Opp."). Ryan also submitted a statement of genuine disputes of
material fact, which includes additional material facts. Dkt. 79-1 ("GDF"). On March 7,
2022, defendants submitted their reply (Dkt. 80 ("Reply")) and a response to plaintiff's
statement of genuine disputes of material fact (Dkt. 80-1 ("SUF Reply")).

The Court held a hearing on March 21, 2022. Having carefully considered the
parties' arguments and submissions, the Court finds and concludes as follows.

///

///

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|---|---|---|---|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

## II.   BACKGROUND

Unless otherwise noted, the Court references only facts that are uncontroverted and to which evidentiary objections, if any, have been overruled.[1]

### A.   The Parties

Ryan was employed by Harbor-UCLA "as a Staff Vascular Surgeon, Physician Specialist, from October 2013 to October 2018, and first obtained medical staff privileges in 2013." SUF No. 9. Harbor-UCLA "is owned by the County of Los Angeles ("County") and operated by the County's Department of Health Services ("DHS")." Id. No. 1.

In order to practice as a physician at Harbor-UCLA, physicians must hold a license issued by the California Medical Board, and separately must hold medical staff privileges that allow physicians to treat patients at Harbor-UCLA. Id. No. 2. Medical staff privileges at Harbor-UCLA are granted by the Credentials Committee, a subcommittee of the Medical Executive Committee ("MEC"), which, in turn, is part of Harbor-UCLA's Professional Staff Association ("PSA"). Id. Medical staff privileges for Harbor-UCLA must be renewed every two years. Id.

Harbor-UCLA's PSA functions in accordance with its Bylaws, and "is tasked with monitoring physicians' compliance with credentialing requirements, and evaluating all members and applicants in accordance with peer review criteria, adopted consistent with the Bylaws and the PSA's peer review process." Id. Nos. 3-4. "The PSA's MEC includes the PSA's Officers and the Chair of each PSA Department (e.g., Roger Lewis, M.D., as Chair of Emergency Medicine from 2013 to 2020), among others, as well as several ex officio members without voting privileges, including Harbor-UCLA's Chief

---

[1] "In motions for summary judgment with numerous objections, it is often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." Capitol Records, LLC v. BlueBeat, Inc., 765 F. Supp. 2d 1198, 1200 (C.D. Cal. 2010). To the extent that the Court relies on objected-to evidence, it has considered and **OVERRULED** the applicable evidentiary objections because the objected-to-evidence is relevant and admissible. Evidence not considered by the Court is not addressed.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

Medical Officer ("CMO")—but did not include Hal Yee, Jr., M.D. after 2013, or Mitchell Katz, M.D. at any time." Id. No. 5.

De Virgilio "has been Chair of Harbor-UCLA's Department of Surgery since January 2016, after serving one year as Interim Chair, and has been a member of the MEC as Chair and Interim Chair." Id. No. 8. Yee "has served as CMO of the County's DHS since 2011." Id. No. 46. Katz "was Director of the County's DHS from 2010 to September 2017." Id. No. 47. Mahajan "has served as Harbor-UCLA's CMO since August 2016, at which time he became an ex officio (nonvoting) member of the MEC." Id. No 48. Lewis was Chair of Emergency Medicine at Harbor-UCLA from 2013 to 2020, and was part of the MEC during that time period. Id. No. 5.

Putnam "was a member of the MEC from 2011 to 2021, and served as President of the PSA and Chair of the MEC from July 1, 2015 to June 30, 2018." Id. No. 6. Vintch "has been a member of the MEC since 2006; she was Vice President of the PSA and Vice Chair of the MEC from July 1, 2015 to June 30, 2018, and President of the PSA and Chair of the PSA from July 1, 2018 to June 30, 2021." Id. No. 7.

Yee, Mahajan, and Katz did not attend any MEC meetings during which Ryan was discussed. Id. No. 49.

## B.     The Best-CLI Trial and Ryan's Concerns that UCLA-Harbor Physicians Falsified their Attestations

In 2014, Ryan "became aware of a clinical trial sponsored by the National Institute of Health ("NIH") called BEST-CLI, which stands for Best Endovascular vs. Best Surgical Therapy in Patients with Critical Limb Ischemia." GDF No. 100. "The clinical trial was designed to evaluate what procedures on patients with critical limb ischemia led to the best results, comparing endovascular surgery (which uses catheters and is less invasive) with open surgery." Id. The trial required physicians to have completed a set number of surgeries to qualify for participation. Id. No. 101. Ryan "became concerned that some [UCLA-Harbor] surgeons—including Dr. Rodney White [] and Dr. Carlos Donayre []—had not completed the requisite number of surgeries to qualify for the trial, and that they had therefore falsified the attestation in their applications in order to participate." Id. White has stated that the BEST-CLI trial was "a big national trial [that cost] over $20 million dollars." Id. No. 182.

On December 4, 2014, Ryan reported his concerns regarding the possibly falsified attestations to Dr. Timothy Van Natta, Chief Medical Officer at UCLA-Harbor, and De

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | **'O'** |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

Virgilio, but based on their responses, Ryan did not believe that "they were seriously investigating whether Harbor surgeons had falsely inflated their surgical experience in order to qualify for the BEST-CLI trial." Id. Nos. 102-103. Accordingly, on December 4, 2014, Ryan "contacted the NIH and reported his concerns, providing his basis for believing that Dr. White and Dr. Donayre, among others, had falsified their attestations in their application to participate in the BEST-CLI trial." Id. No. 105. On approximately December 9, 2014, Ryan informed Van Natta that he had made a report to the NIH. Id. No. 106.

On February 12, 2015, the Surgical and Interventional Management Committee ("SIMC") for the BEST-CLI Trial found that "no one at [UCLA-Harbor] currently meets the criteria to serve as an independent endovascular operator" and that until someone on site met the criteria, "the site should no longer enroll patients in the BEST-CLI Trial." Dkt. 62-5 at Ex. 331. On March 30, 2015, SIMC "found that several members of the Harbor-UCLA team misrepresented their procedural volume histories to meet the criteria of independent endovascular operator." Dkt. 61-7 at Ex. 24. However, despite the finding that members of the Harbor-UCLA team had engaged in misrepresentation, the HHS Office of Research Integrity "advised that the falsification of information in this situation would not constitute research misconduct" and stated that it "will not investigate this matter further." Id.

C.   **Patient "BH" and Ryan's Concerns Regarding an Alleged Kickback Scheme**

In December 2013, Ryan "treated a patient 'BH' for an aortic dissection . . . with medication, which he believed to be the appropriate course." GDF No. 109. Shortly after Ryan treated patient BH, "Dr. White's nurse Rowena Buwalda copied Dr. Ryan on an email reporting that she had instructed BH to come to the hospital the following day and to complain of chest pains when she did so." Id. No. 110. Ryan "further learned that Dr. White had performed surgery on BH, implanting a stent graft manufactured by Medtronic," even though Ryan "firmly believed that BH had responded well to non-surgical management and that she had no need for the stent graft procedure." Id. Nos. 112-113. BH "suffered a serious aortic injury as a result of the stent graft surgery, resulting in a major stroke that impaired her ability to speak." Id. No. 114.

Ryan believed that "Dr. White had falsified the medical record to justify the stent graft, describing symptoms inconsistent with what I had observed." Dkt. 62-4 (Declaration of Plaintiff Timothy Ryan, M.D. ("Ryan Decl.")) ¶ 6. Moreover, Ryan

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

"concluded that Dr. White, Dr. Donayre, and others were implanting stent grafts manufactured by Medtronic in patients where they were not medically warranted, and that they had a financial incentive to do so" because "[t]he device manufacturer Medtronic was paying them thousands of dollars each time they implanted one of Medtronic's stent grafts under the guise that they were conducting a 'teaching course' on how to do so when they implanted the stent graft." Ryan Decl. ¶ 7. Ryan states that he "knew this because in December 2013 Medtronic offered to pay me to participate" in the teaching courses. Id. Ryan states that "[b]ased on my direct observation of the operations associated with these supposed 'courses,' I know there were no physicians present to observe the procedure, so no one to 'learn' from the 'course.'" Id.

Ryan conducted an "investigation," and came to believe that "the doctors received several thousand dollars per implant," and that "Medtronic was paid tens of thousands of dollars per case where Medtronic devices were implanted." Id. Ryan "was gravely concerned by this development, because he believed it represented doctors getting kickbacks from a device manufacturer for using their product, that it compromised medical judgment about whether the devices were medically indicated, and that it threatened the health and safety of patients for whom the stent grafts were not medically indicated, as in the case of BH." GDF No. 120.

Accordingly, Ryan submitted a complaint regarding White, and later was able to confirm that the Harbor-UCLA PSA conducted a Focused Professional Performance Evaluation ("FPPE") of White because Ryan was interviewed by the FPEE team. SUF No. 13; GDF No. 125. In the interview, Ryan told the FPPE team "about his concerns and conclusions about Dr. White and the Medtronic kickbacks, and provided them with documentation including BH's medical records." GDF No. 125.

By September 2014, Yee was aware of the FPPE against White, that Ryan was threatening to blow the whistle to federal authorities, and that Ryan felt that White was retaliating against him. GDF No. 227.

**D.    Ryan Reports the Alleged Kickback Scheme to Criminal Authorities**

Ryan was not satisfied with UCLA-Harbor's response to his complaint regarding the alleged Medtronic kickback scheme. GDF No. 126. Accordingly, on approximately January 12, 2015, Ryan "called the Los Angeles District Attorney's Office and spoke to a Deputy District Attorney . . . describing his concerns that Harbor physicians were getting kickbacks for implanting devices that were not medically indicated." Id. No. 127. "The

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

Deputy District Attorney told Dr. Ryan that the District Attorney's Office would investigate, and later interviewed Dr. Ryan." Id. Shortly thereafter, Ryan told de Virgilio that "he had reported his concerns to the District Attorney's Office and [that] they would be investigating." Id. No. 128.

On January 15, 2015, Dr. Yee learned from Dr. Van Natta that Dr. Ryan's reports to the District Attorney's office had resulted in an apparent investigation, and that Dr. Ryan had made a report to the NIH. GDF No. 229.

Defendants contend that Lewis was not aware that Ryan made any reports to persons or entities outside of Harbor-UCLA. SUF No. 93. However, it appears that Lewis was present at a April 25, 2016 MEC meeting during which Yee gave input regarding whether action by the PSA against Ryan could be seen as retaliation for whistleblowing, and the participants discussed that one aspect of Ryan's lawsuit involves "patient concerns and whistleblowing." Dkt. 62-5 at Ex. 360.

### E. White's Complaints Regarding Ryan; The MEC's Response

On January 26, 2015, White emailed Human Resources, Van Natta, and de Virgilio "to report invasion of personal privacy, and potential federal [] and state (California Medical Privacy Act) patient privacy violations by Dr. Timothy Ryan." Dkt. 62-5 at Ex. 341. On February 4, 2015, White submitted an affidavit and several exhibits in support of his report. Id. White's affidavit "complained that Dr. Ryan had improperly reviewed medical records and operative reports and approached [UCLA-Harbor] personnel to collect information regarding Dr. White and his patients." GDF No. 133. Moreover, White's affidavit "attached a computerized report of surgeries which he claimed Dr. Ryan had asked an assistant to print for him."[2] Id. No. 135. "[A] recognized HIPAA Compliance Officer review[ed] the case and it was found that no [HIPAA] violation occurred on the part of Dr. Ryan." Dkt. 62-5 at Ex. 365.[3]

---

[2] The footer at the bottom of the report is dated January 30, 2015, i.e., after White's complaint. See Dkt. 62-5 at Ex. 341. The parties dispute whether this date refers to the date the report was created or to the date the documented was printed or reprinted. See GDF No. 136; SUF Reply No. 136.

[3] Separately, on July 29, 2015, White filed suit against Ryan. SUF No. 41. The lawsuit was later dismissed in exchange for Ryan's dismissal of his own lawsuit against White. Id. No. 42.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

On August 25, 2015, White made a Request for Corrective Action ("CAR") to be taken against Ryan to the PSA.  SUF No. 14.  White claimed, inter alia, that Ryan "engaged in conduct detrimental to the delivery of quality patient care," "invaded his personal privacy, and violated both the Health Insurance Portability and Accountability Act ("HIPAA") and California's Confidentiality of Medical Information Act, by accessing confidential patient information in Dr. White's office." Id.; GDF Nos. 148-149.  Ryan contends that "Dr. White's [CAR] described Dr. Ryan's activities asking for and reviewing records to make reports to the NIH and District Attorney's Office."  Ryan Decl. ¶ 13.

On September 28, 2015, the MEC discussed Dr. White's CAR.  SUF No. 15; GDF No. 153.  The draft meeting minutes noted that "Dr. Ryan considers himself a whistleblower because he thought this bad thing happened and he wanted to do right." Dkt. 62-5 at Ex. 365.  They further noted that "[t]o take corrective action beyond the investigation could be considered retaliation because we feel this issue has been investigated adequately," but, "[o]n the other hand, it is not necessarily under the purview of the whistleblower to do their own investigation and start digging into whatever they want."  Id.  The draft meeting minutes also stated that "[t]he PSA spent months and worked very diligently on this and ultimately there was no resolution," "now we are being asked to investigate this again," and that "these complaints were taken seriously and went appropriately to HR Performance Management and the HIPAA compliance Officer and the difference now is that there are attorneys involved and litigation."  Id. Finally, they stated that "a recognized HIPAA Compliance Officer review[ed] the case and it was found that no HIPAA violation occurred on the part of Dr. Ryan."  Id.

In November or December 2015, White submitted an addendum to his CAR.  SUF No. 16; GDF No. 169.  The addendum stated, in part, that:

"On November 19, 2015 I was advised by the County's Intake Specialist Unit that Dr. Ryan filed a complaint against me. On November 24, 2015, I received another letter from that same unit, that the complaint had been initially investigated, that the allegations would not be investigated further and that the matter was considered closed. Enclosed are copies of both letters. This continuing pattern of harassment, and unscrupulous conduct by Dr. Ryan, is having a severe adverse impact on me, as a member of the medical staff, and on my personal and professional life."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

SUF No. 16; GDF No. 169.[4]  On December 28, 2015, Putnam presided over an MEC meeting to discuss White's addendum to his CAR.  SUF No. 19; GDF No. 172.  At the meeting, the MEC "noted the next step would be to complete an FPPE on Dr. Ryan because of the allegations of questionable conduct."  SUF No. 19.[5]  Accordingly, on December 28, 2015, the MEC directed a FPPE be undertaken by an "Ad Hoc Committee."  Id. No. 21.  The members of the committee were chosen by de Virgilio as Department Chair; none of the committee members are parties to this litigation.  Id.; GDF No. 174.  While defendants contend that the MEC directed the FPPE "[p]ursuant to the PSA bylaws," SUF No. 21, Ryan claims that the FPPE was not directed pursuant to the PSA bylaws because the MEC "believed it [had] investigated the issue 'adequately' and the previous investigation determined 'no HIPAA violation occurred on the part of Dr. Ryan.'"  GDF No. 21 (quoting Dkt. 62-5 at Ex. 365 (draft of September 28, 2015 MEC meeting minutes)).

---

[4] Similarly, on December 31, 2015, White wrote to de Virgilio complaining that Ryan had violated HIPAA by gathering data "to initiate the Fraud investigation against Harbor (me) with the trial Steering Committee, and the NIH."  GDF No. 173.

[5] Whereas Putnam stated in his deposition that "typically when there are concerns brought forward either from a department chair or independently to the PSA leadership about unprofessional behavior, our first approach is always to make sure the staff member's correct supervisor has been involved, has done the appropriate counseling, and the department chair would definitely get involved if the initial supervisor counseling had not improved things" (SUF Reply No. 189), Ryan was not counseled about yelling at people prior to the imposition of the FPPE.  GDF Nos. 191-192.  On the other hand, de Virgilio stated in deposition that he spoke to Ryan about his temper, and about being more positive and collaborative, but added that speaking to Ryan was difficult because he was "intimidating."  SUF No. 95; SUF Reply No. 189.  The PSA Bylaws state that "[t]hese bylaws encourage[] the use of progressive steps by Association leaders and Medical Center management, beginning with collegial and educational efforts, to address questions relating to an Association Member's clinical practice and/or professional conduct.  The goal of these efforts is to arrive at voluntary, responsive actions by the individual to resolve questions that have been raised."  GDF No. 190.  The PSA Bylaws also state that "collegial intervention efforts are encouraged but are not mandatory, and shall be within the discretion of the appropriate Association and Medical Center management."  SUF Reply No. 190.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

Yee, Mahajan, and Katz had no involvement in the MEC's decision to direct an FPPE regarding Ryan.  SUF No. 50.  Plaintiff contends that "The PSA involved Drs. Yee, Mahajan, and Katz in its actions against Dr. Ryan throughout its process of retaliation, including prior to and during the time the PSA ordered the FPPE, and Drs. Yee, Mahajan, and Katz deliberately participated in the PSA's responses."  GDF No. 50.  However, the Court reviewed the evidence submitted by plaintiff, and that evidence does not establish that Yee, Mahajan, or Katz participated in the decision to direct an FPPE regarding Ryan.  See Dkt. 79-2 ("Supp. White Decl."), Exs. H-K, L-O, Q-V.

### F.    The FPPE Investigation and Findings; The Behavioral Agreement

Ryan refused to meet with the Ad Hoc Committee after it rejected his request to be provided all questions in writing or be allowed to bring in his lawyer.  SUF No. 23.  Ryan stated that he feared he would not be treated fairly by the Ad Hoc Committee.  GDF No. 23.  After engaging in fact-finding and interviewing 13 witnesses, on February 26, 2016, "the Ad Hoc Committee issued a FPPE report for the MEC's review, which included unanimous committee findings and recommendations with respect to Dr. Ryan's conduct, which it found to be unprofessional."  SUF No. 24.  The FPPE report, generated by the Ad Hoc Committee, included the following summary:

"The Ad Hoc Committee believes that Dr. Ryan's behavior is well below expected standards for professional conduct.  Further, the committee believes that Dr. Ryan's behavior has had serious adverse impacts on the wellbeing of many health care professionals including attending physicians, physician trainees, nurses and other ancillary staff.  His unauthorized access of the files of patients enrolled in studies or under the care of other physicians may constitute a violation of HIPAA.  Finally, it appears that despite Dr. Ryan's acknowledged technical expertise, he is adversely impacting patient care through his behavior.  The MEC is advised that the Ad Hoc committee believes that disciplinary action is justified to safe guard Harbor employees, trainees, and patients.  We recommend that MEC should explore possible actions to remedy the underlying chaotic situation in vascular division created by Dr. Ryan's unprofessional behavior.  Dismissal from the medical staff or discontinuation of medical privileges are options that can [be] considered but the committee is not knowledgeable regarding standards or precedents for such as action based solely on a lack of professionalism.  At a minimum, we believe that Dr. Ryan should receive professional counseling regarding his behavior, that behavioral limits should be set, and that ongoing monitoring of his interactions with others should take place until the problem is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

believed to be resolved.  The Department Chair, residency/fellowship program directors and nursing directors are suggested as the monitoring team for such action.  This report reflects a unanimous consensus among committee members."

Dkt. 61-7 at Ex. 5.  Ryan contends that the FPEE "accused him of accessing and requesting medical records improperly, but did not discuss or disclose that he was doing so to gather information to provide to the NIH, even though the MEC had previously acknowledged this."  GDF No. 179.  Moreover, Ryan points out that the FPPE did not disclose the Ryan's report to the NIH "had resulted in Dr. White and Dr. Donayre being disqualified for participation in endovascular procedures in the BEST-CLI trial."  Id. No. 180.  According to Donayre's witness statement in Ryan's FPPE, "Dr. Donayre felt the need to constantly look over his shoulders all the time because of Dr. Ryan. . . . For this reason Dr. Donayre decided to leave Harbor-UCLA."  Id. No. 186.  White left Harbor-UCLA at the end of April 2016, two months after the FPPE report was issued.  SUF Reply No. 180.

In or around April 2016, MEC members met with Yee to discuss whether any action taken against Dr. Ryan might compromise the County's own actions, or might create "a medical-legal action" against the MEC; Dr. Yee suggested the MEC "proceed with caution because there was concern about whistleblowing," but stated the PSA was "within its rights to take action" and "should proceed" as it sees fit.  SUF No. 52.

Following the completion of the FPPE report, "[t]he MEC discussed [it] at its meetings on March 28 and April 25, 2016, rejected issuing a summary suspension of Dr. Ryan's privileges at the March 28 meeting, voted unanimously at the April 25 meeting to inform Dr. Ryan that it was contemplating taking action against him, and asked Dr. Ryan to appear before the MEC to give his perspective and answer questions."  SUF No. 26.

On July 25, 2016, Ryan attended a MEC meeting with his attorney, and responded to the FPPE report as follows:

"[Ryan] did not yell at a patient; he may have spoken sternly to fellows because he expects more from them; he corrected fellows when they did something wrong; without specific dates he could not answer regarding lack of communication with other vascular surgeons; he believed he communicated well; he was not responsible for Dr. White's retirement or the departure of another vascular surgeon (Carlos Donayre, M.D.); and he would consider a behavioral or anger management program."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                                    **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|---|---|---|---|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

SUF No. 28.  After Ryan and his counsel left the July 25, 2016 meeting, the MEC deliberated and voted on its next course of action, but de Virgilio left before this vote took place.  SUF No. 29.  "[A] majority of the MEC voted to recommend a Behavioral Contract and proceed with revocation of Dr. Ryan's privileges and membership only if he either did not agree to the Behavioral Contract or breached its terms."  Id. No. 30.  Yee, Mahajan, Katz, and de Virgilio did not participate in the MEC's decisions to ask Ryan to sign a Behavioral Agreement and recommend a revocation of Ryan's clinical privileges upon his refusal to sign the Behavioral Agreement.  Id. No. 54.[6]  Pursuant to the PSA bylaws, the DHS Director (Katz) and CMO (Yee) and the CMO of Harbor-UCLA (Mahajan), have no role in any MEC determination of medical disciplinary action, except to be notified of any recommended corrective action, and the Governing Body's only roles are to either adopt the MEC's recommendation or decide any appeal after a hearing and decision by the JRC.  Id. No. 55.

While the MEC has offered behavioral agreements to other Harbor-UCLA practitioners, the parties dispute whether UCLA-Harbor has offered Behavioral Agreements with the same terms as Ryan's to other practitioners.  Id. No. 31; GDF No. 31.  In any event, on September 6, 2016, Ryan was provided with the behavioral agreement (the "Agreement" or "Behavioral Agreement"), which:

- "Listed specific behavioral requirements, including that he not access computers or other documents belonging to other PSA members, faculty, or others without authorization, or medical records of patients for whom he is not directly involved in treatment without express permission by his Department Chair;

- Required Plaintiff to address concerns regarding individuals at Harbor-UCLA 'in private to the appropriate supervisor, administrator, faculty or PSA leader in a courteous manner, or in written reports using the established Hospital reporting forms and procedures,' and prohibited 'unconstructive criticism' calculated 'to intimidate, undermine confidence, belittle or imply

---

[6] The Court finds that the evidence submitted by plaintiff does not support a dispute of this fact, because it does not demonstrate that Yee, Mahajan, Katz, and de Virgilio were involved in those MEC decision to offer the Behavioral Contract and revoke Ryan's privileges if he refused it.  See GDF No. 54; SUF Reply No. 54.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

stupidity or incompetence';

- Required Dr. Ryan to participate in one of two listed anger management programs;

- Included a waiver of 'claims[7] resulting' from any actions or communications 'consistent with the terms of this Agreement,' or regarding the anger management program;

- Required Dr. Ryan to cooperate with the PSA's Well-Being Committee as specified;

- Required Dr. Ryan to 'consult with a psychologist or psychiatrist' (or use a therapist if he is currently engaged with one) 'for the purposes of discussing the scope of the evaluation and the therapeutic goals,' and 'to undertake therapy if recommended by the consultant,' and required any consulted mental health clinician 'to provide progress reports' to the Well-Being Committee;

- Provided that upon Dr. Ryan's failure to comply with the Agreement, he 'shall be subject to corrective action' as authorized by the PSA Bylaws, 'subject to any hearing rights provided in Article VII of the Bylaws, or its successor, for such corrective action,' provided that a single arbitrator qualified to serve as a hearing officer under Article VII may serve as trier of fact in the MEC's discretion;

---

[7] The wavier of claims stated that Ryan "agrees to hold free and harmless the Hospital, members of the EC or authorized committees of the Hospital's Professional Staff, the Programs, and any and all representatives of any of them, from and against any and all claims resulting from any and all actions taken, or communications made, consistent with the terms of this Agreement. Dr. Ryan further acknowledges that there shall be no monetary liability on the part of, and no cause of action for damages shall arise against, the EC, members of the EC or authorized committees of the PSA, the Hospital, or any and all representatives of any of them, for any acts performed or communications made regarding the subject matter of this Paragraph 3.2(ii)." Dkt. 61-7 at Ex. 7.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                                    **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|---|---|---|---|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

- [Provided that] the Agreement may be terminated by either party; and

- [Provided that] entering into the Agreement would 'not constitute an action or recommendation taken for a medical disciplinary cause or reason' and would not 'in and of itself . . . require a report to the Medical Board of California or any other federal or state agency.'"

SUF No. 32 (quoting Dkt. 61-7 at Ex. 7 (Behavioral Agreement as of September 6, 2016)).[8]  On September 7, 2016, when Putnam informed Ryan that the MEC was demanding that he accept a Behavioral Contract, union representative Jake Baxter wrote to DHS officials asserting that the MEC's actions against Dr. Ryan were retaliatory and illegal.  GDF No. 239.  On September 8, 2016, Mahajan responded to Baxter's email, asserting that the PSA was independent of DHS, and that DHS had no role in the PSA's actions.  GDF No. 240.  In discussing Baxter's claims, Mahajan noted to Yee that county counsel was "involved in earlier aspects of this related to concerns about retaliation vis-à-vis whisteblow."  Dkt. 79-2 at Ex. S.  On September 9, 2016, Yee stated in an email to Mahajan that "[y]ou may need to help [county counsel] educate the PSA that they are indeed indemnified by the County for their appropriate and approved work as physicians at Harbor, and as such are covered for their work on the PSA as medical staff themselves."  Id., Ex. T.

In any event, Ryan did not sign the Agreement; he believed that he could not sign it because "it required [him] to admit to things that were not true, that it was illegal in that it purported to restrict [him] from reporting misconduct to entities outside of Harbor, and that it was illegal because it forced [him] to waive claims against the MEC and Hospital."  Ryan Decl. ¶ 21; see also SUF No. 33.  Putnam and Vintch could not recall any other behavioral agreements that included a waiver of claims.  GDF No. 208; SUF Reply No. 208.  In at least one instance, another UCLA-Harbor physician "was offered a behavioral contract for unprofessional, intimidating, and disruptive behavior" that "did not include the waiver of claims or psychiatric counseling they demanded of Dr. Ryan."  GDF No. 209.

---

[8] Lewis has never provided input into the contents of a behavioral contract, other than to vote on whether to offer such a contract, and has not been involved in discussion of any waiver provision in such an agreement.  SUF No. 96.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**        **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|---|---|---|---|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

### G. The MEC's Proposed Action to Revoke Ryan's Staff Membership and Privileges

"Based on Dr. Ryan's refusal to sign a Behavioral Agreement, and in accordance with the MEC's decision at the July 25, 2016 meeting, the PSA issued Dr. Ryan the MEC's Notice of Proposed Action and Hearing Rights, dated October 5, 2016, which stated, in part, that:

- "The FPPE report found Dr. Ryan 'acted aggressively' and was 'verbally abusive to other practitioners, nurses, fellows, and in some instances, patients,' that he created 'a hostile work environment' where some people 'felt threatened' and 'intimidated' to the point where they desired to leave 'the vascular work team' or their jobs, and that he publicly criticized 'the patient management of other members of the team,' which adversely affected well-being of other healthcare officials;

- The FPPE report found Dr. Ryan's behavior was 'well below expected standards for professional conduct' and violated the PSA Bylaws (§§ 2.2-2.2, 2.4-2, 2.4-3, 2.4-7, 2.5-2, and 2.5-2.4), and that disciplinary action was justified to safeguard employees, trainees, and patients;

- Because Dr. Ryan did not sign and return the Behavioral Agreement, the MEC proceeded with the final proposed action to revoke Dr. Ryan's professional staff membership and privileges at Harbor-UCLA pursuant to Article VI of the PSA Bylaws;

- This action would not become final until Dr. Ryan exhausted or waived his hearing and appeal rights under Article VII of the Bylaws, and that his membership and privileges would remain in place until the action became final; and

- If the action became final, California Business & Professions Code § 805 would require the filing of a report with the Medical Board of California, and a report also would be filed with the National Practitioner Data Bank ("NPDB") pursuant to 42 U.S.C. § 11101 et seq."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

SUF No. 34. Ryan "exercised his appeal rights in October 2016 and requested a hearing before a Judicial Review Committee ("JRC") on the recommendation to revoke his privileges." Id. No. 35. On November 10, 2016, PSA sent Ryan a "Notice of Charges" outlining the PSA's accusations against him. Id. No. 36; GDF No. 214. The Notice of Charges accused Ryan of "[o]penly threaten[ing] to call external agencies to conduct investigations," and included other accusations related to Ryan's allegedly unprofessional and "angry manner," but did not reference any HIPAA violations. SUF No. 36; GDF No. 214. The Notice of Charges also stated that Ryan made "unfounded accusations in an angry manner," but at deposition Putnam could not remember any unfounded accusations made by Ryan. SUF No. 36; GDF Nos. 168, 214-215; SUF Reply No. 215. On February 27, 2017, Putnam sent Ryan a First Amended Notice of Charges that deleted the accusations related to threatening to call external agencies and making unfounded accusations in an angry manner. GDF No. 217.

On June 20, 2018, counsel for Ryan and the PSA "jointly submitted a letter . . . which requested dismissal of the JRC hearing on Dr. Ryan's appeal without determination of the merits, and stated that the matter became moot because Dr. Ryan's PSA membership and privileges had lapsed." SUF No. 39. After deeming Dr. Ryan's privileges and membership to have lapsed, the PSA did not file a report regarding Dr. Ryan with the California Medical Board, and did not file such a report with the NPDB until 2020 after determining it was required to do so." SUF No. 40.

Ryan contends that he has been unable to secure a surgeon position ever since the PSA's proceedings against him, despite dozens of applications, at least in part because the applications "require him to disclose whether he [has] ever been investigated by a Professional Staff Association." GDF No. 221. Ryan believes that "hospitals and practices will not hire surgeons who are the subject of peer review investigations regarding their privileges." Id. No. 222.

## H. DHS Investigations into Ryan for Privacy Violations and Professional Discourtesy

White's privacy complaint against Ryan to DHS in January and February of 2015 (Case # HU15004) accused Ryan of invading his personal privacy and potentially violating HIPAA and state privacy laws. SUF No. 59. Initially, Harbor-UCLA's privacy coordinator determined that the allegation of unauthorized access in Dr. White's privacy complaint to DHS (Case # HU15004) was not substantiated, because DHS policy permits physicians to obtain de-identified information for research purposes. Id. No. 61.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

However, Harbor-UCLA's Privacy Coordinator was instructed to reopen the investigation of Case # HU15004 on January 19, 2016. Id. No. 65. Thereafter, the privacy coordinator determined that Dr. Ryan inappropriately requested and received PHI on patients for whom he had no authority, without obtaining prior approval of the Internal Review Board as required by DHS policy. Id. No. 66. While Ryan acknowledges that this was the conclusion, he contends that it was legally incorrect because the report did not address that Ryan was gathering the information to make a report of misconduct. GDF No. 66.

Additionally, three registered nurses ("RNs") alleged that Dr. Ryan engaged in discourteous conduct towards them before July 7, 2015. Id. No. 58. Accordingly, on July 7, 2015, Joi Williams, then the Chair of DHS's Performance Management ("PM") Unit, sent an email stating that "PM will review issues related to . . . discourtesy by Dr. Ryan, and allegations of inappropriate comments by Dr. Ryan related to Dr. White." Id. No. 57. Dr. Ryan and one of his attorneys, Mark Quigley, met with two PM Investigators, Cathy Yoo and Nairi Gevorki, on January 26, 2017, for an administrative interview; Dr. Ryan was given the opportunity to provide an affidavit, but he did not do so. Id. No. 68. Several other witnesses were interviewed, and several affidavits obtained. Id. No. 69. After completing its investigation, the PM team drafted a Notice of Intent to Suspend for Dr. Ryan for Dr. Mahajan's review, which proposed suspending Plaintiff for 25 calendar days. Id. No. 70. Dr. Mahajan reviewed the draft Notice of Intent to Suspend to Dr. Ryan, and approved it without making any changes. Id. No. 71. Mahajan issued the Notice of Intent to Suspend, dated April 4, 2017, to Dr. Ryan on or about April 7, 2017. Id. No. 73. It cited, inter alia, disruptive behavior, ethical conflicts, and misuse of confidential patient information. Id.; see also SUF No. 74 (investigative evidence cited in support of the Notice of Intent to Suspend, including evidence of professional discourtesy, false statements during the investigation, and inappropriate access of personal health information). The Notice of Intent to Suspect made the following conclusion:

> "Dr. Ryan, your unauthorized access to a list of surgical procedures that included procedures conducted by other surgeons with protected patient information was unnecessary and not related to a legitimate business reason. In addition to reflecting poor judgment, this unauthorized access was a violation of departmental guidelines and policies meant to safeguard the private medical information of patients who place their trust in the County. You then continued to show a disregard for Department policy by provide false information to the Department

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|----------|------------------------|------|----------------|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

during an administrative investigation and completely denying receiving information contained in the report that you requested.  Your conduct caused concern to the Department due to actions and your lack of accountability.  Also, your angry behavior and threatening body language not only violates the Department's written policy and procedures but also creates a disruptive environment and is not conducive in creating a healthy, professional workplace.  Due to your unauthorized access of PHI and your discourteous behavior, the Department intends to suspend you for twenty-five (25) calendar days from your permanent position of Physician Specialist."

SUF No. 77.  Ryan and Mahajan first met fact-to-face in April 2017, when Mahajan issued the Notice of Intent to Suspend to Ryan.  Id. No. 79.  On April 12, 2017, Ryan submitted a response to the Notice of Intent to Suspend, in order to "refute [its] findings and object to any proposed suspension."  Id. No. 81.  Therein, Ryan stated, in part:

"I have been and continue to be the victim of a pattern of harassment ever since I reported the practices of Dr's White and Donayre, and your proposed action continues this harassment.  Your review of my use of confidential information ignores the law.  California's Confidentiality of Medical Information Act specifically allows a provider of healthcare to disclose information without consent in a number of circumstances. . . . [including] public agencies[.]"

SUF No. 81.  Mahajan and the PM team received, reviewed, and discussed Dr. Ryan's response to the Notice of Intent to Suspend, and agreed there was no merit to Ryan's response.  Id. No. 82.  On August 14, 2017, Mahajan issued Ryan a Notice of Suspension, which stated that Ryan was being suspended for 25 calendar days, from September 1 through September 25, 2017.  Id. No. 83.  Ryan's suspension was not reported to the California Medical Board.  Id. No. 84; GDF No. 84.

In his briefing before the Ninth Circuit, Ryan stated that "Dr. Ryan's section 1983 claim does not rely on the PSA Bylaws nor the Suspension Notice.  The only references to the PSA Bylaws are in setting out the series of events leading to Defendants' retaliatory actions underlying this action."  GDF No. 92.

**III.    LEGAL STANDARD**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

56(a).  The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out "specific facts showing a genuine issue for trial" in order to defeat the motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e).  The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324.  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987).  When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997).  Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue.  See Matsushita, 475 U.S. at 587.

## IV.   DISCUSSION

Drs. Yee, Katz, Mahajan, de Virgilio and Lewis ("defendants") move for summary judgment or partial summary judgment as to the retaliation claim set forth by Dr. Ryan ("plaintiff") in the FAC.  Mot. at 9.  Defendants argue Yee, Katz, and Mahajan "were not voting members of the MEC at the relevant time, and never participated in MEC votes or actions regarding plaintiff."  Id.  With respect to Mahajan, defendants point out that plaintiff's Section 1983 claim is not based on Mahajan's decision to suspend Ryan, and that the FAC does not mention the suspension.  Id. at 10.  Finally, defendants argue that de Virgilio's involvement in directing the FPPE was not an adverse employment action, and that although Lewis participated in relevant the MEC vote to offer the Behavioral

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

Agreement in lieu of suspending Ryan's privileges, Lewis was not aware of plaintiff's reports to the NIH or law enforcement and therefore did not harbor any retaliatory motive. Id. at 10-11. Finally, defendants argue that they are entitled to qualified immunity. Id. at 9-11.

The Court addresses defendants' arguments in turn.

**A.    First Amendment Retaliation**

The framework set forth in Eng v. Cooley governs First Amendment retaliation claims. See Kennedy v. Bremerton Sch. Dist., 869 F.3d 813, 822 (9th Cir. 2017) (citing Eng, 552 F.3d at 1070–72 (9th Cir. 2009). To overcome summary judgment on his retaliation claim, Ryan must demonstrate that there is a triable issue of material fact that (1) he spoke on a matter of public concern; (2) he spoke as a private citizen rather than as a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action(s). See Coomes v. Edmonds Sch. Dist. No. 15, 816 F.3d 1255, 1259 (9th Cir. 2016) (citing Eng, 552 F.3d at 1070-71).

"[I]f the plaintiff has passed the first three steps, the burden shifts to the government to show that 'under the balancing test established by [Pickering], the [state]'s legitimate administrative interests outweigh the employee's First Amendment rights.'" Eng, 552 F.3d at 1071 (quoting Thomas v. City of Beaverton, 379 F.3d 802, 808 (9th Cir. 2004)). "[F]inally, if the government fails the Pickering balancing test, it alternatively bears the burden of demonstrating that it 'would have reached the same [adverse employment] decision even in the absence of the [employee's] protected conduct.'" Eng, 552 F.3d at 1072 (quoting Thomas, 379 F.3d at 808).

1.    Yee and Katz

*a. Adverse Employment Action*

Defendants argue that Yee and Katz never took any adverse employment action against Ryan, i.e., any "action that was 'reasonably likely to deter employees from engaging in protected activity.'" Mot. at 22 (quoting Dahlia v. Rodriguez, 735 F.3d 1060, 1078 (9th Cir. 2013)). Defendants point out that the only adverse employment action specifically alleged in the FAC was the vote to revoke plaintiff's PSA membership and privileges, but Yee and Katz never attended the MEC meetings at which votes related to Ryan were taken. Mot. at 23. Moreover, they note that, under the PSA's Bylaws, Yee

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

(CMO of the County's DHS) and Katz (Director of the Country's DHS) have "no role in any MEC determination of medical disciplinary action, except to be notified of recommendations." Id. at 23-24. Accordingly, defendants argue that "Yee and Katz cannot be liable for an 'adverse employment action' as a matter of law, and are entitled to summary judgment." Id. at 24.

In opposition, plaintiff argues that he has presented sufficient evidence to create a genuine dispute of material fact "about whether Dr. Yee and Dr. Katz approved and endorsed adverse employment actions against him." Opp. at 15. Plaintiff argues that Yee "approved" the MEC's adverse employment action of investigating Ryan and threatening to suspend his privileges on the basis of evidence the plaintiff contends suggests that "MEC members consistently sought Dr. Yee's input about their ongoing efforts to investigate Dr. Ryan." Opp. at 15-16. This evidence includes Yee's April 2016 statement that the MEC should "proceed with caution" in taking action against Ryan "because there was concern about whistleblowing," but is "within its rights to take action." Dkt. 62-5 at Ex. 362. Plaintiff also points to Yee's suggestions that County Counsel reassure PSA members that they are indemnified for their work on the PSA. Opp. at 17. With respect to Katz, plaintiff argues that because Katz was aware of Ryan's external reports and complaints, the Court may infer that "Dr. Katz joined Dr. Yee in endorsing the MEC's adverse employment actions." Id. at 17-18.

In reply, defendants argue that "Plaintiff offers no evidence Dr. Katz had contemporaneous knowledge of the MEC's votes, let alone that he was actively involved," and that, in any event, "inaction and tacit encouragement have not been upheld as bases for [Section 1983] liability." Reply at 9-10. In sum, defendants claim that "[b]ecause Plaintiff offers no evidence that Dr. Katz initiated 'disciplinary proceedings,' 'threatened to revoke' Plaintiff's staff privileges, or acted with 'a negative effect on employment prospects'—the pleading bases for the earlier Ninth Circuit decision—Dr. Katz is entitled to summary judgment." Id. at 10 (quoting Ryan v. Putnam, 777 F. App'x 245, 246 (9th Cir. 2019)). With respect to Yee, defendants reiterate that the evidence fails to suggest that Yee participated in any adverse employment action, and note that "the PSA Bylaws require the MEC to coordinate and cooperate with Drs. Yee, Mahajan, and Katz regarding matters of 'mutual concern'—which naturally included Plaintiff, given his ongoing litigation against the County—but otherwise give DHS no role in any MEC medical disciplinary action." Reply at 17. In sum, with respect to Yee, defendants argue that "Plaintiff lacks any evidence that Dr. Yee 'initiated disciplinary proceedings' or took other action that threatened Plaintiff's privileges or negatively impacted his

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|----------|------------------------|------|----------------|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

employment prospects, so Dr. Yee can't be liable under § 1983." Id. at 18 (quoting Ryan, 777 F. App'x at 246).

The Court finds that summary judgment as to Yee and Katz is appropriate, as neither took any adverse employment action reasonably likely to deter Ryan from engaging in protected activity under the First Amendment. Coszalter, 320 F.3d at 976. It is undisputed that Yee and Katz did not participate in the MEC votes to initiate the FPPE, or offer the Behavioral Agreement, or revoke plaintiff's PSA privileges, as Yee and Katz were not members of the MEC during those votes. See SUF No. 5. Pursuant to the PSA's Bylaws, Yee and Katz "have no role in any MEC determination of medical disciplinary action, except to be notified of any recommended corrective action." Id. No. 55. Given this undisputed evidence, plaintiff argues that Yee and Katz "approved" the MEC's adverse employment actions of investigating Ryan and threatening to suspend his privileges. Opp. at 15-16. While affirmative approval of a retaliatory adverse employment action can give rise to Section 1983 liability, Freitag v. Ayers, 468 F.3d 528, 543 (9th Cir. 2006), Yee and Katz had no authority to "approve" the adverse employment actions against Ryan.

Plaintiff principally relies upon evidence that, at an MEC meeting in April 2016, Yee suggested the PSA "proceed with caution [with respect to Ryan] because there was concern about whistleblowing," and added the PSA was "within its rights to take action" and "should proceed" as it sees fit. SUF No. 52. These statements fail to raise any genuine dispute of material fact that Yee approved any particular course of action, and plaintiff points to no authority suggesting the imposition of liability on Yee based on his deference to the MEC is appropriate. The same is true for Yee's suggestions that County Counsel reassure PSA members that they are indemnified for their work on the PSA, which does not constitute "approval" of the MEC's adverse employment actions. In sum, the evidence fails to suggest that Yee participated in or approved the MEC's adverse employment actions against Ryan. See Freitag, 468 F.3d at 543, n.8 (reversing judgment as to official who did not contribute to, and was not responsible for, adverse employment actions).

With respect to Katz, plaintiff argues that because Katz was aware of Ryan's external reports and complaints about White's retaliation, the Court may infer that "Dr. Katz joined Dr. Yee in endorsing the MEC's adverse employment actions." Opp. at 17-18. This argument fails to raise a triable issue that Katz approved or participated in the MEC's adverse employment actions, and plaintiff points to no authority suggesting that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

unofficial endorsement of an adverse employment action is a basis for Section 1983 liability.

Accordingly, the Court **GRANTS** summary judgment to Yee and Katz on the basis that they took no adverse employment actions against Ryan, and need not address the parties' other arguments with respect to Yee and Katz.

2.   Mahajan

a.  *Adverse Employment Action*

Defendants note that "Plaintiff declared in his reply brief to the Ninth Circuit that his § 1983 claim 'does not rely on . . . the Suspension Notice' which Dr. Mahajan issued," and that "the FAC does not even mention the [] Notice of Suspension."  Mot. at 31 (citing SUF No. 92).  Accordingly, defendants argue that "Dr. Mahajan's undisputed lack of involvement in the MEC's vote on Plaintiff's clinical privileges []—the only adverse employment action alleged in the FAC []—is a sufficient basis for granting summary judgment for Dr. Mahajan under § 1983."  Mot. at 31.

In opposition, plaintiff argues that defendants' focus on the Notice of Suspension is a "red herring," as "Dr. Ryan has presented evidence that Dr. [Mahajan], like Dr. Yee and Dr. Katz, approved and endorsed the MEC's retaliatory investigation of him."  Opp. at 23-24.  Plaintiff points to evidence that "[w]hen a union representative protested that the MEC was retaliating against Dr. Ryan by demanding he sign a Behavioral Contract, Dr. Mahajan responded, claiming that the MEC's actions were independent of DHS – yet Dr. Mahajan also forwarded the complaint to Dr. Yee."  Id. at 24 (citing GDF Nos. 240-41).  Plaintiff also argues that Mahajan and Yee "discussed the claims of retaliation, and Dr. Mahajan acknowledged that they had previously discussed concerns about retaliation with counsel."  Opp. at 24.

In reply, defendants contend that plaintiff's argument that Mahajan approved and endorsed the adverse employment actions is frivolous given that "[t]he earliest email on which Plaintiff relies which Dr. Mahajan received or sent was dated September 7, 2016—more than six weeks after the MEC voted to offer Plaintiff a Behavioral Agreement and recommend revoking his clinical privileges if he rejected that Agreement, and more than one month after Dr. Mahajan became CMO of Harbor-UCLA."  Reply at 12.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                                    **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|----------|------------------------|------|----------------|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

The Court finds that summary judgment as to Mahajan is appropriate, as he did not take any adverse employment action reasonably likely to deter Ryan from engaging in protected activity under the First Amendment. Coszalter, 320 F.3d at 976. Plaintiff does not contend that the Mahajan's decision to suspend Ryan was an adverse employment action resulting in injury in this case, and it is undisputed that Mahajan did not participate in the MEC's adverse employment actions. Accordingly, plaintiff argues that Mahajan "approved and endorsed" the MEC's adverse employment actions. Opp. at 23-24. However, the only evidence upon which plaintiff relies to show that Mahajan approved and endorsed the MEC's adverse employment actions is a series of September 2016 emails in which Mahajan responded to union representative Jake Baxter's allegations that the MEC's actions against Ryan were retaliatory. In response to Baxter, Mahajan stated:

> "Thank you for your message. I am the new CMO at Harbor. We haven't had an opportunity to meet yet. I look forward to doing so and working with you. Re the matter below, as I understand it (admittedly, I am new, so please correct me if I am wrong), the PSA is a body independent of hospital/medical administration and is authorized by the Joint Commission to be the sole arbiter of a physician's peer review and clinical privileges. As you know, the PSA is governed by the physician staff themselves, most of whom are your members. Harbor/DHS Medical Administration including myself and the Associate Medical Directors explicitly do not participate in PSA voting and decision-making to honor the PSA's independence in these matters. You may want to speak directly with your membership at Harbor and/or PSA President Dr. Brant Putnam regarding the decision the PSA arrived at re Dr. Ryan. Please let me know if I can be of further assistance."

Dkt. 79-2 at Ex. S. Mahajan then forwarded Baxter's email to Yee, and stated that county counsel should participate in a meeting regarding how to handle Baxter's email, given that county counsel "was involved in earlier aspects of this related to concerns about retaliation vis-à-vis whisteblow." Id. This evidence does not raise a triable issue of material fact as to whether Mahajan approved or endorsed the MEC's adverse employment actions. Rather, in his response to Baxter, Mahajan makes clear that "Harbor/DHS Medical Administration including myself and the Associate Medical Directors explicitly do not participate in PSA voting and decision-making to honor the PSA's independence in these matters." Id. Plaintiff submits no authority suggesting that Mahajan's deference to the PSA/MEC is a valid basis for Section 1983 liability.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**      **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|---|---|---|---|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

Accordingly, the Court **GRANTS** summary judgment to Mahajan on the basis that he took no adverse employment actions against Ryan, and need not address the parties' other arguments with respect to Mahajan.

    3.     <u>De Virgilio and Lewis</u>

            *a. Adverse Employment Action*

Defendants argue that de Virgilio "did not participate in the only adverse employment action alleged in the FAC—the MEC's vote to recommend revoking Plaintiff's PSA membership and privileges," and that "Plaintiff's failure to identify any adverse employment action by Dr. de Virgilio is a sufficient basis, by itself, to grant summary judgment in his favor." Mot. at 34. While defendants acknowledge that de Virgilio participated in initiating the FPPE process, they claim that it "was not predestined to result in discipline, and instead was designed to evaluate Plaintiff's behavior and develop a recommended course of action." <u>Id.</u> at 35. Moreover, defendants argue that the initiation of the FPPE process was not "sufficiently final" to constitute an adverse employment action, and that de Virgilio was not involved in any subsequent disciplinary proceedings or actions that had a negative effect on Ryan's employment prospects. <u>Id.</u> (quoting <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 930 (9th Cir. 2000)).

In opposition, plaintiff argues that de Virgilio "supervised the FPPE process himself," and that "[t]his Court has already found that the FPPA itself was an adverse employment action." Opp. at 26. Plaintiff also notes that de Virgilio "participated in subsequent MEC meetings at which the MEC decided to revoke Dr. Ryan's privileges when he did not accept the Behavioral Contract." <u>Id.</u> Plaintiff claims that "[t]his is more than enough to create a genuine dispute of material fact about whether Dr. de Virgilio took an adverse employment action." <u>Id.</u>

In reply, defendants contend that the Court's prior summary judgment order never found that the FPPE was an adverse employment action, because "Dr. Vintch was absent for that vote, and she and Dr. Putnam both attended the ultimate vote on the Agreement and privilege revocation." Reply at 25. In other words, de Virgilio "is the only Defendant who Plaintiff seeks to hold liable" for the FPPE itself, which de Virgilio did not supervise, although he appointed the Committee that undertook the investigation. <u>Id.</u> Based on this evidence, and de Virgilio's lack of involvement in the vote to revoke

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|----------|------------------------|------|----------------|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

plaintiff's privileges upon his rejection of the Behavioral Agreement, defendants contend that plaintiff's retaliation claim against de Virgilio fails given that "retaliation liability cannot be premised on allegedly adverse actions that are not 'sufficiently final.'" Id. at 26 (quoting Brooks, 229 F.3d at 930).

The Court finds that de Virgilio's participation in the initiation of the FPPE represents an adverse employment action. In this case, the Ninth Circuit has stated that "[s]ince 2002, [it has] recognized that an employer's decision to initiate disciplinary proceedings against a doctor that threaten to revoke staff privileges, when combined with a negative effect on employment prospects, is enough to satisfy the 'adverse employment action' requirement." Dkt. 26 at 2-3 (citing Ulrich, 308 F.3d at 977). Here, the FPPE is a disciplinary proceeding that "threatens" (Ulrich, 308 F.3d at 977) to revoke staff privileges, as evidenced by the fact that Ryan's FPPE report stated the following:

> "We recommend that MEC should explore possible actions to remedy the underlying chaotic situation in vascular division created by Dr. Ryan's unprofessional behavior. Dismissal from the medical staff or discontinuation of medical privileges are options that can [be] considered but the committee is not knowledgeable regarding standards or precedents for such as action based solely on a lack of professionalism."

Dkt. 61-7 at Ex. 5.[9] Although defendants cite Brooks in support of an argument that the initiation of the FPPE was not "sufficiently final" to constitute an adverse employment action, the Court finds that Brooks is distinguishable. In Brooks, which was a Title VII case, the evaluation at issue "was not an adverse employment action because it was subject to modification by the city" and "the evaluation could well have been changed on appeal." Brooks, 229 F.3d at 930 (9th Cir. 2000). Here, the Ninth Circuit has confirmed that an "employer's decision to initiate disciplinary proceedings against a

---

[9] At oral argument, counsel for defendants claimed that the FPPE, as defined in the PSA Bylaws, is not considered an investigation, and that the results of any FPPE are not preordained. See Dkt. 61-7 at Ex. 301 (PSA Bylaws), § 6.1-3 ("FPPE is not considered an investigation as defined in these Bylaws"). Despite this argument, the Court finds that, at a minimum, the evidence raises a triable issue of material fact as to whether the FPPE against Ryan "threatened to revoke his clinical privileges." Ulrich, 308 F.3d at 977. This conclusion in supported by the fact that the PSA Bylaws themselves note that a possible outcome of an FPPE is "recommending corrective action under these bylaws." Dkt. 61-7 at Ex. 301 (PSA Bylaws), § 6.1-5.1-e.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**                    **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

doctor," when privileges and employment prospects are threatened, is enough to satisfy the adverse employment action requirement. Moreover, defendants present no evidence that suggests the decision to initiate the FPPE could have been appealed or was subject to modification.

Accordingly, the Court finds that summary judgment on the basis that de Virgilio did not participate in an adverse employment action would be inappropriate.

### b. Retaliatory Motive

Defendants also argue that retaliatory motive cannot be imputed as to de Virgilio or Lewis. Mot. at 35. Defendants claim that Lewis had no knowledge that Ryan made any external reports of alleged misconduct, and accordingly cannot be liable for retaliation. Id. Moreover, defendants contend that de Virgilio's participation in directing the FPPE "only three months after he made a decision favorable to Plaintiff—approving his application for renewal of his medical staff privileges—even though Dr. de Virgilio allegedly knew all along of Plaintiff's protected speech. . . . raises 'the same-actor inference'—'a strong inference' that Dr. de Virgilio did not act out of retaliatory motive." Id. at 36-37 (citing Schechner v. KPIX-TV, 686 F.3d 1018, 1026 (9th Cir. 2012)). Otherwise, defendants argue that the timing raises no inference of retaliation, that de Virgilio and Lewis never opposed protected speech, and that plaintiff lacks specific, substantial evidence of pretext as to de Virgilio and Lewis. Mot. at 36-39.

In opposition, plaintiff notes that whether Lewis knew Ryan had reported misconduct to outside authorities is disputed, because Lewis was present at multiple MEC meetings at which Ryan's reports to outside authorities were discussed. Opp. at 27. Additionally, plaintiff argues that the proximity in time between "Dr. White demanding that the MEC punish Dr. Ryan's protected speech, and the [MEC's actions] (including Dr. Lewis and Dr. de Virgilio) [] was only a few months, short enough to support an inference of retaliation." Id. Additionally, plaintiff argues that de Virgilio and Lewis have opposed Ryan's protected speech, and that there is sufficient evidence of pretext to overcome summary judgment. Id. at 27-29.

In reply, with respect to Lewis, defendants claim that the "[u]ndisputed evidence shows Dr. Lewis did not attend the meetings when the MEC voted to convene the FPPE or when the FPPE Report was read aloud (and that Report didn't mention outside reports in any event), and that Plaintiff's outside reports were not discussed at the few meetings

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**            **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

Dr. Lewis did attend." Reply at 23. Moreover, defendants argue that even if is assumed that Lewis was present at MEC meetings where plaintiff's external reports were discussed, the time period between the allegedly protected activity and the MEC's July 2015 vote are too great to support an inference of causality without other evidence of retaliatory motive. Id. at 23-24. Finally, defendants claim that no evidence of pretext, causality, or retaliatory motive exists, because the evidence of pretext the Court cited with respect to Putnam and Vintch do not apply to Lewis, and that therefore summary judgment is appropriate. Id. at 24-25.

With respect to de Virgilio, defendants point out that plaintiff failed to acknowledge their "same-actor inference" argument. Reply at 26. Otherwise, defendants reiterate that there isn't sufficient evidence to support causation, given that de Virgilio "was not allegedly involved in any of the events on which this Court found a triable issue of pretext as to Drs. Vintch and Putnam—more favorable treatment for allegedly similarly-situated persons, deviation from usual MEC practices on discipline, or the Notice of Charges." Id. at 27.

As the party opposing summary judgment, Ryan must demonstrate a triable issue of material fact as to one of three methods of showing that the protected speech was a substantial or motivating factor in the adverse employment decision, namely proximity in time, employer opposition to the speech, and pretextual justification associated with the adverse employment action. See Coszalter, 320 F.3d at 977. This analysis is "purely a question of fact." Eng, 552 F.3d at 1071. Evidence of pretext may be "direct or circumstantial" because "[d]efendants who articulate a nondiscriminatory explanation for a challenged employment decision may have been careful to construct an explanation that is not contradicted by known direct evidence." Davis v. Team Elec. Co., 520 F.3d 1080, 1091 (9th Cir. 2008) (citations and quotation marks omitted). Accordingly, Ryan may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). "Where evidence of pretext is circumstantial, rather than direct, the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext." Earl, 658 F.3d at 1113. However, "a plaintiff's burden to raise a triable issue of pretext is 'hardly an onerous one.'" Id. (quoting Noyes v. Kelly Servs., 488 F.3d 1163, 1170 (9th Cir. 2007).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

The Court finds that, as to De Virgilio and Lewis, plaintiff has met his burden on summary judgment of raising a triable issue of material fact regarding defendants' motives in taking the adverse employment actions against Ryan. See Mabey v. Reagan, 537 F.2d 1036, 1045 (9th Cir. 1976) ("Since questions of motive predominate in the inquiry about how big a role the protected behavior played in the decision, summary judgment will usually not be appropriate.").

With respect to Lewis, the evidence raises a triable issue of fact regarding whether he was aware of Ryan's external reports, because Lewis was present at the April 25, 2016 MEC meeting in which Yee gave input regarding whether any action by the PSA against Ryan might be seen as potential retaliation for whistleblowing. Dkt. 62-5 at Ex. 360. Otherwise, at least some of the evidence indicative of pretext that applied to Putnam and Vintch applies to Lewis, including the "comparative evidence" that "similarly situated employees," including Putnam, were treated "more favorably" than plaintiff (see Earl, 658 F.3d at 1113) for unprofessional conduct such as yelling, and the fact that the evidence from Putnam and Vintch's depositions suggests that no other Behavioral Agreement has included a waiver of claims. Additionally, Lewis was present at the September 28, 2015 MEC meeting where the minutes reflect that, to the extent the issues with Ryan were associated with HIPAA violations, "a recognized HIPAA Compliance Officer review[ed] the case and it was found that no HIPAA violation occurred on the part of Dr. Ryan." Dkt. 62-5 at Ex. 365. The minutes from the same meeting state that "[t]o take a corrective action beyond the investigation could be considered retaliation because we feel this issue has been investigated adequately." Id. Nonetheless, Lewis proceeded to vote in favor of the Behavioral Agreement, and condition Ryan's privileges on his acceptance of that Agreement. Accordingly, the Court finds that there is a triable issue of fact regarding whether the adverse employment actions directed at Ryan by Lewis were based solely on his "unprofessional conduct," or whether in fact Ryan's external reports were a substantial factor in those actions. See Ulrich, 308 F.3d at 977 ("Although these [adverse employment] decisions by the hospital could have been taken for a number of reasons, if they were in retaliation for his protected speech activity then the First Amendment was violated.").

With respect to de Virgilio, the evidence raises a triable issue of material fact that de Virgilio expressed opposition to Ryan's speech. For example, de Virgilio was interviewed as part of the FPPE into Ryan. Dkt. 62-5 at Ex. 356. Therein, de Virgilio stated that "Dr. Ryan accused Dr. White without evidence of wrongdoing;" that "Dr.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|---|---|---|---|
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

Ryan looked at private patient information that belonged to Drs. White, Donayre and de Virgilio for the purpose of finding information to shut down the [BEST-CLI] study at Harbor-UCLA," but "[t]he NIH subsequently investigated Dr. Ryan's complaint and determined that it was unfounded;" and that "according to many people . . . files have gone missing from their desks and they feel Dr. Ryan 'snoops around' looking and taking things away." Id. These statements suggest opposition to Ryan's external reports. For example, although de Virgilio contends that Ryan acted "without evidence of wrongdoing" and harbored a purpose "of finding information to shut down the [BEST-CLI] study," Ryan external reports were partially vindicated when, on February 12, 2015, the Surgical and Interventional Management Committee ("SIMC") for the BEST-CLI Trial found that "no one at [UCLA-Harbor] currently meets the criteria to serve as an independent endovascular operator," and that until someone on site met the criteria, "the site should no longer enroll patients in the BEST-CLI Trial." Dkt. 62-5 at Ex. 331. Additionally, on March 30, 2015, SIMC "found that several members of the Harbor-UCLA team misrepresented their procedural volume histories to meet the criteria of independent endovascular operator." Dkt. 61-7 at Ex. 24. This suggests that, contrary to de Virgilio's statements, Ryan acted with some evidence of wrongdoing.

Additionally, de Virgilio participated in the December 28, 2015 MEC decision to direct an FPPE against Ryan, even though the HIPAA compliance officer had previously "determined there was no HIPAA violation," Dkt. 61-7 at Ex. 12, and even though, as previously discussed, "comparative evidence" suggests that "similarly situated employees" were were treated "more favorably" than plaintiff for unprofessional conduct. See Earl, 658 F.3d at 1113. This raises a triable issue of material fact regarding whether the initiation of the FPPE was pretextual. Moreover, the December 28, 2015 MEC meeting minutes explicitly state that "we have completed an FPPE on Dr. White, so our next step would be to complete an FPPE on Dr. Ryan because the conduct that was implied by his search for negative information on Dr. White is questionable." Dkt. 61-7 at Ex. 12. This suggests that the initiation of the FPPE may have been based, in part, on Ryan's external reports.

Defendants argue that de Virgilio is entitled to the "'the same-actor inference'—'a strong inference' that Dr. de Virgilio did not act out of retaliatory motive," based on the fact that de Virgilio approved plaintiff's application for renewal of medical staff privileges only three months before de Virgilio participated in the initiation of the FPPE. The Court is not convinced. See Mot. at 36-37. In Schencher, the case relied upon by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

defendants, the Ninth Circuit noted that "'[w]here the same actor is responsible for both the hiring and the firing of a *discrimination* plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.'" Schechner, 686 F.3d at 1026 (emphasis added) (quoting Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270-71 (9th Cir.1996)). The same-actor doctrine reflects the belief that "'[a]n individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class.'" Bradley, 104 F.3d at 271 (quoting Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995)). Even assuming that the same actor-doctrine is relevant in first amendment retaliation cases, the evidence of opposition and pretext discussed herein rebut the same-actor inference, which "may be weakened by other evidence and is 'insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact.'" Tumbling v. Merced Irrigation Dist., No. CV F 08-1801 LJO DLB, 2010 WL 11450406, at *11 (E.D. Cal. Sept. 27, 2010) (quoting Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 573–574 (6th Cir. 2003)).

Finally, to the extent defendants argue that the length in time between Ryan's speech and the adverse actions is too great to support an inference of causality, "[t]here is no set time beyond which acts cannot support an inference of retaliation, and there is no set time within which acts necessarily support an inference of retaliation." Coszalter, 320 F.3d at 978.

In sum, given the evidence of pretext and opposition to protected speech offered by Ryan, summary judgment on this "purely fact[ual]" element (see Eng, 552 F.3d at 1071) would be inappropriate.

### c. Adequate Justification

Defendants argue that de Virgilio and Lewis had adequate justification in that even though "Plaintiff's disruptive behavior at Harbor-UCLA was found by the neutral Ad Hoc Committee to have created a hostile work environment and to have a negative impact on patient care," "[o]nly when Plaintiff rejected [the Behavioral] Agreement, without explanation or discussion, did the MEC vote to propose revoking Plaintiff's privileges." Mot. at 39. Defendants argue that these actions "were reasonably calculated to promote the efficiency and effectiveness of the provision of healthcare services to Harbor-UCLA patients," and "clearly outweigh plaintiff's asserted free speech interest."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

Id. Accordingly, defendants claim that "Pickering balancing weighs in favor of Drs. de Virgilio and Lewis, and further supports summary judgment." Id. at 40.

In opposition, plaintiff argues that there is a genuine dispute of fact as to adequate justification, and therefore summary judgment is inappropriate. Opp. at 29.

The Court finds that, in this case, the adequate justification inquiry implicates "underlying factual disputes" that are inappropriate for resolution on summary judgment. Eng, 552 F.3d at 1071. Defendants fail to explain how their proffered interest of "promot[ing] the efficiency and effectiveness of the provision of healthcare services to Harbor-UCLA patients" could not have been served by intermediate steps such as counseling intended to address Ryan's unprofessional behavior. Additionally, defendants' argument that "[b]oth the minutes explaining the convening of the FPPE and the PSA's initial Notice of Charges make clear on their face that it was the loud and disruptive nature of Plaintiff's threats and other workplace conduct—not the substance of Plaintiff's actual reports outside of work to external agencies—which caused the MEC to act," Mot. at 39, is inherently factual, and implicates the same evidence of pretext and opposition that the Court previously discussed. Accordingly, the Court finds that summary judgment on this basis is inappropriate.

### d. Inevitability

Finally, defendants contend that the undisputed facts establish that defendants would have initiated the FPPE, asked Ryan to sign the Behavioral Agreement, and moved to revoke Ryan's privileges if he rejected the Agreement, "regardless of whether or not Plaintiff engaged in any protected speech." Mot. at 40. In sum, defendants contend that "Plaintiff has no evidence—let alone enough evidence to raise a triable issue of material fact—that Drs. de Virgilio and Lewis would not have taken their respective measures but for his allegedly protected speech," and that therefore "[s]ummary judgment is compelled on this additional basis." Id.

In opposition, plaintiff argues that there is a genuine dispute of fact as to inevitability, and therefore summary judgment is inappropriate. Opp. at 29.

The Ninth Circuit has stated the inevitability inquiry is "purely a question of fact." Eng, 552 F.3d at 1072. For the same reasons articulated above, the Court finds that there

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

is a triable dispute of material fact regarding whether de Virgilio and Lewis would have taken the adverse employment actions described herein absent Ryan's reports to the NIH and the District Attorney's Office.  Accordingly, granting summary judgment on this basis would be inappropriate.

**B.     Qualified Immunity**

Generally, courts follow a two-step inquiry in determining whether a government official is entitled to qualified immunity.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right."  Pearson v. Callahan, 555 U.S. 223, 232 (2009).  Second, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Id.

"To be 'clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Acosta v. City of Costa Mesa, 718 F.3d 800, 824 (9th Cir. 2013) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  "Defendants are entitled to qualified immunity, even if they violated [plaintiff's] First Amendment rights, if they reasonably could have believed that their conduct was lawful 'in light of clearly established law and the information [that they] possessed.'"  Demers v. Austin, 746 F.3d 402, 417 (9th Cir. 2014) (quoting Cohen v. San Bernardino Valley Coll., 92 F.3d 968, 973 (9th Cir.1996)).

A "case directly on point" is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  The determination of whether the law was clearly established "must be undertaken in light of the specific context of the case."  Saucier, 533 U.S. at 201.  The qualified immunity standard "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  In other words, the law must provide officials with "fair warning" that their conduct is unconstitutional.  Hope v. Pelzer, 536 U.S. 730 (2002).  "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  Pearson, 555 U.S. at 232.

1.     De Virgilio and Lewis

Defendants contend that de Virgilio and Lewis are entitled to qualified immunity because there is no clearly established law suggesting that they committed any adverse

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

employment action. Mot. at 41. With respect to de Virgilio, defendants claim that "Plaintiff has offered no authority—let alone clearly established law—holding that convening an FPPE committee to conduct fact-finding and issue a report is 'sufficiently final' to constitute an adverse employment action." Id. (citing Brooks, 229 F.3d at 929-30). With respect to Lewis, defendants contend that there is no clearly established law providing that "individual committee members' alleged votes regarding an FPPE, behavioral contract, or even revocation of privileges, may constitute actionable adverse employment actions." Mot. at 41. Additionally, defendants argue that there is no clearly established law on temporal nexus, and that there is no other evidence that would raise a triable issue on causation. Mot. at 41-42. Finally, defendants argue that there is no clearly established law on adequate justification, as "[n]o clearly established law provides a quasi-judicial body such as the MEC cannot evaluate the results of a fact-finding committee, vote on proposed remedial action, or attempt to administratively regulate a disruptive physician's conduct." Id. at 42.

In opposition, plaintiff argues that the Ninth Circuit's MTD order and the Court's order on Putnam and Vintch's motion for summary judgment counsel against qualified immunity, and that Ninth Circuit authority makes clear that Ryan "had a First Amendment right to make reports to government authorities without retaliation." Opp. at 21-23, 29 (citing Dahlia, 735 F.3d at 1067).

In reply, defendants reiterate that "Plaintiff offers no clearly established law, or any authority at all, holding that convening an FPPE committee to conduct fact-finding and issue a report is 'sufficiently final' to constitute an adverse employment action." Reply at 28. Otherwise, defendants contend that plaintiff "fails to rebut the other reasons discussed in the moving papers that show both Drs. de Virgilio and Lewis are entitled to qualified immunity." Id.

In reversing the grant of defendants' motion to dismiss in this case, the Ninth Circuit found that qualified immunity was not warranted because "[s]ince 2002, [it has] recognized that an employer's decision to initiate disciplinary proceedings against a doctor that threaten to revoke staff privileges, when combined with a negative effect on employment prospects, is enough to satisfy the 'adverse employment action' requirement." Dkt. 26 at 2-3 (citing Ulrich, 308 F.3d at 977). Here, although defendants argue that there is no clearly established law holding that "convening an FPPE committee to conduct fact-finding and issue a report is "sufficiently final" to constitute an adverse employment action," Mot. at 41, as discussed, the Court finds that the decision to initiate the FPPE was a "decision to initiate disciplinary proceedings" that threatened to revoke

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

staff privileges, and was combined with a negative effect on employment prospects, as evidenced by the fact Ryan's FPPE report stated the following:

> "We recommend that MEC should explore possible actions to remedy the underlying chaotic situation in vascular division created by Dr. Ryan's unprofessional behavior.  Dismissal from the medical staff or discontinuation of medical privileges are options that can [be] considered but the committee is not knowledgeable regarding standards or precedents for such as action based solely on a lack of professionalism."

Dkt. 61-7 at Ex. 5.  This places the decision to initiate the FPPE squarely within the Ninth Circuit's previous ruling that qualified immunity was not warranted in this case.[10]

To the extent that defendants argue that Lewis is entitled to qualified immunity because he acted in concert with other MEC members, rather than individually, defendants fail to explain why this fact should exonerate Lewis.  Rather, courts apply the qualified immunity analysis in the same manner to defendants acting in concert, without examining whether the underlying case that clearly established the right at issue involved an individual defendant or a group of defendants.  See Gaalla v. Brown, 460 F. App'x 469, 479 (5th Cir. 2012) (finding that "the Board members are not entitled to qualified immunity, and the district court properly denied them summary judgment on this claim" because "it is without question clearly established that the Cardiologists have a right to be free from racial discrimination"); Strinni v. Mehlville Fire Prot. Dist., 681 F. Supp. 2d 1052, 1082–83 (E.D. Mo. 2010) (denying defendants' motion for summary judgment because "genuine issues of fact exist to preclude a finding that Board Member Defendants are entitled to qualified immunity to the extent Plaintiffs' First Amendment

---

[10] At oral argument, counsel for defendants attempted to distinguish Ulrich on the basis that the investigation in that case was a "formal" investigation, whereas, pursuant to the PSA Bylaws, the FPPE is not an investigation, and is not disciplinary in nature.  On this basis, defendants' counsel argued that de Virgilio's initiation of the FPPE cannot be considered an adverse employment action under clearly established law.  The Court finds that the attempt to distinguish between the "formal" investigation at issue in Ulrich and the FPPE is unavailing.  Even if an FPPE is not defined as an investigation by the PSA's Bylaws, Ryan's FPPE did in fact investigate Ryan's conduct, and recommended the MEC "explore . . . [d]ismissal from the medical staff or discontinuation of medical privileges." Dkt. 61-7 at Ex. 5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

rights are pursued against these Defendants in their individual capacities"); Waddell v. Forney, 108 F.3d 889, 895 (8th Cir. 1997) ("[I]n light of the record before us, we affirm the district court's denial of qualified immunity for each of the named defendants."). Notably, on appeal in this case, the Ninth Circuit found plaintiff's allegations "sufficiently similar to Ulrich to satisfy the clearly established prong of the qualified immunity analysis," even though those allegations corresponded to the collective actions of defendant "doctors." Dkt. 26 at 3.

Defendants also argue that "[t]he absence of clearly established law on the temporal nexus issue [] entitles Drs. de Virgilio and Lewis to qualified immunity." Mot. at 41-42. As a preliminary matter, this argument this argument frames the qualified immunity inquiry too narrowly. Ellins, 710 F.3d at 1064. This is because "[t]he question is not whether an earlier case mirrors the specific facts here. Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" Id. (quoting Bull v. City & Cnty. of San Francisco, 595 F.3d 964, 1003 (9th Cir.2010)); see also White v. Lee, 227 F.3d 1214, 1238 (9th Cir. 2000) ("Closely analogous preexisting case law is not required to show that a right was clearly established."). In any event, this argument is premised on defendants' contention that "Plaintiff has no other evidence that would raise a triable issue of causation," Mot. at 42, which the Court has already rejected.

Finally, while defendants argue that there is no clearly established law on adequate justification, Mot. at 42, Ryan's "right to speak [is] so 'clearly established'—that is, that the Pickering balance so clearly weigh[s] in [his] favor—that [defendants] could not have 'reasonably believed'" (Moran v. State of Wash., 147 F.3d 839, 850 (9th Cir. 1998)) that their "adequate justification for their respective votes on the FPPE and recommended treatment of Plaintiff [] outweigh[] Plaintiff's asserted free speech rights." Mot. at 42. In Robinson v. York, the Ninth Circuit stated that "the public's interest in learning about illegal conduct by public officials and other matters at the core of First Amendment protection outweighs a state employer's interest in avoiding a mere potential disturbance to the workplace." 566 F.3d 817, 824 (9th Cir. 2009) (citations and quotations omitted). Similarly, in Francisco Jose Rivero v. City & Cty. of San Francisco, the Ninth Circuit stated that "[w]histleblowing is a particular kind of speech on matters of public concern. It was already the law of this circuit in 1993 that the state's legitimate interest in 'workplace efficiency and avoiding workplace disruption' does not weigh as heavily against whistleblowing speech as against other speech on matters of public concern."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
| TITLE | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

316 F.3d 857, 866 (9th Cir. 2002) (finding that appellants were not entitled to qualified immunity).

Accordingly, the Court finds that de Virgilio and Lewis are not entitled to qualified immunity at this stage.

### C.   Punitive Damages

Defendants argue that plaintiff's request for punitive damages against de Virgilio, and Lewis should be summarily dismissed because de Virgilio and Lewis did not act with malice, or with a conscious disregard for plaintiff's rights.  Mot. at 43.

In opposition, with respect to Lewis, Ryan contends that he has "presented evidence that even though Dr. Lewis was exposed to repeated statements showing that Dr. Ryan was being targeted for making reports to outside authorities, he still participated in the MEC's actions of initiating the FPPE, demanding that Dr. Ryan sign the Behavioral Contract, and revoking his privileges when he did not."  Opp. at 30.  With respect to de Virgilio, Ryan argues de Virgilio "led the creation of the FPPE, provided quotes to the FPPE complaining that Dr. Ryan had made reports to the NIH and falsely stating that the NIH had found them unfounded, presented the FPPE (complete with its repeated references to Dr. Ryan's protected speech) to the MEC, and participated in subsequent meetings at which the MEC affirmed that Dr. Ryan's privileges should be revoked for not accepting the Behavioral Contract."  Id.  In sum, Ryan contends that the evidence creates a genuine dispute of material fact regarding whether defendants were recklessly indifferent to Ryan's rights.  Id. at 30-31.

In reply, defendants argue that plaintiff's claim for punitive damages is based on "demonstrably false pretenses," and asks to Court to "emphatically reject Plaintiff's deceitful tactics and summarily dismiss all of his punitive damages claims."  Reply at 29.

The law is clear that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  Smith v. Wade, 461 U.S. 30, 56 (1983); see also Dang v. Cross, 422 F.3d 800, 807 (9th Cir. 2005) ("The standard for punitive damages under § 1983 mirrors the standard for punitive damages under common law tort cases. . . . malicious, wanton, or oppressive acts or omissions are within the boundaries of traditional tort standards for assessing punitive damages and . . . are therefore all proper

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:17-cv-05752-CAS-RAOx | Date | March 21, 2022 |
|----------|------------------------|------|----------------|
| TITLE    | TIMOTHY RYAN V. BRANT PUTNAM; ET AL | | |

predicates for punitive damages under § 1983.") (internal citations and quotation marks omitted).

Here, Lewis was present at the September 28, 2015 MEC meeting where the draft meeting minutes noted that "Dr. Ryan considers himself a whistleblower because he thought this bad thing happened and he wanted to do right," and that "[t]o take corrective action beyond the investigation could be considered retaliation because we feel this issue has been investigated adequately." Dkt. 62-5 at Ex. 365. Despite understanding that taking corrective action could be considered retaliation, Lewis proceeded to vote in favor the Behavioral Agreement, and to authorize the revocation of Ryan's privileges if he refused the Behavioral Agreement. Similarly, de Virgilio was present at the December 28, 2015 MEC executive meeting wherein the minutes reflect that "Dr. Ryan now believes he is protected as a whistleblower," but nevertheless participated in the initiation of the FPPE against Ryan. Dkt. 61-7 at Ex. 12. The text of Ninth Circuit Model Civil Jury Instruction 5.5 (2017 ed.) specifically notes that "[c]onduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's safety or rights, or if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law." Accordingly, because a jury could find that de Virgilio and Lewis's adverse employment actions against Ryan were recklessly indifferent to Ryan's rights, summary judgment on Ryan's claim for punitive damages against de Virgilio and Lewis is inappropriate.

## V.   CONCLUSION

In accordance with the foregoing, the Court **GRANTS** summary judgment to Katz, Yee, and Mahajan, and **DENIES** summary judgment to de Virgilio and Lewis.

IT IS SO ORDERED.

|  | 00 | : | 50 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |